```
                                                               1
 1
 2     * H I G H L Y   C O N F I D E N T I A L *
 3     UNITED STATES DISTRICT COURT
 4     SOUTHERN DISTRICT OF NEW YORK
 5     Civil Action File No. 14-CV-7473
 6     ------------------------------------x
 7     THE PEOPLE OF THE STATE OF NEW YORK, by
 8     and through ERIC T. SCHNEIDERMAN, Attorney
 9     General of the State of New York,
10
11                 Plaintiff,
12
13         - against -
14
15     ACTAVIS, PLC and FOREST LABORATORIES, LLC,
16
17                 Defendants.
18     ------------------------------------x
19                 November 3, 2014
20                 9:43 a.m.
21
                   Videotaped Deposition of ALAN
22     JACOBS, pursuant to Notice, held at the
       offices of White & Case LLP, 1155 Avenue
23     of the Americas, New York, New York,
       before Jineen Pavesi, a Registered
24     Professional Reporter, Registered Merit
       Reporter, Certified Realtime Reporter and
25     Notary Public of the State of New York.
```

VERITEXT REPORTING COMPANY
212-267-6868                                         516-608-2400

HIGHLY CONFIDENTIAL                          FRX-AT-01733475

**Page 94**

```
 1        JACOBS - HIGHLY CONFIDENTIAL
 2   you can answer.
 3      A.    There is lots of things we try
 4   to do; because we're titrating the
 5   medicine up from 5 milligrams to ten
 6   milligrams, for example, if the symptoms
 7   come at ten milligrams we often say stop
 8   everything, let the symptoms go away.
 9           On a second look you may not
10   have the same side effects and that works
11   a lot, a large percentage of the time, but
12   not all the time.
13           If we do that and even 2.5
14   milligrams causes side effects and we
15   realize we can't use an oral drug like
16   that, we might try the Excelon Patch, we
17   would for sure if it was GI side effects,
18   even if is the other side effects we might
19   try because it is a different molecule and
20   they don't always behave the same way by
21   any means and so we would try the patch.
22           Interestingly enough, it is
23   just never come to dilanthamine, the third
24   one.
25      Q.    Typically if a patient doesn't
```

**Page 95**

```
 1        JACOBS - HIGHLY CONFIDENTIAL
 2   respond well to donepezil, they will
 3   respond well to the Excelon Patch, and to
 4   clarify, when I say respond well, I mean
 5   in terms of side effects, not necessarily
 6   efficacy?
 7           MR. CROWE:  Objection to form,
 8   vague, calls for speculation, but you can
 9   answer.
10      A.    Often that is the case, not
11   always, but often.
12      Q.    If a patient had side effects
13   with Namenda, what would you switch them
14   to?
15           MR. CROWE:  Objection to form,
16   calls for speculation and vague.
17           You can answer.
18      A.    Every once in a blue moon
19   someone put on Namenda, I will be told by
20   their caregiver typically that they got
21   confused, more confused, and we will stop
22   it and see if the confusion goes away
23   after thinking about other reasons they
24   might have got confused, and if we end up
25   deciding that it was the Namenda, we might
```

**Page 96**

```
 1        JACOBS - HIGHLY CONFIDENTIAL
 2   still do that, try it again once, and if
 3   it happens again we can't use it so we
 4   stop it and they can't be on Namenda.
 5      Q.    Normally would those patients
 6   be on a cholinesterase inhibitor already?
 7           MR. CROWE:  Objection to form,
 8   vague.
 9           You can answer.
10      A.    Typically.
11      Q.    Is there ever a reason a
12   patient would take both of the two
13   cholinesterase inhibitors that you
14   described, donepezil and rivastigmine?
15           MR. CROWE:  Objection to form,
16   calls for speculation, you can answer.
17      A.    I can't imagine any situation,
18   it would invite toxicity.
19      Q.    But many of your patients are
20   on both -- one of the cholinesterase
21   inhibitors and also Namenda, correct?
22      A.    Yes.
23      Q.    In about how many patients is
24   that?
25           MR. CROWE:  Objection to form,
```

**Page 97**

```
 1        JACOBS - HIGHLY CONFIDENTIAL
 2   vague.
 3      A.    So if you take the whole
 4   universe of my patients on cholinesterase
 5   inhibitor and you restrict to the ones
 6   that have moderate to severe dementia or
 7   even are on the borderline of moderate to
 8   severe, because I will try in those
 9   situations, too, I will be adding the
10   second drug because they are hungry for
11   treatment and to think better and so why
12   wouldn't you.
13      Q.    So typically you would add
14   Namenda to the patient's treatment regimen
15   somewhere between the mild to moderate
16   stage, that kind of transitional area, I
17   know these aren't clear distinctions?
18           MR. CROWE:  Objection to form,
19   vague.
20           You can answer.
21      A.    Typically it is moderate to
22   severe.
23           For sure if I said at a meeting
24   I think we're now into the moderate stage
25   of this illness, I want to add a drug, but
```

**Page 102**

JACOBS - HIGHLY CONFIDENTIAL

other ways we could help that we don't have drugs yet to satisfy because it is a rich soup of neurotransmitters and what not.

