**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>All Direct Purchaser Actions | **Civil Action No.: 1:15-CV-07488-CM** |

# MEMORANDUM IN SUPPORT OF DIRECT PURCHASER CLASS PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

**TABLE OF CONTENTS**

I.      INTRODUCTION ….…………………………………………………………1

II.     PROCEDURAL BACKGROUND…...……………………………………………...3

III.    ARGUMENT ….………………………………………………………………5

        A.      Requests for Productions Relating to the '703 Patent and "Patent Litigations"….7

        B.      Requests and Production Relating to Other Patents……………………….....10

        C.      Requests for Production Relating to Litigation Costs…………………………...11

        D.      Requests for Productions Concerning Reverse Payment Related Agreements.....12

        E.      At–Issue Privilege Waiver…………………………………………………....18

IV.     CONCLUSION...………………………………………………………………23

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Adam Friedman, LLC v. MediaG3,*
    No. 10 Civ. 5350, 2012 U.S. Dist. LEXIS 62591 (S.D.N.Y. May 1, 2012)……………21

*Arista Records LLC v. Lime Grp. LLC,*
    No. 06-CV-5936, 2011 U.S. Dist. LEXIS 42881 (S.D.N.Y. Apr. 20, 2011)…………..20

*Bowne, Inc. v. AmBase Corp.,*
    150 F.R.D. 465 (S.D.N.Y. June 3, 1993)…………………………………………………18

*Chevron Corp. v. Donziger,*
    No. 11 Civ. 0691, 2013 U.S. Dist. LEXIS 168187 (S.D.N.Y. Nov. 21, 2013)………...20

*FTC v. Actavis, Inc.,*
    133 S. Ct. 2223 (2013)…………………………………………………………………....2

*HSH Nordbank AG NY Branch v. Swerdlow,*
    259 F.R.D. 64 (S.D.N.Y. July 22, 2009)………………………………………………...20

*In re Aggrenox Antitrust Litig.,*
    94 F. Supp. 3d 224 (D. Conn. March 23, 2015)…………………………………………14

*In re Ford Motor Co. Bronco II Prods. Liab. Litig.,*
    MDL-991, 1994 U.S. Dist. LEXIS15867 (E.D. La. October 28, 1994)…………………18

*John Doe Co. v. U.S.,*
    350 F.3d 299 (2d Cir. 2003)……………………………………………………………..20

*In re Lidoderm Antitrust Litig.,*
    No. 14-md-02521, 2016 U.S. Dist. LEXIS 105619 (N.D. Cal. Aug. 9, 2016)………..…21

*In re Lipitor Antitrust Litig.,*
    No. 12-2389, 2013 U.S. Dist. 118387 (D. N.J. August 30, 2013)………………………..8

*In re Microcrystalline Cellulose Antitrust Litig.,*
    221 F.R.D. 428 (E.D. Pa. May 6, 2004)………………………………………………..7

*In re Mushroom Direct Purchaser Antitrust Litig.,*
    Nos. 06-CV-0620; 06-CV-0638; 06-CV-0657; 06-CV-0677; 06-CV-0861; 06-CV-0932; 06-CV-1464; 06-CV-1854, 2012 U.S. Dist. LEXIS 12319, *37 (E.D. Pa. Jan. 31, 2012)……………………………………………………………………………………7

*In re Nexium (Esomeprazole) Antitrust Litig,*
  42 F. Supp. 3d 231 (D. Mass. 2014)……………………………………………………..15

*In re Nexium (Esomeprazole) Antitrust Litig.,*
  842 F.2d 34 (1st Cir. 2016)………………………………………………………………16

*In re Niaspan Antitrust Litig.,*
  42 F. Supp. 3d 735 (E.D. Pa. 2014)……………………………………………………...15

*In re Omnicom Grp., Inc. Sec. Litig.,*
  233 F.R.D. 400, 413 (S.D.N.Y. Feb. 28, 2006)…………………………………………20

*In re Opana ER Antitrust Litig.,*
  No. 14 C 10150, 2016 U.S. Dist. LEXIS 23319 (N.D. Ill. Feb. 25, 2016)………………17

*In re Veeco Instruments, Inc., Sec. Litig.,*
  No. 05-MC-01695, 2007 U.S. Dist. LEXIS 102363 (S.D.N.Y. June 28, 2007)…………22

*In re Wellbutrin XL Antitrust Litig.,*
  133 F. Supp. 3d 734 (E.D. Pa. 2015)……………………………………………………...6

*John Doe Co. v. U.S.,*
  350 F.3d 299 (2d Cir. 2003)……………………………………………………………20

*Kimble v. Marvel Entm't,*
  135 S. Ct. 2401 (2015)……………………………………………………………………5

*King Drug Co. of Florence, Inc., v. SmithKline Beecham Corp.,*
  791 F.3d 388 (3d Cir. 2015)………………………………………………………………6

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.,*
  88 F. Supp. 3d 402 (E.D. Pa. Jan. 28, 2015)…………………………………………..14

*Leviton Mfg. Co. v. Greenberg Traurig LLP,*
  No. 09 Civ 8083, 2010 U.S. Dist. LEXIS 128849 (S.D.N.Y. Dec. 6, 2010)……………21

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,*
  No. 09 Civ. 3255, 2012 U.S. Dist. LEXIS 92435 (S.D.N.Y. July 3, 2012)……………..19

*Mitchell v. U.S.,*
  526 U.S. 314 (1999)…………………………………………………………………...…………19

*Overseas Motors, Inc. v. Import Motors, Ltd.,*
  375 F. Supp. 499 (E.D. Mich. March 18, 1974)…………………………………………18

*Pereira v. United Jersey Bank,*
*Pritchard v. Cty. of Erie (In re Cty. of Erie)*, 546 F.3d 222 (2d Cir. 2008)……………………...20

*Rochester Drug Co-Operative, Inc. v. Warner Chilcott Co. (In re Loestrin 24 Fe Antitrust Litig.)*,
    814 F.3d 538 (1st Cir. 2016)…………………………………………...……………….....17

*SEC v. R.J. Reynolds Tobacco Holdings, Inc.,*
    No. 03-1651, 2004 U.S. Dist. LEXIS 24545 (D. D.C. 2004)…………………………...12

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC,*
    No. 15-CV-6549, 15-CV-7488, 2016 U.S. Dist. LEXIS 128349 (S.D.N.Y. Sept. 13,
    2016)………………………………………………………………………………...…..5

*Smithkline Beecham Corp. v. Apotex Corp.*,
    Nos. 99-CV-2926, 99-CV-4304, 00-CV-1393, 00-CV-4888, 00-CV-5953, 00-CV-6464,
    01-CV-0159, 01-CV-1027, 01-CV-2169, 01-CV-2602, 01-CV-2981, 01-CV-3364, 02-
    CV-1484, 02-CV-8493, 03-CV-6117, 2006 U.S. Dist. LEXIS 4276 (E.D. Pa. Jan. 31,
    2006)…………………………………………………………………………………7

