IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

In re Namenda Direct Purchaser Antitrust
Litigation

THIS DOCUMENT RELATES TO:
All Direct Purchaser Actions

Case No. 1:15-cv-07488-CM (JF)

**MEMORANDUM OF LAW IN SUPPORT OF FOREST'S
MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS
<u>BY THE DIRECT PURCHASER PLAINTIFFS</u>**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..........................................................................................................ii

INTRODUCTION ......................................................................................................................1

BACKGROUND ........................................................................................................................2

ARGUMENT ............................................................................................................................4

I.   THE REQUESTED MATERIALS ARE RELEVANT AND DISCOVERABLE ..................4

    A.   Downstream Discovery Is Relevant to Liability and Class Certification Issues..........5

        1.   Downstream Discovery Is Necessary to Disprove DPPs' Liability Case ...........5

        2.   Downstream Discovery Is Relevant to Determining Whether DPPs'
              Proposed Class is Ascertainable and Whether Common Issues Predominate ....7

        3.   Downstream Discovery Is Relevant to Assessing Class-Wide Impact,
              Injury, and Damages..........................................................................................8

    B.   Forest Is Entitled to Downstream Discovery to Determine Whether the Cost-Plus
       Exception Applies ....................................................................................................10

II.  FOREST'S DISCOVERY REQUESTS ARE NOT UNDULY BURDENSOME ................12

CONCLUSION........................................................................................................................13

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979).................................................................6

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946)............................................................................10

*Brecher v. Republic of Argentina*,
802 F.3d 303 (2d Cir. 2015)................................................................7

*Chattanooga Foundry & Pipe Works v. City of Atlanta*,
203 U.S. 390 (1906)............................................................................9

*DNAML Pty, Ltd. v. Apple Inc*,
25 F. Supp. 3d 422 (S.D.N.Y. 2014).................................................10

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968).......................................................................1, 11

*Hickman v. Taylor*,
329 U.S. 495 (1947)............................................................................5

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
424 F.3d 363 (3d Cir. 2005)................................................................9

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977).......................................................................1, 11

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)................................................................8

*In re Initial Pub. Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006)..................................................................7

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008)...................................................................8

*In re Pharm. Indus. Average Wholesale Price Litig.*,
491 F. Supp. 2d 20 (D. Mass. 2007) ................................................12

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    No. 13-MD-2445, 2016 U.S. Dist. LEXIS 83499 (E.D. Pa. June 27, 2016) ........................2, 6

*In re Urethane Antitrust Litig.*,
    237 F.R.D. 454 (D. Kan. 2006)....................................................................................................7

*Meijer, Inc. v. Warner Chilcott Holdings Co.*,
    245 F.R.D. 26 (D.D.C. 2007)....................................................................................................12

*Mylan Pharm. Inc. v. Warner Chilcott plc*,
    838 F.3d 421 (3d Cir. 2016)........................................................................................................5

*Mylan Pharm. Inc. v. Warner Chilcott plc*,
    No. 12-3824, 2015 U.S. Dist. LEXIS 50026 (E.D. Pa. Apr. 16, 2015)....................................6

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) .............................................................................................2, 7

*Walgreen Co. v. AstraZeneca Pharm. L.P.*,
    534 F. Supp. 2d 146 (D.D.C. 2008)...........................................................................................5

*West Virginia v. Chas. Pfizer & Co.*,
    440 F.2d 1079 (2d Cir. 1971)...................................................................................................11

## STATUTES AND RULES

Fed. R. Civ. P. 26 .............................................................................................................4, 5, 12

iii

**INTRODUCTION**

Defendants Forest Laboratories, Inc., Forest Laboratories, LLC, Forest Laboratories Holdings Ltd., and Actavis plc (collectively "Forest"), bring this motion to compel Direct Purchaser Plaintiffs JM Smith Corporation and Rochester Drug Co-Operative, Inc. ("DPPs") to produce documents pertaining to "downstream" discovery.

DPPs have brought an antitrust action seeking class action status and potentially significant treble damages, yet they refuse to produce documents or data concerning their interactions with their customers. DPPs justify this refusal by asserting that *Hanover Shoe* and *Illinois Brick* render irrelevant all activity that occurred below DPPs in the chain of distribution. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968). In short, DPPs have made a unilateral, preemptive determination on the legal merits of certain defenses in order to evade discovery.

