UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -:

IN RE NAMENDA DIRECT PURCHASER   :   15 Civ. 7488 (CM) (JCF)
ANTITRUST LITIGATION           :

                                 :        MEMORANDUM
                                 :        <u>AND ORDER</u>

                                 :

                                 :

- - - - - - - - - - - - - - - - - -:

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

     This is a putative class action asserting violations of antitrust law by defendants Actavis plc (now known as Allergan plc) and Forest Laboratories, LLC (together, "Forest") in connection with the patented Alzheimer's drugs Namenda IR and Namenda XR (brand names for memantine hydrochloride). The plaintiffs, JM Smith Corp. and Rochester Drug Co-Operative, Inc. (known in the motion papers as "DPPs," an abbreviation of "Direct Purchaser Plaintiffs") are entities that purchased the relevant products directly from Forest for resale to pharmacies. Forest has filed a motion to compel the plaintiffs to produce so-called "downstream" discovery, which is a general term for data and other information related to the plaintiffs' own distribution and sales. Specifically, it seeks information regarding analyses of the profitability of the distribution of brand name as opposed to generic medications, as well as sales data. The motion is denied.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/21/17

1

Background

The motion at issue is connected to allegations that Forest violated Section 2 of the Sherman Act, 15 U.S.C. § 2, when it engineered a scheme by which it would attempt to force patients and physicians to switch from Namenda IR (a medication that is taken twice each day) to Namenda XR (a pharmacologically identical drug that is taken once each day) "by effectively removing Namenda IR from the market before its patent exclusivity period expired and a generic substitute to the Namenda drugs became available."[1] Namenda III, 2016 WL 4992690, at *1. Because, under FDA regulations, generic versions of Namenda IR are not "therapeutically equivalent" to brand name Namenda XR, "pharmacists are prohibited from substituting generic IR for Namenda XR under most, if not all, state drug substitution laws,"

---

[1] As I noted in an earlier opinion, In re Namenda Direct Purchaser Antitrust Litigation, No. 15 Civ. 7488, 2017 WL 2226591, at *1 n.2 (S.D.N.Y. May 19, 2017), the Honorable Colleen McMahon, C.J., addressed Forest's motions to dismiss in three coordinated cases in Sergeants Benevolent Association Health & Welfare Fund v. Actavis, PLC ("Namenda III"), Nos. 15 Civ. 6549, 15 Civ. 7488, 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016). Further background can be found in that opinion, Judge McMahon's opinion on competing partial summary judgment motions, In re Namenda Direct Purchaser Antitrust Litigation ("Namenda IV"), No. 15 Civ. 7488 (S.D.N.Y. May 23, 2017), and in decisions in a related 2014 case brought by the State of New York against Actavis and Forest, New York v. Actavis, PLC ("Namenda I"), No. 14 Civ. 7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014), and New York ex rel. Schneiderman v. Actavis PLC ("Namenda II"), 787 F.3d 638 (2d Cir. 2015).

which give a preference to generic drugs over brand name ones in order to foster competition. Namenda II, 787 F.3d at 644-47.

When Forest introduced Namenda XR into the market in July 2013 (approximately two years before Namenda IR's patent exclusivity period ended), it adopted a number of strategies to encourage physicians and patients to switch to Namenda XR, such as promoting Namenda XR at the expense of Namenda IR and making Namenda XR less expensive than Namenda IR. Id. at 647-48. These efforts are known as "soft switch" tactics. Id. at 648; Namenda III, 2016 WL 4992690, at *4. In February 2014, however, Forest began to engineer a "hard switch" by announcing that Namenda IR would no longer be available after August 15, 2014, a date that was later extended to fall 2014. Namenda II, 787 F.3d at 648. This prompted an antitrust action by the State of New York, which resulted in a "standstill" -- beginning in September 2014 -- on the plan to discontinue Namenda IR, and, on December 15, 2014, a preliminary injunction requiring Forest to continue manufacturing Namenda IR. Id. at 648-50, 663. That, in turn, inspired this litigation, which alleges that Forest's anticompetitive conduct damaged the plaintiffs by forcing them to pay for some patients' treatments at brand name, rather than generic, prices because those patients switched to Namenda XR before the preliminary injunction was issued. Namenda III, 2016 WL 4992690, at *12.

