**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION | Case No. 1:15-CV-07488-CM-JCF |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DIRECT PURCHASER CLASS PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

**SUBMITTED FOR FILING UNDER SEAL**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

      A.     Forest Launched the Blockbuster Namenda IR Under an Invalid Patent .............. 3

      B.     Forest Entered into an Illegal Reverse Payment with Mylan to Delay Generic Competition.................................................................................................... 3

      C.     The Forest-Mylan Agreement Delayed Entry of Generic Memantine ................. 4

      D.     Forest's Generic Suppression Scheme Gave It Time to Switch the Memantine Market to Namenda XR ...................................................................................... 5

      E.     The Expert Report of Russell Lamb, Ph.D. Establishes Classwide Impact........... 6

III.  ARGUMENT ....................................................................................................... 7

      A.     The Class is So Numerous as to Render Joinder Impractical ................................ 8

      B.     There Are Common Issues of Law and Fact..................................................... 13

      C.     The Class Representatives' Claims Are Typical of Those of the Class .............. 14

      D.     The Class Representatives and Class Counsel Will Fairly and Adequately Protect the Interests of the Class ................................................................................ 15

            1.     Absence of Conflict of Interest .............................................................. 15

            2.     Counsel is Qualified.............................................................................. 15

      E.     Common Legal and Factual Questions Predominate........................................... 16

            1.     Proving Liability Presents Predominantly Common Issues..................... 17

            2.     Proving Injury Presents Predominantly Common Issues......................... 18

            3.     Proving Classwide Damages Presents Predominantly Common Issues ... 22

      F.     A Class Action is Superior to Other Methods of Adjudication ........................... 24

IV.  CONCLUSION ................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Am. Exp. Co. v. Italian Colors Rest.*,,
   133 S. Ct. 2304 (2013) .................................................................................................... 10

*Am. Sales Co. v. SmithKline Beecham Corp.*,
   274 F.R.D. 127 (E.D. Pa. 2010) .................................................................................. 1, 23

*Am. Sales Co., LLC v. Pfizer, Inc.*,
   Civ. A. No. 2:14cv361, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017) ..................................... 1

*Am. Sales Co., LLC v. Pfizer, Inc.*,
   Civ. A. No. 2:14cv361, 2017 WL 3669604 (E.D. Va. Jul. 28, 2017) .............................. 1, 9, 12

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997) .............................................................................................. 1, 17, 25

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S. Ct. 1184 (2013) ................................................................................................. 8, 16

*Anderson Living Trust v. WPX Energy Prod., LLC*,
   306 F.R.D. 312 (D.N.M. 2014) .......................................................................................... 10

*Ark. Educ. Ass'n. v. Bd. of Educ.*,
   446 F.2d 763 (8th Cir. 1971) ............................................................................................ 10

*Bergen Drug Co. v. Parke, Davis & Co.*,
   307 F.2d 725 (3d Cir. 1962) .............................................................................................. 11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ......................................................................................................... 19

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007) .......................................................................................... 8, 10

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ................................................................................... 8, 17, 23, 24

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007) ........................................................................................ passim

*Cypress v. Newport News Gen'l & Nonsectarian Hosp. Ass'n*,
   375 F.2d 648 (4th Cir. 1967) .............................................................................................. 9

*DeMarco v. Nat'l Collector's Mint, Inc.*,
    229 F.R.D. 73 (S.D.N.Y. 2005) .......................................................... 13

*DG ex rel. Stricklin v. Devaughn*,
    594 F.3d 1188 (10th Cir. 2010) ........................................................ 19

*Eastman Kodak Co. v. S. Photo Mat. Co.*,
    273 U.S. 359 (1927) .......................................................................... 23

*Flores v. Anjost Corp.*,
    284 F.R.D. 112 (S.D.N.Y. 2012) ................................................... 8, 13

*Gen. Tel. Co. v. Falcon*,
    457 U.S. 147 (1982) .......................................................................... 14

*Hanover Shoe, Inc. v. United Mach. Corp.*,
    392 U.S. 481 (1968) .......................................................................... 19

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972) ............................................................................ 7

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.*,
    424 F.3d 363 (3d Cir. 2005) .................................................. 20, 21, 22

*Ill. Brick Co. v. Ill.*,
    431 U.S. 720 (1977) .......................................................................... 11

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ......... 14, 16, 19, 22

*In re Am. Exp. Merchants' Litig.*,
    667 F.3d 204 (2d Cir. 2012) .............................................................. 10

*In re Bayou Hedge Fund Investment Litigation*,
    248 F.R.D. 404 (S.D.N.Y. 2008) ...................................................... 13

*In re Brand Name Prescription Drugs Antitrust Litig., No. 94-cv-897*,
    1999 U.S. Dist. LEXIS 12936, at *11 (N.D. Ill. Aug. 16, 1999) ............. 24

*In re Buspirone Patent & Antitrust Litig.*,
    210 F.R.D. 43 (S.D.N.Y. 2002) ............................................... passim

*In re Carbon Black Antitrust Litig.*,
    No. CIV.A.03-10191-DPW, 2005 WL 102966 (D. Mass. Jan. 18, 2005) ............... 15

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 297 (E.D. Mich. 2001) .......................................... 1, 7, 23

*In re Cardizem CD Antitrust Litig.*,

iii

218 F.R.D. 508 (E.D. Mich. 2003) ....................................... 24

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) .................................... 25

*In re DDAVP Direct Purchaser Antitrust Litig.*, 05-2237,,
2011 U.S. Dist. LEXIS 97487, at *6 .............................. 1, 14

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ........................................ 16

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) .......................................... 8

*In re K-Dur Antitrust Litig.*,
686 F.3d 197 (3d Cir. 2012) ............................... 1, 15, 18, 23

*In re K-Dur Antitrust Litig*,
2008 WL 2699390 (D.N.J. Apr. 14, 2008). ................. 7, 16, 17

*In re Lidoderm Antitrust Litig.*,
No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .......................... passim

*In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, No. 06-052,
2011 U.S. Dist. LEXIS 158153 (D. Del. Nov. 16, 2011) ....................... 1

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
209 F.R.D. 323 (S.D.N.Y. 2002) .................................... 9

*In re Modafinil Antitrust Litigation*,
837 F.3d 238 (3d Cir. 2016) ........................................ 12

*In re Namenda Direct Purchaser Antitrust Litig.*,
No. 15-7488, 2017 WL 2693713 (S.D.N.Y. June 21, 2017) .................. 19

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ............................ 13, 15, 22

*In re Neurontin Mktg. & Sales Practices Litig.*,
No. 04-cv-10739, 2011 WL 3852254 (D. Mass. Aug. 31, 2011) .......................... 24

*In re Neurontin Antitrust Litig.*, MDL No. 1479,
2011 U.S. Dist. LEXIS 7453 (D.N.J. Jan. 25, 2011) ...................... 1

*In re Nexium (Esomeprazole) Antitrust Litig.*,
296 F.R.D. 47 (D. Mass. 2013) ................................. 1, 9, 23

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) ................................... 18, 22, 23

iv

*In re Nifedipine Antitrust Litig.*,
   246 F.R.D. 365 (D.D.C. 2007).................................................................. 1, 7, 17, 23

*In re OxyContin Antitrust Litig., MDL No. 1603*,
   2010 U.S. Dist. LEXIS 146003 (S.D.N.Y. Sept. 27, 2010)................................... 1, 14

*In re Prograf Antitrust Litig.*,
   MDL No. 2242, 2013 WL 2395083 (D. Mass. Apr. 23, 2013) ............................ 1, 9

*In re Relafen Antitrust Litig.*,
   218 F.R.D. 337 (D. Mass. 2003)................................................................... 1, 7, 18

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ........................................................................... 22

*In re Skelaxin Metaxalone Antitrust Litig., MDL No. 2343*,
   2014 U.S. Dist. LEXIS 60214 (E.D. Tenn. Apr. 30, 2014) ...................................... 1

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)............................................................................. 15

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)............................................................................... 2

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
   No. 04-5525, 2008 WL 1946848 (E.D. Pa. May 2, 2008)................................... 1, 7

*In re Wellbutrin XL Antitrust Litig.*,
   No. 08-2431, 2011 WL 3563385 (E.D. Pa. Aug. 11, 2011) ............................ passim

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
   225 F.R.D. 208 (S.D. Ohio 2003) ....................................................................... 1

