# Exhibit 123
# (Filed Under Seal)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION | Case No. 1:15-CV-07488-CM-JCF |

## DECLARATION OF JAMES FINCHEN

I, James Finchen, hereby declare as follows:

1.      I am currently employed at Alkermes, Inc. as Director, Contracts Counsel.  My current responsibilities include providing legal advice to the Government Pricing, Payer, and Trade functions, as well as overseeing the U.S. Contracting function.

2.      I was employed by Forest Laboratories, Inc. ("Forest") from October 2000 until March 2014.

3.      From October 2000 through June 2006, I held various positions in the Sales Administration department.

4.      From July 2006 through May 2010, I worked in the Commercial and Government Contracting group as an Associate Manager of Contract Development and Analysis (July 2006 – June 2007), a Manager of Contract Development and Analysis (July 2007 – June 2009), and a Senior Manager of Contract Development and Analysis (July 2009 – May 2010).   My responsibilities within the Commercial and Government Contracting group included overseeing calculation of government rebates and pricing, and developing contracts for various trade channels (such as PBMs, Medicaid, Medicare, and GPOs).

5.      While working at Forest, I attended law school through an evening program at Brooklyn Law School, and I received my J.D. in June 2008.  From June 2010 until I left Forest in March 2014, I worked in the legal department as Associate Legal Counsel, where my responsibilities included counseling the Government Pricing function, and ordinary course contracting.

6.      Since approximately July 2006, my work has required an understanding of government pricing and rebates, including the manner in which Medicaid rebates are calculated. Medicaid rebates are, broadly speaking, rebates owed from branded pharmaceutical manufacturers to Medicaid, based, in part, upon the "best price" for which the pharmaceutical manufacturer sells its pharmaceuticals to non-government purchasers.

7.      In or around January 2010, I was asked to analyze the additional Medicaid rebate liability Forest would incur by manufacturing an authorized generic version of Lexapro for Mylan's distribution and sale ████████████ in contrast to the Medicaid rebate liability Forest would incur in the event that Mylan manufactured an authorized generic version of Lexapro itself for its distribution and sale ███████████

8.      ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

9.      I was not involved in any negotiations with Mylan regarding the Lexapro Amendment, nor was I involved in decision-making regarding a strategy for revising the Lexapro Agreement.

10.     My work in analyzing the Medicaid rebate liability for the authorized generic version of Lexapro pre-dated my time as Associate Legal Counsel at Forest, and was conducted in a purely business role.

11.     I was primarily responsible for analyzing the additional Medicaid rebate liability Forest would incur ███████████████████████████ including how changes to various assumptions underlying the analysis would change Forest's Medicaid rebate liability.

12.     To analyze the additional Medicaid best price liability Forest would incur ███ ████████████████████ I utilized a financial model to calculate the expected liability under each scenario, and I analyzed the effect that altering certain assumptions and inputs would have on the expected liability. ████████████████████████ ████████████████

13.     Like any financial model, the Medicaid rebate model incorporates certain assumptions.  These assumptions were, to the best of my knowledge, based upon Forest's experience in the industry and reasonable expectations at the time of the analysis, and were provided to me by various groups at Forest responsible for each of those areas of business. ███ ████████████████████████ ██████████████████████████ ██████████████████

b. ████████████████████████████████████

████████████████████     ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

c.  Expected generic Lexapro launch date of March 2012;

d. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

e. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

f.  Expected quarterly change in CPI (consumer price index), which affects the

average rebate per unit (RPU).

14.    Between January 2010 and March 2010, I created ███████████ iterations of the

Lexapro Medicaid best price liability analysis, as I received updated information on assumptions

including Lexapro unit and price forecasts, transfer price, and profit share.  To the best of my

recollection, in each case, I calculated that Forest would incur ████████████ less in Medicaid best price liability ██████████████████.

15.     To the best of my knowledge, based on my review of several versions of the analysis, Exhibit 1 appears to be the latest Lexapro Medicaid best price analysis conducted in advance of execution of the Lexapro Amendment ████████████, and it appears to reflect the final assumptions and inputs available at that time. ████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of October, 2017, in Waltham, Massachusetts.

James Finchen