# Exhibit 198
# (Filed Under Seal)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK )
)
By and through Eric T. Schneiderman, )
Attorney General of the State of New York )
)
Plaintiff, )
)
v. )  C.A. No. 14-cv-7473
)  Filed Under Seal
ACTAVIS, PLC, and FOREST LABORATORIES, )
LLC )
)
Defendants. )
)

## DECLARATION OF JERRY A. HAUSMAN
### October 21, 2014

PX287

HIGHLY CONFIDENTIAL

FRX-AT-01779957

# I.    INTRODUCTION AND QUALIFICATIONS

1.    I am an economist specializing in econometrics, the application of statistical methods to economic data, and applied microeconomics, the study of behavior by firms and by consumers. I have been asked by counsel for Forest to consider economic issues related to Forest's plan to restrict the distribution of Namenda® IR.[1] As described more fully below, I have reached the following conclusions:

- Market evidence, including the share of patients converted from twice-daily Namenda® IR to once-daily Namenda XR®, surveys of physicians, pharmacists, and caregivers, and the coverage Namenda® XR has obtained from third-party payers, indicates that Namenda XR® offers benefits over Namenda® IR. Restricting the distribution of Namenda® IR is unlikely to lead to significant disruption in the marketplace.

- Restricting the distribution of Namenda® IR is unlikely to foreclose generic entry for Namenda® IR. Payers are sophisticated buyers who have the incentive and ability to encourage the use of generic Namenda® IR, and market evidence indicates that switching from Namenda XR® to Namenda® IR is feasible and likely to be substantial.

- Forest has invested hundreds of millions of dollars developing and promoting Namenda®. Preventing Forest from restricting the distribution of Namenda® IR would increase the extent to which generic manufacturers can "free ride" on Forest's investments in the Namenda® franchise and would decrease the incentives of branded manufacturers to invest in new and improved drugs.

2.    I am the MacDonald Professor of Economics at the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts. I graduated from Brown University in 1968. I received a D.Phil. (Ph.D.) in economics from Oxford University in 1973 where I was a Marshall Scholar. I have been at MIT since completing my D.Phil. My academic specialties are econometrics, the application of statistical methods to economic data, and applied microeconomics, the study of behavior by firms and by consumers.

3.    I have been an associate editor of *Econometrica*, the leading economics journal, and the *Rand (Bell) Journal of Economics*, the leading journal of applied microeconomics. In December 1985, I received the John Bates Clark Award of the American Economic Association, awarded every other year for the most "significant contributions to economics" by an economist under the age of 40. In 1980, I was awarded the Frisch Medal of the Econometric Society. In 2013, I was named a Distinguished Fellow by the American Economic Association. I have been a member of numerous government advisory committees for both the U.S. government and the

---

[1] I do not offer any opinion on the relevant product market. For purposes of this report, I assume that the relevant product market is as defined in the complaint (NMDA antagonists) (Complaint, ¶¶46-51).

HIGHLY CONFIDENTIAL                                                                FRX-AT-01779958

Commonwealth of Massachusetts. I have published over 170 academic research papers in leading economic journals including the *American Economic Review*, *Econometrica*, and the *Rand (Bell) Journal of Economics*.

4. I have done academic research and consulted in the pharmaceutical industry for over 20 years. In 1984 and 1985, I published a number of academic papers that considered the effects of research and development on patents. The papers included an analysis of companies in the pharmaceutical industry. About that time I consulted with Eli Lilly & Co. about economic strategy for pricing of branded drugs after they came off patented status. I also consulted on a number of mergers in the industry including the acquisition of Medco (a Pharmacy Benefit Manager ("PBM")) by Merck. I did extensive studies of pricing and marketing by pharmaceutical companies in the mid-1990s. I have continued to consult over the years on pricing strategy by pharmaceutical companies, including the effect of regulation of prices by numerous foreign governments. I have also consulted for a number of PBMs, including Medco, Express Scripts, and Caremark. I have written academic papers that study competition in the pharmaceutical industry, including "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," with S. Fisher Ellison, I. Cockburn, and Z. Griliches, *Rand Journal of Economics* 28, 1997.

5. I have extensive experience in antitrust matters. I have testified as an expert witness in a number of antitrust proceedings. I have also been involved in actions before the U.S. Department of Justice, the Federal Trade Commission, the Canadian Antitrust Agency, the Australian competition authorities, the U.K. competition authorities, the German competition authorities, the Slovenian antitrust authorities, the New Zealand competition authorities, and the European Commission. In addition, I have given a number of invited lectures on antitrust issues to members of the Department of Justice, the Federal Trade Commission, the Australian competition authorities, and the American Bar Association.

