# Exhibit 301
# (Filed Under Seal)

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3     C.A. No.  1:15-cv-07488-CM
       -------------------------------------x
 4
       IN RE:
 5
       NAMENDA DIRECT PURCHASER
 6     ANTITRUST LITIGATION
 7     -------------------------------------x
 8                       1221 Avenue of the Americas
                         New York, New York
 9
                         October 11, 2017
10                       10:36 a.m.
11
                    *** HIGHLY CONFIDENTIAL ***
12
13
14            VIDEOTAPED 30(b)(6) DEPOSITION of
15     FOREST LABORATORIES (now ALLERGAN) and its
16     Representative JULIE A. SNYDER, taken by the
17     Plaintiffs, held at the aforementioned time and
18     place, before Sherri Flagg, a Registered
19     Professional Reporter, Certified LiveNote
20     Reporter, and Notary Public.
21
                         *   *   *
22
23
24
25
```

Page 26

1    MS. McDEVITT: Objection to form.
2    The document says what it says.
3    A.   That's what the document says.
4    Q.   So Kirkland estimated that it
5 would cost [redacted] to prepare trial and
6 post-trial briefs, correct?
7    A.   That's --
8    MS. McDEVITT: Objection to form.
9    A.   That's what the document says.
10   Q.   And Kirkland, which is, again,
11 Forest's attorneys, estimated that it would
12 cost -- total litigation costs for appeal would
13 be [redacted], correct?
14   MS. McDEVITT: Objection to form.
15   A.   You're reading what's on the
16 document. I mean, I don't know what -- you
17 know, what Kirkland -- what they anticipated.
18 This is what they've put on the document.
19   Q.   And what they put on the document
20 was that the total appeal costs, total
21 litigation costs for appeal would be
22 [redacted] correct?
23   A.   That's what the document says for
24 Q3 2010.
25   Q.   And if you add up the trial and

Page 27

1 post-trial briefs and the appeal costs, you
2 arrive at total litigation costs of
3 [redacted]. Correct?
4    A.   If you're asking if [redacted]
5 [redacted] yes, that's what
6 the document says.
7    MS. McDEVITT: You want her to
8    read this divorced from the paragraph
9    that precedes it, these numbers?
10   MR. ENGER: No, I do not want her
11   to divorce anything.
12   Q.   My question is: Did Kirkland
13 estimate that the total litigation costs for
14 trial and post-trial briefs and appeal costs
15 for the Namenda patent litigation would be
16 $3.5 million?
17   MS. McDEVITT: Objection to form.
18   A.   I mean, the document clearly
19 states that these are estimates and they're
20 preliminary and subject to change based on
21 changes in the case schedule, the conduct of
22 our adversaries and various other factors that
23 impact litigation. So there's a sentence in
24 there that defines what -- you know, what could
25 happen.

Page 28

1    Q.   Again, what Forest attorneys told
2 Forest was that it was going to cost about
3 [redacted] to try the case, to do post-trial
4 briefings and to do appeal?
5    MS. McDEVITT: Objection to form.
6    That mischaracterizes what she just said
7    and mischaracterizes the document.
8    A.   It's a forecast, it's an estimate,
9 preliminary.
10   Q.   How much did Kirkland
11 preliminarily forecast that it would cost to do
12 trial, post-trial briefs and appeal costs?
13   A.   You're asking me to read what's on
14 the document?
15   Q.   I want you to answer my question.
16   MS. McDEVITT: I think it's asked
17   and answered.
18   If you can.
19   Q.   Is the answer [redacted]?
20   MS. McDEVITT: I think you need to
21   ask the question again.
22   Q.   Did Forest's attorneys
23 preliminarily estimate that it would cost
24 [redacted] to try the Namenda patent
25 litigation, to do post-trial briefs and to do

Page 29

1 appeal costs?
2    MS. McDEVITT: Objection to form.
3    A.   On March 23rd, 2009, the date of
4 this letter, they provided a preliminary
5 estimate, and estimates are in this -- are in
6 this document. That's all I know.
7    Q.   How does the estimate that
8 Forest's attorneys provided Forest compare with
9 the number that Mr. Coletti provided you
10 yesterday?
11   A.   The number that Ryan provided me
12 yesterday was, you know, shy [redacted]
13 [redacted]. We can compare
14 that to the numbers on this page, but they're,
15 you know, obviously different numbers.
16   Q.   Mr. Coletti's number is about
17 [redacted]
18 [redacted] is that fair?
19   A.   I don't know if I'm comparing
20 apples to apples. I mean, I can't comment on
21 that.
22   Q.   Apart from this March 23rd, 2009,
23 letter, did Forest or its attorneys prepare
24 other litigation budgets?
25   A.   I wouldn't -- I'm not aware. And

Page 62

1  how I do my five-year forecasts, you know, I
2  look at potential scenarios.
3      Q.   And in this particular situation,
4  the earliest potential generic entry using your
5  calculations was ▇▇▇▇, correct?
6      A.   Based on the new chemical entity,
7  Hatch Waxman plus the 30 months, that's the
8  ▇▇▇▇ that we see here.
9      Q.   So do you recall ever doing a
10 forecast or a model that called for a potential
11 generic Namenda Immediate-Release product that
12 came ▇▇▇▇?
13     A.   That's probably the earliest I
14 would have done.  But like I said, I run
15 hundreds of scenarios so I don't remember every
16 single one.
17     Q.   What I'm getting at is you're not
18 in the business of creating forecasts for some
19 pie-in-the-sky scenario that could never come
20 to pass, right?
21         MS. McDEVITT:  Objection to form,
22     mischaracterizes her testimony.
23     Q.   There would be higher and better
24 uses of your time than to forecast something
25 that couldn't come to pass?

Page 63

1         MS. McDEVITT:  Objection to form.
2      A.   I forecast various scenarios for
3  any potential situation.  When -- you know, in
4  Alzheimer's disease, there are -- there's
5  developments all the time. ▇▇▇▇
6  ▇▇▇▇
7  ▇▇▇▇ n
8  ▇▇▇▇
9  ▇▇▇▇ ors
10 ▇▇▇▇.
