# Exhibit 327
# (Filed Under Seal)

Page 1

1  ** H I G H L Y   C O N F I D E N T I A L **
2  UNITED STATES DISTRICT COURT
3  SOUTHERN DISTRICT OF NEW YORK
4  Civil Action No.  1:15-cv-07488-CM
5  ------------------------------------x
6
   IN RE NAMENDA DIRECT PURCHASER
7  ANTITRUST LITIGATION
8
9  ------------------------------------x
            July 27, 2017
10          9:59 a.m.
11
12
13     Videotaped Deposition of AMNEAL
14  PHARMACEUTICALS LLC by KAPIL GUPTA, taken
15  by Defendants, pursuant to 30(b)(6) Notice,
16  held at the offices of Norris McLaughlin &
17  Marcus, P.A, 400 Crossing Boulevard,
18  Bridgewater, New Jersey, before Todd
19  DeSimone, a Registered Professional
20  Reporter and Notary Public of the State of
21  New Jersey.
22
23
24
25

Page 10

```
 1    Q.    And what did you guys talk
 2  about?
 3          MS. STRANG:  I would just like
 4  to caution the witness not to reveal any
 5  legal advice that he may have received from
 6  Ken Cappel, who was an attorney at Amneal.
 7          MR. ADAM:  Fair enough.  I'm
 8  definitely not asking about those kind of
 9  communications.
10          MS. STRANG:  So maybe we can
11  get to that one in the context of actual
12  questions as opposed to him telling you
13  right now everything he learned from Ken.
14          MR. ADAM:  That's fair.
15    Q.    And who did you speak to from
16  Validation?
17    A.    I spoke to Vikrant Bendale.
18    Q.    How do you spell that last
19  name?
20    A.    V-i-k -- last name is Bendale,
21  B-e-n-d-l-e -- d-a-l-e.
22    Q.    And what did you talk to him
23  about with respect to validation?
24    A.    I spoke to him regarding when
25  did we start planning for the validations,
```

Page 11

```
 1  when did we start buying the material for
 2  the validations and the launch, and were
 3  there any problems related to the
 4  manufacturing or the validations.
 5    Q.    And did you speak to anyone
 6  other than these three individuals in
 7  preparing for your deposition, aside from
 8  your lawyers?
 9    A.    Yes, I did.  I spoke to API
10  Purchase Group also, and specifically Krupa
11  Kamdhar.
12    Q.    Can you spell that one again
13  for me, please.
14    A.    First name is K-r-u-p-a, last
15  name is Kamdhar, K-a-m-d-h-a-r.
16    Q.    Did you bring any documents
17  with you today to the deposition?
18    A.    No, I didn't.
19    Q.    After speaking to these various
20  individuals at Amneal, are you comfortable
21  today testifying regarding the topics that
22  the parties have agreed upon with respect
23  to the scope of this deposition today?
24    A.    Yes, I am.
25    Q.    And you understand that your
```

Page 12

```
 1  testimony today is on behalf of Amneal,
 2  correct?
 3    A.    That's correct.
 4    Q.    You are currently employed at
 5  Amneal.  How long have you been there?
 6    A.    I started with Amneal in Amneal
 7  India in 2012.
 8    Q.    And what's your current role?
 9    A.    I look after the business
10  development and portfolio management in
11  Amneal.
12    Q.    And what does that entail?
13    A.    Primarily it's new product
14  selection and managing the current in
15  development pipeline.
16    Q.    And how long have you been
17  doing that?
18    A.    Eight years now, in total.
19  That includes outside of Amneal and Amneal.
20    Q.    And how long have you been
21  doing it at Amneal?
22    A.    Over four years.
23    Q.    Have you held any other
24  positions at Amneal?
25    A.    Yeah, when I was recruited, I
```

