# Exhibit 330
# (Filed Under Seal)

HIGHLY CONFIDENTIAL

Page 1

         UNITED STATES DISTRICT COURT

         SOUTHERN DISTRICT OF NEW YORK

   _____

   IN RE NAMENDA DIRECT   )
   PURCHASER ANTITRUST    ) Civil Action No.
   LITIGATION             ) 1:15-cv-07488-CM

   _____


         SUN PHARMACEUTICAL INDUSTRIES, INC.

              TWO INDEPENDENCE WAY

           PRINCETON, NEW JERSEY  08540

                 AUGUST 31, 2017

                   9:21 A.M.


           ****HIGHLY CONFIDENTIAL****

                   VIDEOTAPED

           RULE 30(b)(6) DEPOSITION

                      OF

       SUN PHARMACEUTICAL INDUSTRIES, INC.

           BY AND THROUGH ITS DESIGNEE

           BHARATI NADKARNI, PH.D.(TECH)


   REPORTED BY:
   DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE
   JOB NO. NY 2677298

Page 46

1  generic memantine; correct?
2      A.  Yes.
3      Q.  If you could direct your
4  attention to the attachments to the letter,
5  specifically the settlement agreement and
6  the licensing agreement.  For the
7  settlement agreement if you could turn to
8  Page 9.
9      A.  (The witness complies with the
10 request of counsel.)
11     Q.  So there's multiple Page 9s
12 because there's different signature pages
13 for each.  If you could turn to the Page 9
14 that has Sun Pharmaceutical Industry
15 Limited's signature.
16         Do you see that?
17     A.  Yes.
18     Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24     Q.  Is this a complete and accurate
25 copy of the settlement agreement that Sun

Page 47

1  entered into with Forest for the generic
2  memantine litigation?
3      A.  Yes.
4      Q.  If you could turn to the
5  signature pages of the licensing
6  agreement --
7      A.  (The witness complies with the
8  request of counsel.)
9      Q.  -- which is on Page 14, Sun's
10 signature.
11     A.  (The witness complies with the
12 request of counsel.)
13     Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17     Q.  And is this a true and accurate
18 copy of the licensing agreement between Sun
19 and Forest?
20     A.  Yes.
21     Q.  You can put that document aside,
22 but keep it handy because we'll come back
23 to it.  Okay?
24     A.  Sure.
25     Q.  Sun received final approval for

Page 48

1  its generic memantine ANDA on May 5th,
2  2010; correct?
3      A.  Yes.
4         MR. BAVE:  The court
5  reporter will hand you Sun
6  Exhibit 7 which has Document Number
7  SUN0007329.
8         (Exhibit Sun-7, letter
9  bearing Bates Numbers SUN0007329
10 through SUN0007332, is marked for
11 identification.)
12        THE WITNESS:  (Reviewing
13 document.)
14 BY MR. BAVE:
15     Q.  Ready?
16     A.  Yes.
17     Q.  This is a May 5th, 2010 letter
18 from the FDA granting final approval of
19 Sun's ANDA for generic memantine; correct?
20     A.  Yes.
21        MR. CHIOREAN:  Objection,
22 form.
23 BY MR. BAVE:
24     Q.  The letter notes that it's
25 backdated to May 5th, 2010 because of a

Page 49

1  minor change to the Sun entity on the
2  letter; correct?
3      A.  Yes.
4      Q.  Was this letter received and
5  maintained in the normal course of business
6  at Sun?
7      A.  Yes.
8      Q.  If you look to the first page in
9  the fourth paragraph, it reads, "We have
10 completed the review of this ANDA and have
11 concluded that adequate information has
12 been presented to demonstrate that the drug
13 is safe and effective for use as
14 recommended in the submitted labeling.
15 Accordingly, the ANDA is approved,
16 effective on the date of this letter."
17        Do you see that?
18     A.  Yes.
19     Q.  And you understand that although
20 the letter was backdated, the operative
21 date is May 5th, 2010?
22     A.  Yes.
23     Q.  If you turn to Page 2, the last
24 sentence of the first full paragraph reads,
25 "You also notified the agency that Forest

HIGHLY CONFIDENTIAL

Page 62

1    A.  I don't really understand this.
8    MR. CHIOREAN: Objection to
9    form.
12   BY MR. BAVE:

Page 63

1    MR. CHIOREAN: Objection,
2    form, misstates the law.
4    BY MR. BAVE:
10   MR. LEFKOWITZ: Objection to
11   the form.
14   BY MR. BAVE:
15
19   MR. LEFKOWITZ: Objection,
20   calls for speculation.
21   THE WITNESS:
23   BY MR. BAVE:
24   Q.  If you look at Provision 1.12,
25   the launch date, you'll notice that the

