# Exhibit 359
# (Filed Under Seal)

** H I G H L Y C O N F I D E N T I A L **

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:15-cv-07488-CM

-----------------------------------x

IN RE NAMENDA DIRECT PURCHASER

ANTITRUST LITIGATION

-----------------------------------x

August 29, 2017

8:49 a.m.

Videotaped Deposition of FOREST LABORATORIES, LLC; ACTAVIS, PLC; FOREST LABORATORIES, INC.; and FOREST LABORATORIES HOLDINGS LTD., by MARK DEVLIN, taken by Plaintiffs, pursuant to Rule 30(b)(6) Notice, held at the offices of Garwin Gerstein & Fisher LLP, 88 Pine Street, New York, New York, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.

HIGHLY CONFIDENTIAL

Page 86

Page 88

Page 87

MR. TOTO: I object to form, lacks foundation, calls for speculation, mischaracterizes the document.

Page 89

23 (Pages 86 - 89)

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 90

MR. TOTO: I object to form.

Page 91

MR. TOTO: The document speaks for itself.

Page 92

Page 93

MR. TOTO: I object to form.

MR. TOTO: I object to form.

A. No.



Page 134

lacks foundation.

MR. TOTO: Other than Bill Meury?

Page 135

Page 136

MR. TOTO: Objection, mischaracterizes the document.

Page 137

MR. TOTO: I object to form.

Page 170

MR. TOTO: I object to form.

MR. TOTO: I object to form, lacks foundation.

Page 171

MR. TOTO: I object to form, lacks foundation.

MR. TOTO: I object to form, lacks foundation.

MR. TOTO: I object to form, argumentative, mischaracterizes his testimony.

Page 172

MR. TOTO: Objection. Those documents speak for themselves.

Page 173

(Devlin Exhibit 20 marked for identification.)

Q. So the document I have marked as Exhibit 20 bears Bates number

Page 174

FRX-AT-01775242. It's an e-mail -- or it's a document from Namenda XR Brand Team to various folks and CC'd to various individuals, including you, correct?

A. Correct.

Q. I'm sorry?

A. Correct.

MR. TOTO: I will just note

Page 175

before you go on, Counselor, that the metadata, which is on the second page of the document does have different dates. So I'm not sure which date is accurate.

MR. SORENSEN: Yeah. You are referring to the metadata document, .

MR. TOTO: That's right.

MR. SORENSEN: Understood.

Page 176

Page 177

(Devlin Exhibit 21 marked for identification.)

Q. Sir, I have shown you an exhibit marked Exhibit 21. It has Bates number FRX-AT-01779498.

Do you see that, sir?

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. It bears a Devlin exhibit sticker from your August 21, 2014 New York AG deposition. Do you see that?

A. Yes.

Q. And what is this document, sir?

A. It's a press release that announces a plan to discontinue sale of Namenda IR.

Q. And was, as far as you know,

this the first press release announcing that plan?

A. As far as I know, yes.

Q. So this is February 14th, 2014, correct?

A. Correct.

Q. All right. You can put that aside, sir.

Now, in connection with the announcement to discontinue IR and move to XR, isn't it correct that Forest also engaged in a fairly extensive information media campaign to contact caregivers, physicians, others, about this announcement?

MR. TOTO: You are talking about the February 14th, Exhibit 21, right?

MR. SORENSEN: Yes.

MR. TOTO: Okay.

A. Yes,

Q. So Forest sent out thousands of such notices; is that correct?

A. I don't know the number, but we did communicate with others, yes.

Q. Any idea the magnitude, 5,000 e-mails, 100,000?

A. I just know in my area it was probably several hundred.

Q. In your area, what was your area, again?

A. Insurance companies, health plans, pharmacy benefit management companies.

Q. So you contacted all those -- all those companies; is that correct?

A. Yes.

Q. But other folks dealing with physicians or long-term care facilities or others would be responsible for communicating to their customers or their audience, correct?

A. I believe so, yeah.

Q. Did you participate in any meetings where the topic was, you know, the

scope or how to communicate this message of withdrawal as widely as possible?

A. I remember some discussion about the press release and about notifying customers of what our plan was, but the extent and the numbers of customers that were being contacted, I don't recall specific numbers.

Q. Was there a person or persons in charge of that kind of media or information publicity campaign?

A. I don't know if it was the brand team responsibility or if it was Corporate Communications' responsibility for that. I don't know.

