IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Namenda Direct Purchaser Antitrust Litigation<br><br>THIS DOCUMENT RELATES TO:<br>All Direct Purchaser Actions | Case No. 1:15-cv-07488-CM (RL)<br><br>FILED UNDER SEAL |

**MEMORANDUM OF LAW IN SUPPORT OF FOREST'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DR. ERNST BERNDT AND DR. RUSSELL LAMB REGARDING FORECAST AVERAGES**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................................................ ii

I. INTRODUCTION ............................................................................................................ 1

II. BACKGROUND .............................................................................................................. 2

    A. Dr. Berndt's Analysis ........................................................................................... 2

    B. Dr. Lamb's Analysis ............................................................................................ 4

III. ARGUMENT .................................................................................................................... 6

    A. Dr. Berndt And Dr. Lamb Did Not Perform Any Economic Analysis To Determine The Conversion Rate In The But-For World ....................................... 6

    B. Dr. Berndt And Dr. Lamb Did Not Apply Any Expert Methodology To Average Forecasts Or To Select Which Forecasts To Include In Their Averages .............................................................................................................. 7

    C. Drs. Berndt And Lamb Haphazardly Selected Forecasts For Their Averages ... 9

        1. Drs. Berndt And Lamb Placed Arbitrary And Improper Timeframe Limitations On Their Selection Of Forecasts ........................................... 9

        2. Dr. Lamb Arbitrarily Excluded Forecasts With A January Loss Of Exclusivity ............................................................................................... 11

        3. Dr. Berndt Improperly Excluded Forecasts He Thought Were Duplicates Based On Their Titles ............................................................ 11

    D. Neither Dr. Berndt Nor Dr. Lamb Pressure Tested The Forecasts To Determine Their Reliability ................................................................................ 12

IV. CONCLUSION ............................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ................................................................................16

*Bruno v. Bozzuto's, Inc.*,
311 F.R.D. 124 (M.D. Pa. 2015) .................................................................................13

*Caruso v. Bon Secours Charity Health Sys.*,
2016 U.S. Dist. LEXIS 104067 (S.D.N.Y. Aug. 5, 2016) .....................................8, 13

*Cholakyan v. Mercedes-Benz USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) ..................................................................................6

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
367 F. Supp. 2d 413 (W.D.N.Y. 2005) ........................................................................13

*Dzielak v. Whirlpool Corp.*,
No. 2:12-0089, 2017 U.S. Dist. LEXIS 39232 (D.N.J. Mar. 17, 2017) ...................12

*EEOC v. Bloomberg L.P.*,
2010 U.S. Dist. LEXIS 92511 (S.D.N.Y. Aug. 31, 2010) .................................. 12-13

*In re Namenda Direct Purchaser Antitrust Litig.*,
No. 15-cv-7488, 2017 U.S. Dist. LEXIS 83446 (S.D.N.Y. May 23, 2017) ..............15

*In re Puda Coal Secs., Inc.*,
30 F. Supp. 3d 230 (S.D.N.Y. 2014) .............................................................................2

*In re Scotts EZ Seed Litig.*,
2017 U.S. Dist. LEXIS 125621 (S.D.N.Y. Aug. 7, 2017) .........................................12

*Kargo Glob., Inc. v. Advance Magazine Publrs., Inc.*,
2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6, 2007) .............................................8

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
2003 U.S. Dist. LEXIS 15976 (S.D.N.Y. Sep. 15, 2003) ..........................................13

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999) ...................................................................................... 8-9

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2002) ............................................................................................8

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .......................................................................................15

## I.   INTRODUCTION

Neither Dr. Berndt nor Dr. Lamb employed any expert methodology in calculating a but-for world conversion rate of Namenda IR to Namenda XR if the hard switch had not been announced. Instead, both economists simply averaged a select group of cherry-picked Forest forecasts. Neither employed any uniform or "expert" methodology in how they selected which Forest forecasts would be included in that average, and neither employed any particular expertise in simply adding up the conversion rates listed in those forecasts and averaging them.

