IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

In re Namenda Direct Purchaser Antitrust
Litigation

THIS DOCUMENT RELATES TO:
All Direct Purchaser Actions

Case No. 1:15-cv-07488-CM (RL)

FILED UNDER SEAL

**MEMORANDUM OF LAW IN SUPPORT OF FOREST'S MOTION TO EXCLUDE
CERTAIN OPINIONS AND PROPOSED TESTIMONY OF DR. RUSSELL LAMB**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ...................................................................................................... 3

     A.      This Court Provided Plaintiffs A Roadmap To Establish Antitrust Injury From
             The Hard Switch Announcement................................................................................ 3

     B.      Dr. Lamb's Analysis .................................................................................................. 4

           1.      Dr. Lamb's No Hard Switch But-For Methodology ....................................... 5

           2.      Dr. Lamb's No Reverse Payment But-For Methodology ............................... 7

III.    ARGUMENT ............................................................................................................ 8

     A.      Dr. Lamb's No Hard Switch Methodology Is Fatally Flawed Because It
             Cannot Isolate The Effect Of The February 2014 Announcement On
             Namenda XR Market Share ....................................................................................... 9

     B.      Dr. Lamb's Improper Expansion Of The Impact Of The February 2014
             Discontinuation Announcement Provides Another Basis To Exclude His No
             Hard Switch Methodology ....................................................................................... 13

           1.      Dr. Lamb's Methodology Improperly Includes Alleged Injury From
                 Before The February 2014 Announcement .................................................. 13

           2.      Dr. Lamb's Methodology Improperly Ignores The Impact of The
                 Injunction On Namenda XR Conversion .................................................... 16

     C.      The Fatal Flaws In Dr. Lamb's No Hard Switch Methodology Make His No
             Reverse Payment Methodology Unreliable As Well ............................................... 18

IV.     CONCLUSION ....................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amorgianos v. AMTRAK*,
 303 F.3d 256 (2d Cir. 2002)..................................................................................8, 9

*Argus Inc. v. Eastman Kodak Co.*,
 801 F.2d 38 (2d Cir. 1986)..........................................................................................9

*Blue Tree Hotels Invest. (Canada), Ltd. v. Starwood*
 *Hotels & Resorts Worldwide, Inc.*,
 369 F.3d 212 (2d Cir. 2004).......................................................................................9

*Coleman Motor Co. v. Chrysler Corp.*,
 525 F.2d 1338 (3d Cir. 1975)...................................................................................13

*Comcast Corp. v. Behrend*,
 133 S. Ct. 1426 (2013).........................................................................................12, 19

*Concord Boat Corp. v. Brunswick Corp.*,
 207 F.3d 1039 (8th Cir. 2000) ..............................................................................9, 15

*Group Health Plan, Inc. v. Philip Morris Inc.*,
 188 F. Supp. 2d 1122 (D. Minn. 2002)....................................................................18

*Highland Capital Mgmt., L.P. v. Schneider*,
 379 F. Supp. 2d 461 (S.D.N.Y. 2005)......................................................................17

*In re Namenda Direct Purchaser Antitrust Litig.*,
 No. 15-cv-7488, 2017 U.S. Dist. LEXIS 83446 (S.D.N.Y. May 23, 2017) ...............3, 4, 14

*In re Namenda Direct Purchaser Antitrust Litig.*,
 No. 15-cv-7488, 2017 U.S. Dist. LEXIS 95796 (S.D.N.Y. June 21, 2017) ...............4, 13

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
 725 F.3d 244 (D.C. Cir. 2013)............................................................................14, 16

*Intimate Bookshop Inc. v. Barnes & Noble, Inc.*,
 No. 98-cv-5564, 2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003) ...............................9

*Macaluso v. Herman Miller, Inc.*,
 No. 01 CIV. 11496, 2005 U.S. Dist. LEXIS 3717 (S.D.N.Y. Mar. 10, 2005) ...........18

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
 708 F.2d 1081 (7th Cir. 1982) .............................................................................12-13

*New York ex rel. Schneiderman v. Actavis PLC,*
  787 F.3d 638 (2d Cir. 2015).........................................................................................14

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis plc,* No. 15-cv-
  7488, 2016 U.S. Dist. LEXIS 128349 (S.D.N.Y. Sept. 13, 2016)...............................3, 13, 16

*United States Football League v. Nat'l Football League,*
  842 F.2d 1335 (2d Cir. 1988).........................................................................................9

*USAirways Group, Inc. v. British Airways PLC,*
  989 F. Supp. 482 (S.D.N.Y. 1997)..................................................................................9

*West v. Prudential Sec.,*
  282 F.3d 935 (7th Cir. 2002) ........................................................................................15

## STATUTES AND RULES

Fed. R. Evid. 702 ...............................................................................................................8, 18

iii

## I.   INTRODUCTION

This case is unique because part of the alleged anticompetitive conduct — the withdrawal of Namenda IR from the market and hard switch to Namenda XR — was never fully realized. The District Court's injunction ensured that Namenda IR remained available on the market at all times through the entry of generic memantine.  As such, Plaintiffs are left with an allegation that the mere announcement of the future withdrawal of Namenda IR coerced patients and physicians to switch to Namenda XR.

