**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>All Direct Purchaser Actions | Civil Action No.: 1:15-CV-07488-CM-RWL |

<u>**DIRECT PURCHASER CLASS PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FOREST'S MOTION TO EXCLUDE CERTAIN OPINIONS AND PROPOSED TESTIMONY OF DR. RUSSELL LAMB**</u>

<u>**FILED  UNDER SEAL**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ i

I.      INTRODUCTION ....................................................................................................... 1

II.     DR. LAMB'S DAMAGES METHODOLOGY ........................................................... 3

III.    ARGUMENT ................................................................................................................ 5

        A.   *Daubert* Standard ............................................................................................. 5

        B.   Standards for Proving Injury and Damages ...................................................... 8

        C.   Dr. Lamb's Methodology Adequately Attributes Damages to Forest's
             Campaign to Publicize Withdrawal of Namenda IR .......................................11

             1.   Dr. Lamb's Opinions Are Consistent With This Court's Motion to
                  Dismiss Opinion ..................................................................................... 16

             2.   Defendants' Attacks Concerning Timing in the "No Hard Switch"
                  Model Are Misplaced ............................................................................. 18

                  a.   Dr. Lamb's Analysis Does Not Include Injury or Damage
                       Before February 2014 for the "No Hard Switch" Damage
                       Model ........................................................................................... 18

                  b.   The Hard Switch Impacted Direct Purchasers after December
                       2014 ............................................................................................. 21

        D.   Defendants Offer No Basis for Excluding Dr. Lamb's No Reverse Payment
             Methodology ..................................................................................................... 23

IV.     CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Air Cargo Shipping Servs. Antitrust Litig.*,
No. MDL No. 1775, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .......................................... 6

*Allen v. Dairy Mktg. Servs., LLC*,
No. 5:09-CV-230, 2013 WL 6909953 (D. Vt. Dec. 31, 2013) ................................................ 19

*Am. Sales Co., LLC v. Pfizer, Inc.*,
Civ. A. No. 2:14cv361, 2017 WL 3669604 (E.D. Va. Jul. 28, 2017)....................................... 23

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital*,
No. 11 Civ. 505, 2017 WL 733225 (S.D.N.Y. Feb. 10, 2017) ................................................. 1

*Bazemore v. Friday*,
478 U.S. 385 (1986)............................................................................................................. 20

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)............................................................................................................. 10

*Borawick v. Shay*,
68 F.3d 597 (2d Cir. 1995)...................................................................................................... 6

*Boykin v. W. Express, Inc.*,
No. 12-CV-7428 NSR JCM, 2015 WL 539423 (S.D.N.Y. Feb. 6, 2015) ................................. 7

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013)..................................................................................................... 9, 10

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) .............................................................................................. 20

*Daubert v. Merrell Dow Pharma., Inc.*,
509 U.S. 579 (1993).................................................................................................... *passim*

*Dial Corp. v. News Corp., No. 13cv6802*,
2016 WL 690868 (S.D.N.Y. Feb. 17, 2016)............................................................................ 7

*Dover v. British Airways, PLC (UK)*,
254 F. Supp. 3d 455 (E.D.N.Y. 2017) .................................................................................. 21

*Eastman Kodak Co. v. Southern Photo Materials Co.*,
273 U.S. 359 (1927)............................................................................................................... 9

*Group Health Plan, Inc. v. Philip Morris Inc.*,
188 F. Supp. 2d 1122 (D. Minn. 2002).................................................................................. 23

i

*Highland Capital Mgmt., L.P. v. Schneider,*
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................................ 22

*Hollman v. Taser Int'l Inc.,*
    928 F. Supp. 2d 657 (E.D.N.Y. 2013) ................................................................................ 8

*In re Actos End-Payor Antitrust Litig.,*
    848 F.3d 89 (2d Cir. 2017) .................................................................................................. 8

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.,*
    276 F.R.D. 364 (C.D. Cal. 2011) ....................................................................................... 4

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    No. 94 C 897, 1999 WL 639173 (N.D. Ill. Aug. 17, 1999) .............................................. 14

*In re Buspirone Patent & Antitrust Litig.,*
    210 F.R.D. 43 (S.D.N.Y. 2002) ........................................................................................ 23

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 297 (E.D. Mich. 2001) ................................................................................... 23

*In re Cardizem CD Antitrust Litig.,*
    218 F.R.D. 508 (E.D. Mich. 2003) ................................................................................... 13

*In re Domestic Drywall Antitrust Litig.,*
    No. 13-MD-2437, 2017 WL 3623466 (E.D. Pa. Aug. 23, 2017) ....................................... 4

*In re Elec. Books Antitrust Litig.,*
    No. 11 MD 2293 DLC, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ............................ 19

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
    256 F.R.D. 82 (D. Conn. 2009) ........................................................................................ 20

*In re Flonase Antitrust Litig.,*
    798 F.Supp.2d 619 (E.D. Pa. 2011) .................................................................................... 8

*In re High-Tech Employee Antitrust Litig.,*
    No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ............................ 10

*In re K-Dur Antitrust Litig.,*
    686 F.3d 197 (3d Cir. 2012) .............................................................................................. 23

*In re Lidoderm Antitrust Litig.,*
    No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .......................... 23

*In re Linerboard Antitrust Litig.,*
    497 F. Supp. 2d 666 (E.D. Pa. 2007) ............................................................................ 7, 11

ii

*In re Neurontin Mktg. & Sales Practices Litig.*,
   No. 04-CV-10739-PBS, 2011 WL 3852254 (D. Mass. Aug. 31, 2011)................................... 13

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012)................................................................................................ 8

*In re Puerto Rican Cabotage Antitrust Litig.*,
   269 F.R.D. 125 (D.P.R. 2010) ......................................................................................... 4

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   No. MC 07-0489 (PLF), 2017 WL 5311533 (D.D.C. Nov. 13, 2017) ..................................... 19

*In re Rail Freight Fuel Surcharge Litig.*,
   725 F.3d 244 (D.C. Cir. 2013).......................................................................................... 19

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
   No. CV 14-MD-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017) ..................................... 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. C 10-1064 SI, 2013 WL 124347 (N.D. Cal. Jan. 8, 2013) .............................................. 22

*In re Titanium Dioxide Antitrust Litig.*,
   284 F.R.D. 328 (D. Md. 2012)........................................................................................... 4

*In re Urethane Antitrust Litig.*,
   166 F. Supp. 3d 501 (D.N.J. 2016) .................................................................................... 10

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)............................................................................................. 9

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
   No. CIV 04-4213 JRT/AJB, 2011 WL 167259 (D. Minn. Jan. 14, 2011)........................ 10, 11

*Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*,
   No. 98 Civ.5564 (WHP), 2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003) ....................... 15, 16

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981)....................................................................................................... 9

