# Exhibit 8

Page 1

1   ** H I G H L Y   C O N F I D E N T I A L **

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Civil Action No. 1:15-cv-07488-CM

5   -----------------------------------x

6

    IN RE NAMENDA DIRECT PURCHASER

7   ANTITRUST LITIGATION

8

9   -----------------------------------x

                October 26, 2017

10                8:58 a.m.

11

12

13        Videotaped Deposition of GEORGE W.

14   JOHNSTON, JR., taken by Defendants,

15   pursuant to Notice, held at the offices of

16   Gibbons, P.C., One Gateway Center, Newark,

17   New Jersey, before Todd DeSimone, a

18   Registered Professional Reporter and Notary

19   Public of the State of New Jersey.

20

21

22

23

24

25



Page 50

Page 52

5      Q.    We were discussing the
6  Memantine Studies earlier this morning.
7          You would agree with me,
8  wouldn't you, that the Memantine Studies do
9  not expressly disclose Alzheimer's disease?
10     A.    I would agree that the studies
11  discuss OBS.  The studies discuss treatment
12  of dementia.  And because of the genus
13  species concept, they would disclose the
14  Alzheimer's of the dementia type.
15          Just for simplicity, maybe we
16  can just say Alzheimer's, if it's okay with
17  you.
18     Q.    That's fine with me.
19     A.    Great.
20     Q.    I think we understand each
21  other on this, but I just want to be clear,
22  those Memantine Studies, they don't use the
23  words "Alzheimer's disease," do they?
24     A.    Again, I haven't gone through
25  every one now, but to the best of my

Page 53

1  recollection I believe you are correct.
2          But, again, I haven't gone, if
3  you want me to go through them, I can, but
4  if you want to suggest to me that that's
5  the case, fine.

We have been
5  going a little bit over an hour, but feel
6  free to --
7          MR. JOHNSON:  That's fine.  I
8  will try to stop every hour or so today.
9          THE WITNESS:  Do you want to
10  finish your anticipation section?
11          MR. JOHNSON:  No, I've got a
12  little bit more, so why don't we take a
13  quick break.
14          THE WITNESS:  Okay.
15          THE VIDEOGRAPHER:  We will be
16  going off the record at 10 a.m.  This marks
17  the end of media 1A.
18          (Recess taken.)
19          THE VIDEOGRAPHER:  We are going
20  back on the record at 10:08 a.m.  This
21  marks the beginning of media 1B.
22          Go ahead, Counselor.
23          MR. JOHNSON:  Thank you.
24  BY MR. JOHNSON:

14 (Pages 50 - 53)



Page 54

```
16    Q.    Let me ask, do you plan on
17 testifying about the Gleave standard and
18 subsequent cases to the jury in this case?
19    A.    No, I'm going to focus -- I'm
20 going to focus on cases up to 2010.
21    Q.    But you plan on discussing the
22 case law before the jury?
23        MR. CHORUSH:  Objection.
24    A.    It depends upon what I've been
25 asked to do at trial.
```

Page 56

```
 8    Q.    I'm sorry about that, sir.  Do
 9 you think you will be able to manage?
10    A.    I will try my best.  It might
11 take a little bit longer.
12    Q.    If I had a copy with bigger
13 print, I would surely give it to you.
14    A.    I appreciate it.  It's okay.
15        So you have directed me to what
16 section, please?
17    Q.    I have asked you to focus on --
18 let me be sure I have the right page.
19        Perhaps you could read pages 38
20 to 40 and let me know when you've done so.
21    A.    Okay.
22        (Witness perusing document.)
```

Page 55

```
15    Q.    And you have reviewed his
16 report?
17    A.    I have.
18    Q.    And his deposition transcript?
19    A.    I have.
```

```
25    Q.    So you don't have any basis to
```



Page 58

1  disagree with it?
2      A.   I don't -- I don't know if -- I
3  don't know if there are contrary reports or
4  expert witnesses who might disagree with
5  that, but I don't personally have any basis
6  for disagreeing with it.  But, again, I'm
7  not the technical expert.

3      Q.   And, again, you don't have any
4  basis to disagree with that, do you?
5      A.   I don't have a basis to agree
6  or disagree.  I'm not the technical expert.
7  There might have been technical experts who
8  would have a different interpretation.  I
9  just don't recall.

Page 60

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430



Page 130

1  Q.   And the answer was, down on
2  page 42, line 7, "Okay.  Well, I think
3  most -- I think most people -- well,
4  let's -- okay.  So let me think.  So I
5  think there would have been -- I think on
6  balance people would not have been
7  motivated to try that."
8       Do you see that?
9  A.   Yes, I do.

[redacted]

22       He says, well, it's a short
23 term, maybe someone would have wanted to go
24 long term.  The same words -- almost the
25 same words as Dr. Fleischhacker was

Page 131

1  suggesting.  He says "For example, but if
2  the Fleischhacker paper had already come
3  out" -- he is talking about the timing, I
4  guess in terms of whether or not it is out
5  or not -- he goes on to say "then they" --
6  "they" being the skilled artisan -- "might
7  have been dissuaded by the fact that the
8  Fleischhacker paper did not report a
9  beneficial effort in Alzheimer's disease
10 benefits" -- "might," he doesn't say they
11 definitely would have been dissuaded --
12 then he goes on to say "although you
13 specified long term," and then he says "the
14 Fleischhacker was short term."
15       You know, so he then goes on to
16 say that "A skilled artisan might have
17 said, well, you know, maybe this is just
18 too short a time to treat."

[redacted]
r.

