# Exhibit 10

Page 1

1       UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF NEW YORK
3  --------------------------------:
   IN RE NAMENDA DIRECT PURCHASER  :
4                                  :No. 15-cv-7488-CM-JCF
   ANTITRUST LITIGATION            :
5  --------------------------------:
6                        Washington, D.C.
7                 Wednesday, October 18, 2017
8                    ***CONFIDENTIAL***
9  Videotaped Deposition of:
10                  RODERICK McKELVIE,
11 called for oral examination by counsel for
12 Plaintiff, pursuant to notice, at the office of
13 White & Case, LLP, 701 13th Street, N.W., before
14 SUSAN L. CIMINELLI, CRR, RPR, of Veritext Legal
15 Solutions, a Notary Public in and for the District
16 of Columbia, beginning at 9:06 a.m., when were
17 present on behalf of the respective parties:
18
19
20
21
22

Page 2

```
 1        A P P E A R A N C E S
 2  On behalf of Plaintiff:
 3     RUSSELL A. CHORUSH, ESQUIRE
        Heim, Payne & Chorush, LLP
 4      Heritage Plaza
        1111 Bagby
 5      Suite 2100
        Houston, Texas  77002
 6      (713) 221-2000
        rchorush@hpllp.com
 7
    On behalf of Defendants:
 8
        RYAN P. JOHNSON, ESQUIRE
 9      White & Case, LLP
        1221 Avenue of the Americas
10      New York, New York  10020-1095
        (212) 819-8893
11      rjohnson@whitecase.com
12      -and-
13      ERICA R. SUTTER, ESQUIRE
        White & Case, LLP
14      3000 El Camino Real
        Five Palo Alto Square
15      9th Floor
        Palo Alto, California  94306-2109
16      (650) 213-0338
        erica.sutter@whitecase.com
17
   ALSO PRESENT:
18
        PATRICK GRAHAM, Video Technician
19
              * * * * *
20
21
22
```

Page 4

```
 1  McKELVIE DEPOSITION EXHIBITS:              PAGE
 2  Exhibit 13  LexisNexis CFMT, Inc.          209
 3  Exhibit 14  LexisNexis Manchack 98-1530    215
 4  Exhibit 15  LexisNexis The Johns Hopkins
 5              University v. CellPro          217
 6  Exhibit 16  Order AbbVie No. 14-5151       220
 7  Exhibit 17  Memorandum FTC v. AbbVie       222
 8  Exhibit 18  FTC v. AbbVie Memorandum in Support of
 9              Plaintiff                      223
10  Exhibit 19  LexisNexis Merck Sharp & Dohme 227
11  Exhibit 20  LexisNexis In re Copaxone Consolidated  230
12  Exhibit 21  LexisNexis Aventis Pharma v. Hospira   232
13  Exhibit 22  LexisNexis Santarus v. Par     234
14  Exhibit 23  LexisNexis AbbVie v. Hospira   236
15  Exhibit 24  LexisNexis Tris Pharma, Inc. v. Actavis  238
16  Exhibit 25  LexisNexis Allergan v. Watson  239
17  Exhibit 26  LexisNexis Pliva v. Gladys Mensing  245
18
19  (Exhibits attached to transcript.)
20
21
22
```

Page 3

```
 1           C O N T E N T S
 2  RODERICK McKELVIE
 3  EXAMINATION BY:                            PAGE
 4    Counsel for Plaintiff                    6
 5
 6
 7  McKELVIE DEPOSITION EXHIBITS:              PAGE
 8  Exhibit 1   Expert Report of Roderick McKelvie   7
 9  Exhibit 2   AIPLA Quarterly Journal v.34 2006    70
10  Exhibit 3   Generic Drug Entry Prior to Patent
11              Expiration FTC Study July 2002       74
12  Exhibit 4   Lemley article Fall 2010             79
13  Exhibit 5   The Fractioning of Patent Law/Lemley 82
14  Exhibit 6   RBC Capital Markets January 15, 2010 88
15  Exhibit 7   AndroGel Transcript McKelvie 4/19/17 89
16  Exhibit 8   Mylan's Defenses in the Namenda Patent
17              Litigation                           121
18  Exhibit 9   FRX-AT-03882414-2420
19              Forest-Mylan Meeting 2/11/10         148
20  Exhibit 10  U.S. Patent 5,061,703                197
21  Exhibit 11  LexisNexis EMI Group                 213
22  Exhibit 12  LexisNexis Manchak                   215
```

