# Exhibit 19

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

* * * * * * * * * * * * * * 

IN RE: *

NAMENDA DIRECT PURCHASER * C.A. 1:15-cv-07488-CM

ANTITRUST LITIGATION *

* * * * * * * * * * * * * * 

** HIGHLY CONFIDENTIAL **

Videotaped Deposition of ERNST R. BERNDT, Ph.D.

Thursday, November 2, 2017

9:07 a.m.

White & Case LLP

75 State Street - 24th Floor

Boston, Massachusetts 02109

----------- Janis T. Young, RDR, CRR ----------

Registered Professional Reporter

you have here, you also cite this article in your opening report in Footnote 75, which is the one we were just looking at a minute ago. And I'll just read the parenthetical that you have for this article and just ask you one question about it.

You say, and you're quoting the article, "Just as spreading investments over many assets reduces risk, so averaging forecasts across different forecasters reduces the size of the expected error, a point first formalized by Bates and Granger in 1969 almost 30 years ago."

Do you see that?

A. Yes.

Q. Does that indicate to you that this will -- at least your second article was about different forecasters and not one forecaster?

MR. LUKENS: Object to the form. If you have a recollection; otherwise don't speculate.

A. That suggests -- well, literally, it was different forecasts, yes; and I think the context is it was looking at the forecasts of a couple of international agencies, one being the International Monetary Fund, the IMF, and the other being the OECD, the Organization of Economic and -- I forgot what the CD stands for.



They're different agencies, and it looked at those two forecasts versus a published consensus forecast, and it said that the consensus forecast made by a number of different forecasters was better than just looking at those two.

Q. In your reply report, turning back to that, Paragraph 12 --

A. We didn't go to Paragraph 12 before.

Q. I just meant, turning back to your reply report.

If we look at Paragraph 12 --

A. Yes.

Q. -- you state closer to the end of the paragraph, it's about the fifth line up from the bottom, [redacted]

Do you see that?

A. Yes.

Q. And is that true, you reviewed all of the forecasts and related documents for 2012 to 2015 that you could find?

A. For this case, yes.



Q. Were there any projections that you reviewed that you did not consider?

MR. LUKENS: Objection. Give me a second.

I think you're running close -- and I'll let you answer this question.

I'm going to let him answer this question, but you're running close to materials that needs to be examined on per the stipulation are the ones relied on.

I'll let you ask him if there are those that he didn't rely upon or review, but I'm going to hold you tight to that stipulation.

A. There were some forecasts that appeared to be duplicates conducted on the same day, and so rather than adopting a number of those duplicates, I just chose one for that day.

And depending on the calculation, in some cases I also restricted it just to those forecasts that were done after [redacted] after which IMS data had become available on actual sales, and I excluded forecasts made before then.

Q. Would you consider additional non-duplicative forecasts to be relevant to your analysis and average?



MR. LUKENS: Object to the form.

A. It would depend. They could be.

Q. In what way would they not be?

MR. LUKENS: Object to form. You're talking about an undefined set of documents that may or may not exist and how they might impact something, and it's incredibly broad and I don't know how he could possibly answer that question.

Q. Explain to me what you meant by "they could be."

A. If there's strong evidence that they were circulated internally, that they were cited externally to investors, things like that.

If their findings were seemingly just very, very different from other forecasts, it would be useful to know how the forecast was employed internally, and in external statements to the investor community.

Q. Did you take those same factors that you just enumerated for me when selecting the forecasts that you included in your Exhibit D?

A. For the most part, yes, I believe I did.

Q. Did you find accompanying documents that showed that the forecasts that you included in Exhibit D were circulated internally?

Page 98

Q. Namenda XR actually launched in mid-June, but you chose to exclude forecasts from June; is that right?

A. For that calculation, yes; and in part because IMS data typically comes -- at least the NPA data, becomes available about ten days after a week ends.

And so there probably was minimal, if any, data available in July 2013 that talked about the first few weeks of data. I'll take your representation; I may have gotten the launch date wrong.

Was it June 14, you're saying, 2013?