Q. With regards to the timing, are these drugs typically more effective at different stages?

A. Right, so the cholinesterase inhibitor will be most effective when there is cholinergic deficiency at the same time that there is neurons around to utilize the return of acetylcholine and Namenda will be more or memantine will be more effective any time the brain cells are leaking calcium, I know we don't have a more direct way of measuring that, we assume that's the case when dementia is of moderate severity.

Q. Going back specifically to the cholinesterase inhibitors, you said that there are three that you're aware of that are actively prescribed?

A. That are on the market.

Q. Right.

**Page 103**

JACOBS - HIGHLY CONFIDENTIAL

Those are all distinct chemical compounds, is that correct?

A. Yes.

Q. But they are broadly the same mechanism of action, is that accurate?

MR. CROWE: Objection to form, vague, calls for speculation, but you can answer.

A. They all purport to inhibit the enzyme acetylcholinesterase.

Q. Which, again, that's distinct from what an NMDA receptor antagonist does?

A. Yes.

Q. Until now we have been talking broadly about Namenda and my understanding is that Namenda comes in basically three forms, there is the IR and the XR.

First of all, do those terms mean anything to you, IR versus XR?

A. Yes.

MR. CROWE: Objection to form. You can answer.

Q. The IR being the

**Page 104**

JACOBS - HIGHLY CONFIDENTIAL

instant-release twice-a-day tablet, correct?

A. Well, the immediate release form comes in both a tablet and an elixir, two milligrams per ml, and the XR form is a once-a-day capsule filled with little caplety beads.

Q. Turning to the elixir, which sometimes I might call oral solution because that's how I think about it, do you prescribe that to any of your patients?

A. I have not prescribed it ever once to a patient.

Q. Why not?

A. The need hasn't come up.

Q. When would a patient need that particular solution?

MR. CROWE: Objection to form, vague.

You can answer.

A. One common reason has to do with -- patients with Parkinson's disease often have Alzheimer's disease and vice

**Page 105**

JACOBS - HIGHLY CONFIDENTIAL

versa and if you have Parkinson's disease you're very slow, you're swallowing mechanism is slow and you have poor saliva production and so it is just so much easier to have a liquid squirted into your mouth in that setting than to have to chew on a pill and get it moisturized and swallow.

There are other sorts of neurological conditions that you can imagine where chewing is hard or it may be their dentition, the person's dentition is such that it is hard and you would prefer a liquid.

But, yeah.

Q. Forgive me if you have addressed this already, but do you treat any patients with Parkinson's disease?

A. Yes.

Q. And Parkinson's and Alzheimer's disease?

A. Because I am not a movement disorder specialist, I wouldn't be seeing nearly as commonly with people just

### Page 106

```
 1      JACOBS - HIGHLY CONFIDENTIAL
 2   run-of-the-mill Parkinson's, so to speak,
 3   but once they get dementia I'm often
 4   seeing them to diagnose what the nature of
 5   the dementia is, because it can be one of
 6   three things going on in that stage.
 7      Q.   Some of those patients that you
 8   treat that have Alzheimer's disease and
 9   also Parkinson's, are some of those on
10   Namenda, one of the Namenda products?
11         MR. CROWE:  Objection to form,
12   you can answer.
13      A.   To the degree they have
14   Alzheimer's disease as the cause of their
15   dementia, I do the same thing I do with
16   other patients who have Alzheimer's
17   disease, which is start with a
18   cholinesterase inhibitor, because I am
19   usually seeing them earlier in the phase
20   of their dementia syndrome, and then try
21   to get them on both drugs because that's
22   two different types of good band-aids to
23   help them think better.
24      Q.   But even within those patients
25   you have never felt the need to prescribe
```

### Page 107

```
 1      JACOBS - HIGHLY CONFIDENTIAL
 2   the oral solution?
 3      A.   Not that I haven't felt the
 4   need, the need hasn't come up.
 5      Q.   I think you referenced that for
 6   the patients that need the oral solution,
 7   you squirt in their mouth.
 8         What is your understanding how
 9   you administer that particular dosage
10   form?
11         MR. CROWE:  Objection to form,
12   you can answer.
13      A.   It apparently comes in a box
14   with a syringe that you can put a top on
15   it, interacts with a bottle and you would
16   pull the plunger and get the amount you're
17   going to give, which would be like 5 ccs
18   if it is 2 milligrams per cc and you
19   wanted to give 10 milligrams and then you
20   would unhook it and put it at the side of
21   the mouth and just squirt it in.
22      Q.   Has a patient ever asked for
23   that particular formulation in your
24   experience?
25      A.   Not in my experience.
```