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare
Fund v. Teikoku Pharma USA, Inc.*,
    74 F. Supp. 3d 1052 (N.D. Cal. 2014)……………………………………………...14

*U.S. v. Apple, Inc.,*
    791 F.3d 290 (2nd Cir. 2015), *writ denied* 2016 U.S. LEXIS 1750 (U.S., Mar. 7,
    2016)………………………………………………………………………………..16

*U.S. v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)……………………………………………………19

*U.S. v. Schwimmer*,
    892 F.2d 237 (2d Cir. 1989)……………………………………………………..18

*U.S. v. Topco Assocs.,*
    405 U.S. 596 (1972)……………………………………………………………5


**ORDERS**


Order, *In re Effexor EX Antitrust Litig.*,
    No. 11-cv-5479 (D.N.J. Sept 18, 2013), ECF No. 268…………………………………8

Interim Case Mgmt. Order No. 5, *In re Loestrin 24 Fe Antitrust Litig.*,
    No. 13-md-2472 (D.R.I. Dec. 19, 2016), ECF Document No. 236………………………8

# RULES AND STATUTES

Fed R. Civ. P. 26(b)(1)…………………………………………………………………………………7

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 108 P.L. 173, 117 Stat. 2066, 2461-2463…………………………………………………………………….............................17

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION | **Civil Action No.: 1:15-CV-07488-CM** |
| THIS DOCUMENT RELATES TO: All Direct Purchaser Actions | |

## MEMORANDUM IN SUPPORT OF DIRECT PURCHASER CLASS PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

## I.       INTRODUCTION

Direct Purchaser Class Plaintiffs ("Plaintiffs") allege that Forest[1] engaged in a multifaceted conspiracy to forestall generic competition in the market for memantine hydrochloride, which Forest sold under the brand name Namenda IR.  The wrongful conduct involved several, collectively and independently illegal components.  First, Forest entered into a series of illegal, anticompetitive litigation settlements with multiple generic drug companies that had challenged U.S. Patent No. 5,061,703 (the "'703 patent"), which purportedly protected Namenda IR. Pursuant to these settlements, in exchange for cash and other consideration (such as ███████████████ to Mylan), the generics agreed not to compete with Forest and to stay off the market *even after the '703 patent expired on April 11, 2015*. Second, Forest used the competitive delay it bought to destroy the market for Namenda IR by switching prescriptions from Namenda IR to a new product, Namenda XR, before generics could enter the market with their lower-priced generic Namenda IR products.

---

[1] The instant motion is directed solely to Forest-affiliated defendants Forest Laboratories, LLC and Actavis, plc (n/k/a Allergan, plc) (collectively "Forest").  "Defendants" refers to all defendants in the above-captioned matter.

One of Forest's central defenses to Plaintiffs' claims is that the patent settlements were "presumptively lawful" because the settlement entry dates were negotiated based on Forest and the generics' "assessment[] of the likely outcome of the [patent] suit".[2] Forest asserts that the settlement entry dates were not only justified by the patent merits, but that Forest acted in "*good faith*" because it *believed* that the settlement entry date was appropriate in light of Forest's internal, legal evaluation of the patent merits.

These and other defenses Forest may raise clearly make relevant: (a) the patent merits and Forest's evaluation of the patent merits; and (b) the settlement negotiations and Forest's internal discussions regarding such negotiations. This information is also independently relevant under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013) which has as its central inquiry whether patent settlement agreements included payments intended to keep a would-be generic competitor off the market for a period beyond a hypothetical negotiated entry date without such a payment. However, despite the clear holding of *Actavis*, and Forest's assertions that the settlement entry dates are justified by the patent merits, Forest refuses to produce unredacted documents from the patent cases (such as information exchanged between the parties in discovery, deposition transcripts, expert reports, etc.) so that Plaintiffs can evaluate the patent merits to test Forest's affirmative assertions. Similarly, despite Forest's assertions that the settlements were justified and lawful under *Actavis* because the settlement entry dates were based on the patent merits (and not influenced by side payments), Forest refuses to produce documents regarding the settlement negotiations, other than the final agreements and communications regarding such.

These affirmative assertions and others, including that Forest negotiated an entry date

_____

[2] Forest's Combined Mem. of Law Supp'g Forest's Mot. for Partial Summ. J (Count 3) and Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. (Count 3), March 16, 2017 at 9-10, ECF No. 163.

"reflecting [its] assessment of the strength of the patent," have placed "at issue" Forest's internal legal analysis of the patent merits and discussions regarding the settlement negotiations, and waived any privilege claims for such information. What if Forest actually thought the patents were weak, but it used the payments to induce the generics to accept a delayed entry date? If that is the case, then, contrary Forest's assertions, it would not have negotiated an entry date that was consistent with and reflecting its assessment of the patent strengths. If Forest is permitted to advance such assertions without producing the underlying evidence of what it *actually* believed, then it would simultaneously be using privilege as a sword (i.e., affirmatively asserting that it acted in "good faith" by negotiating entry dates based on and "reflecting" its legal analysis of the patent merits) and a shield (i.e., blocking discovery of its *actual* patent analysis and purported "good faith" to prevent Plaintiffs from testing the veracity of its assertions). Therefore, Forest must choose between producing privileged information concerning the assertions "at issue" or, alternatively, foregoing these defenses. If Forest elects to advance these defenses, Plaintiffs must be allowed an unfettered opportunity to fully develop the evidence to rebut them. If Forest chooses to continue withholding such information, then Plaintiffs request that the Court preclude Forest from raising affirmative defenses, or making affirmative assertions, which places such information at issue.

## II.      PROCEDURAL BACKGROUND

Plaintiffs served Forest with their First Set of Requests for Production of Documents ("First Set of RFPs") on December 27, 2016.[3] Forest responded to Plaintiffs' First Set of RFPs

---

[3] Exhibit 1 to Declaration of Dan Litvin ("Litvin Decl.") (Plaintiffs' First Set of RFPs to Defendants dated December 27, 2016).

on January 31, 2017 with numerous objections.[4]   On March 10, after sifting through Forest's objections, Plaintiffs explained the relevance of their requests.[5]   The parties held a lengthy meet and confer teleconference on March 22, 2017, in which Plaintiffs focused on the most important issues and agreed to compromise on many requests.   Plaintiffs focused on:

    (a)    Non-privileged documents relating to the merits of the patents on which Forest is relying (such as documents filed, produced, served or exchanged in the '703 patent infringement litigations against the generic Namenda IR ANDA filers).[6]

    (b)    Non-privileged documents regarding any other patents about which Forest might choose to make assertions in connection with any defenses in this case.