But, as set forth below, neither of those decisions precludes downstream discovery where — as here — such discovery is relevant to liability issues or other exceptions to the general rule barring downstream discovery in direct purchaser actions. To establish liability, causation and damages on DPPs' product hopping claim, DPPs must prove (1) that Forest's announcement of its intent to remove Namenda IR from the market caused patients who were taking Namenda IR to switch to Namenda XR, and (2) that patients who switched due to the announcement failed to switch back to generic versions of Namenda IR after they became available due to Forest's conduct. The discovery Forest seeks is relevant because it may show that patients switched to

Namenda XR (and did not switch back) for reasons other than Forest's conduct and that DPPs' claims are subject to other exceptions to the rule barring a downstream pass-on defense.

Moreover, downstream discovery is highly relevant to class certification issues. Well-reasoned decisions have made clear that *Hanover Shoe* and *Illinois Brick* do not limit *discovery* as to liability and class certification issues. *See Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1192 (11th Cir. 2003) (determining that neither case bars downstream discovery in evaluating class certification); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2016 U.S. Dist. LEXIS 83499, at *16 (E.D. Pa. June 27, 2016) (finding downstream discovery relevant to issues of liability).

## BACKGROUND

DPPs are regional wholesale distributors of pharmaceutical products, including brand name and generic drugs. Forest manufactures and sells a variety of treatments for moderate to severe Alzheimer's disease ("AD"), including: Namenda IR oral solution; Namenda XR, a once-daily tablet treatment; and Namzaric, a combination of Namenda XR and Aricept. Forest entered the AD market in 2004 when it began offering twice-daily Namenda IR tablets to patients in the United States. In response to several competitors offering once-daily AD treatments, Forest began developing Namenda XR, its once-daily treatment that received FDA approval in June 2010 and which was first offered for sale in June 2013.

Due to the benefits of a once-daily AD treatment over a twice-daily option, patients began switching from Namenda IR to Namenda XR. With sales of Namenda XR increasing, Forest announced on February 14, 2014 that it would discontinue Namenda IR effective August 15, 2014, although Namenda IR oral solution would remain available. Forest, however, did not

discontinue the sale of Namenda IR tablets at that time.  Instead, on June 10, 2014, Forest announced that it would continue selling the tablets into the fall.  Thereafter, on September 15, 2014, the New York Attorney General filed suit to enjoin Forest from discontinuing Namenda IR until after generic entry, and Judge Sweet entered an order granting the injunction on December 15, 2014.  There is no dispute that Forest continued to sell Namenda IR tablets until at least 30 days after July 11, 2015, the date when generic versions of Namenda IR became available.

Nevertheless, DPPs bring this action against Forest alleging (among other things) that (1) even though Forest did not remove Namenda IR tablets from the market until after generic entry, its announced intention to discontinue Namenda IR coerced patients to switch to Namenda XR, and (2) these patients were not likely to and did not switch back to generic Namenda IR once it became available.  In essence, DPPs contend that Forest's announced discontinuation of Namenda IR sales, standing alone, foreclosed generics from competing for Namenda patients.

On September 13, 2016, this Court entered a Memorandum Decision and Order Denying Defendants' Motions to Dismiss, ECF No. 106 ("Order").  In the Order, the Court acknowledged that the December 2014 injunction "blunted much of the success" of Forest's efforts to use potentially anticompetitive conduct to switch patients from Namenda IR to Namenda XR (Order at 19), and that many patient "switches surely resulted from the Company's soft-switch campaign."  Order at 19-20.  But the Court also held that DPPs might establish injury in fact for a limited set of customers: those who "switched to Namenda XR because of the announced withdrawal of Namenda IR" before the injunction was entered in December 2014, and who were forced to continue paying for Namenda XR "*after* generic entry" in July 2015.  Order at 24.

On January 31, 2017, Forest served its First Set of Requests for Production of Documents ("RFPs").  Given the importance of determining the number of patients who switched from Namenda IR to Namenda XR and the reasons why they switched, Forest requested sales data and documents for the purpose of assessing certain key issues in this case, including: (1) prices DPPs charged their customers for AD treatments and how those prices impacted customer choice; (2) insurance coverage and reimbursement information; (3) profitability; (4) decisions to discontinue or modify DPPs' distribution of AD treatments; (5) any license or supply agreements regarding Namenda; and (6) contracts with DPPs' customers for the sale of AD treatments.  This included information on whether wholesaler discounting practices incentivized switching to Namenda XR or created disincentives for switching to generic Namenda IR.

On March 3, 2017, DPPs served their objections and responses to the RFPs, in which DPPs objected and refused to produce any documents responsive to Requests 11, 25, 38-39, 42, 44-45, 124-131, 144-145, 156, and 168-169, on the basis that they sought "downstream discovery."  Ex. 1 to the Decl. of Michael E. Hamburger, dated May 17, 2017.  From April 3 to April 20, 2017, the parties exchanged letters regarding DPPs' objections.  During a telephone call on April 26, 2017, DPPs agreed to produce the materials sought in Requests 11, 25, 45, 124-131 and 156, despite their downstream discovery objection.  DPPs, however, maintain that they will not produce information sought by Requests 38-39, 144-145, and 168-169, or sales data.