On May 23, 2017, Judge McMahon issued <u>Namenda IV</u>. In that
decision, she granted in part the plaintiffs' motion for partial
summary judgment, finding that "key facts" as to Forest's violation
of Section 2 of the Sherman Act were previously litigated in the
antitrust action brought by the State of New York (which resulted
in <u>Namenda I</u> and <u>Namenda II</u>) and must be deemed established here.
<u>Namenda IV</u>, No. 15 Civ. 7488, slip op. at 18. Specifically,

> Forest is precluded from re-litigating the questions of
> (1) whether it possessed monopoly power over the U.S.
> memantine market up until the entry of generic
> competition; (2) whether its February 2014 announcement
> of the upcoming discontinuation of Namenda IR was
> coercive and anticompetitive; and (3) whether Forest had
> any non-pretextual procompetitive justification for its
> illegal conduct.

<u>Id.</u> at 33. However, Judge McMahon did not grant summary judgment
as to liability on the claim because the previous litigation did
not address "questions of causation and injury," that is, whether
Forest's illegal scheme was a materially contributing factor to
the plaintiffs' injuries. <u>Id.</u> at 33-34.

In this motion, submitted mere days before the <u>Namenda IV</u>
decision was filed, Forest requests documents from the plaintiffs
that concern their profits from the distribution of the drugs at
issue. Specifically, the six requests in question seek (1)
documents "concerning any analysis of the profitability of
distributing, and/or servicing the distribution of" brand name

4

pharmaceuticals and generic pharmaceuticals, "including any financial modeling or analyses" that the plaintiffs "conducted or received," whether or not they could be used for or applied to Alzheimer's treatments (Direct Purchaser Plaintiffs' Objection and Responses to Defendants' First Request for Production of Documents ("Responses to RFPs"), attached as Exh. 1 to Declaration of Michael E. Hamburger dated May 17, 2017, at 29, 93-94 (Request Nos. 38-39, 144-45)); and (2) documents "concerning the profitability of any of the putative class members' distribution and/or servicing of sales of brand name pharmaceuticals relative to their distribution and/or servicing of generic versions of brand name pharmaceuticals," including documents related to the profitability of the Namenda products relative to their generic versions. (Responses to RFPs at 104 (Request Nos. 168-169).

The plaintiffs contend that data regarding "downstream" sales are "presumptively irrelevant" pursuant to the Supreme Court's decisions in <u>Hanover Shoe, Inc. v. United Shoe Machinery Corp.</u>, 392 U.S. 481 (1968), and <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977), but note that, even so, they have agreed to produce certain "downstream" materials in response to Forest's other document requests. (Direct Purchaser Plaintiffs' Memorandum in Opposition to Forest's Motion to Compel the Production of Documents ("Pl. Memo.") at 1, 3-4, 4 n.6; Memorandum of Law in Support of

Forest's Motion to Compel the Production of Documents by the Direct Purchaser Plaintiffs ("Def. Memo.") at 4).  Forest disagrees with the plaintiffs' reading of <u>Hanover Shoe</u> and <u>Illinois Brick</u>, and asserts that the requested documents are relevant to the plaintiffs' liability case, to class certification, and to "the so-called cost-plus exception" to establishing damages.[2]  (Def. Memo. at 1-2, 11).