*King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 2:06-CV-1797*,
   2017 WL 3705715 (E.D. Pa. Aug. 28, 2017) ...................................................... 12

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
   571 F.3d 672 (7th Cir. 2009) ........................................................................... 18

*Logory v. Cty. of Susquehanna*,
   277 F.R.D. 135 (M.D. Pa. 2011)........................................................................ 10

*Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*,
   2008 U.S. Dist. LEXIS 123291 (S.D.N.Y. Apr. 8, 2008)............................... 1, 14, 25

*Meijer, Inc. v. Abbott Labs.*,
   No. 07-5985, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) .................................. 1

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,

v

246 F.R.D. 293 (D.D.C. 2007) ................................................................ 1, 7, 9, 23

*Mims v. Stewart Title Guar. Co.*,
590 F.3d 298 (5th Cir. 2009) .......................................................................... 19

*Mullen v. Treasure Chest Casino, LLC*,
186 F.3d 620 (5th Cir. 1999) .......................................................................... 10

*Mylan Pharms., Inc. v. Warner Chilcott Public Ltd., No. 12-3824*,
2014 U.S. Dist. LEXIS 21504 (E.D. Pa. Feb. 18, 2014) ...................................... 1, 9

*New York v. Actavis, PLC*,
No. 14-CV-7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ............................. 2

*Paper Sys., Inc. v. Nippon Paper Indus.*,
281 F.3d 629 (7th Cir. 2002) .......................................................................... 20

*Paxton v. Union Nat'l Bank*,
688 F.2d 552 (8th Cir. 1982) ............................................................................ 9

*Pichardo v. Carmine's Broadway Feast Inc.*,
No. 15-CV-3312 (RA), 2016 WL 5338551 (S.D.N.Y. Sept. 23, 2016) ..................... 9

*Rannis v. Recchia*,
No. 09-55859, 380 Fed. Appx. 646 (9th Cir. May 27, 2010) ................................. 9

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ........................................................................................ 7

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) ............................................................................ 23

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) ................................................................ 8, 9, 12, 14

*Rochester Drug Coop. v. Braintree Labs.*,
796 F. Supp. 2d 560 (D. Del. 2011) ............................................................. 11, 12

*Rochester Drug Co-Op., Inc. v. Braintree Labs., No. 07-142*,
2012 U.S. Dist. LEXIS 190011 (D. Del. Feb. 6, 2012) ......................................... 1

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
No. 15-CV-6549, 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) ............................. 2

*Steward v. Janek*,
315 F.R.D. 472 (W.D. Tex. 2016) .................................................................... 10

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931) ...................................................................................... 23

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015) ........................................................................................... 16

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008) ............................................................................................ 8

*Teva Pharms. USA, Inc. v. Abbott Labs.*,
  252 F.R.D. 213 (D. Del. 2008) .......................................................................... 1, 7, 13, 18

*Town of New Castle v. Yonkers Contracting Co., Inc.*,
  131 F.R.D. 38 (S.D.N.Y. 1990) ....................................................................................... 9

*W. Va. Univ. Hosps. v. Casey*,
  499 U.S. 83 (1991) ......................................................................................................... 10

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................................................... 8, 13

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ....................................................................................................... 18

Other Authorities

1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 3:10 (4th ed. 2002) ................. 13

6 Newberg § 18:5 ................................................................................................................ 13

# I.    INTRODUCTION

Conduct that impairs generic competition inflicts predictable, market-wide harm on direct purchasers in the form of overcharges. Recognizing this, numerous courts have certified classes of direct purchasers alleging, as here, impaired generic entry,[1] including the Third Circuit in *In re K-Dur Antitrust Litigation*.[2] This case likewise meets all criteria of Rule 23 and should be certified.

---

[1]*See Am. Sales Co., LLC v. Pfizer, Inc.*, Civ. A. No. 2:14cv361, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017) (adopting *Am. Sales Co., LLC v. Pfizer, Inc.*, Civ. A. No. 2:14cv361, 2017 WL 3669604 (E.D. Va. Jul. 28, 2017) ("*Celebrex*")); *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *1 (N.D. Cal. Feb. 21, 2017); *In re Nexium (Esomeprazole) Antitrust Litig.,* 296 F.R.D. 47 (D. Mass. 2013); *In re Prograf Antitrust Litig.*, MDL No. 2242, 2013 WL 2395083 (D. Mass. Apr. 23, 2013); *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2011 WL 3563385 (E.D. Pa. Aug. 11, 2011) ("*Wellbutrin XL*"); *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2011 U.S. Dist. LEXIS 7453 (D.N.J. Jan. 25, 2011); *Am. Sales Co. v. SmithKline Beecham Corp.*, 274 F.R.D. 127 (E.D. Pa. 2010) ("*Flonase*"*)*; *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-5525, 2008 WL 1946848 (E.D. Pa. May 2, 2008); *Teva Pharms. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213 (D. Del. 2008) ("*TriCor*"); *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, 2008 U.S. Dist. LEXIS 123291 (S.D.N.Y. Apr. 8, 2008) ("*Arava*"); *In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365 (D.D.C. 2007) ("*Nifedipine*"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293 (D.D.C. 2007) ("*Ovcon*"); *In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003); *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43 (S.D.N.Y. 2002); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001). *See also In re Asascol Antitrust Litig.*, No. 1:15-cv-12730 (D. Mass. Sept. 14, 2017) (ECF No. 461) (certifying class upon settlement); *In re Skelaxin Metaxalone Antitrust Litig.,* MDL No. 2343, 2014 U.S. Dist. LEXIS 60214 (E.D. Tenn. Apr. 30, 2014) (same); *Mylan Pharms., Inc. v. Warner Chilcott Public Ltd.*, No. 12-3824, 2014 U.S. Dist. LEXIS 21504 (E.D. Pa. Feb. 18, 2014) ("*Doryx*") (same); *Rochester Drug Co-Op., Inc. v. Braintree Labs.*, No. 07-142, 2012 U.S. Dist. LEXIS 190011 (D. Del. Feb. 6, 2012) ("*Miralax*") (same); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-2237, 2011 U.S. Dist. LEXIS 97487 (S.D.N.Y. Aug. 15, 2011) (same); *In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, No. 06-052, 2011 U.S. Dist. LEXIS 158153 (D. Del. Nov. 16, 2011) ("*Toprol*") (same); *In re OxyContin Antitrust Litig.*, MDL No. 1603, 2010 U.S. Dist. LEXIS 146003 (S.D.N.Y. Sept. 27, 2010) (same). Settlement classes must satisfy all requirements of Rule 23 except manageability. *See Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 620 (1997) (citation omitted). Classes of direct purchasers of pharmaceuticals have also been certified in analogous antitrust contexts where brand companies have suppressed competition from less expensive branded rivals. *See Meijer, Inc. v. Abbott Labs.*, No. 07-5985, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (certifying class challenging market exclusion of less-expensive drugs) ("*Norvir*"); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208 (S.D. Ohio 2003) (certifying class alleging suppression of entry of near-identical drug) ("*Premarin*").

[2] *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 221 (3d Cir. 2012), *judgment vacated sub nom. on other grounds*, 133 S. Ct. 2849 (2013), *reinstatement granted*, No. 10-2077, 2013 WL 5180857 (3d Cir. Sept. 9, 2013). The Third Circuit's *K-Dur* decision affirmed *In re K-Dur Antitrust Litig.*,

The core issues here, as in other cases alleging the suppression of generic drug competition, are all common to the class and will be proven through evidence that is predominantly, if not entirely, common to the class rather than individual to its members. These core common issues predominate over any conceivable individual issues, and will be proven at (or before) trial using classwide evidence and methodologies. Direct Purchaser Class Plaintiffs JM Smith Drug Co. and Rochester Drug Co-Operative, Inc. (collectively, "plaintiffs") therefore respectfully move for certification of the following class:

> All persons or entities in the United States and its territories who purchased branded Namenda IR 5 or 10 mg tablets, and/or generic Namenda IR 5 or 10 mg tablets (including an authorized generic), and/or branded Namenda XR capsules, directly from Forest or its successors in interest, Actavis and Allergan, and/or from any generic manufacturer at any time during the period from June 2012 until September 30, 2015 (the "Class"). Excluded from the Class are the defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

## II.   BACKGROUND

Plaintiffs allege that Forest worked to delay and impair generic competition for Forest's immediate release Namenda ("Namenda IR"), a medicine used to treat Alzheimer's Disease. Forest's actions include entering into an illegal agreement with its prospective generic competitor, Mylan, and then orchestrating a "hard switch" product hop from Namenda IR to extended-release Namenda XR ("Namenda XR").[3] As this Court held, Forest is collaterally estopped from contesting the illegality of its "coercive and anticompetitive" hard-switch to Namenda XR that

---

No. 01-1652, 2008 WL 2699390 (D.N.J. Apr. 14, 2008). *See also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004).