6. My curriculum vitae is attached as Exhibit 1. A list of recent cases in which I have testified is attached as Exhibit 2. A list of materials I have considered is attached as Exhibit 3. I am being compensated at a rate of $1,250 per hour. My compensation is not contingent on the content of my opinions or the outcome of the case.

## II.   NAMENDA XR® OFFERS BENEFITS OVER NAMENDA® IR

7. In June 2013 Forest launched Namenda XR®, a once-daily extended-release formulation of its Alzheimer's disease treatment Namenda® IR, which is dosed twice a day. Market evidence since the time of launch, including the share of patients converted from Namenda® IR to XR®, surveys of physicians, pharmacists, and caregivers, and the coverage Namenda XR® has obtained from third-party payers, indicates that Namenda XR® offers benefits over Namenda® IR.

8. Survey evidence demonstrates the acceptance of Namenda XR®, and further provides information on the reasons Namenda XR® is preferred. An October 2013 survey of caregivers found that 73% of caregivers were satisfied or extremely satisfied

HIGHLY CONFIDENTIAL                                                      FRX-AT-01779959

with Namenda XR®, with the remaining 27% exhibiting neutral satisfaction (i.e., rating their satisfaction level 5 or 6 out of 10).[2]  An October 2013 survey of physicians found even higher satisfaction levels for Namenda XR®, with 93% of physicians reporting that they were satisfied to extremely satisfied, 5% reporting neutral satisfaction, and only 2% reporting that they were unsatisfied or not at all satisfied.[3]  Similarly, a November 2013 survey of caregivers found that 78% of caregivers were somewhat or very satisfied with Namenda XR®, and that 53% of caregivers were more satisfied with Namenda XR® than they were with Namenda® IR, with only 9% less satisfied with Namenda XR®.[4]  A November 2013 survey of physicians found that 88% of physicians were somewhat or very satisfied with Namenda XR®.[5]

9.  If potential cost differences are set aside, caregivers, pharmacists, and physicians all prefer Namenda XR® to Namenda® IR.  In this situation 79% of caregivers prefer Namenda XR® to Namenda® IR, while 99% of both pharmacists and physicians prefer Namenda XR® to Namenda® IR.[6]

10.  The survey evidence also indicates that the once-a-day dosing of Namenda XR® is an important benefit from the perspective of both caregivers and physicians.[7]  86% of caregivers report that the fact that Namenda XR® is taken once a day was somewhat or very important to the decision to take Namenda XR®, and 98% of caregivers report that the once-daily dosing of Namenda XR® is somewhat or very convenient.[8]  Similarly, 93% of physicians report that once-daily dosing is somewhat or very important to Alzheimer's patients, and 90% of physicians report that the once-daily dosing of Namenda XR® was somewhat or very important in the decision to prescribe Namenda XR®.[9]  One reason that once-daily dosing is particularly important for Namenda® patients is that many Namenda® patients also take other once-daily drugs for Alzheimer's, so taking Namenda XR® allows them to take all of the Alzheimer's medications only once a day.[10]  Because many Namenda® patients take other once-daily drugs for Alzheimer's, the value of once-daily Namenda XR® is likely to be high.

11.  The once-daily dosing provided by Namenda XR® also provides potential benefits in terms of reduced burdens on caregivers, reduced patient agitation, reduced medication administration errors, and reduced costs associated with administering medications.  In 2013, an estimated 15.5 million caregivers provided 17.7 billion hours of

---

[2] FRX-NY-01565466-474, p. 466.
[3] FRX-NY-01565494-510, p. 494.
[4] FRX-NY-01565511-547, pp. 522-523.
[5] FRX-NY-01565511-547, p. 536.
[6] FRX-NY-01565466-474, p. 472; FRX-NY-01565475-493, p. 487; FRX-NY-01565494-510, p. 506.
[7] The importance of once-a-day dosing has long been known in the pharmaceutical industry.  An example is the class of drugs I studied in "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," with S. Fisher Ellison, I. Cockburn, and Z. Griliches, *Rand Journal of Economics* 28, 1997, 426-446.
[8] FRX-NY-01565511-547, p. 524.
[9] FRX-NY-01565511-547, p. 534.
[10] Approximately 70% of Namenda® patients also take another Alzheimer's drug (FRX-NY-01707228, p. 229).  Many of those patients are also taking Aricept (donepezil), which is dosed once a day (Devlin Dep., p. 163).