11         I do -- I forecast any -- any
12 scenario.  So I -- you know, like I said, I do
13 hundreds of scenarios.  So, yes, while I would
14 not forecast something that's completely out
15 of -- out of scope of what I'm looking at, I
16 forecast so many different scenarios just
17 for -- to see what the numbers would look like.
18 That's part of my job.
19     Q.   In your previous answer, you
20 mentioned ▇▇▇▇
21 ▇▇▇▇
22 ▇▇▇▇
23 ▇▇▇▇
24     A.   Yes, um-hmm.
25     Q.   So back to page 1 of the

Page 64

1  attachment of Solomon Exhibit 3, there are two
2  stars below that text box we were just
3  discussing, and it says Actual Patent Expires
4  April 2015.  Do you see that?
5      A.   I see that.
6      Q.   Does that refresh your
7  recollection that that's referring to the '703
8  patent as relates to Namenda?
9      A.   I'm not sure which patent it
10 refers to.
11     Q.   Do you recall any other patents in
12 play as relates to Namenda Immediate-Release?
13     A.   No.  But I mean, I'm not familiar
14 with the -- you know, I'm not involved in
15 the -- in patent -- you know, in patents.  I
16 mean, it's really not part of my job.  I just,
17 you know -- that's the only one I recall.  I
18 recall this one patent.
19     Q.   Correct me if I'm wrong.  Are you
20 saying that you may not know the patent by its
21 patent number, but you knew there was a patent
22 related to Namenda Immediate-Release?  Is that
23 fair?
24     A.   I think every drug has a patent
25 so, yes, I would be aware that there would be a

Page 65

1  patent.
2      Q.   Was this email and attachment
3  prepared and maintained in the ordinary course
4  and scope of Forest's business?
5      A.   Yes.  This is -- I mean, like I
6  said, this is how I prepare forecasts.  It's
7  nothing out of the ordinary that I can see from
8  this.
9      Q.   You can set that aside, please.
10     A.   Okay.
11     Q.   So I'd like to switch gears and
12 talk to you about the authorized generic topics
13 now.
14     A.   Okay.
15     Q.   And I think there's some basic
16 concepts that, if we can get on the same page
17 about, it would probably make things go more
18 smoothly.
19         Are you familiar with the term
20 "active pharmaceutical ingredient"?
21     A.   Yes.
22     Q.   And it's also API for short?
23     A.   Yes.
24     Q.   Can you tell me what your
25 understanding of active pharmaceutical

Page 74

1 the declaration to --
2     Q.    We'll get to it but it at least
3 discusses the removal of Namenda Immediate-
4 Release from the market, right?
5     A.    I don't think it does.
6           MS. McDEVITT: Objection to form,
7     mischaracterizes the declaration.
8     Q.    In February 2014, Forest announced
9 its intention to remove Namenda Immediate-
10 Release from the market, correct?
11    A.    I believe that's the date, yes.
12    Q.    My question to you is: When did
13 you recall that decision was made to make that
14 announcement?
15          MS. McDEVITT: I'm going to object
16    and instruct. This is outside the scope.
17    She is not here to answer questions about
18    the hard switch or the -- I mean, you
19    guys went through this in the last
20    30(b)(6) deposition.
21          We have an email from your
22    co-counsel that says that that won't be
23    on the table. So she's not here in her
24    individual capacity.
25          MR. LETTER: I am asking her one

Page 75

1     question about the -- when the decision
2     was made to make the announcement to
3     remove Namenda Immediate-Release from the
4     market. One question.
5           MS. McDEVITT: If she knows the
6     answer, I will allow her to answer. If
7     she knows the answer, she can answer the
8     question.
9     A.    I actually don't know the answer.
10 I was not working on the brand team in February
11 of 2014.
12 BY MR. LETTER (continuing):
13    Q.    I believe you testified, when
14 Mr. Enger was asking you questions, that you
15 had joined--and please correct me if I'm
16 wrong--the Namenda franchise team in 2014.
17    A.    Yes, I believe it was March of
18 2014.
19    Q.    So back to Snyder Exhibit 4 for a
20 moment. The testimony that starts with my
21 question at the bottom of page 58 and is
22 answered by the bottom of page 59, Mr. Solomon
23 draws a distinction between what Forest would
24 have done prior to being acquired by Actavis
25 and things that would take place after. I'm

Page 76

1 not saying he said what would have happened;
2 I'm saying he draws a distinction. Is that
3 fair?
4     A.    You're saying he draws a
5 distinction between what might have happened
6 and what actually happened? Absolutely. And
7 Forest and Actavis are, you know, two different
8 companies, two different time periods.
9     Q.    So let's just establish. Forest
10 did, in fact, launch an authorized generic in
11 or around July 11, 2015, correct?
12          MS. McDEVITT: Objection to form.
13    A.    No, that was Actavis.
14    Q.    Forest was part of Actavis at that
15 point, correct?
16    A.    Actavis had acquired Forest but as
17 I was -- as I was saying, yes, they're two
18 different companies. Actavis -- what Actavis
19 did would not necessarily have been the same
20 thing that Forest would have done had Actavis
21 not acquired Forest. Different companies,
22 different management.
23    Q.    Prior to Forest being acquired by
24 Actavis -- are we on the same page?
25    A.    Um-hmm.

Page 77

1     Q.    Prior to Forest being acquired by
2 Actavis, Forest could have licensed the
3 authorized generic to another company, correct?
4           MS. McDEVITT: Objection to form,
5     calls for speculation.
6     A.    Yeah, I'm not sure what -- I mean,
7 I don't know the answer to that.
8           MS. McDEVITT: And foundation.
9     Q.    So the distinction I'm drawing
10 here is launching -- Forest launching the
11 authorized generic itself, or Forest entering
12 into a license with another company whereby
13 Forest allows that other company to launch an
14 authorized generic. Are you with me?
15    A.    Are you talking about the
16 definition of an authorized generic?
17    Q.    I'm unclear as to your answer.
18    A.    You're asking -- I mean, is that
19 what happens when there's an authorized
20 generic, that, yes, a company can launch an
21 authorized generic or they can authorize
22 someone else to launch an authorized generic
23 under the NDA. Yes, that's by definition.
24    Q.    And when you say "authorize,"
25 that's generally done through a license

20 (Pages 74 - 77)

Page 78

1 process?
2   A.   I'm not that familiar with the
3 process.