Page 13

```
 1  was assistant general manager, and then now
 2  I have moved to Amneal U.S., and now I am
 3  senior manager, but looking after the same
 4  business development and portfolio
 5  management.
 6    Q.    And how did your
 7  responsibilities change from assistant
 8  general manager to, I believe the
 9  business -- sorry, senior manager?  Sorry.
10    A.    Not necessarily -- it's just
11  designation change because of the location,
12  but the responsibilities in totality
13  remains the same.
14    Q.    Prior to working at Amneal, you
15  said you did similar work.  Where was that
16  at?
17    A.    Prior to Amneal, I was with
18  Zydus Cadila.
19    Q.    And what was your title at
20  Zydus?
21    A.    I was senior manager, business
22  development and portfolio.
23    Q.    So same types of
24  responsibilities, selecting products,
25  product pipeline?
```



Page 58

[redacted]

Page 59

[redacted]

```
 7   Q.    You can put that document
 8  aside.
 9        I'm shifting gears a bit here
10  to kind of the regulatory side of Amneal's
11  involvement with generic Namenda.  I
12  understand that this is not exactly in your
13  wheelhouse, but I'm going to ask you a
14  couple of questions about these documents.
15  If anything I'm asking you is kind of
16  beyond what you understand about the
17  regulatory side of things, just speak up,
18  okay?
19   A.    Sure.
20   Q.    Let's turn to what's Exhibit 3.
21  We don't need to spend much time on this.
22        I just wanted to confirm with
23  you that the date of Amneal's, and
24  Interpharm here, but ultimately Amneal's
25  ANDA, is 10-16-2007; is that correct?
```

Page 60

```
 1   A.    That's correct.
 2   Q.    And that's your understanding,
 3  too, correct?
 4   A.    Yes.
 5   Q.    Do you know what a Paragraph IV
 6  filer is?
 7   A.    Yes.
 8   Q.    Can you just give me a
 9  high-level overview of what a Paragraph IV
10  filer is?
11   A.    If an ANDA filer chooses to --
12  chooses to challenge the brand company's
13  patents, and those are listed in Orange
14  Book, which is FDA Orange Book, then it
15  goes under the Paragraph IV certification.
16        Any ANDA filer has to certify
17  Paragraph I, II, III, or IV to the Orange
18  Book listed patents.  So Paragraph IV means
19  the generic company is challenging either
20  the validity or the noninfringement of
21  those listed patents.
22   Q.    Do you know if Amneal was a
23  first filer?  Sorry, back up.
24        Do you know -- so Amneal was a
25  Paragraph IV filer, correct?
```

Page 61

```
 1   A.    Yes.
 2   Q.    Do you know if Amneal was a
 3  first filer?
 4   A.    Amneal was one of the first
 5  filers.
 6   Q.    And what does that mean, to be
 7  a first filer?
 8   A.    So FDA -- the Hatch-Waxman law
 9  says that whoever files first as a
10  Paragraph IV will be awarded, and if it
11  succeeds in the litigation, gets 180 days
12  of exclusivity.
13        MR. ADAM:  Let me mark this as
14  Exhibit 7.
15        (Amneal Exhibit 7 marked for
16  identification.)
17   Q.    Mr. Gupta, do you recognize
18  this document?
19   A.    Yes.
20   Q.    What is it?
21   A.    This is a final approval letter
22  from FDA to Amneal.
23   Q.    And in the top left corner, it
24  has ANDA 090041.  That's the
25  Interpharm/Amneal ANDA for generic Namenda,
```

Page 62

1  correct?
2     A.    That's correct.
3     Q.    And I will represent to you
4  that I didn't -- I didn't get this from
5  your production.  I pulled this down from
6  the FDA website myself, or my colleague
7  did.
8           And if you turn to the end, the
9  signature is dated April 10th, 2015.  Do
10 you see that?  It is an electronic
11 signature stamp on the right.
12    A.    That's correct.
13    Q.    You don't have any reason to
14 believe that date is not correct, right?
15    A.    Absolutely no reason.
16    Q.    If you flip to the top of the
17 second page, this paragraph coming from the
18 FDA confirms I believe what you just told
19 me, that Amneal was one of the first ANDA
20 applicants to submit a complete ANDA and
21 was therefore a first filer and entitled to
22 180 days of exclusivity, correct?
23    A.    That's correct.
24    Q.    You understand that Amneal
25 could share that 180 days with other first