Page 64

1    language includes extensions for pediatric
2    exclusivity whether granted before, on, or
3    after the execution date.
4       Do you see that?
5    A.  Yes.
6    Q.  You understand that it provides
7    for pediatric exclusivity in the future
8    after the date of the settlement; correct?
9    A.  That's right.
14   MR. CHIOREAN: Objection,
15   form, foundation.
17   BY MR. BAVE:
18   Q.  Sun actually launched its
19   generic memantine product; correct?
20   A.  Yes.
21   Q.  Sun launched on the first day
22   that generics could enter the market on
23   July 11th, 2015; correct?
24   A.  I think it would be right to say
25   that Sun launched on the day that Sun was

Page 65

1    allowed under the agreement with Forest.
2    Q.  And that was July 11th, 2015;
3    correct?
4    A.  Yes.
5    MR. BAVE: The court
6    reporter is going to hand you
7    what's being marked Sun Exhibit 9,
8    which is Document Number
9    SUN0007310.
10   (Exhibit Sun-9, e-mail
11   correspondence bearing Bates
12   Numbers SUN0007310 through
13   SUN0007312, is marked for
14   identification.)
15   THE WITNESS: (Reviewing
16   document.)
17   BY MR. BAVE:
18   Q.  Ready?
19   A.  Yes.
24   Do you see that?
25   A.  Yes.

17 (Pages 62 - 65)

Page 66

1  Q. Do you see that you're one of
2  the recipients of the e-mail?
3  A. Yes.
4  Q. Did you receive this e-mail on
5  or about July 14th, 2015?
6  A. Yes.
7  Q. Did you receive this in the
8  normal course of your job responsibilities
9  at Sun?
10  A. Yes.
11  Q. In this e-mail he indicates that
12  the actual launch date was July 11, 2015.
13  Do you see that?
14  A. Yes.
15  Q. If I could direct your attention
16  to the second e-mail in time, which is from
17  Ashish Paliwal, do you see that?
18  A. Yes.
19  Q. Who is Ashish Paliwal at this
20  time? What position did he hold?
21  A. I don't remember what position.

Page 67

[redacted]

Page 68

[redacted]

Page 69

[redacted]

HIGHLY CONFIDENTIAL

Page 70
1   MR. BAVE: The court
2  reporter will hand you what's being
3  marked Sun Exhibit 10.
4      This is a e-mail with two
5  attachments. The first document
6  Number is SUN0007178.
7      (Exhibit Sun-10 e-mail
8  correspondence with attachment
9  bearing Bates Numbers SUN0007178
10 through SUN0007183, is marked for
11 identification.)
12     THE WITNESS: (Reviewing
13 document.)
14 BY MR. BAVE:
15 
21     A. Yes.
22     Q. Did you receive this e-mail on
23 or about April 1st, 2015?
24     A. Yes.
25     Q. Did you receive it in the normal

Page 71
1  course of your job responsibilities at Sun?
2      A. Yes.
3      Q. This is an e-mail chain
4  discussing the status of the generic
5  memantine launch; correct?
6      A. Yes.
7      Q. And this is sent about a little
8  over three months before the actual launch
9  date; is that right?
10     A. Yes.
11 
24     Do you see that?
25     A. Yes.

Page 72

Page 73
8
14     Q. When we referred earlier to a
15 drug substance, is that the same thing as
16 an active pharmaceutical ingredient?
17     A. That's right.
18     Q. And it's sometimes referred to
19 as API; is that correct?
20     A. Right.
21     Q. My understanding is the drug
22 product was manufactured at Sun's Dadra
23 plant and the active ingredient was
24 manufactured at the Ahm -- can you --
25 what --

19 (Pages 70 - 73)

Page 122
1  '703 Patent on January 25th, 2008; correct?
2     A.  Yes.
3     Q.  And Sun and Actavis entered into
4  a settlement agreement on ▮▮▮▮▮
5  releasing all the claims regarding the
6  infringement of the '703 Patent; correct?
7     A.  Yes.
8  ▮▮▮▮▮
12    Q.  If you could, turn to Exhibit 6.
13    A.  (The witness complies with the
14  request of counsel.)
15    Q.  This is the settlement and
16  licensing agreement we saw earlier.
17       If you could turn to Section 4
18  of the settlement agreement which is on
19  Page 2, there's a provision there called
20  "Legal Compliance."
21       Do you see that?
22    A.  Yes.