Q. Who was in charge of Corporate Communications at this time?

MR. TOTO: Counsel, which 30(b)(6) topic is this encompassed within?

MR. SORENSEN: I think it is within topic 6, strategy.

MR. TOTO: I don't believe so. I object, beyond the scope.

Q. Go ahead.

A. At the time I believe it might

Q. Right, okay. And you had responsibilities for Lexapro of some type?

A. Well, I had the same responsibilities then as I did with Namenda, which was health plans and PBMs, mail order companies, discounting market access.



MR. SORENSEN: With that, I'm done.

I will note that we may be in touch about seeking additional, whatever, 30(b)(6) witnesses after I consult with my colleagues. It's not clear to me that this was an adequately prepared witness.

I'm not trying to argue it. I just wanted to note it, and we may be in touch about that.

MR. TOTO: Okay, I understand your position. Our position, as you might imagine, is he was fully prepared, and we object and do not agree to bring any additional witnesses on these topics. And we could talk about it offline.

EXAMINATION BY MR. TOTO:

Q. I do have some questions for



you, Mr. Devlin.

A. Okay.

Q. I know it has been a long day, but I will try to be concise.

Just starting on where we left off on Exhibit 33, you received this document in the ordinary course of business, correct, sir?

A. Correct.

MR. SORENSEN: Where are you?

MR. TOTO:



Q. Okay. Switching topics, throughout your testimony today, a couple of times you used the term "access." Do you recall that?

A. Yes.

Q. You talked about Part D access and plan access. Do you recall that?

A. Yes.

Q. Can you explain what you mean by access?

A. Yeah. Access is a term that refers to formulary coverage, and, you know, the health plans and payors generally are in commercial markets or Medicare Part D, as the case with Namenda, because they

had a large percentage of the business, a large majority that is paid for through the Medicare Part D program, and there's just a small number of approved plan sponsors that we negotiate with for formulary coverage or access to our products.

If you don't have that access, you get literally no business in Medicare. And if you have that access, you get a lot of business. So you have to, in order to gain that access, you have to negotiate and discount your price, and those companies are very formidable negotiators. That's their sole job, is to negotiate the lowest price possible for them and the highest discounts or rebates back from the manufacturer.

Q. And did you in fact negotiate with these plans to gain access for Namenda XR?

A. We did. We did. They were -- those plans, the access and our success came on over time, and the largest Medicare plan sponsor we were able to gain access in January of 2014, which had a large impact

on our Namenda XR uptake.

Q. And who was that plan?

A. That was United Healthcare AARP, some may call it Optum, you may see it Optum in the spreadsheet, that's the PBM, but it is all owned by United Healthcare, which has the large majority of Medicare beneficiaries.

Q. Can you describe how the concept of access is related to formulary coverage?

MR. SORENSEN: I will just note an objection. This is outside the scope of the 30(b)(6). But go ahead.

MR. TOTO: It is certainly in the scope of what you asked him. Go ahead.

MR. SORENSEN: I disagree with that, too. I'm not stopping you from testifying, I'm just noting objections. Go ahead.

A. Yeah, so those companies such as United AARP or Silverscript or Humana that I had testified to maintain a formulary, and there can be products on that formulary that are preferred by that

plan sponsor, and preferred means that's the product that they receive the best price for, the product that they then charge the lowest out-of-pocket co-pay for the patient, or they can have a product that will be nonpreferred brand, which will have a higher co-pay for the patient.

They can put restrictions in place and barriers to physicians prescribing one product over another through generic step requirements at the point of sale, prior authorizations from physicians, or they can choose to simply not cover the product and force the patient, the Medicare patient to pay full price and reject it.

Q. Do plans negotiate for preferential pricing in the form of discounts in return for preferential formulary placement?

A. Yes.

MR. SORENSEN: Same objections. Go ahead.

A. Yes, they do.

Q. And did you in fact have those

negotiations when it came to Namenda XR?

MR. SORENSEN: Same objections. I object to this entire line of questions so far.

A. We did. It's part of my primary job responsibility.

(Devlin Exhibit 34 marked for identification.)

Q. Sir, you have been handed Exhibit 34. Do you have that in front of you?

A. I do.

Q. You are aware, before we get to the specifics of 34, you are aware that -- there was testimony today about a plan that Forest had in the past to withdraw Namenda IR from the market, right?