Both experts also failed to conduct any independent investigation to verify the accuracy or reliability of the data or assumptions utilized in those forecasts. Dr. Lamb relied on Dr. Berndt's opinion that the forecasts were "reliable," but Dr. Berndt did not know who created the forecasts, who commissioned the creation of them or what data was included in them. Dr. Berndt failed to even compare the forecasts visually to determine which forecasts were duplicates, and he erroneously and unknowingly excluded non-duplicative forecasts in his average.

Dr. Berndt expressly disavowed that he was using forecasts as a way of estimating a "but-for" world conversion rate. Yet, that is *exactly* what Dr. Lamb does with the forecasts. He has opined that there are ███████████ of damages based on a but-for world created by this unscientific selection of a handful of Forest forecasts.

The failure to conduct an actual economic analysis to determine the conversion rate in a but-for world, the failure to employ any reliable methodology for selecting and averaging forecasts, and the failure to ensure the reliability of the forecasts on which they rely, warrants striking both experts' opinions regarding their forecast averages under Rule 702, Rule 403 and *Daubert*.

## II. BACKGROUND

### A. Dr. Berndt's Analysis

Dr. Berndt submitted an Opening Expert Report on September 15, 2017 ("Berndt Rep.") (Hamburger Decl., Ex. 7), a Reply Expert Report on October 25, 2017 ("Berndt Reply") (Hamburger Decl., Ex. 8), and an Amended Reply Report on November 8, 2017 ("Berndt Am. Reply") (Hamburger Decl., Ex. 9).[1] Dr. Berndt's Opening Report offers an opinion on (1) "whether it is reasonable as a matter of economics to conduct a damages analysis of the impact of Forest's announcement and conduct of a 'hard switch' marketing campaign . . . . based upon use of relevant Forest projections and forecasts" and if so, (2) "what objectively reasonable expected market share Namenda XR would have had if there had been no Hard Switch announcement and marketing campaign (as shown by Forest's reasonable forecasts)." Hamburger Decl., Ex. 7 (Berndt Rep.) ¶ 6.

Dr. Berndt concludes, without any academic support, that forecasts are a "reliable predictor" of what the Namenda XR share would have been absent the announcement of the hard switch (Hamburger Decl., Ex. 7 (Berndt Rep.) ¶ 51), and concludes it was appropriate for Dr. Lamb to "model damages" from the hard switch announcement by relying upon a series of Forest forecasts, again without any support in literature or academic papers. Hamburger Decl., Ex. 7 (Berndt Rep.) ¶ 65.

---

[1] Defendants specifically request that the Court strike Dr. Berndt's Amended Reply Report on the basis that it was an improper amendment. *In re Puda Coal Secs., Inc.*, 30 F. Supp. 3d 230, 235 n. 4 (S.D.N.Y. 2014) (striking improper attempt to amend an expert report for new opinions offered). Dr. Berndt's Amended Reply Report specifically addresses issues and documents raised during his deposition and thus was essentially an improper sur-rebuttal. *See* Hamburger Decl., Ex. 9 (Berndt Am. Reply) Ex. D, n.1 ("I reviewed the forecasts dated prior to October 29, 2013 listed in Exhibit 17 to my November 2, 2017 deposition ...."). Forest reserves all rights to seek exclusion of this Amended Reply Report in a motion *in limine* as well should the Court deny this Motion.

2

Dr. Berndt then selectively chooses twenty-one "Recent Forecasts" and averages those forecasts to determine that approximately ▮ was the "reasonable expected market share" of Namenda XR if there had been no Hard Switch announcement. Hamburger Decl., Ex. 7 (Berndt Rep.) Ex. D (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also* Hamburger Decl., Ex. 7 (Berndt Rep.) ¶ 69. Dr. Berndt's Reply Report updates his average calculation after removing a November 25, 2013 forecast, and his Amended Reply Report updates his average calculation yet again after Dr. Berndt included figures from one forecast that previously had "na" listed under the "Total" column. *Compare* Hamburger Decl., Ex. 7 (Berndt Rep.) Ex. D *and* Hamburger Decl., Ex. 8 (Berndt Reply) Ex. D (▮▮▮▮▮▮▮▮▮▮▮▮▮) *with* Hamburger Decl., Ex. 9 (Berndt Am. Reply) Ex. D (▮▮▮▮▮▮▮▮▮).