Given these unprecedented circumstances, this Court provided Plaintiffs with a very clear roadmap to meet their burden to establish antitrust injury from Forest's thwarted withdrawal of Namenda IR.  This Court determined that any injury must stem from patients who switched to Namenda XR *before* entry of the injunction on December 15, 2014, *because of* Forest's February 2014 announcement of Namenda IR's discontinuance, and who continued taking Namenda XR *after* generic entry in July 2015.  Despite this clear guidance on establishing antitrust injury, Dr. Russell Lamb, Plaintiffs' economic expert on causation and damages, concedes that his methodology for measuring the impact of the hard switch announcement is incapable of identifying Namenda XR purchases that fall within these Court-designated parameters.

Dr. Lamb has endeavored to construct a "but-for" world in which Forest never announced the future withdrawal of Namenda IR, but his methodology made no attempt at all to isolate the effect, if any, on physician prescribing decisions, patient preferences or formulary placement. Indeed, Dr. Lamb conceded that the data underlying his analysis do not reflect physician or patient preferences.  Thus, Dr. Lamb's methodology is incapable of proving whether conversion to Namenda XR was occurring because of the announcement or as a result of other market factors such as a preference for the once-a-day formulation or Forest's continued legal soft

switch marketing efforts. Dr. Lamb's model merely imposes a cap on the but-for Namenda XR market share (i.e., maximum share of memantine sales that Namenda XR would have achieved through lawful soft switching) based on internal Forest forecasts, and then *assumes* that any real world Namenda XR market share above that cap is attributable to the February 2014 discontinuation announcement.

Moreover, Dr. Lamb concludes — in direct contravention of this Court's findings—that the hard switch began before the February 2014 announcement and persisted beyond the December 2014 injunction. Thus, Dr. Lamb's model improperly attributes injury to purchases on behalf of patients who were being newly prescribed Namenda XR post-injunction. By incorporating these conclusions into his model, Dr. Lamb improperly ascribes injury to Namenda XR purchases that could not have been caused by the February 2014 announcement. Even if the Court disregards its prior findings on the date of the hard switch announcement and permits Plaintiffs to attempt to expand the liability period, it would not matter. As discussed above, Dr. Lamb's model is incapable of actually identifying sales of Namenda XR that were made because of the February 2014 announcement.

Dr. Lamb's methodology purporting to measure impact and damages from the hard switch announcement is fatally flawed because it cannot identify the patients, if any, who switched to Namenda XR prior to the entry of the injunction because of the announced withdrawal of Namenda IR and how many of those patients, if any, remained on Namenda XR after generic entry. Because Dr. Lamb's model merely assumes injury caused by the anticompetitive announcement, and does not meet the Court's test for injury and causation, his methodology must be excluded. Because his methodology for determining impact and damages

2

from the alleged reverse payment also attributes damages to proposed class members from the purported anticompetitive effects of the hard switch announcement, it must also be excluded.

## II.   BACKGROUND

### A.   This Court Provided Plaintiffs A Roadmap To Establish Antitrust Injury From The Hard Switch Announcement

In its motion to dismiss, Forest argued that Plaintiffs lacked standing as they suffered no antitrust injury from the alleged hard switch because the injunction ensured that Namenda IR remained available for purchase at all times.   This Court fully recognized the effect of the injunction, finding that the "injunction blunted much of the success of Forest's 'hard switch.'" *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis plc*, No. 15-cv-7488, 2016 U.S. Dist. LEXIS 128349, at *30 (S.D.N.Y. Sept. 13, 2016) ("MTD Order"); *see also In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 U.S. Dist. LEXIS 83446, at *4, 25 (S.D.N.Y. May 23, 2017) (recognizing that injunction required "Forest to affirmatively undo the effects of its announcement of the withdrawal") ("Collateral Estoppel Order").   Nevertheless, the Court denied Forest's motion.