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
   309 F.R.D. 195 (E.D. Pa. 2015)........................................................................................ 22

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)....................................................................................................... 5

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003)............................................................................................. 9

*Litton Sys., Inc. v. AT&T Co.*,
 700 F.2d 785 (2d Cir. 1983) ............................................................................. 8

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ............................................................... 6

*Macaluso v. Herman*,
 No. 01 Civ. 11496 (JGK), 2005 U.S. Dist. LEXIS 3717 (S.D.N.Y. Mar. 10, 2005) .............. 23

*Perkins v. Am. Elec. Power Fuel Supply, Inc.*,
 91 F. App'x 370 (6th Cir. 2004) ...................................................................... 16

*Roton Barrier, Inc. v. Stanley Works*,
 79 F.3d 1112 (Fed. Cir. 1996) ........................................................................ 22

*Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*,
 208 F. Supp. 2d 423 (S.D.N.Y. 2002) ................................................................ 7

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
 No. 15-CV-6549 (CM), 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) ........................... *passim*

*Schwabenbauer v. Bd. of Educ. of City Sch. Dist. of City of Olean*,
 777 F.2d 837 (2d Cir. 1985) ........................................................................... 16

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
 282 U.S. 555 (1931) ...................................................................................... 9

*U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*,
 112 F. Supp. 3d 122 (S.D.N.Y. 2015) ............................................................... 23

*U.S. Football League v. Nat'l Football League*,
 842 F.2d 1335 (2d Cir. 1988) .......................................................................... 15

*United States v. Am. Exp. Co.*,
 No. 10-CV-4496 NGG RER, 2014 WL 2879811 (E.D.N.Y. June 24, 2014) .................... 6, 20

*Vitamin C Antitrust Litig., No.*,
 06-MD-1738, 2012 WL 6675117 (E.D.N.Y. Dec. 21, 2012) ...................................... 7

*West v. Prudential Sec., Inc.*,
 282 F.3d 935 (7th Cir. 2002) .......................................................................... 20

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
 395 U.S. 100 (1969) ............................................................................... 8, 9, 10

**Rules**

Federal Rule of Evidence 702 ....................................................................................... 6, 7


**Other Authority**

Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 ............................................. 6

Am. Bar Ass'n, *Proving Antitrust Damages* (3d ed. 2017) ......................................................... 25

## I.    INTRODUCTION

Recently, this Court had occasion to criticize the unrestrained proliferation of *Daubert* motions, observing that "so many such motions, [are] nothing more than a 'we do not agree with his opinion so it is junk science' motion[s], of the sort that causes this and many judges to view all *Daubert* motions with a certain degree of skepticism." *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital*, No. 11 Civ. 505, 2017 WL 733225, at *1 (S.D.N.Y. Feb. 10, 2017). Forest's motion against Dr. Lamb is more of the same.

Dr. Lamb offers opinions concerning the impact of Forest's unlawful conduct on the direct purchaser class, relying partly upon Forest's own contemporaneous internal forecasts and communications about Forest's own analysis of the market. Forest attacks Dr. Lamb for allegedly failing to account for Forest's "soft-switch" tactics, but Forest is wrong, and Dr. Lamb not only took "soft-switch" factors into account, his analysis comports with the findings in Judge Sweet's injunction opinion – informed by Forest's own internal forecasts and documents – that Forest expected its "soft-switch" efforts to yield only ███ conversion from Namenda IR to XR, that Forest's conversion efforts were lagging in the months leading up to the hard switch strategy, and that Forest achieved a conversion rate of over ███ only *after* enacting its hard switch campaign. As this Court found in granting estoppel against Defendants:

> **Both Judge Sweet and the Second Circuit concluded that the result of the hard switch would be that a "significantly higher" number of patients would convert from Namenda IR to Namenda XR than if Forest had not attempted to pull Namenda IR from the market.** *Namenda I*, 2014 WL 7015198, at *28; *id.* at *39 (hard switch would result in "inflation of [Namenda] XR's share of the memantine market"); *see also Namenda II*, 787 F.3d at 655 (holding that Forest's hard switch "has the effect of significantly reducing usage of rivals' products" (quoting *Microsoft*, 253 F.3d at 65)). Forest's own internal projections estimated that, using only soft-switch tactics, only ███ of Namenda IR patients would voluntarily switch to Namenda XR. *Namenda I*, Unredacted Op. at 80. Under a hard-switch strategy, that percentage skyrocketed to ███████ *Id.*

***

Importantly, Judge Sweet found that Forest's hard-switch tactics had *already* [italics in original] resulted in more customers converting from Namenda IR to Namenda XR than Forest had estimated would convert voluntarily. **At the time the preliminary injunction was entered, "*about 50% of existing patients* [had] converted from Namenda IR to Namenda XR in anticipation of the lack of availability of Namenda IR." *Namenda I*, 2014 WL 7015198, at \*29. This is significantly more than the ▬▬ that Forest had estimated would convert if only soft-switch tactics were employed.**

Declaration of Joseph Opper (Dec. 11, 2017) ("Opper Decl.") Ex. 29, Opinion, *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15 Civ. 7488 (CM), at 24-25 (May 23, 2017) ("Estoppel Op.") (unredacted version) (emphases added). *See also* Opper Decl. 30, Opinion, *New York v. Actavis, Plc and Forest Labs., LLC*, 14-Civ-7473 (S.D.N.Y. Dec. 1, 2014) ("Unredacted Sweet Op.") ¶¶134, 142, & p.117.

Defendants also claim that Dr. Lamb's methodology does not accord with a test they themselves conjured up from various out-of-context quotes from this Court's motion to dismiss opinion. While that opinion did identify at least one way in which Plaintiffs were injured, the Court never established any straightjacketed methodology by which Plaintiffs must prove injury. Nor did the Court have had occasion to do so, as Plaintiffs' proof of the full extent of Forest's conduct was not before the Court (indeed no evidence was before the Court on a motion to dismiss).

Finally, Defendants ask the Court to ignore the evidence that the effects of Forest's widespread communications campaign repeatedly announcing that Forest was withdrawing Namenda IR were not completely cured by Judge Sweet's December 2014 injunction, because (1) Forest understood that once physicians got into the habit of writing Namenda XR prescriptions, they would likely maintain that habit, because as Forest itself stated: ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ Forest not only had broadcast widely its plan to withdraw IR, it had stopped manufacturing IR ▬▬▬▬▬▬▬▬▬▬▬▬▬ (*see*

Plaintiffs' Affirmative Statement of Material Facts In Support of Their Opposition to Defendants' Motion for Summary Judgment ("PASoF"), filed concurrently herewith, ¶¶412, 397-98; and (2) in response to the injunction, Forest issued press releases announcing it was appealing and stating it was "optimistic" the injunction would be overturned, then sent out communications to the market announcing it was appealing, ███████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ (PASoF ¶397),

thereby continuing to sow fear and doubt about the continued availability of Namenda IR.