Page 132

1  Q.   Okay.  And at the end of his
2  answer on page 44 says "but there also
3  might be reasons to be encouraged to try,"
4  right?
5  A.   He goes back and forth.
6  Q.   Back and forth.
7  A.   In a very logical fashion, very
8  methodical fashion, and the net result is,
9  I think it is fair to say, he is just not
10 sure.
11 Q.   He is not sure.  So how can he
12 be sure that the claims are not enabled?
13 If it might make perfect sense to a person
14 of ordinary skill to try memantine in
15 patients with Alzheimer's disease, it is
16 inconsistent with his position that a
17 person reading the '703 patent wouldn't use
18 memantine for Alzheimer's disease?
19       MR. CHORUSH:  Objection.
20 A.   That's not the standard.
21 Q.   But that was his position,
22 wasn't it?
23 A.   That's not the standard for
24 enablement.  The standard for enablement is
25 that the skilled artisan, without question,

Page 133

1  would know how to use it, and he is saying
2  Fleischhacker goes both ways.
3       As a result of that, you would
4  question whether to use it, and you would
5  need additional data which was not found in
6  the specification to clarify or direct a
7  skilled artisan that it makes sense to use
8  it.
9  Q.   Okay.
10 A.   Fair enough?
11 Q.   I understand your position.
12 A.   Sounds good.

[redacted]

24 Q.   And enablement is a conclusion
25 of law, right?

34 (Pages 130 - 133)



Page 134

1  A.   As I understand it, yes.  But,
2 again, for clarity, we had two enablement
3 arguments.  One was the unproven
4 hypothesis, and the other one was did they
5 enable the full scope.
6  Q.   I got it.
7  A.   And I assume you are talking
8 about the unproven hypothesis approach that
9 we have articulated in this report, in my
10 report.
11  Q.   Well, all I've asked you so far
12 is just whether enablement is a conclusion
13 of law.
14  A.   Okay.
15  Q.   And your recollection is that
16 it is, right?
17  A.   Right.

Page 136

4  Q.   They are advising their clients
5 on the likelihood that a court will reach a
6 particular legal conclusion?
7  A.   No.  They are asking for my
8 opinion based upon my professional
9 judgment, what's the likelihood of success.
10  Q.   And success means which way the
11 Court comes out?
12  A.   That's fair.  That's fair.
13  Q.   And on enablement, it's a
14 question of law, so it is the likelihood of
15 success with regard to a particular legal
16 conclusion, right?
17  A.   Well, it's applying the law to
18 the facts and to the differences in the
19 facts between the two parties, and then the
20 additional secret sauce of my putting my
21 professional judgment into the mix to come
22 out with a percentage.
23  Q.   I understand.
24  A.   Which happens again and again
25 and again at major pharmaceutical

Page 137

1 organizations.





Page 158

3      Q.    The last sentence is "In fact,
4 one of ordinary skill in the art, in view
5 of the severe hallucinogenic and
6 memory-impairing side effects, would have
7 been dissuaded by the '703 patent from
8 administering memantine to patients
9 diagnosed with Alzheimer's disease."
10          Did I read that correctly?
11     A.    You did.

5      Q.    Do you agree with me?
6      A.    Yes.

Page 160

2      Q.    In terms of anything.  Do you
3 recall them giving inconsistent testimony?
4      A.    I can go through my report if
5 you would like, but I don't -- I don't
6 think you would prefer me to do that.
7      Q.    You are correct, yes.

Page 161

1          Have you ever served as a judge
2 at a trial?
3      A.    No.
4      Q.    Have you ever represented a
5 party in court at a trial?
6      A.    You mean in terms of presenting
7 arguments?
8      Q.    Yes.
9      A.    At a trial?
10     Q.    Yes.
11     A.    No.
12     Q.    How many trials have you
13 observed in your career?
14     A.    Ballpark, 15, 20, part-time and
15 full-time, depending upon the matter.
16     Q.    Meaning that for some of those
17 you may not have been present for the
18 entire trial?
19     A.    Correct.
20     Q.    And were all of those patent
21 trials?
22     A.    Yes.
23     Q.    And perhaps I asked you this
24 before, but maybe I didn't, how many patent
25 trials have you observed in the District of

41 (Pages 158 - 161)

Page 162

1 Delaware?
2     A.    You did ask that before and I
3 think my final answer was a few.
4     Q.    A few?
5     A.    A few.
6     Q.    I think before you said one or
7 two or three, does that sound like a few?
8     A.    Well, I would say one to
9 five --
10     Q.    One to five, okay.
11     A.    -- would be a few.
12     Q.    And just so my question was
13 clear, I did say observed, so you mean you
14 were present for those few trials?
15     A.    Correct.
16     Q.    Okay.  Fair to say that most of
17 Roche's patent cases were outside the
18 District of Delaware?
19     A.    During what time period?
20     Q.    During your time period at
21 Roche.
22     A.    I think that's fair to say.
23     Q.    Would it be fair to say that
24 most of them were in the District of New
25 Jersey?

Page 163

1     A.    I think that's fair to say too.
2     Q.    Can we quantify that at all in
3 terms of a percentage of cases that were
4 not in the District of Delaware?
5         MR. CHORUSH:  Objection.
6     A.    It is tough for me to do that
7 because we were all over the country, from
8 Texas to Northern California, Indianapolis,
9 to New Jersey, to Pennsylvania, to
10 Delaware, even down into Florida.  So it is
11 hard for me to do that.
12     Q.    I looked and I only found one
13 final decision in a Roche patent case from
14 a court in the District of Delaware.  Does
15 that sound about right to you?
16     A.    It's possible.  The reason I
17 say it's possible, because it is very
18 likely we had more than that but often we
19 were able to settle matters.
20         That was one of the approaches
21 that we at Roche liked to do, if at all
22 possible.  We were always open to
23 reasonable settlement terms.  So I can't
24 say that one is correct, if you take into
25 consideration settlements.