Page 5

```
 1            P R O C E E D I N G S
 2        VIDEO TECHNICIAN:  Good morning.  We are
 3  going on the record at 9:06, on October 18th, 2017.
 4  This is the video recorded deposition of Roderick
 5  McKelvie, in the matter In Re Namenda Direct
 6  Purchaser Antitrust Litigation, filed in the United
 7  States District Court, Southern District of New
 8  York.
 9        This deposition is being held at White &
10  Case, located at 701 13th Street, Northwest,
11  Washington D.C., 20005.  My name is Patrick Graham
12  from the firm Veritext, and I'm the videographer.
13  The court reporter is Sue Ciminelli from Veritext.
14  Will counsel please introduce themselves beginning
15  with the party noticing this proceeding.
16        MR. CHORUSH:  This is Russell Chorush of
17  the law firm of Heim, Payne & Chorush, on behalf of
18  the plaintiffs.
19        MR. JOHNSON:  Ryan Johnson from White &
20  Case on behalf of defendants and the witness.  And
21  with me is my colleague, Erica Sutter.
22        VIDEO TECHNICIAN:  Will the court
```

Page 6

1  reporter please swear in the witness?
2  Whereupon,
3         RODERICK McKELVIE,
4  was called as a witness by counsel for Plaintiff,
5  and having been duly sworn, was examined and
6  testified as follows:
7       EXAMINATION BY COUNSEL FOR PLAINTIFF
8  BY MR. CHORUSH:
9   Q.   Good morning.  Please state your full
10 name?
11  A.   Roderick Radcliff McKelvie.
12  ▪   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
    ▪ ▪ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
    ▬▬▬▬▬▬▬▬
15  Q.   Do you understand that your testimony
16 today is being given under oath?
17  A.   Yes.
18  Q.   Do you understand that the oath that
19 you've taken today at this deposition is just as
20 solemn as the oath that you would take if testifying
21 at trial?
22  A.   I do.

Page 7

1   Q.   Do you understand that your testimony can
2  be used at trial?
3   A.   I assume so.
4   Q.   Is there any reason why you cannot --
5  strike that.
6        Is there any reason that you cannot
7  testify fully and accurately today?
8   A.   Not that I know of.
9   Q.   I'll be happy to provide you breaks
10 throughout the course of the deposition.  I would
11 just request that you let me know a few minutes
12 ahead of time, so that I can wrap up the line of
13 questioning that I'm on.
14  A.   That's fine.
15  Q.   Thank you.
16       (McKelvie Exhibit No. 1 was
17        marked for identification.)
18 BY MR. CHORUSH:
19  Q.   I've placed in front of you the McKelvie
20 report marke8d as Exhibit 1 to this deposition.  Do
21 you see that?
22  A.   I do.

Page 8

1   Q.   Is Exhibit 1 a true and correct copy of
2  the expert report that you submitted in this case?
3   A.   It appears to be.
4        MR. JOHNSON:  Take your time if you need
5  to, to check things like that.
6        THE WITNESS:  It appears to have all the
7  pages.
8  BY MR. CHORUSH:
9   Q.   On page 39 is a signature.  Is that your
10 signature?
11  A.   It is.
12  Q.   I plan to refer to Exhibit 1 as your
13 report or the McKelvie report.  Is that acceptable
14 to you?
15  A.   That's fine.
16  Q.   Which attorneys for Forest have you
17 interacted with in connection with your work in this
18 matter?
19  A.   Erica and Ryan only.
20  Q.   You're referring to Erica Sutter, is that
21 correct?
22  A.   Correct.  Ryan Johnson.

Page 9

1   Q.   How much time have you spent preparing
2  your report and preparing to give your deposition
3  today?
4   A.   A little over 130 hours.
5   Q.   Who wrote your report?
6   A.   I wrote my first draft of the report, and
7  then I worked with counsel in improving it.
8   Q.   I will refer to Forest Laboratories, Inc.
9  as Forest.  Is that acceptable to you?
10  A.   Yes, that's fine.
11  Q.   I will refer to Mylan Pharmaceuticals,
12 Inc. as Mylan.  Is that acceptable to you?
13  A.   Yes, that's fine.
14  Q.   In 2008, Forest filed patent infringement
15 lawsuits against Mylan and a number of other
16 generics, alleging infringement of United States
17 Patent Number 5,061,703, correct?
18  A.   Correct.
19  Q.   If I refer to United States Patent Number
20 5,061,703 as the '703 patent, will you understand
21 me?
22  A.   Yes.