Q. It was mid-June, 2013.

A. So early August would be the first time you would get some monthly data.

Q. And when you keep referring to IMS data, I want to make sure that we're clear. You're not talking about IMS data in terms of the actual projections; right? You're talking about the IMS data that was included in Forest's projections; correct?

A. I'm including -- what I'm referring to is that when Forest made its internal projections, to my understanding it was based on data they purchased

Page 99

from IMS.

And IMS has several data sources. In the context of making these monthly forecasts, I presumed that they used a monthly data source from IMS. But they may have also used some of their weekly data forecasts.

Q. And you include in Exhibit D some forecasts that are dated on the same date; correct?

A. Yes, particularly when they had some different information.

So, for example, I have two of them on [REDACTED], and they have different numbers. And I have two of them on [REDACTED] and they have some different numbers.

And you have three on [REDACTED] correct?

A. And on two of the three -- there are two that have the same numbers. And I included a second one on [REDACTED], as you see in my footnote there, that the metadata suggests that that document was created in [REDACTED] was last printed on that date, so I don't know exactly when it was made, but in order to err on the side of caution of forecasted rates, since that's a forecast that has a [REDACTED] percent conversion rate, which is on the high end, I

Page 100

included it.

Q. And in your definition of recent forecasts, the end date was pre February 14, 2014; correct?

A. Yes.

Q. And why did you choose that date as the end date?

A. That was the date that Forest announced its hard switch strategy. There may have been some forecasts after [REDACTED], between February -- between [REDACTED], and February 14 of 2014; but since the decision was made internally, announced internally to pursue the hard switch on [REDACTED] I believe the date was, I didn't include many forecasts beyond that, because they would be tainted by knowledge of the internal decision.

Q. And, sir, when you refer to the internal decision being in [REDACTED], I believe you discuss that in Paragraph 37 of your original report; correct?

A. Yes.

Q. And you cite to one document for that proposition; is that right?

A. That is correct.

Q. And that is an [REDACTED] email from [REDACTED]; is that correct?

Page 101

A. Yes.

Q. Who is [REDACTED]; do you know?

A. No, I do not.

Q. Was he deposed in this action?

A. I do not know.

(Marked, Exhibit 10, [REDACTED] [REDACTED], FRX-NY-01576623 - 624.)

Q. Sir, I'm handing you what's been marked as Exhibit 10. This is an email from -- the top email is from [REDACTED] [REDACTED] Do you see that?

A. Yes, I see that.

Q. And the first email in time, the second is [REDACTED] Do you see that?

A. Yes. It's not clear to me whether that means [REDACTED]

Q. And sir, you understand Brent to mean Brent Saunders, the CEO of Forest?

forecast in here after [redacted]. And so --
Q. Right; and I'm just trying to understand why you would include this language here.
A. I think I've answered that question.
Q. Actually, I'm not sure that you have.
MR. LUKENS: Well, he's provided an answer. You may not like it, but he's certainly provided an answer to the question.
MS. BURKE: No, I don't think I actually got an answer to my last question.
Q. If you're assuming that everything after the decision was made and you're assuming the decision was made in [redacted] if you're assuming that everything after that is tainted, why would you need to include a February 14, 2014 end date in your recent forecasts?
A. It was non-binding. I didn't include anything after [redacted]
Q. So why did you write it here?
MR. LUKENS: Objection, asked and answered.
A. I don't remember why, but it's certainly non-binding in the sense that I'm not including anything after [redacted]
Q. And why did you include the [redacted]



forecast if you believed that was tainted?
A. I believe I answered that a minute ago.
Q. Right, you said to err on the side of caution; correct?
A. Yes.
Q. Why didn't you include any other forecasts beyond [redacted] to also err on the side of caution?
A. My experience in these forecasts is that sometimes there takes a while for information to diffuse through an organization, and it may have been that some of the forecasting people didn't know about the hard switch decision being made on [redacted] [redacted] and again to err on the side of caution, I'll give them an extra between twelve days -- eleven days here, I guess -- and I note that it's on the high-end range of forecast. A [redacted] percent one, I presume I would have been criticized for not having included it.
So again, to err on the side of caution, I included it.
Q. And you said it's -- that could potentially be because it would take a while for information to diffuse through an organization.
Did you see any evidence that any of the