### Page 108

```
 1      JACOBS - HIGHLY CONFIDENTIAL
 2         MR. CROWE:  Objection.
 3      Q.   Just to clarify the question,
 4   paragraph 27 of your declaration, it says
 5   "Symptomatic treatments such as memantine
 6   hydrochloride (Namenda) and cholinesterase
 7   inhibitors tend to have an additive effect
 8   to make patients think and behave more
 9   normally."
10         Is that correct?
11      A.   Yes.
12      Q.   What exactly do you mean by
13   additive effect there?
14      A.   It was nice to have a second
15   drug in the symptomatic armamentarium that
16   by virtue of addressing a different
17   problem that brain cells have when they
18   are afflicted with Alzheimer's disease, so
19   to speak, seems to not just overlap such
20   that you choose one because you're only
21   going to get X amount of benefit
22   regardless of which one you use, but in
23   fact have additive benefit so that if
24   you're cognitive scores go up X, the
25   addition of the second drug usually makes
```

### Page 109

```
 1      JACOBS - HIGHLY CONFIDENTIAL
 2   it go up close to 2X, and so it is
 3   additive.
 4      Q.   Do you know of any doctors that
 5   prescribe the oral solution product?
 6      A.   No, not individuals that I know
 7   by name.
 8         I don't ask them, I haven't
 9   asked that question.
10      Q.   Why might you keep a patient on
11   the Namenda instant-release tablet instead
12   of switching them to the XR capsule?
13         MR. CROWE:  Objection to form,
14   lack of foundation, vague, and calls for
15   speculation.
16         But you can answer.
17      A.   Once the XR came out, it became
18   pretty obvious that that would be
19   preferable because of it's once-a-day
20   dosing regimen.
21         So if I haven't seen someone
22   yet, I wouldn't be calling them up and say
23   come in, I want to give you XR, I would
24   typically wait until they come in for
25   followup and see they are on the IR drug
```

28 (Pages 106 to 109)

HIGHLY CONFIDENTIAL                         FRX-AT-01733502

**Page 202**

```
 1         JACOBS - HIGHLY CONFIDENTIAL
 2    version of the Namenda IR product, the
 3    tablet specifically, would be entering the
 4    market, is that correct?
 5         A.    What I said was I assumed it
 6    would be because, just like I assumed any
 7    medicine eventually loses its patent and
 8    generics come onboard and that generic
 9    drugs exist and therefore any given drugs
10    will eventually go generic.
11              I didn't have specific
12    knowledge of when Namenda would prior to
13    any of this.
14         Q.    Do you normally receive
15    marketing materials or detailing from
16    branded drug manufacturers?
17              MR. CROWE:  Objection to form.
18              You can answer.
19         A.    No; I get things in the mail
20    and I usually just throw them right away
21    because I am not going to bother with
22    anything like that, that's just sort of
23    not medical information.
24         Q.    You don't get like the pens or
25    the pads?
```

**Page 203**

```
 1         JACOBS - HIGHLY CONFIDENTIAL
 2         A.    I still have a box of Aricept
 3    pens in my office that was given to me in
 4    1996 with so many pens that I am never
 5    going to run out.
 6              So I never needed anymore pens.
 7         Q.    What about from generic drug
 8    companies, do you get any marketing
 9    information or pens from those firms?
10              MR. CROWE:  Objection, vague.
11              You can answer.
12         A.    I don't remember ever
13    getting -- I don't know anything about
14    generic companies honestly, never heard of
15    one.
16         Q.    You can't name a single generic
17    company?
18         A.    Not at all.
19         Q.    What about patients, are
20    patients typically aware of generic drugs
21    when they come into your office?
22              MR. CROWE:  Objection to form,
23    vague, calls for speculation, but you can
24    answer.
25         Q.    In your experience.
```

**Page 204**

```
 1         JACOBS - HIGHLY CONFIDENTIAL
 2         A.    We have discussions all the
 3    time, it happens a lot in
 4    neuroendocrinology because those patients
 5    are young and they are not wealthy and
 6    they care a lot about cost issues and they
 7    may say something like I want the generic
 8    and I might say, you know what, we should
 9    do the brand first for a while because
10    phamacokinetics are well-described and
11    standardized and then, assuming we can get
12    the dose response that we want and we like
13    the efficacy and you don't have side
14    effects, then you can switch to the
15    generic because then we'll know if there
16    is a difference.
17              And if there is a difference,
18    you'll have data to say to your insurance
19    company, you ought to pay for this brand
20    because it works better.
21              So that happens a lot in that
22    setting, I can't remember -- I think I
23    also remember when Aricept went generic,
24    everyone was happy, my patients were
25    happy, because now they were just getting
```

**Page 205**

```
 1         JACOBS - HIGHLY CONFIDENTIAL
 2    the donepezil and we learned quickly there
 3    was no difference, it was less expensive
 4    and worked the same.
 5         Q.    Specifically with the
 6    neuroendocrinology context, was it the
 7    patient that initiated the discussion
 8    about the generics or did you inform them
 9    that there was a generic available and
10    that you would try this treatment
11    strategy?
12              MR. CROWE:  Objection, form,
13    vague and calls for speculation.
14              You can answer.
15         A.    I mean, over time in the 20
16    years I have been practicing medicine,
17    really the ten years I have been in
18    private practice, where people give me
19    money to see me and I have to feel like I
20    owe them as much benefit as I can give
21    them, I've become more and more aware to
22    the point where I often initiate that and
23    say, you know, I am going to give you this
24    and I have a discussion about why I might
25    want to -- I say would you rather have
```