    (c)    Non-privileged documents relating to Forest's expended litigation costs and its projections regarding litigation costs and expenses.

    (d)    Non-privileged documents relating to the various agreements surrounding the settlement of the '703 patent infringement suits against the generic Namenda IR ANDA filers (such as communications with the settling generics).[7]

Following up on the March 22nd meet and confer call, the parties exchanged letters on March 27, 2017, March 30, 2017, and April 3, 2017.[8]   Further, in correspondence dated April 6, 2017, Plaintiffs additionally sought privileged documents that Forest has placed at issue in this litigation relating to internal legal analysis of the '703 patent and internal documents regarding

---

[4] Litvin Decl. Ex. 2 (Forest's Response to Plaintiffs' First Set of RFPs to Defendants dated January 31, 2017 (Forest lodged 121 total objections).

[5] Litvin Decl. Ex. 3 (Plaintiffs' letter to Forest dated March 10, 2017 regarding deficiencies in Defendants Response to Plaintiffs' First Set of RFPs).

[6] Litvin Decl. Ex. 1, at 23-27. (RFPs 39-57 related to patent and patent litigation documents).

[7] Litvin Decl. Ex. 1, at 27-28. (RFPs 58, 59 and 63 related to analysis of Plaintiffs' reverse payment claim).

[8] Litvin Decl. Ex. 4 (Plaintiffs' letter to Forest dated March 27, 2017 providing Plaintiffs' search terms and expressing surprise that Forest had begun document review and production efforts prior to agreement on relevant search terms); Litvin Decl. Ex. 5 (Forest's letter to Plaintiffs dated March 30, 2017 responding to March 22, 2017 meet and confer teleconference); Litvin Decl. Ex. 6 (Plaintiffs' letter to Forest dated April 3, 2017 responding to Defendants' March 30, 2017 letter).

the settlements and underlying negotiations with the generics challenging the '703 patent.[9] To date, Plaintiffs and Forest have been unable to reach an agreement regarding these documents.

Due to the aggressive discovery deadlines in this case and the parties' inability to reach an agreement regarding these issues, Plaintiffs file the instant motion seeking an order compelling production of the aforesaid categories of documents, including the purportedly privileged documents and information that Forest has placed "at issue."

## III. ARGUMENT

Plaintiffs allege, among other things, that the reverse-payment agreements here were unlawful under *Actavis*. These reverse payment settlements were substantial. For example,

████████████████████████████████████████████████

████████████[10] Plaintiffs allege that the settlements are also illegal under Supreme Court decisions such as *United States v. Topco Assocs.,* 405 U.S. 596 (1972) and *Kimble v. Marvel Entm't,* 135 S. Ct. 2401 (2015) because the settlements were agreements to exclude competition even after the patents expired. On September 13, 2016, this Court denied Forest's motion to dismiss Plaintiffs' reverse payment claims.[11]

One of Forest's central defenses is that the settlements were "presumptively lawful" because the settlement entry dates were based on Forest and the generics' "assessment[] of the

---

[9] Litvin Decl. Ex. 7 (Plaintiffs' letter to Forest dated April 6, 2017 regarding Defendants' "at issue" privilege waiver claim.)

[10] Mem. in Supp. of Defs. Forest and Merz's Mot. to Dismiss Indirect Purchaser Pls.' Class Action Compl. and Direct Purchaser Plaintiffs' First Am. Class Action Compl., December 22, 2015 at 10-11, ECF No. 57.

[11] *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC,* No. 15-cv-6549, 2016 U.S. Dist. LEXIS 128349 (S.D.N.Y. Sept. 13, 2016).

likely outcome of the [patent] suit".[12]  As Forest stated in response to Plaintiffs' recent summary judgment motion, and in support of Forest's counter motion for summary judgment:

> According to the FTC, a Hatch-Waxman settlement agreement that simply establishes "a compromise date of generic entry" that falls "in between those endpoints," in light of "the parties' respective assessments of the likely outcome of the suit," is presumptively lawful. *Id.* at 23, 26-27; *see also King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.,* 791 F.3d 388, 405 n.23 (3d Cir. 2015) (an early-entry date compromise "reflecting [the parties'] assessment of the strength of the patent" is generally lawful); *In re Wellbutrin XL Antitrust Litig.,* 133 F. Supp. 3d 734, 752 (E.D. Pa. 2015) (pharmaceutical patent settlements that simply set an early entry date based on "the strength of the patent claims" at-issue are "not subject to antitrust scrutiny").

> Consistent with those lawful general principles, Defendants and the generics considered the merits of their respective litigation positions—after the district court decided claim construction almost entirely in Defendants' favor—and reached a settlement.[13]

As the foregoing reflects, Forest is asserting that in negotiating the settlements, Forest "considered the merits of their respective litigation positions" and, this situation is consistent with the cited cases in which the parties negotiated an entry date "based on the strength of the patent claims" and "reflecting [its] assessment of the strength of the patent"[14].

Similarly, in its Answer to Plaintiffs' Complaint, Forest raised affirmative defenses in which it argued that the settlement entry date was not only justified by the patent merits, but also that Forest acted in "*good faith*" because it *believed* that the settlement entry date was consistent with the patent strength.  For example, Forest has affirmatively asserted that:

- "[The] '703 Patent was valid and infringed by each generic manufacturer that filed an ANDA."[15]

---

[12] ECF No. 163, at 9-10.

[13] ECF No. 163, at 9-10.

[14] *Id.*

[15] Forest Defs.' Answer to Direct Purchaser Pls.' First Am. Class Action Compl., Sept. 27, 2016 at 62, ECF No. 107 (40th Affirmative Defense).

- "[The negotiated] entry date for generic Namenda was procompetitive in light of the patent merits in the Namenda IR patent litigation."[16]

- "[Forest] acted in good faith in furtherance of its legitimate business interests . . ."[17]

- "[Plaintiffs'] claims are barred, in whole or in part, because the agreements at issue were bona fide agreements," and "[Plaintiffs'] claims are barred, in whole or in part, because the agreements at issue were for 'fair value.'"[18]

Furthermore, as part of its effort to claim that the negotiated entry date was consistent with the patent merits – and that the parties acted consistently with their views about the patent merits – Forest has asserted that the amendment to the Mylan agreement was "mutually beneficial" and "reflect[ed] fair value for the services."[19]

The documents that Plaintiffs seek in this motion are directly related to these issues, and are therefore both relevant and discoverable.

### A.     Requests for Productions Relating to the '703 Patent and "Patent Litigations."

Federal Rule of Civil Procedure 26 provides that "unless otherwise limited by court order" parties "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense."[20]  Moreover, there is a "general policy of allowing liberal discovery in antitrust cases,"[21] particularly those involving allegations of monopolization.[22]

---

[16] *Id.* at 60 (Forest's 31st Affirmative Defense).