## ARGUMENT

## I.      THE REQUESTED MATERIALS ARE RELEVANT AND DISCOVERABLE

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ."  Fed. R. Civ. P. 26(b)(1).  Such information "need not be

4

admissible in evidence to be discoverable." *Id.*  In applying this Rule, the Supreme Court has made clear that pretrial discovery is "accorded broad and liberal treatment." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).  As discussed below, the requested discovery is relevant at the very least (1) to rebut DPPs' contention that Forest's conduct caused the injuries complained of in the Complaint, (2) to evaluate whether DPPs' forthcoming class certification motion should be granted, and (3) to determine the applicability of the cost-plus exception to the bar on asserting a downstream pass-through defense.

A.      **Downstream Discovery Is Relevant to Liability and Class Certification Issues**

The requested materials are relevant to contesting DPPs' theory of liability and whether a DPP class should be certified — areas that other courts have found warrant compelling direct purchasers to produce downstream discovery.

1.      **Downstream Discovery Is Necessary to Disprove DPPs' Liability Case**

For DPPs to succeed on their product hopping claim, they must prove that (1) "they were forced to pay for certain patients' memantine treatment at brand-name prices because these patients switched to Namenda XR *prior* to the entry of the injunction," and (2) the DPPs continued "having to pay for Namenda XR *after* generic entry" as a result of anticompetitive conduct by Forest.   Order at 24.   Within the context of DPPs' product hopping claims, anticompetitive conduct is that "which prevents actual or potential rivals from competing or impairs their opportunities to do so effectively." *Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 150 (D.D.C. 2008) (citation omitted).   A crucial component of this inquiry is whether generic manufacturers were foreclosed from competing for customers in the relevant product market. *Mylan Pharm. Inc. v. Warner Chilcott plc*, 838 F.3d 421, 438 (3d Cir. 2016)

5

(finding that because generics were not "foreclosed from the market," the alleged product hop was not anticompetitive and could not constitute a Section 2 violation); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir. 1979) (recognizing that Section 2 claims require proof that a "'substantial' amount of competition is foreclosed").

Downstream discovery is relevant to all of these issues.  First, downstream discovery may show the extent to which factors other than Forest's announced discontinuation of Namenda IR influenced patients' prescription choices, including prices of the products at issue and efforts by DPPs to steer patients to particular drugs at specific times.  If patients chose to shift from taking Namenda IR to taking Namenda XR for any reason other than the alleged "hard switch" — such as the actions of DPPs themselves — then DPPs have failed to prove Forest's conduct caused their alleged injury.  Order at 20-21.

Second, DPPs apparently intend to argue that Forest's conduct foreclosed generic competition via AB-rated substitution by proving a price "disconnect," meaning that "price does not drive prescriptions for Namenda IR or other Alzheimer's medications."  First Am. Class Action Compl. ¶¶ 15, 212, ECF No. 26 ("Compl.").  Downstream discovery will clarify whether DPPs' price disconnect theory has merit, or whether generic competitors could nevertheless compete with Forest despite the alleged product hop through "advertising, promotion, cost competition, or superior product development."  *See Mylan Pharm. Inc. v. Warner Chilcott plc*, No. 12-3824, 2015 U.S. Dist. LEXIS 50026, at *40 (E.D. Pa. Apr. 16, 2015).  Because DPPs allege this supposed price disconnect and that purchasers of Namenda XR were coerced into switching, Forest should be given access to "evidence which disproves these allegations." *Suboxone*, 2016 U.S. Dist. LEXIS 83499, at *16 (overruling Magistrate Judge's recommendation

6

to deny discovery based on the *Hanover Shoe* bar because "downstream evidence . . . is potentially relevant to issues of liability under a product hop theory").

> ## 2. Downstream Discovery Is Relevant to Determining Whether DPPs' Proposed Class is Ascertainable and Whether Common Issues Predominate

Downstream discovery is also relevant to a number of class certification issues, including ascertainability and predominance. *See Valley Drug*, 350 F.3d at 1192 (refusing to permit *Hanover Shoe* and *Illinois Brick* to bar "this court from exercising its duty to conduct an inquiry into whether the plaintiffs' proposed class satisfies the four requirements of Rule 23(a)"); *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 461 (D. Kan. 2006) (finding downstream discovery relevant to class certification). Although ascertainability and predominance may have overlapping inquires, they are distinct issues and DPPs must establish both in order to obtain class certification. *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 45 (2d Cir. 2006).