Discussion

A.  Relevance

Rule 26(b)(1) allows discovery of

any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).  This recently-amended rule is intended to "encourage judges to be more aggressive in identifying and discouraging discovery overuse" by emphasizing the need to analyze

---

[2] A "cost-plus" contract has been defined as an agreement in which the "customer is committed to buying a fixed quantity regardless of price," thus insulating the upstream purchaser "from any decrease in its sales as a result of attempting to pass on the overcharge," <u>Illinois Brick</u>, 431 U.S. at 736, or an agreement by an indirect purchaser "to purchase a fixed quantity, paying the direct purchaser's costs plus a predetermined additional fee," <u>Simon v. KeySpan Corp.</u>, 694 F.3d 196, 202 (2d Cir. 2012).

proportionality before ordering production of relevant information. Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment. Relevance is still to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on," any party's claim or defense. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). The burden of demonstrating relevance remains on the party seeking discovery, and the party resisting discovery generally has the burden of showing undue burden or expense. Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment; see also Fireman's Fund Insurance Co. v. Great American Insurance Co. of New York, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) ("Once relevance has been shown, it is up to the responding party to justify curtailing discovery." (quoting Trilegiant Corp. v. Sitel Corp., 275 F.R.D. 428, 431 (S.D.N.Y. 2011))). Information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

Here, the plaintiffs argue primarily that Forest has failed to show relevance. Noting that the court may proscribe certain discovery if it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," Fed. R. Civ. P. 26(b)(2)(C), the plaintiffs contend that, because the materials requested are not

relevant, "any burden on [them] is too great."[3]  (Pl. Memo. at 5).

B.  "Downstream" Discovery

In  Hanover  Shoe, the Supreme Court addressed an anticompetitive scheme in which the defendant, United Shoe Machinery Corp. ("United"), "monopolized the shoe machinery industry" by "leasing and refusing to sell its more complicated and important shoe machinery" to shoe manufacturers like Hanover Shoe, Inc. ("Hanover").  392 U.S. at 483.  The district court had found that if United had sold the relevant machines, Hanover would have bought them rather than leased them, and determined the amount of Hanover's damages as the difference between the cost to Hanover of the lease and the price United would have charged to sell its machines, trebled.  Id. at 487.

Before the Supreme Court, United argued that "Hanover suffered no legally cognizable injury" because "the illegal overcharge . . . was reflected in the price charged for shoes by Hanover to its customers and that Hanover, had it bought the machines at lower prices, would have charged less and [therefore] made no [greater] profit."  Id. at 487-88.  Relying on other

---

[3] The plaintiffs further contend that certain documents are beyond the scope of the requests for production at issue.  (Pl. Memo. at 5, 12, 16).  Because I find that Forest has not established that the information is relevant, I do not address this argument.

8

antitrust actions holding that "the possibility that plaintiffs had recouped [] overcharges from their customers was [] irrelevant in assessing damages," the Supreme Court decided that "when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage." Id. at 489-90. The Court was influenced by complications of proof that approving this "passing-on defense" would allow, anticipating that "[t]reble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories" about the costs allegedly transferred to later customers. Id. at 493-94. In rejecting the general applicability of a passing-on defense, however, the Court recognized that it might be available in limited circumstances, such as when "an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged." Id. at 494.

Illinois Brick addressed whether the "pass-on" theory could be used "offensively by an indirect purchaser plaintiff against an alleged violator" of antitrust laws. 431 U.S. at 726. Illinois Brick Co. ("Illinois Brick") manufactured and distributed concrete block that it sold primarily to masonry subcontractors; these subcontractors submitted bids to general contractors who in turn

submitted bids to customers such as the State of Illinois ("the State"). Id. The State alleged that Illinois Brick engaged in a price-fixing conspiracy resulting in an overcharge of more than $3 million. Id. at 726-27. However, the only way that the alleged antitrust violation could have damaged the State was if the overcharge was passed on to the State by masonry and general contractors "rather than being absorbed at the first two levels of distribution." Id. at 727.

Faced with arguments to "cut back or abandon" Hanover Shoe, the Court instead reaffirmed the rule of the earlier case largely rejecting the use of pass-on theories, noting, again, the complexity that such theories would add to already intricate treble-damages cases. Id. at 731-32, 736-37. In doing so, the Court recognized the cost-plus contract exception mentioned in Hanover Shoe, remarking that the scope of such an exception was intentionally narrow and applied only where

> the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

Id. at 735-36.