[3] Much of Forest's conduct regarding its unlawful "hard switch" product hop has been described in prior court opinions. *See New York v. Actavis, PLC*, No. 14-CV-7473, 2014 WL 7015198, at *1 (S.D.N.Y. Dec. 11, 2014) ("*Namenda I*"), *aff'd sub nom. Schneiderman ex rel. New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ("*Namenda II*"); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, No. 15-CV-6549, 2016 WL 4992690, at *1-7 (S.D.N.Y. Sept. 13, 2016) ("*Namenda III*"). Further citations to *Namenda I* are to the unredacted version of Judge Sweet's opinion, FRX-AT-01747338-473 (Ex. 1 to Decl. of Dan Litvin ("Litvin Decl.")).

began in February 2014. *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-CV-7488, 2017

U.S. Dist. LEXIS 83446, *50 (S.D.N.Y. May 23, 2017) ("*Namenda IV*").

### A. Forest Launched the Blockbuster Namenda IR Under an Invalid Patent

In June 2000, Forest received an exclusive license to U.S. Patent No. 5,061,703 (the "'703

patent"), and obtained FDA approval to market Namenda IR for the treatment of Alzheimer's

disease on October 16, 2003. *Namenda I* ¶¶37-38. By 2013, sales for Namenda IR exceeded $1.5

billion. *Id.* ¶44.[4]

Beginning in 2007, several generic companies submitted abbreviated New Drug

Applications ("ANDAs") seeking to market AB-rated generic versions of Namenda IR. Forest

received Paragraph IV notices from these generic companies asserting that the '703 patent was

invalid or not infringed. Lamb Rpt. ¶31. Forest then sued the ANDA filers in the District of

Delaware. *Id.* at ¶32. As set forth in plaintiffs' expert reports, (i) the asserted claims of the '703

patent were invalid as anticipated, obvious, and for lack of enablement, (ii) Forest improperly

obtained a patent term extension, which was unenforceable and/or invalid in whole or in part, and

(iii) the generic memantine hydrochloride ("memantine") products made by one or more of the

ANDA filers would not have infringed the asserted claims of the '703 patent.[5]

### B. Forest Entered into an Illegal Reverse Payment with Mylan to Delay Generic Competition

To prevent generic entry that would devastate its lucrative Namenda franchise, Forest

entered into an illegal reverse payment agreement with Mylan and provided additional generic

entrants with ██████████████ (explained below). In a July 21, 2010 agreement with

---

[4] *See also* Litvin Decl. Ex. 3, Exp. Rpt. of Russell Lamb ¶27 ("Lamb Rpt.") (Namenda IR sales exceeded $1.7 billion in 2013).

[5] *See* Litvin Decl. Ex. 4, Exp. Rpt. of George W. Johnston, Esq. ("Johnston Rpt."); Litvin Decl. Ex. 5, Exp. Rpt. of Dr. Nathan Herrman; Litvin Decl. Ex. 6, Exp. Rpt. of Lon S. Schneider.

Mylan, Forest agreed to make a large reverse payment worth ███████ or more in exchange for Mylan's agreement to drop its patent challenge and to delay generic entry until January or July 2015. *See* Litvin Decl., Exs. 9-10, FRX-AT-01710604-27; FRX-AT-00000428-63.

### C.    The Forest-Mylan Agreement Delayed Entry of Generic Memantine

Absent Forest's unlawful agreement with Mylan for delay, full, unconstrained generic competition would have begun far earlier. The jury may find that absent the large payment: (1) Mylan would have won the '703 patent case by June 2012;[6] or (2) Forest and Mylan would have reached a lawful, payment-free agreement providing for a launch date of November 2, 2012.[7] In addition, once Mylan entered, additional generic entrants would have entered also. ██████████

████████████████████████████████████████████████████ █ ████████████████████████████████████████████████████ █ ██ ████████████████████████████████████████████████████████ ████████████████████████████████████████ Thus, full unimpaired

---

[6] Johnston Rpt. at ¶ 17, 414, 416.

[7] Litvin Decl. Ex. 7, Exp. Rpt. of Einer Elhauge ¶¶ 2, 64-65.

[8] ████████████████████████████████████████████████████████ *See* Litvin Decl. Ex 10, [Dr. Reddy's] at FRX-AT-00000019, §1.11; Ex. 11, [Cobalt] at FRX-AT-00000057, §1.11; Ex. 12, [Wockhardt] at FRX-AT-00000094, §1.12; Ex. 13, [Sun] at FRX-AT-00000130, §1.8; Ex. 14, [Upsher] at FRX-AT-00000166, §1.9; Ex. 15, [Teva] at FRX-AT-00000202, §1.8; Ex. 16, [Amneal] at FRX-AT-00000236, §1.10; Ex. 17, [Apotex] at FRX-AT-00000292, §1.10; Ex. 18, [Torrent] at FRX-AT-00000322, §1.7; Ex. 19, [Lupin] at FRX-AT-00000360, §1.7; Ex. 20, [Orchid] at FRX-AT-00000398, §1.8; Ex. 9, [Mylan] at FRX-AT-00000447, §1.8; Ex. 21, [Aurobindo] at FRX-AT-00000497, §1.10.

[9] ████████████████████████████████████████████████████████ *See* Litvin Decl. Ex 10, [Dr. Reddy's] at FRX-AT-00000024, §4.4; Ex. 11, [Cobalt] at FRX-AT-00000057, §4.4; Ex. 12, [Wockhardt] at FRX-AT-00000098, §4.4; Ex. 13, [Sun] at FRX-AT-00000134, §4.4; Ex. 14, [Upsher] at FRX-AT-00000169, §4.4; Ex. 15, [Teva] at FRX-AT-00000207, §4.5; Ex. 16, [Amneal] at FRX-AT-00000240, §4.4; Ex. 17, [Apotex] at FRX-AT-00000295, §4.4; Ex. 18, [Torrent] at FRX-AT-00000322, §4.4; Ex. 19, [Lupin] at FRX-AT-00000364-65, §4.5; Ex. 20, [Orchid] at FRX-AT-00000404, §4.4; Ex. 9, [Mylan] at FRX-AT-00000451, §4.4; Ex. 21, [Aurobindo] at FRX-AT-00000502, §5.2.

[10] ████████████████████████████████████████████████████████. Litvin

generic competition for Namenda IR would have begun in 2012, well before July 2015 – when generic entry belatedly occurred.

### D. Forest's Generic Suppression Scheme Gave It Time to Switch the Memantine Market to Namenda XR

Having bought itself some time before generic entry, Forest then implemented its next strategy to impair generic competition – switching from Namenda IR to an extended-release formulation of memantine, Namenda XR. Forest began marketing Namenda XR on July 21, 2013. *Namenda I* ¶52. As Judge Sweet found, "For Forest's plan to avoid the 'patent cliff' to be successful Forest had to switch large numbers of patients from Namenda IR to Namenda XR. Forest also realized that, to be successful, its product switch had to be accomplished before less expensive generic versions of Namenda IR tablets became available in the market." *Namenda I* ¶88. Had Forest "maintain[ed] the status quo with respect to IR sales and distribution, generic memantine will have about 80% of the total memantine market within three months and 90% after twelve." *Namenda I* ¶71. *See also id.* ¶88 (citing testimony of Prof. Berndt to similar effect).

Forest projected that, without a hard switch, approximately 30% of the market would switch from Namenda IR or Namenda XR prior to the availability of generic memantine. *See Namenda I* ¶¶87, 134, 137; Lamb Rpt. at ¶87, 151-57. Thus, Forest began to consider withdrawing Namenda IR from the market, and ultimately decided in ██████████ to withdraw Namenda IR. *Namenda I* ¶¶73, 75. Forest publically stated that the purpose of the switch was to impede generic competition, and boasted that it would be "very difficult for the generics then to reverse-commute back." *Id.* ¶76 (quoting Jan. 21, 2014 Forest earnings call).