4

care (valued at $220.2 billion) to patients with Alzheimer's and other dementias.[11]  56% of caregivers report that their patient always or sometimes becomes agitated when taking medication, and 80% of those caregivers report that Namenda XR® has helped with agitation.[12]  Research has found a high medication administration error rate for patients in assisted living,[13] and the risk of medication administration errors is greater when the number of doses per day is higher.[14]  Research has also found that extended release formulations reduce the costs associated with administering medications in nursing homes and long-term-care facilities.[15]

12.  The coverage Namenda XR® has received from third-party payers also demonstrates the acceptance of Namenda XR®.  Most of the Namenda XR® business is reimbursed by third-party payers such as Medicare Part D payers (responsible for ▮ of Namenda XR® business) and commercial payers (responsible for ▮ of Namenda XR® business).[16]  These third-party payers are sophisticated buyers that use tiered formularies to manage their drug expenditures.  Formularies are typically divided into three tiers, although some payers use formularies with four or more tiers.  The first tier is typically generic drugs with approximately $10 co-pays.  The second tier typically consists of branded products in a preferred position, with co-pays of approximately $40 for Medicare Part D plans or $30 for commercial plans.[17]  Products in the third formulary tier are typically disfavored branded products where co-pays are approximately $90 for Medicare Part D plans or $50 for commercial plans.[18]  As a result of the significantly higher co-pay, there is substantially less demand for products in the third tier than for products in the first and second tiers.

13.  Table 1 shows that as of August 2014, all of the top Medicare Part D payers and 7 of the top 11 commercial payers have placed Namenda XR® on the preferred second tier of their formularies.  I note that these Medicare Part D payers are all very sophisticated buyers of pharmaceuticals and they are well aware that generic Namenda® IR will have a significantly lower price than branded Namenda® IR or Namenda XR®.  Nevertheless, their market behavior (placing Namenda XR® on the second tier of their formularies) demonstrates their recognition of the value of Namenda XR®.

---

[11] www.alz.org/alzheimers_disease_facts_and_figures.asp.

[12] FRX-NY-01565511-547, p. 527.

[13] H. Young et al., "Types, Prevalence, and Potential Clinical Significance of Medication Administration Errors in Assisted Living," *Journal of the American Geriatric Society* 56(7), 2008, pp. 1199-1205.

[14] P. van den Bemt et al, "Medication Administration Errors in Nursing Homes Using an Automated Medication Dispensing System," *Journal of the American Medical Informatics Association* 16(4), 2009, pp. 486-492.

[15] I. Hamrick et al., "Nursing Home Medication Administration Cost Minimization Analysis," *Journal of the American Medical Directors Association* 8(3), 2007, pp. 173-177; S. Zlotnick et al., "Cost Analysis of Immediate- Versus Controlled-Release Medication Administration in Long-Term Care," *The Consultant Pharmacist* 11(7), 1996, pp. 689-692.

[16] FRX-NY-01707710.

[17] FRX-NY-01566424, slides 20-21.

[18] FRX-NY-01566424, slides 20-21.

HIGHLY CONFIDENTIAL                                                          FRX-AT-01779961

**Table 1: Namenda XR® Formulary Placement as of August 2014[19]**

| Medicare Part D Payers | Formulary Placement | Share of Namenda XR® Business |
|---|---|---|
| OPTUMRX/AARP | T2 | 20.4% |
| HUMANA | T2 | 10.3% |
| CMK SILVERSCRIPT/CCRX | T2 | 8.8% |
| CIGNA | T2 | 1.6% |
| WELLCARE HEALTH PLANS | T2 | 2.9% |
| COVENTRY HEALTH CARE/FIRST HLTH | T2 | 2.8% |
| Prime Therapeutics | T2 | 3.0% |
| EXPRESS SCRIPTS / MEDCO | T2 | 2.2% |
| AETNA INC. | T2 | 1.6% |
| BCBS WELLPOINT/ANTHEM/WELLCHOICE | T2 | 1.5% |
| Commercial Payers | | |
| EXPRESS SCRIPTS / MEDCO | T2 | 4.4% |
| CAREMARK | T2 | 2.4% |
| FEDERAL EMPLOYEES/ FEHB | T3 | 1.8% |
| CATAMARAN | T2 | 0.7% |
| AETNA INC. | T2 | 0.6% |
| UNITED HEALTHCARE | Restricted | 0.2% |
| BCBS WELLPOINT/ANTHEM/WELLCHOICE | T2 | 0.4% |
| OPTUMRX | T2 | 0.4% |
| CIGNA | T3 | 0.3% |
| HUMANA | T2 | 0.2% |
| COVENTRY HEALTH CARE/FIRST HLTH | Restricted | 0.1% |