4   Q.   I don't believe we've actually
5 discussed this yet. Do you have an
6 understanding of what an authorized generic is?
7   A.   Yes.
8   Q.   Can you tell me, please.
9   A.   Yes. An authorized generic is
10 pretty much what I just said. When a company
11 either makes a generic version or authorizes
12 someone else to make a generic version under
13 their NDA.
14   Q.   And when you say "under their
15 NDA," you're referring to the brand product's
16 application with the FDA, correct?
17   A.   Yes, under the NDA.
18   Q.   Is it fair to say that an
19 authorized generic is essentially the brand
20 product under generic trade dress, marketed
21 under generic trade dress?
22        MS. McDEVITT: Objection to form.
23   A.   It's -- I mean, it's the same
24 active ingredient as what's in the generic.
25 It's the same exact product.

Page 79

1   Q.   It's the same exact product?
2   A.   It's the same -- it's the same
3 ingredient, yes, the same active ingredient.
4   Q.   But it's, in fact, the exact same
5 product because it's made pursuant to the
6 specifications approved by the FDA under the
7 new drug application for the brand, correct?
8   A.   Correct.
9   Q.   So back to my question about prior
10 to Forest being acquired by Actavis, Forest
11 could have licensed to another company the
12 right to market an authorized generic version
13 of Namenda Immediate-Release, correct?
14   A.   Yes.
15   Q.   And, in fact, they did that with
16 Lexapro, correct?
17   A.   I'm not familiar with that.
18   Q.   So I went through a document with
19 Mr. Solomon where the FDA maintains a list of
20 authorized generics that they're aware of being
21 marketed, and I'm trying to avoid going through
22 that list again with you.
23        What I want to do is go back to
24 Solomon Exhibit 1, if you wouldn't mind pulling
25 that up, and turning your attention to topic

Page 80

1 number 3. At the very bottom of topic number
2 3, there's a discussion of previous authorized
3 generics marketed or licensed by Forest.
4        Are you with me?
5   A.   I see the paragraph.
6   Q.   Okay. Did you do any
7 investigation as to whether or not this is an
8 accurate list of Forest-authorized generics?
9   A.   I didn't go through and look each
10 one up, but, yes, there is a -- I mean, an FDA
11 listing that I'm sure you can provide that we
12 could confirm that.
13        But I mean, I think the point
14 is is that, I mean, every situation is
15 different and, you know, regardless of what was
16 done for Lexapro or some of these other
17 products, there was -- there was never any
18 discussion about launching an authorized
19 generic at Forest.
20        From my perspective, I ran the
21 forecasts, I never -- was never involved at all
22 in a discussion of an authorized generic for
23 Namenda.
24   Q.   And is that because the lifecycle
25 management technique associated with when

Page 81

1 Namenda Immediate-Release was to go generic was
2 to convert the market to Namenda XR, correct?
3        MS. McDEVITT: Objection to form,
4     lack of foundation, mischaracterizes her
5     testimony.
6   A.   That's -- no, that's not correct.
7   Q.   What is incorrect about --
8   A.   I'm just saying that I -- there
9 was never any discussion about an authorized
10 generic. That's all I said.
11   Q.   Were there discussions about
12 anything other than a conversion to Namenda XR
13 from Namenda Immediate-Release?
14   A.   I mean, that's part of my job. Of
15 course there were discussions about -- I mean,
16 there were discussions about -- I'm not sure
17 when you're referring to in discussions. I
18 mean, there were discussions about lots of
19 things related to Namenda.
20   Q.   Well, you said you forecast all
21 sorts of things, right? Is that a fair
22 statement?
23   A.   Yes.
24   Q.   So other than a conversion from
25 Namenda Immediate-Release to Namenda XR, what

Page 82

1 were some of the other things that you
2 forecasted? And I'm referring to the
3 pre-Actavis acquisition time here.
4   A.   If you're asking things that I
5 forecast, I mean, [redacted] rent
6 [redacted]
7 [redacted]
8 [redacted]
9 [redacted]
10 [redacted]
11 [redacted]
12 [redacted] I mean, there's an endless
13 number of things that I would look at to do a
14 forecast.
15   Q.   I used the term previously
16 "lifecycle management." Have you heard of that
17 term before?
18   A.   Yes.
19   Q.   Do you have an understanding of
20 what it is?
21   A.   Yes.
22   Q.   Can you tell me what it is?
23   A.   Lifecycle management is just, you
24 know, some -- what you would do with the drug
25 in the future in terms of other indications or

Page 83

1 things like that.
2   Q.   So in your previous answer about
3 all the different things you forecasted and
4 you've had a list of things, would you consider
5 all of those things to be lifecycle management
6 techniques?
7   A.   No, not all of them.
8   Q.   What were some of the lifecycle
9 management techniques in the things that you
10 listed?
11   A.   I probably didn't -- those weren't
12 related to lifecycle management.
13   Q.   Is it fair to say that conversion
14 from the Immediate -- Namenda Immediate-Release
15 to Namenda XR would be considered a lifecycle
16 management method?
17       MS. McDEVITT: Object to form and,
18   again, I think we're getting pretty fair
19   afield from the scope of the 30(b)(6)
20   topic here.
21       MR. LETTER: I'm going based on
22   her answers.
23       MS. McDEVITT: Well, we're taking
24   it question by question but, I mean, I
25   thought we were talking about the

Page 84

1   authorized generic topic and we're not
2   there right now. And I think that's
3   not -- she's not here to testify in her
4   individual capacity.
5       MR. LETTER: I understand that.
6   But we're here right now because of her
7   previous answers.
8       MS. McDEVITT: No, we're not.
9   We're not here right now because --
10       (Inaudible)
11       MR. LETTER: I'm not arguing. Can
12   you have my most previous question read
13   back, please.
14       (Requested portion read.)
15       MS. McDEVITT: Objection to form,
16   outside the scope.
17   A.   I think -- I mean, I'm talking
18 specifically about forecasting and, you know, I
19 think those are two different conversations
20 that we're having. We're talking about
21 forecasting versus lifecycle management so...
22   Q.   I'm fine to make the distinction
23 that we're talking about lifecycle management
24 now. If that helps you answer the question.
25       MS. McDEVITT: I'm going to shut

Page 85

1   this down if we're talking about
2   lifecycle management, just be forewarned.