Page 63

1  filers, correct?
2           MS. STRANG:  Objection, just to
3  the extent that calls for a legal
4  conclusion.  You can answer.
5           MS. LEGER:  Same objection.
6     A.    That's correct.
7     Q.    You can put that aside.
8           Do you know what tentative
9  approval is?
10    A.    Yes, I do.
11    Q.    And what is tentative approval?
12    A.    If FDA completes the review of
13 an ANDA, and ANDA applicant has not either
14 reached a final outcome of the litigation,
15 if they are litigating on the patents, then
16 FDA gives -- FDA confirms that the review
17 at FDA is completed for an ANDA, and they
18 give a tentative approval, until the --
19 until both the parties, ANDA filer and
20 brand company, resolves the patent
21 litigation.
22    Q.    Amneal, or any other company
23 for that matter, cannot launch their
24 product with only tentative approval,
25 correct?

Page 64

1     A.    Yes, that's correct.
2     Q.    You need final approval, right?
3     A.    Yes.
4     Q.    Do you know when Amneal got
5  tentative approval?
6     A.    I think it was in 2010 when we
7  got tentative approval, April of 2010.
8           MR. ADAM:  Let me mark this as
9  Exhibit 8.
10          (Amneal Exhibit 8 marked for
11 identification.)
12    Q.    Do you recognize this document,
13 Mr. Gupta?
14    A.    I do.
15    Q.    And what is it?
16    A.    This is a request for
17 converting tentative approval into a final
18 approval to FDA from Amneal.
19    Q.    And this type of
20 correspondence, this is something that is
21 kept in the regular course of business at
22 Amneal, correct?
23    A.    That's correct.
24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Page 65

1  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
[lines 2-7 redacted]
8     A.    Yes.
9     Q.    This is a fax and a letter
10 dated January 8th, 2010 awarding Amneal
11 tentative approval for its generic Namenda
12 ANDA, correct?
13    A.    That's correct.
14    Q.    And you don't have any reason
15 to believe this isn't a true and correct
16 copy of the letter sent from the FDA,
17 right?
18    A.    Absolutely no reason.
[lines 19-24 redacted]
25    Q.    Do you know if the FDA granted

Page 66

```
 1  that final approval of this request or came
 2  back to Amneal and asked for additional
 3  information?
 [redacted]
 7     Q.   And do you remember what that
 8  ECD was for in between?
 [redacted]
13          MR. ADAM: I'm going to mark
14  this as Exhibit 9.
15          (Amneal Exhibit 9 marked for
16  identification.)
17     Q.   Let me know when you've had a
18  chance to look at this.
19          (Witness perusing document.)
20     Q.   Mr. Gupta, do you recognize
21  this document?
22     A.   I do.
23     Q.   And what is it?
24     A.   This is a confirmation which
25  Amneal had sent to FDA stating all the
```

Page 67

```
 1  compliance status of the API facilities.
 2     Q.   And so the record is clear,
 3  this is AMNEAL0000402, February 19th, 2015
 4  letter from Amneal to the FDA.
 5          This letter is something that
 6  is kept in the regular course of business
 7  at Amneal, correct?
 8     A.   That's correct.
 9     Q.   This February 19th date, this
10  is ten days from the final approval letter
11  we just looked at?
12     A.   That's correct.
13          MS. STRANG: Objection, just to
14  clarify for the record, are you referring
15  to Exhibit 8, final approval requested?
16          MR. ADAM: I am, yes.
17     Q.   So the one we just looked at
18  was February 9th, this is February 19th.
19          Can you explain to me what this
20  minor amendment, final approval requested
21  follow-up letter entails?
 [redacted]
```

Page 68

```
 [redacted lines 1-16]
17     Q.   So this is a separate
18  communication from the FDA regarding
19  Amneal's ANDA between final approval
20  requested and actually obtaining the final
21  approval, in addition to the one we looked
22  at with the three manufacturing points that
23  we walked through earlier, correct?
24     A.   That's correct.
25     Q.   You can put that aside.
```