Page 123
▮▮▮▮▮

Page 124
1  ▮▮▮▮▮
14       MR. CHIOREAN:  Objection,
15  form.
16       THE WITNESS: ▮▮▮
17  BY MR. BAVE:
18    Q.  If you turn to the licensing
19  agreement now, Section 2.5.
20    A.  (The witness complies with the
21  request of counsel.)
22    Q.  This section is entitled
23  "Litigation Expenses Defrayed and Avoided
24  By the Settlement Agreement and This
25  Licensing Agreement."

Page 125
1       Do you see that?
2    A.  Yes.
3    Q.  The provision reads, (as read):
4  "Sun has represented that its attorney's
5  fees and costs to date in the action have
6  exceeded ▮▮▮▮▮."
7       Do you see that?
8    A.  Yes.
9    Q.  Is that an accurate
10 representation as to the amount of the
11 attorney's fees as of the date of the
12 settlement?
13    A.  Yes.
14    Q.  What are typical litigation
15 costs, including attorney's fees, in patent
16 actions taken to trial?
17    A.  I'm sorry.  Can you say that
18 again?
19    Q.  Sure.  What are the typical
20 litigation costs, including attorney's
21 fees, in patent litigations taken to trial?
22    A.  ▮▮▮▮▮
24  ▮▮▮▮▮

Page 126

1  ▮
2    Q.  What if a case is taken through
3  trial and appealed, do you have an
4  understanding of the average costs that
5  that would entail?
6    A.  ▮
   ▮
8    Q.  Can you direct your attention to
9  Section 1.12 of the licensing agreement?
10 This is the one we looked at earlier, the
11 "Launch Date."
12   A.  (The witness complies with the
13 request of counsel.)
14   Q.  And looking at Section (a) of
15 the Launch Date, the three calendar months
16 prior to expiration of the '703 Patent,
17 including any extensions and/or pediatric
18 exclusivity, whether granted before, on or
19 after the execution date," we looked at
20 that language; correct?
21   A.  Yes.

Page 127

5    Q.  And do you see at the bottom of
6  that clause it says, "Unless accelerated as
7  described herein"?
8    A.  Yes.
9    Q.  Can you turn to page -- or
10 excuse me -- Clause 4.3?
11       Do you understand this to be an
12 acceleration clause?
13   A.  Yes.
14   Q.  And you understand that it means
15 that if any generic is able to launch
16 earlier than Sun, Sun's entry date would
17 accelerate to that earlier date; correct?
18   A.  Yes.
19   Q.  Including a provision such as
20 this to accelerate the date is in Sun's
21 independent best interest; correct?
22   A.  Sorry?
23   Q.  Including a provision such as
24 this, which accelerates Sun's launch date
25 in the event that another generic gets an

Page 128

1  earlier launch date, is in Sun's
2  independent best interest; correct?
3    A.  Yes.
4    Q.  Because it allows Sun the
5  earliest entry possible into the market;
6  correct?
7    A.  That's correct.
8    Q.  Are you familiar with the term
9  "at risk" in connection with a launch?
10   A.  Yes.
11   Q.  What's your understanding of
12 what that means?

Page 129

7       MR. CHIOREAN:  Objection,
8    form.
9  BY MR. BAVE:

15      MR. CHIOREAN:  Objection,
16   form.
17 BY MR. BAVE:
18   Q.  So the settlement and license
19 agreement that we were just looking at was
20 a result of a back-and-forth negotiation
21 between Sun and Forest; correct?
22   A.  Yes.
23   Q.  Before Sun settled the patent
24 litigation, did it discuss the terms of
25 the patent litigation settlements with any

Page 130

1  other generic memantine manufacturers?
2     A.  No.
3     Q.  Are you aware of any individuals
4  at Sun that communicated with the other
5  generic manufacturers about the terms of
6  Sun's patent settlement with Forest?
7     A.  No.
8     Q.  Did anyone at Sun disclose the
9  terms of the settlement with Forest to
10 other generic manufacturers?
11    A.  No.
12    Q.  At no time during those
13 negotiations did Sun communicate with any
14 of the other generic defendants concerning
15 the settlement agreement; right?
16    A.  We did not.
17    Q.  To your knowledge, before
18 entering the settlement agreement, did
19 Forest ever provide copies of its
20 settlement agreements with the other
21 generics to Sun?
22    A.  No.
23    Q.  And at no time after Sun had
24 executed the settlement agreement did Sun
25 communicate with the other generics about