A. Correct.

Q. And are you aware that there was a lawsuit brought by the New York Attorney General in response to that plan?

A. Yes.

MR. SORENSEN: Objection, beyond the scope of the 30(b)(6).

Q. And were you deposed in that

case?
A. I was.
MR. SORENSEN: Same objections.
Q. Are you aware of the resolution of that case?
A. Yes, I am.
MR. SORENSEN: Same objections.
Q. What was the resolution?
MR. SORENSEN: Same objections.
A. Well, there was a, in the course of the lawsuit, there was a judge that approved an injunction that prevented us from implementing the plan to withdraw Namenda IR, and then ultimately the court ruled in favor of the Attorney General and we abandoned that plan. We were not allowed to withdraw.
Q. So did the injunction prohibit you from withdrawing IR from the market?
A. Yes.
Q. Did the injunction prohibit you from limiting the distribution of Namenda IR in any way?
A. Yes.
MR. SORENSEN: Same objections.

Q. Did Forest fully comply --
MR. SORENSEN: Hold on. I'm sorry.
I also object insofar as you are asking for legal conclusions and it is all beyond the scope of the 30(b)(6).
MR. TOTO: Just state your objections and let's move on.
Q. Did the injunction prohibit Forest from limiting the distribution of Namenda IR in any way?
MR. SORENSEN: Same objections.
A. Yes, the injunction prohibited us from limiting the distribution of IR.
Q. Now turning to Exhibit 34, do you recognize this to be a press release from the New York Attorney General's office announcing the resolution of that lawsuit?
A. Yes.
MR. SORENSEN: If you could please just give me a chance to object.
Same objections, and I object to the document as hearsay. But go ahead.
Q. Now, you'll see -- well, let me just read part of this to you.

It says "Attorney General Eric T. Schneiderman today announced that his office has resolved the antitrust lawsuit it brought in September of 2014, which has successfully prevented pharmaceutical manufacturer Allergan plc (previously named Actavis plc) from forcing Alzheimer's patients to switch medications as part of an anti-competitive strategy designed to maintain higher prices."
Do you see that?
A. I do.
Q. And that's a true and correct statement, correct?
MR. SORENSEN: Same objections.
A. Correct.
Q. And that's a reliable statement, correct?
MR. SORENSEN: Same objections. Beyond the scope.
A. That's correct.
Q. It goes on to say "In December of 2014, a federal judge granted New York's request for an injunction and prohibited Allergan from engaging in the controversial

tactic sometimes called a forced switch, which would have needlessly disrupted the treatment plans of these patients solely to protect corporate profits."
Do you see that?
A. I see that.
Q. And that was the injunction you just referred to a little bit earlier, correct?
MR. SORENSEN: Same objections.
A. Correct.
Q. That is a correct and reliable statement; is that right?
MR. SORENSEN: Same objections. Beyond the scope, hearsay.
A. That's correct.
Q. It goes on to say "Because the injunction protected competition and allowed low-cost generic drugs to enter the market unimpeded, the Attorney General's office has determined that it is no longer necessary to continue legal action."
Do you see that?
A. Yes, I see that.
Q. Is that a correct and reliable

statement?
MR. SORENSEN: Same objections, beyond the scope, calls for hearsay, lack of foundation. Go ahead.
A. That's correct.
Q. Going on, it says "'Our lawsuit prevented Allergan from pursuing its plan to block competition, thus preserving patient choice for hundreds of thousands of Alzheimer's patients, and protecting the public from bearing hundreds of millions of dollars in unnecessary drug costs,' said Attorney General Schneiderman."
That's what it says, right?
A. Yes.
Q. Is that a true and reliable statement?
MR. SORENSEN: Objection, same objections, beyond the scope, calls for hearsay, lack of foundation.
A. Yes.
Q. If you turn to the second page of Exhibit 34, and look at the first full paragraph there, it says "As a result of the injunction, Alzheimer's patients have