Dr. Berndt's Opening Report does not outline the methodology he used to determine which Forest forecasts out of the hundreds created by Forest (Hamburger Decl., Ex. 24 (Snyder Dep.) at 54:6-11) would go into his average. During his deposition, however, Dr. Berndt testified that "I understand the methodology was to look at forecasts that had a date on them, preferably; that were non-duplicative, as I mentioned earlier; and I think the criterion was to put a preference for those forecasts that were circulated internally." Hamburger Decl., Ex. 23 (Berndt Dep.) at 116:3-7. But Dr. Berndt could not recall if he excluded any forecasts because they were not circulated internally (Hamburger Decl., Ex. 23 (Berndt Dep.) at 116:8-10), and cited no evidence in his reports or at his deposition proving that the forecasts he selected were all circulated internally.

Dr. Berndt also stated that he chose forecasts beginning in August 2013 because August would have been the first time Forest would have had IMS data after the launch of Namenda XR,

3

but admitted that he thought Namenda XR launched in July 2013, not June. Hamburger Decl., Ex. 23 (Berndt Dep.) at 97:14-98:14. Even though his opening report includes a November 25, 2013 forecast in his average (*see* Hamburger Decl., Ex. 7 (Berndt Rep.) Ex. D.), Dr. Berndt also claimed that he chose only forecasts prior to October 29, 2013 because he interpreted one

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████" Hamburger Decl., Ex. 23 (Berndt Dep.) at 100:2-101:3; *id.* at 107:13-23.

### B. Dr. Lamb's Analysis

Dr. Lamb submitted an Amended Opening Expert Report on September 20, 2017 ("Lamb Rep.") (Hamburger Decl., Ex. 2), and an Amended Reply Report on November 9, 2017 ("Lamb Am. Reply") (Hamburger Decl., Ex. 3) to correct for the error in Dr. Berndt's Reply Report, on which Dr. Lamb relied and of which Dr. Lamb was unaware. Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 9:22-10:20.

Dr. Lamb's Amended Report opines as to Plaintiffs' potential class-wide damages stemming from the alleged "product hop" and "reverse payment" which includes behavior that this Court acknowledged was "soft switch" conduct. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶¶ 13(c)-(d). In order to account for sales under a conventional "soft switch" strategy in his damages model, Dr. Lamb had to calculate an estimated conversion rate for Namenda XR in his but-for world. *Id.* at ¶ 78. To estimate this number, Dr. Lamb considered Forest's "documents and testimony" (including forecasts) regarding "the effect of a conventional switch." *Id.* at ¶ 150.

4

Using eight of the same forecast documents used by Dr. Berndt, but excluding all the others, Dr. Lamb "averaged the forecasted Soft Switch Namenda IR to XR conversion rate" at 18 months after Namenda XR's launch resulting in a ▮ estimated conversion rate. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶¶ 144, 152 & tbl. 3. Dr. Lamb claims that these eight forecast documents were "comprehensive" because (according to Dr. Lamb) only those forecasts (1) projected "the effect of a 'conventional' switch," (2) were "based on the actual dates of Namenda XR entry (June 2013) and Namenda IR LOE (July 2015)[,]" and (3) "w[ere] informed by at least some part of the early experience with Namenda conversion." *Id.* at ¶ 152 & tbl. 3; Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 165:11-166:12. Similar to Dr. Berndt, Dr. Lamb excluded forecasts from after October 2013 because of his belief that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 169:17-171:8.