In recognition of the unique nature of a case where the alleged product hop was thwarted, however, the Court set forth the precise elements that Plaintiffs must establish to prove injury given the injunction: (1) "patients switched to Namenda XR because of the announced withdrawal of Namenda IR" in February 2014; (2) Plaintiffs "were forced to pay for certain patients' memantine treatment at brand-name prices because the patients switched to Namenda XR *prior* to the entry of the injunction" in December 2014; and (3) Plaintiffs paid higher prices because these patients continued to use "Namenda XR *after* generic entry," i.e., these patients did not switch back to IR or discontinue treatment.   MTD Order at *38-39 (emphases in

3

original).    In defining the scope of discovery, Judge Francis relied upon this finding. Memorandum and Order at 11, *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 U.S. Dist. LEXIS 95796, at *13 (S.D.N.Y. June 21, 2017) (acknowledging that "the plaintiffs' injury must stem from patients who switched from Namenda XR before entry of the injunction on December 15, 2014, because of Forest's announcement of Namenda IR's discontinuance and who continued taking Namenda XR after generic entry in July 2015") ("Downstream Discovery Order").

On May 23, 2017, the Court issued an order granting in part and denying in part Plaintiffs' motion for collateral estoppel.  The Court determined that Forest is precluded from re-litigating the question of "whether its February 2014 announcement of the upcoming discontinuation of Namenda IR was coercive and anticompetitive."  Collateral Estoppel Order at *50.  The Court also recognized, however, that outstanding questions of material fact remain regarding Plaintiffs' ability to "prove that the defendants' illegal conduct resulted in antitrust injury to the plaintiff."  *Id.* at *51-52.  Given the outstanding issues on impact, causation and injury, the Court denied Plaintiffs' motion for summary judgment on the product hop claim.  *Id.*

### B.    Dr. Lamb's Analysis

On September 20, 2017, Dr. Lamb, one of Plaintiffs' economists, submitted an Amended Expert Report on class certification and damages.  Decl. of Michael E. Hamburger, Ex. 2 (Lamb Rep.).  Dr. Lamb was tasked with addressing: (1) the impact of delay in generic entry from the allegedly illegal agreement with Mylan (assuming liability is established); (2) the impact from the anticompetitive hard switch announcement; (3) whether common evidence exists to show proposed Class members were injured by Forest's alleged anticompetitive conduct under two separate but-for worlds: the No Reverse-Payment But-For World, assuming generic entry was

delayed by reverse payments and would have occurred earlier otherwise; and the No Hard Switch But-For World, assuming that generic entry would have occurred in July 2015 just as it did, but that the announcement caused injury; and (4) the amount of aggregate damages. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 10.  On November 9, 2017, Dr. Lamb submitted an Amended Expert Reply Report in which he "reaffirmed the conclusions set forth in the Lamb Report." Hamburger Decl., Ex. 3 (Lamb Reply) ¶ 5.

### 1.     Dr. Lamb's No Hard Switch But-For Methodology

To determine whether Forest's February 2014 discontinuation announcement had an impact on the market, Dr. Lamb employed a "structural break test" by regressing the actual shares of Namenda XR sales on three different variables to conclude that "there is a structural break in the Namenda XR conversion rate" beginning in February 2014. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 119.  Based on the structural break test, he concluded that the February 2014 discontinuation announcement was effective in converting more Namenda IR prescriptions to Namenda XR prescriptions than otherwise would have been the case.  *Id.*  But importantly, he conceded that his structural break test measures only aggregated market-wide data, rather than measuring whether the announcement had an effect on any particular direct purchaser's Namenda XR purchases.  Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 85:2-11.  Dr. Lamb also conceded that the structural break test itself cannot identify the cause of the break in the Namenda XR conversion rate.  *Id.* at 95:22-96:19.  Instead, Dr. Lamb purportedly concludes that the cause of the break was the February 2014 announcement.  *Id.*  Critically, he did not test whether there were any breaks in the conversion rate to Namenda XR before the February 2014 announcement, and summarily dismisses other possible causes for the break.  Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 107:3-111:8.

Dr. Lamb purports to estimate overcharge damages stemming from the hard switch announcement based on "higher prices paid for branded Namenda XR than would have been paid for . . . generic Namenda IR in the but-for world."[1]  Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 145.  His methodology first estimates sales of Namenda XR in the but-for world based on his conclusion that Namenda XR would have achieved a peak share of ██████████ of total memantine sales and then would have remained constant until generic entry.  *Id.* ¶ 150.  In short, he claims that this is an estimate of Namenda XR sales through lawful, soft switch conversions.  Then, after generic entry, Dr. Lamb assumes that the trend in Namenda XR's share in the but-for world would mimic the monthly changes in the actual world, but starting from the lower ████████.  *Id.*  Dr. Lamb also offers an "alternative analysis" using a peak but-for Namenda XR market share of ████████, rather than ████████, in reliance on another expert, Dr. Ernst Berndt.  Hamburger Decl., Ex. 3 (Lamb Reply) ¶ 97.