Defendants are wrong that Dr. Lamb finds "hard switch" damages pre-dating Forest's February 2014 publicity blitz relating to the announcement. Dr. Lamb simply observes and takes into account, correctly, that Forest both made the decision to withdraw IR before February 2014 and had communicated about the withdrawal to portions of the market before February 2014. *See* Declaration of Michael E. Hamburger in Support of Memoranda of Law Supporting Forest's Motions to Exclude Expert Testimony ("Hamburger Decl."), Amended Expert Report of Russell Lamb, Sept. 20, 2017 ("Lamb Report") ¶¶51-55; Hamburger Decl. Ex. 3, Amended Expert Reply Report of Russell Lamb, Nov. 9, 2017 ("Lamb Reply") ¶¶51-55. *See also* PASoF ¶¶358-375; Plaintiffs' Response to Defendants' Statement Of Undisputed Material Facts In Support Of Defendants' Motion For Summary Judgment ("PRSoF") ¶¶371, 373, 403-04.

While Defendants' attacks may be potential fodder for cross-examination, they pose no sound basis for a *Daubert* challenge. Forest's motion should be denied.

## II.   DR. LAMB'S DAMAGES METHODOLOGY

Forest does not challenge Dr. Lamb's qualifications, or the "fit" of his opinions to this case. Nor could it. Dr. Russell Lamb is a widely respected economist with substantial experience in

assessing injury to purchasers in antitrust cases. *See* Dr. Lamb's CV attached to the Lamb Report at Ex. 2. Dr. Lamb's analyses in antitrust cases have been credited by multiple federal district courts in assessing classwide injury. *See*, *e.g.*, *In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2017 WL 3623466, at *39-42 (E.D. Pa. Aug. 23, 2017) (concluding Dr. Lamb had set forth sufficient economic evidence, including a structural break test, that plaintiffs had suffered classwide harm); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 347 (D. Md. 2012), *amended by* 962 F. Supp. 2d 840 (D. Md. 2013) (finding "Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case"); *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 374 (C.D. Cal. 2011) (finding, for purposes of class certification, that "Dr. Lamb's report provides a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid"); *In re Puerto Rican Cabotage Antitrust Litig.*, 269 F.R.D. 125, 139 (D.P.R. 2010) ( "Dr. Lamb has set forth a reputable and workable model for determining damages as to individual class members in his affidavit").

  ***Damages from the Hard Switch.*** Dr. Lamb's methodology for proving injury and damages from the hard switch is based, in part, on Defendants' own forecasts and internal documents concerning the expected effect of Forest's planned hard switch strategy. ████████████ ████████████████████████████████████████████████████████████████ Dr. Lamb uses data from these forecasts to model a but-for world of what would have happened absent the hard switch. Dr. Lamb thus relies on the same sorts of forecasts that Judge Sweet relied upon, as well as Forest's adoption of those forecasts in internal discussions among high-level executives (including Forest's Board) to arrive at an ████████ conversion rate from Namenda IR to XR, in the absence of the wrongful "hard switch." Lamb Report ¶¶151-55; Lamb Reply ¶¶30-

36, 42, 97. Dr. Lamb also examines IMS National Sales Perspective and manufacturer data concerning memantine hydrochloride sales at the wholesale level at which the direct purchasers operate. Lamb Report ¶¶24-26, 42, 78-85, 122-24; Lamb Reply ¶¶40; Opper Decl. Ex. 18, Lamb (Oct. 6) Dep. at 42-44.

Using this evidence, Dr. Lamb found that, if Plaintiffs can prove that generic competition would have started earlier absent Forest's illegal pay-for-delay agreements, and absent the "hard switch" strategy to convert patients from Namenda IR to XR, then all or nearly all Class members suffered overcharges by paying inflated prices for (at least some of) their memantine hydrochloride purchases. Lamb Report ¶¶65-120, 161. Furthermore, Dr. Lamb also found that aggregate overcharge damages can be proven through classwide models using formulas and methodologies that do not require individualized analysis. *Id.* ¶¶121-160, 161.

***Damages from the Reverse Payment.*** Dr. Lamb also created an economic model regarding the expected effects of delayed generic entry. Dr. Lamb, using but-for entry dates for generic Namenda IR of June or November 2012 (based on the analysis of other Plaintiffs' experts, George Johnston and Professor Einer Elhauge, respectively), compares the actual price purchasers paid for memantine hydrochloride to the prices that would have prevailed but for Defendants' conduct, and compares the volumes of brand Namenda purchased to the volumes of generic Namenda that would have been purchased but for Defendants' conduct. Lamb Report ¶¶127-42.

Notably, Dr. Lamb's models are substantially similar to ones that courts have approved in numerous other cases involving delayed generic entry.

## III.   ARGUMENT

### A.   *Daubert* Standard

Expert testimony is admissible under Federal Rule of Evidence 702 when a qualified expert offers relevant and reliable opinions. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141

(1999). The district court serves as the "gatekeeper" with respect to decisions regarding the admissibility of expert testimony. *Daubert v. Merrell Dow Pharma., Inc*., 509 U.S. 579, 597 (1993); *see also* Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony"). However, as the Supreme Court stated in *Daubert*, the drafting history of Rule 702 reflects the "liberal thrust" of the Federal Rules of Evidence and their "general approach of relaxing the traditional barriers to 'opinion' testimony." 509 U.S. at 588 (citation omitted).

Indeed, the Second Circuit has observed that "*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (Federal Rules of Evidence "favor the admissibility of expert testimony," and court's gatekeeper role "is not intended to serve as a replacement for the adversary system.") (citations and internal quotes omitted). Accordingly, "[t]he Second Circuit's standard for admissibility of expert testimony is especially broad, and the rejection of expert testimony is the exception rather than the rule[.]" *United States v. Am. Express Co.*, No. 10-CV-4496 (NGG) (RER), 2014 WL 2879811, at *2 (E.D.N.Y. June 24, 2014) (citation and internal quotes omitted). Because of the "liberal standard of admissibility for expert opinions, the assumption the court starts with is that a well-qualified expert's testimony is admissible[.]" *Id.* (citations omitted).

Moreover, "[d]eference to experts is particularly appropriate when expert testimony concerns 'soft sciences' like economics. Because these disciplines 'require the use of professional judgment,' expert testimony is less likely to be excluded because 'challenges may ultimately be viewed as matters in which reasonable experts may differ.'" *In re Air Cargo Shipping Servs. Antitrust Litig.*,

No. MDL No. 1775, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014) (quoting *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 6675117, at *5 (E.D.N.Y. Dec. 21, 2012)).