Page 164

1     Q.    Fair to say that you settled
2 most of the patent cases that you oversaw
3 in your time at Roche?
4     A.    In terms of either settling or
5 prevailing, yes.
6     Q.    What about settling versus any
7 disposition on the merits, win or lose, do
8 you think you settled more patent cases
9 than you went to a final decision on?
10     A.    I would say about 50/50.
11     Q.    50/50?
12     A.    Yeah.
13     Q.    Okay.
14     A.    Again, I'm guessing.  I don't
15 have any real statistics for that.  It is
16 just my recollection as I sit here today.
17     Q.    Okay.  Would you dispute that
18 Judge McKelvie knows patent trials in the
19 District of Delaware better than you do?
20     A.    At what time?
21     Q.    2010.
22     A.    Yeah, I don't know if I know
23 more than Dr. McKelvie -- Dr. McKelvie --
24 Judge McKelvie -- did we say Dr. before?
25     Q.    It is entirely possible.  I'm

Page 165

1 used to calling people Dr. in their
2 deposition.
3     A.    In any event, Judge McKelvie in
4 2010.  The reason I say that is he left the
5 bench in 2000, so there is a lot of
6 territory between 2000 and 2010.
7         So to be candid with you, I
8 don't know what his skill set and his
9 experience and his relationships to the
10 Delaware judiciary might be at 2010.
11     Q.    Okay.  Do you think you are
12 more qualified than Judge McKelvie to opine
13 on the likely outcome of the '703 patent
14 litigation were there a trial?
15     A.    Let me, if you don't mind, let
16 me rephrase that a little bit based on what
17 I was asked to do.
18         Going back to what I was asked
19 to do is to consider what a reasonable
20 patent attorney would do to come up with
21 some sort of a quantifiable number in terms
22 of overall likelihood of success, which
23 could be communicated to the client, either
24 of the two litigants, at the time of
25 settlement.  And I do think -- I know that

42 (Pages 162 - 165)

1 I would be more qualified than Judge
2 McKelvie because that's what I did at
3 Roche. That was one of the aspects that
4 was my job for 16 years.
5     Q.    You don't think Judge McKelvie
6 has extensive experience counseling clients
7 on the potential outcome of a pending
8 patent litigation?
9     A.    Well, let's see what he says.
10     Q.    I don't think we have marked
11 his report as an exhibit yet, so can you
12 answer that without looking at his report?
13     A.    If you want me to, but I prefer
14 to have the best information in front of
15 me.
16     Q.    Let's try for now to do it
17 without his report.
18     A.    Okay. And if you would be
19 gracious enough to repeat the question.
20     Q.    Sure. The question was you
21 don't think Judge McKelvie has extensive
22 experience counseling clients on the
23 potential outcome of a pending patent
24 litigation?
25     A.    Well, I understand he worked at

1 Covington & Burling for a number of years.
2 I don't know specifically how many clients
3 he was involved with at that time as
4 related to patent litigations. I don't
5 know if his clients asked him to opine on
6 those type of things. Normally those
7 questions are handled by inside counsel.
8 They are the type of questions that a chief
9 patent counsel would be required to provide
10 information to senior management.
11     Q.    Okay.
12     A.    So I guess the answer is no, I
13 think I would be better qualified with
14 regard to that specific issue.
15     Q.    Okay. Can you remind me, sir,
16 of your undergraduate degree?
17     A.    Yeah. I received a bachelor of
18 engineering, concentration in chemical
19 engineering, from Stevens Institute of
20 Technology in Hoboken.
21     Q.    Do you think your technical
22 background in terms of your undergraduate
23 degree makes you better suited than Judge
24 McKelvie to opine on the issues in this
25 case?

1     A.    And "these issues," we are
2 talking about likelihood of success, just
3 to make sure we're on the same page?
4     Q.    Yes.
5     A.    I do, in conjunction with my
6 experience of 36 years at Hoffmann-LaRoche
7 interfacing on a regular basis with the
8 scientists, yes. My understanding is, and,
9 again, without looking at the report, that
10 Judge McKelvie has no scientific background
11 whatsoever.
12     Q.    And the judge who would have
13 decided the '703 patent case did not have a
14 technical background either, did he?
15     A.    Judge Sleet?
16     Q.    Yes.
17     A.    I don't know. I just don't
18 know.
19     Q.    Judges who decide patent cases
20 in the United States do not of necessity
21 have technical backgrounds, do they?
22     A.    At the District Court level?
23     Q.    Yes.
24     A.    I think it's fair to say that
25 the vast majority do not have technical

1 expertise. They might have some. I
2 haven't done a survey. I'm shooting from
3 the hip. But I think it's fair to say at
4 least the majority have other than
5 technical backgrounds.
6     Q.    Would you be surprised to learn
7 that Judge Sleet didn't have any scientific
8 training?
9     A.    No, I wouldn't be surprised.
10     Q.    Do you think your undergraduate
11 degree in engineering would make you better
12 suited to understanding what the judge
13 would have decided at trial?
14         MR. CHORUSH: Objection.
15     A.    Well, two things. One, it is a
16 chemical engineering degree, and we are
17 talking about --
18     Q.    I'm sorry, I didn't mean to
19 misstate it.
20     A.    Oh, that's okay. I didn't take
21 offense. Chemical engineering, which is
22 not inconsistent with what the broad
23 technology, broad technology, of this
24 patent, it is chemistry.
25         Moreover, with my experience,

43 (Pages 166 - 169)

Page 170

as I mentioned before, interfacing on a very regular basis with the Ph.D. and post-docs at Hoffmann-LaRoche I think I would have developed -- I have developed a reasonable understanding.

Let me make clear, I do not consider myself as a technical expert, particularly in this matter. I said that in my report and I just want to rephrase it. But I think I would have more understanding of the technology than Judge McKelvie.

By the way, if I might, just for the record, state I say "Judge McKelvie" out of respect for his former position as a judge. He is no longer a judge. We could say "Mr. McKelvie," but, again, out of my respect for his former position, that's why I say Judge.

Q. I do the same.

A. Fair enough.

Q. Okay. So you said you think you would have more of an understanding of the technology than Judge McKelvie. You would say the same for Judge Sleet if we

Page 171

assume he doesn't have a technical background, correct?

A. Well, the reason I hesitate, is because my job is different than Judge Sleet's job. He has to make a decision, an actual decision. All I have to do is -- all, it is not so all -- what my goal was, what I was asked to do, again, is what would a reasonable patent attorney perceive as the ultimate likelihood. I don't have to say exactly what that is. I have to give percentages. The judge has to actually make the ultimate decision. So it's a different role.

So I think that the skill set that Judge Sleet has would be different than the skill set that I have, and I think with the question that was asked of me I would respectfully suggest I have better qualifications.

Q. Okay. Now, you mentioned a few moments ago that -- well, you touched on, I think, your lack of technical expertise; is that fair?