Page 66

[redacted]

BY MR. CHORUSH:
Q. And when you say, no, I can't tell if you were agreeing with me, or disagreeing with me. Did you offer any opinion in your report that the time frame for an appellate decision from the Federal Circuit would be longer than 12 months?
A. The whole process I said could be as late as October of 2012.
Q. To get to an exhaustion of all appeals, correct?
A. Right.
Q. I'm talking about the time when a Federal Circuit decision would be issued.
A. Well, it would be a number of months short of October 2012. It could be April 2012. As I said, approximately 12 months.
MR. CHORUSH: We've been going about an

Page 67

hour.
MR. JOHNSON: I was just going to say that.
MR. CHORUSH: Yeah, it's up to you.
MR. JOHNSON: I'm personally game for a break.
MR. CHORUSH: Okay, sounds good.
VIDEO TECHNICIAN: We are off the record at 10:07.
(Recess.)
VIDEO TECHNICIAN: We are back on record at 10:20.
BY MR. CHORUSH:
Q. One of the factors that patent attorneys consider in advising clients on whether or not to settle a patent infringement case is likelihood of success, correct?
A. Yes.
Q. Is it common, in your experience, for clients to seek their attorney's advice, in terms of evaluating likelihood of success in patent litigation?

Page 68

A. Yes.
Q. Is it common, in your experience, for a patent attorney to provide the client with the attorney's assessment of the likelihood of success in patent infringement litigation?
A. Yes.
Q. In your opinion, does experience with patent litigation provide patent attorneys with any specialized knowledge from which to evaluate likelihood of success in patent infringement cases?
A. It does.
Q. One of the factors patent attorneys consider in advising a client on whether or not to settle a patent infringement case is the time and expense it will take to reach a resolution of the litigation if the case does not settle, correct?
A. Did you say it was clients or lawyers?
Q. One of the factors that the patent attorney considers in advising the client on whether or not to settle is the time and expense it will take to reach a resolution of the litigation if the case doesn't settle?

Page 69

MR. JOHNSON: Objection to form.
THE WITNESS: It's my experience --
MR. JOHNSON: Objection, outside the scope.
THE WITNESS: My experience is this is something that mainly comes from the client, as opposed to the lawyer. The client asks the lawyer advice about time and expense.
BY MR. CHORUSH:
Q. Do patent lawyers typically provide that type of advice?
A. They try to.
Q. Does experience with patent litigation provide patent attorneys with specialized knowledge from which to evaluate the likely costs and timing in patent infringement litigation?
MR. JOHNSON: Objection.
THE WITNESS: It can.
BY MR. CHORUSH:
Q. Do you agree that early in a patent infringement lawsuit, statistical studies can be a helpful tool for patent attorneys in getting a

18 (Pages 66 - 69)

Page 70

1 general sense for likelihood of success?
2    A.   Yes.
3    Q.   Over the course of your professional
4 career, you have reviewed various statistical
5 studies addressing likelihood of success in patent
6 litigation, correct?
7    A.   Yes.
8    Q.   Are you familiar with the AIPLA quarterly
9 journal?
10   A.   I am.
11   Q.   AIPLA stands for the American
12 Intellectual Property Law Association, correct?
13   A.   Correct.
14   Q.   AIPLA is a national association of patent
15 attorneys, correct?
16   A.   Correct.
17   Q.   Are you a member of AIPLA?
18   A.   I don't think so.
19   Q.   I'm going to hand you what will be marked
20 as McKelvie Exhibit 2.
21          (McKelvie Exhibit No. 2 was
22          marked for identification.)

Page 71

1 BY MR. CHORUSH:
2    Q.   McKelvie Exhibit 2 is an article by
3 Professor Paul Janicke titled, Who Wins Patent
4 Infringement Cases, correct?
5    A.   Correct.
6    Q.   If I refer to this article as the Janicke
7 study, is that acceptable to you?
8    A.   Yes, that's fine.

Page 72

11   Q.   So you did read it in the context of
12 forming your opinions in this case, correct?
13   A.   I skimmed it.

Page 73

7    Q.   I'm trying to distinguish between two
8 things, and I think I understand your position that
9 the conclusions in the Janicke study aren't
10 relevant.  I'm asking a different question, which is
11 whether or not you have any basis or you've
12 identified one for doubting the accuracy of the
13 conclusions.  They might, in theory, be irrelevant
14 to this case.  I understand your position on that.
15 But that's not my question.  Do you understand the
16 distinction that I'm drawing?
17   A.   Yes.  But I haven't made a judgment about
18 the accuracy of his conclusions.  I made a judgment
19 about the relevance of his conclusions.  If I
20 thought they were relevant, I would then make a
21 judgment about the accuracy.

Page 78

[lines 1-5 redacted]
6  Q.  If the Court ultimately finds that any of
7  the accused infringer's validity defenses have been
8  established, the accused infringer wins, correct?
9      A.  If the patent is found invalid, yes.
10     Q.  So the accused infringer can win a
11 lawsuit by prevailing on non-infringement or any
12 invalidity defense, correct?
13     A.  Correct.
14     Q.  Do you agree that patent owners sometimes
15 push the envelope in patent litigation by relying on
16 an unrealistic scope for their patent claims?
17     A.  It happens, yes.
18     Q.  Do you agree that patent owners sometimes
19 litigate based on what they wish the patent claims
20 had said, rather than what the patent claims
21 actually say?
22     A.  I don't know.