forecasters ever received that email or received any indication that a decision had been made in [redacted] [redacted]?
MR. LUKENS: Object to the form. You're asking about an email that he's drawing from his recollection here that has listed on it people who were copied; and I'm not suggesting that they say one thing or another, but you're asking about who received the email, and he doesn't have that email. So I think it's an unfair question.
Q. Did you understand my question, sir?
A. Please repeat it.
Q. Did you see the evidence that the people that prepared these Forest forecasts ever received any email or notification that a decision had been made to enforce the hard switch in [redacted]?
MR. LUKENS: Same objection.
A. I don't know. I don't have the email in front of me to which I referred to the decision being announced internally at -- whatever that footnote was.
Q. Do you know who the individuals were that prepared these forecasts?
A. They were done under the supervision I believe of Julie Snyder, and I think there was a



woman, Mei, M-e-i, I think was her first name, and L-e-u-n-g or something like that, who was one of the to-do people.
Q. Are those the only people that you understand prepared --
A. I understand --
MR. LUKENS: Wait; let her ask her question.
Q. Are those the only people that you understand prepared the Forest forecasts?
MR. LUKENS: Objection to form. This is not a memory test. You have documents that have this information. To expect Professor Berndt to remember the names of the individuals in this case is truly unfair.
A. As I sit here, I can't recall other names, but I believe Julie Snyder testified that she had an army of forecasters.
(Marked, Exhibit 12, email chain, at top, [redacted] FRX-NY-01565865 - 867.)
Q. Sir, I'm handing you what's been marked as Exhibit 12. And this, for the record, is actually Bates-stamped FRX-AT-01779417.
I realize that the New York AG stamp at

the bottom is there as well, but --
A. I don't see the AT --
Q. And I apologize; that Bates number has been cut off of the document, but I will represent to you that that is the Bates number for this deposition.
MR. LUKENS: And it was Devlin Exhibit 3, as long as we identify it that way.
Q. And this is the document that you cite to in -- the one document that you cite to in Paragraph 37 of your report to indicate that the decision was made in [redacted] is that right?
A. That is correct.
Q. And you'll see in both the original email as well as the next email in time, Julie Snyder and Julie May were not recipients of this document, or this email; correct?
A. Correct. I do see that Mark Devlin was and so was William Meury, who were both very actively involved in the marketing and in the planning, and I believe both of them -- and Lei Meng is there as well, the woman whose name I mentioned a few minutes ago. I believe she was one of the people who actually did the forecasting.
Q. Sir, I believe a moment ago you mentioned Julie May --

A. No, Julie Snyder I mentioned, and I mentioned a Lei Meng -- or was it Mei Leung, I may have said, M-e-i, L-e -- I got the names backwards.
But Meng Lei, who's on this email, is to the best of my understanding a woman who was very much involved in making the forecasts.
Q. Did you understand that any other individuals were involved in making the forecasts?
A. I think you asked me that before.
Q. I did; I'm sorry.
So Meng Lei and Julie Snyder are the only two individuals that you can recall; is that correct?
A. Correct.
Q. If we turn to one of the forecasts that you go through in your Exhibit D, what was your methodology for selecting which forecast to pick for Exhibit D?
MR. LUKENS: Object to form. He's already testified to this.
But you're free to testify again to it.
A. I asked --
MR. LUKENS: Objection. She asked for your methodology. If you're going to get into communications with your staff or with counsel,

don't do so. I instruct you not to do that. She's asking about the methodology, not the logistics.
A. I understand the methodology was to look at forecasts that had a date on them, preferably; that were non-duplicative, as I mentioned earlier; and I think the criterion was to put a preference for those forecasts that were circulated internally.
Q. You said there was a preference for doing so. Was there an exclusion for doing so?
A. I don't recall.
Q. Do you know who at Forest commissioned the creation of the forecasts?
A. No, I do not.
Q. Do you know the qualifications of the people that created the forecasts?
A. No, I do not.
Q. Do you know which department at Forest created the forecasts?
A. Not offhand.
Q. Do you know the assumptions that were incorporated into the forecasts?
A. To the extent that they were listed at the beginning of the forecast, yes.
Q. Do you know how those assumptions changed over time?