[17] *Id.* at 57 (Forest's 12th Affirmative Defense).

[18] *Id.* at 60 (Forest's 29th and 30th Affirmative Defenses).

[19] ECF No. 57, at 48.

[20] *See* Fed R. Civ. P. 26(b)(1).

[21] *See In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2012 U.S. Dist. LEXIS 12319, at *37 (E.D. Pa. Jan. 31, 2012) (quotation omitted).

[22] *See Smithkline Beecham Corp. v. Apotex Corp.*, No. 99-CV-4888, U.S. Dist. LEXIS 4276, at

Underlying patent litigation materials (including pleadings, privilege logs, discovery material, transcripts and expert reports) are commonly requested and produced in reverse payment cases because they are clearly pertinent to the *Actavis* inquiry. *See, e.g.*, Interim Case Mgmt. Order No. 5, *In re Loestrin 24 Fe Antitrust Litig*., No. 13-md-2472 (D.R.I. Dec. 19, 2016), ECF No. 236 (ordering defendants to produce "the entire file for the underlying patent suit(s)" along with the agreements between the brand and generic companies while motions to dismiss were pending); Order, *In re Effexor EX Antitrust Litig*., No. 11-cv-5479 (D.N.J. Sept. 18, 2013), ECF No. 268 (ordering defendants to produce all of the relevant settlement agreements, communications related to settlements, and various material from the underlying patent infringement cases); *In re Lipitor Antitrust Litig.,* No. 12-23892013 U.S. Dist. 118387, *22-25, 27-29 (D. N.J. Aug. 30, 2013) (granting Plaintiffs' motion to compel production of underlying patent litigation documents, explaining that such documents were relevant because "they may shed light on the nature of the reverse payment agreement between [the parties]" and "are likely to lead to discovery of admissible evidence" and ruling that confidential information can be adequately protected by Protective Order in the antitrust case).

Moreover, Forest raises arguments in this case that are based on the patent merits. For example, in its motion to dismiss, Forest argued that the patent merits precluded Plaintiffs from showing that, absent the reverse payment settlements in this case, the generic patent challengers would have launched at risk, won the patent cases, or agreed to more procompetitive settlement

---

*9 (E.D. Pa. Jan. 31, 2006) (monopolization cases call for "broad discovery . . . to uncover evidence of invidious design, pattern, or intent"); *see also In re Microcrystalline Cellulose Antitrust Litigation*, 221 F.R.D. 428, 429-30 (E.D. Pa. 2004) (broad discovery is appropriate in antitrust litigation because relevant business documents pertaining to conspiracy may not exist and covert behavior may have to be proven through less direct means).

agreements.[23]  In its Answer to Plaintiffs' complaint, Forest asserted that the "'703 Patent was valid and infringed" by each generic manufacturer that filed an ANDA" (40th Affirmative Defense) and that the negotiated "entry date for generic Namenda was procompetitive in light of the patent merits in the Namenda IR patent litigation." (31st Affirmative Defense).[24]

Thus, it is not surprising that Plaintiffs' Requests for Productions 39-57 seek among other things the following:

(1) unredacted copies of all non-privileged documents and materials from the Namenda Patent Litigation.[25]  This would include, but not be limited to: (a) documents and other materials served, produced and/or exchanged between the parties, (b) all correspondence and pleadings including briefing and responses to interrogatories, requests for admission, and requests for production, (c) all deposition, hearing or other transcripts, (d) all expert reports and supporting materials, and (e) any exhibits to the foregoing categories of documents and materials;

(2) all privilege logs produced, served or exchanged in the Namenda Patent Litigation;

(3) to the extent not already encompassed and produced pursuant to the above, all documents on which Forest intends to rely regarding the '703 Patent;

(4) all non-privileged documents related to the merits of the "Patents," a term defined to include *any* patents that Forest contends affected any Generic Manufacturer's right, ability or willingness to market a Generic Namenda product; and

(5) all non-privileged documents related to Forest's actual litigation costs and Forest's projected litigation timing and future litigation costs.[26]

Incredibly, even though Forest's defenses rely heavily on assertions and characterizations of the '703 patent merits, Forest is blocking discovery on those issues, refusing to produce anything about the '703 patent infringement litigation except for *publicly filed* documents from

---

[23] ECF No. 57, at 45-46.

[24] ECF No. 107, at 60, 62.

[25] Namenda "Patent Litigation" is defined as litigation filed by Defendants pertaining to any Paragraph IV ANDA certification concerning U.S. Patent No. 5,601,703 purportedly covering Namenda IR.

[26] Litvin Decl. Ex. 1, at 23-27. (RFPs 39-57 related to patent and patent litigation documents).

that litigation. That offer makes no sense since Plaintiffs can obtain those documents on their own. And in any event those documents are heavily redacted, and inadequate to enable an assessment of the '703 patent's strength. Second, many of the materials central to assessing the merits of the '703 patent's strength – *e.g.*, expert reports, transcripts, and key documents – were never even filed but were merely produced, served or exchanged between the patent litigants. To test Forest's affirmative assertions regarding the strength of the patent and whether Forest's chances of winning did, in fact, justify the settlement entry date, Plaintiffs are entitled to the fact and expert discovery from that case and unredacted court submissions. Any confidentiality concerns are baseless considering that any documents properly subject to protective order in the Patent Litigation would also be protected by the Protective Order in this case. Likewise, any documents produced (or served or exchanged) in the patent litigation – *i.e.*, documents that the patent litigants deemed relevant to the outcome of their cases – are relevant in this case.

**B.    Requests and Production Relating to Other Patents.**

Plaintiffs have also requested discovery regarding other patents (i.e. non-'703- patents) should Forest intend to rely upon any non-'703 patent-related claims or defenses.[27] In an attempt to streamline discovery, Plaintiffs offered to limit Forest's discovery responses to only materials related to the '703 patent in exchange for a stipulation that Forest would not raise any arguments or claims in this case regarding any non-'703 patents.[28] Forest has limited its response to the '703 patent, while at the same time reserving the right to raise non-'703 patent-related claims or defenses without restriction.[29] Forest claims that it would be *willing to negotiate* additional

---

[27] Litvin Decl. Ex. 1, at 23-24 (RFPs 40 – 46, 48 – 50 related to the Namenda IR "patents" or regulatory exclusivities).

[28] Litvin Decl. Ex. 3, at 6-8 (Plaintiffs' patent-related production compromise offer).

[29] Litvin Decl. Ex. 5, at 4. ("Forest is willing to represent, at this time . . . [that it] has no plans of

limited discovery if at some later date it pursues such claims or defenses.[30]  Given the time constraints in this case, Plaintiffs cannot reasonably agree to forego discovery on potential defenses that Forest expressly states they it raise at trial.