The ascertainability criterion focuses on "whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher v. Republic of Argentina*, 802 F.3d 303, 304 (2d Cir. 2015) (internal quotations omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.* at 305 (internal quotations omitted). Not only must DPPs show that their class is ascertainable, they also must put forward a method of proving that common questions of law and fact predominate over individualized questions. This can be particularly difficult in antitrust cases, where individual injury or antitrust "impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is

7

an element of the claim that may call for individual, as opposed to common, proof." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).

As noted above, DPPs may only recover, if at all, for purchases of Namenda XR they made in order to serve patients who were coerced into switching to Namenda XR due to the purported "hard switch." Order at 19-21. Here, the Court has acknowledged that "[m]any of those switches surely resulted from the Company's soft-switch campaign," rather than the allegedly unlawful hard switch conduct. Order at 19-20. Thus, the downstream discovery Forest seeks goes directly to whether DPPs can demonstrate a viable, practical way of ascertaining class membership, and show through class-wide proof that class members suffered cognizable harm. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008) ("In antitrust class actions, common issues do not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be established through common proof."). Although the DPPs bear the burden of proof on these issues, Forest should not be prevented from obtaining discovery that may be used to rebut the proof DPPs ultimately advance.

### 3. Downstream Discovery Is Relevant to Assessing Class-Wide Impact, Injury, and Damages

In addition, downstream discovery is necessary — separate and apart from the pass-on issues relating to *Hanover Shoe —* to inform other class certification and damages issues in this case. Indeed, to the extent that DPPs are attempting to limit discovery based on the cost-plus issue, discovery may reveal that *Hanover Shoe* does not apply at all. Furthermore, as noted above, Rule 23 requires DPPs to prove class-wide impact in order to certify any proposed class. Similarly, DPPs must demonstrate a sound methodology for proving class-wide damages.

8

DPPs contend that they are entitled to treble damages based on "overcharges." *See* Compl. at 79 (requesting the Court to "[a]ward the class damages (*i.e.*, three times overcharges) in an amount to be determined at trial"). But on its face, a damages methodology based on overcharges is inapplicable here. An overcharge is simply the difference between the price that a plaintiff paid for a product and an estimate of the price that plaintiff would have paid for that *same* product absent the alleged anticompetitive conduct. *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 395-96 (1906) (allowing plaintiff to recover damages based on difference between the price paid and the price it would have paid for the same piping); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 374 (3d Cir. 2005) (defining an overcharge as "the difference between the price paid for goods actually purchased [artificial teeth] and the price that would have been paid [for the same artificial teeth] absent the illegal conduct"). The latter estimate is also known as the "but for" price, *i.e.* the estimated price but for the alleged conspiracy.

Here, however, DPPs are attempting to construct an overcharge theory based on differences in the prices of *different* products, that is, Namenda XR and Namenda IR. For example, DPPs allege that "[b]ut for defendants' anticompetitive conduct, plaintiff and members of the Class would have paid less for memantine hydrochloride by: (a) substituting purchases of less-expensive AB-rated generic Namenda IR for their purchases of more-expensive branded Namenda IR and/or Namenda XR . . . and (c) purchasing Namenda IR at lower prices sooner." Compl. ¶ 229. Thus, DPPs are not seeking overcharges on a single product, the type of damages at issue in *Hanover Shoe*, *Illinois Brick*, and countless other cases. Rather, DPPs are impermissibly seeking overcharges based on differences in the prices of different products.

9

The thrust of DPPs' allegations is that Forest delayed the entry of generic Namenda IR and forced a switch to Namenda XR.  In essence, DPPs claim that Forest made generic Namenda IR unavailable to them, closely mirroring an antitrust action based on a refusal to sell.  As the refusal-to-sell cases make clear, the correct measure of damages in those scenarios is not overcharges, but rather lost profits.  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) (employing a lost profits analysis); *cf. DNAML Pty, Ltd. v. Apple Inc,* 25 F. Supp. 3d 422, 429-30 (S.D.N.Y. 2014) (finding that a lost profits analysis was a proper method for determining damages).  Stated another way, DPPs argue that they would have preferred to sell a certain product (generic Namenda IR), but were not able to do so due to Forest's conduct.  In such a situation the proper measure of damages is the profits, if any, that DPPs lost from being unable to sell their preferred product.