C.    Relevance to Liability and Class Certification

As noted above, Judge McMahon has held that Forest has engaged in anticompetitive and coercive conduct, and that the only remaining element the plaintiffs must show in order to establish Forest's liability on the relevant claim is "an antitrust injury . . . caused by Forest's [anticompetitive] conduct." Namenda IV, No. 15 Civ. 7488, slip op. at 34.  That is, the plaintiffs must show that the illegal hard switch scheme caused the alleged overcharges for Alzheimer's disease treatments.[4]  More specifically, the plaintiffs' injury must stem from patients who switched to Namenda XR before entry of the injunction on December 15, 2014, because of Forest's announcement of Namenda IR's discontinuance and who continued taking Namenda XR after generic entry in July 2015.  Namenda III, 2016 WL 4992690, at *11-12.

Forest asserts that "[d]ownstream discovery is relevant" to that liability issue because it "may show the extent to which factors other than Forest's announced discontinuation of Namenda

_____

[4] As I understand it, if the plaintiffs establish that injury was caused by the hard switch, that injury will necessarily be an antitrust injury.  See, e.g., Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342 (1990) ("[The antitrust injury requirement] ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief.").

IR influenced patients' prescription choices, including prices of the products at issue and efforts by DPPs to steer patients to particular drugs at particular times." (Def. Memo. at 6; Reply Memorandum of Law in Support of Forest's Motion to Compel the Production of Documents by the Direct Purchaser Plaintiffs ("Reply") at 3-4). Forest also contends that "[d]ownstream discovery is [] relevant to a number of class certification issues, including ascertainability and predominance" because "the downstream discovery Forest seeks goes directly to whether DPPs can demonstrate a viable, practical way of ascertaining class membership, and show through class-wide proof that class members suffered cognizable harm." (Def. Memo. at 7-8).

Forest's argument lacks specificity. By lumping together "downstream discovery" as a single category, Forest has failed to explain why profitability analyses and their supporting data, in particular, are relevant. Moreover, the plaintiffs have agreed to produce documents in response to many requests that seek such discovery. Forest lists a number of them in its motion:

(1) Documents concerning purchasing, coverage, and reimbursement decisions of purchasers or payors (including wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to treatment for Alzheimer's disease. The documents include information regarding price. (Responses to RFPs at 13 (Request No. 11); Def. Memo. at 4);

(2) Documents concerning the impact of price on a patient's choice between Alzheimer's treatments (Responses to RFPs at 22 (Request No. 25); Def. Memo. at 4);

(3) Documents concerning any changes in coverage for any Alzheimer's treatment (Responses to RFPs at 33 (Request No. 45); Def. Memo. at 4);

(4) Documents concerning the plaintiffs' decision to discontinue or modify the distribution of Namenda tablets in response to Forest's press releases or announcements relating to Namenda on February 14, 2014, June 10, 2014, August 5, 2014, November 5, 2014, December 11, 2014, December 15, 2014, January 6, 2015, and May 22, 2015 (Responses to RFPs at 81-85 (Request Nos. 124-131); Def. Memo. at 4); and

(5) Documents concerning the financial terms of any license or supply agreement related to a pharmaceutical product (Responses to RFPs at 99 (Request No. 156); Def. Memo. at 4).

Forest does not suggest which documents that it now seeks would not be cumulative of information it already has (or will receive). For example, discovery related to the "prices of the products at issue and efforts by DPPs to steer patients to particular drugs at particular times" (Def. Memo. at 6) would appear to be encompassed in requests for which the plaintiffs have agreed to produce documents. Forest has the burden here, but its briefing leaves me to hypothesize how the specific requests for production on which it has moved will produce relevant, non-cumulative information. That is not sufficient.