---

Decl. Ex 10, [Dr. Reddy's] at FRX-AT-00000023, §4.3(a); Ex. 11, [Cobalt] at FRX-AT-00000057, §4.3; Ex. 12, [Wockhardt] at FRX-AT-00000098, §4.3; Ex. 13, [Sun] at FRX-AT-00000134, §4.3; Ex. 14, [Upsher] at FRX-AT-00000169-70, §4.3(a); Ex. 15, [Teva] at FRX-AT-00000207, §4.3; Ex. 16, [Amneal] at FRX-AT-00000239-40, §4.3; Ex. 19, [Lupin] at FRX-AT-00000364, §4.4; Ex. 20, [Orchid] at FRX-AT-00000403, §4.3(a); Ex. 9, [Mylan] at FRX-AT-00000450-51, §4.3.

On February 14, 2014, Forest initiated the "forced switch" through a public announcement that Forest would with withdraw Namenda IR. *Namenda I* ¶77. Forest began a massive marketing campaign to quickly push the market from Namenda IR to Namenda XR in light of the withdrawal. Lamb Rpt. at ¶¶37, 98-104. "Physicians interpreted the announcement as a warning to switch their patients from Namenda IR to Namenda XR." *Namenda I* ¶78. Forest also worked to convert its largest customer base, Medicare patients, by impelling Centers for Medicare and Medicaid Services to withdraw Namenda IR from its formulary. *Namenda I* at ¶80.

As a result, while approximately 30% of the market was expected to switch absent the hard switch, Dr. Lamb estimates that more than 50% of the market switched in the aftermath of Forest's statements that it would withdraw Namenda IR. Lamb Rpt. at ¶¶87, 151-57.

### E. The Expert Report of Russell Lamb, Ph.D. Establishes Classwide Impact

Plaintiffs proffer expert testimony from economist Dr. Russell Lamb, a widely respected economist with substantial experience in assessing injury to purchasers in antitrust cases.[11] Dr. Lamb concludes that common proof is available to show that the suppression of generic competition brought about by the Forest's agreement and hard switch resulted in classwide antitrust impact in the form of overcharges.[12] This proof includes (a) economic and government studies on the predictable market-wide effects of unimpaired generic competition; (b) documents from Forest and other drug manufacturers analyzing the projected market-wide effects of unimpaired generic competition, including the impact of unimpaired generic competition had it occurred earlier, and Forest's extensive analyses of the impact its hard switch strategy would have on impairing generic competition; (c) the actual pricing and sales of Namenda; and (d) the direct

---

[11] *See* Dr. Lamb's CV attached to his expert report.
[12] *See* Lamb Rpt. at ¶¶43-120.

purchasers' role in the distribution chain.[13] Using this evidence, consistently held by courts to be common to all class members and sufficient to prove impact,[14] Dr. Lamb found that, if plaintiffs can prove that generic competition would have started earlier absent Forest's illegal agreements, and absent the "hard switch" product hop from Namenda IR to XR, then all or nearly all Class members suffered overcharges by paying inflated prices for (at least some of) their memantine hydrochloride purchases.[15] Furthermore, Dr. Lamb also found that aggregate overcharge damages can be proven through classwide models using formulas and methodologies that do not require individualized analysis.[16]

## III.   ARGUMENT

Antitrust class actions play an important role in antitrust enforcement.[17] Courts in this district and others have repeatedly certified direct purchaser classes in cases alleging monopolization and/or conspiracy in connection with the sale of pharmaceutical products, and supply a compelling blueprint for certification here. They involve some of the same proposed class plaintiffs and counsel, similar classes, analogous fact patterns, legal claims, and requested relief.[18]

Plaintiffs must satisfy all prerequisites of Rule 23(a) and one prong of Rule 23(b) (here,

---

[13] *See* Lamb Rpt. at ¶¶42, 67; *see also id.* at ¶¶68-120.

[14] *E.g.*, *Lidoderm*, 2017 WL 679367, at *10 (certifying class and holding that aggregate damages model was appropriate "given the well-established academic and industry-accepted evidence of the swift and significant (in volume) switch to generic drugs mandated by state laws and the economic realities upon generic entry"); *Relafen*, 218 F.R.D. at 344-46; *Wellbutrin XL*, 2011 WL 3563385, at *14-16; *Neurontin*, 2011 U.S. Dist. LEXIS 7453, at *7-9; *K-Dur*, 2008 WL 2699390, at *15-20; *Wellbutrin SR*, 2008 WL 1946848, at *8-9 & n.20; *TriCor*, 252 F.R.D. at 229-30 & n.39; *Nifedipine*, 246 F.R.D. at 369-71; *Ovcon*, 246 F.R.D. at 308-09; *Buspirone*, 210 F.R.D. at 58; *Cardizem*, 200 F.R.D. at 308.

[15] Lamb Rpt. at ¶¶65-120, 161.

[16] Lamb Rpt. at ¶¶121-160, 161; *see also* Ex. 23 Exp. Rpt of Ernst R. Berndt

[17] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343-44 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262-66 (1972).

[18] *See supra* nn. 1-2.

Rule 23(b)(3)).[19] To grant certification, the district court must "mak[e] a determination that all of the Rule 23 requirements are met," and must resolve factual disputes necessary to making such a determination,[20] with findings supported by the "preponderance of the evidence."[21] However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered, to the extent–but only to the extent–that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[22] "A motion for class certification should not ... become a mini-trial on the merits."[23]

## A.   The Class is So Numerous as to Render Joinder Impractical

Under Fed. R. Civ. P. 23(a)(1), plaintiffs must show that the proposed Class is so numerous that joinder is impracticable. Plaintiffs need not show joinder is "impossible," *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993), only that the "difficulty or inconvenience of joining ***all*** members of the class make use of the class action appropriate."[24]

"Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *Robidoux*, 987 F.2d at 936. While classes of forty or more presumptively satisfy Rule 23(a)(1), a class may contain fewer members. *See id.* at 935-36 ("a court may certify a class even if it is composed of as few as 14 members") (internal quotes and citation omitted).

---

[19] *See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 & 104 (2d Cir. 2007); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006) ("*IPO*").

[20] *IPO*, 471 F.3d at 40. The Second Circuit was an early adopter of the more rigorous standard on a Rule 23 motion. *See id.* at 40-41. Accordingly, later decisions from the Supreme Court such as *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) are in harmony with post-*IPO* decisions from the Second Circuit and this Court.

[21] *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc*., 546 F.3d 196, 202 (2d Cir. 2008).

[22] *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). *See also IPO*, 471 F.3d at 41-42.

[23] *Flores v. Anjost Corp.*, 284 F.R.D. 112, 122 (S.D.N.Y. 2012) (McMahon, J.).

[24] *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007) (emphasis added).

"Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, [and] the ability of claimants to institute individual suits." *Robidoux*, 987 F.2d at 936. Moreover, class members' fear of possible reprisal by the defendant, "even without specific evidence of possible retaliation," can render joinder impracticable. *Pichardo v. Carmine's Broadway Feast Inc*., No. 15-CV-3312 (RA), 2016 WL 5338551, at *2 (S.D.N.Y. Sept. 23, 2016).

Accordingly, multiple district courts have certified substantively identical classes alleging the same harm direct purchasers allege here. *See*, *e.g.*, *Celebrex*, 2017 WL 3669604 (class of 32); *Asacol*, slip op. at 3 (class of "at least 26 members geographically dispersed"); *Doryx*, 2014 U.S. Dist. LEXIS 21504, at *12 (class of 23 geographically dispersed); *Nexium*, 296 F.R.D. at 51 (24-29 class members geographically dispersed); *Prograf,* 2013 WL 2395083, at *1 (class of 25 geographically dispersed); *Ovcon*, 246 F.R.D. at 305-06 & n.14 (class of 30).[25]

Here, the Class consists of 65 entities located across the country. Lamb Rpt. ¶¶42. The prospect of "individual suits" by these Class members – spread in courts throughout the country – would substantially burden the judicial system and thus favors a finding of impracticability of joinder. *Robidoux*, 987 F.2d at 936.