14. Figure 1 charts the Namenda XR® conversion rate, which is defined as the share of total Namenda® prescriptions accounted for by Namenda XR®. As Figure 1 shows, in July 2014 before Forest began experiencing temporary supply issues with Namenda XR® (discussed in more detail below), the conversion rate reached ███. The Namenda XR® conversion rate based on new prescriptions peaked at an even higher level, approximately ███[20] These conversion rates exceeded Forest's original conversion rate target of ███[21] (which was set prior to the launch of Namenda XR®) and further demonstrates the market acceptance of Namenda XR®.

---

[19] Source: FRX-NY-01707710.
[20] FRX-NY-01707710.
[21] FRX-NY-01566108, slide 3.

6

15. The evidence I have discussed in this section indicates that Namenda XR® has benefits over Namenda® IR and has been well accepted, which indicates that total Namenda® usage would not decline substantially if Namenda® IR were distributed in a limited fashion. However, I note that in ████████████████████████ Forest assumed that there would be ████████ "disruption" if Namenda® IR were withdrawn from the marketplace or distributed in a limited fashion.[23] "Disruption" refers to the extent to which sales would be lower if only Namenda XR® were available compared to the situation in which both Namenda XR® and Namenda® IR are available. The evidence of market acceptance discussed above about the acceptance of Namenda XR® indicates that Forest's disruption estimates of ████████████ were ████████████. Indeed, the October 2013 surveys of caregivers, pharmacists, and physicians resulted in much lower estimates of disruption. The disruption estimates from these surveys were 4% to 6% (caregivers),[24] 3% to 5% (pharmacists),[25] and 3% to 9% (physicians).[26] Forest's estimates of ████████ disruption ██████████████████████ on the experience of OxyContin, which introduced a new abuse-deterrent formulation in 2010.[27] ████████████ ████████████████████████████████████ The use of OxyContin as an analog is likely to substantially overstate the disruption associated with withdrawing Namenda® IR, because introducing an abuse-deterrent formulation is much more likely to lead to reduced sales (due to less abuse) than moving from twice-daily to once-daily dosing. Indeed, I have previously analyzed the sales of the abuse-deterrent formulation of OxyContin and found that a significant reason for the decrease in sales was a shift to

---

[22] Source: FRX-NY-01707710.
[23] See, e.g., FRX-NY-01627489, slide 13; FRX-NY-01566424, slide 27.
[24] FRX-NY-01565466-474, p. 467.
[25] FRX-NY-01565475-493, p. 477.
[26] FRX-NY-01565494-510, p. 495.
[27] FRX-NY-01627489, slide 13; FRX-NY-01566424, slide 28.

HIGHLY CONFIDENTIAL FRX-AT-01779963

non-abuse-deterrent therapeutic substitutes.[28]  Thus, the experience of OxyContin likely overstates the amount of "disruption" if Namenda® IR is withdrawn or distributed in a limited fashion.

## III.   WITHDRAWAL OF NAMENDA® IR IS UNLIKELY TO FORECLOSE GENERIC ENTRY

16. The elimination or restriction of the distribution of Namenda® IR is unlikely to foreclose generic entry for Namenda® IR.   As is discussed above, most of the Namenda® sales are reimbursed by third-party payers.   These payers are sophisticated buyers who have the incentive and ability to encourage the use of generic Namenda® IR. In particular, these payers can move Namenda XR® to a higher formulary tier or remove Namenda XR® from their formularies altogether.   Indeed, some payers have already announced 2015 formularies in which Namenda XR® has been moved to a higher formulary tier or other restrictions have been placed on its use.[29]  Such actions would create considerable incentives for patients and physicians to use generic Namenda® IR instead of Namenda XR®.