3       MR. LETTER: I'm asking questions
4   based on her previous answers.
5       MS. McDEVITT: No, you're not.
6 BY MR. LETTER (continuing):
7   Q.   Ms. Snyder, can you answer my
8 question? I intend to move on as soon as you
9 answer this question.
10   A.   Ask me -- please ask me the
11 question again.
12       MR. LETTER: Please read it back.
13       (Requested portion read.)
14       MS. McDEVITT: And I'm going to
15   object to the question and instruct the
16   witness not to answer as outside the
17   scope of the agreed-upon topics that
18   she's here to testify about today.
19 BY MR. LETTER (continuing):
20   Q.   Are you going to follow your
21 counsel's instruction?
22   A.   I am.
23       MR. LETTER: I'll note for the
24   record that I disagree with the
25   instruction not to answer. It's not a

22 (Pages 82 - 85)

Page 94

1   Q.   Okay. From the context of this
2 testimony on Bates ending 461, it's fair to say
3 that Mr. Saunders was being asked about the
4 possibility of Forest/Actavis launching an
5 authorized generic for Namenda Immediate-
6 Release, right?
7       MS. McDEVITT: Objection to form,
8   Actavis launching an authorized generic.
9   I mean, that's what the questions say.
10  A.   Yes, he was being asked about
11 Actavis.
12  Q.   And their launch --
13  A.   Of an authorized generic, yes.
14  Q.   So let's talk about the
15 acquisition of Forest by Actavis for a minute.
16 Forest was primarily a brand business, right?
17  A.   Yes.
18  Q.   And Actavis had brand products but
19 also generic products as well, right?
20  A.   Actavis, yes, had...
21  Q.   So when Actavis acquired Forest,
22 for lack of a better term, was there some kind
23 of Chinese wall between the brand side of the
24 business and the generic side of the business?
25  A.   I don't know if I'd characterize

Page 95

1 it like that but I -- from a commercial
2 perspective, I didn't work with commercial
3 colleagues on the generic side of the business.
4   Q.   And so is that the reason for the
5 distinction that you keep making about Actavis
6 launching an authorized generic versus when I
7 say Forest, do you simply mean that Forest was
8 acquired by Actavis or that there was a
9 distinction between the brand side of the
10 business and the generic side of the business?
11  A.   I think -- I think it's different.
12 I think Forest, like you said, was primarily a
13 branded company, whereas Actavis -- and I think
14 Mr. Saunders, you know, talks about his generic
15 group as well. I mean, there was a large
16 generics group that was not present when we
17 were at Forest.
18  Q.   And it's fair to say, in this
19 testimony on Bates ending 461, that
20 Mr. Saunders was expressing the fact that the
21 generic side of the business at Actavis was
22 pressuring him to launch an authorized generic
23 version of Namenda Immediate-Release, correct?
24  A.   I mean, I'm -- I'm not going to
25 put words in his mouth. I mean, I think we can

Page 96

1 read what it is that he says here. He says:
2 Our generic division would love to do this from
3 Actavis.
4   Q.   And you have no reason to believe
5 that this testimony wasn't correct at the time
6 it was being given, right?
7   A.   I would have no reason to believe
8 that he would say something incorrect.
9   Q.   The course of your investigation
10 on the authorized generic topics didn't
11 indicate any reason why -- for you to believe
12 that this testimony was incorrect at the time
13 it was given?
14  A.   No.
15  Q.   It's also fair to say that in this
16 testimony, Mr. Saunders expresses reluctance to
17 make the decision to launch an authorized
18 generic version of Namenda Immediate-Release as
19 of this time, correct?
20       MS. McDEVITT: Objection to form.
21  The testimony speaks for itself.
22  A.   I think we can all read what he --
23 what he said.
24  Q.   I realize that we can all read
25 what he says. But I'm trying to get on the

Page 97

1 same page with you about -- we had previously
2 established that Actavis launched an authorized
3 generic in July 2015. But as of November 2014,
4 Mr. Saunders was expressing a reluctance to
5 launch that authorized generic.
6   Are we on the same page?
7       MS. McDEVITT: Same objection.
8   A.   I mean, I would be -- I would need
9 to make a judgment on what he was feeling and,
10 you know, I think we can just read what it is
11 he said.
12  Q.   Let me come at it like this: What
13 changed between November 2014 and July 2015
14 such that Mr. Saunders felt comfortable
15 launching an authorized generic version of
16 Namenda Immediate-Release?
17      MS. McDEVITT: Objection to form,
18  lack of foundation.
19  A.   I'd have to speculate. I don't
20 know what result -- what caused Actavis to
21 launch a generic.
22  Q.   You didn't do any independent
23 investigation as to why Actavis made the
24 decision to launch an authorized generic
25 version of Namenda Immediate-Release, correct?

Page 98

1  A.  I will say, I mean, Actavis was in
2  the generics business. That was -- that was
3  what they did. You know, they -- you know,
4  apparently from this testimony, they saw it
5  as -- let's see what -- how Brent characterized
6  it. He said it's going to be a very
7  competitive marketplace and they think they
8  could do well.
9      And so they -- you know, based on
10 the number of generic sites that were available
11 at -- that were planning to launch at that
12 time, they apparently found that it was going
13 to be a competitive marketplace that they were
14 interested in -- in getting into.
15  Q.  I appreciate Mr. Saunders'
16 testimony.
17  A.  Um-hmm.
18  Q.  But what I'm trying to figure
19 out--and partially the reason why you're here
20 today and we're doing this again after
21 Mr. Solomon's deposition--is I need to know on
22 the record, the jury needs to know what changed
23 between November 2014 and July 2015 to cause
24 Actavis to launch an authorized generic version
25 of Namenda Immediate-Release. And I'm

Page 99

1  understanding you to be testifying that you
2  don't know and you didn't do any independent
3  investigation. Is that fair?
4      MS. McDEVITT: Objection to form.
5  A.  I think, you know, the exact
6  reasons why the generic division -- you know,
7  what -- what caused them to say, okay, we are
8  going to launch it, I don't know.
9      What I do know is that, you know,
10 there were -- at this point there were
11 probably, you know, four or five generics that
12 were planning to launch and it was a
13 competitive marketplace. And so they must have
14 done some analysis that made them determine
15 that they wanted to launch the authorized
16 generic.