Page 69

```
 1          Do you know how long it
 2  typically takes from submitting a letter
 3  for final approval to actually getting
 4  final approval?
 5     A.   [redacted]
 [redacted through line 16]
17     Q.   Thanks. Do you know when
18  Amneal ultimately received final approval?
19     A.   Yeah, as I just said, April of
20  2015 we got our final approval.
21     Q.   We looked at the launch letter
22  earlier, so I might have tipped you off
23  here on this question, but when did Amneal
24  ultimately launch generic memantine?
25     A.   July 11th of 2015.
```

Page 90

1  Q.  In the column for 2015, it
2  still says about ▮▮▮; is that right?
3  A.  That's correct.
4  Q.  But we are working from July
5  2015 entry date now as opposed to a January
6  2015 entry date, right?
7  A.  Yes.
8  Q.  So give or take, this
9  projection is, I'm not a math guy, but
10 roughly ▮▮▮ what the previous projection
11 was from 2014, correct?
12 A.  Yes.
13 Q.  You can put that aside.
14     These projections are based on,
15 you know, Amneal's best assessment of the
16 market at the time they are making the
17 projection, right?
18 A.  That's correct.
19 Q.  These projections, they are not
20 guesses, they are based on information
21 filtered up to your folks in the
22 Forecasting Department, correct?
23 A.  That's correct.
24 Q.  I will represent to you that I
25 looked through all of these forecasts and I

Page 91

1  did not see an entry date estimated earlier
2  than January 2015.  Is that surprising to
3  you?
4  A.  No.
5  Q.  To your knowledge, Amneal had
6  no plans of launching a generic Namenda
7  product earlier than January 2015, correct?
8  A.  That's correct.
9     MR. ADAM:  It is a little after
10 12.  Do you want to grab lunch now?  I
11 probably have 25 minutes or so left.
12    MS. STRANG:  I think it might
13 make sense to either take a break and then
14 keep going before lunch or to just finish
15 up before lunch if that works for you guys.
16    Do you need a break?
17    THE WITNESS:  I'm good.
18    MR. LETTER:  So, in other
19 words, lunch between when we start and
20 after he asks questions?
21    MS. STRANG:  If we can time
22 that right, that will probably be a good
23 idea.
24    MR. ADAM:  And if I'm going
25 long and we need to take a break, someone

Page 92

1  speak up.
2     MS. STRANG:  Sounds good.
3  Q.  You are aware that Amneal
4  produced its generic Namenda IR sales data
5  in this case; is that right?
6  A.  Yes.
7  Q.  Have you reviewed that sales
8  data in any way?
9  A.  No.
10 Q.  So I'm going to mark this
11 document for identification purposes and
12 authentication purposes.  It is just a
13 print-up of the sales data.  I'm only going
14 to mark one.  I just want to put it on the
15 record.  I don't think I need to pass it
16 out.  I think we all understand what this
17 is.
18    This is Amneal Exhibit 13.
19    (Amneal Exhibit 13 marked for
20 identification.)
21 Q.  So you are familiar with the
22 sales data produced in this case, correct?
23 A.  Yes.
24 Q.  This sales data is sales data
25 that is kept in the regular course of

Page 93

1  business at Amneal, correct?
2  A.  That's correct.
3  Q.  Do you know from reviewing this
4  sales data whether or not Amneal sells its
5  generic Namenda product to the two direct
6  purchaser plaintiffs in this case, J.M.
7  Smith, or Smith Drug, and Rochester Drug?
8  A.  I'm not aware.
9  ▮▮▮
   ▮▮▮
   ▮▮▮
   ▮▮▮
   ▮▮▮
15    You don't have any reason to
16 believe that's not accurate, do you?
17 A.  I don't have any reason.
18 ▮▮▮
   ▮▮▮
   ▮▮▮
   ▮▮▮
   ▮▮▮
   ▮▮▮
24    You don't have any reason to
25 believe that's not accurate, do you?