Page 131

1  the terms of the settlement agreement; is
2  that right?
3     A.  We did not.
4        MR. BAVE:  Well, thank you
5  very much.  That's all the
6  questions I have at this time.  I'm
7  reserving my right to ask a few
8  more after the Plaintiffs go.
9        THE WITNESS:  Sure.
10       MR. BAVE:  Thank you.  Why
11 don't we go off the record?
12       MR. LEFKOWITZ:  Before we go
13 off --
14       THE VIDEOGRAPHER:  Off the
15 record 11 --
16       MR. LEFKOWITZ:  -- before we
17 go off the record, I just want to,
18 just given what -- the testimony, I
19 want to make sure we note this as
20 highly confidential.
21       MR. BAVE:  Sure.  We have no
22 problem with that.
23       MR. LEFKOWITZ:  Okay.
24       THE VIDEOGRAPHER:  Off the
25 record 11:47.

Page 132

1        (A recess is held from
2  11:47 p.m. to 12:04 p.m.)
3        THE VIDEOGRAPHER:  On the
4  record.  12:04.
5  BY MS. HENNINGS:
6     Q.  Good afternoon, Dr. Nadkarni.
7        My name is Kimberly Hennings and
8  I represent the direct purchaser
9  plaintiffs.  I'm going to be asking you
10 some more questions.
11    A.  Good afternoon.
12    Q.  Before we start, I'd like to
13 briefly go through your educational
14 background.  Do you have an undergraduate
15 degree?
16    A.  Yes.
17    Q.  And what is that degree in?
18    A.  Pharmacy.
19    Q.  And where did you obtain that
20 degree?
21    A.  University of Mumbai.
22    Q.  Do you have any graduate
23 degrees?
24    A.  Yes.
25    Q.  And what are those degrees?

Page 133

1     A.  A masters in pharmacy.
2     Q.  And where did you obtain that
3  masters?
4     A.  Also from the University of
5  Mumbai.
6     Q.  Do you have any other graduate
7  degrees?
8     A.  I have a doctorate in pharmacy.
9     Q.  And where did you get that
10 doctorate?
11    A.  University of Mumbai.
12    Q.  Any other degrees?
13    A.  No.
14    Q.  Are you an attorney?
15    A.  No.
16    Q.  Do you have any -- have you had
17 any formal legal training?
18    A.  No.
19    Q.  Okay.  I believe you said your
20 current position is Vice-President for
21 Portfolio Planning and IP Litigation; is
22 that right?
23    A.  Yes.
24    Q.  Have you ever worked in
25 Regulatory Affairs?

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 214

1  from reading what it says here, I really
2  don't have a view on this because it just
3  says,
4                                             so I don't know.
5
6
7
8
9
10         MR. BAVE: Objection, lacks
11  foundation, calls for speculation.
12
13
14
15  BY MS. HENNINGS:
16
17
18
19
20
21
22
23
24
25

Page 215

1
2
3
4
5
6
7
8
9
10
11         MR. LEFKOWITZ: Objection,
12  lack of foundation.
13         MR. BAVE: Join.
14
15
16
17  BY MS. HENNINGS:
18     Q.  Okay.  You can put that aside.
19     A.  (The witness complies with the
20  request of counsel.)
21         MS. HENNINGS: Let's take a
22  quick break so I can see if I have
23  anything else.
24         MR. LEFKOWITZ: That would
25  be great.

Page 216

1         THE WITNESS: Sure.
2         THE VIDEOGRAPHER: Off the
3  record. 2:02.
4         (A recess is held from
5  2:04 p.m. to 2:15 p.m.)
6         THE VIDEOGRAPHER: We're on
7  the record.  2:15.  This is the
8  beginning of Tape Number 5.
9  BY MS. HENNINGS:
10     Q.  Okay.  I just have a few more
11  questions.  So earlier we talked about all
12  the different steps that Sun takes when
13  it's getting ready to launch a product,
14  right, and all of the different teams that
15  Sun uses to get ready for launch; right?
16     A.  Yes.
17
18
19
20
21
22
23
24
25

Page 217

1
2
3         MR. BAVE: Objection, lacks
4  foundation, calls for speculation.
5         THE WITNESS:
6  BY MS. HENNINGS:
7
8
9
10         MR. BAVE: Objection, lacks
11  foundation, calls for speculation.
12         THE WITNESS:
13  BY MS. HENNINGS:
14     Q.
15
16
17         MR. BAVE: Objection, lacks
18  foundation.
19         MR. LEFKOWITZ: Objection,
20  lacks foundation.
21         THE WITNESS:
22  BY MS. HENNINGS:
23     Q.
24
25         MR. BAVE: Objection, lacks

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

```
                Federal Rules of Civil Procedure
                            Rule 30
```

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.