not been forced to switch from Namenda IR to Namenda XR and instead have been able to select which drug to use based on their and their physician's views of which drug is best for them."
Do you see that?
A. Yes.
Q. Was that a true and reliable statement?
MR. SORENSEN: Objection, beyond the scope; objection, hearsay; objection, lack of foundation.
A. Yes, I believe it to be true and reliable.
Q. It goes on to say "By summer 2015, low-cost generic versions of Namenda IR became widely available in the market."
Do you see that?
A. Yes.
Q. Was that a true and reliable statement?
MR. SORENSEN: Same objections.
A. Yes.
Q. It continues, "Accordingly, as a result of the Attorney General's lawsuit,

patients who wished to remain on IR during early 2015 and then switch to the generic version when it became available over the summer were able to do so without any disruption in their medical treatment."
Do you see that?
A. Yes.
Q. Was that a true and reliable statement?
MR. SORENSEN: Same objections, beyond the scope, lack of foundation, hearsay.
A. Yes.
Q. I'm only going to read a few more sentences.
"In addition, Alzheimer's patients who wish to take Namenda XR instead of Namenda IR are also free to do so."
Do you see that?
A. Yes.
Q. Is that a true and reliable statement?
MR. SORENSEN: Same objections.
A. Yes.

Q. And your answers to my questions about this document were based on your experience at Forest and your involvement in the lawsuit, correct?
MR. SORENSEN: Same objections.
A. That's correct.
Q. You can put that document aside.
Now, sir, Mr. Sorensen asked you a few questions today, well, a bunch of questions, let's say, about forecasts for the expected conversion from Namenda IR to XR; do you recall many questions on that?
A. Yes.
Q. And you also looked at a bunch of documents that had different numbers on them when it came to that -- the forecasted conversion rate; do you recall that?
A. Yes.
[redacted]



Page 258

Page 260

MR. SORENSEN: Move to strike that entire speech as nonresponsive and beyond the scope.

(Devlin Exhibit 37 marked for identification.)

Q. Do you have Exhibit 37 in front of you, sir?

MR. TOTO: And I oppose the motion to strike.

Q. Do you have that exhibit in front of you?

A. I do.

Q. You see this is an e-mail chain, the top e-mail is dated December 18th, 2013?

A. Yes.

Q. Now, by definition, that's just

Page 259

Page 261

prior to the January or early 2014 period that you just mentioned, correct?

A. Correct.

[redacted]

MR. SORENSEN: Objection, leading. Objection, beyond the scope.

[redacted]

[redacted]

MR. SORENSEN: Same objections.

[redacted]

Q. Okay. Now, Mr. Sorensen asked you a lot of questions about the period 2014 and earlier, right?

A. Yes.

Q. He didn't really ask you any questions about after the injunction, in

other words, you know, after December 2014 into 2015; is that right?

MR. SORENSEN: Objection, leading. Go ahead.

A. That's about right.

MR. TOTO: I think the record will reflect that.

MR. SORENSEN: It doesn't make it not leading.

Q. Now, after the injunction issued, is there any reason that a patient that was on XR at that point in time couldn't switch back to Namenda IR prior to the loss of exclusivity of Namenda IR?

MR. SORENSEN: Objection, leading, beyond the scope.

A. No. I think as I testified before, the patients had, and physicians, had the choice, they could have changed from XR back to IR if they wanted to, or IR to XR, both were available, there was no -- there was no withdrawal. There was no limited distribution or restriction of any kind.

Q. After the injunction issued,

did you stop promoting XR?

A. No.

Q. Did you continue to promote it aggressively?

A. We did.

MR. SORENSEN: Same objections, beyond the scope and leading. Go ahead.

A. Yes, we did.

Q. You had some -- there were a number of questions about communications about the withdrawal, when that was -- when that was announced in and around February 2014. Do you recall those questions?

A. Yes.

Q. A block of questions about letters that were sent out or communications plan, that kind of thing?

A. Yes.

[redacted]

MR. SORENSEN: I object insofar as you objected to my questions about those communications as beyond the scope and yet you're asking about it. But go ahead.

Page 294

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of August, 2017.

[signature]

________________________

TODD DESIMONE

* * *

Page 295

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: IN RE NAMENDA
DATE OF DEPOSITION: 8/29/17
WITNESS' NAME: MARK DEVLIN

PAGE/LINE(S)/ CHANGE REASON

___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________
___/_____/____________/________

________________

MARK DEVLIN

SUBSCRIBED AND SWORN TO BEFORE ME THIS_____DAY OF____________, 2017.

______________

NOTARY PUBLIC

MY COMMISSION EXPIRES______________