Although Dr. Lamb contends that his original average using only eight forecasts is "appropriate and sound," Dr. Lamb supplemented his prior damages model with one constructed in reliance on Dr. Berndt's calculated average. Hamburger Decl., Ex. 3 Lamb Reply ¶¶ 30, 36. Dr. Lamb, however, did not independently verify Dr. Berndt's average calculation prior to relying on Dr. Berndt's arithmetic, prompting yet another error in Dr. Lamb's damages calculation when Dr. Berndt amended his calculation. Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 11:22-12:2 ("Q. In your amended expert reply report, did you have to rerun any of your damages calculations as a result of the change to Dr. Berndt's ▮ estimated Namenda XR soft switch conversion rate? A. Yes.").

5

## III. ARGUMENT

### A. Dr. Berndt And Dr. Lamb Did Not Perform Any Economic Analysis To Determine The Conversion Rate In The But-For World

Both economists' failed to employ any actual economic analysis to ensure the reliability of their calculated conversion rate in the but-for world and the unreliability of their calculations warrants exclusion of their forecasting averages. *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 544, 546-47 (C.D. Cal. 2012) (excluding expert for "parroting" of another expert, doing no independent analysis, and incorporating "wholesale" the results of other insurance investigations with no independent analysis regarding the validity of the reports, which "suggests that [the expert] ha[d] little independent assessment of the relevant issues to offer."). All they have done is simply average some cherry-picked and unverified Forest forecasts of Namenda XR's market share.

As Dr. Berndt admits, forecasts are inherently uncertain since they are simply projections into the future. Hamburger Decl., Ex. 23 (Berndt Dep.) at 78:8-25. Dr. Berndt even admitted that his average of the forecasts was "probably not accurate." *Id.* at 80:9-16. Yet, neither Dr. Berndt nor Dr. Lamb computed any kind of confidence interval to account for any errors in those forecasts. *Id.* at 85:15-18; *see also* Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 179:16-18 (noting that "the range has to be bound by, informed by some other parameters"). Dr. Berndt even contends that economists should account for real world events that occur after forecasts are made if one attempts to use forecasts to construct a but-for damages model; yet neither he nor Dr. Lamb did so. Hamburger Decl., Ex. 23 (Berndt Dep.) at 87:19-25; *see also* Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 108:15-111:8 (noting that Dr. Lamb only ran a structural break test in February 2014, even though other periods may have had justifiable "reason[s] why there would be a change there"). Nor did they employ any regression models or other economic

6

analysis to determine the conversion rate of Namenda IR to Namenda XR absent the announcement. Hamburger Decl., Ex. 23 (Berndt Dep.) at 159:4-9; 185:22-186:6 ("I have not undertaken any econometric analysis"); Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 152 ("Using the forecast documents that were created after Namenda XR had entered the market and before the Hard Switch was implemented, I averaged the forecasted Soft Switch Namenda IR to XR conversion rate for November 2014 . . . and found the but-for conversion rate to be approximately ▇▇▇"). Yet, Dr. Lamb intends to ask the jury to base a ▇▇▇▇▇ dollar verdict on the difference between actual sales and this supposed but-for world. He should be precluded from doing so on the basis that his and Dr. Berndt's forecast averages are unreliable.

### B. Dr. Berndt And Dr. Lamb Did Not Apply Any Expert Methodology To Average Forecasts Or To Select Which Forecasts To Include In Their Averages

Dr. Berndt cites only two pieces of academic literature to support his theory that averaging forecasts is "useful for predicting expected outcomes" and cites no literature or peer-reviewed material supporting the conclusion that forecasts are a "reliable predictor" of a but-for world that can be used to "model damages." Hamburger Decl., Ex. 7 (Berndt Rep.) ¶¶ 40 n. 75, 51, 65. Indeed, Dr. Berndt expressly disavowed that he was using forecasts to determine the actual conversion rate from Namenda IR to Namenda XR in a but-for world. Hamburger Decl., Ex. 23 (Berndt Dep.) at 75:17-76:2 ("Q. So more specifically, in your report you take Forest's projections from the real world and conclude that those forecasts can be used to determine what Namenda IR to Namenda XR conversion would have looked like in a but-for world where Forest never announced its planned withdrawal of Namenda IR; is that right? A. Not quite right. I think what I said is, can I infer what Forest thought its conversion rate from IR to XR would be, as evidenced by internal documents.").