Dr. Lamb then assumes that generic Namenda IR and Namenda XR prices in the actual world would be unchanged in the but-for world.  Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 147.  Next, in the period before generic entry, Dr. Lamb's methodology *assumes* that all actual world Namenda XR purchases greater than ████████ share of total memantine sales (or ████████ in his alternative analysis) would have been purchases of brand Namenda IR in the but-for world.  Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 46:13-24.  Starting in June 2015, Dr. Lamb

---

[1] Defendants contend that measuring overcharges on the basis of two different pharmaceutical products that are not AB-rated (Namenda XR and generic Namenda IR) is incorrect and that the correct measure of damages is lost profits.  *See* Forest's Opp. to Plaintiffs' Mot. for Class Certification, Dkt. 417, at 34-35.  Without waiving this issue or any others presented in Forest's Opposition, Forest notes that determining the correct measure of damages is not necessary for ruling on this motion.  Even assuming that Dr. Lamb may calculate overcharges, his methodology fails for the reasons stated herein.

calculates incremental shares of generic IR in the but-for world (i.e., the sales of generic Namenda IR that should have been made absent the hard switch) as the difference between actual and but-for Namenda XR shares, multiplied by the generic penetration rate. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶¶ 136-37.

Dr. Lamb concludes that "[a]ll or nearly all proposed Class members who purchased at least Namenda IR and XR, or XR [only], were impacted by Defendants' anticompetitive Hard Switch strategy." *Id.* at ¶ 13(b). Dr. Lamb calculates aggregate hard switch damages between ▮▮▮▮▮▮▮ and ▮▮▮ ▮▮▮ under his model using the peak ▮▮▮▮▮ market share rate. Hamburger Decl., Ex. 3 (Lamb Reply) tbl. 4. Under his alternative model using ▮▮▮▮▮ peak Namenda XR but-for market share, he concludes hard switch damages are between ▮▮▮ ▮▮▮▮▮▮▮▮▮. *Id.* (All figures are prior to mandatory trebling).

### 2. Dr. Lamb's No Reverse Payment But-For Methodology

Dr. Lamb conducted a benchmark analysis based on a "before and after" methodology to construct his separate No Reverse Payment But-For World. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 127. Dr. Lamb concludes that "[a]ll or nearly all proposed Class members were impacted by Defendants' allegedly anticompetitive agreement with Mylan," and estimates "aggregated, class-wide damages" that he asserts reflect the extent of overcharge damages to proposed class members. *Id.* ¶ 13a, c. The damages measured under the No Reverse Payment But-For World are not, however, limited to the impact of the reverse payment. This separate but-for world also includes damages allegedly suffered from the hard switch announcement.

---

[2] The range in damages comes from Dr. Lamb's analysis of two different data sets: (i) IMS NSP database which provides national sales estimates of product packages sold into retail drugstores, hospitals, clinics, and other non-retail outlets; and (ii) Forest's transactional data showing sales to direct purchaser wholesalers and distributors. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 122.

Dr. Lamb's No Reverse Payment But-For World assumes that Namenda XR would have been launched 12 months before generic memantine hydrochloride was introduced to the market. *Id.* ¶ 135. He also assumes that Forest did not implement the hard switch strategy for Namenda XR and thus Namenda XR's market share would have reached a peak of ▇▇▇▇▇▇ at the time of generic entry, at which point Namenda XR's market share would begin to decline until it was no longer sold in the market. *Id.* Any real-world Namenda XR purchases above ▇▇▇▇▇▇ are converted to generic IR purchases at the rate of generic conversion observed in the actual world for damages purposes. Dr. Lamb acknowledges that his No Reverse Payment methodology includes damages attributed to patients who were purportedly switched to Namenda XR based on Forest's announced discontinuation of Namenda IR. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 64:19-65:9; 66:4-20.

Dr. Lamb calculates aggregate damages under the No Reverse Payment methodology between ▇▇▇▇▇▇ and ▇▇▇▇▇▇. Hamburger Decl., Ex. 3 (Lamb Reply) tbl. 3. (Again, these figures are prior to mandatory trebling). Dr. Lamb also presents alternative damage scenarios in his Amended Reply Report. *Id.*

## III.   ARGUMENT

"When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. AMTRAK*, 303 F.3d 256, 266 (2d Cir. 2002). When determining admissibility of an expert's opinion "it is critical that an expert's analysis be reliable at every step. . . . In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the

8

method by which the expert draws an opinion from those facts, and how the expert applies the
facts and methods to the case at hand." *Id.* at 267.