Under the standards set forth in *Daubert* and Fed. R. Evid. 702, the admissibility of expert testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; *see also Kumho Tire*, 526 U.S. at 141 (citing Fed. R. Evid. 702) (holding that "*Daubert's* general holding . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge"). This assessment of reliability and fit stops short of drawing conclusions about the weight or credibility of expert testimony. As the Supreme Court has explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) ("Once the thresholds of reliability and relevance are met, the testimony is admissible. Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility."); *Dial Corp. v. News Corp.*, No. 13cv6802, 2016 WL 690868, at *4 (S.D.N.Y. Feb. 17, 2016) ("at most, [movant's] arguments concerning the assumptions in [expert's] analysis go to its weight, not admissibility of that testimony"); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 676 (E.D. Pa. 2007) ("[P]laintiffs must be free to select their own [antitrust] damages theories as long as they are supported by a reasonable foundation."). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Boykin v. W. Express, Inc.*, No. 12-

CV-7428 NSR JCM, 2015 WL 539423, at *6 (S.D.N.Y. Feb. 6, 2015) (quoting *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (E.D.N.Y. 2013) (citations omitted)).

### B.    Standards for Proving Injury and Damages

Contrary to Defendants' argument, controlling Supreme Court law requires a plaintiff to show only that the illegal conduct is "a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under [section] 4 [of the Clayton Act]." *Zenith Radio Corp. v. Hazeltine Res., Inc*., 395 U.S. 100, 114 (1969). The Second Circuit has explained that "an antitrust defendant's unlawful conduct need not be the sole cause of the plaintiffs' alleged injuries; to prove a 'causal connection' between the defendant's unlawful conduct and the plaintiff's injury, the plaintiff need only 'demonstrate that [the defendant's] conduct was a substantial or materially contributing factor' in producing that injury." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) (quoting *Litton Sys., Inc. v. AT&T Co*., 700 F.2d 785, 823 n. 49 (2d Cir. 1983)); *In re Actos End-Payor Antitrust Litig*., 848 F.3d 89, 97 (2d Cir. 2017) (defendant's anticompetitive act need not be "sole cause" of plaintiffs' injury). This Court likewise held in its Estoppel Opinion that a "plaintiff need only show that the illegal conduct 'was a substantial or materially contributing factor' to its injuries.'" Estoppel Op. at 33 (quoting *Litton Sys., Inc.*, 700 F.2d at 823 n.49). *Litton* is illustrative. There, the plaintiff could establish injury from defendant's unlawful conduct in opposing certain certification standards in regulatory proceedings; the fact that plaintiffs' injuries may have been caused by other petitioning activity as well did not defeat plaintiffs' showing of injury. *Litton*, 700 F.2d at 823 n.16. *See also In re Flonase Antitrust Litig*., 798 F.Supp.2d 619, 627-28 (E.D. Pa. 2011) ("An antitrust violation can be the proximate cause of a plaintiff's injury even if there are additional independent causes of the injury.") (internal citations and quotes omitted).

Proof of injury requires only that Plaintiffs suffered "some damage flowing from the unlawful conspiracy." *Zenith*, 395 U.S. at 114 n.9. Thus, Plaintiffs need only demonstrate they made "some purchases at the higher price." *In re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124, 139 (2d Cir. 2001), *overruled on other grounds by In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006). In short, the direct purchaser Plaintiffs here need only prove that *some* (not all) of their purchases were converted to Namenda XR to prove injury from Defendants' unlawful hard switch conduct.

Once the fact of injury is shown, damage "calculations need not be exact." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). *See also LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) ("Once a jury has found that the unlawful activity caused the antitrust injury, the damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork.").

The Supreme Court has long recognized that a defendant should not be able to benefit from the uncertainty that its own conduct has produced. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) (expressing "willingness to accept a degree of uncertainty" in antitrust damage proof given that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation"); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 378 (1927) ("a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible"); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only

approximate"); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) ("Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.").

To the extent plaintiffs must "disaggregate" damages, they need only present a method to attribute damages to the exclusionary conduct. *See, e.g.*, *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, No. CIV 04-4213 JRT/AJB, 2011 WL 167259, at \*14 (D. Minn. Jan. 14, 2011). A damages model need not "precisely segregate out effects of every possible factor, including legal conduct, that could impact the dependent variable, in order to be admissible under *Daubert*," because such an unrealistically high threshold would "directly contraven[e] well-established Supreme Court […] authority holding that damages in antitrust cases often cannot, and therefore need not, be proven with exact certainty." *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at \*18 (N.D. Cal. Apr. 4, 2014); *id.* ("[D]amages issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.") (quoting *Zenith*, 395 U.S. at 123). Accordingly, while a class damages model should "'measure only those damages attributable to [plaintiffs'] theory,'" the "fundamental principle of antitrust law" remains and there is no requirement that "an expert's model precisely tailor, in a fool-proof way, the connection between the damages claimed and the anticompetitive conduct alleged in order to be admissible under *Daubert*." *High-Tech Employee*, 2014 WL 1351040, at \*18 (quoting *Comcast*, 133 S. Ct. at 1433). *See also In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 511 (D.N.J. 2016) ("*Comcast* does not require Plaintiffs to tie specific acts of alleged wrongdoing, *i.e.*, simultaneous price announcements, to their damages models. Assuming [*Comcast*] is applicable here, *Comcast* merely requires Plaintiffs to link their models to their asserted theory of antitrust impact. Because the models do just that, they are admissible.");

10

*Linerboard*, 497 F. Supp. 2d at 676 (plaintiffs' model admissible that "accounted for exogenous factors").

While Defendants "may still object to [plaintiffs'] methodology for disaggregation, such concerns are best addressed through cross-examination." *Insignia Sys.*, 2011 WL 167259, at *14.

### C.   Dr. Lamb's Methodology Adequately Attributes Damages to Forest's Campaign to Publicize Withdrawal of Namenda IR

Dr. Lamb studied Forest's own internal business planning documents, communications, and forecasts demonstrating that Forest itself expected that it would achieve far higher IR/XR conversion by pursuing the hard switch strategy as compared to a "soft switch" alone, and that merely announcing the hard switch would accelerate conversion to Namenda XR. Dr. Lamb's analysis thus comports with Judge Sweet's findings, reiterated by this Court in its estoppel opinion, that Forest expected to attain only ▮▮▮ of sales with its soft-switch tactics but retained in excess of ▮▮ of sales by publicizing the hard switch. *Supra* at 1-2.

In his report, Dr. Lamb expands upon this Court's findings by utilizing data from Forest forecasts to model a but-for world of what would have happened absent the hard switch. Dr. Lamb relies on Forest's own post-XR-launch forecasts (the same sort of forecasts Judge Sweet relied upon), and Forest's adoption of those forecasts in internal discussions among high-level executives (including Forest's Board) to arrive at an expected ▮▮▮ conversion rate from IR to XR, in the absence of the wrongful "hard switch." *See* Lamb Report ¶¶151-154; Lamb Reply ¶¶30-36, 42, 97. *See also* PASoF ¶¶314-30; PRSoF ¶¶380-96.