A. I don't think I said that. I

Page 172

said --

Q. Then let me just ask the questions then and hopefully I will make it clear.

Do you consider yourself a technical expert in the field of the '703 patent?

A. No.

Q. And you're not a person of ordinary skill in the art to which the '703 patent pertains?

A. That is correct, and it's noted in my report.

Q. And you've read the expert reports submitted in connection with the '703 patent litigation, correct?

A. I have.

Q. And you did not have the scientific expertise that those experts possessed, correct?

A. I think that's fair to say.

Q. Nor do I.

So you agree, Mr. Johnston, that you do not have the specialized technical expertise required to opine on

Page 173

whether the use of Mylan's product infringes the claims of the '703 patent?

A. Just for clarity, I'm not a technical expert and I wouldn't have the expertise as a technical expert to make that determination.

Q. I'm going to ask you a couple of similar questions though.

A. Sure.

Q. Would you agree with me that you did not have the specialized technical expertise required to opine on what a person of ordinary skill in the art understood about memantine in 1989?

A. Let me just clarify. Again, it goes back to why I was there, not to be a technical expert, but review the evidence established by the technical experts and make a determination of what a reasonable patent attorney would do.

Now, probably you are going to ask me similar questions, so instead of me repeating that each time, if you do ask me similar questions, please consider that that's the thrust, that I had a different

1 role than that of the technical experts. I
2 had a very focused role in terms of what a
3 reasonable patent attorney, often
4 considered, say, a chief patent counsel,
5 because we did it all the time, would have
6 perceived as the likelihood of success at
7 the time of settlement.



13    Q.    And you would agree with me
14 that if the '703 patent litigation had gone
15 to trial it would have been technical
16 experts that testified on the issues of
17 infringement, correct?
18    A.    Yes, technical experts would be
19 the ones who presented the evidence to
20 Judge Sleet to make a determination on.
21    Q.    The same with validity,
22 correct?
23    A.    Yes.
24    Q.    And your expertise, sir, is
25 patent law; is that correct?

1       MR. CHORUSH:  Objection.
2    A.    Patent law -- I've got to slow
3 down -- patent law, licensing, my expertise
4 based upon being a chief patent counsel for
5 16 years at a major pharmaceutical
6 organization whereby on a regular basis we
7 would do these interpretations of
8 likelihood of success, I should say
9 perceived likelihood of success.  We would
10 do the handicapping.
11    Q.    Sure.  You're not an economist,
12 correct?
13    A.    No.
14    Q.    You don't have any degrees in
15 economics that I'm not aware of?
16    A.    No, sir.
17    Q.    You don't have any expertise in
18 economic modeling?
19    A.    No, I do not.
20    Q.    You don't consider yourself
21 qualified to testify as an expert regarding
22 economics, do you?
23    A.    You are correct.
24    Q.    And just to, because I have it
25 written here, you didn't do any economic

1 modeling in this case, did you?
2    A.    Absolutely not.  That was not
3 what I was asked to do.
4    Q.    I understand.  Do you plan to
5 testify at trial in this case?
6    A.    I will testify at trial if
7 asked to do so.
8    Q.    And if you are asked to do so,
9 do you plan to testify about patent law?
10    A.    Well, what I plan to testify
11 would be, number one, what I'm asked to do
12 in terms of at that time, and, number two,
13 is I believe it would have to be consistent
14 with what's in my briefs, I should say my
15 report, the opening report and the reply
16 report.
17       So that means I would be
18 testifying on three or four items, the
19 likelihood of success, the timing, the
20 cost, and I'm sure I'm forgetting one, but
21 I think you got the drift.  It is all
22 identified in the report.
23    Q.    You discuss the patent laws
24 throughout your report, it's fair to say,
25 isn't it?

1    A.    I do.
2    Q.    And you included as Exhibit M
3 to your report a 20-page summary of the
4 patent laws; is that correct?
5    A.    I did.
6    Q.    Feel free to take a look if you
7 need to.
8    A.    I did.
9    Q.    And I presume you included that
10 summary as Exhibit M so you could testify,
11 if needed, about those aspects of patent
12 law at trial?
13       MR. CHORUSH:  Objection.
14    A.    Well, the reason that I
15 included it was that I thought it would be
16 helpful to have it as a reference during my
17 deposition.
18    Q.    Okay.  And here we are.
19    A.    And here we are, and we've used
20 it.
21    Q.    We have.  So thank you for
22 that.  Can you take your report out,
23 Exhibit 1.
24    A.    Sure.
25    Q.    I would like to go through a



Page 178

1 few sections of your report, so let's just
2 dive in and my hope is that we can keep
3 this relatively quick.

19      Q.      And that would include the
20 Schering case, correct?
21      A.      Let's see.  Yes, and it looks
22 like I cite it for the proposition that a
23 claim is invalid for anticipation if a
24 single prior art reference discloses each
25 and every limitation of the claimed

Page 179

1 invention.
2      Q.      And then you cite on the next
3 page the Verve case as well?
4      A.      I do.
5      Q.      And then you also cite the
6 Sanofi v. Apotex case there still in
7 paragraph 125, right?
8      A.      I do.
9      Q.      And then you also have -- you
10 have a footnote -- strike that.
11      A.      Okay.
12      Q.      Paragraph 126, citing a few
13 additional cases, correct?
14      A.      Well, let's see what it says.
15          That is correct.  It looks like
16 I am citing certain cases for the
17 proposition that the standard for
18 anticipation and the standard for
19 enablement are a bit different.
20      Q.      Well, what you said in your
21 first sentence is a patent claim, however,
22 cannot be anticipated by a prior art
23 reference if the allegedly anticipatory
24 disclosures cited as prior art are not
25 enabled?