Page 79

1        MR. JOHNSON:  Objection, outside the
2  scope.
3        THE WITNESS:  I don't know about that,
4  one way or the other.  I mean, we can project into
5  that certain conclusions, but I can't say that I've
6  ever been involved in a case where that necessarily
7  happened.
8            (McKelvie Exhibit No. 4 was
9             marked for identification.)
10 BY MR. CHORUSH:
11     Q.  I'm going to hand you what has been
12 marked as McKelvie Exhibit 4.  Exhibit 4 is an
13 article by Mark Lemley titled, Where to File Your
14 Patent Case, correct?
15     A.  Correct.
16     Q.  If I refer to this article as the Lemley
17 Where to File article, is that acceptable to you?
18     A.  Yes.
19     Q.  The Lemley Where to File article is a
20 document you reviewed in preparing your expert
21 report, correct?
22     A.  I did.

Page 80

1   Q.  You know Mark Lemley personally, correct?
2   A.  I do.
3   Q.  In fact, you've known him since the
4  1990s, correct?
5   A.  I have.
6   Q.  You hold Mr. Lemley in high regard,
7  correct?
8   A.  I do.
9   Q.  He is a professor at Stanford Law School,
10 is that correct?
11  A.  Yes.
12  Q.  Stanford Law School is a very prestigious
13 law school, correct?
14  A.  It is.
15  Q.  You're aware that in addition to serving
16 as a professor at Stanford Law School, he's also a
17 patent litigator, correct?
18  A.  Correct.
19  Q.  And you understand that the Lemley Where
20 to File article studies the historical rates of
21 success in patent infringement litigation, based on
22 the district in which are the litigation was

Page 81

1  conducted, correct?
2   A.  Correct.
3   Q.  And would you please turn to page 8 of
4  the Lemley Where to File article.
5   A.  Yes.
6   Q.  Just above table 3 is a sentence that
7  reads, "even among these districts, the patentee win
8  rate varies substantially.  Table 3 sorts the top 33
9  districts by patentee win rate."  Do you see that?
10  A.  Yes.
11  Q.  Patentee is another word for patent
12 owner, correct?
13  A.  Yes.
14  Q.  The title of table 3 is Patentee Win Rate
15 in Districts With 25 Or More Outcomes, is that
16 correct?
17  A.  Correct.



CONFIDENTIAL



Page 106

Page 110

[redacted]

9  Q.  Your opinion is that Forest likely would
10 have prevailed on infringement, correct?
11     A.  Yes.
12     Q.  What does likelihood mean in terms of a
13 numerical percentage?
14         MR. JOHNSON:  Objection.
15         THE WITNESS:  More probable than not.
16 BY MR. CHORUSH:
17     Q.  Okay.  So greater than 50 percent,
18 correct?
19     A.  At least.
20     Q.  Now, does likely mean 100 percent?
21     A.  Nope.
22     Q.  Okay.  What's the range?  You've told me

Page 111

1 that likely means greater than 50 percent, but below
2 what?
3     A.  Just likely.  You speak French.  I speak
4 German.
5     Q.  Okay.  So when the jury hears you say
6 that Forest was likely to win the Namenda patent
7 litigation, it should understand that to mean
8 something above 50 percent, correct?
9         MR. JOHNSON:  Objection.
10        THE WITNESS:  Yes.
11 BY MR. CHORUSH:
12    Q.  But you're not setting any sort of an
13 upper limit for what that number could be, just --
14    A.  There is no value to it.  What's a client
15 going to do, sleep better?  Because you say 76
16 percent versus 75 percent?
17    Q.  Well, you've already told us that no
18 patent litigator offers a number like 80 percent,
19 correct?
20    A.  Correct.
21    Q.  So when you say likely -- strike that.
22        When you say Forest likely would have

Page 112

1 prevailed on infringement, do you mean something
2 between 51 percent and 80 percent?
3     A.  I mean likely.  I don't think percentages
4 are helpful.
5     Q.  Well, but you just put a lower bound on
6 the number by saying greater than 50 percent,
7 correct?
8     A.  It's likely.  I wouldn't say 50 percent
9 to a client.  Because I don't think numbers are
10 helpful.
11    Q.  Okay.  So for purposes of interpreting
12 your usage of the term likely, the jury should
13 simply understand it to mean greater than 50
14 percent, correct?
15        MR. JOHNSON:  Objection.
16        THE WITNESS:  It just means likely.
17 BY MR. CHORUSH:



29 (Pages 110 - 113)





31 (Pages 118 - 121)