MR. LUKENS: Object to the form.
A. I believe Julie Snyder testified [redacted]
Q. Do you know what Namenda IR price is incorporated into the forecasts?
MR. LUKENS: Object to the form. Into any specific forecast? Generally? That question is incredibly vague. You're asking about a body of forecasts and you used the term "Namenda price," so I don't know how he can answer that question. But if he understands it, he can answer that question.
A. My understanding is that -- and what I recall is at the beginning part of the forecast, [redacted]
Q. And changes in the data or changes in the prices would potentially affect the ultimate outcome

of the forecast; is that right?

MR. LUKENS: Objection to the form, vague.

A. Yes.

Q. Projections made closer in time -- you're working under the assumption that the decision was made in [redacted]; correct?

A. [redacted], is when I see that email that's now Exhibit 11, I believe; or is it 12?

Q. So projections --

A. That's Exhibit 12; sorry.

Q. Working under the assumption that that actually is the date of the decision, projections made closer in time to that decision would reflect all the data that Forest had up until that point; correct?

MR. LUKENS: Objection to the form.

A. I think it's reasonable, although it's not 100 percent certain, that later forecasts incorporated more actual data.

Q. And when you would incorporate more actual data you would have greater accuracy; is that correct?

A. Other things being equal.

MR. LUKENS: Object to form.



THE WITNESS: Sorry; I should have waited.

MR. LUKENS: No, I've got to go faster. I'm just getting hungry; that's all.

Q. And projections closer in time, if they have greater accuracy, potentially should be given greater weight as well?

MR. LUKENS: Objection to form. Closer in time to what?

A. Again, other things being equal, if there are projections made that contain numbers that are not communicated either internally in documents or externally to investors and so on, whereas earlier forecasts are, then it's reasonable to infer that the later forecast for some reason or another was not deemed to be reliable because it wasn't announced, whereas earlier ones were.

Q. So, sir, you think that it's reasonable to infer that because those forecasts weren't circulated, that they are less reliable; is that what you just said?

MR. LUKENS: Objection to the form, mischaracterizes what he said, and it's frankly --

A. Julie Snyder testified that they did hundreds of forecasts in response to various



requests and so forth, and I think a pretty definitive criterion is, was this forecast announced -- or were the numbers in this forecast publicly announced to the external community?

And so forecasts that were made but were never -- their numbers were never really publicly disclosed, other things being equal, seem to have plausibly less reliability.

Q. Would you agree with me, then, that the same would be true about the announcement of the withdrawal of Namenda IR, that once it was publicly announced, then it was more reliable than an email from [redacted]?

MR. LUKENS: Objection to the form.

A. It could be, but again --

MR. LUKENS: Objection; objection to the form, and to the characterizations.

A. They could be, but again, my understanding is, while it was not publicly announced until February 14, [redacted]

And so that made that very credible.

Q. And how would that taint the projections after [redacted]?



A. [redacted]

Q. Did that change any of the data that went into the forecasts after [redacted]

MR. LUKENS: Objection to form, vague.

A. I'm not sure how to answer that question, because the data that went into it consisted basically of two things: one, actual data; and assumptions.

[redacted]

Q. Assuming -- let's put aside the assumptions for a minute, but it would not have affected the actual data; is that fair?

[REDACTED]

Q. If you turn to the page that's titled July [REDACTED] --
A. Which exhibit are you talking about?
Q. For both exhibits, sir.
MR. LUKENS: 15 and 16?
MS. BURKE: 15 and 16.
MR. LUKENS: What's the title you're looking for?
MS. BURKE: [REDACTED]
Q. And do you see that the dollar amounts listed under Namenda IR Branded Net Sales are all different; correct?
MR. LUKENS: I'm sorry; which page are you on? I'm not seeing that so I want to make sure I'm on the right page.
MS. BURKE: It's the next page.
A. I'm seeing they're the same for all fiscal years except fiscal year '14.
Q. I'm sorry; you're looking under the highlighted line that says --
A. No, I'm looking right at the top of the page.