### C.    Requests for Production Relating to Litigation Costs.

Additionally, Forest objects to producing documents reflecting its expended litigation costs, and its projections regarding litigation costs and litigation timing.  In *Actavis*, the Supreme Court expressly mentioned avoided litigation costs as a factor in reverse-payment analysis under the rule-of-reason.[31]  In denying Forest's Motion to Dismiss, this Court expressly noted that "[d]iscovery is needed to reveal whether the payments Forest made to the Generic companies were actually commensurate with the legal fees they expected to pay over the course of the ANDA patent litigation."[32]  The projected timing of the litigation is also relevant to showing the perceived risks of imminent generic competition that the challenged agreements sought to prevent.  Forest's motion to dismiss acknowledged the significance and relevance of both of these issues.[33]  Also, Forest's thirty-third affirmative defense states, "[Plaintiffs'] claims are barred, in whole or in part, because any alleged payment in excess of fair value reflects saved

---

relying on patents other than the '703 to mount its defense.  As such, Forest will not search for information or documents concerning any other patents at this time. That said, if Forest later raises a defense that relies on a patent other than the '703, Forest *agrees to negotiate additional limited discovery* on such patent(s) at a later date.") (emphasis added).

[30] *Id.*

[31] *See Actavis*, 133 S. Ct. at 2236 (explaining that the Court examines traditional settlement considerations such as avoided litigation costs in determining if a reverse payment is large or unjustified).

[32] *Sergeants,* 2016 U.S. Dist. LEXIS 128349, at *28-29.

[33] ECF No. 57, at 34-45 (Defendants argue that their payments for avoided litigation costs are not reverse payments under *Actavis).*

litigation costs and attorney fees."[34]  Thus, litigation costs and the lawsuit's anticipated duration are clearly related to Forest's defenses in the case, making them relevant and discoverable.[35]

    **D.**    **Requests for Productions Concerning Reverse Payment Related Agreements.**

Even though the Court has not dismissed Plaintiffs' *Actavis* claims, Forest, citing relevance and burden issues, refuses to produce anything other than final versions of any Patent Litigation-related settlement agreements and communications related to *those final versions of the agreements*,[36] excluding, for example, drafts of the agreements and drafts of side-deals that they acknowledge are subject to the *Actavis* analysis[37] and communications relating thereto.

Plaintiffs' Requests for Productions 58, 59 and 63 seek:

RFP 58: Documents and communications related to any draft, contemplated or executed Patent Litigation settlement agreements, including any analyses of commercial, financial, legal or regulatory impact of any draft, contemplated or executed settlement agreement, in part or in whole;

RFP 59: All documents and communications related to any draft, contemplated or executed agreements with any of the Generic Manufacturers in their role as generic defendants in the Patent Litigation within one year of the settlement of the Patent Litigation with that Generic Manufacturer (e.g. Lexapro-Mylan and Ceftaroline-Orchid agreements), including any documents or communications showing:

    a.  the negotiation of the agreement(s);

---

[34] ECF No. 107, at 60.

[35] Responsive documents cannot be properly withheld on privilege grounds. The request at issue seeks aggregated litigation cost information and projections, not disclosures concerning the mental thoughts and opinions of Defendants' counsel. *See SEC v. R.J. Reynolds Tobacco Holdings, Inc.,* No. 03-1651, 2004 U.S. Dist. LEXIS 24545, at *15 (D.D.C. June 29, 2004) (quarterly and annual aggregated litigation costs that don't convey the mental impressions or opinions of counsel are not protected under work product doctrine.)

[36] *See* Litvin Decl. Exs. 2 and 5 (Forest's refusal provided in their Response to Plaintiffs' First Set of RFPs and repeated in Defendants' letter to Plaintiffs dated March 30, 2017).

[37] ECF No. 57, at 47-50 (Defendants argued that Mylan and Orchid agreements did not constitute impermissible reverse payments).

b. service(s) under the agreement(s);
c. analyses of the value of the agreement(s); and/or
d. payment(s) made or between Defendants and Generic Manufacturers; and

RFP 63:   All documents and communications related to any communication between Defendants and generic defendants in any Patent Litigation, regardless of date, relating to:
a. competition with or market entry of Generic Namenda IR;
b. any draft, contemplated or executed term(s) of settlement agreement(s) between Defendants and generic defendants in any other Patent Litigation;
c. any payment(s), compensation, provision of product(s), performance of service(s), or service(s) to be performed in any form in connection with any agreement(s) identified in response to RFPs 58 and 59; and
d. any royalt(ies) or license(s) in connection with any agreement(s) identified in response to RFPs 58 and 59.[38]

In *Actavis*, the Supreme Court held that if there is a large brand-generic payment for which Forest offers no legitimate explanation or pro-competitive justification, then the payment alone is "strong evidence" from which a jury can conclude, that at the time of settlement: (a) the patent holder had "serious doubts about the patent's survival" (*i.e.*, believed it was likely to lose the patent case); and (b) the payment was intended to induce the generic rival to abandon its patent challenge and thereby prevent the risk of generic competition.[39]

Once Plaintiffs establish a "large" reverse payment, Forest can raise various defenses,

---

[38] Litvin Decl. Ex. 1, at 27-28. (RFPs 58, 59 and 63 related to analysis of Plaintiffs' reverse payment claim).

[39] *See Actavis*, 133 S. Ct. at 2235 ("The payment may instead provide <u>strong evidence</u> that the patentee seeks to induce the generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market.") (emphasis added); *Id.* at 2236 ("An unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival. And that fact, in turn, suggests that the payment's *objective* is to maintain supracompetitive prices . . . .") (emphasis added); *id.* ("[T]he payment (if otherwise unexplained) likely *seeks* to prevent the risk of competition.") (emphasis added); *id.* at 2237 ("Although the parties may have reasons to prefer settlements that include reverse payments, the relevant antitrust question is: What are those reasons? If the basic *reason* is *a desire* to maintain and to share patent-generated monopoly profits, then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement.") (emphasis added).

including the defense that the intent and purpose for the payment at the time of the settlement was not to eliminate a risk of competition, but instead for a legitimate reason.[40] Defendant(s) bear the burden of production and persuasion as to this affirmative defense.[41] A "legitimate explanation" defense focuses specifically on the actual purpose, "reason" or "objective" for the payment at the time it was made – *i.e.*, what the parties were "seeking" to achieve by the payment when the reverse payment was made.[42]

Here, documents reflecting Patent Litigation settlement negotiations and draft/proposed agreements are highly relevant to assessing Forest's intentions and reasons for the settlement and the payments. Indeed, in its answer to Plaintiffs' complaint, Forest asserted that it "acted in good

---

[40] *See Actavis,* 133 S. Ct. at 2236 (Court noted that reverse payment settlements could potentially reflect permissible outcome of traditional settlement considerations).