At this stage, the Court is not called upon to decide these class certification and merits issues.  However, all of the issues discussed above are contested and critical to the case.  For that reason, Forest respectfully requests that DPPs be ordered to produce the downstream data and documents we seek, which will enable Forest to assess and to substantiate whether DPPs lost profits due to Forest's conduct.  The downstream discovery will better inform the Court and the parties of the issues relevant to class certification and damages.

**B.     Forest Is Entitled to Downstream Discovery to Determine Whether the Cost-Plus Exception Applies**

As regional wholesalers, DPPs are not the end consumers of the prescription drugs at issue in this case.  DPPs purchase and then resell prescription drugs to their customers, including retail pharmacies.  As is common in the pharmaceutical industry, wholesalers typically resell

prescription drugs pursuant to cost-plus contracts.  *See West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1088 (2d Cir. 1971) ("The record below makes it clear that the arrangements under which the wholesalers and retailers resold these products were, in virtually all cases, cost plus a set percentage markup . . . .").  Therefore, to the extent that DPPs allege harm resulting from their purchases of Namenda XR, some or all of the alleged injury from any inflated prices may have simply been passed on to DPPs' customers on a cost-plus basis.  According to DPPs, these downstream issues are irrelevant under the general prohibition on the use of a pass-on defense in federal antitrust cases.  *See Hanover Shoe*, 392 U.S. at 489-90.

The bar on asserting a pass-on defense, however, is subject to certain exceptions, including the so-called cost-plus exception.  *See Hanover Shoe*, 392 U.S. at 494 (acknowledging pass-on defense may apply where a cost-plus contract is in issue); *Chas. Pfizer & Co.*, 440 F.2d at 1088.  Within the context of this suit, cost-plus sales are those where a wholesaler prices on the basis of its acquisition cost plus a fixed margin.  As the Supreme Court noted in *Illinois Brick*, "[t]he effect of the overcharge [in a cost-plus situation] is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case."  431 U.S. at 736.

Because it is common for wholesalers to resell pharmaceutical products on a cost-plus basis, Forest has reason to believe that downstream discovery from DPPs will show that they utilize cost-plus pricing for sales of pharmaceuticals to their customers, and therefore cannot recover damages for their alleged injuries.

While DPPs have told Forest that they do not have contracts with customers obligating them to purchase specific quantities of products at a fixed markup, DPPs have steadfastly refused

to explain the different pricing arrangements they have with customers.  DPPs' stonewalling thus has prevented Forest from exploring whether DPPs' resale practices fall within the cost-plus exception.  At the very least, DPPs should be required to produce their customer contracts and documents showing how DPPs price to their customers, rather than forcing Forest to rely on DPPs' representations alone.  *See, e.g.*, *Meijer, Inc. v. Warner Chilcott Holdings Co.*, 245 F.R.D. 26, 35 (D.D.C. 2007) (holding that defendant was "entitled to explore the applicability of a cost plus exception" permitted under *Hanover Shoe*).  At this phase of the litigation, DPPs should not have the ability to determine unilaterally that the cost-plus exception does not apply and curtail discovery of downstream data and documents.

## II.    FOREST'S DISCOVERY REQUESTS ARE NOT UNDULY BURDENSOME

To the extent DPPs argue that the "burden or expense of the proposed discovery outweighs its likely benefits," that argument should be rejected.  Fed. R. Civ. P. 26(b)(1).  DPPs have never explained why the production of such information would be unduly burdensome, or even the total number of documents they are withholding pursuant to their downstream discovery objection.  And to the extent they argue that the information could be obtained from public sources like IMS Health, Inc., DPPs ignore that IMS data is no substitute for the transactional data DPPs possess.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 102 (D. Mass. 2007) (noting "IMS data did not provide a clear representation" of prices of a pharmaceutical product).  Among other things, IMS data sheds no light on whether DPPs were injured based on their purchases of Namenda XR, including whether DPPs' customers were coerced into switching to Namenda XR because of potentially unlawful hard switch conduct, or made the decision to switch for other reasons.  Because the downstream information sought here

12

is relevant and DPPs have provided no concrete basis for their contention that the information is

unduly burdensome, the downstream discovery should be produced.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Forest's Motion to Compel.


Dated:  May 17, 2017

*/s/ Heather K. McDevitt*

Heather K. McDevitt
Martin M. Toto
Jack E. Pace III
Kristen O'Shaughnessy
Michael E. Hamburger
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

J. Mark Gidley
Peter J. Carney
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

Kevin C. Adam
WHITE & CASE LLP
75 State Street, Floor 24
Boston, MA 02109
Telephone: (617) 979-9300
Facsimile: (617) 979-9301
kevin.adam@whitecase.com

**Counsel for Defendants Actavis plc, Forest Laboratories, LLC, Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd.**

13