Forest's attempt to compel production of sales data suffers from that same deficiency. Forest mentions "sales data" a couple of times in its opening brief -- primarily to note that Forest requested its production (Def. Memo. at 4) -- but does not explain why that data, in particular, is necessary.[5] In its Reply, Forest states that it needs information about (1) the volume of the plaintiffs' sales of Namenda IR and Namenda XR before and after Forest's announcements and (2) the volume of their Namenda IR sales after generic entry in order to "inform the basic question of how many patients switched from Namenda IR to Namenda XR." (Reply at 5). This, it asserts, may help to determine the cause of those switches as well as the ability of patients to switch back from Namenda XR to Namenda IR. (Reply at 5). Because the first substantive explanation of the relevance of this data appears in the Reply, I could deem this argument waived. See, e.g., Sacchi v. Verizon Online LLC, No. 14 CIv. 423, 2015 WL 1729796, at *1 n.1 (S.D.N.Y. April 14, 2015) ("Generally, a court '[does] not consider issues raised in a reply brief for the first time because if a [party] raises a new argument in a reply brief [the opposing party]

---

[5] I make a distinction here between general sales data and information related to plaintiffs' "pricing for sales of pharmaceuticals to their customers," which appears to be connected primarily with Forest's argument about the "cost-plus exception" (Def. Memo. at 11), and is discussed below.

may not have an adequate opportunity to respond to it.'" (alterations in original) (quoting Evergreen National Indemnity Co. v. Capstone Building Corp., No. 07 CV 1189, 2008 WL 926520, at *2 (D. Conn. March 31, 2008))).

Even overlooking that defect, Forest's argument does not succeed. As the plaintiffs note, they have already agreed to produce documents concerning patient switching. (Pl. Memo. at 12). But more fundamentally, the requested sales data would not help to show how many consumers switched between or among the pharmaceuticals, because the plaintiffs do not sell to consumers, but rather to pharmacies. (Pl. Memo. at 12). Data regarding the plaintiffs' sales of Namenda would not "inform" the questions for which Forest purportedly seeks this information. (Pl. Memo. at 12-13).

D.    Relevance to Damages

1.    Lost Profits as Measure of Damages

As discussed above, Hanover Shoe states that, in an action brought by a direct purchaser of goods sold at an increased price as a result of anticompetitive conduct, the proper measure of damages is the full amount of the overcharge, and the purchaser's actual lost profit is generally irrelevant. See Hanover Shoe, 392 U.S. at 488-89; see also Illinois Brick, 431 U.S. at 731-32. Forest suggests that a damages methodology based on overcharges is

appropriate only where a plaintiff alleges that it paid a higher price for a single identified product based on illegal conduct. (Def. Memo. at 9). Here, the plaintiffs "attempt[] to construct an overcharge theory based on different products, that is, Namenda XR and Namenda IR." (Def. Memo. at 9). Forest contends that this is more like a refusal-to-sell antitrust action, where lost profits are the measure of damages. (Def. Memo. at 10).

Case law does not support this argument. For example, in In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation, the plaintiffs were direct purchasers of the pharmaceutical at issue. 64 F. Supp. 3d 665, 672 (E.D. Pa. 2014). They alleged that the defendant switched from sublingual Suboxone tablets, a product for which generic competitors would soon enter the market, to a newer sublingual Suboxone film, which enjoyed a significant number of remaining years of patent exclusivity, "for the purpose of stymying generic competition." Id. In conjunction with the introduction of the film, the defendant allegedly attempted to destroy the market for the tablet by fabricating safety concerns and then announcing the removal of the tablets from the market. Id. at 674. Although the two drugs were allegedly nearly identical, they were not bioequivalent under FDA regulations, and so "a pharmacist cannot provide a patient with generic Suboxone tablets when a patient has a prescription for

16

Suboxone film." Id. The magistrate judge denied the defendant's request for so-called downstream discovery and noted that "[t]he relevant inquiry is whether, in the unique market . . . defendant's alleged 'product hopping' caused plaintiffs to pay more than they would have paid absent any unlawful conduct to suppress competition."[6] In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation, __ F.R.D. __, __, 13-MD-2445, 2016 WL 3519618, at *2 (E.D. Pa. 2016) (second alteration in original) (quoting In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation, No. 13-MD-2445, slip op., ¶ 3 (E.D. Pa. Feb. 16, 2016)). The district judge agreed with the magistrate judge's analysis that the discovery sought was not relevant to the plaintiffs' damages. See id. at *6 (citing Hanover Shoe, 392 U.S.