Moreover, many of these Class members are small wholesalers (Lamb Rpt. ¶42) – the sort of small entities who lack the resources to bring complex, expensive, expert-intensive antitrust suits on their own. Antitrust claims are rightly considered to be "true negative value" claims. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 209 F.R.D. 323, 350 (S.D.N.Y. 2002)

---

[25] *Accord Rannis v. Recchia*, No. 09-55859, 380 Fed. Appx. 646, 651-52 (9th Cir. May 27, 2010) ("class of 20"); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982) (citing with approval cases certifying classes of 16-20 members); *Cypress v. Newport News Gen'l & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 652 (4th Cir. 1967) (class of 18); *Town of New Castle v. Yonkers Contracting Co., Inc.,* 131 F.R.D. 38, 40 (S.D.N.Y. 1990) (class of 36).

(contrasting "true negative value claim such as those seen in antitrust cases"). Hatch-Waxman and health care antitrust litigation in particular is notoriously expensive, often running into the millions of dollars,[26] sums too great for the smaller Class members. Here, plaintiffs have submitted no less than eight expert reports – with rebuttal reports, expert discovery and trial testimony yet to come. Such costs not recoverable under the Clayton Act, which does "not permit a shift of expert witness fees."[27] Hence, for Class members with smaller claims, costs would far exceed potential damages. And assessing potential damages requires accounting for the likelihood of success and the possibility of failure.[28] These entities would effectively be precluded from suit absent class certification. Since joinder of *some* class members is uneconomical and impracticable, then joinder of "***all***" class members – as Rule 23(a)(1) stipulates – is impracticable.[29]

---

[26] *See*, *e.g.*, Order and Final Judgment, ECF No. 543 at 10, *In re TriCor Direct Purchaser Antitrust Litig.*, No. 05-340 (D. Del.) ($3,590,415.82 in expenses); Order and Final Judgment, ECF No. 407, *Natchitoches Parish Hosp. Serv. District v. Tyco Int'l, Ltd.,* No. 1:05-cv-12024 (D. Mass.) ($4,127,391.02 in expenses); Order and Final Judgment, ECF No. 1557 at 10, *In re Terazosin Hydrochloride Antitrust Litig.*, Master File No. 99-MDL-1317 (S.D. Fla.) ($3,133,070.86 in expenses).

[27] *W. Va. Univ. Hosps. v. Casey,* 499 U.S. 83, 95 (1991).

[28] *See Anderson Living Trust v. WPX Energy Prod., LLC,* 306 F.R.D. 312, 452 (D.N.M. 2014) ("the Court must multiply the case's potential damages by the plaintiff's likelihood of success, thus calculating the case's expected value"). The court must also consider the risk of plaintiffs' losing. *See In re Am. Exp. Merchants' Litig.,* 667 F.3d 204, 218 (2d Cir. 2012) ("Even with respect to reasonable attorney's fees, which are shifted under Section 4 of the Clayton Act, the plaintiffs must include the risk of losing, and thereby not recovering any fees, in their evaluation of their suit's potential costs.") (citation and internal quotation marks omitted), *rev'd on other grounds sub nom. Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013).

[29] *See Cent. States*, 504 F.3d at 244-45 (requiring joinder of "all" class members); *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir. 1999) (affirming district court's finding of numerosity where it could be reasonably inferred that just "*some of them* would be geographically dispersed" and unavailable for joinder (emphasis added)); *Ark. Educ. Ass'n. v. Bd. of Educ.*, 446 F.2d 763, 765 (8th Cir. 1971) (fact that a portion of the class continued to work for defendant made joinder impractical due to "natural fear or reluctance to bring this action on an individual basis"); *Logory v. Cty. of Susquehanna*, 277 F.R.D. 135, 140-41 (M.D. Pa. 2011) (fact that "some members resid[e] outside of" the district and that many "would have great difficulty in pursuing their rights individually … only bolsters a finding that numerosity is satisfied"); *Steward v. Janek*, 315 F.R.D. 472, 480 (W.D. Tex. 2016) (agreeing that "joinder is impracticable because

Nor would Class members be likely to sue – individually or collectively – absent certification. Class members are all competitors of the others, and have no pre-existing collaborative relationship as a group. Their interactions are arms-length and wary. And that competing pharmaceutical distributors would meet to plan strategy and share information could raise its own antitrust issues.

Also, fear of reprisal leads Class members to forego suing for meritorious claims. The Class members here are distributors of pharmaceutical products, and they must stock a full range of products to sell to their customers. Class members are therefore beholden to drug companies like Forest so they can maintain a supply of sole-source medicines like Namenda XR and Forest's latest memantine product, Namzaric.[30] A lawsuit puts the Class members' relationship with such a sole-source supplier at risk. Given the highly competitive wholesaler market, even a slight disruption in the established routine of supply can have serious effects on a wholesaler's business. The Supreme Court recognized such fears when it observed "that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers." *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 746 (1977).

The threat is real – drug manufacturers have made and carried out threats to cut off wholesalers in the past for filing suit. *See*, *e.g.*, *Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725 (3d Cir. 1962) (drug wholesaler terminated after filing antitrust litigation against its drug company supplier); *Rochester Drug Coop. v. Braintree Labs.*, 796 F. Supp. 2d 560 (D. Del. 2011). In the latter case, Braintree cut off three small wholesalers who had sued it for antitrust violations.

---

*some* class members … face barriers to obtaining counsel or otherwise vindicating their interests[.]" (emphasis added)).

[30] Forest (now known as Allergan) lists several additional "blockbuster," sole-source medicines on its website. *See* Allergan, https://www.allergan.com/products/key-products/specialty-products (last accessed Sept. 15, 2017).

*See id.* at 563-64. The supply relationship was restored only after an injunction for which the wholesalers had to post a $750,000 bond.[31] Thus, a Class member's suit (assuming one is economical in the first place) would put it at risk without the protections a class action entails, such as class counsel willing to seek an injunction and to advance costs for a bond.

The only case to deny certification of a direct purchaser class in a generic-delay context on the basis of Rule 23(a)(1) directly contradicts Second Circuit precedent. In *In re Modafinil Antitrust Litigation*, 837 F.3d 238 (3d Cir. 2016), the district court had certified the class of 22 class members, but Third Circuit vacated and remanded, finding the court had not adequately explained why joinder was impractical and directing the district court to restrict its analysis to a "binary" choice between joinder and class certification, and not to consider the possibility of multiple lawsuits in different jurisdictions. On remand, the district court accordingly denied certification. *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2017 WL 3705715, at *1 (E.D. Pa. Aug. 28, 2017), *Rule 23(f) petition pending*, Appeal No. 17-8049 (3d Cir.).   However, *Modafinil* and *King Drug* flatly contradict the law of this Circuit which specifically directs courts to consider whether certification would further judicial economy through "the avoidance of a multiplicity of actions." *Robidoux*, 987 F.2d at 936. Importantly, the only defendants remaining were generic manufacturers (litigation against Cephalon, Inc., the brand manufacturer, had been resolved, *Modafinil*, 837 F.3d at 246), and so the case now does not involve the same concerns of suing a sole-source supplier. And finally, district courts outside of the Third Circuit continue to certify analogous classes, *see, e.g., Celebrex*, 2017 WL 3669604 at *10, and decline to follow *Modafinil*. *See Lidoderm*, 2017 WL 679367, at *14 ("*Modafinil* does not control

---

[31] *See* Litvin Decl. Ex. 22, Order at 2, *Rochester Drug Coop. v. Braintree Labs.*, No. 07-142-SLR (D. Del.) (ECF No. 150).

and is not persuasive.").[32]

### B.      There Are Common Issues of Law and Fact

Rule 23(a)(2) requires that common issues of law or fact affect all class members. A single common issue may suffice, *DeMarco v. Nat'l Collector's Mint, Inc.*, 229 F.R.D. 73, 80 (S.D.N.Y. 2005) (McMahon, J.), but the "common contention ... must be of such a nature that it is capable of classwide resolution." *Flores v. Anjost Corp.*, 284 F.R.D. 112, 125 (S.D.N.Y. 2012) (McMahon, J.) (ellipsis in original) (quoting *Wal-Mart*, 564 U.S. at 350). "Rule 23(a)(2) does not require the plaintiffs to demonstrate that the class members' claims are identical; rather, it demands that the disputed issue of law or fact 'occup[ies] essentially the same degree of centrality to the named plaintiffs' claim as to that of the other members of the proposed class.'" *Id.*

This standard is easily met in cases involving antitrust conspiracies and monopolistic conduct. "Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *Buspirone*, 210 F.R.D. at 57; *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996) (same). *See also TriCor*, 252 F.R.D. at 225 (defendants' product hop and "whether, and to what extent, defendants' conduct caused antitrust injury to the business or property of plaintiffs and the members of the proposed class" posed common issues).[33]

Here, common issues of law and fact are abundant. Plaintiffs have alleged that Forest

---

[32] This case is also unlike another case Forest may cite, *In re Bayou Hedge Fund Investment Litigation*, 248 F.R.D. 404, 405 (S.D.N.Y. 2008) (McMahon, J.), where the class ultimately comprised only 19 members, "no evidence" of geographic dispersion was presented, no possibility of reprisal was argued, and certification would not have avoided multiple actions as many were already pending.