17. Survey evidence indicates that even if third-party payers leave Namenda XR® on the second tier, substantial numbers of patients would switch to cheaper generic Namenda® IR.   When caregivers were asked to choose between Namenda XR® at a co-pay of $40 or higher and generic Namenda® IR at a co-pay of $5 to $10, only 43% said that they would continue with Namenda XR®, with 51% saying they would ask for generic Namenda® IR.[30]  Pharmacists and physicians also estimate that at those co-pay levels fewer than half of Namenda XR® users would continue with Namenda XR®.[31]  The pharmacist and physician surveys also confirm that patients and caregivers will be given information about the availability of generic Namenda® IR.   Only 27% of pharmacists surveyed and 24% of physicians surveyed would refill a Namenda XR® prescription without mentioning the generic.[32]

18. The ease with which patients have switched from Namenda® IR to Namenda XR® suggests that it will not be problematic for patients to switch back from Namenda XR® to generic Namenda® IR.[33]  95% of caregivers report that switching from Namenda®

---

[28] Studies by medical researchers have also found that the introduction of the abuse-deterrent formulation of OxyContin reduced abuse of OxyContin (see, e.g., T. Cicero, M. Ellis, and H. Surratt, "Effect of Abuse-Deterrent Formulation of OxyContin," *New England Journal of Medicine* 367(2), July 12, 2012, pp. 187-189).

[29] For example, Namenda XR® was on Tier 4 (branded non-preferred drugs) for the Health Alliance Plan 2014 Formulary (www.hap.org/healthinsurance/medicare/pdf/Formulary.pdf, p. 55), but has been removed from the 2015 Formulary (www.hap.org/healthinsurance/medicare/pdf/2015/Formulary.pdf, p. 55). Namenda XR® was on Tier 4 for the Network Health 2014 Part D Formulary (www.networkhealthmedicare.com/_files/pdf/2014_Formulary.pdf, p. 20), and in the 2015 Part D Formulary Namenda XR® remained on Tier 4 but prior authorization restrictions were imposed (www.networkhealthmedicare.com/_files/pdf/2015_Pharmacy_Files/2015_Formulary.pdf, p. 30).

[30] FRX-NY-01565466-474, p. 467. The caregivers that choose to stay with Namenda XR® would be making a choice based on the price and perceived quality differences of the products.

[31] FRX-NY-01565475-493, p. 478; FRX-NY-01565494-510, p. 496.

[32] FRX-NY-01565475-493, p. 478; FRX-NY-01565494-510, p. 496.

[33] Patients can be switched from Namenda® IR to Namenda XR® the very next day without titration

HIGHLY CONFIDENTIAL                                                                 FRX-AT-01779964

IR to Namenda XR® was easy.[34]  99% of physicians strongly agree or somewhat agree that switching patients from Namenda® IR to Namenda XR® is easy.[35]  I note that while in Dr. Lah's personal opinion there are concerns about switching patients from Namenda® IR to Namenda XR®,[36] his opinion contrasts with the opinions of the hundreds of doctors surveyed who say that switching is easy.  Furthermore, at his deposition Dr. Lah testified that he had "no foundation or basis on which to conclude that [patients] either will or will not have greater or lesser tolerability or that an individual patient will have greater adverse effects going to XR from IR."[37]  Dr. Lah further acknowledged that he has had very limited experience switching patients from Namenda® IR to Namenda XR® (and vice versa),[38] and that he is not aware of any published data or clinical trials indicating that switching from Namenda® IR to Namenda XR® (or vice versa) might harm patients.[39]

19. The temporary supply issues with Namenda XR® (apparent in Figure 1 above) provide a "natural experiment" that confirms that patients can and do switch back from Namenda XR® to Namenda® IR.  Recently, Forest experienced manufacturing yield issues which made it unable to meet rising demand for Namenda XR®.  Forest notified the FDA of a shortage in August 2014.[40]  This temporary supply issue has meant that in recent months Forest has not been able to supply enough Namenda XR® to meet the demands of patients currently taking Namenda XR®.  If it were not possible for patients on Namenda XR® to switch back to Namenda® IR, then I would expect Namenda XR® patients who are not able to obtain Namenda XR® to switch to a different Alzheimer's treatment or discontinue therapy altogether instead of switching to Namenda® IR.  Instead, ███ of the patients switching away from Namenda XR® in August 2014 switched to Namenda® IR.[41]  Based on the results of this natural experiment, I would expect that patients would be able to switch from Namenda XR® to generic Namenda® IR when the latter becomes available.  I further note that this natural experiment, which is based on actual market behavior, is inconsistent with Mr. Stitt's claim that he expects little switching from Namenda XR® to generic Namenda® IR.[42]  Economists place considerable weight on actual behavior in comparison to claims made in declarations that are not substantiated by actual behavior.