17  Q.  Is it fair to say that the generic
18 division within Actavis would have felt that
19 way no matter when other generic Namenda
20 Immediate-Release products entered the market?
21 Do you follow me? Let me orient you as to
22 time.
23      July 2015, there were generics
24 other than Forest's authorized generic that
25 launched at the same time. Correct?

Page 100

1  A.  Correct.
2  Q.  Assume for me, hypothetically,
3  that that generic launch -- strike that.
4      Assume for me, hypothetically,
5  that generics, other than Forest's authorized
6  generic, launched earlier in time, before July
7  2015. Are you with me?
8  A.  I'm following what you're saying
9  but this is, you know --
10 Q.  It's a hypothetical.
11 A.  Hypothetical, yeah.
12 Q.  Can you articulate any reasons why
13 the generic division of Actavis would have
14 acted any differently had there been entry by
15 other generic Namenda Immediate-Release
16 products, had that happened earlier than July
17 2015?
18     MS. McDEVITT: Object to form.
19     The hypothetical, again, we're -- I feel
20     like it's -- well, go ahead. I'm going
21     to object to form, calls for speculation.
22     Different corporate entities involved
23     here.
24 A.  Yeah, it's a -- I mean, it's
25 totally hypothetical. I'm not even sure I'm

Page 101

1  following. So you're saying if someone had
2  launched prior to --
3  Q.  Are you aware of the term "true
4  generic" as opposed to "authorized generic"?
5  A.  Yes. I mean, I haven't heard that
6  term but I assume -- well, tell me what you
7  mean by "true generic."
8  Q.  I mean launches by ANDA generics.
9  A.  Yes.
10 Q.  As opposed to NDA-authorized
11 generics. Are we on the same page?
12 A.  Yes.
13 Q.  So suppose, hypothetically, that
14 ANDA generics launched in January 2015. Are
15 you with me?
16 A.  Yes.
17 Q.  Can you articulate any reasons why
18 the generic division at Actavis would approach
19 the launch of an authorized generic version of
20 Namenda Immediate-Release any differently under
21 those circumstances?
22     MS. McDEVITT: Objection to form,
23     calls for speculation.
24 A.  I really can't speculate.
25 Q.  So the answer is no, you can't

Page 106

1 appearance by Namenda Immediate-Release. Do
2 you have any reason to doubt the results of
3 that search?
4   A.   No.
5   Q.   Has Forest ever had -- has Forest
6 ever encountered a supply shortage for
7 memantine hydrochloride API?
8   A.   Not that I'm aware.
9   Q.   Does Forest always attempt to meet
10 customer demand across all products?
11       MS. McDEVITT:  Objection to form.
12   A.   I can't speak to all products.
13 Obviously Forest would want to supply their
14 customers with the products they need.
15   Q.   Until the launch of generic
16 Immediate-Release Namenda in July 2015, was
17 Forest able to supply the entire memantine
18 hydrochloride market by itself?
19       MS. McDEVITT:  Objection to form.
20   A.   Can you say that again?  I mean, I
21 didn't -- can you read that back?
22       (Requested portion read.)
23   A.   It's a broad question.  I'm not
24 sure what you're asking.
25   Q.   Sure.  So when I say "memantine

Page 107

1 hydrochloride market," I'm referring to that
2 list that we went over earlier of Namenda
3 Immediate-Release tablets, Namenda
4 Immediate-Release oral solution, Namenda
5 Extended-Release capsules, and Namzaric.  Are
6 we on the same page?
7   A.   I'm just not sure what you're
8 asking.  Are you asking was there ever a
9 shortage of any of those products?  I'm not
10 sure what you're asking.
11   Q.   Sure, if you'd like to
12 characterize it that way.  Can you think of a
13 shortage of any of those products ever?
14   A.   Yes.  There were times when there
15 were products on backorder, absolutely.
16   Q.   Were any of those Namenda
17 Immediate-Release products?
18   A.   Like I said before, I mean, I
19 don't recall a situation where there was an
20 issue supplying Namenda Immediate-Release, but
21 I -- you know, there could have been a
22 backorder at some time that I was not aware of.
23       Backorders are very common, you
24 know, so I don't know.
25   Q.   Does Forest attempt --

Page 108

1 Forest/Actavis/Allergan, do they attempt to
2 rectify backorders as soon as possible?
3   A.   Of course.
4   Q.   I am now going to switch gears
5 into the personal capacity declaration topic.
6 Shall we take a break?
7       MS. McDEVITT:  Do you want to take
8 a break.
9       THE WITNESS:  Sure.
10      MS. McDEVITT:  Why don't we.
11      VIDEO TECHNICIAN:  The time on the
12 video monitor is 1:01 p.m.  We're off the
13 record.
14      (Lunch recess taken.)

Page 109

1       A F T E R N O O N   S E S S I O N
2       VIDEO TECHNICIAN:  We are back on
3 the record.  The time on the video
4 monitor is 1:40 p.m.  This starts Media
5 No. 3.
6       (Exhibit 6:  Declaration of Julie
7 Snyder 10/6/17, was marked for
8 identification.)
9 CONTINUED EXAMINATION
10 BY MR. LETTER:
11  Q.   Welcome back, Ms. Snyder.  I'm
12 having the court reporter hand you what's being
13 marked Snyder Exhibit 6.  Take your time
14 reviewing that.
15       And while you're doing so, I will
16 read into the record that this is the
17 Declaration of Julie Snyder, dated October 6th,
18 2017, submitted in the In Re Namenda Direct
19 Purchaser Antitrust Litigation.
20  A.   (Perusing exhibit.)
21       Okay.
22  Q.   You've had an opportunity to
23 review?
24  A.   Yes.
25  Q.   So to orient you, I'd like to

HIGHLY CONFIDENTIAL

Page 110

1  discuss what is on internal page 1, it's the
2  first page of substance.
3       Q.   Do you recognize this document?
4       A.   Yes.
5       Q.   And can you tell me what it is?
6       A.   It's a document that I signed
7  talking about the communications that were sent
8  in -- I don't know if the date's on here, but
9  they were sent in -- I believe they were in
10 early 2015 regarding the availability of
11 Namenda IR.
12      Q.   So this is the Declaration of
13 Julie Snyder, correct?
14      A.   Yes.
15      Q.   And the date of it is October 6th,
16 2017?