24 (Pages 90 - 93)

Page 110

1  to familiarize yourself, that's fine. It's
2  the top e-mail that I'm looking at.
3       (Witness perusing document.)
4   A.  Okay.
5   Q.  This is a February 4th, 2015
6  e-mail from Tramara Dam at the FDA, and
7  that's an individual we have seen before on
8  this FDA correspondence, right?
9   A.  Yes.
10  Q.  And this e-mail is to Patel
11 Alpesh. Who is that?
12  A.  That is another vice president
13 in Regulatory Affairs.
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 111

1       Did I read that right?
2   A.  Yes.
3   Q.  So here the FDA is again
4  communicating to Amneal that pediatric
5  exclusivity for the '703 patent applies to
6  Amneal's ANDA product for generic Namenda,
7  correct?
8       MR. LETTER: I object to the
9  form.
10  A.  Yes.
11      MR. ADAM: Let's mark this as
12 Exhibit 16.
13      MS. STRANG: Before we get
14 started on that other document, are you
15 almost wrapping up, or do you think it
16 would make sense to take our lunch break
17 now?
18      MR. ADAM: About ten minutes,
19 probably.
20      MS. STRANG: Are you okay to
21 keep going?
22      THE WITNESS: Yeah.
23      MS. STRANG: Okay.
24      (Amneal Exhibit 16 marked for
25 identification.)

Page 112

1   Q.  Do you recognize this document?
2   A.  Yes, I do.
3   Q.  And what is it?
4   A.  It is a settlement agreement
5  between Forest and Amneal.
6   Q.  And this is a Forest Bates
7  number, FRX-AT-000218. This is the
8  settlement agreement as well as the license
9  agreement between Forest and Amneal.
10      Have you reviewed this document
11 before?
12  A.  Yes.
13  Q.  I want to flip to page ending
14 238, and I'm looking specifically at
15 Section 2.5. Are you there?
16  A.  Yes, I am.
17  Q.  And this is a section on
18 litigation expenses related to the
19 settlement, correct?
20  A.  Yes.
21  Q.  And it says here "Amneal has
22 represented that its attorneys' fees and
23 costs to date in this action have exceeded
24 ▓▓▓▓▓▓"; is that correct?
25  A.  That's correct.

Page 113

1   Q.  So this is a representation
2  from Amneal to Forest that its litigation
3  costs have not exceeded ▓▓▓▓▓, correct?
4   A.  Sorry, can you please rephrase?
5   Q.  Sure. This is a representation
6  from Amneal to Forest that its attorneys'
7  fees and costs to date have exceeded
8  ▓▓▓▓▓, correct?
9   A.  Yes.
10  Q.  Do you know how much more they
11 were?
12  A.  What I learned from Ken was
13 around ▓▓▓▓▓
14  Q.  And it says, if you go a little
15 farther down, "Given that this Settlement
16 Agreement and License Agreement willfully
17 resolve the action, plaintiffs shall pay
18 Amneal ▓▓▓▓▓ to defray a portion of the
19 paid attorneys' fees and costs that Amneal
20 has already expended in the action,"
21 correct?
22  A.  That's right.
23      MR. ADAM: I want to mark
24 Exhibit 17.
25      (Amneal Exhibit 17 marked for

29 (Pages 110 - 113)

Page 114

```
 1  identification.)
 2      Q.   Let me know when you've had a
 3  chance to look at that.
 4           (Witness perusing document.)
 5      A.   Yeah.
 6      Q.   This doesn't have a Bates
 7  number on it, but I will represent to you
 8  this was produced in Amneal's production.
 9           Do you know what this document
10  is?
11      A.   Yes.
12      Q.   And what is it?
13      A.   This is a litigation expense
14  report for Namenda IR tablets.
15  [REDACTED]
```