If an expert does not apply any expert methodology, and thus is deemed unreliable, exclusion of his testimony is warranted to prevent jury confusion. *Kargo Glob., Inc. v. Advance Magazine Publrs., Inc.*, 2007 U.S. Dist. LEXIS 57320, at *34-35 (S.D.N.Y. Aug. 6, 2007) (excluding live testimony of "highly seasoned and impressively credentialed" expert where testimony about a flawed survey would have been both "powerful and quite misleading"); *see also United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2002) ("Under *Daubert* and Fed. R. Evid. Rule 702, expert testimony should be excluded if the witness is not actually applying expert methodology.").

Here, neither Dr. Lamb nor Dr. Berndt cite to any academic literature identifying appropriate methodologies for averaging forecasts or for selecting particular forecasts to average for any purpose. Dr. Berndt's reports do not even identify the methodology he employed in selecting which forecasts to include in the average, and the explanation of his methodology during his deposition was minimal and unsupported by his reports. Hamburger Decl., Ex. 23 (Berndt Depo.) at 93:11-22 (explaining some factors he considered "for the most part" when selecting forecasts included in his average); 115:15-116:10 (testifying as to his understanding of the methodology used to select forecasts for his average but noting that he did not recall on what basis forecasts were excluded).

Dr. Lamb and Dr. Berndt's failure to support their methodologies with any scientific standards or academic literature, and Dr. Berndt's inability to explain his own methodology warrant exclusion of their forecasting average calculations and opinions as unreliable. *See Caruso v. Bon Secours Charity Health Sys.*, No. 14 CV 4447 (VB), 2016 U.S. Dist. LEXIS 104067, , at *15-16 (S.D.N.Y. Aug. 5, 2016) (finding that expert's opinions were unreliable because her report did not explain the methodology she used to reach her conclusions); *see also*

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("Not only did [expert] fail to discuss in his report the nature of the data and its meaning, but he failed to explain . . . whether the sampling methodology used to compile these documents corresponded to methods that might be considered legitimate in his discipline.").

C.  **Drs. Berndt And Lamb Haphazardly Selected Forecasts For Their Averages**

Even if this Court accepted Drs. Berndt and Lamb's forecast averaging of Namenda XR market share as an appropriate expert methodology for calculating a but-for world conversion rate from Namenda IR to Namenda XR, Drs. Berndt and Lamb applied an unreliable method for cherry-picking which forecasts to include in those averages.

1.  **Drs. Berndt And Lamb Placed Arbitrary And Improper Timeframe Limitations On Their Selection Of Forecasts**

Dr. Berndt testified that "forecasts that are based on the most recent data are more likely to be viewed as informative by decision-makers at Forest." Hamburger Decl., Ex. 23 (Berndt Dep.) at 125:14-22. Thus, according to his logic, forecasts that were made leading up to Forest's February 2014 decision to announce a hard switch would be more reliable. And even though Dr. Berndt originally included a November 25, 2013 forecast in his initial average, neither expert included any forecasts after October 29, 2013 in their final calculated averages. *Compare* Hamburger Decl., Ex. 7 (Berndt Rep.) Ex. D *with* Hamburger Decl., Ex. 8 (Berndt Reply) Ex. D.

███████████████████████████████████████████

(Hamburger Decl., Ex. 7 (Berndt Rep.) ¶ 37 n. 69 (citing FRX-AT-01779417); Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 89) — ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████. Hamburger Decl., Ex. 7 (Berndt Rep.) ¶ 37; Hamburger Decl., Ex. 23 (Berndt Dep.) at 100:5-15; Hamburger Decl., Ex. 19 (Lamb Dep.