### A. Dr. Lamb's No Hard Switch Methodology Is Fatally Flawed Because It Cannot Isolate The Effect Of The February 2014 Announcement On Namenda XR Market Share

Proving antitrust injury depends on establishing a causal link to an antitrust violation.
*See, e.g., Blue Tree Hotels Invest. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
369 F.3d 212, 220 (2d Cir. 2004) (finding that to establish antitrust injury, "a plaintiff must show
(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury
contemplated by the statute"); *see also USAirways Group, Inc. v. British Airways PLC,* 989 F.
Supp. 482, 489 (S.D.N.Y. 1997) ("In order to satisfy the antitrust injury requirement, the alleged
violations of the antitrust laws must be the but-for cause of the injury.") (citing *Argus Inc. v.
Eastman Kodak Co.,* 801 F.2d 38, 41 (2d Cir. 1986)).

To prove antitrust injury here, Plaintiffs must show that the February 2014
discontinuation announcement — and not other factors — caused their alleged injury. *See
United States Football League v. Nat'l Football League,* 842 F.2d 1335, 1377-79 (2d Cir. 1988)
(holding that plaintiffs must demonstrate that defendants' unlawful acts, and not other factors,
substantially contributed to their injuries); *Intimate Bookshop Inc. v. Barnes & Noble, Inc.,* No.
98-cv-5564, 2003 WL 22251312, at *8 (S.D.N.Y. Sept. 30, 2003) ("As noted, [plaintiff]'s
unsupported assumption of causation and supposition that all of its losses were caused by
defendants' allegedly unlawful conduct, and failure to account for defendants' lawful conduct
and intervening market factors are fatal to its claim."); *see also Concord Boat Corp. v.
Brunswick Corp.,* 207 F.3d 1039, 1057 (8th Cir. 2000) (holding expert opinion insufficient to
sustain damages claim where it did not distinguish lawful from unlawful conduct).

Given the unprecedented circumstances of this case — the injunction preventing withdrawal of Namenda IR — the relevant question to show antitrust injury is not *whether* a patient switched from Namenda IR to Namenda XR, but rather *why* the patient switched. If Plaintiffs cannot show that the February 2014 Namenda IR discontinuation announcement actually coerced patients or prescribing physicians to switch to Namenda XR, then they have not shown antitrust injury from the anticompetitive act. Yet, incredibly, Dr. Lamb's position is that an analysis of patient behavior is "irrelevant for purposes of assessing damages suffered by the proposed Class." Hamburger Decl., Ex. 3 (Lamb Reply) ¶ 29; *see also id.* at ¶ 79.

Instead of analyzing any patient preferences or prescribing decisions, Dr. Lamb purports to focus on the effect of the challenged misconduct with respect to the direct purchasers (i.e., wholesalers and distributors). He claims that viewing the market-wide data in the aggregate is appropriate because "conversion of Namenda IR to Namenda XR is a market-wide phenomenon and is appropriately measured at the market level." Hamburger Decl., Ex. 3 (Lamb Reply) ¶ 56. For instance, his methodology utilizes NSP data, which provides no insight into prescribing rationales (whether patients selected XR or chose to remain on it post-generic entry). Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 43:21-44:5; *see also id.* at 188:15-189:16 ("Q: . . . There is no way we can tell from this data whether patients were reverse commuting to Namenda IR because of the supply shortage of Namenda XR. Correct? . . . A: I think that's correct."). Therefore, by his own admission, the NSP data alone cannot answer (1) whether a Namenda XR sale was due to the announcement; and (2) whether there was reverse commuting to Namenda IR. Yet, despite these admitted flaws, Dr. Lamb did not utilize any data-sets that measure prescription level data, or adjust his model in any other way, to ensure his methodology was measuring the actual harm from the hard switch announcement.

10

Dr. Lamb's purported reliance on direct purchaser data, both NSP data and transactional data, which only measures the upstream level of the supply chain, is completely misplaced to show antitrust injury in this case. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ And Plaintiffs have admitted that "[i]f a Plaintiff's sales of Namenda decreased, for example, there is no way to determine if such lost sales represent patients who stopped taking the drug, began taking a different drug, or started getting their prescriptions filled at a pharmacy served by a different wholesaler. Nor would a record of Plaintiffs' sales reveal why a pharmacy chose to place an order for Namenda, let alone why a doctor chose to prescribe it." Memo. in Opp'n to Forest's Mot. to Compel Prod. of Docs., Dkt. 254, at 12-13.