Dr. Lamb focused on "forecast documents that were created after Namenda XR had entered the market and before the Hard Switch was implemented" and which included an expected generic IR entry date ▮▮▮▮▮▮▮▮▮▮▮▮▮ to compute the but-for conversion rate. Lamb Report ¶152 (including table showing soft switch conversion rates in eight separate Forest

forecasts); Lamb Reply ¶30. Thus, in his analysis, Dr. Lamb relied upon the same forecasts Forest

itself relied on immediately before embarking on the wrongful conduct.

Importantly, Dr. Lamb relied upon Forest forecasts ███████████████████████████

█████████████████████████████████████████, as well as internal high-

level discussions of and reliance upon these forecasts to reach conclusions about what the

conversion rate of Namenda IR to XR would have been absent initiation of the hard switch

strategy. Lamb Report ¶¶90-97; Lamb Reply ¶30; PASoF ¶¶314-19, 369; PRSoF ¶¶390-91. These

analyses were prepared contemporaneously with the decision to engage in the hard switch ████,

and were relied upon by Defendants to estimate the expected incremental effects of a hard switch

strategy – over and above a soft-switch-only approach – and the ability of a hard switch to limit

the "patent cliff" effects associated with generic entry. These documents – admissions by Forest

of the effects of its hard switch – provide a reliable basis to estimate what would have happened

had Forest not embarked on its anticompetitive hard switch strategy.[1]

Forest understood that once physicians got into the habit of writing Namenda XR

prescriptions, they would likely maintain that habit, ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████. *See* PASoF ¶¶412, 397. Forest's executives expected that simply by

announcing the impending withdrawal of Namenda IR, the conversion to Namenda XR would

---

[1] *See also* Direct Purchaser Class Plaintiffs' Mem. in Opp'n to Forest's Mot. To Exclude
Opinions and Testimony of Dr. Ernst Berndt and Dr. Russell Lamb Regarding Forecast Averages,
filed contemporaneously herewith ("Forecast Averages Opp'n"); Mem. of Law in Support of
Direct Purchaser Class Plaintiffs' Mot. For Class Certification, Sept. 15, 2017 at 6-7, 20-24 (ECF
No. 381); Reply Mem. of Law in Support of Direct Purchaser Class Plaintiffs' Mot. for Class
Certification, at 11-19 (ECF No. 421) ("Class Reply"). We incorporate those briefs here.

accelerate. *See, e.g.,* Opper Decl. Ex. 31, FRX-AT-03724244-47 (████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████). ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ *See also* PRSoF ¶464 (discussing several similar Forest

forecasts predicting acceleration of Namenda XR conversion upon announcement of withdrawal).

This was borne out in practice, as evidenced in the deposition of Dr. Lah, a neurologist

who treats many Alzheimer's patients, and who testified in the New York Attorney General action

that "knowing that Namenda IR would no longer be available past a certain date, we began

switching patients from Namenda IR to Namenda XR." Opper Decl. Ex. 33, Lah Tr. at 63:2-12

(Hearing Transcript, *New York v. Forest Labs., LLC,* 14-cv-7473) (Nov. 10, 2014).

Dr. Lamb also conducted a structural break test – a regression analysis using actual sales

data from IMS National Sales Perspectives ("NSP")[2]– to demonstrate a statistical difference in the

---

[2] IMS NSP data has been called the "gold standard" for prescription drug sales data in the United States. *See In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-CV-10739-PBS, 2011 WL 3852254, at *32 (D. Mass. Aug. 31, 2011), *aff'd*, 712 F.3d 21 (1st Cir. 2013). *See also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 538 (E.D. Mich. 2003) (referring to IMS Health, Inc. as "the recognized leader in data collection for the pharmaceutical industry."); *In re Brand*

rate of conversion to Namenda XR before and after the February 2014 widespread announcement of the hard switch campaign. *See* Lamb Report ¶¶119-20; Lamb Reply ¶¶48-49. Dr. Lamb's analysis showed a statistically significant structural break for nearly all purchasers who bought monthly from June 2013 through June 2015. *See* Lamb Reply ¶¶58-59.

Thus, Dr. Lamb's methodology correctly attributes Plaintiffs' injuries to Defendants' unlawful campaign publicizing the withdrawal of Namenda IR, and provides a methodology to exclude any effects stemming from supposed soft-switch tactics. This suffices under the law.

While Defendants attack Dr. Lamb and his structural break test for not focusing on patient or individual switching (Def. Mem. at 10-13), Plaintiffs and the proposed class are direct purchasers (wholesalers)*,* and Dr. Lamb appropriately examined data at the wholesale level, Lamb Report ¶¶24-26, 42, 78-85, 122-24; Lamb Reply ¶¶76-87. As Forest itself has explained: "Forest deals with wholesalers, not patients." PRSoF ¶458 (quoting Reply Br. of Defendants-Appellants, *State of New York ex rel. Schneiderman v. Actavis PLC*, No. 14-4624 (2d Cir.), filed Feb. 23, 2015 (ECF No. 275)). ██████████████████████████████████████████████████

███████████████. Lamb Reply ¶¶82-97. While Defendants cite Lamb's testimony that he did not *directly* test whether a particular individual switched because of the hard switch strategy (Def. Mem. 10-11), Dr. Lamb's analysis – incorporating Defendants' own forecasts, National Sales Perspectives data from IMS, and manufacturer data – reflects patient and physician switching because of the impending withdrawal rather than for "soft switch" strategies. PRSoF ¶¶460-62.

---

*Name Prescription Drugs Antitrust Litig*., No. 94 C 897, 1999 WL 639173, at *4 (N.D. Ill. Aug. 17, 1999) (IMS Health data analyzes sales information in "an effective and cost-efficient manner" and there is "no reason exists not to utilize this data when measuring the Class Plaintiffs' damages."); Johns Hopkins Bloomberg School of Public Health, Data Assets, ("The National Sales Perspectives™ (NSP) is considered the industry standard for measuring pharmaceutical spending."), *available at* https://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/data-assets/.

Dr. Lamb confirmed this in his deposition. Opper Decl. Ex. 18, Lamb (Oct. 6) Dep. at 57:12-58:11



"); *Id.* at 59:12-18

If, as Forest concluded, its "soft switch" alone would result in of patients switching to XR, then (1) logically, the hard switch caused the additional post-hard switch demand; and (2) there is no need to identify or trace individualized patient switching decisions because the hard switch's impact is reflected in wholesalers' own increased XR purchases.  Accordingly, Dr. Lamb analyzed wholesaler level IMS National Sales Perspective and manufacturer data to identify the effects of Forest's hard switch *on direct purchasers*. Lamb Report ¶¶24-26, 42, 119-20, 145-60; Lamb Reply ¶¶40-43, 48-49; PRSoF ¶¶460-62.