Page 180

1      A.      Correct.
2      Q.      And then at the end of
3 paragraph 126 you have a footnote?
4      A.      Yes.
5      Q.      Footnote 57.
6      A.      I do.
7      Q.      And there you cite six
8 additional cases?
9      A.      Correct.  And I'm just -- well,
10 yes.  Let me just answer your question.
11      Q.      Thank you.  Let's turn to page
12 39.  Let me point you to paragraph 153.
13      A.      Okay.
14      Q.      You are citing several cases in
15 that paragraph for this genus species
16 argument that we talked about at length
17 today I think; is that right?
18      A.      Let me take a look, please.
19      Q.      Okay.
20          (Witness perusing document.)
21      A.      Yes, sir.  And what is the
22 question, please?
23      Q.      The question was simply that
24 the cases in that paragraph, you are citing
25 them for this genus species argument that

Page 181

1 we have been talking about today?
2      A.      Broadly speaking, based upon
3 all of the testimony I have given today
4 regarding genus species, yes.

Page 182



Page 184

4   Q.   And you are also citing in your
5   paragraph 153 this Perricone v. Medicis
6   case.  Do you see that?
7   A.   I do.

23   Q.   I understand that's your
24   position.  Just to wrap it up, you are
25   citing the Bristol-Myers Squibb versus Ben

Page 185

1   Venue Labs in paragraph 153?
2   A.   I am.

9   Q.   And you are citing the Atofina
10   v. Great Lakes case there?
11   A.   It is cited.

15   Q.   You are also citing the Gleave
16   case in your paragraph 153, correct?
17   A.   I do.

you

19   cite a few cases on the law of obviousness,
20   that's right?
21   A.   I do.

21   Q.   And you note that Gleave is
22   quoting Eli Lilly v. Zenith Goldline there,
23   right?
24   A.   Correct.

47 (Pages 182 - 185)



Page 210

1    A.    Yes, I do.

[text redacted]

[redacted] you are citing a Boston Scientific
8  case; is that right?
9    A.    I see Boston Scientific, yes.
10    Q.    And you are citing it for the
11  proposition that a hypothesis can be
12  insufficient to prove infringement?
13    A.    Yes.

Page 213

1         We have been going through your
2  report for a little while now.  Fair to say
3  that you explain the law throughout your
4  report?
5    A.    Well, there I go with my yes
6  and no again.  You are right, but I
7  respectfully suggest you can't look at that
8  in a vacuum.  It is part of the analysis
9  that I had to do.  It is part of the
10  analysis that I would need to do to come up
11  with a percentage.
12         You take a look at the law, the
13  various differences in the approaches that
14  are being considered by both parties, you
15  take a look at the facts, what's the
16  difference.  You apply the law and the
17  facts and then you put that, as I say, my
18  expertise over the years or my professional
19  judgment as to how to handicap it, and
20  that's exactly what I did.
21         In no way was I intending to be
22  the judge.  The judge is the one that
23  actually comes up with what the law is.  I
24  was not opining on the law.  I was not
25  being the judge.  The judge makes that

54 (Pages 210 - 213)

Page 214

1 determination. I had to do an analysis for
2 purposes of answering the question of which
3 I was asked, that of a reasonable patent
4 attorney, because a reasonable patent
5 attorney would have done that.
6     Q.    And part of that analysis was
7 ascertaining what the law was and applying
8 that law to the facts?
9     A.    Part of that analysis, yes,
10 part of that methodology.
11    Q.    And you did that for each of
12 the parties' claims and defenses that you
13 addressed?
14    A.    That is correct.
15    Q.    Fair to say that your opinions
16 rely upon the law as you set it forth in
17 your report?
18    A.    Well, I don't know if I used
19 the word "rely." That is probably fine.
20 But I would say my opinions require as a
21 component to establish that opinion a
22 review of the law as I see it, as I call
23 it.
24    Q.    What if we took all of that law
25 out of your report, all these paragraphs

Page 215

1 that we just went through where you are
2 citing case law, we removed all that from
3 your report, what would be left?
4     A.    The facts.
5     Q.    Would your analysis still make
6 sense if we removed all the law?
7     A.    Well, I think so, and I think
8 so because the facts -- I then apply the
9 law to the facts in the various paragraphs
10 outside of the paragraphs which you just
11 identified. So I think it would make
12 sense, but I think it would be very hard to
13 understand.
14    Q.    Fair to say that the portions
15 of your report that we just went through
16 oftentimes read like a legal brief?
17        MR. CHORUSH:  Objection.
18    A.    Well, let me phrase it this
19 way: Legal briefs have law. One of the
20 components which I needed to consider was
21 the law, and I did so in these paragraphs.
22 This was not a legal brief. This was not
23 intended to be a legal brief. It is a
24 report based upon what I was asked to do.
25    Q.    So you wouldn't agree with me

Page 216

1 that portions of your report do in fact
2 read like a legal brief?
3     A.    Well, again, I'm not sure what
4 you mean by reading like a legal brief.
5 You might have a different interpretation
6 than I do.
7     Q.    I mean, a brief submitted to a
8 court arguing a particular legal issue.
9     A.    If you are suggesting that
10 those type of documents have a legal
11 section or refer to the law, I would agree
12 to you.
13        But that was not my goal to put
14 together a legal brief, because if I put
15 together a legal brief, it wouldn't read
16 like this, it would read very differently.
17    Q.    But you did set forth the law
18 and apply the law to the facts, correct?
19    A.    That, among other things, yes,
20 as part of my methodology.
21    Q.    I understand. And you are
22 familiar with the law of obviousness I
23 assume?
24    A.    Yes.
25    Q.    I'm sure that you are.

Page 217

1     A.    Yes.
2     Q.    Now, obviousness is a legal
3 conclusion, correct, based on underlying
4 findings of fact?
5     A.    That's my understanding.
6     Q.    You give opinions here on the
7 likelihood that Mylan would have prevailed
8 on obviousness, correct, from the
9 perspective of a reasonable and competent
10 patent attorney?
11    A.    From the perspective of a
12 reasonable and competent patent attorney,
13 that person's perception so they could
14 advise their client at the time of
15 settlement, yes.
16    Q.    Understood. And we've been
17 over this already, but enablement is also a
18 legal conclusion as well, right?
19    A.    I would agree with you.
20    Q.    And, likewise, you opine in
21 your report as to the likelihood that Mylan
22 would have prevailed on enablement from the
23 perspective of a reasonable and competent
24 patent attorney?
25    A.    At the time of settlement and

55 (Pages 214 - 217)

1 all that good stuff, yes.  But, again, just
2 for clarity, I think it is worth repeating,
3 in no way was I attempting to usurp the
4 power and the responsibilities of either
5 Judge Sleet or any other judge.  They have
6 the responsibility of making the actual
7 determination on the law.
8        I'm simply handicapping it at
9 this particular time, providing my best
10 understanding of the law, providing the
11 facts as I see it based upon the evidence,
12 putting into that what I have learned over
13 the years in terms of professional judgment
14 and then making an assessment for
15 management at the time of settlement so
16 they can figure out is it worth settling
17 and for how much.
18    Q.   I understand.  I'm going to ask
19 a few questions here at the risk of making
20 Mr. Chorush blush a little bit.
21        Your counsel, Mr. Chorush, he
22 is an experienced patent lawyer, isn't he?
23    A.   I think that's fair to say.
24    Q.   He has been practicing patent
25 law for quite some time?