Q. Right, and I'm asking about the dollar amounts listed under Namenda IR Branded Net Sales, the first highlighted line.
A. Okay.
Q. Those are all different amounts; correct?
A. They're different price assumptions, yes.
Q. And if you turn to the page before that's entitled Withdrawal Scenario, do you see that there's a number -- there's a set of information on the right-hand side that is not included on Exhibit 16, that's not included in Exhibit 15?
A. Say that once again, please?
Q. Sure. On this page in the Withdrawal Scenario --
A. This page of which document?
Q. Of Exhibit 16.
A. 16; I got it.
Q. Do you see that there's a number of information and entries in these columns off to the side of the table in the chart on Exhibit 16 that are not included on Exhibit 15; correct?
A. That is correct.
Q. And the total amount of NPV of operating profit is different between these two documents as well; right?



A. That's correct.
Q. In addition to other differences between them?
MR. LUKENS: Object to the form of that question.
Q. If you pull up Exhibit 17, which is the other one I handed you, and go to the same Withdrawal Scenario page in that document, do you see that the, for example, Namenda IR branded net sales, those amounts are different than either Exhibit 16 or Exhibit 15?
A. So yes, there are differences in the withdrawal scenarios.
Q. So you would agree with me, sir, that these three documents are not duplicates of each other?
MR. LUKENS: Object to the form. You can answer the question.
But you asked him about a couple entries on the document, and he's testified about what his view is of them. But you haven't asked him about the forecasts in here with respect to the conventional scenario, which are inscrutable on this document.
So with that objection, you can answer.
Q. Sir, these are not exact duplication of



each other, are they?
A. They're not exact duplicates of each other under the withdrawal scenario, no.
Q. The Excel spreadsheets as a whole are not exact duplicates of each other; is that correct?
A. They are not exact duplicates in every detail, no.
Q. Thank you.
The projections -- there were other projections that you didn't consider in your revised Exhibit D; correct?
MR. LUKENS: Object to form.
A. There may well be.
Q. For instance, you didn't consider any projections after [REDACTED]; right?
A. I believe that's the case, yes.
Q. And projections from [REDACTED] have been the closest in time to when Forest announced its withdrawal of Namenda IR in February; correct?
MR. LUKENS: Object to the form.
A. They would have been closer in time to the announcement. They would have been farther away from the board meeting.
Q. Well, let's talk about the board meeting.

A. Can I put these exhibits away?
Q. Yes, sir; thank you.
Actually, before we get to that, I just want to ask a couple more questions about revised Exhibit D.
So you took in here the dates that are included here, the dates of the -- the titles rather than the metadata; is that correct?
A. I believe so, yes.
Q. So you weren't necessarily accounting for different forecasts as we saw with those [REDACTED] ones that may have had [REDACTED] all listed in the title, but were actually, the forecasts themselves were different dates; is that right?
MR. LUKENS: Objection to the form, assumes facts.
A. I looked primarily -- as I testified before, I primarily looked at the captions on the spreadsheets, the titles, and did not go into the metadata, which has its own ambiguities.
Q. And you potentially discounted what you considered duplicates on the basis because the titles had the same initial date on those titles; is that right?
MR. LUKENS: Object to the form,



mischaracterizes his earlier testimony on the issue.
A. I viewed them as duplicative and therefore excluded them.
(Marked, Exhibit 18, entitled Forest [REDACTED] [REDACTED].)
Q. Sir, you'll see that I've just handed you what's been marked as Exhibit 18, and Exhibit 18 is a chart that I have put together, which takes your revised Exhibit D of entries after [REDACTED] to the end of your entries of [REDACTED], which you've listed in your chart as being the most recent forecasts.
And I've added in some columns and some additional entries. The columns that I've added are from the metadata that was provided with each of those spreadsheets, being the date last modified, the date last printed, the date created, and I also included a column --
A. Can I just go through that again?
Q. Sure. There's a column that's listed Date Last Modified --
A. I see.
Q. That on your chart you just have date and you said you took that from the title of the