[41] *Actavis,* 133 S. Ct. at 2236 ("An antitrust *defendant* may show . . . that legitimate justifications are present . . . .") (emphasis added); *see also King Drug Co. of Florence, Inc.*, 791 F.3d at 412 (3d Cir. 2015) (upon proof of a payment, "the burden then shifts to the defendant" to show that legitimate justifications are present); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 245 (D. Conn. 2015) (noting once the antitrust plaintiff meets its initial burden of showing an actual adverse effect on competition, "the burden then shifts to defendant to offer evidence that its conduct had procompetitive effects"); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.,* 88 F. Supp. 3d 402, 418 (E.D. Pa. 2015) ("Defendants, not Plaintiffs, bear the burden of explaining the payments."); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1065 (N.D. Cal. 2014) ("[T]he burden is on the defendant to show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason.") (internal quotation marks omitted) (citing *Actavis*, 133 S. Ct. at 2236).

[42] *See Actavis*, 133 S. Ct. at 2236 ("An unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival. And that fact, in turn, suggests that the payment's *objective* is to maintain supracompetitive prices . . . .") (emphasis added); *Id.* ("[T]he payment (if otherwise unexplained) likely *seeks* to prevent the risk of competition.") (emphasis added); *id.* at 2237 ("Although the parties may have reasons to prefer settlements that include reverse payments, the relevant antitrust question is: What are those reasons? If the basic *reason* is *a desire* to maintain and to share patent-generated monopoly profits, then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement.") (emphasis added).

faith" (12th Affirmative Defense), that the patent settlement agreements were "bona fide" (29th Affirmative Defense) and were for "fair value." (30th Affirmative Defense).[43] Similarly, ████████████████████████████████████████████, Forest asserts that the amendment to the Mylan agreement was "mutually beneficial," "reflect[ed] fair value for the services," and that ██████████████████████████████████[44] These arguments call for discovery about what Forest believed and intended in the negotiations, some of which may be revealed by settlement communications with the generics and other, internal documents regarding the negotiations.

Likewise, in its recent response to Plaintiffs' Motion for Partial Summary Judgment, Forest asserted that the settlement entry dates were determined based on the parties' "consider[ation of] the merits of their respective litigation positions," and this situation is consistent with other cases where the entry date "reflected" "the parties' respective assessments of the likely outcome" of the underlying patent suit.[45] But what if the patent litigants' entry-date agreement was not based *solely* on the patent merits, but was also influenced by the payments that were exchanged? But none of the cases Defendants cited for that proposition held that a plaintiff is not entitled to discovery to investigate that proposition. As another court stated in denying a motion to dismiss in a recent reverse payment case, a reverse payment "by the brand-name manufacturer to the potential generic manufacturer is likely to induce the generic to agree to enter the market at a date later than that to which it would otherwise agree based solely on the estimated strength of its litigation position." *In re Niaspan Antitrust Litig.,* 42 F. Supp. 3d 735, 751-52 (E.D. Pa. 2014). Discovery around the agreements and side-deals is clearly warranted.

---

[43] ECF No. 107, at 57, 60.

[44] ECF No. 57, at 48.

[45] ECF No. 163, at 9-10.

Draft and proposed agreements and related communications, including negotiations, can reasonably be expected to shed light on the motives of the settling parties, including for example, the relative importance of various provisions to the parties, whether certain provisions were added or changed during negotiations in exchange for a later generic launch date, and the extent to which the generics relied on parallel provisions in other settlement agreements with other settling generic companies in determining whether (and on what terms) to settle.

Specifically, regarding Forest's communications with generics regarding the terms of actual/proposed agreements with the generics, Plaintiffs allege that the contingent entry license provisions in all of Defendants' settlement agreements with the generic first-filers created a network of illegal horizontal market allocation agreements. *See* First Am. Class Action Compl., Oct. 13, 2015 at 76-77, ECF No. 26 (Count 4)). Communications between Defendants and the generics are relevant to a showing of interconnectedness as part of these conspiracy claims. As the Second Circuit explained in *United States v. Apple, Inc.*:

> Apple portrays its Contracts with the Publisher Defendants as, at worst, "unwittingly facilitat[ing]" their joint conduct . . . We disagree . . . Apple's benign portrayal of its Contracts with the Publisher Defendants is not persuasive – not because those Contracts themselves were independently unlawful, but because, in context, they provide strong evidence that Apple consciously orchestrated a conspiracy among the Publisher Defendants . . . Apple offered each Big Six publisher a proposed Contract that would be attractive only if the publishers acted collectively.

791 F.3d 290, 316 (2nd Cir. 2015), *cert. denied,* 136 S.Ct. 1376 (2016). *See also In re Nexium (Esomeprazole) Antirust Litig.,* 842 F.2d 34, 56-57 (1ˢᵗ Cir. 2016) (Court explained that evidence relating to pre-agreement discussions are "critical" to determining whether the parallel contingent launch clauses were the result of 'mere conscious' parallel action in each party's self-interest or represented "illegal tacit agreements"); *In re Nexium (Esomeprazole) Antitrust Litig,* 42 F. Supp. 3d 231, 254 (D. Mass. Sept. 4, 2014) ("the contingent launch clauses themselves

were the mechanism of a single agreement, the means by which individual market delay concessions knit together into a network of related agreements . . . There is no independence in agreeing to terms that depend on the actions of third parties in order to operate . . .").

Documents regarding other contemporaneous agreements are also clearly relevant in that side agreements are expressly contemplated and discussed in *Actavis* as one means by which settling parties may attempt to disguise a reverse payment, and companies settling Hatch-Waxman patent disputes like this one are required to file any such side deals with the Federal Trade Commission and Department of Justice for antitrust review.[46] Requests seeking information on side agreements are in no way speculative in this case, where discovery has already revealed contemporaneous side agreements with two of the settling generics.[47] For example, Forest acknowledges that in connection with settling a Namenda IR patent suit, Mylan and Forest amended a prior Lexapro distribution agreement in a manner that potentially funneled at least a ███████ payment to Mylan.[48] These side deals are plainly relevant under *Actavis*. *See Rochester Drug Co-Operative, Inc. v. Warner Chilcott Co. (In re Loestrin 24 Fe Antitrust Litig.),* 814 F.3d 538, 549 (1st Cir. 2016) ("the Supreme Court [in *Actavis*] recognized that a disguised above-market deal in which a brand manufacturer effectively overpays a generic manufacturer for services rendered may qualify as a reverse payment subject to antitrust scrutiny."); *In re Opana ER Antitrust Litig.,* No. 14 C 10150, 2016 U.S. Dist. LEXIS 23319, *27-28 (N.D. Ill. Feb. 25, 2016) (analyzing Endo-Impax settlement as a whole, including side agreement to develop new Parkinson's drug as part of its reverse payment analysis); *In re*

---

[46] Medicare Prescription Drug Improvement, and Modernization Act of 2003, 108 P.L. 173, 117 Stat. 2066, 2461-2463.

[47] ECF No. 57, at 47-50 (Forest's discussion of agreements with Mylan and Orchid).

[48] *Id.*, at 46-48 (Defendants' discussion of Mylan-Lexapro agreement).

*Niaspan Antitrust Litig.,* 42 F. Supp. 3d 735, 752 (E.D. Pa. Sept. 5, 2014) ("Defendants may not improperly "dismember" plaintiffs' [claims] by examining each of the three settlement agreements in isolation. . . . [T]he Licensing Agreement must be read in conjunction with the Co-Promotion and Manufacturing Agreements.").

Forest also argues that the agreement-related documents and communications are protected from discovery by the attorney-client privilege and Federal Rules of Evidence (FRE) Rule 408 regarding the inadmissibility of settlement negotiations.[49]   Both arguments are meritless.  First, draft agreements and communications with opposing parties in litigation, even if drafted by counsel, are not protected under attorney-client privilege once the agreements are exchanged with the other side.[50]   Second, FRE Rule 408 only applies to the admissibility of settlement communications for the purposes of establishing liability or valuation of the claim or transaction to which the settlement communication pertains.[51]   Where settlement communications and agreements themselves are the subject of the lawsuit, they are subject to

---

[49] Litvin Decl. Ex. 2, at 78-81, 84-85 (Forest's Responses to RFPs 58, 59 and 63).

[50] *See Bowne, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 478 (S.D.N.Y. June 3, 1993) ("Attorney-client privilege is waived if the 'holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication.'") (citations omitted); *U.S. v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989) (Joint defense or common-interest privilege serves to protect communications between parties "where a joint defense or strategy have been decided upon and undertaken"  . . . and only [protects] those communications made in the course of an ongoing common enterprise and intended to further the enterprise.") (citations omitted).

[51] *See In Re Ford Motor Co. Bronco II Prods. Liab. Litig.,* MDL-991, 1994 U.S. Dist. LEXIS 15867, at *14-15 (E.D. La. Oct. 28, 1994) ("[T]here is clear and consistent case law holding that discovery into the negotiations of the proposed settlement is improper *unless* there is some independent evidence of collusion between the plaintiffs and defendant in the negotiating process.") *See also Overseas Motors, Inc. v. Import Motors, Ltd.,* 35 F. Supp. 499, 537 (E.D. Mich. 1974) ("[I]t would . . . seem reasonable to admit [settlement communications] where the settlement negotiations are themselves subject of the lawsuit – *i.e.* operative facts.")

discovery.[52]

## E. At–Issue Privilege Waiver.

Courts have long recognized that the attorney-client privilege "constitutes an obstacle to the truth-finding process" and "should be cautiously observed to ensure that its application is consistent with its purpose." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 2012 U.S. Dist. LEXIS 92435, at *14 (S.D.N.Y. July 2, 2012). Thus, a party may not disclose only self-serving communications, while excluding discovery of other communications, which could be used to challenge the truth of the claim. As the Supreme Court stated in *Mitchell v. United States*:

> It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details.
>
> The justifications for the rule of waiver in the testimonial context are evident: A witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry. As noted in *Rogers*, a contrary rule "would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony[.]" It would, as we said in *Brown*, "make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell.[53]

Although *Mitchell, Rogers* and *Brown* address the Fifth Amendment privilege against self-incrimination, the Supreme Court's reasoning in those cases applies here as well to prevent abuses of the attorney-client privilege and/or work-product doctrine in the civil context. As the Court noted, it would be manifestly unfair, and a distortion and disruption to the truth-finding process, if a party could "select any stopping place in the testimony" and use its various privilege protections to pick and choose what aspects of a particular subject to discuss, in a fundamentally

---

[52] *See Id.* (Both courts explained that such material was discoverable).

[53] *Mitchell v. United States*, 526 U.S. 314, 321 (1999) (internal citations omitted).

unfair attempt to prevent discovery or questioning that would cast doubt on the trustworthiness of the statements that it does make.

Consequently, courts in this Circuit have repeatedly held that it would be fundamentally unfair for a party to "affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). *See also John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003) (It would be unfair to allow a party to "use[] an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion."). At the heart of these defenses are "factual assertions, the truthfulness of which may be assessed only by an examination of the privileged communications or documents." *In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400, 413 (S.D.N.Y. 2006); *Bilzerian*, 926 F.2d at 1292 ("The attorney-client privilege may be waived "when the defendant asserts a claim that in fairness requires examination of protected communications."); *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 74 (S.D.N.Y. 2009).

Significantly, an "at-issue" waiver is triggered by the factual assertions of what happened or the parties' state-of-mind, even if the party does not: (a) expressly reveal the attorney's legal advice or attorney-client communications, and (b) does not expressly state that the party "relied" on legal advice or communications. *See Chevron Corp. v. Donziger*, 11 Civ. 0691, 2013 U.S. Dist. LEXIS 168187, at *10-11 (S.D.N.Y. Nov. 21, 2013) ("implied waiver may be found where a party puts a claim or defense at issue that in fairness requires disclosure of privileged material, *whether or not the privileged material explicitly was relied upon in making the claim or defense.*") (emphasis added); *MBIA Ins. Corp.*, 2012 U.S. Dist. LEXIS 92435, at *18-22

(explaining that an implied waiver does not require a party to affirmatively rely on privileged communications, and stating "waiver is justified 'when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'") (quoting *Pritchard v. Cty. of Erie (In re Cty. of Erie)*, 546 F.3d 222, 229 (2d Cir. 2008); *Arista Records LLC v. Lime Group LLC*, 06 CV 5936, 2011 U.S. Dist. LEXIS 42881, at *2-3 (S.D.N.Y. Apr. 14, 2011) (rejecting the argument that a party could present state of mind evidence without waiving the attorney client privilege, so long as it refrained from relying on the advice of counsel); *Leviton Mfg. Co. v. Greenberg Traurig LLP*, No. 09 Civ. 8083, 2010 U.S. Dist. LEXIS 128849, at *7-8 (S.D.N.Y. Dec. 6, 2010) ("[A] party need not explicitly rely upon advice of counsel to implicate privileged communications. Instead, advice of counsel may be placed in issue where, for example, a party's state of mind, such as his good faith belief in the lawfulness of his conduct, is relied upon in support of a claim or defense. Because legal advice that a party received may well demonstrate the falsity of its claim of good faith belief, waiver in these instances arises as a matter of fairness[.]"); *Adam Friedman Assocs. LLC v. MediaG3, Inc.*, No. 10 Civ. 5350, 2012 U.S. Dist. LEXIS 62591, at *10-11 (S.D.N.Y. May 1, 2012) ("[T]he privilege may be waived if the privilege holder makes factual assertions the truth of which can only be assessed by examination of the privileged communication.").

Recently, in *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2016 U.S. Dist. LEXIS 105619, at *36 (N.D. Cal. Aug. 9, 2016), the Northern District of California echoed this reasoning when it held in a reverse-payment case just like this one that a "party cannot testify to its subjective beliefs about the reasons for entering into the settlement and preclude its adversaries from discovering the content of the lawyers' advice by simply asserting that the attorney-client advice was irrelevant to those subjective beliefs." The court noted that

"Attorney-client privilege issues lie at the heart of litigation over a settlement alleged to be anticompetitive when a party's lawyers are the principal negotiators and advisors regarding the agreement." *Id.* at *36. The court then went on to hold that if "the record shows that attorney-client advice played a significant role in formulating a party's subjective beliefs on central issues in the case, the adversaries are entitled to disclosure of the otherwise privileged material to test the credibility of those subjective beliefs." *Id.* Based on the foregoing, the court held "*if* defendants choose to rely on a subjective belief . . . that the record shows directly implicate[s] attorney-client advice, defendants will have effectuated an at-issue waiver for that belief and will be required to produce withheld privileged documents." *Id.* at *52. In that regard, that *Lidoderm* court held that "[a]ny attempt to rely on a subjective belief regarding the strength of the relevant patents and expectations concerning the outcome of the Watson patent litigation would create an at-issue waiver . . . [and] [g]iven that the subject matter here *is the Watson patent litigation* and the justifications for resolving that litigation, these subjective beliefs necessarily involve attorney-client advice." *Id.* at *54 (citing *Xuedan Wang v. Hearst Corp.*, No. 12 CV 793, 2012 U.S. Dist. LEXIS 179609, at *8 (S.D.N.Y. Dec. 19, 2012)).

Here, much like in *Lidoderm*, Forest's assertions regarding the underlying merits of the patent litigation, and that in negotiating the settlement Forest "considered the merits of their respective litigation positions" and negotiated an entry date "reflecting [its] assessment of the strength of the patent," necessarily implicates purportedly privileged information regarding Forest's legal analysis of the patent merits, and Forest's mental processes during the settlement negotiations. *See Arista Records LLC*, 2011 U.S. Dist. LEXIS 42881, at *7 (a party "may not assert that it believed its conduct was lawful, and simultaneously claim privilege to block inquiry into the basis for the party's state of mind or belief"); *Leviton*, 2010 U.S. Dist. LEXIS 128849, at

*7-8;  *In re Veeco Instruments, Inc., Sec. Litig.*, No. 05-MC-01695, 2007 U.S. Dist. LEXIS 102363, at *23 (S.D.N.Y. June 28, 2007)  (when a party "puts at issue his understanding of the law based on the advice of counsel, the defendant has waived any applicable privilege relating to those communications") (citations omitted).

Similarly, Forest's assertions that it "acted in good faith" (12th Affirmative Defense) and that Forest believed the patent settlement agreements were "bona fide" (29th Affirmative Defense) and for "fair value." (30th Affirmative Defense), place Forest's internal analysis at issue for the same reasons.  An assertion of a "good-faith defense involves an inquiry into state of mind," and thus "typically calls forth the possibility of implied waiver of the attorney-client privilege.  *In re Cty. of Erie*, 546 F.3d at 228-229.  Here, Forest "cannot be permitted, on the one hand, to argue that they acted in good faith and without an improper motive and then, on the other hand, to deny [] access to the advice given by counsel where that advice . . . played a substantial and significant role in formulating [their] actions."  *Pereira v. United Jersey Bank*, No. 94 Civ. 1565, 1997 U.S. Dist. LEXIS 19751, at *17 (S.D.N.Y. Dec. 11, 1997); *Leviton Mfg.*, 2010 U.S. Dist. LEXIS 128849, at *7.

Thus, as a matter of fairness to test the veracity of Forest's "good faith" assertions, Plaintiffs are entitled to examine Forest's internal discussions about the amendment, to determine whether the estimated ███████████████ truly reflected "fair value for services," or that Mylan was paid off to delay generic competition.  Likewise, in light of Forest's assertion that the reverse payments in the patent settlement agreements reflected avoided litigation costs,[54] Plaintiffs are entitled to review Defendants' anticipated litigation costs to test

---

[54] ECF No. 57, at 36; Reply Mem. in Further Supp. of Defs. Forest and Merz's Mot. to Dismiss Indirect Purchaser Pls.' Class Action Compl. and Direct Purchaser Plaintiffs' First Am. Class

the truthfulness of that statement.

## IV.    CONCLUSION

Plaintiffs cannot reasonably forgo discovery on highly relevant or potentially dispositive defenses. Forest has failed to raise any legitimate objections for their refusal to provide adequate discovery related to patent documents, patent litigation documents, and documents related to the various settlement agreements. For these reasons, the Court should grant Plaintiffs' motion to compel production of the above categories of documents. Additionally, if Forest continues to assert affirmative defenses that in fairness require disclosure of privileged documents and communications to test, Forest must produce such privileged materials. Alternatively, Forest must be precluded from asserting such defenses.

Dated: April 12, 2017

Respectfully Submitted:

**Rochester Drug Co-Operative, Inc. and the Proposed Class**

David F. Sorensen
Daniel C. Simons
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (fax)
dsorensen@bm.net
dsimons@bm.net

**JM Smith Corporation d/b/a Smith Drug Company and the Proposed Class**

Bruce E. Gerstein
Joseph Opper
Kimberly M. Hennings
Dan Litvin
Garwin Gerstein & Fisher LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
bgerstein@garwingerstein.com
jopper@garwingerstein.com
khennings@garwingerstein.com
dlitvin@garwingerstein.com

Action Compl., February 12, 2016 at 24, ECF No. 76.

Peter Kohn
Joseph T. Lukens
Faruqi & Faruqi, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com
jlukens@faruqilaw.com

David C. Raphael, Jr.
Erin R. Leger
Smith Segura & Raphael, LLP
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
draphael@ssrllp.com

Stuart E. Des Roches
Andrew W. Kelly
Odom & Des Roches, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
stuart@odrlaw.com

Russ Chorush
Miranda Jones
Heim Payne & Chorush, LLP
600 Travis, Suite 6710
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
rchorush@hpcllp.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2017, I electronically filed the above Notice by CM/ECF system.

Respectfully submitted

Dan Litvin