---

[6] The magistrate judge held:

> The downstream price charged throughout the chain of distribution is irrelevant to plaintiffs' alleged damage for overcharges. The relevant inquiry is whether, in the unique market of pharmaceutical drugs, defendant's alleged "product hopping" caused plaintiffs to pay more than they would have paid absent any unlawful conduct to suppress competition. Evidence of discounts, coupons, contracts, margins, and rebates involving downstream sales made after the wholesalers' purchase would have no tendency to make a fact of consequence more or less probable than it would be without the evidence.

In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litigation, No. 13-MD-2445, slip op., ¶ 3 (E.D. Pa. Feb. 16, 2016) (citations omitted).

at 494).

Forest contends that it "has raised the good faith possibility that the distinct concept of lost profits -- not overcharges -- should determine damages" and cites as support Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc., 424 F.3d 363, 374 (3d Cir. 2005). (Reply at 6). To be sure, that opinion recognizes that some scholars suggest that lost profits "could theoretically be used" as a measure of damages in cases in which an antitrust plaintiff alleges that anticompetitive conduct caused prices to rise. Howard Hess Dental, 424 F.3d at 374. But the court ultimately did not endorse that view, stating that "the standard method of measuring damages in price enhancement cases is overcharge, not lost profits," and suggesting that "overcharge damages, unlike lost profits, may induce antitrust plaintiffs to make arguments that will protect rather than injure consumers." Id. at 374-75 (citing Frank H. Easterbrook, Treble What?, 55 Antitrust L.J. 95, 96-97, 100-01 (1986) (arguing that overcharge to consumers "should be the basis of all [antitrust] damages")).

Ultimately, however, Forest's argument that this information is relevant to determining the correct theory of damages is crippled by the plaintiffs' acknowledgement not only that they will not seek to prove that they have lost profits, but also that they "do not claim to have lost profits as a result of Forest's

18

anticompetitive scheme." (Pl. Memo. at 16). Thus, if Judge McMahon were ultimately to decide that lost profits are the proper measure of damages, the plaintiffs could not recover on the Section 2 claim. The requested information is therefore not relevant to this question.

## 2. Cost-Plus Exception

Hanover Shoe suggested that, where the direct purchaser antitrust plaintiff had a "pre-existing 'cost-plus' contract," a defendant "might" be permitted to show that the overcharges were passed along to downstream purchasers, "thus making it easy to prove that [the plaintiff] has not been damaged." 392 U.S. at 494. Illinois Brick explained that the "cost-plus" contract identified in Hanover Shoe insulates the direct purchaser "from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price." Illinois Brick, 431 U.S. at 736. Later cases confirm that the cost-plus arrangement that might overcome the prohibition of the passing-on defense is a pre-existing contract with a fixed quantity that insulates the direct purchaser from any decrease in profit. See, e.g., Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 217 (1990); McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 855 (3d Cir. 1996) ("[P]laintiffs have failed to show that they meet the prerequisites

of th[e] [cost-plus] exception. Specifically, plaintiffs have failed to show the existence of a pre-existing agreement to purchase a fixed quantity of photocopies from the attorneys." (citing Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573, 580 (3d Cir. 1979))); Hospital Authority of Metropolitan Government of Nashville v. Momenta Pharmaceuticals, Inc., No. 3:15-cv-1100, 2017 WL 1064308, at *4 (M.D. Tenn. 2017) ("Plaintiff has been unable to produce any Supreme Court or Sixth Circuit Court of Appeals case law clearly establishing that a plaintiff is entitled to avail itself of the cost-plus exception based on a contract that does not contain a fixed purchase quantity."); Lefrak v. Arabian American Oil Co., 487 F. Supp. 808, 819-20 (E.D.N.Y. 1980) (stating that cost-plus exception must involve automatic pass-on of overcharge, insulation from decrease in sales or profit, and fixed quantity contract, and collecting cases).

The plaintiffs have stated that they "do not have contracts with customers obligating them to purchase specific quantities of products at a fixed markup." (Def. Memo. at 11; Pl. Memo. at 16). Notwithstanding this assertion, Forest requests information related to the plaintiffs' pricing arrangements to determine whether they "otherwise price on a cost-plus basis" (Reply at 7), by which they seem to mean sell to purchasers at the plaintiffs'

cost plus a set percentage markup, but not at a fixed quantity (Def. Memo. at 11-12). Forest cites no precedent that suggests that such agreements can be the basis for the cost-plus exception, and the cases above make clear that they cannot.

Forest next insists that the plaintiffs' "contractual arrangements must be understood in the contexts of the economic realities of those arrangements," suggesting that agreements with a fixed markup but without a fixed quantity meet the requirements of the cost-plus exception "where demand for the product in question is inelastic." (Reply at 8). But Supreme Court precedent indicates that such circumstances do not trigger the cost-plus exception. In Illinois Brick, the Court noted that some lower courts had urged an exceptions to the Hanover Shoe rule for "situations in which most of the overcharge is purportedly passed on," such as when "the demand for the price-fixed good [is] highly inelastic." 431 U.S. at 743-44. The majority "reject[ed] these attempts to carve out exceptions to the Hanover Shoe rule for particular types of markets." Id. at 744. And in UtiliCorp, the Court stated that, even in a case where the market was highly inelastic and the entire overcharge was passed on to consumers, "the need to inquire into the precise operation of market forces would negate the simplicity and certainty that could justify a cost-plus contract exception." 497 U.S. at 218; see also Hanover

Shoe, 392 U.S. at 492 (rejecting applicability of pass-on defense even where "overcharge is imposed equally on all of a buyer's competitors and where the demand for the buyer's product is so inelastic that the buyer and his competitors could all increase their prices by the amount of the cost increase without suffering a consequent decline in sales"); cf. Hospital Authority, 2017 WL 1064308, at *6 ("Opening the cost-plus exception to transactions that merely involve the functional equivalent of a fixed-quantity provision, however, would unavoidably lead the Court back into the factual and analytical thicket that Illinois Brick was intended to avoid. . . . This Court will not embark down that road when the Supreme Court has so strongly cautioned against it."); In re Midwest Milk Monopolization Litigation, 529 F. Supp. 1326, 1332 (W.D. Mo. 1982) (refusing to apply exception to "functional equivalent" of cost-plus contract), aff'd 730 F.2d 528 (8th Cir. 1984). In light of this precedent, Forest has not established that the requested discovery is relevant.

Conclusion

For the foregoing reasons, the defendants' motion to compel (Docket No. 245) is denied.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           June 21, 2017

Copies transmitted this date:

Bruce E. Gerstein, Esq.
Dan Litvin, Esq.
Joseph Opper, Esq.
Noah H. Silverman, Esq.
Kimberly M. Hennings, Esq.
Garwin Gerstein & Fisher, L.L.P.
1501 Broadway Suite 1416
New York, NY 10036

Heather McDevitt, Esq.
Jack Pace, Esq.
Peter J. Carney, Esq.
Martin M. Toto, Esq.
Kristen O'Shaughnessy, Esq.
Ryan P. Johnson, Esq.
Michael E. Hamburger, Esq.
Charles C. Moore, Esq.
White & Case LLP
1221 Ave of the Americas
New York, NY 10020

John M. Gidley, Esq.
White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005

Kevin C. Adam, Esq.
White & Case LLP
75 State Street
Boston, MA 02109