[33] *See generally* 1 Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 3:10 (4th ed. 2002) ("NEWBERG") ("existence of an alleged conspiracy" serves as common issue); 6 NEWBERG § 18:5 & n.9 (4th ed. 2002) (monopoly allegations establish common question requirement).

impeded generic competition by entering into unlawful and conspiratorial agreements and then executing a "hard switch" from Namenda IR to Namenda XR. Plaintiffs will prove at trial that Defendants wrongfully impaired generic competition, and the Class suffered overcharges because they would have purchased generic Namenda IR – at significantly lower prices – but for Forest's conduct. Numerous other common issues – including Forest's affirmative defenses – are present here, as identified in plaintiffs' Trial Plan.  Litvin Decl. Ex. 2 at 2, 4-7.

### C.    The Class Representatives' Claims Are Typical of Those of the Class

Rule 23(a)(3) requires that the named plaintiffs' claims be typical of the absent members' claims.[34] The typicality requirement is satisfied when a representative plaintiff can show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936. Class members' claims need not be "identical," and "differences in the amount of damages, date, size or manner of purchase, the type of purchaser ... and other such concerns will not defeat class certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class."[35] Courts in similar cases have found the typicality prong met because plaintiffs asserted that defendants had impaired generic competition, and sought overcharges for themselves and the class.[36] Here, the named plaintiffs' claims arise from the same unlawful conduct and rely on the same legal theory as the rest of the Class, satisfying Rule 23(a)(3).

---

[34] *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982) (class representatives must "possess the same interest and suffer the same injury" as the unnamed class members).

[35] *In re Air Cargo Shipping Servs. Antitrust Litig*., No. 06-MD-1175, 2014 WL 7882100, at *31 (E.D.N.Y. Oct. 15, 2014) (ellipsis in original; citations omitted), *report and recommendation adopted*, No. 06-MD-1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

[36] *See, e.g*., *Arava*, 2008 U.S. Dist. LEXIS 123291 at *7 (determining "LWD alleges on behalf of the proposed Direct Purchaser Class the very same manner of injury from the very same course of conduct that it complains of for itself, and LWD asserts on its own behalf the same legal theory that it asserts for the Class."); *DDAVP*, 2011 U.S. Dist. LEXIS 97487, at *6 (similar); *Oxycontin*, 2010 U.S. Dist. LEXIS 146003, at *42 (similar); *Buspar*, 210 F.R.D. at 57 (similar).

14

### D.     The Class Representatives and Class Counsel Will Fairly and Adequately Protect the Interests of the Class

"Determination of adequacy typically entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 103 (2d Cir. 2007) (internal quotes and citation omitted). Plaintiffs meet both criteria.

### 1.     Absence of Conflict of Interest

A proposed class representative is adequate under Rule 23(a)(4) unless it has non-speculative conflicts with absent class members that are "so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation."[37] To preclude certification, the "conflict must be more than merely speculative or hypothetical." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001). Where defendants' actions form the basis of the antitrust claim, "named plaintiffs and their counsel have the same core objectives as would absent class members."[38] Here, as in similar prior cases, "because *Hanover Shoe* sets the amount of the overcharge as plaintiffs' damages, all of the class members have the same financial incentive for purposes of the litigation – *i.e.*, proving that they were overcharged and recovering damages based on that overcharge." *K-Dur*, 686 F.3d at 223. The interests of the Class representatives are aligned with those of absent Class members.

### 2.     Counsel is Qualified

The Court previously appointed Berger & Montague, P.C. ("B&M") and Garwin, Gerstein & Fisher LLP ("GGF") as Interim Co-Lead Counsel. *See* Order, Dec. 16, 2016, ECF No. 125.

---

[37] *NASDAQ*, 169 F.R.D. at 514-15.
[38] *In re Carbon Black Antitrust Litig.*, No. CIV.A.03-10191-DPW, 2005 WL 102966, at *14 (D. Mass. Jan. 18, 2005) (citation omitted).

Since then, Interim Co-Lead Class Counsel have worked diligently, harmoniously and efficiently with other counsel for the Class. These firms have extensive experience in similar antitrust class actions.[39] Class counsel satisfy Rules 23(a)(4), as well as Rule 23(g).

### E.    Common Legal and Factual Questions Predominate

Predominance is "'a test readily met in certain cases alleging . . . violations of the antitrust laws.'" *Cordes*, 502 F.3d at 108. Predominance requires that "*questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."[40] "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Id*.

In *Amgen*, the Supreme Court explained that "Rule 23(b)(3) ... does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof" but rather that "common questions '*predominate* over any questions affecting only individual [class] members.'"[41] If common issues and evidence have greater overall significance, the presence of individual issues will not defeat predominance.[42] Rather, the plaintiff need only "demonstrate that the element of antitrust impact is *capable of proof at trial* through evidence that is common to the class rather than individual to its members."[43]

---

[39] *See* GGF Firm Resume, ECF No. 114-1 and B&M Firm Resume, ECF No. 114-2. *See also In re Aggrenox Antitrust Litig.*, No. 3:14-md-02516-SRU (D.Conn. June 6, 2014) (ECF No. 94) (appointing GGF interim lead counsel); *In re Lamictal Antitrust Litig.*, No. 2:12-cv-00995-WHW-CLW (D.N.J. May 16, 2012) (ECF No. 34) (same); *Wellbutrin XL*, 2011 WL 3563385, at *5 (finding class counsel B&M to be "well-qualified"); *K-Dur*, 2008 WL 2699390, at *7 & n.8 (finding B&M and GGF qualified as co-lead class counsel).

[40] *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (emphasis added).

[41] *Id.* at 1196 (emphases and alterations in original).

[42] *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 87 (2d Cir. 2015) ("The mere existence of individual issues will not be sufficient to defeat certification. Rather, the balance must tip such that these individual issues predominate.").

[43] *Air Cargo*, 2014 WL 7882100, at *41 (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008) (emphasis added)).

Under *Comcast Corp. v. Behrend*, the Court has a "duty to take a 'close look' at whether common questions predominate over individual ones." 133 S. Ct. 1426, 1432 (2013) (quotation omitted). The "'three required elements of an antitrust claim'" that Plaintiffs must demonstrate are "'(1) a violation of antitrust law; (2) injury and causation; and (3) damages.'" *Cordes*, 502 F.3d at 105. That "close look" shows the proof relating to each of these elements is predominantly common, as it was in every prior case alleging impaired generic drug competition. If Class members were to pursue this case individually, each would have to prove the same course of conduct, using the same documents and witnesses.

### 1.     Proving Liability Presents Predominantly Common Issues

As to the first element, this Court has already held in a highly similar action brought by one of the named Plaintiffs here, that "[p]roof of the allegedly monopolistic and anti-competitive conduct at the core of the alleged liability is common to the claims of all the plaintiffs" who pled an overcharge theory. *Buspirone*, 210 F.R.D. at 57 (*citing Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997)). This is because the proof necessary to establish Defendants' wrongdoing will not vary Class member-by-Class member. *Cf. Cordes*, 502 F.3d at 105 (in price-fixing case, "allegations of the existence of a price-fixing conspiracy are susceptible to common proof and, if proven true, would satisfy the first element of the plaintiffs' antitrust cause of action."). Here, proof that Forest entered into an illegal reverse payment with Mylan will present solely issues common issues that will not vary by Class members, just as in prior cases.[44]  Plaintiffs' product

---

[44] *See, e.g., Lidoderm*, 2017 WL 679367, at *10; *Wellbutrin XL*, 2011 WL 3563385, *6 ("If each class member pursued its claims individually, the class member would have to prove the same antitrust violations using the same documents, witnesses, and other evidence. Furthermore, the issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members."); *K-Dur*, 2008 WL 2699390, at *12 ("Courts routinely find that proof of a violation of the antitrust law focuses on the defendants' conduct and not on the conduct of individual class members."); *Nifedipine*, 246 F.R.D. at 369 n.5 ("[w]hether [defendants' actions]

hop theory likewise presents predominantly common issues.[45] *See, e.g.*, *TriCor*, 252 F.R.D. at 228.

That remains true although the illegality of Forest's "hard switch" will be fixed via collateral

estoppel per this Court's opinion in *Namenda IV*. In *In re Nassau County Strip Search Cases*, the

defendant made admissions as to "major liability issues," removing them as topics for trial, but the

Court of Appeals nevertheless considered them in satisfying the predominance requirement. 461

F.3d 219, 228 (2d Cir. 2006). "Eliminating conceded issues from Rule 23(b)(3)'s predominance

calculus would undermine the goal of efficiency by requiring plaintiffs who share a commonality

of the violation and the harm, nonetheless to pursue separate and potentially numerous actions

because, ironically, liability is so clear."[46]

### 2.    Proving Injury Presents Predominantly Common Issues

Likewise, with respect to proving the fact of antitrust injury (or impact), Plaintiffs would

advance proof common to the Class. Antitrust injury, or impact, requires a showing of "some

damage" due to a defendant's antitrust violation.[47] Class certification is proper even if the Class

includes some uninjured members,[48] or if this Court were to find that "the issue of injury-in-fact

---

constituted a 'conspiracy' … is an issue common to all prospective plaintiffs") (predominance standard satisfied).

[45] *See TriCor*, 252 F.R.D. at 228 (where allegations involved product hop, "the court finds that each putative class member, had they pursued their claims individually, would have been required to prove identical facts, such as defendants' monopoly power, exclusionary scheme, effect on interstate commerce, conspiracy, and unreasonable restraint of trade. Therefore, these common issues predominate over any individual issues relating to proof of an antitrust violation"). *See also Buspirone*, 210 F.R.D. at 58 ("[p]roof of the allegedly monopolistic and anti-competitive conduct at the core of the alleged liability is common to the claims of all the plaintiffs"); *Flonase*, 2010 U.S. Dist. LEXIS 120177, at *21; *Relafen*, 218 F.R.D. at 343.

[46] *Id.* at 228 (internal quotes omitted).

[47] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).

[48] *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("[A] certified class may include a de minimis number of potentially uninjured parties."); *K-Dur*, 686 F.3d at 221-22 (that some class members have "zero" or "negative" damages does not defeat certification if "all (or virtually all) members of the proposed class" were harmed); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct … Such a possibility or indeed inevitability does not preclude class

presents individual questions, [because] it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." *Cordes*, 502 F.3d at 108 (reversing denial of class certification).

Under Second Circuit law, antitrust injury "poses two distinct questions," one legal and one factual. *Id.* at 106. The legal question is "whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Here, as in *Cordes*, "[t]here is only one type of injury alleged in the Complaint – overcharges paid" by purchasers as the result of an antitrust violation. 502 F.3d at 107. And this Court has emphasized that "the proper measure of damages is the full amount of the overcharge" and that "a purchaser's actual lost profit is generally irrelevant." *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-7488, 2017 WL 2693713, at *6 (S.D.N.Y. June 21, 2017) (Francis, M.J.) (citing *Hanover Shoe, Inc. v. United Mach. Corp.*, 392 U.S. 481, 489 (1968)). Thus, "the legal question raised by the antitrust injury element is common to the class." *Cordes*, 502 F.3d at 108.

The second question respecting antitrust injury is "the familiar factual question" of "whether injury-in-fact is susceptible to common proof in this case." *Id.* at 106. Plaintiffs allege injury (as in all prior generic suppression cases) in the form of overcharges. *See supra* nn. 1-2. Plaintiffs allege that were it not for the Forest's unlawful agreement with Mylan and for its "hard switch," unimpaired generic memantine competition would have begun in June 2012, and all or nearly all Class members would have paid less for their requirements of memantine by substituting

---

certification."); *Air Cargo*, 2014 WL 7882100, at *44 ("Nothing in our class certification jurisprudence requires that every single class member suffer an impact or damages, regardless of the size of the class. To the contrary, courts have routinely recognized what an unrealistic burden this would put on plaintiffs"); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010); *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009).

less-expensive generic memantine for more-expensive brand Namenda IR and Namenda XR and/or by paying less for the generic. Plaintiffs allege that all or nearly all Class members were injured because Forest thwarted such unimpaired generic competition.

"If [a] single formula can be employed to make a valid comparison between the but-for fee and the actual fee paid, then … the injury-in-fact question is common to the class." *Id.* at 107. Plaintiffs here are seeking their overcharges -- the difference between the price that was actually charged and the price that would have been charged had the anticompetitive conduct not occurred. *See*, *e.g.*, *Paper Sys., Inc. v. Nippon Paper Indus.*, 281 F.3d 629, 633 (7th Cir. 2002). The relevant price difference is then multiplied by the quantity of affected products "actually purchased." SECTION OF ANTITRUST LAW, AMERICAN BAR ASS'N, PROVING ANTITRUST DAMAGES 90 (3d ed. 2017). This is "the standard method of measuring damages in price enhancement cases[.]" *Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.*, 424 F.3d 363, 374-75 (3d Cir. 2005).

Dr. Lamb, an experienced economist retained by plaintiffs, has concluded that: (1) Forest's allegedly unlawful conduct, if proven, had a direct, market-wide effect on memantine prices generally (*i.e.*, maintaining prices above the level that would have occurred absent the allegedly unlawful conduct), and (2) absent that conduct and unimpaired generic competition beginning in 2012, all or nearly all Class members would have paid less for their purchases of memantine. Lamb Rpt. ¶¶43-161. Dr. Lamb sets forth sets forth several types of evidence, all common to the Class, that both independently and in combination support his conclusion that all or nearly all members of the Class incurred at least some overcharges from impaired generic competition, and therefore suffered antitrust injury.

First, Dr. Lamb reviews extensive empirical economic research demonstrating that

generics are substantially cheaper than and rapidly substituted for their brand counterparts.[49] Unconstrained generic competition reduces prices because (a) AB-rated generics are priced substantially below than their brand counterparts and quickly capture unit sales formerly enjoyed by the brand, (b) brand manufacturers may launch their own authorized generics ("AG") to compete on price,[50] and (c) generic prices are lower with more generic competitors on the market.[51] The literature also shows that generic prices typically fall as more generics enter the market.[52] This research shows the competitive effects of unimpaired generic entry and is strong common evidence of the classwide impact of the challenged conduct here.[53]

Second, Dr. Lamb cites contemporaneous forecasting documents, prepared for business purposes by Forest and generic manufacturers, which conclude that, with unimpaired generic competition, generic memantine would be priced lower than branded Namenda IR and Namenda XR, and would quickly capture most branded Namenda sales.[54] These forecasts also show that the price of generic memantine would fall further as more generic memantine manufacturers entered the market.[55] In addition, Dr. Lamb cites forecasts prepared by Forest estimating the expected share of the market that would be converted to Namenda XR with the advent of the hard switch and compared that against Forest's analysis of how much market share Namenda XR would obtain without the hard switch.[56] These forecasts are common evidence, demonstrating that delaying

---

[49] *Id.* ¶¶68-74 (citing, *e.g.*, a 2010 FTC Study concluding that generic penetration rate is 90% on average approximately one year after generic entry and generic prices were 85% lower than brand).

[50] Plaintiffs are filing a motion to compel Forest to provide additional Rule 30(b)(6) testimony regarding its plans for an AG, and plaintiffs reserve the right to supplement the record on point.

[51] *Id.* ¶¶73-74.

[52] *Id.* ¶¶72-74.

[53] *Id.* ¶¶74.

[54] *Id.* ¶¶75-78. *See also id.* ¶¶93-95.

[55] *Id.* ¶¶75-78.

[56] *Id.* ¶¶87, 93-95, 151-57.

generic entry impacts all or nearly all members of the Class by preventing them from obtaining the substantial savings resulting from unimpaired generic competition, and that the hard switch caused higher IR to XR conversion and, hence, inflicted overcharges because higher XR conversion meant lower IR purchases and, consequently, lower generic IR purchases and lower associated savings.[57]

Third, Dr. Lamb examines actual data concerning what happened during the period when Forest's anticompetitive conduct impaired generic competition and the period after generic entry was allowed under the challenged agreements, starting July 2015. The Class paid much less for generic memantine than for brand Namenda IR or Namenda XR once the generic was available.[58]

Finally, Dr. Lamb concludes that because Class members are intermediaries in the chain of pharmaceutical distribution, there is no reason to think that any Class member, in its capacity as either a wholesaler or a retailer, exclusively served that small fraction of the prescription base that would not have taken advantage of the enhanced generic competition that would have occurred but for the alleged unlawful conduct.[59]

Courts in this district and elsewhere have found these kinds of common evidence can sufficiently establish antitrust impact through predominantly common proof. *See supra* nn. 1-2.

### 3.   Proving Classwide Damages Presents Predominantly Common Issues

The predominance requirement is further satisfied where, as here, aggregate damages to the Class can be reliably measured using classwide evidence.[60] A "defendant whose wrongful

---

[57] *Id*. ¶¶67.

[58] *Id*. ¶¶79-85.

[59] *Id*. ¶¶42, 67.

[60] *See, e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (approving use of classwide aggregate damages model); *Air Cargo*, 2014 WL 7882100, at *61 ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." (citation omitted)); *NASDAQ*, 169 F.R.D. at 521 (approving damage model "to determine aggregate damages for the Class as a whole"); *Nexium*,

conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."[61] "Calculations need not be exact[],"[62] though "any model supporting a plaintiff's damages case must be consistent with its liability case[.]"[63]

The possibility of individual damages inquiries poses no obstacle to certification.[64] As such, courts have certified similar classes alleging suppressed generic competition despite defense arguments that individual damage questions and "variations" in prices and rebates preclude certification.[65] That Class members suffered varying amounts of damage is also no bar to certification.[66]

Dr. Lamb has measured aggregate Class damages caused by Forest's alleged illegal conduct. Lamb Rpt. ¶¶121-60. Dr. Lamb's "model purporting to serve as evidence of damages in

---

777 F.3d at 19 (rejecting challenge under *Comcast* where "the plaintiffs' theory and model for damages would only require that the defendants pay aggregate damages equivalent to the injury that they caused.").

[61] *Eastman Kodak Co. v. S. Photo Mat. Co.*, 273 U.S. 359, 379 (1927). Damages may be estimated from available evidence. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

[62] *Comcast*, 133 S. Ct. at 1433.

[63] *Id.* (citations and quotations omitted).

[64] *See, e.g.*, *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("*Comcast,* then, did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis."); *Nexium*, 777 F.3d at 21 ("the need for some individualized determinations at the liability and damages stage does not defeat class certification.").

[65] *E.g.*, *Lidoderm*, 2017 WL 679367, at *11 (that direct purchasers paid different prices and were injured in different amounts no bar to certification); *K-Dur*, 686 F.3d at 221-22; *Cardizem*, 200 F.R.D. at 318 (similar); *Flonase*, 274 F.R.D. at 134 (similar); *Nexium*, 296 F.R.D. at 57-58 (similar); *Nifedipine*, 246 F.R.D. at 370 (similar); *Ovcon*, 246 F.R.D. at 312 (similar); *Wellbutrin XL*, 2011 WL 3563385, at *12 (similar). *See also Nexium*, 777 F.3d at 21 ("Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.") (internal quotation and citations omitted).

[66] *Nexium*, 777 F.3d at 21 ("For example, damages will not be uniform across the class. But it is well-established that the individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3)." (quotation and citations omitted)).

this class action [] measure[s]only those damages attributable to that theory"[67] and is based on Dr. Lamb's extensive past work with aggregate overcharge analyses and his work here. Overcharge damages arise from the difference between the actual prices that Class members paid for branded Namenda IR and Namenda XR and the prices the Class would have paid for generic memantine had generic competition not been impaired. Lamb Rpt. ¶¶122. Dr. Lamb uses data obtained from IMS Health,[68] Forest, and generic memantine manufacturers to determine the prices the Class actually paid; and calculates the volumes and prices the Class would have paid for brand and generic memantine using the prices the Class actually paid and the manufacturers' business forecasting documents showing the expected prices and unit sales of brand and generic memantine. Lamb Rpt. ¶¶122-24. In formulaically calculating aggregate Class damages, Dr. Lamb utilizes and relies only on proof common to the Class.[69] This is not a case where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 133 S. Ct. at 1433.

In sum, this action satisfies the predominance requirement of Rule 23(b)(3).

### F.    A Class Action is Superior to Other Methods of Adjudication

The "superiority" requirement of Rule 23(b)(3) ensures that a class action will "achieve

---

[67] *Comcast*, 133 S. Ct. at 1433.

[68] IMS Health, the leading provider of prescription drug data, maintains a database designed to enable pharmaceutical companies – including Forest, which used IMS data – to assess the competitive dynamics in the U.S. pharmaceutical market. It is the "gold standard" of prescription sales data. *See In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10739, 2011 WL 3852254, at *32 (D. Mass. Aug. 31, 2011). *See also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 538 (E.D. Mich. 2003) (referring to IMS Health, Inc. as "the recognized leader in data collection for the pharmaceutical industry"); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94-cv-897, 1999 U.S. Dist. LEXIS 12936, at *11 (N.D. Ill. Aug. 16, 1999) (IMS Health data analyzes sales information in "an effective and cost-efficient manner" and "no reason exists not to utilize this data when measuring the Class Plaintiffs' damages.").

[69] *Id*. ¶¶122-60. *See generally Lidoderm*, 2017 WL 679367, at *9-13.

economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. As demonstrated above, this case concerns common issues and evidence. Certification avoids congesting the courts with numerous individual suits (for those who can afford to sue), prevents inconsistent results, and allows Class members with smaller claims an opportunity for redress they might otherwise be denied. In every prior case alleging suppressed generic drug competition, courts have found that a class action was the superior method of adjudicating the case. *See supra* nn. 1-2. Absent certification, Defendants may argue that Class members may not benefit from this Court's collateral estoppel ruling as to the illegality of Forest's "hard switch" product hop. *Cf. Nassau County Strip Search Cases*, 461 F.3d at 228 (requiring individual plaintiffs to prove "anew" defendants' liability would be inefficient). In short, certification of the Class is plainly the superior method by which Class members can obtain compensation for their injuries. *See In re Currency Conversion Fee Antitrust Litig*., 264 F.R.D. 100, 118 (S.D.N.Y. 2010) (holding "[a] class action is the superior method of adjudicating these claims. Many of the class members' claims will be small relative to the high costs of maintaining an antitrust action…Streamlining the litigation in one forum will simplify the process and avoid inconsistency."); *Buspirone*, 210 F.R.D. at 58 (holding class certification for a direct purchaser class action was the superior method of adjudicating the claims at issue); *Arava*, 2008 U.S. Dist. LEXIS 123291 at *10 (same).

## IV.   CONCLUSION

For these reasons, Plaintiffs respectfully request that their motion be granted.

Dated: September 15, 2017

Respectfully submitted:

**Rochester Drug Co-Operative, Inc. and the Proposed Class**

**JM Smith Corporation d/b/a Smith Drug Company and the Proposed Class**

David F. Sorensen
Daniel C. Simons
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-4675
Fax: (215) 875-4604
Email: dsorensen@bm.net
         dsimons@bm.net

Peter Kohn
Joseph T. Lukens
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Tel: (215) 277-5770
Fax: (215) 277-5771
Email: pkohn@faruqilaw.com
         jlukens@faruqilaw.com

Bruce E. Gerstein
Joseph Opper
Dan Litvin
GARWIN GERSTEIN & FISHER LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
Email: bgerstein@garwingerstein.com
         jopper@garwingerstein.com
         khennings@garwingerstein.com
         dlitvin@garwingerstein.com

David C. Raphael, Jr.
Erin R. Leger
SMITH SEGURA & RAPHAEL, LLP
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
Email: draphael@ssrllp.com
         eleger@ssrllp.com

Stuart E. Des Roches
Andrew W. Kelly
Dan Chiorean
ODOM & DES ROCHES, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
Email: stuart@odrlaw.com

26

Russ Chorush
Miranda Jones
HEIM PAYNE & CHORUSH, LLP
600 Travis, Suite 6710
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
Email: rchorush@hpcllp.com

**CERTIFICATION OF SERVICE**

I, Dan Litvin, hereby certify that on **September 15, 2017**, a copy of the foregoing document was served upon all parties to this action via the Court's ECF system, where it is available for viewing and downloading. A confidential version of this brief was also served upon all parties via electronic mail.

**Dan Litvin**