20. Although the evidence indicates that switching from Namenda XR® to generic Namenda® IR will not be problematic, it is also important to consider that over ███ of Namenda® patients are new each year.[43]  Even if it were difficult to switch from

---

(www.fda.gov/downloads/Drugs/DrugSafety/DrugShortages/UCM386064.pdf).
[34] FRX-NY-01565511-547, p. 523.
[35] FRX-NY-01565511-547, p. 537.
[36] Lah Declaration, ¶¶24-25.
[37] Lah Dep., p. 279.
[38] Lah Dep., p. 219.
[39] Lah Dep., p. 24.
[40] Stewart Declaration, ¶ 11.
[41] FRX-NY-01707228, p. 234.
[42] Stitt Declaration ¶¶35-37.
[43] FRX-NY-01609010-021, p. 017.

HIGHLY CONFIDENTIAL

Namenda XR® to generic Namenda® IR, such difficulties would not prevent those new users from starting on generic Namenda® IR.

21. The amount of Namenda® franchise sales further indicates that the restriction of Namenda® IR distribution is unlikely to foreclose generic entry. Total Namenda® sales are over ███████ per year. Given that the expenses required for a generic manufacturer to enter are low (estimated to be in the range of $2 million to $5 million),[44] only a small fraction of Namenda XR® patients need to switch to generic Namenda® IR for generic entry to be profitable.

## IV. PREVENTING THE RESTRICTION OF NAMENDA® IR DISTRIBUTION WOULD SUBSIDIZE FREE RIDING BY GENERIC MANUFACTURERS

22. Branded pharmaceutical manufacturers invest hundreds of millions (if not billions) of dollars developing and promoting pharmaceuticals.[45] Forest invested approximately ███████ in research and development prior to the launch of Namenda® IR, approximately ███████ in research and development for Namenda XR®, and over ███████ in royalty payments to Merz as compensation for Merz's development of Namenda® IR.[46] Forest's expenditures on marketing and selling Namenda® IR and Namenda XR® have exceeded ███████ in the last four fiscal years.[47]

23. Generic manufacturers typically do not make any substantial investments of their own, but instead "free ride" on the investments made by the branded manufacturer, relying on automatic substitution to gain sales. In the current situation, if the distribution of Namenda® IR is restricted, the entry of generic Namenda® IR is unlikely to be foreclosed, and generic Namenda® IR will compete with Namenda XR®. Preventing Forest from restricting the distribution of Namenda® IR would increase the extent to which generic manufacturers can free ride on Forest's investments in the Namenda® franchise, and would decrease the incentives of branded manufacturers to invest in product improvements such as Namenda XR®. Branded manufacturers such as Forest only invest the hundreds of millions (if not billions) of dollars that are necessary to develop and market new drugs because of the returns they earn by selling those drugs. Increasing the amount of free riding, which reduces the return to the branded manufacturer, therefore reduces the branded manufacturer's incentives to invest in the development and marketing of new drugs.

---

[44] E. Berndt and J. Newhouse, "Pricing and Reimbursement in US Pharmaceutical Markets," in *The Oxford Handbook of the Economics of the Biopharmaceutical Industry*, P. Danzon and S. Nicholson, eds., 2012, p. 212.

[45] Studies have found that the cost of successfully bringing a new drug to the market are at least in the high hundreds of millions of dollars and can exceed $1 billion (see, e.g., J. DiMasi, R. Hansen, and H. Grabowski, "The price of innovation: new estimates of drug development costs," *Journal of Health Economics* 22, 2003, pp. 151-185; C. Adams and V. Brantner, "Spending on new drug development," *Health Economics* 19, 2010, pp. 130-141). The cost of successfully developing an Alzheimer's drug is likely higher given that the success rate for Alzheimer's drugs during the 2002-2012 was only 0.4% (J. Cummings, T. Morstorf, and K. Zhong, "Alzheimer's disease drug-development pipeline: few candidates, frequent failures," *Alzheimer's Research & Therapy* 6:37, 2014).

[46] Meury Declaration, ¶¶6, 8.

[47] FRX-NY-01707708, FRX-NY-01707721.

10

24. The antitrust laws should not be used to favor one competitor over another competitor, especially when the favored competitor is free riding on the investment of its competitor. Forest invested billions of dollars getting approval for and building market acceptance of Namenda®, while the generic entrants have not made any such investments but will instead be free riding on Forest's investment. Forest should not be required to permit even more free riding by generic entrants on its investment.

11

HIGHLY CONFIDENTIAL

I declare under penalty of perjury that the foregoing is true and correct.

Jerry A. Hausman
October 21, 2014

12

HIGHLY CONFIDENTIAL

FRX-AT-01779968

# Exhibits Filed Under Seal