17      A.   Yes.
18      Q.   And that is your signature on
19 internal page 2?
20      A.   Yes.
21      Q.   Back to internal page 1, the first
22 paragraph says you are currently executive
23 director of neurology marketing at Allergan
24 plc.  Do you see that?
25      A.   Yes.

Page 111

1       Q.   Does Namenda fall into the
2  neurology area, for lack of a better term?
3       A.   Yes.
4       Q.   The second paragraph says
5  (as read):
6            Beginning in 2014, I was senior
7       product director at Forest.
8            Do you see that?
9       A.   Yes.
10      Q.   And then it goes on (as read):
11           ...during which time I was the
12      brand manager for the Namenda franchise.
13      A.   Yes.
14      Q.   We had previously discussed, in
15 one of the earlier documents, back in 2009 you
16 were senior product manager for Namenda.  That
17 is Solomon Exhibit 3 if you'd like to refresh
18 yourself.
19           Is there a distinction or a
20 difference between being brand manager and
21 senior product manager?
22      A.   So the titles -- I mean, each
23 promotion comes with an increasing level of
24 responsibility.  In 2014 I had responsibility
25 for the marketing for the Namenda franchise.

Page 112

1  When I was senior product manager, I would have
2  had specific responsibilities on the team.  So
3  not every single thing related to the marketing
4  of the product.
5       Q.   So in other words, you had more
6  than just Namenda that you were in charge of as
7  the brand manager; is that fair?
8       A.   I'd say not necessarily more than
9  just Namenda but more responsibility in that
10 all of the marketing would have reported in to
11 me as opposed to just certain activities on the
12 brand.  So it's a, you know, more -- bigger
13 scope of responsibility on the Namenda
14 franchise.
15      Q.   And when we say "Namenda
16 franchise" as referred to here, we're talking
17 about Namenda Immediate-Release, Namenda XR and
18 Namzaric, right?
19      A.   Correct.
20      Q.   And then it goes on, same
21 paragraph two there, April 2015 you
22 transitioned into executive director of
23 marketing for Actavis?
24      A.   Yes.
25      Q.   Did your responsibilities change

Page 113

1  as part of that?
2       A.   No.  It was just a title change.
3       Q.   So the transition from Forest to
4  Actavis essentially there was a different
5  title?
6       A.   Yes, right.
7       Q.   And now that you're executive
8  director of neurology marketing at Allergan, is
9  that the same sort of thing that happened when
10 Forest became Actavis, in that your
11 responsibilities are essentially the same but
12 your title has changed?
13      A.   Essentially, yes.
14      Q.   Going down to the third paragraph
15 on internal page 1, it begins "It is my
16 understanding."  Do you see that?
17      A.   Yes.
18      Q.   And then it discusses an
19 injunction being entered by a federal court in
20 December 2014.  Do you see that?
21      A.   Yes.
22      Q.   And that injunction relates to
23 prohibiting Forest from withdrawing Namenda
24 Immediate-Release from the market or limiting
25 its distribution, correct?

Page 114

1  A.  Correct.
2  Q.  Did you read the injunction order
3  that was entered by the Federal Court in
4  December 2014?
5  A.  Yes.
6  Q.  The second sentence in that same
7  paragraph three mentions a February 2014
8  withdrawal announcement. Do you see that?
9  It's at the very back of the second sentence.
10 A.  I'm sorry, where are you?
11 Q.  Third paragraph, number three.
12 A.  Yes.
13 Q.  Second sentence, end of the second
14 sentence.
15 A.  Yes.
16 Q.  And that withdrawal announcement
17 was related to Namenda Immediate-Release,
18 correct?
19 A.  Yes.
20 Q.  Turning over to internal page 2,
21 paragraph five, it begins "Forest sent
22 caregivers." Do you see that?
23 A.  Yes.
24 Q.  And then in the middle of that
25 sentence, it references 900,000 communications.

Page 115

1  Do you see that?
2  A.  Yes.
3  Q.  So these were over 900,000
4  communications that Forest sent to various
5  entities and folks, correct?
6  A.  Yes.
7      MS. McDEVITT: Objection to form.
8  A.  This is -- yeah, Forest sent over
9  900,000 communications to these various people,
10 as it says here.
11 Q.  Did you review all 900,000
12 communications?
13 A.  Did I review everything? I
14 reviewed all the communication -- communication
15 templates. I did not review each individual
16 communication, as there's, you know, HIPAA
17 violations with me reviewing something that
18 specifically would have a character's name on
19 it.
20 Q.  So correct me if I mischaracterize
21 this. There were templates, say, to send to
22 caregivers; there was a template to send to
23 healthcare providers; there was a template to
24 send to long-term care facilities, et cetera,
25 et cetera, as listed here in the beginning of

Page 116

1  paragraph five?
2  A.  Yes.
3  Q.  And you put your eyeballs on all
4  the templates that went to these various
5  entities?
6  A.  Yes.
7  Q.  After paragraph six, there is a
8  sentence that says (as read):
9      I declare under penalty of
10     perjury...
11     Do you see that?
12 A.  Yes.
13 Q.  So when you signed this, you were
14 declaring under the penalty of perjury that
15 everything previous to that was true and
16 correct, correct?
17 A.  Yes.
18 Q.  I want you to keep this one handy,
19 but we're moving on from it for now. I'm going
20 to show you what's being marked as Snyder
21 Exhibit 7.
22     (Exhibit 7: Communication to
23     sales representatives (#FRX-AT-03794674),
24     was marked for identification.)
25 BY MR. LETTER (continuing):

Page 117

1  Q.  Ms. Snyder, please review that.
2  While you're doing so, I will read for the
3  record that this was a document produced by
4  Forest to plaintiffs in this litigation bearing
5  the Bates stamp FRX-AT-03794674. And let me
6  know when you've had an opportunity to review.
7  A.  (Perusing exhibit.)
8      Okay.
9  Q.  So, Ms. Snyder, very early on in
10 this deposition when Mr. Enger was asking you
11 questions, you said that, as part of the
12 Namenda marketing team, one of the duties that
13 you undertook was to write sales force
14 communications. Do you recall that?
15 A.  Yes.
16 Q.  Is this a communication to sales
17 representatives that you wrote? And the reason
18 I ask that is because it says "Thanks Julie"
19 down at the bottom.
20 A.  Right. I mean, it looks like
21 something that, you know, I drafted based on
22 this. But there's no information on whether I
23 sent this or whether someone, you know, wrote
24 it and I reviewed it. You know, people
25 write -- on my team would write communications

Page 118

1 for me as well, so I'd have to see more detail
2 to know for sure.
3    Q.    Is it fair to say that if someone
4 on your team wrote this communication and it
5 says "Thanks Julie," you would probably have
6 reviewed it before it went out?
7    A.    Yes.
8    Q.    Are you familiar with something
9 called metadata?
10   A.    Not much but yes.
11   Q.    Essentially it's data about the
12 electronic file that the document comes from?
13   A.    Um-hmm.
14   Q.    And the metadata for this
15 particular document indicates that it's from
16 January of 2015. Do you have any reason to
17 dispute that on the face of the document?
18   A.    No.
19   Q.    So under the bold Important
20 Message there, there's a paragraph that begins
21 "As you know, the District Court." Do you see
22 that?
23   A.    Yes.
24   Q.    And then it references the Court
25 entering a preliminary injunction requiring

Page 119

1 Actavis to continue distribution of Namenda
2 Immediate-Release tablets. Do you see that?
3 And that's the same thing that is referenced in
4 the Declaration of Julie Snyder that we talked
5 about earlier, right, the injunction order?
6    A.    Yes.
7    Q.    The second sentence in that
8 paragraph that begins "As you know," says
9 (as read):
10         We are appealing this decision.
11         Do you see that?
12   A.    Yes.
13   Q.    Why did Forest include information
14 about appealing the injunction order?
15   A.    I don't remember the details, but
16 it's factual.
17   Q.    What did Forest intend to do if it
18 won the appeal of the injunction order?
19         MS. McDEVITT:  Objection to form.
20     And I would just caution Ms. Snyder that
21     if she can answer the question without
22     revealing any privileged communications
23     with lawyers, she can do so. But if it
24     calls for privileged information, then we
25     need to be mindful of that.

Page 120

1    A.    I'd have to speculate. You know,
2 I don't know.
3    Q.    Maybe we can come at it like this:
4 There was an injunction order in place
5 directing Actavis to continue distribution of
6 Namenda Immediate-Release tablets, correct?
7    A.    Yes.
8    Q.    And Actavis Forest -- strike that.
9         Actavis was appealing that
10 injunction order, right?
11   A.    Yes, um-hmm.
12   Q.    So what would be the purpose of
13 appealing the injunction order?
14   A.    You'd have to talk to the
15 attorneys. I mean, that's -- I'm providing
16 factual information to our sales
17 representatives we're appealing this decision.
18   Q.    Would the result of winning the
19 appeal for Actavis be anything other than
20 withdrawing Namenda Immediate-Release tablets
21 from the market?
22         MS. McDEVITT:  Objection to form,
23     calls for speculation.
24   A.    It's all speculation. You know, I
25 don't know.

Page 121

1    Q.    Can you think of another result at
2 all that it could possibly be?
3         MS. McDEVITT:  Same objection.
4    A.    I have nothing further to add on
5 it. It's all speculation of what -- you know,
6 what would have happened. It's another -- you
7 know, it's another hypothetical situation.
8    Q.    It seems more straightforward than
9 a typical hypothetical here, though. You're
10 either required to keep Namenda
11 Immediate-Release on the market, or you win the
12 appeal and remove Namenda Immediate-Release
13 from the market. Am I leaving any other
14 possibilities out?
15         MS. McDEVITT:  Objection to form,
16     mischaracterizes. And, yeah, there's
17     lots of other possibilities. You know
18     what time the decision came down. I
19     mean, it just -- she's -- it calls for
20     speculation. Objection.
21         MR. ENGER:  Counsel, I would ask
22     you not to use speaking objections,
23     please.
24         MS. McDEVITT:  You've got to ask a
25     question that's fair and is based on her

Page 138

1  asking you is: In putting together your
2  declaration, did you do any analysis as to how
3  many times Forest sales representatives told
4  physicians that Immediate-Release would be
5  discontinued before the injunction?
6      A.   No, I don't have that data.
7      Q.   And I believe--you correct me if
8  I'm wrong--one of your recent answers was that
9  you didn't do any analysis about how many times
10 Forest's sales representatives told physicians
11 that Immediate-Release would not be
12 discontinued after the injunction, correct?
13     A.   What I'm saying is that we -- as
14 with any training of our sales representatives,
15 we provide them the information to communicate
16 to physicians, but we don't -- you know, we're
17 not there for every single call to know exactly
18 what is said on any one given call. But we
19 provide the direction and the sales
20 representatives -- the sales representatives
21 have conversations per the direction that they
22 are given.
23     Q.   There are certain legal
24 consequences for a sales representative making
25 representations to a physician, say, about

Page 139

1  off-label marketing, correct?
2          MS. McDEVITT: Objection.
3      A.   Sales representatives are -- I
4  don't know what happened to sales
5  representatives based on what they say. But
6  they are trained to deliver on-label and
7  appropriate messages to physicians.
8      Q.   In your experience, do sales
9  representatives go off-script often?
10     A.   I wouldn't say they have a -- they
11 have a script. They are trained to comply with
12 what's listed on the label and what's accurate.
13     Q.   So taking -- I appreciate your
14 answer about the label. But in the context
15 here of making -- of communicating with
16 physicians about the injunction, do you know of
17 any instances where sales representatives told
18 physicians that Namenda Immediate-Release would
19 not be discontinued after the injunction?
20     A.   Yes. There were definitely --
21 sales representatives would have communicated
22 that to physicians. Like I said, I'm not with
23 every sales representative every day, but they
24 -- I mean, I had communications with physicians
25 that Namenda would remain on the market.

Page 140

1      Q.   Did you have communications with
2  physicians about Immediate-Release being
3  discontinued prior to the injunction, you
4  personally?
5      A.   I personally was not on the team
6  in early 2014, so, you know, I would not have
7  had that communication.
8      Q.   Do you know of any instances in
9  which Forest's sales representatives told
10 physicians that Namenda Immediate-Release
11 tablets would not be discontinued after the
12 injunction -- strike that.
13         Let me ask it like this: In those
14 instances where Forest's sales representatives
15 told physicians that Immediate-Release tablets
16 would not be discontinued after the injunction
17 -- are we on the same page? So in those
18 instances. How many times did the sales
19 representatives also tell the physicians that
20 Forest was appealing the Court ruling?
21     A.   I don't know.
22         MR. LETTER: Those are all the
23 questions I have.
24         MS. McDEVITT: Let's just go off
25 the record.

Page 141

1          VIDEO TECHNICIAN: The time on the
2  video monitor is 2:23 p.m. We're off the
3  record.
4          (Recess taken.)
5          VIDEO TECHNICIAN: We are back on
6  the record. The time on the video
7  monitor is 2:32 p.m.
8  EXAMINATION BY
9  MS. McDEVITT:
10     Q.   Thank you, Ms. Snyder, for your
11 time today. I just have a few questions for
12 you. And I was hoping you could take out the
13 document that's been previously marked as
14 Solomon Exhibit 3.
15     A.   Okay. I have that.
16     Q.   All right. And do you remember
17 asking [sic] some questions about this document
18 earlier today?
19     A.   Yes.
20     Q.   And just to orient the record,
21 this is a September 9th, 2009, Namenda
22 projection that you prepared?
23     A.   Yes.
24     Q.   Now, if we turn to the first page
25 -- well, actually it would be the second page

```
                                                        Page 150
 1  the scenarios that you ran in Solomon Exhibit 3
 2  were somehow not valid because of Snyder
 3  Exhibit 11, correct?
 4      A.   What I'm testifying is that there
 5  are various scenarios that I would have run.  I
 6  don't think any forecast is correct.  I mean, I
 7  think every forecast is exactly that; it's a
 8  forecast and I run different scenarios for
 9  different things.
10      Q.   You wouldn't want to bother a
11  gentleman in Mr. Meury's position with an
12  e-mail about forecasts and scenarios that were
13  just simply not possible to occur, correct?
14           MS. McDEVITT:  Objection to form.
15      A.   Mr. Meury, Bill, he was in charge
16  of the marketing department.  I ran a lot of
17  forecast scenarios by Mr. Meury.
18      Q.   Let me come at it like this:  Did
19  he write you back after you sent him this
20  e-mail and said:  Julie, why are you wasting my
21  time sending this?
22           MS. McDEVITT:  Objection to form.
23      A.   Like I said, I sent him hundreds
24  of scenarios.  I don't recall his response to
25  any individual -- any individual e-mail.
```

```
                                                        Page 151
 1      Q.   Has he ever responded to you in
 2  that way, meaning has he ever said to you:
 3  Julie, why are you wasting my time sending me
 4  these forecasts?
 5      A.   Knowing Bill, that's not something
 6  he would respond with regardless of what -- you
 7  know, I'd have to speculate what he was
 8  thinking.
 9      Q.   If he did respond in that way,
10  that would be something that would stick in
11  your mind, correct?
12           MS. McDEVITT:  Objection to form.
13      A.   I really don't recall every e-mail
14  Bill's ever sent me.
15      Q.   But at this moment you can't
16  recall one where he said:  Don't waste my time
17  with these forecasts, correct?
18           MS. McDEVITT:  Objection to form,
19      asked and answered.
20      A.   I already answered that.  I don't
21  -- I -- I sent Bill many scenarios.  Sometimes
22  he responded, sometimes he didn't.  I don't
23  remember the context of every response that he
24  sent.
25           MR. LETTER:  Ms. Snyder, thank you
```

```
                                                        Page 152
 1  for your time.  I have no further
 2  questions.
 3           MS. McDEVITT:  No questions for
 4  me.  Thank you.
 5           VIDEO TECHNICIAN:  The time on the
 6  video monitor is 2:45 p.m.  We are off
 7  the record.  This ends our deposition.
```

```
                                                        Page 153
 1  STATE OF NEW YORK  )
 2                     ) ss:
 3  COUNTY OF NEW YORK )
 4
 5
 6       I, JULIE A. SNYDER, the witness
 7  herein, having read the foregoing testimony of
 8  the pages of this deposition, do hereby certify
 9  it to be a true and correct transcript, subject
10  to the corrections, if any, shown on the
11  attached page.
12
13
             _____
14              JULIE A. SNYDER
15
16  Sworn and subscribed to
17  before me this _____ day
18  of_____ 2017.
19
             _____
20           NOTARY PUBLIC
21
22
23
24
25
```

39 (Pages 150 - 153)

Page 154

```
 1      E R R A T A  S H E E T
 2  WITNESS:  JULIE A. SNYDER
    DATE:     October 11, 2017
 3  REPORTER: Sherri Flagg, Reporter
 4
    PAGE/LINE(S)/    CHANGE      REASON
 5  ____/_____/_____/_____
 6  ____/_____/_____/_____
 7  ____/_____/_____/_____
 8  ____/_____/_____/_____
 9  ____/_____/_____/_____
10  ____/_____/_____/_____
11  ____/_____/_____/_____
12  ____/_____/_____/_____
13  ____/_____/_____/_____
14  ____/_____/_____/_____
15  ____/_____/_____/_____
16  ____/_____/_____/_____
17  ____/_____/_____/_____
18  ____/_____/_____/_____
19  Subscribed and Sworn to before me this_____day
20  of_____, 2017.
21  _____
22  NOTARY PUBLIC_____
23  MY COMMISSION EXPIRES_____
24
25
```

Page 155

```
 1          C E R T I F I C A T I O N
 2
 3
 4         I, Sherri Flagg, a Certified
 5  Professional Reporter, Certified LiveNote
 6  Reporter, and a Notary Public, do hereby
 7  certify that the foregoing witness, JULIE A.
 8  SNYDER, was duly sworn on the date indicated
 9  and that the foregoing is a true and accurate
10  transcription of my stenographic notes.
11         I further certify that I am not
12  employed by nor related to any party to this
13  action.
14
15
16
17   [signature]
18
19   _____
20       Sherri Flagg, Reporter
21
22
23
24
25
```