Page 115

```
[REDACTED]
12      A.   That's correct.
13      Q.   Do you know what stage in the
14  litigation the parties were at when this
15  settlement was executed?
16      A.   No, I'm not sure.
17      Q.   I will represent to you that it
18  was before fact discovery had even closed
19  in the case.
20           So it's fair to say had Amneal
21  and Forest continued litigating, the number
22  on this Exhibit 17 would have gone up
23  significantly, correct?
24           MS. LEGER:  Objection to form
25  and foundation.
```

Page 116

```
 1      Q.   You can answer.
 2      A.   That's correct.
 3      Q.   Let's go back to the settlement
 4  agreement for a minute.  It is Exhibit 16.
 5      A.   Okay.
 6      Q.   I want to go to page 236, in
 7  the launch date section.
 8      A.   Okay.
 9      Q.   1.14.  The '703 patent was set
10  to expire on April 11th, 2015, correct?
11      A.   Yes.
12      Q.   And with pediatric exclusivity,
13  the six-month period tacked on, Forest
14  could have sold Namenda IR safe from any
15  generic competition until October 11th,
16  2015, correct?
17           MR. LETTER:  I object to the
18  form.
19      A.   Yes.
20      Q.   So reading this launch date
21  scenario here, it is giving two scenarios,
22  both of which allow three months earlier
23  entry.
24           Under either one of these
25  scenarios, Amneal was able to enter the
```

Page 117

```
 1  market three months earlier than it
 2  otherwise would have been able to, correct?
 3           MR. LETTER:  I object to the
 4  form.
 5      A.   Yes.
 6      Q.   I also want to point you to the
 7  definition of '703 patent on page 235, on
 8  the other side of the document.
 9           The definition of '703 patent
10  here includes any extensions and pediatric
11  exclusivities, correct?
12      A.   That's correct.
   [REDACTED]
22      Q.   And we talked about this
23  earlier, I think, but you're not aware of
24  any pushback, I guess, from Amneal to
25  Forest regarding the pediatric exclusivity
```

Page 118

1 provision in this agreement, are you?
2         MS. STRANG: Objection, form,
3 foundation.
4     A.    Can you please rephrase?
5     Q.    Sure. I believe earlier you
6 testified that there weren't communications
7 back and forth between Forest and Amneal
8 regarding pediatric exclusivity; is that
9 right?
10    A.    Yes.
11    Q.    Now, let's turn to the pages
12 ending 239 and 240, and I'm specifically
13 looking at Section 4.3.
14         Have you read through these --
15 this provision before, Section 4.3?
16    A.    Yes.
17    Q.    And do you understand Section
18 4.3 as well as 4.4 and 4.5 to be MFN
19 clauses or acceleration clauses?
20    A.    Yes, I do understand
21 acceleration clause.
22    Q.    And that means if any other
23 generic is able to launch, the entry date
24 for Amneal accelerates to that date, right?
25    A.    That's correct.

Page 119

1     Q.    Including a provision like this
2 in the settlement agreement is in Amneal's
3 independent best interest; is it not?
4     A.    Yes.
5     Q.    Because it assures that Amneal
6 has the earliest entry possible, correct?
7     A.    That's correct.
8     Q.    This settlement agreement that
9 we're looking at here, this is the result
10 of back and forth negotiations between
11 Forest and Amneal, right?
12    A.    Yes.
13    Q.    At no time during those
14 negotiations did Amneal communicate with
15 any of the other generic defendants
16 regarding the terms of any Namenda
17 settlement agreements that they were
18 negotiating, correct?
19    A.    Yes.
20         MR. ADAM: I don't have
21 anything else.
22         MS. STRANG: Okay. I think
23 this is a good time to go off the record
24 for lunch.
25         THE VIDEOGRAPHER: The time is

Page 120

1 12:37. We are going off the record. This
2 will end media unit number two.
3         (Luncheon recess: 12:37 p.m.)

Page 121

1     AFTERNOON SESSION
2         1:24 p.m.
3 KAPIL GUPTA, resumed.
4         THE VIDEOGRAPHER: The time is
5 1:24. We are back on the record. This
6 will be the start of media unit number
7 three.
8 EXAMINATION BY MS. LEGER:
9     Q.    Good afternoon, Mr. Gupta.
10 Thank you so much for being here today. My
11 name is Erin Leger, and I'm with the law
12 firm of Smith, Segura & Raphael, and we are
13 located in Louisiana, and I represent the
14 direct purchaser class plaintiffs in this
15 action, and I will have some additional
16 questions to ask.
17    A.    Sure.
18    Q.    So let's get started. At this
19 time I would like to introduce for
20 identification purposes what has been
21 marked as Exhibit 18.
22         (Amneal Exhibit 18 marked for
23 identification.)
24    Q.    Would you like to take a moment
25 to look at this document?

31 (Pages 118 - 121)

Page 126

1  Q.  And is it correct that
2  according to this Paragraph IV
3  certification, that it was Interpharm's
4  belief the '703 patent was invalid,
5  unenforceable and/or would not be infringed
6  by the manufacture, use or sale of
7  Interpharm's generic product?
8  [REDACTED]
9  [REDACTED]
10 [REDACTED]
11 [REDACTED]
12 [REDACTED]
13 [REDACTED]
14 [REDACTED]
15 Q.  And so it was Interpharm's
16 belief that the patent was infringed by
17 filing this Paragraph IV; is that correct?
18 [REDACTED]
19     MR. ADAM:  Objection, form,
20 calls for speculation.
21 Q.  And when Amneal acquired
22 Interpharm's generic Namenda IR ANDA in
23 2008, was Amneal aware that Interpharm was
24 engaged in litigation with Forest relating
25 to the '703 patent?

Page 127

1  A.  Yes.
2  Q.  And when Amneal acquired
3  Interpharm's generic Namenda IR ANDA in
4  2008, did Amneal change the Paragraph IV
5  certification to a Paragraph III
6  certification?
7  A.  No.
8  Q.  And a Paragraph III
9  certification would mean that Amneal was no
10 longer interested in challenging the '703
11 patent; is that correct?
12     MR. ADAM:  Objection, form.
13     MS. STRANG:  Objection, form.
14 A.  Sorry, can you please rephrase?
15 Q.  I guess, first, what would a
16 Paragraph III certification mean?
17 A.  Paragraph III certification
18 would have meant that Amneal will not
19 challenge the patent, the listed patent.
20 Q.  And Amneal did not change to a
21 Paragraph III?
22 A.  Amneal did not.
23     MS. STRANG:  Could we get the
24 same agreements that objections made by
25 Forest counsel go for me?

Page 128

1     MS. LEGER:  Absolutely.
2     MS. STRANG:  Thank you.
3     MR. ADAM:  I will try not to
4  jump the gun.
5     MS. STRANG:  That is fine.  As
6  long as one of us does.
7  Q.  In testimony earlier today you
8  also talked about Amneal's first to file
9  status related to its generic Namenda IR
10 product; is that correct?
11 A.  That's correct.
12 Q.  And when did Amneal learn that
13 its Namenda IR product had first to file
14 status?
15 [REDACTED]
16 [REDACTED]
17 [REDACTED]
18 [REDACTED]
19 [REDACTED]
20 [REDACTED]
21 [REDACTED]
22 [REDACTED]
23 [REDACTED]
24 [REDACTED]
25 [REDACTED]

Page 129

1  [REDACTED]
2  [REDACTED]
3  [REDACTED]
4  [REDACTED]
5  [REDACTED]
6  [REDACTED]
7  Q.  And you stated earlier that
8  there were other first filers; is that
9  correct?
10 A.  Yes.
11 Q.  And do you know about how many
12 other first filers there were?
13 A.  I don't remember the number.
14 Q.  Maybe I can point you to
15 Exhibit 10 that was introduced earlier
16 today.
17 A.  Okay.
18 Q.  Take a look at that document.
19 And I can direct you to page ending in 8431
20 of Exhibit 10, and maybe that would refresh
21 your recollection that in at least February
22 of 2015, there were at least nine -- I'm
23 sorry, eight other generic competitors that
24 were expected to launch at the time of
25 Amneal's launch; is that correct?  It is

33 (Pages 126 - 129)