9

Tr. I) at 169:17-171; *see also* Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 108:19-110:113:4 (explaining that "" even though Dr. Lamb conceded "if I had looked for a structural break say in October . . . , I wouldn't necessarily have thought that there could be an effect that quickly in the marketplace from that conduct."). But neither expert considered another email from the same author ▮▮▮ (Hamburger Decl., Ex. 33 (FRX-AT-01603645)), or the testimony of Forest's CEO, Brent Saunders, that he actually made the decision in February 2014. Hamburger Decl., Ex. 34 (FRX-AT-01751083) at 262:18-23; *see also* Hamburger Decl., Ex. 23 (Berndt Dep.) at 106:5-107:6.

Even assuming that , neither expert cites to any evidence that the individuals creating the forecasts from ▮▮▮ knew about the ▮▮▮ or incorporated this one-off communication into their forecast models. Dr. Berndt could not even testify as to when the individuals creating the forecasts would have known about the decision to implement a hard switch strategy, and relied on unscientific speculation. Hamburger Decl., Ex. 23 (Berndt Dep.) at 111:6-21 (relying on his "experience" with forecasts Dr. Berndt assumes that "sometimes there takes a while for information to diffuse through an organization, and it may have been that some of the forecasting people didn't know about the hard switch decision being made on ▮▮▮ and again to err on the side of caution, I'll give them an extra between twelve days — eleven days here, I guess . . . ."). The arbitrary decision to disregard forecasts generated after ▮▮▮ had a transparent purpose and effect — starting in mid-▮▮▮ Forest's forecasted soft switch rates consistently landed at ▮▮▮ (▮▮▮ months after the launch of

Namenda XR). Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 152 & tbl. 3. These higher soft switch forecasts would have significantly reduced DPPs' claimed damages.

### 2. Dr. Lamb Arbitrarily Excluded Forecasts With A January Loss Of Exclusivity

Because Forest received pediatric exclusivity on June 16, 2014, Forest's forecasting team needed to project for *both* the January and July loss of exclusivity scenarios during the modeling period Dr. Lamb deems as relevant ( ▆▆▆▆▆▆▆ ) to understand Namenda XR's potential revenue. Both such models could reasonably offer insights into Forest's expectations about conversion. *See, e.g.*, Hamburger Decl., Ex. 35 (FRX-AT-01595859); Hamburger Decl., Ex. 36 (FRX-AT-01671051); *see also* Hamburger Decl., Ex. 37 (FRX-AT-01618023) (excluded by both Berndt and Lamb). Yet Dr. Lamb inexplicably excluded all forecasts from his average that had a January loss of exclusivity. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 124:24-126:20.

### 3. Dr. Berndt Improperly Excluded Forecasts He Thought Were Duplicates Based On Their Titles

Even though Dr. Berndt included forecasts in his average that according to his own chart were from the same date (*see* Hamburger Decl., Ex. 8 (Berndt Reply) Ex. D (including two forecasts from ▆▆▆▆▆▆▆ , two forecasts from ▆▆▆▆▆▆▆ and three forecasts from ▆▆▆▆▆▆▆ )), Dr. Berndt discounted three forecasts in his Reply Report under the assumption that they "appear to have been created" on the same date. Hamburger Decl., Ex. 8 (Berndt Reply) ¶ 4, n.3. Dr. Berndt admitted during his deposition that he excluded any forecasts "that appeared to be duplicates" by looking to see if the Excel files had the same date in the caption of the title because he "relied on the title" for informing the date of the document. Hamburger Decl., Ex. 23 (Berndt Dep.) at 92:1-22; 123:3-19; 135:15-18; 146:21-147:3.

However, a number of Forest forecasts contained two dates within the title of the Excel files — one date that was the date of the original model, and one date that was the date that the forecast was updated. *See* Hamburger Decl., Ex. 8 (Berndt Reply) ¶ 4, n. 3 (criticizing Dr. Fowdur's inclusion of forecasts that "appear to have been created on the same day" and citing FRX-AT-03729066 (Namenda production forecast ▮ ▮Flex XR LOE▮; FRX-AT-01608750 (Namenda production forecast▮ Flex XR LOE ▮); FRX-AT-01639171 (Namenda production forecast▮ Flex XR LOE ▮ July Carolyn) (emphasis added)). Dr. Berndt admitted that he did not review the metadata or the substance of the forecasts themselves to determine which documents were actual duplicates. Hamburger Decl., Ex. 23 (Berndt Dep.) at 136:16-19; 284:17-285:4; 286:23-287:4. When confronted with metadata and the actual Excel files of forecasts that he excluded, Dr. Berndt admitted that they were not duplicates of each other as he had stated in his Reply Report. *Id.* at 135:25-147:3 ("I viewed them as duplicative and therefore excluded them."). Dr. Berndt also admitted that if he had considered forecasts that were not duplicates (including additional ▮ forecasts), his calculated average would change. *Id.* at 149:20-150:20.

Thus, even assuming Dr. Berndt's selection of forecasts from the ▮ timeframe was not arbitrary, his average improperly excluded forecasts even from those months, and thus, is unreliable.

### D. Neither Dr. Berndt Nor Dr. Lamb Pressure Tested The Forecasts To Determine Their Reliability

Experts must independently verify the accuracy or reliability of the data or material upon which they are relying. *Dzielak v. Whirlpool Corp.*, No. 2:12-0089 (KM)(JBC), 2017 U.S. Dist. LEXIS 39232, at *66-68 (D.N.J. Mar. 17, 2017) (finding expert's opinion unreliable where expert performed no independent investigation of accuracy or reliability of data in document

upon which he relied); *In re Scotts EZ Seed Litig.*, 2017 U.S. Dist. LEXIS 125621, at *30-31 (S.D.N.Y. Aug. 7, 2017) (citing *Dzielak*, 2017 U.S. Dist. LEXIS 39232, at *66-68); *EEOC v. Bloomberg L.P.*, 2010 U.S. Dist. LEXIS 92511, at *45-46 (S.D.N.Y. Aug. 31, 2010) (finding expert testimony was unreliable where expert relied "solely on information fed to him by [party] without independently verifying whether the information [was] representative"); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 U.S. Dist. LEXIS 15976, at *15 (S.D.N.Y. Sep. 15, 2003) (excluding expert's damages calculation in part for failing to independently validate information provided by Plaintiff); *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 446-47 (W.D.N.Y. 2005) (excluding testimony in part because expert made no effort to independently verify the accuracy of the data relied upon).

"[B]lind adherence to data absent any sort of independent investigation stops short of the type of reliability contemplated by *Daubert* . . . ." *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137-38 (M.D. Pa. 2015) (excluding expert's testimony where expert "conducted no independent investigations into the validity of those projections, and had no knowledge of the details surrounding their generation"); *Caruso*, 2016 U.S. Dist. LEXIS 104067, at *15-16 (finding expert's opinion unreliable where she "did not conduct her own review of the evidence" and deposition testimony revealed "critical gaps in her knowledge of the facts as well as mistaken assumptions, reflecting her failure to verify the veracity and completeness of the facts supplied by plaintiff's counsel").

Rather than conduct his own analysis, Dr. Lamb claims to rely on Dr. Berndt's opinion that the Forest forecasts are reliable. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 144 ("I further understand that it is Professor Berndt's opinion that these forecasts of the Namenda XR conversion rate are a reliable basis for an analysis of the incremental effect of the Hard Switch

on the conversion from branded Namenda IR to branded Namenda XR. I have relied on these forecasts in performing my analysis."); *see also* Hamburger Decl., Ex. 3 (Lamb Reply) ¶¶ 95, 97 ("Professor Berndt explains in his reply report why he uses this average conversion rate, and I have relied on Professor Berndt's opinion in that regard."). But Dr. Berndt did not conduct any independent analysis of the Forest forecasts either. Dr. Berndt did not even know who created the forecasts. Hamburger Decl., Ex. 23 (Berndt Dep.) at 163:20-164:12 ("I mentioned earlier that I don't know who prepared all the forecasts.").

Dr. Berndt also did not know how rapidly the forecasts were updated, which department at Forest created the forecasts, or what the qualifications were of the individuals creating the forecasts. *Id.* at 116:11-19; 128:9-16 ("I have no knowledge on whether they — how rapidly they updated it, but it certainly could have had the most recent data available."). Nor did Dr. Berndt even know where Forest got the data used in these forecasts. *Id.* at 98:17-99:6 ("In the context of making these monthly forecasts, I presumed that they used a monthly data source from IMS. But they may have also used some of their weekly data forecasts.").

Both Dr. Berndt and Dr. Lamb also claim that the Forest forecasts from August through October "already accounted for the impact of soft-switch tactics." Hamburger Decl., Ex. 9 (Berndt Am. Reply) ¶¶ 14-18; Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I.) at 44:9-45:21 (citing Lamb Rep. ¶ 146) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). But Dr. Berndt did not know which soft switch tactics Forest employed, and did not consider how changes in those tactics would potentially affect the forecast rates of Namenda XR adoption. Hamburger Decl., Ex. 23 (Berndt Dep.) at 160:22-165:11; 167:14-23. Moreover, Dr. Lamb conflates all Forest conduct after ▮▮▮▮▮.

14

as "tainted" and belonging to a "hard switch strategy" — which Forest did not implement until February 2014 — even though it is undisputed that Forest continued to use soft switch marketing efforts (such as discounting and promotion) throughout this period. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 110:1-111:7; *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 U.S. Dist. LEXIS 83446, at *50 (S.D.N.Y. May 23, 2017) (finding that that the hard switch anticompetitive conduct began with the February 2014 announcement); *see also* Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 37:11-38:1 ("Q. What is a soft switch as you understand it? A. Well, in this matter, the soft switch would be a world in which Forest had brought Namenda XR to the marketplace and introduced it into the market, and attempted to convert patients from Namenda IR to Namenda XR. But without the conduct surrounding — including the announcement, the communications — surrounding the removal of Namenda IR from the marketplace, in other words, a world in which the conversion to Namenda XR was not affected or influenced by communications and announcements and discussions of the removal of Namenda IR from the marketplace.").

Neither expert conducted any independent analysis of the forecasts used in their averages to ensure the reliability of the data included in them. Therefore, their use of those forecasts to calculate what Dr. Lamb uses as the but-for world conversion rate is improper and should be excluded. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292-94 (3d Cir. 2012) (affirming district court's rejection of expert who "relied on a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based" and explaining that an "expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable[]" because the expert's "lack of familiarity with the methods and the reasons underlying [someone

else's] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination") (quoting *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993)); *see also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 173 (C.D. Cal. 2007) (rejecting misplaced reliance on company projections).

## IV. CONCLUSION

For the foregoing reasons, Forest respectfully requests that Dr. Berndt's and Dr. Lamb's conclusions and opinions regarding their forecast averages be stricken.

Dated: November 17, 2017

WHITE & CASE LLP

By: _____
Heather K. McDevitt
Martin M. Toto
John H. Chung
Ryan P. Johnson
William H. Bave, III
Michael E. Hamburger
Kristen O'Shaughnessy
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200

J. Mark Gidley
Peter J. Carney
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600

Heather M. Burke
WHITE & CASE LLP
3000 El Camino Real
5 Palo Alto Square, 9th Floor
Palo Alto, CA 94306
Telephone: (650) 213-0300

Kevin C. Adam
WHITE & CASE LLP
75 State Street, Floor 24

Boston, MA 02109
Telephone: (617) 979-9300

Counsel for Defendants Actavis plc,
Forest Laboratories, LLC, Forest
Laboratories, Inc., and Forest
Laboratories Holdings Ltd.