By focusing on the upstream level of the supply chain, Dr. Lamb has completely ignored the relevant inquiry for proving antitrust injury: why the patient switched from Namenda IR to Namenda XR. Nevertheless, Dr. Lamb maintains his position that what happened at the patient level is irrelevant to his inquiry. Hamburger Decl., Ex. 3 (Lamb Reply) ¶ 81 ("[B]ehavior observed at the patient level cannot be used to assess injury at the direct purchaser level."). Tellingly, even though Dr. Lamb acknowledges that physicians "played a critical role in the share of the memantine hydrochloride market which Namenda XR was able to capture," (*Id.* at ¶ 83) he concedes that his methodology does not look at physician prescribing preferences either. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 63:15-24.

Dr. Lamb's methodology is incapable of separating out those patients who switched because of the announcement from those patients who switched for other reasons. Indeed, Dr. Lamb conceded that his damages will likely include Namenda XR sales that were not tainted by any anticompetitive conduct, such as XR sales to patients who simply preferred a once-daily formulation. *See* Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 56:7-21 ("[I]t's possible that your damages calculation includes sales of XR to patients who simply prefer a once-a-day formulation. That's possible. Correct? . . . THE WITNESS: I think that's possible. . . ."). Dr. Lamb also confirmed that his methodology is unable to exclude first-time memantine patients over time. *Id.* at 48:8-49:3. As a result, Dr. Lamb's damages include all Namenda XR volume after generic entry in July 2015, without regard to whether those patients were converted from Namenda IR or were new memantine patients altogether. Dr. Lamb's model will inevitably include purchases for patients who first started taking Namenda XR after July 2015, *i.e.*, when consumers could freely choose between XR, IR, and generic IR. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████ ██ ████████████████████████████████████████████████████

████████████████████

This failure to isolate damages from anticompetitive conduct means that Dr. Lamb's model cannot possibly establish antitrust injury. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ("There is no question that the model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised."); *see also MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1162 (7th Cir. 1982) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the

12

presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage."); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) ("[W]e cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition.").

### B. Dr. Lamb's Improper Expansion Of The Impact Of The February 2014 Discontinuation Announcement Provides Another Basis To Exclude His No Hard Switch Methodology

Dr. Lamb's No Hard Switch methodology also fails because he ignored the Court's clear statement about the about the timing of patient conversion necessary to prove antitrust injury in this case: Plaintiffs' injury must stem from patients who switched to Namenda XR *before* entry of the injunction on December 15, 2014, *because of* Forest's announcement of Namenda IR's discontinuance and who continued taking Namenda XR *after* generic entry in July 2015. MTD Order at *38-39; *see also* Downstream Discovery Order at 11. But Dr. Lamb acknowledges that his model makes no attempts to meet these criteria. Hamburger Decl., Ex. 3 (Lamb Reply) ¶¶ 60-61 (criticizing Defendants' experts for following this Court's instruction on the proper damages period as being "based on a legal opinion and not an economic one"). Dr. Lamb's model instead improperly expands the time period of alleged injury.

### 1. Dr. Lamb's Methodology Improperly Includes Alleged Injury From Before The February 2014 Announcement

Dr. Lamb contends that Forest's anticompetitive conduct began in October 2013 *before* the February 2014 discontinuation announcement. Hamburger Decl., Ex. 3 (Lamb Reply) ¶¶ 62-68. His contention is, however, directly contradicted by both this Court's collateral estoppel order and the test for antitrust injury set forth in the MTD Order. In its collateral estoppel order, the Court unambiguously found that the anticompetitive conduct began with the February 2014

announcement. Collateral Estoppel Order at \*50. It is unclear how Plaintiffs intend to rely on the collateral estoppel order as proof of anticompetitive conduct, while at the same time having their expert disregard the Court's clear finding on the start date of the anticompetitive conduct. In any event, Dr. Lamb's contention is unsupportable because prior factual findings, which this Court relied on in granting collateral estoppel, determined that the hard switch did not begin until there was a public announcement about the withdrawal of Namenda IR from the market. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 648 (2d Cir. 2015) ("The hard switch began on February 14, 2014 with the announcement of Defendants' intention to withdraw Namenda IR . . . .").

Dr. Lamb's position is also belied by his own purported "structural break" test. According to Dr. Lamb, his analysis revealed a "structural break" in the conversion rate to Namenda XR in February 2014 that he concludes supports his position that the announcement had an anticompetitive impact. Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 119-20. Notably, however, he did not run his structural break test in ███████████ when he claims the anticompetitive conduct began. Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 108:15-111:8. This Court should reject Dr. Lamb's attempts to improperly broaden the alleged anticompetitive conduct in a situation such as this where the allegation is directly contrary to prior factual and legal findings and contradicts the expert's own analysis. *See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 254-55 (D.C. Cir. 2013) (rejecting plaintiffs' argument that anticompetitive conduct began before class period where the argument was contrary to prior factual findings and contradicted by expert's own structural break test).

Dr. Lamb's contention that the anticompetitive conduct began in ███████████ is offered in an attempt to explain away the effect of Namenda XR being added to four major formularies

14

starting in January 2014 in response to deep pro-competitive discounting. Hamburger Decl., Ex. 5 (Fowdur Rep.) ¶ 104. By lumping together Forest's pre-February 2014 legal soft switch activities with the hard switch conduct, he is improperly disregarding the impact of the formulary placements as another potential cause for the alleged "structural break" that he identified in February 2014. It is wholly improper, however, for an expert to simply ignore a material fact because it is inconvenient for them. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055-56 (8th Cir. 2000) (excluding expert's testimony as "mere speculation" that ignored inconvenient evidence and was not based on the economic reality of the relevant market); *see also West v. Prudential Sec.*, Inc., 282 F.3d 935, 939-40 (7th Cir. 2002) (reversing certification because "[b]y failing to test for and exclude other potential sources of [share] movement, [plaintiffs' expert] undercut the power of the inference that he advanced" that the movement was due to defendants' conduct).

Dr. Lamb's improper conclusion about the start of the anticompetitive conduct has resulted in his methodology attributing harm to proposed class members that could not have suffered injury from the hard switch announcement. ██████████████████████████

████████████████████████████████ – ████████████████████████████████

████████████████████████████████ ██████ ██████

██████ As such, there is no way those purchases were made on behalf of patients who were coerced into switching to Namenda XR out of fear Namenda IR would be discontinued. Yet, Dr. Lamb contends that his model properly shows that these proposed class members were in fact injured. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 196:9-14 ("Q. If a potential class member stopped purchasing Namenda XR before the February 2014 announced withdrawal of Namenda IR, could they have suffered injury under your no hard switch but-for world? A. Yes."). The fact

15

that Dr. Lamb's methodology finds harm from the hard switch where there could be none illustrates that his methodology is unreliable. *In re Rail Freight*, 725 F.3d at 252 (vacating class certification because damage model detected injury "where none could exist" because the model found that customers whose rates were negotiated *before* the alleged price-fixing conspiracy began suffered injury).

### 2.   Dr. Lamb's Methodology Improperly Ignores The Impact Of The Injunction On Namenda XR Conversion

Dr. Lamb also assumes, once again in direct contravention of this Court's findings, that the injunction did not have any effect in undoing the anticompetitive effects of the discontinuation announcement. *Compare* Hamburger Decl., Ex. 2 (Lamb Rep.) ¶¶ 106-18 and Hamburger Decl., Ex. 3 (Lamb Reply) ¶¶ 69-75 (claiming that the injunction did not eliminate the anticompetitive effects of the Hard Switch strategy), *with* MTD Order at *30 (recognizing that the "injunction blunted much of the success of Forest's 'hard switch.'"); *see also* Hamburger Decl., Ex. 32 (NYAG Settlement Agreement) at 3 (Nov. 24, 2015) (noting that the injunction "was effective in protecting competition in the relevant market"). Dr. Lamb's assumption is flawed for a number of reasons.

To start, Dr. Lamb's assumption on the effect of the injunction is contrary to this Court's findings that any injury must result from patients who switched to Namenda XR *before* entry of the injunction. MTD Order at *38-39. Hence, under this Court's findings, if a new patient began taking XR after the December 2014 injunction, purchases of XR for that patient are not actionable. Yet, as discussed above, Dr. Lamb admits that his model does not track first-time memantine patients over time. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 48:8-49:3. Dr. Lamb's inability to separate out those Plaintiffs' purchases of Namenda XR on behalf of patients

whose first memantine purchase occurred after the injunction means that the model cannot reliably track any injury from the anticompetitive act. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 50:15-51:2.

Additionally, Dr. Lamb's entire opinion on the ineffectiveness of the injunction is based on conclusions reached through his interpretation of Forest's post-injunction notices informing patients, physicians and other healthcare professionals that Namenda IR was going to remain available pursuant to a court order, but that also included the truthful statement that Forest was appealing the decision. Hamburger Decl., Ex. 3 (Lamb Reply) ¶¶ 69-75. Dr. Lamb speculates that Namenda's intent in mentioning its appeal in the post-injunction notice was "to create confusion and doubt in the marketplace, especially among physicians, about the future availability of Namenda IR." *Id.* at ¶ 75; *see also* Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 113:24-118:14 (discussing Dr. Lamb's perception of Forest's "purpose" for including language about the appeal in various announcements). Dr. Lamb, however, did no empirical analysis of whether the mere mention of an appeal had *any* effect on prescribing decisions or patient switching. Hamburger Decl., Ex. 20 (Lamb Dep. Tr. II) at 120:1-121:24.

Dr. Lamb should be precluded from improperly expanding the period of anticompetitive effect with nothing more than speculation about Forest's intent behind referencing the appeal in the post-injunction notices, and no analysis of whether the statements about the appeal actually had any effect on doctors, patients and caregivers. *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (excluding proposed expert's speculation regarding "the state of mind and motivations of certain parties who were involved in the relevant transaction, often without citation to any record evidence" on the ground that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert

17

testimony"). Dr. Lamb's unsupported speculation on the ineffectiveness of the injunction fails to meet the standard set forth in Rule 702 and mandates that his methodology be excluded. *See, e.g., Macaluso v. Herman Miller, Inc.,* No. 01 CIV. 11496 (JGK), 2005 U.S. Dist. LEXIS 3717, at *23 (S.D.N.Y. Mar. 10, 2005) (finding that the expert's "analysis fails to meet this standard [set forth in Rule 702] because it is based on incorrect factual assumptions that render all of his subsequent conclusions purely speculative"); *see also Group Health Plan, Inc. v. Philip Morris Inc.,* 188 F. Supp. 2d 1122 (D. Minn. 2002) (rejecting expert testimony where the "causation and damages model is precariously built on a foundation of assumptions and speculation").

Assuming for the moment that Plaintiffs are permitted to ignore the Court's prior holdings and the case law prohibiting speculative assumptions in expert opinions, this unjustified expansion of the alleged hard switch period would not save Plaintiffs. Dr. Lamb's methodology over the extended time period remains the same, and it does not in any way attempt to isolate damages from sales made to patients that were actually coerced into purchasing Namenda XR by the February 2014 announcement.

### C. The Fatal Flaws In Dr. Lamb's No Hard Switch Methodology Make His No Reverse Payment Methodology Unreliable As Well

The fundamental problems discussed above infect Dr. Lamb's reverse payment model as well, because both models rely on the same assumptions regarding the growth and total purchases of Namenda XR but-for the announcement. *See* Hamburger Decl., Ex. 2 (Lamb Rep.) ¶ 135. Dr. Lamb acknowledges that his No Reverse Payment model attributes damages to proposed class members from the hard switch announcement. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 66:10-20 (admitting that in his "no reverse payment" damages calculation, the "hard switch itself had an effect on damages"). As with his No Hard Switch model, Dr. Lamb

never looked at individual prescribing preferences in constructing the but-for Namenda XR market share. Hamburger Decl., Ex. 19 (Lamb Dep. Tr. I) at 70:8-21. Although Dr. Lamb has submitted an alternative No Reverse Payment methodology that purports to remove his assumptions about the impact of the hard switch on XR market share, he maintains that his original methodology is sound and plans to present it at trial. Hamburger Decl., Ex. 3 (Lamb Reply) ¶ 104.

Because Dr. Lamb's No Hard Switch methodology is fatally flawed, and he provided no means to disaggregate the hard switch damages from the reverse payment damages, both his models fail and must be excluded. *Comcast*, 133 S. Ct. at 1433 ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory" of anticompetitive impact accepted for class-action treatment).

## IV.   CONCLUSION

For the foregoing reasons, this Court should grant Forest's motion to exclude Dr. Lamb's methodologies for determination of class-wide damages under both the No Hard Switch But-For World and the No Reverse Payment But-For World, which includes damages from the hard switch announcement.

Dated: November 17, 2017

WHITE & CASELLP

By: _____

Heather K. McDevitt
Martin M. Toto
John H. Chung
Ryan P. Johnson
William H. Bave, III
Michael E. Hamburger
Kristen O'Shaughnessy
White & Case LLP
1221 Avenue of the Americas
New York, New York 10020

19

Telephone: (212) 819-8200

J. Mark Gidley
Peter J. Carney
White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600

Heather M. Burke
White & Case LLP
3000 El Camino Real
5 Palo Alto Square, 9th Floor
Palo Alto, CA 94306
Telephone: (650) 213-0300

Kevin C. Adam
White & Case LLP
75 State Street, Floor 24
Boston, MA 02109
Telephone: (617) 979-9300

**Counsel for Defendants Actavis plc,
Forest Laboratories, LLC, Forest
Laboratories, Inc., and Forest
Laboratories Holdings Ltd.**