Defendants' cited authorities either agree with Plaintiffs or are wholly distinguishable. *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335 (2d Cir. 1988) holds only that "damages awarded must be traced *to some degree* to unlawful acts." *Id.* at 1378 (emphasis added). The plaintiff's damages claim there was decided by jury verdict, not summary judgment, and was upheld because the defendant offered "much evidence" that plaintiff's "self-destructive" business decision, not alleged anticompetitive conduct, led to the harm. *Id.* at 1377. *See also id.* at 1370 ("Courts do not exclude evidence of a victim's suicide in a murder trial."). *See also Intimate*

15

*Bookshop, Inc. v. Barnes & Noble, Inc*., No. 98 Civ.5564 (WHP), 2003 WL 22251312, at *7 (S.D.N.Y. Sept. 30, 2003) (plaintiff offered "no evidence, in any form, that defendants' alleged violation of the Act, as opposed to other intervening market factors, was a material cause" of its injuries). Neither opinion requires the intricate sort of netting that Defendants would impose here.

### 1. Dr. Lamb's Opinions Are Consistent With This Court's Motion to Dismiss Opinion

Defendants invoke this Court's motion to dismiss opinion, but they badly misread it. First, Defendants use a pastiche of out-of-context quotes to conjure a supposed three-part test for proving injury. Def. Mem. 57-58. In their motion to dismiss, Defendants had argued that Plaintiffs could not demonstrate injury at all. *See* Motion to Dismiss, ECF No. 57 at 30 (arguing "Plaintiffs lack standing, as they suffered no antitrust injury here."). In response, the Court explained one way that Plaintiffs had alleged injury, which warranted denying Defendants' motion. *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC,* No. 15-CV-6549 (CM), 2016 WL 4992690, *12 (S.D.N.Y. Sept. 13, 2016) ("MTD Op."). The opinion in no way, however, set down rigid rules cabining what types of injuries direct purchasers can prove. The Court was not required to lay down such rules, nor did it. Nor did Plaintiffs have occasion to argue these points on the motion to dismiss. And, of course, the motion – and the Court's decision – came before fact and expert discovery. *See Schwabenbauer v. Bd. of Educ. of City Sch. Dist. of City of Olean*, 777 F.2d 837, 842 (2d Cir. 1985) (issue not briefed or argued previously and not necessary to resolution is dicta and does not bind court); *Perkins v. Am. Elec. Power Fuel Supply, Inc*., 91 F. App'x 370, 374 (6th Cir. 2004) ("the issue must squarely have been presented for decision[…] 'peripheral' statements as to issues that were not briefed or argued do not constitute law of the case."). The Court, for instance, was not required to cite, let alone analyze, Plaintiffs' allegation that injuries continued past not only Judge Sweet's injunction but past generic entry in order to deny Defendants' motion.

*See* ECF No. 26 ¶¶226-29.  Moreover, the motion to dismiss opinion appears to have focused on the *indirect purchasers*, inadvertently describing the direct purchasers as "health plans," 2016 WL 4992690 at *1, rather than as wholesalers. Wholesalers do not sell to, or deal with, patients, but serve broad swaths of the market. *See* Lamb Report ¶¶24-26, 42.

In this light, the Court's statement that "patients switched to Namenda XR because of the announced withdrawal of Namenda IR," MTD Op. at *12, was simply refuting the notion that Plaintiffs must show *actual withdrawal* to prove injury.

Defendants incompletely quote the Court's statement regarding direct purchaser plaintiffs' purchases following generic entry. *Compare* Def. Summ. Judg. Mem. 58, Nov. 17, 2017 (claiming Court held that plaintiffs must show that "DPPs paid for these patients' use of 'Namenda XR after generic entry' because this subset of patients never switched back to generic Namenda IR") *with* MTD Op. at *12 ("Plaintiffs' injury comes from having to pay for Namenda XR *after* generic entry — when absent Defendants' anticompetitive conduct, their patients' prescriptions would have been filled by a far cheaper generic (which, as Defendants state, was available for less than 10% of the July Namenda IR price") (emphasis in original). In the full quote, it appears the Court held merely that Plaintiffs' injury can be shown by the price difference between branded Namenda XR and generic Namenda IR when purchases would have been made of the less expensive generic, and did not impose some sort of tracing requirement (if the Court intended for the discussion of patients to apply to wholesalers at all).

And while purchasers who "switched to Namenda XR *prior* to the entry of the injunction" certainly sufficiently alleged injury, *id.* at *12, the Court never ruled out (or even discussed) the possibility of ongoing harm after the entry of an injunction. *See* Section III.C.2.A, *infra*.

17

### 2.    Defendants' Attacks Concerning Timing in the "No Hard Switch" Model Are Misplaced

Defendants raise various other criticisms of Plaintiffs' damages analysis. None has merit. Fundamentally, Forest ignores that Plaintiffs have also proven injury from Forest's reverse payment, an injury that does not depend on also proving harm from the hard switch. Lamb Reply ¶12. But for Forest's reverse payment to Mylan, generic competition would have begun years earlier, and the ███████ substitution and sharp price drops that occurred after July 2015, would have occurred years before. Lamb Report ¶¶83-85, 139-142. The Court upheld both Plaintiffs' hard switch and reverse payment claims. MTD Op. at *9, 12.

### a.    Dr. Lamb's Analysis Does Not Include Injury or Damage Before February 2014 for the "No Hard Switch" Damage Model

Forest appears to misread Dr. Lamb's report when arguing that his methodology improperly includes injury from before the widespread February 2014 announcement for the "No Hard Switch" damage model. Dr. Lamb simply anticipated Forest's claims that increased conversion to Namenda XR *after* February 2014 resulted not from its illegal hard switch, but from better formulary placement for XR *before* February 2014, including the addition of plans such as Optum. *See*, *e.g.*, Hamburger Decl. Ex. 5, Fowdur Report ¶¶106, 147; Hamburger Decl. Ex. 6, Cremieux Report ¶57. In response, Dr. Lamb explained how even in fall of 2013, the "evidence indicates that Forest communicated its intention to withdraw Namenda IR to managed care entities to influence the decision to add Namenda XR to their formularies." Lamb Reply ¶51; *see also* Lamb Report ¶¶89, 102; Hamburger Decl. Ex. 7, Berndt Report ¶56; Hamburger Decl., Ex. 9, Berndt Reply ¶29; PRSoF ¶¶373; PASoF ¶67 (████████████████████████████████ ████████████████████████████). Hence, changes in formulary placement were tainted by the hard switch conduct, and were part and parcel of the hard switch strategy itself.

Lamb (Oct. 6) Dep. 169:17-173:17. 

. *See* Lamb Reply ¶¶52-53; PRSoF ¶373; Opper

Decl. Ex. 34, (Lahman (Optum) Dep. at 143:13-145:11 (

).

Forest argues, without explanation, that Dr. Lamb's opinion is improper because he did not

run a structural break test in October 2013. As Dr. Lamb explained, however, he ran a structural

break test in February 2014 because there was strong reason to believe that the widespread hard

switch announcement then caused the Namenda XR conversion rate to increase, Lamb Report

¶119; Lamb Reply ¶¶48-49, which that test confirms.[3]

Forest also criticizes Dr. Lamb's structural break analysis for not controlling for formulary

changes and other marketing efforts. As noted above, Defendants' *own forecasts* had already

controlled for sales and formulary placement that Forest was able to achieve through soft switch

tactics alone. Indeed, Forest's own experts fail to offer any statistical explanation of how formulary

changes and marketing efforts impacted the Namenda XR adoption rate. Forest's unsupported

suggestion that Dr. Lamb should have accounted differently for marketing activities or formulary

placement is not grounds for exclusion, but at most goes to weight. *See*, *e.g.*, *United States v. Am.*

---

[3] Forest misses the mark citing to *In re Rail Freight Fuel Surcharge Litig.*, 725 F.3d 244, 254-55 (D.C. Cir. 2013). There, the D.C. Circuit remanded to the district court to consider in the first instance issues with the expert's damages model concerning "false positives" – an issue Defendants have not raised here. *Id.* On remand, days before Forest filed its motion, the district court conducted a "rigorous analysis" of that expert opinion and admitted it. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. MC 07-0489 (PLF), 2017 WL 5311533, at *25- 29 (D.D.C. Nov. 13, 2017). Moreover, district courts in this circuit have declined to follow the appellate *Rail Freight* decision. *See*, *e.g.*, *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at *22 (S.D.N.Y. Mar. 28, 2014); *Allen v. Dairy Mktg. Servs., LLC*, No. 5:09-CV-230, 2013 WL 6909953, at *17 n.9 (D. Vt. Dec. 31, 2013).

*Exp. Co.*, No. 10-CV-4496 NGG RER, 2014 WL 2879811, at *4 (E.D.N.Y. June 24, 2014) ("Yet as the Supreme Court has explained, such flaws normally 'affect the analysis' probativeness, not its admissibility.'") (quoting *Bazemore v. Friday,* 478 U.S. 385, 400 (1986)); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 102 (D. Conn. 2009) ("While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors" should be excluded.).

Dr. Lamb's report has no resemblance to the reports at issue in the cases Forest relies upon. In *Concord Boat Corp. v. Brunswick Corp*, a damages expert conceded his model "ignored inconvenient evidence," and that report completely failed to account for various critical market events. 207 F.3d 1039, 1056 (8th Cir. 2000). Here, Dr. Lamb addresses each variable Forest raises. In *West v. Prudential Sec., Inc.*, the expert "did not explain why he departed from the normal understanding" of economics. 282 F.3d 935, 939 (7th Cir. 2002). Dr. Lamb's analysis is consistent with large body of economic literature examining the impact of generic delay.

Forest incorrectly claims that Dr. Lamb finds four purchasers who stopped purchasing Namenda XR before the February 2014 announcement were injured by the hard switch strategy. (Def. Mem. at 15). Rather, Dr. Lamb concludes these entities were injured by the *reverse payment*, as they likely would have purchased generic IR had it been available since 2012, and so each would have purchased generic sooner at lower prices. Lamb Reply ¶¶17, 27, 47. *See also* Class Reply at 3 n.4. To be sure, Dr. Lamb is correct that entities making purchases prior to February 2014 "could" have been injured (Def. Mem. at 15 (quoting Lamb (Oct. 6) Dep. at 196:9-14)), because Forest began communications about the expected withdrawal before the public announcement. But Dr. Lamb does not actually find injury or damages for such entities from the hard switch.

**b.      The Hard Switch Impacted Direct Purchasers after December 2014**

Forest contends that harm to Plaintiffs from the hard switch magically disappeared after entry of Judge Sweet's injunction in December 2014. Def. Mem. at 16-18. Forest is wrong. In response to the injunction, Forest issued press releases announcing it was appealing and stating it was "optimistic" the injunction would be overturned, then sent out communications to the market in January 2015 announcing it was appealing (PASoF ¶397), thereby continuing to sow fear and doubt about the continued availability of Namenda IR. Lamb Reply ¶¶69-75. *See also* PRSoF ¶¶397-98, 484. Forest argues this is unduly speculative, ████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████. Forest offers no evidence that after losing in the Second Circuit in May 2015, it sent letters to customers about the ruling, and Forest did not drop its public legal challenge to the injunction until November 2015, after generic IR had (belatedly) entered. And Forest's efforts to communicate its planned withdrawal far exceeded its efforts to communicate IR's continued availability. PASoF ¶¶397-398. In short, Forest intentionally sowed doubt about whether the injunction would stand, and so it is not surprising that the effects of the hard switch continued. Lamb Report ¶¶115-17; Lamb Reply ¶¶60-75. Dr. Lamb was not required to provide a mathematical model as to the lingering fear and confusion in the market following the injunction. *See Dover v. British Airways, PLC (UK)*, 254 F. Supp. 3d 455, 461 (E.D.N.Y. 2017) (rejecting argument that the opinion offered by plaintiffs' economic expert was unreliable because it was not based on a regression).

Moreover, Forest is wrong that "Dr. Lamb's entire opinion on the ineffectiveness of the injunction is based on conclusions reached on his interpretation of Forest's post-injunction

21

notices[.]" Def. Mem. at 17. Dr. Lamb also examines evidence that the marketplace, once shifted, would be slow to revert back to IR, if it did at all, regardless of the injunction. Lamb Report ¶¶87; 107-109 & chart examining post injunction prescriptions for Namenda XR, Namenda IR, and Generic IR), ¶118 (███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████); Lamb Reply ¶¶ 90-93.

This Court itself has observed the reluctance to "reverse commute" of patients who had already been forcibly switched from IR to XR. MTD Op. at *10 (observing "Alzheimer's patients that switch medications infrequently 'reverse commute'"). Injuries can continue to accrue after anticompetitive conduct ceases; if Defendants have contrary evidence, they can present it to the jury. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-1064 SI, 2013 WL 124347, at *1 (N.D. Cal. Jan. 8, 2013)("To the extent defendants believe that Dr. Rao used the wrong end date for his regression analysis, defendants can challenge that determination through cross-examination and the testimony of their own economic expert, Dr. Carlton."); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 309 F.R.D. 195, 205 (E.D. Pa. 2015) (recognizing damages period could extend beyond period of alleged delay; it "takes time for the full effects of generic competition to occur"), *rev'd on other grounds*, *In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d Cir. 2016). *Cf. Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1120 (Fed. Cir. 1996) (in a patent infringement case, upholding award of "future price erosion damages" which would be incurred following removal of infringing product from the market).

None of Defendants' cases supports the exclusion of the type of expert economic analysis here. *Highland Capital Mgmt., L.P. v. Schneider,* 379 F. Supp. 2d 461 (S.D.N.Y. 2005) did not

involve any economic analysis, but a former U.S. Attorney attempting to opine about how the conduct at issue would be treated by a criminal prosecutor. *Id.* at 465. In *Macaluso v. Herman*, a plaintiff offered expert testimony inconsistent with his own testimony, and sought to buttress the expert via an affidavit contradicting the plaintiff's earlier deposition. No. 01 Civ. 11496 (JGK) 2005 U.S. Dist. LEXIS 3717, at *19–21 (S.D.N.Y. Mar. 10, 2005). *See also Group Health Plan, Inc. v. Philip Morris Inc.,* 188 F. Supp. 2d 1122, 1133 (D. Minn. 2002) (expert damages model attempted to measure cost of smoking over 55-year timeframe but failed to account for "host of other sociological factors").

### D.    Defendants Offer No Basis for Excluding Dr. Lamb's No Reverse Payment Methodology

Defendants offer no basis for excluding Dr. Lamb's assessment of injury and damages as a result of the reverse payment. Dr. Lamb has relied on other experts – as permitted (*see*, *e.g.*, *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) (McMahon, J.)) – who have concluded that generic entry would have occurred earlier but for the unlawful reverse payment (either in June or November of 2012). Lamb Report ¶¶127-42. Dr. Lamb then compared the actual memantine prices paid and volumes purchased to but-for prices and volumes, calculated using, *inter alia,* post-generic entry data on prices and substitution rates. This is the same basic approach validated in every case alleging delayed generic competition. *See*, *e.g.*, *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 221 (3d Cir. 2012), *judgment vacated sub nom. on other grounds*, 133 S. Ct. 2849 (2013), *reinstatement granted*, No. 10-2077, 2013 WL 5180857 (3d Cir. Sept. 9, 2013); *Am. Sales Co., LLC v. Pfizer, Inc.*, Civ. A. No. 2:14cv361, 2017 WL 3669604 (E.D. Va. Jul. 28, 2017); *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *10-11 (N.D. Cal. Feb. 21, 2017); *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 58 (S.D.N.Y. 2002); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 308-10 (E.D. Mich. 2001).

Plaintiffs are entitled to overcharge damages based on the higher price of branded XR, as compared to lower price of generic IR they would have purchased, but for Defendants' unlawful conduct. The court in *Solodyn* permitted plaintiffs to recover overcharges on purchases of both the original product as well the follow-on product, *even where the switch was presumed lawful*:

> [I]n regard to Legacy Strength, DPPs are explaining how their theory of damages involves calculating overcharges on Legacy and Add-On Strength Solodyn that would have been purchased but for the Medicis-Impax agreement that delayed and suppressed generic entry into the market. That is, the theory present here is one of illegal reverse-payment settlements—specifically, the Medicis-Impax agreement—the impact of which is overcharges. *See* D. 631 at 19-20. If the jury finds the Medicis-Impax agreement was unlawful and that class members would have purchased lower-priced generic Solodyn rather than brand Add-On Strength Solodyn, then these class members who purchased brand Add-On Strength Solodyn were overcharged.

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *10 (D. Mass. Oct. 16, 2017); *see also id.* *9-10 (hop was not being challenged as independently unlawful).

Defendants acknowledge, as they must, that Dr. Lamb also "has submitted an alternative No Reverse Payment methodology" that uses the actual Namenda XR conversion rate as it occurred.  Def. Mem. at 19 (citing Lamb Reply ¶104). Defendants offer no basis to exclude this model.

Nor is Dr. Lamb's original model subject to attack because he did not postulate Namenda XR achieving conversion rates of ▮▮▮ or more. As discussed above, Dr. Lamb disaggregated supposedly "lawful" conversion resulting from soft-switch tactics as Forest's own forecasts show Forest itself calculated that such tactics would only enable it to achieve approximately ▮▮ of market sales.  Sales above that are attributable to illegal conduct. Lamb Report ¶135. *See also* Forecast Averages Opp'n at 7-18.  Moreover, Dr. Lamb's model is inherently conservative, as his models posit that with earlier generic IR entry, Forest would have launched Namenda XR earlier

24

than it did in June 2013. *See* Lamb Report ¶129. Forest did not, in fact, introduce Namenda XR until June 2013, and by then (absent the reverse payment and delayed generic entry), the market would have been genericized. *See, e.g.*, PASoF ¶31 (█████████████████████████

███████████████████████████████████████████████████████████████

████; Unredacted Sweet Op. ¶32. Thus, the "but for" conversion rate would have been nearly zero. *See* Am. Bar Ass'n, *Proving Antitrust Damages* 91-92 (3d ed. 2017) ("it is not relevant that the defendant… could theoretically have caused the same harm through lawful means[.]").

## IV.    CONCLUSION

Direct Purchaser Plaintiffs respectfully request that Defendants' motion be denied.

Dated: December 11, 2017

Respectfully submitted,

*Dan Litvin*

Dan Litvin

**Rochester Drug Co-Operative, Inc. and the**          **JM Smith Corporation d/b/a Smith**
**Proposed Class**                                      **Drug Company and the Proposed Class**

David F. Sorensen                                        Bruce E. Gerstein
Daniel C. Simons                                         Joseph Opper
Berger & Montague, P.C.                                  Dan Litvin
1622 Locust Street                                       Garwin Gerstein & Fisher LLP
Philadelphia, PA 19103                                   88 Pine Street, 10th Floor
(215) 875-3000                                           New York, NY 10005
(215) 875-4604 (fax)                                     Tel: (212) 398-0055
dsorensen@bm.net                                         Fax: (212) 764-6620
dsimons@bm.net                                           bgerstein@garwingerstein.com
                                                         jopper@garwingerstein.com
                                                         dlitvin@garwingerstein.com

Peter Kohn                                               David C. Raphael, Jr.
Joseph T. Lukens                                         Erin R. Leger
Faruqi & Faruqi, LLP                                     Smith Segura & Raphael, LLP
101 Greenwood Avenue, Suite 600                          3600 Jackson Street, Suite 111

Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com
jlukens@faruqilaw.com

Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
draphael@ssrllp.com


Stuart E. Des Roches
Andrew W. Kelly
Odom & Des Roches, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
stuart@odrlaw.com

Russ Chorush
Miranda Jones
Heim Payne & Chorush, LLP
1111 Bagby St. Ste. 2100
Houston, TX 77002
Tel:  (713) 221-2000
Fax:  (713) 221-2021
rchorush@hpcllp.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2017, I served the foregoing on counsel of record via email.

Respectfully submitted,

_____
Dan Litvin

27