1    A.   I think that's fair to say.
2        MR. CHORUSH:  You are aging me.
3 I'm objecting.
4        MR. JOHNSON:  How long, 15
5 years maybe, something like that?
6        MR. CHORUSH:  I think a little
7 bit more than that.
8        MR. JOHNSON:  Okay.
9    Q.   And Mr. Chorush, he has
10 significant experience evaluating the
11 merits of patent issues, doesn't he?
12        MR. CHORUSH:  Objection.
13    A.   I don't know.  I just don't
14 know.
15    Q.   Okay.
16    A.   I just don't know.  I know that
17 in this case he has been an exceptionally
18 gifted patent attorney, but I just want to
19 make it clear that all the percentages were
20 done by me and me alone.  I did not rely on
21 anybody, including Mr. Chorush, to come up
22 with these percentages.
23        In fact, Mr. Chorush made it
24 crystal clear when --
25        MR. CHORUSH:  I'm sorry, I'm

1 going to interrupt you for a moment just
2 because I don't know what you were about to
3 say, but whatever it was it was a
4 discussion that we had.
5        THE WITNESS:  I'm sorry.  You
6 are right.
7        MR. CHORUSH:  And so please
8 don't get into conversations that we might
9 have had.
10        THE WITNESS:  Thank you for
11 doing that.
12    Q.   And you are going down a road
13 that I wasn't trying to send us down.
14    A.   Fair enough, thank you.
15    Q.   So I guess my question was,
16 based on Mr. Chorush's expertise as a
17 patent lawyer, you've got that in mind, you
18 would agree it wouldn't be appropriate for
19 him to take the witness stand in this case
20 and testify about Mylan's likelihood of
21 success on its various claims and defenses
22 in the '703 patent litigation?
23        MR. CHORUSH:  Objection.
24    A.   I agree, because I have more
25 expertise to answer the questions that have

1 been presented to me than Mr. Chorush.
2        Mr. Chorush might be the best
3 trial counsel in the United States, or
4 maybe the second best after you, but the
5 truth of the matter is there are few people
6 who have the expertise that I have other
7 than people who have held the role as chief
8 patent counsel, and I held that role for
9 many, many years.
10    Q.   And that expertise is advising
11 your clients on issues relating to patent
12 law?
13    A.   Well, in this case it is very
14 precise, handicapping this case so that
15 they could figure out how much it makes
16 sense to settle, what would be the
17 likelihood of success on each and every one
18 of these issues, and then together what
19 would be the overall success so that they
20 can determine whether or not it makes sense
21 to settle, consider settling, not settling,
22 put together budgets, or simply walking
23 away.
24    Q.   Fair to say that any
25 experienced patent lawyer could take a

Page 222

1 crack at that?
2    A.   Well, a lot of people can take
3 cracks at it.  It is a question of whether
4 or not it would be a considered a
5 reasonable patent attorney with the
6 expertise to do it.
7         Chief patent counsel,
8 particularly pharmaceutical chief patent
9 counsel, with a number of years of
10 experience, yes, I would suggest, because
11 we all do it.  It is part of what our job
12 is.  It is what we do.  It is what we are
13 supposed to do as a chief patent counsel at
14 a pharmaceutical house.
15    Q.   Understood.  Do you plan to
16 testify at trial about patent prosecution
17 procedures?
18    A.   That's up to the litigators to
19 decide if they want me to discuss it.
20    Q.   Do you see any reason why that
21 would be relevant in this case?
22         MR. CHORUSH:  Objection.
23    A.   It is really not my call.  I
24 would be prepared to discuss it because
25 it's in my brief and my attachments, the

Page 223

1 exhibits, but I'm just not sure that's
2 what's going to be required of me.
3         All I know is they have those
4 three or four items which I have asked to
5 opine on specifically, and I'm assuming
6 that's what I would be doing.
7    Q.   Have you ever worked in the
8 Patent Office?
9    A.   No.
10    Q.   Are you qualified to testify as
11 an expert regarding Patent Office practice
12 and procedure?
13         MR. CHORUSH:  Objection.
14    A.   I have testified in depositions
15 as an expert on patent practice and
16 procedures, yes.
17    Q.   You believe you are qualified
18 to do so?
19    A.   I do, from being a registered
20 patent attorney who has prosecuted many
21 patent applications over the years,
22 particularly in the pharmaceutical arena.
23    Q.   Now, let me ask you to take out
24 your reply report.
25    A.   Okey-dokey.  I have it in front

Page 224

1 of me now.
9    Q.   And in making that point you
10 are assuming that both the in-house counsel
11 and the trial counsel are reasonable patent
12 attorneys?
13    A.   Not as I've defined reasonable
14 patent attorneys.
15    Q.   Why is that?
16    A.   Well, because what I'm trying
17 to suggest is that a person with expertise
18 as chief patent counsel would be more
19 appropriate to answer the questions of
20 which I've been asked to answer, because
21 for the various reasons I mention in
22 paragraph 3, that trial counsel might be
23 great trial counsel, but they might from
24 time to time have a different approach to
25 the likelihood of success for the various

Page 225

1 reasons which I've identified.
2         This is not to be disrespectful
3 to trial counsel.  Trial counsel's opinion
4 would be at least one factor which I would
5 consider, but the buck would stop with me
6 in communicating to senior management.
7    Q.   But you would agree with me,
8 wouldn't you, that different patent
9 attorneys might have different views
10 regarding the merits of a particular patent
11 litigation?
12         MR. CHORUSH:  Objection.
13    A.   I would suggest that based upon
14 the question I've been asked to answer and
15 the fact that I need to put in my mind that
16 of a reasonable patent attorney, there
17 might be differences, but in all likelihood
18 they would be pretty darn close to what I
19 came up with, because my methodology has
20 been something which I've used for many
21 years as chief patent counsel.
22         I know my colleagues who are
23 chief patent counsels use the same
24 methodology because they get the same
25 questions from their senior management, are

Page 226

1 we going to win, what's the percentages,
2 why are we going to win, what is the
3 downside, things of that nature, all of
4 which gets wrapped up into the likelihood
5 of success.
6         I have been involved with other
7 chief patent counsel through my
8 professional experiences on the ACPC, the
9 Association of Corporate Patent Counsel --
10 Chief Patent Counsels, excuse me,
11 Association of Chief Patent Counsels, which
12 I have been a member of for many, many
13 years, and we have programs twice a year
14 where we actually sit and we talk about
15 issues that we all face, how we run our
16 departments, how we provide -- how we
17 resolve issues, whether it be employment
18 issues, issues with management, how we
19 address things of that nature, and also
20 this is a process for networking, and this
21 gives me the opportunity, if I have a
22 concern as to how to approach something, I
23 would have the -- I would know who to call.
24         And that happens on a regular
25 basis. We know each other, and our

Page 227

1 approaches I found over the many years with
2 regard to these handicapping matters are
3 very, very similar.
4    Q.    So you think any reasonable and
5 competent in-house patent counsel would
6 have arrived at numbers very similar to
7 yours; is that your opinion?
8    A.    I do.
9    Q.    Does it make a difference
10 whether that reasonable and competent
11 in-house patent counsel works for a branded
12 company or a generic company?
13   A.    It shouldn't.
14   Q.    But does it?
15   A.    It could, but it shouldn't.
16 And when I did mine, I made sure that that
17 bias was eliminated.





Page 228



6         You said you tried to eliminate
7 the potential bias inherent in this issue
8 by taking a very conservative estimate.
9    A.    Yes.

4    Q.    And if you had been less
5 conservative, it's possible you would have
6 come up with a higher percentage?
7         MR. CHORUSH:  Objection.
8    A.    It's possible, but, again, I
9 approached the report from being
10 conservative, so that right now I cannot
11 tell you if it would be, in your words,
12 significantly higher or not, a little
13 higher, or around the same, but I think
14 it's fair to say that if I wasn't
15 conservative, it would be higher, and
16 that's why I said greater than 60 percent.
17   Q.    Can you tell me how much
18 higher?
19   A.    It is hard to say.
20   Q.    5 percent?
21        MR. CHORUSH:  Objection.
22   A.    Well, again, you are asking me
23 to shoot from the hip, and I would prefer
24 not to do that.
25        My percentages took a long time

58 (Pages 226 - 229)

1 to figure out in my mind, and to make sure
2 that everything seemed appropriate, such
3 as, you know, taking into consideration the
4 statistical numbers, which I also took into
5 consideration as a factor, so that I think
6 at this stage for me to try to peg a number
7 on how much higher would be problematic.
8        I would tell you this, I have
9 never heard of a chief patent counsel in
10 either direction giving more than a 70 or
11 75 percent.  It is just not done because
12 there are so many uncertainties.  And what
13 I tried to do is be fair and reasonable as
14 a reasonable and a competent patent
15 attorney, hopefully, would do in making
16 this analysis.



24     Q.     And so you took a conservative
25 approach?

1     A.     You got it.
2     Q.     Okay.  You said you never heard
3 of a chief patent counsel in either
4 direction giving more than a 70 or 75
5 percent chance of success?
6     A.     Correct.
7     Q.     So that puts some boundaries on
8 the analysis, doesn't it?
9     A.     In a sense, pragmatic
10 boundaries, pragmatic boundaries.
11     Q.     I see.  So on one end you could
12 advise your client they have a 75 percent
13 chance of winning, right?
14     A.     Correct.
15     Q.     And on the other end they could
16 have a 75 percent chance of losing?
17     A.     I think that's appropriate.
18     Q.     So placing Mylan's case on that
19 spectrum, they are almost all the way at
20 one end, right?
21        MR. CHORUSH:  Objection.
22     Q.     You say a greater than 60
23 percent chance that Mylan would prevail.
24 That puts them right up at the boundary at
25 the highest possible chance of success,

1 agreed?
2        MR. CHORUSH:  Objection.
3     A.     No, I would disagree.
4     Q.     Why not?
5     A.     Because there is a difference
6 between 50 and 55 and there is a difference
7 between 60, there is a difference between
8 60 and 65, all the way up to 75.  It is a
9 gradient and from 75 being as strong as
10 exceptionally strong to 50 being a toss-up,
11 and everything in between.
12     Q.     So there is a difference
13 between 60 and 65?
14     A.     Yes.
15     Q.     Pretty significant difference,
16 no?
17     A.     Well, again, I don't know if I
18 would use the word "significant," but I
19 would say there's a difference.
20     Q.     A meaningful difference?
21     A.     "Meaningful" is a better word,
22 thank you.
23     Q.     I brought up this specter of
24 in-house counsel for the generics having a
25 different perspective from in-house counsel

1 for branded companies, right?
2     A.     Correct.
3     Q.     And you were in-house counsel
4 for a branded company?
5     A.     Correct.
6     Q.     You negotiated, I presume, many
7 settlements with generic companies over the
8 course of your time at Roche; is that
9 right?
10     A.     That's very fair to say.
11     Q.     And in your experience, is it
12 also fair to say that in-house counsel for
13 those generics often had a different
14 perception of the merits of their case than
15 you did?
16        MR. CHORUSH:  Objection.
17     A.     Well, I think it's fair to say
18 that at the beginning of negotiations, if
19 we put on the table our percentages, which
20 happened from time to time, there would be
21 a difference of opinion, as you would
22 expect at the beginning of a settlement
23 discussion.
24        But as things got closer
25 because the numbers got closer, then I

Page 234

1  think you would find that we all reached a
2  happy middle someplace.
3      Q.   And in this case, that happy
4  middle was three months before the
5  expiration of the '703 patent, right?
6          MR. CHORUSH:  Objection.
7      A.   Well, I wouldn't characterize
8  it as a happy middle based upon my
9  percentages.
10     Q.   Why not?
11     A.   Well, going with what Judge
12  McKelvie said in his report, he somehow at
13  least gave the impression that there was a
14  95 percent chance of success, because he
15  basically said let's take a look at the
16  time that was left on the patent, and
17  basically Forest retained 95 percent of
18  that time period and the generics retained
19  5 percent of that time period.
20         That doesn't seem to be a happy
21  middle in view of what I handicapped the
22  cases to be.  It seems like there had to be
23  something more that the generics were
24  receiving, if they weren't receiving that
25  time.

Page 235

1      Q.   And what do you know about
2  whether the generics received something
3  more, what facts do you know?
4      A.   I don't know very many facts.
5  Very limited facts.  I know there is
6  something more.  I have a general
7  understanding around the amounts, but
8  nothing more.



22     Q.   And that was compensation for
23  litigation expenses, right?
24         MR. CHORUSH:  Objection.
25     A.   That's the way it was couched.

Page 236

1  Whether it was or wasn't, I don't know.
2  That was not part of my analysis.
3      Q.   Do you have any recollection of
4  what those numbers were?
5      A.   I don't, without looking at the
6  document.
7      Q.   Do you have a recollection that
8  they were fairly modest sums?
9      A.   I have no idea, because I
10  wasn't focused on their numbers.  That, to
11  me, was not relevant to my analysis.
12     Q.   So let me see if I understand
13  you.
14         You would agree with me that a
15  number of generic companies reached
16  settlements with Forest relatively soon
17  after the claim construction decision,
18  right?
19     A.   Well, yes, in that, in the
20  sense of that, it was a time that not only
21  did they reach settlement, but it was a
22  time right -- it was generally after the
23  time of the claim construction.  Where I
24  would pause on is I don't know if there is
25  a correlation between the two.

Page 237

1      Q.   No, I understand.  I'm just
2  trying to get the timing down.
3      A.   Fair enough.

21     Q.   And is it your understanding
22  that all those generic defendants that
23  settled out sometime around the claim
24  construction decision, is it your
25  understanding that they agreed on an entry

60 (Pages 234 - 237)

Page 310

1    Q.    Do you think that number, that
2 percentage, is truly valuable for
3 management?
4    A.    Absolutely.  They utilize that
5 for many reasons, as I identify in my
6 report, some of it is budgetary reasons and
7 other reasons, too.  They somehow take that
8 number and attempt to quantify it in terms
9 of the amount of sales that they will
10 obtain after the patent is adjudicated, for
11 example.
12         MR. JOHNSON:  No further
13 questions from me at this time.  We can go
14 off the record.
15         MR. CHORUSH:  Why don't we go
16 off the record for just a couple of
17 minutes.
18         THE VIDEOGRAPHER:  We will be
19 going off the record at 4:59 p.m.  This
20 marks the end of media 4A.
21         (Recess taken.)
22         THE VIDEOGRAPHER:  We are back
23 on the record at 5:02 p.m.  This marks the
24 beginning of media 4B.  Go ahead, Counsel.
25         MR. CHORUSH:  No questions for

Page 311

1 me.  Thank you for your time today.
2         MR. JOHNSON:  Thank you for
3 your time, Mr. Johnston.
4         THE WITNESS:  Thank you both.
5         THE VIDEOGRAPHER:  We are going
6 off the record at 5:02 p.m., and this
7 concludes today's testimony given by George
8 W. Johnston, Jr.  The total number of media
9 units used was eight and will be retained
10 by Veritext.
11
12         [TIME NOTED:  5:02 p.m.]
13    _____
14         GEORGE W. JOHNSTON, JR.
15
16 Subscribed and sworn to before me
17 this _____ day of _____, 2017.
18
19 _____
20    NOTARY PUBLIC
21
22
23
24
25

Page 312

1     I N D E X
2
WITNESS   EXAMINATION BY    PAGE
3 JOHNSTON   JOHNSON          4
4
5     E X H I B I T S
JOHNSTON  DESCRIPTION     PAGE
6 Exhibit 1  Expert Report of    7
     Johnston
7 Exhibit 2  Reply Expert Report   8
     of Johnston
8 Exhibit 3  Joint Pretrial Order    9
Exhibit 4  Deposition transcript of  55
9     David A. Greenberg
Exhibit 5  Expert Report of Paul   66
10    Spencer Fishman
Exhibit 6  Deposition transcript of  70
11    Paul Spencer Fishman
Exhibit 7  Deposition transcript of  91
12    Jerry Joseph Buccafusco
Exhibit 8  Supplemental Expert   262
13    Report of Malinow
Exhibit 9  Deposition transcript of  267
14    Olney
Exhibit 10 Report and        279
15    Recommendation
     Regarding Claim
16    Construction
Exhibit 11 Memorandum in Forest  284
17    v. Cobalt
Exhibit 12 Expert Report of Doody  285
18 Exhibit 13 Excerpt from The Merck  295
     Index
19
20 DIRECTIONS NOT TO ANSWER
21 Page   Line
     (NONE)
22
23 REQUESTS
24 Page   Line
     (NONE)
25

Page 313

1         CERTIFICATION
2
3    I, TODD DeSIMONE, a Notary Public
4 and within the State of New York, do hereby
5 certify:
6    That the witness whose testimony as
7 herein set forth, was duly sworn by me; and
8 that the within transcript is a true record
9 of the testimony given by said witness.
10    I further certify that I am not related
11 to any of the parties to this action by
12 blood or marriage, and that I am in no way
13 interested in the outcome of this matter.
14    IN WITNESS WHEREOF, I have hereunto set
15 my hand this 27th day of October, 2017.
16
17
18    TODD DESIMONE
19
20
21
22
23
24
25

79 (Pages 310 - 313)