documents. This chart has the dates from the metadata of date last modified, date last printed, date created, and then I included a column at the end that says, excluded from Berndt Exhibit D. And you'll see the ones with X's and also the ones that are highlighted in gray are the projections that we have found that you did not include in your revised Exhibit D average.
Do you see that?
MR. LUKENS: I'll object to the entire characterization of the document. I'm going to object to the use of the document unless you're going to testify about or show him one of the documents that you've cited in here so that he can verify this information.
You're not an expert, you're not testifying. Dr. Fowdur put in a report. I don't see this as an exhibit to her report, and I think this is just a completely improper use of your time, and you can ask him a question.
Q. Do you see that I've done that, sir?
A. I think I see it. The print is pretty small.
Q. I apologize. We were trying to keep it all on one page.



And you'll see that up until [REDACTED] there were eight projections that you did not include in your revised Exhibit D that we found here that were different from other projections listed in your Exhibit D.
MR. LUKENS: I object to the characterization of it as different, and you can accept her representation, Professor Berndt, but you're not required to accept her representation without her showing you the documents.
Q. Dr. Berndt, I'll represent to you that we determined which were duplicates in a manner which was similar to what we did today in terms of comparing the information visually to see whether or not they were exact duplicates of each other, and I'll represent to you that we included only in here documents that were not duplicative of each other.
MR. LUKENS: And you're not required to accept that representation without verifying it.
Q. Sir, if you take that representation, do you see that there are eight documents and eight forecasts that we included here that we found that were not duplicative of the forecasts that you included in your revised Exhibit D that you did not consider in reaching your average and in your

referenced to this document, this NY document, and what I'm doing here is I'm including that document, but it has a different document number, 01752 something.

Q. Right, and I'm asking you how you compared to understand that these two documents, 01752159 was an exact duplicate of what you used in the New York AG case, which is 01657151.

MR. LUKENS: Object to the form.

Q. And you testified --

A. In the New York AG case, I used 01639146, ma'am. I didn't use any AT document; I used an NY document.

Q. I understand, sir. They are the same document because they are Bates-labeled the same, in the exhibit I just gave you.

A. As I state in the bottom of Exhibit -- the revised Exhibit D in my reply report, I note here that the caption says that it's a copy of that report. So it wasn't just looking to see whether the forecast numbers were the same; the caption appears to say that it is the same.

Q. And by "caption," you're referring to the title of the document there; correct?

A. As I state there, "PX-76," et cetera.



Q. And you did not otherwise compare those two documents to one another to determine if the substance was the same between them; is that right?

A. That is correct.

Q. And you do not include 01657151 in your average analysis in Exhibit D; is that right?

MR. LUKENS: Object to the form.

A. That is correct. I do include 01752 -- let me get it right here, for the clerk -- for the court reporter, I do include, as the [redacted] document, 01752159.

MS. BURKE: I have no further questions. Thank you very much.

MR. LUKENS: We've got no questions.

THE VIDEOGRAPHER: The time is approximately 6:04, and this is the end of Media No. 6.

(6:04 p.m.)



CERTIFICATE OF COURT REPORTER

I, Janis T. Young, Registered Professional Reporter and Certified Realtime Reporter, do certify that the deposition of ERNST R. BERNDT, Ph.D., in the matter of In Re: Namenda Direct Purchaser Antitrust Litigation, on November 2, 2017, was stenographically recorded by me; that the witness provided satisfactory evidence of identification, as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, a Notary Public in and for the Commonwealth of Massachusetts; that the transcript produced by me is a true and accurate record of the proceedings to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Transcript review was not requested of the reporter.

Janis T. Young

_____________________________ 11/3/17

Janis T. Young, RDR/CRR



ACKNOWLEDGMENT OF DEPONENT

I, ERNST R. BERNDT, Ph.D., do hereby certify that I have read the foregoing transcript of my testimony taken on 11/2/17, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

ERNST R. BERNDT, Ph.D.

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF ____________, 20___.

(NOTARY PUBLIC) MY COMMISSION EXPIRES: