SA-103

**A. The Appropriate Market is the U.S. Memantine Drug Market**

An initial step in antitrust claim analysis requires identification of the market, which consists of a relevant product and geographic market. PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (components of market definition); Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 496 (2d Cir. 2004) (market definition is the initial step to both Section 1 and Section 2 claims). A relevant geographic market is the area "in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir. 1995). A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." United States v. E. I. Du Pont de Nemours & Co., 351 U.S. 377, 404 (1956). As the geographic market is not in dispute here, definition of the product market is the relevant inquiry. FOF ¶ 70.

In defining the market, courts consider the choices available to consumers in the market. See Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 482 (1992) citing United States v. Grinnell Corp., 384 U.S., at 572. Courts consider

HIGHLY CONFIDENTIAL                                          FRX-AT-01794764

"practical indicia [such as] industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price change, and specialized vendors." See Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Cross-elasticity of demand is a common empirical methodology used to determine whether two or more products comprise the same market. See e.g. Bogan v. Hodgkins, 166 F.3d 509, 516 (2d Cir. 1999) citing Brown Shoe, 370 U.S. at 325; Chapman v. New York State Div. for Youth, 546 F.3d 230, 238 (2d Cir. 2008); Hayden Pub. Co. v. Cox Broad. Corp., 730 F.2d 64, 71 (2d Cir. 1984). The cross-elasticity of demand calculation measures change in sales of a product to price changes of a potential substitute. E. I. du Pont, 351 U.S. at 400. A high cross-elasticity of demand suggests substitutability, while a low one does not; consumers will respond to an increase in the price of one product by purchasing the relatively inexpensive second product only if the two products are substitutes. See id. As a result, two products with high cross-elasticity of demand are properly grouped into the same market since they are substitutes. Id.

103

HIGHLY CONFIDENTIAL                                                    FRX-AT-01794765

A single product may constitute a relevant market where there are no reasonably interchangeable substitutes.  See Image Tech., 504 U.S. at 481-82.  To be a substitute product for purposes of product market definition, customers must be willing to switch to a competitive product as a result of a price change.  United States v. H&R Block, Inc., 833 F. Supp. 2d 36 (D.D.C. 2011).

As in this instance, courts have found a single brand-name drug and its generic equivalents to be a relevant product market in cases where the challenged conduct involves a branded drug manufacturer's effort to exclude generic competition.  See, e.g., In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 377-88 (D. Mass. 2013) ("The fact that other drugs may be used to treat heartburn and related conditions is immaterial to the present inquiry."); In re Terazosin Hydrochloride Antitrust Litig., 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fl. 2005).

The facts found above establish the State's contention that the appropriate product market in this case is the nationwide memantine market.  See generally FOF § IV.  CIs and memantine are not considered substitutes nor are they prescribed

104

SA-106

as such by physicians.  FOF ¶¶ 58, 62.  CIs are used to treat patients with mild-stage Alzheimer's while memantine is not indicated for such patients, and the two types of drugs are predominantly complements rather than supplements.  FOF ¶ 57.

Defendants' contention that the appropriate product market should include CIs is not well supported by the evidence. As found above, Defendants' cross elasticity of demand analysis was less convincing than the State's.  FOF ¶ 67.  Industry categorizations of memantine and CIs as part of the "Alzheimers' Drug Market" or an "anti-dementia" category do not alter the observable behavior of patients and physicians, as reflected in the cross elasticity of demand analyses summarized above.  See FOF § IV.B.  Categorizations in this instance may not be based on substitutability, but rather serve as umbrella terms encompassing distinct product markets: akin to, perhaps, categorizing two distinct non-substitutable products such as a sponge and soap under the umbrella of cleaning supplies. Similarly, the fact that both CIs and memantine tablets can be produced using the same machinery and sold along the same distribution channels does not establish substitutability. Adopting Defendants' contention, tablet forms of dissimilar medicines, for example heart medication and statins, may be

105



considered substitutes because they can be made on the same machines and distributed along the same sales channels.

The appropriate geographic and product market for antitrust purposes in this case has been established as the memantine market in the United States.

## B. The Defendant's Monopoly Power

To establish a claim of unlawful monopolization under Section 2 of the Sherman Act, the State must show that Defendants: (a) have monopoly power in a relevant market and; (b) acquired or maintained such monopoly power through anticompetitive exclusionary conduct. See Grinnell, 384 U.S. at 570-71. To establish a claim of unlawful attempted monopolization under Section 2 of the Sherman Act, the State must show that Defendants: (1) engaged in anticompetitive behavior; (2) with specific intent to monopolize; and (3) with a dangerous probability of achieving monopoly power. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); PepsiCo, 315 F.3d at 105 (2d Cir. 2002). The two claims are substantially identical, with the exception that attempted monopolization requires a showing of specific intent to

106

HIGHLY CONFIDENTIAL                    FRX-AT-01794768

monopolize.  The remaining elements can be addressed jointly.

Exclusionary behavior under the monopolization claim and

anticompetitive conduct under the attempted monopolization claim

overlap.  The first monopolization and the third attempted

monopolization elements vary only by degree.  See Tops Markets,

Inc. v. Quality Markets, Inc., 142 F.3d 90, 100 (2d Cir. 1998)

("the same concept of market power as that used in a completed

monopolization claim [applies] . . . [though] a lesser degree of

market power may establish an attempted monopolization claim

than that necessary to establish a completed monopolization

claim").

          Having established that the relevant market is the

nationwide memantine market, the issue is whether Defendants

have monopoly power in the relevant market, i.e., "the ability

to control prices or exclude competition." United States v.

E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956);

PepsiCo, 315 F.3d at 107.  While a "patent does not of itself

establish a presumption of market power in the antitrust sense,"

In re Indep. Serv. Organizations Antitrust Litig., 203 F.3d

1322, 1325 (Fed. Cir. 2000), a high market share is an

indication of monopoly power.  Tops Markets, 142 F.3d at 98

(quoting Broadway Delivery Corp. v. United Parcel Serv. of

                              107

America, Inc., 651 F.2d 122, 129 (2d Cir.1981) ("the higher a market share, the stronger is the inference of monopoly power"). A complete market power analysis considers market share in light of the relevant market's particular characteristics, including "strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." Id. citing Int'l Distribution Centers, Inc. v. Walsh Trucking Co., 812 F.2d 786, 792 (2d Cir. 1987); see also Hayden, 730 F.2d at 69 citing United States v. Columbia Steel Co., 334 U.S. 495, 527 (1948). Market power may also be established by considering evidence of anticompetitive effects of the challenged conduct. FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 460-61 (1986) ("proof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects."); Geneva Pharms, 386 F.3d at 509; Tops Markets, 142 F.3d at 98 (market power may be proven by direct evidence of anticompetitive effects); Todd v. Exxon Corp., 275 F.3d 191, 206 (2d Cir. 2001) ("If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power.").

HIGHLY CONFIDENTIAL                                                                 FRX-AT-01794770

As established by the facts found above, prior to generic entry into the market, Defendants are the exclusive producers of all forms of memantine. FOF ¶ 41. Until that time, Defendants control price and distribution for memantine, and have a patent-protected right to exclude all competition. FOF ¶ 126. As CIs are not indicated for moderate to severe Alzheimer's patients, most patients in that group have no alternative to memantine. FOF ¶ 57. Prior to July 2015, Defendants have 100% of the market, there is no competition, development is controlled by Defendants, Defendants' patent are absolute barriers to entry, and demand is inelastic: Defendants have monopoly power. See generally FOF § IV.

Starting in July 2015, however, several generic manufacturers enter the memantine market and Defendants' memantine market share is projected to drop below 100%. See FOF ¶¶ 126-27, 136. Determining whether Defendants will continue to enjoy monopoly power following generic entry requires projections of future conditions in the memantine market.

███████████████  ████████████████████████████████████

██████████████████████  ██████████  ████████████████████████

████████████████  FOF ¶ 147. At minimum, this conflict establishes that a serious question exists as to whether

HIGHLY CONFIDENTIAL                                           FRX-AT-01794771

**SA-111**

Defendants will control sufficient market share to qualify as strong evidence of monopoly power.  As found above, Defendants projected control of ▮ of the memantine market (▮ with XR and ▮ with the upcoming fixed dose combination) in 2016.  FOF ¶ 139.  This is a considerable market share, indeed "a share above 70% is usually strong evidence of monopoly power." Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc., 651 F.2d 122, 129 (2d Cir. 1981).

Moreover, depending on other market factors, courts in the Second Circuit have permitted findings of market power with shares less than 50%.  See United States v. Visa USA, Inc., 344 F.3d 229, 240 (2d Cir. 2003) (MasterCard found to have market power with 26% market share); Broadway Delivery, 651 F.2d at 129 ("the jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share"); In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig., 562 F. Supp. 2d 392, 400 (E.D.N.Y. 2008) (a finding of market share less than 30% would not foreclose the possibility of proving monopoly power).

In the hard switch scenario, Defendants' generic competitors will be limited to the ▮ of the memantine market

110

not controlled by XR and the anticipated FDC Namenda product.
FOF ¶ 139.  The switch-resistant Namenda users already taking
XR, i.e., the majority of all memantine users at the time of
generic entry, will likely exhibit the same resistance to
adopting generic IR as exhibited by current IR patients
resisting XR.  FOF ¶¶ 85, 154.  Physician and health plan
hesitations to change their patients' medications will
exacerbate this inertia.  FOF ¶¶ 143-45, 155.

Defendants' dominance in the memantine market creates
an adverse effect on memantine pricing and competition.  FOF ¶
117.  Non-AB-rated generic drugs are not able to compete
effectively for sales of a branded drug in the same class, even
if the price of the generics is much lower than the brand.  FOF
¶ 133.  The Lipitor example, where the absence of AB-
substitution limited a generic to only 30% of the market, is
illustrative.  FOF ¶ 133.  Furthermore, generic drugs are
typically not marketed to physicians or patients.  FOF ¶ 128.
Defendants' conduct, by emphasizing the more expensive patent-
protected formulations of memantine and eliminating distribution
of the Namenda IR formulation subject to generic substitution
laws, may therefore significantly alter the average price of
memantine in the market.  FOF ¶ 117.

111

HIGHLY CONFIDENTIAL

The evidence found above, while not definitive, adequately establishes a substantial question as to whether Defendants have monopoly power over the relevant market.


### C. Anticompetitive Conduct by Defendants

While the mere possession of monopoly power is not unlawful, monopolists cannot run their businesses in an anticompetitive manner.  See e.g., Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004); United States v. Microsoft, 253 F.3d 34, 64 (D.C. Cir. 2001); C.R. Bard, Inc. v. M3 Sys., 157 F.3d 1340 (Fed. Cir. 1998); United States v. Dentsply Int'l, 399 F.3d 181 (3d Cir. 2005).


The central inquiry is whether "a monopoly [is] engaging in exclusionary conduct as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Microsoft Corp., 253 F.3d at 58 quoting Grinnell, 384 U.S. at 571; see also Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 274 (2d Cir. 1979); Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 124 (2d Cir. 2007); In re Adderall XR Antitrust Litig., 754 F.3d 128,

112

HIGHLY CONFIDENTIAL                                        FRX-AT-01794774

SA-114

133 (2d Cir. 2014), as corrected (June 19, 2014); cf. United States v. Colgate & Co., 250 U.S. 300, 307 (1919) ("In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal) (emphasis added).

A monopolist's decision to withdraw a product from customers may violate antitrust laws if done for the sole purpose of harming competition, i.e., if it constitutes exclusionary conduct. See e.g., Abbott Labs. v. Teva Pharm. USA, Inc., 432 F. Supp. 2d 408, 424 (D. Del. 2006) (defendant's decision to withdraw a prior drug formulation of TriCor in an effort to shift patients to a new one and exclude generic competition may be exclusionary); Xerox Corp. v. Media Scis. Int'l., 511 F. Supp. 2d 372, 388 (S.D.N.Y. 2007) (discontinued and redesigned printer models to "foreclose all other competition, and not to improve the product" may be exclusionary); Glen Holly Entm't v. Tektronix Inc., 352 F.3d 367, 374 (9th Cir. 2003) (reversing dismissal of plaintiff's antitrust claims when "discontinuation of the only competing product on the market [left consumers with no] viable choice

113

SA-115

between market alternatives") (internal citation omitted)); <u>Free Freehand Corp. v. Adobe Sys.</u>, 852 F. Supp. 2d 1171, 1182 (N.D. Cal. 2012) ("[I]t is reasonable to infer that Adobe's discontinuation of FreeHand and channeling of FreeHand users to Illustrator made it more difficult for potential competitors of Illustrator . . . to enter the market"); <u>see also</u> <u>Berkey Photo</u>, 603 F.2d at 287 n.39 ("the situation might be completely different if, upon the introduction of the 110 system, Kodak had ceased producing film in the 126 size, thereby compelling camera purchasers to buy a Kodak 110 camera").

The D.C. Circuit case <u>United States v. Microsoft</u> lays out a useful framework for determining whether Defendants have engaged in anticompetitive conduct. 253 F.3d at 58. The plaintiff must demonstrate that the defendant's conduct had an anticompetitive effect. <u>Id.</u> If the plaintiff establishes an anticompetitive effect, then the monopolist may proffer a procompetitive justification for its conduct – "a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." <u>Id.</u> at 58-59. If the monopolist succeeds, then the plaintiff must rebut that justification or

114

SA-116

demonstrate that the anticompetitive harm of the conduct outweighs its procompetitive effect. Id. at 59.

The Microsoft case has been widely cited by courts in this circuit, and its framework is frequently employed. See e.g., Meredith Corp. v. Sesac, LLC, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) (citing Microsoft, 253 F.3d at 59, for the proposition that "the determination of § 2 liability calls for a weighing of the exclusionary conduct against any 'valid business reasons' for it."); IHS Dialysis v. Davita, Inc., 2013 U.S. Dist. LEXIS 47532, *24 (S.D.N.Y. Mar. 31, 2013) (citing Microsoft, 253 F.3d at 58 for the proposition "[w]hether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult to discern: the means of illicit exclusion, like the means of legitimate competition, are myriad."); In re Fresh Del Monte Pineapples Antitrust Litig., 2009 U.S. Dist. LEXIS 97289, *21, 55, 69 (S.D.N.Y. Sept. 30, 2009) (utilizing the Microsoft test to determine a § 2 violation).  This framework has also more recently been applied in another forced switch antitrust decision, In Re Suboxone Antitrust Litigation, MDL No. 2445 (E.D. Pa. Dec. 3, 2014).

115

HIGHLY CONFIDENTIAL

SA-117

As explained below, anticompetitive effect is adequately demonstrated under the Microsoft framework and Defendants' procompetitive justifications are either not plausible or outweighed by the anticipated anticompetitive effects of the limited distribution strategy.

1. The State Demonstrated Anticompetitive Effect

The State demonstrated a substantial risk that Defendants' limited distribution strategy would harm competition in the memantine market, as found above. See generally FOF § VI. Both regulators and commentators recognize the substantial anticompetitive effect that circumvention of state substation laws can have. See Brief for Federal Trade Commission as Amicus Curiae at 9, Mylan Pharms., Inc., v. Warner Chilcott Pub. Ltd. Co., No. 2:12-CV-03824-PD (E.D. Pa. Dec. 13, 2012) (PX4) ("As a practical matter, if a generic cannot be substituted at the pharmacy counter, the economically meaningful market for the generic product disappears."); Brief for Intellectual Prop. & Antitrust Law Professors as Amici Curiae at 14, Mylan (PX5) ("Under Hatch-Waxman and state substitution laws, generics can only compete cost-effectively through substitution on the new or old branded drug version."); cf. FTC v. Actavis, 133 S.Ct. 2223, 2228 (2013) ("The Hatch-Waxman process, by allowing the generic to piggy-back on the pioneer's approval efforts, speed[s] the

116

introduction of low-cost generic drugs to market . . . thereby furthering drug competition.") (internal quotations and citations omitted).

Defendants undertook to achieve significantly higher levels of conversion from IR to XR precisely by reducing generic competition, putting in place a limited distribution strategy to serve as an "obstacle" to generic switching, thwarting state substitution laws.  The result of the forced switch, as found above, is inflation of XR's share of the memantine market.  FOF ¶¶ 134, 137.  Most patients are effectively denied access to IR for the six month prior to generic entry.

That the limited distribution does not ban all competition does not demonstrate absence of exclusionary behavior.  Exclusionary behavior need not result in "total foreclosure" of competition, but rather is found where "the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." Dentsply, 399 F.3d at 191; LePage's Inc. v. 3M, 324 F.3d 141, 159 (3d Cir. 2003); Microsoft, 253 F.3d at 69; In re Fresh Del Monte Pineapples Antitrust Litig., 04-MD-1628, 2009 WL 3241401, at *16 (S.D.N.Y. Sept. 30, 2009) aff'd sub nom. Am. Banana Co. v. J. Bonafede

117

SA-119

Co., 407 F. App'x 520 (2d Cir. 2010). "Where a course of action
is ambiguous, 'consideration of intent may play an important
role in divining the actual nature and effect of the alleged
anticompetitive conduct.'" Berkey Photo, 603 F.2d at 288
quoting United States v. United States Gypsum Co., 438 U.S. 422,
436 n.13 (1978).

The State has met its burden under the first prong of
Microsoft.

> 2. Defendants' Procompetitive Justifications Are
>    Pretextual

In evaluating a monopolization claim, the trier of
fact must distinguish "between conduct that defeats a competitor
because of efficiency and consumer satisfaction, and conduct
that not only (1) tends to impair the opportunities of rivals,
but also (2) either does not further competition on the merits
or does so in an unnecessarily restrictive way." Trans Sport,
Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188-89 (2d Cir.
1992) (internal quotations and citations omitted); see also
Microsoft, 253 F.3d at 59, 65.

HIGHLY CONFIDENTIAL                                       FRX-AT-01794780

The Supreme Court has held that where consumer choices are made as a result of "forcing" customers to purchase a product, then that is not competition on the merits. <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 27 (1984) (condemning tying as anticompetitive where it "restrain[s] competition on the merits by forcing purchases that would not otherwise be made"). Where "the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." <u>Stearns Airport Equip. Co. v. FMC Corp.</u>, 170 F.3d 518, 522 (5th Cir. 1999).

Saunders stated, contemporaneously with the adoption of the hard switch by Forest, that the purpose of the switch was anticompetitive: to put barriers obstacles in the path of producers of generic memantine and thereby protect Namenda's revenues from a precipitous decline following generic entry. FOF ¶ 116. He further stated: "if we do the hard switch and we've converted patients and caregivers to once-a-day therapy versus twice a day, it's very difficult for the generics then to reverse-commute back, at least with the existing [prescriptions]. They don't have the sales force, they don't have the capabilities to go do that. It doesn't mean that it

119

SA-121

can't happen, it just becomes very difficult.  It is an obstacle that will allow us to, I think, again go into to a slow decline versus a complete cliff.").  FOF ¶ 116.

Saunders's motivation for the hard switch, expressed at the hearing, that his team could better "focus" on XR and FDC if IR was no longer sold by Defendants, was not as specific, or as persuasive, as his earlier representations to shareholders, quoted above.  Compare FOF ¶ 78 with ¶ 116; see also FOF ¶ 122.

As found above, Defendants' and Defendants' experts' rationalizations for the hard switch strategy are not only later-in-time but also not as persuasive.  The only quantified savings from the limited distribution are roughly ▮ of the loss of IR revenue within the first six months.  FOF ¶ 119. Defendants did not quantify the remaining pro-competitive justifications identified in conjunction with this case.  FOF ¶¶ 116, 120.  Nor did Saunders elaborate on how the hard switch strategy would allow for greater focus.  FOF ¶¶ 116, 120.  There is no indication that these ancillary benefits were the basis for Defendants' hard switch strategy.  FOF ¶ 121.

120

HIGHLY CONFIDENTIAL                                      FRX-AT-01794782

SA-122

Finally, by contending at the hearing that a preliminary injunction against the forced switch would require significant changes to Defendants' operations as a result of the potential loss of ▓▓▓▓▓▓ in sales, Defendants have essentially conceded that it is this expectation of ▓▓▓▓▓▓ increased sales of Namenda XR that is driving their business decision to engage in the forced switch.  No other non-pretexual pro-competitive purpose has been established, either at the hearing or by any contemporary Forest analysis.

### 3. Any Procompetitive Justifications Are Outweighed by the Anticompetitive Impact of the Conduct

To avoid liability, Defendant may offer legitimate business justifications for their exclusionary conduct that outweigh the anticompetitive effects.  <u>Microsoft</u>, 253 F.3d at 59; <u>Xerox</u>, 511 F. Supp. 2d at 389.  Since these legitimate business justifications must outweigh the anticompetitive effect of the conduct to avoid liability, proffering a minor, immaterial efficiency justification for conduct, the principal purpose and effect of which is to harm competition, will not render such conduct lawful.  <u>Microsoft</u>, 253 F.3d at 58-59, 64-66; <u>Xerox</u>, 511 F. Supp. 2d at 388-89; <u>Abbott Labs.</u>, 432 F. Supp. 2d at 422.  Rather, in such cases, the procompetitive benefits

121

of the business justification must outweigh the anticompetitive effects.

As discussed above, Defendants have not identified how the limited distribution efficiencies would outweigh ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The savings from the limited distribution are dwarfed by the loss of IR revenue within the first six months. FOF ¶ 119. The remaining justifications were not quantified. FOF ¶¶ 119-120. More to the point, these cost savings are dwarfed by the considerable anticompetitive harm: both to patients, who will pay ▮▮▮▮▮▮▮▮▮ in higher co-payments or have to switch medications twice, and to third party payors, who will pay more than ▮▮▮▮▮▮▮▮. FOF ¶ 161.

On the basis of these factual findings, Defendants' justifications are outweighed by the anticompetitive effects of the limited distribution. Therefore, there is a serious question as to whether Defendants' limited distribution strategy constitutes competitive conduct.

**D. Sherman Act Section 1 Claim**

122

To establish a claim under Section 1 of the Sherman Act, the State must demonstrate: (a) concerted action between Defendants and Foundation Care; (b) resulting in an unreasonable restraint of trade affecting the United States.  See Tops Markets, 142 F.3d at 95–96; 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal"); see also Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) (noting that Section 1 is properly construed to bar only unreasonable restraints, not all restrains).

Concerted action within the meaning of Section 1 exists when an agreement between "separate economic actors pursuing separate economic interests . . . deprives the marketplace of independent centers of decisionmaking." Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 195 (2010) (internal quotations and citations omitted).  Foundation Care and Defendants are separate economic actors, occupying differing roles in the memantine supply chain: under the hard switch strategy, Defendants remain the sole supplier, or "vendor," and Foundation Care becomes the sole distributor, termed the "independent contractor."  FOF ¶ 104.  This is sufficient to

123

SA-125

establish concerted action.  See Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012).

    Allegations of restraints that are not per se unlawful are analyzed under the rule of reason test, where "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Leegin, 551 U.S. at 885 (2007) (internal citations and quotations omitted). "When applying the rule of reason, courts weigh all of the circumstances surrounding the challenged acts to determine whether the alleged restraint is unreasonable, taking into account factors such as specific information about the relevant business, the restraint's history, nature, and effect, and whether the businesses involved have market power." Gatt Commc'ns, Inc. v. PMC Associates, L.L.C., 711 F.3d 68, 75 (2d Cir. 2013) (internal quotations omitted) citing Leegin, 551 U.S. at 885).

    The Section 2 analysis above satisfies the unreasonable restrain prong.  Defendants have monopoly power in the memantine market.  See generally FOF § IV.  The hard switch strategy will likely have an anticompetitive effect on that

124

market, denying current memantine patients access the IR tablets and driving up the average price of memantine following generic entry. See generally FOF § VI.  In sum, the hard switch strategy constitutes an unreasonable restrain on trade without a pro-competitive justification, as discussed above.

The cases Defendants cite in opposition to this claim do not alter this conclusion.  While it is true that manufacturers generally have control over distribution, E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 30 (2d Cir. 2006), they are not permitted to exert that control in a manner that violates the antitrust laws.  See Leegin, 551 U.S. at 892 (discussing the illegality of vertical restraints).

In E & L Consulting, the Second Circuit affirmed dismissal of a Section 1 claim for failure to plead that the concerted action would yield an adverse effect on the market. 472 F.3d at 31.  The facts in that case established that the defendant-monopolist would continue to enjoy monopoly power with or without the agreement in question.  Id. at 29 (the monopolist held 95% of the market).  Since the defendant in E & L Consulting did not need the agreement to further its monopoly, the Second Circuit concluded that the agreement was not a proper

125

HIGHLY CONFIDENTIAL                                        FRX-AT-01794787

SA-127

basis for Section 1 liability.  Id. at 30.  By contrast, Defendants in this case face potential competition from numerous generic manufacturers in summer of 2015, and are relying on the MSA to maintain their market power.  This is also not a case where the vertical agreement is made for a pro-competitive reason.  Compare the anticompetitive effect in this case with that in Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977) ("[v]ertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products").

As with the Section 2 claims, the State has demonstrated a substantial question exists as to the legality of the MSA as governed by Section 1 of the Sherman Act.


### E. State Law Violations by Defendants

The Donnelly Act makes illegal and void any contract, arrangement, or agreement that restrains competition in any business, or unlawfully interferes with the free exercise of any activity in the conduct of any business, and is generally construed in accordance with the Sherman Act.  See N.Y. Gen.

126

FRX-AT-01794788

Bus. Law § 340; <u>Anheuser-Busch, Inc. v. Abrams</u>, 71 N.Y.2d 327, 334 (N.Y. 1988).

"A plaintiff alleging a claim under the Donnelly Act must identify the relevant product market, allege a conspiracy between two or more entities, and allege that the economic impact of that conspiracy was to restrain trade in the relevant market." <u>Thome v. Alexander & Louisa Calder Found.</u>, 890 N.Y.S.2d 16, 32 (App. Div. 2009); <u>see also</u>, <u>Benjamin of Forest Hills Realty, Inc. v. Austin Sheppard Realty, Inc.</u>, 823 N.Y.S.2d 79 (App. Div. 2006); <u>Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.</u>, 224 F. Supp. 2d 657, 678 (S.D.N.Y. 2002).

The Donnelly Act analysis tracks the Section 1 of the Sherman Act claim, as analyzed above.  As with the Section 1 claim, the State has met its burden of demonstrating a substantial question going to the merits of this claim.

Under Section 63(12), the New York State Attorney General may sue defendants for violations of state or federal law, including Sherman Act or Donnelly Act violations, affecting more than one person within New York State.  N.Y. Exec. L. §

HIGHLY CONFIDENTIAL                                      FRX-AT-01794789

63(12); State v. Feldman, 210 F. Supp. 2d 294, 300 (S.D.N.Y. 2002) (antitrust violations are predicate offenses); State v. Stevens, 497 N.Y.S.2d 812, 813 (N.Y. Sup. Ct. 1985); People v. Wilco Energy Corp., 728 N.Y.S.2d 471, 471 (2d Dep't 2001) (the Attorney General can show repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person to satisfy the "repetition" requirement under the law).

As discussed above, the State has established a substantial question on the merits of its Sherman and Donnelly Act antitrust claims, and therefore also satisfied adequately established these claims as well.

## IX.   A Preliminary Injunction Is Appropriate

Upon the establishment of serious questions of antitrust violations as concluded above, the standard questions for preliminary injunction relief remain and are concluded in favor of the State.  The irreparable injury has been established, the balance of hardships tips markedly in the favor of the State, and the public interest is best served by preliminary relief maintaining the status quo.

128

Since the introduction of Namenda XR in 2013, Forest has successfully marketed and sold both XR and IR products. FOF ¶ 53. Namenda IR has been in the market since 2004 and its yearly sales have exceeded $1.5 billion, as found above. FOF ¶ 44. The present Forest sales program is consistent with an accepted industry practice of a soft switch when a new product is introduced, a practice that maintains consumer choice before and after generic entry into the market. FOF ¶ 36. To maintain the status quo is appropriate relief under the circumstances here presented.

## A. Irreparable Harm Has Been Established

Although the State has maintained otherwise, see Pl.'s Mem. in Supp't 40, it is not entitled to a presumption of irreparable harm. See 15 U.S.C. § 26 (authorizing injunction "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . and a showing that the danger of irreparable loss or damage is immediate"); Salinger v. Colting, 607 F.3d 68, 78 n.7 (2d Cir. 2010) (noting that eBay Inc. v. MercExchange, LLC, 547 U.S. 388, (2006), eliminated all

129

FRX-AT-01794791

SA-131

presumptions of irreparable harm absent contrary explicit congressional intent); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982) (statute should not be read lightly to replace traditional equity test). Therefore, the State "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotations and citations omitted). Consequently, the State must show that there is a "substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999).

The facts found above established that that patients, caregivers, and physicians will be constrained in obtaining Namenda IR in the absence of a preliminary injunction. FOF ¶ 112. Permanent damage to competition in the memantine market can also result from Defendants' planned hard switch strategy. See generally FOF § VI.A.

130

In addition, in the absence of a preliminary injunction and in the accomplishment of the Defendants' hard switch, consumers will pay almost $300 million more for a memantine drug than if the present sales patter is maintained. Although this is a projected financial loss to Alzheimer's patients, it can be avoided by maintaining the status quo.  See Bon-Ton Stores v. May Dep't Stores Co., 881 F. Supp. 860, 866 (W.D.N.Y. 1994) ("With respect to irreparable harm, doubts as to whether an injunction sought is necessary . . . should be resolved in favor of granting the injunction.") (internal quotations and citations omitted).

## B. The Balance of Hardships Tips in Favor of the State

In determining whether to grant a preliminary injunction, courts consider the balance of harms between the movant and the party subject to the injunction.  See Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987); Random House, Inc. v. Rosetta Books LLC, 283 F.3d 490, 492 (2d Cir. 2002).

The facts found above demonstrate that the hard switch will injure competition and consumers.  See generally FOF § VI. Conversely, the Defendants have not demonstrated any harm

131

HIGHLY CONFIDENTIAL                                    FRX-AT-01794793

resulting from their continuing the same IR distribution
strategy they have been using since 2004.  FOF ¶ 38.  And
Defendants have failed to quantify any material costs that would
result from an injunction.  FOF ¶¶ 116, 120.  No evidence has
been submitted that continuing to supply the market with Namenda
IR, an activity they have been doing by choice for over a
decade, constitutes a hardship.  To the contrary, the evidence
suggests that continuing to sell IR will be a net benefit to
Defendants, ███████████████  ████████████████████████

████████████████████████████████████████████████████████

███████████████   FOF ¶ 118.


        Having to compete with other firms in the market is
what the antitrust laws require, not a cognizable harm.  Harm is
not established by refraining conduct that "seems clearly to be
an effort to game the rather intricate FDA rules to
anticompetitive effect."  Abbott Labs., 432 F. Supp. 2d at 422.
As found above, Defendants actually risk losing ███████████ in
revenues gained through anticompetitive, i.e., illegally,
conduct.  This is not a cognizable harm.


        **C. The Public Interest Favors Granting the Injunction**


132

Finally, "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.") (internal quotations and citations omitted." <u>United States v. First Nat'l City Bank</u>, 379 U.S. 378, 383 (1965); <u>accord</u> <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 424 (2d Cir. 2004) <u>quoting</u> <u>Standard & Poor's Corp. v. Commodity Exch., Inc.</u>, 683 F.2d 704, 711 (2d Cir. 1982).

Here, the State seeks to enforce laws on behalf of the public. FOF ¶ 1. Courts presume that government action taken in furtherance of a regulatory or statutory scheme is in the public interest. <u>See, e.g.</u>, <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 424 (2d Cir. 2004). Enforcing the antitrust laws serves the public interest in a competitive marketplace, here the memantine market. <u>See</u> <u>United States v. Siemens Corp.</u>, 621 F.2d 499, 506 (2d Cir. 1980).

Additionally, a preliminary injunction will protect the public interest by safeguarding the fundamental compromise envisioned by the Hatch-Waxman Act, which sought to reconcile the sometimes conflicting public policy goals of making affordable generic drugs available to consumers and protecting

133

FRX-AT-01794795

pharmaceutical companies' incentives to innovate.  FOF § II.E.
Defendants have accepted a five-year extension to their patent
rights, took advantage of pediatric exclusivity, and used Hatch-
Waxman's mechanism for delaying generic entry by suing would-be
generic competitors, thus delaying their approval.  FOF ¶ 38.
The hard switch violates the spirit of the Hatch-Waxman Act and
the public policy underlying it.

Defendants have contended that allowing them to engage
in the hard switch will allow increased innovation in the long
term, as greater financial resources are made available to
Defendants.  Defs.' Mem. in Opp'n 23.  However, optimizing the
incentives for innovation requires that the legal system reward
pharmaceutical companies for truly innovative conduct that
benefits consumers, by means of better drugs that physicians and
patients are willing to switch to voluntarily.  Providing
financial rewards for anticompetitive conduct is not in the
public interest.

134

## Conclusion

Based upon the finding of fact conclusions of law set forth above, a preliminary injunction will issue. The State will submit a proposed preliminary injunction by 5:00 PM on December 12, 2014, and a hearing will be held in Courtroom 23B on December 15, 2014 at noon.

It is so ordered.

New York, NY
December '/, 2014

_____

ROBERT W. SWEET
U.S.D.J.

135

HIGHLY CONFIDENTIAL                                                  FRX-AT-01794797

# EXHIBIT 252

HIGHLY CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF NEW YORK

3

4     _____

                                    )
5     IN RE NAMENDA DIRECT           )
      PURCHASER ANTITRUST            )Civil Action No.
6     LITIGATION                     )1:15-cv-07488-CM
                                    )
7     _____     )

8

9        THIS TRANSCRIPT IS HIGHLY CONFIDENTIAL

10

11      VIDEOTAPED DEPOSITION OF ERIC AGOVINO

12           Westlake Village, California

13           Tuesday, September 12, 2017

14                  Volume I

15

16

17

18

19

20

21

22   Reported by:
     KATHLEEN E. BARNEY
23   CSR No. 5698
24   Job No. 2672438
25   PAGES 1 - 163

HIGHLY CONFIDENTIAL

Page 42

```
1   A  I don't recall the exact date.        09:47:49
2   Q  Was he the CEO when you arrived?       09:47:52
3   A  Yes.                                   09:47:54
4   Q  And who was Dr. Huchmann?              09:47:54
5   A  Huchmann.  Dr. Huchmann was the chairman of  09:47:59
6  Merz.                                      09:48:04
7   Q  So was this a Paragraph IV certification or  09:48:05
8  notice letter that was sent to Forest and Merz by  09:48:11
9  Mylan with respect to its Paragraph IV ANDA with  09:48:18
10 respect to Namenda?                        09:48:22
11  A  That's what it looks like.             09:48:23
12  Q  Okay.  If you turn to the second page, it  09:48:24
13 says -- there's the next-to-the-last paragraph:  09:48:30
```

[REDACTED]

```
17     Do you see that, sir?                  09:48:42
18  A  Yes.                                   09:48:43
19  Q  And then the following pages to the end of  09:48:43
20 the document -- in fact, the first page on Bates  09:48:45
21 ending in 426 says:                        09:48:52
```

[REDACTED]

Page 43

[REDACTED]

```
2      Do you see that, sir?                  09:49:03
3   A  Yes.                                   09:49:04
4   Q  Okay.  Does that -- does that lead you to  09:49:04
5  believe that this was the -- that this was submitted  09:49:12
6  to Forest with respect to Mylan's Paragraph IV ANDA  09:49:17
7  certification?                             09:49:22
8   A  Can you rephrase that?                 09:49:23
9   Q  Would it be reasonable to conclude that  09:49:28
10 Silber Exhibit 6 was Mylan's Paragraph IV notice of  09:49:32
11 certification letter and detailed statement  09:49:40
12 submitted with respect to its Paragraph IV  09:49:43
13 application to market a generic version of Namenda?  09:49:46
14     MR. TOTO: Objection. Asked and answered.  09:49:50
15     THE WITNESS: I don't know if this is the  09:49:51
16 exact letter.  It says on it that it's a  09:49:54
17 Paragraph IV notice, but I don't know that this is  09:49:57
18 the one that they actually sent.           09:49:59
19 BY MR. OPPER:                              09:50:02
20  Q  Do you have any reason to doubt that this was  09:50:02
21 received by Forest and is what it represents to be?  09:50:04
22  A  I have no reason to doubt that.        09:50:08
23  Q  Did each of the other 15 generic companies  09:50:10
24 that filed Paragraph IV ANDAs with respect to  09:50:25
25 Namenda submit a similar notice and detailed  09:50:31
```

Page 44

```
1  statement of the factual basis for the claims  09:50:35
2  regarding the -- why their product did not infringe  09:50:38
3  the '703 patent?                           09:50:43
4      MR. TOTO: Objection to form.  Vague and  09:50:44
5  ambiguous.  Overbroad.  Compound.          09:50:47
6      THE WITNESS: So my answer is they sent us a  09:50:48
7  notice letter.  I don't know how similar their  09:50:51
8  allegations were.                          09:50:54
9  BY MR. OPPER:                              09:51:04
10  Q  Mr. Agovino, if you could go back to Mears 8,  09:51:04
11 and I'll ask you to look at the second page.  09:51:07
12     Do you recall which of these companies  09:51:13
13 identified were first filers?              09:51:18
14  A  I don't know which ones were first filers.  I  09:51:21
15 know that there were a few that were definitely not  09:51:42
16 first filers.                              09:51:45
17  Q  Who were those that were not first filers?  09:51:46
18  A  Apotex, Torrent, and I don't -- that's as far  09:51:48
19 as my memory goes.                         09:51:59
20  Q  Do you recall whether Mylan was a first  09:52:00
21 filer?                                     09:52:11
22  A  I believe they were.                   09:52:11
23  Q  And do you recall whether Orchid was a first  09:52:16
24 filer?                                     09:52:20
25  A  I don't recall exactly.                09:52:21
```

Page 45

```
1   Q  Were there more than five first filers with  09:52:26
2  respect to Namenda?                        09:52:30
3   A  I think that's fair.                   09:52:32
4   Q  Were there more than ten?              09:52:33
5   A  I don't know that.                     09:52:36
6   Q  Okay.  So your recollection is that it was  09:52:38
7  more than five, but you don't know how many?  09:52:42
8   A  Correct.                              09:52:44
9   Q  I'm not sure if I asked you, what is the  09:52:45
10 benefit or significance to a generic company of  09:52:53
11 being a first filer?                       09:52:56
12  A  If they prevail in the litigation, they would  09:52:58
13 be eligible to receive 180 days of marketing  09:53:03
14 exclusivity.                               09:53:06
15  Q  What happens in circumstances where there are  09:53:08
16 more than one first filers?                09:53:11
17  A  So if they all file on the same day, they  09:53:13
18 potentially share that 180-day exclusivity period.  09:53:16
19  Q  Do you know whether the entry by one generic  09:53:20
20 company would trigger the 180-day period for the  09:53:24
21 other first filers?                        09:53:27
22  A  That, I don't -- I'd have to think about that  09:53:28
23 one.                                       09:53:33
24  Q  So would it be fair to say that based on your  09:53:33
25 recollection, there were at least five first filing  09:53:36
```

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL



Page 54

1  well?                                    10:04:24
2  A  Yes.                                  10:04:24
3  Q  And with respect to Orchid and Mylan, you   10:04:25
4  were involved in those negotiations?     10:04:28
5      MR. TOTO:  Settlement negotiations?   10:04:31
6      MR. OPPER:  Yes.                      10:04:33
7  BY MR. OPPER:                             10:04:33
8  Q  I'm sorry.  The settlement negotiations.   10:04:34
9  A  Charles and I were involved with the   10:04:36
10 settlement of the patent litigation for Mylan and   10:04:39
11 Orchid.                                   10:04:44
12 Q  Okay.  Did -- with respect to Mylan, did --   10:04:44
13 between the two of you, did either of you have   10:04:46
14 principal authority -- let me withdraw that.   10:04:49
15    With respect to Mylan, did either you or   10:04:51
16 Mr. Ryan have primary responsibility for negotiating   10:04:55
17 the settlement agreement?                 10:04:59
18 A  Charles was my boss.  We worked together, but   10:05:00
19 he was -- I reported to him.              10:05:04
20 Q  To the extent there were negotiations, actual   10:05:08
21 negotiations with the generic manufacturer, let's   10:05:12
22 say on the telephone, would both you and Charles   10:05:15
23 Ryan have been involved?                  10:05:18
24    MR. TOTO:  Object to form.             10:05:19
25    You may answer.                        10:05:21

Page 55

1      THE WITNESS:  In general, we were on the   10:05:21
2  phone at the same time.                   10:05:23
3  BY MR. OPPER:                             10:05:26
6      MR. TOTO:  Object to form.            10:05:37
8  BY MR. OPPER:                             10:05:42
22 BY MR. OPPER:

Page 56

1      MR. TOTO:  I'm going to object that it's   10:06:34
2  overbroad and compound.                   10:06:36
3      You may answer.                       10:06:37
5  BY MR. OPPER:                             10:06:40
13    But if you're capable of answering that   10:07:12
14 question, go ahead.                       10:07:15
15    THE WITNESS:  Sorry.  Can you repeat that?   10:07:17
16 BY MR. OPPER:
17 Q  Do you recall whether Forest ever sent a   10:07:19
18 draft settlement agreement to a generic company that   10:07:22
19 was unsolicited by that generic company?   10:07:26
20 A  The question was whether it was unsolicited?   10:07:30
21 Q  Yes.                                   10:07:33
22    MR. TOTO:  Object to form.  Vague and   10:07:33
23 ambiguous.                                10:07:35
24    THE WITNESS:  I can't recall.          10:07:35
25 ////

Page 57

1  BY MR. OPPER:                             10:07:36
2  Q  Do you recall who was the first generic   10:07:41
3  manufacturer to enter into a settlement agreement   10:07:45
4  with Forest?                              10:07:48
5  A  So if we're excluding Ranbaxy, Synthon, Barr   10:07:49
6  and Genpharm, I believe the first one was Amneal.   10:08:05
7  Q  All right.  Let me -- I'd like to introduce   10:08:24
8  as Agovino 1 a document Bates stamped   10:08:31
9  FRX-AT-00000218 through 252.              10:08:48
10 A  Okay.
11    (Exhibit 1 was marked for identification by
12 the court reporter and is attached hereto.)
13 BY MR. OPPER:                             10:09:52
14 Q  Do you recognize what has been marked as   10:09:52
15 Agovino 1?                                10:09:54
16 A  Yes.                                   10:09:56
17 Q  And what do you recognize it to be?    10:09:56
18 A  A settlement agreement between Forest, Forest   10:10:00
19 Holdings, Merz, and various Amneal entities.   10:10:04
20 Q  And this is the Amneal settlement agreement   10:10:08
21 that you were referring to?               10:10:12
22 A  Yes.                                   10:10:13
25 Q  Now, would it be fair to say this was the   10:10:21

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 66

1 Q  And I believe that you suggested that Forest  10:20:25
2 did get a patent term extension with respect to the  10:20:33
3 '703 patent?                              10:20:37
4 A  To be clear, Merz owned the patent. They  10:20:38
5 were the ones who obtained the patent extension.  10:20:41
6 Q  But Merz did receive a patent extension,  10:20:45
7 patent term extension?                   10:20:47
8 A  The '703 patent was awarded a patent term  10:20:48
9 extension.                               10:20:52
10 Q  Do you recall what the expiration date of the  10:20:53
11 patent term extension was?                10:20:55
12 A  The PTO granted patent term extension of a  10:20:57
13 full five years. My recollection, sitting here  10:21:01
14 today, is that it was April of 2015.     10:21:05
15 Q  If I said April 11, 2015 --            10:21:08
16 A  Sounds right.                         10:21:14
17 Q  So prior to the patent term extension, the  10:21:15
18 patent would have expired in April 11, 2010; is that  10:21:19
19 correct?                                 10:21:23
20 A  Sounds right.                         10:21:27
21   MR. TOTO: Can you keep going for a little  10:21:33
22 while or break?                          10:21:35
23   THE WITNESS: I'm fine.                 10:21:37
24   MR. TOTO: Maybe we'll go for a little longer  10:21:38
25 and take a break. It's been a while, but we'll keep  10:21:41

Page 67

1 going right now.                          10:21:45
2 BY MR. OPPER:                             10:21:45
3 Q  Okay. The launch date in the Amneal      10:21:49
4 agreement says:                           10:21:52
5   "Launch date shall mean the later       10:21:53
6 of, Subsection 3, three calendar          10:21:55
7 months prior to the expiration of the     10:21:59
8 '703, including any extensions."          10:22:00
9   And I believe you testified that Forest -- or  10:22:03
10 Merz did get an extension; is that correct?  10:22:07
11 A  I did testify to that, yes.           10:22:09
12 Q  And so the date as reflected by the patent  10:22:11
13 term extension would be the launch date for purposes  10:22:16
14 of this section?                          10:22:19
15   MR. TOTO: Object to form.              10:22:21
16   THE WITNESS: Can you repeat that?       10:22:23
17   MR. TOTO: The document speaks for itself.  10:22:25
18 BY MR. OPPER:                             10:22:25
19 Q  With respect to the three calendar months  10:22:27
20 prior to the expiration -- let me just back up a  10:22:29
21 bit.                                     10:22:33
22   The launch date, that provides the date for  10:22:34
23 which Amneal would be able to enter the market with  10:22:38
24 a generic version of Namenda; is that correct?  10:22:41
25   MR. TOTO: Object to form. Vague and    10:22:43

Page 68

1 ambiguous. Document speaks for itself.    10:22:46
2   THE WITNESS: So the launch date is -- and  10:22:47
3 this is a long agreement. The launch date is  10:22:52
4 mentioned a few times, but I would just qualify what  10:22:57
5 you said with the fact that there were pre-booking  10:23:02
6 activities as well that were prior to the launch  10:23:05
7 date that we granted Amneal.              10:23:08
8 BY MR. OPPER:                             10:23:10
9 Q  Okay. But would it be fair to say the launch  10:23:12
10 date with respect to this agreement is defined in  10:23:14
11 paragraph 1.14 of the settlement agreement and  10:23:16
12 license?                                 10:23:21
13 A  There is a definition of launch date in  10:23:21
14 Section 1.14.                            10:23:25
15 Q  So given the fact that Merz obtained a patent  10:23:26
16 term extension until April 2015, the three calendar  10:23:39
17 months prior, as provided in this term, would be  10:23:45
18 with respect to that 4/11/15 date; is that correct?  10:23:48
19   MR. TOTO: Object to form. Document speaks  10:23:54
20 for itself.                              10:23:55
21   THE WITNESS: Yes. There's also pediatric  10:24:02
22 exclusivity mentioned here. I'll just note that.  10:24:05
23 BY MR. OPPER:                             10:24:08
24 Q  Putting aside pediatric exclusivity for now.  10:24:09
25 A  Putting that aside, I would agree that it  10:24:13

Page 69

1 would be three months prior to the extended date.  10:24:15
2 Q  What is pediatric exclusivity?          10:24:18
3 A  Pediatric exclusivity is an award that is  10:24:22
4 granted for companies to conduct studies in patient  10:24:34
5 populations that are not well served. It's an  10:24:40
6 incentive for them to conduct those studies.  10:24:44
7 Q  Did Forest receive pediatric exclusivity with  10:24:46
8 respect to Namenda?                       10:24:51
9 A  So pediatric exclusivity was granted for  10:24:54
10 memantine, which is the molecule.         10:25:02
11 Q  So given the fact that Merz received a patent  10:25:04
12 term extension and Forest received pediatric  10:25:07
13 exclusivity, what would the date be as contemplated  10:25:11
14 by Subsection A of Section 1.14?          10:25:16
15   MR. TOTO: Object to form.              10:25:22
16   THE WITNESS: If you take three months off  10:25:23
17 the patent, including extensions and/or exclusivity,  10:25:31
18 it would be July of 2015.                 10:25:36
19 BY MR. OPPER:                             10:25:38
20 Q  Or July 11 of --                      10:25:38
21 A  July 11, around that time.            10:25:40
22 Q  I believe that is the date, but --     10:25:40
23 A  But, again, the other thing I'll note is it  10:25:44
24 says the date that Amneal obtains final approval.  10:25:46
25 So if they didn't get final approval by then, then  10:25:49

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

1    A   I don't recall the specific language, but
2  they did not have three months early entry.
3    Q   So they -- Apotex was not licensed to enter
4  the market prior to patent expiration?
5    A   They -- they did not have that three-month
6  prior language, that's right.
7    Q   Other than Apotex, did all the other generic
8  manufacturers with which Forest settled have the
9  word-for-word identical launch date?
10      MR. TOTO:  Same objection.
11      THE WITNESS:  So just to be clear, we're not
12  talking about any of the ones on that list that are
13  in the other categories?
14  BY MR. OPPER:
15    Q   That was Mears 8, yes.  We're talking about
16  the --
17    A   Just the ten?
18    Q   The ten that settled and Mylan and Orchid.
19  12.
20    A   Got it.  Okay.  So the answer is no.
21    Q   Okay.  Which generic companies did not get
22  the identical launch date?
23      MR. TOTO:  Object to form.
24      THE WITNESS:  I don't know if -- sitting here
25  today, if the language was the same for each

1  company.  I've already identified Apotex.  I believe
2  Torrent also did not have three months early entry.
3  But, again, I don't know for the rest if the
4  language is exactly the same.
5  BY MR. OPPER:
6    Q   Well, whether the generic manufacturer got
7  the same launch date, did that depend upon whether
8  it was a first filer?
9    A   Yes.
10    Q   Okay.  So would it be fair to say that all of
11  the generic companies that were first filers got a
12  word-for-word identical launch date in their
13  settlement agreements?
14      MR. TOTO:  Objection.  Documents speak for
15  themselves.
16      THE WITNESS:  I don't know if it's a
17  word-for-word identical.
18  BY MR. OPPER:
19    Q   But in substance would you say they were
20  identical?
21      MR. TOTO:  Same objection.
22      THE WITNESS:  I think they all had three
23  months early entry.  That's the -- that's what we
24  announced -- Forest announced in their press
25  release.

1  BY MR. OPPER:
2
3
4
5
6
7
8      MR. TOTO:  I caution you not to reveal the
9  substance of any privileged communications or
10  privileged legal analysis, which may mean you can't
11  answer the question.  But I defer to you.
12  BY MR. OPPER:
13    Q   Well, let me withdraw that question because
14  I'm not trying to be tricky.  I just want to know if
15  you're going to assert privilege objections.
16
17
18
19      MR. TOTO:  So that is a yes or no question.
20
21  BY MR. OPPER:
22    Q   And what was the advice or position conveyed
23  by Forest's counsel?
24      MR. TOTO:  I'll object and instruct you not
25  to answer.

1  BY MR. OPPER:
2    Q   Are you going to follow your attorney's
3  instructions?
4    A   Yes.
5
6
7
8
9      MR. TOTO:  Objection.  Document speaks for
10  itself.
11      You may answer.
12
13  BY MR. OPPER:



HIGHLY CONFIDENTIAL



Page 78

8       MR. TOTO:  You may answer.

15 BY MR. OPPER:

20      MR. TOTO:  Objection.  Documents speak for
21 themselves.

23 BY MR. OPPER:

25      MR. TOTO:  And, again, I caution you not to

Page 79

1 get into any privileged communications.

6 BY MR. OPPER:

11      MR. TOTO:  Object to form.

15 BY MR. OPPER:

19      MR. TOTO:  Objection. Compound. Overbroad.

22 BY MR. OPPER:

Page 80

15      MR. TOTO:  Object to form.  Vague and
16 ambiguous.  What provision are we even talking
17 about?  8 now?

Page 81

2 BY MR. OPPER:

6       MR. TOTO:  Object to form.  Lacks foundation.

10      MR. OPPER:  This might be a good time for a
11 break.
12      MR. TOTO:  Sure.
13      THE VIDEOGRAPHER:  Off the record.  10:41.
14      (Recess.)
15      THE VIDEOGRAPHER:  The time is 10:54.  We are
16 back on the record.
17 BY MR. OPPER:

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL



Page 138

1 amendment. I was part of the settlement agreement
2 and the license agreement, and we had different
3 teams negotiating each of these.
4 BY MR. OPPER:

10      MR. TOTO: Objection. Lacks foundation.
11 Calls for speculation.

15 BY MR. OPPER:

23      MR. TOTO: Objection. Calls for speculation.

Page 139

1 BY MR. OPPER:

            : Objection. Document speaks for
7 itself.
8      THE WITNESS: Can you repeat that? I'm
9 sorry.
10      MR. OPPER: Could you read back the question,
11 please.
12      (Record read.)

18 BY MR. OPPER:

22      MR. TOTO: Objection. Asked and answered.
23 Calls for speculation.

Page 140

1 BY MR. OPPER:

8      MR. TOTO: Objection. Lacks foundation.
9 Calls for speculation. Misstates prior testimony.

14 BY MR. OPPER:

18      MR. TOTO: Objection. Asked and answered.

21 BY MR. OPPER:

Page 141

2      MR. TOTO: Hold on one second.
3      THE WITNESS: I was going to ask to repeat
4 that question. I got lost.
5      MR. OPPER: Repeat it, please.
6      (Record read.)

9      MR. OPPER: Okay. If we could have a break.
10 I think I have probably another half an hour.
11      MR. TOTO: Okay.
12      THE VIDEOGRAPHER: Off the record. 12:45.
13      (Recess.)
14      THE VIDEOGRAPHER: We are back on the record.
15 The time is 12:58.
16 BY MR. OPPER:
17 Q  Mr. Agovino, was Dr. Reddy's one of the
18 generic manufacturers that filed an ANDA with the
19 Paragraph IV certification regarding Namenda?
20 A  Yes. Dr. Reddy's filed a Paragraph IV.
21 Q  Was Dr. Reddy's one of the first filers?
22 A  I believe they were.
23 Q  Were you involved in negotiating the patent
24 litigation settlement with Dr. Reddy's?
25 A  Yes.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL



Page 158

1  BY MR. OPPER:                          01:29:51

01:30:10

Page 159

5      MR. OPPER:  Thank you.  I have no further    01:31:38
6  questions.                              01:31:40
7      MR. TOTO:  Okay.  I have a few questions.    01:31:40
8
9          EXAMINATION
10  BY MR. TOTO:

18      MR. OPPER:  Objection to form.      01:32:09

21  BY MR. TOTO:                          01:32:16

Page 160

1      Do you recall that testimony?          01:32:28
2  A   Yes.                               01:32:29

6      MR. OPPER:  Objection as to form.      01:32:38

8  BY MR. TOTO:                          01:32:40
9  Q   Now, under the Hatch-Waxman scheme, when    01:32:41
10  there are multiple first filers, such as with    01:32:47
11  respect to Namenda, are all the first filers    01:32:50
12  entitled to enter on the same date, assuming they    01:32:52
13  have approval to do so?                  01:32:57
14  A   Yes.                               01:32:58
15      MR. OPPER:  Objection as to form.      01:32:59
16      THE WITNESS:  Yes.                  01:33:00
17  BY MR. TOTO:                          01:33:00

21      MR. OPPER:  Objection as to form.      01:33:12

23  BY MR. TOTO:                          01:33:18

17      MR. OPPER:  Objection as to form.      01:34:22

19      MR. TOTO:  No further questions.      01:34:25
20      MR. OPPER:  I'm done.              01:34:27
21      THE VIDEOGRAPHER:  This concludes today's    01:34:30
22  testimony given by Eric Agovino.  All recorded media    01:34:37
23  will be retained by Veritext Legal Solutions.  We're    01:34:41
24  off the record at 1:34.  Thank you.      01:34:44
25      (TIME NOTED:  1:34 p.m.)

41 (Pages 158 - 161)

# EXHIBIT 263

Page 1

```
 1
 2      ----------------------------------------x
 3
 4      In Re:   Namenda 343 Statement
 5
        ----------------------------------------x
 6
 7                State of New York
 8            Office of the Attorney General
 9        120 Broadway, 26th Floor, Antitrust Bureau
10      New York, New York 10271
11
12                      August 21, 2014
13                      9:36 a.m.
14
15
16      Witness:  Mark Devlin
17      Reported By:   Anthony Giarro
18
19
20
21        *        TRANSCRIPT OF PROCEEDINGS        *
22
23
24
25
```

HIGHLY CONFIDENTIAL                                    FRX-AT-01769297



Page 42

MARK DEVLIN

```
1
2        Q       Do you remember what Kevin
3    said to you?
4        A       I believe they were just
5    general discussions about manufacturing
6    process, the burden, general discussions
7    about his visits to Ireland in our
8    manufacturing facility there.
9        Q       Did he say to you that they
10   could not maintain production of both IR
11   and XR?
12           MR. TOTO:  Object to form.
13       A       I don't recall if he
14   specifically said that.
15       Q       Just going back to Exhibit 3.
16       A       Okay.
17
18
19
20
21
22
23       Q       What does it mean to
24   transition patients to Namenda XR?
25          MR. TOTO:  Object to form.
```

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400



Page 44

MARK DEVLIN

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400



Page 43

MARK DEVLIN

```
1
2        Q       What is your understanding of that
3    language?
4        A       I don't know what
5    Mr. Samoriski exactly meant with his
6    statement.
7        Q       I'm asking for your
8    understanding when you read this.
9        A       My understanding is that to
10   transition patients to Namenda XR
11   requires the physician to make the
12   judgment.  That's what they want the
13   patient to be on and to write the
14   prescription for it.
15       Q       And you didn't understand
16   that to mean Forest's transition of
17   patients to XR?
18           MR. TOTO:  Object to form.
19       A       As I said before, my view is
20   Forest does not transition patients.  A
21   physician does that.
22
23
24
25
```

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400



Page 45

MARK DEVLIN

```
25          MR. TOTO:  Object to form.
```

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400

HIGHLY CONFIDENTIAL

FRX-AT-01769308



```
                                        Page 74
1                    MARK DEVLIN
2    consideration.
3         Q        Was that ever adopted?
4              MR. TOTO:  Object to form.
5         A    I don't recall.  I don't
6    believe so.  But I don't recall
7    specifically.
8         Q        Let's look at the next document,
9    Exhibit 7.
10        A    Okay.
11        Q        Earlier in your testimony, I
12   think you said you couldn't recall
13   whether the managed care companies, your
14   customers said anything about waiting for
15   the introduction of generic IR.  Does
16   this refresh your recollection?
17              MR. TOTO:  Object to form.
18        A        That the managed care
19   companies were --
20
21
22
23              MR. TOTO:  Object to form.
24   I'm not sure it's a question.  You
25   may answer if you understand the
```



```
                                        Page 75
1                    MARK DEVLIN
2         question.
3         A    I don't fully understand the
4    question, no.
5
6
7
8
9
10
11
12
13
14
15              MR. TOTO:  Object to form;
16   assumes facts, lacks foundation.
17   Also, do you intend to show the
18   witness the PowerPoint that's
19   attached that this is a comment
20   about?
21              MS. HOFFMANN:  I don't have
22   the slides.
23              MR. TOTO:  I object to this
24   line of questioning.  This is clearly
25   comments of an attached PowerPoint.
```



```
                                        Page 76
1                    MARK DEVLIN
2         You may answer.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
                                        Page 77
1                    MARK DEVLIN
2
3
4
5
6
7
8
9
10
11        Q        If Forest discontinued IR,
12   would that limit the loss of XR business
13   to generic IR?
14              MR. TOTO:  Object to form.
15        You may answer.
16        A    It may; it may not.
17        Q        Did you talk to anyone at Forest about
18   that possibility?
19              MR. TOTO:  Object to form.
20        A        Possibility of losing --
21        Q        Less XR business to generic IR if IR
22   were discontinued.
23        A    I think that came up in some
24   discussions.
25        Q        Discussions with whom?
```

HIGHLY CONFIDENTIAL

FRX-AT-01769316

# EXHIBIT
# 273

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2
           Civil Action No. 1:15-cv-07488-CM
3
4      - - - - - - - - - - - - - - - -
5      IN RE NAMENDA DIRECT PURCHASER
6      ANTITRUST LITIGATION
7      - - - - - - - - - - - - - - - -
8
9
           VIDEO DEPOSITION OF MARTIN R. FARLOW, M.D.
10
                 HIGHLY CONFIDENTIAL
11
12          The video deposition upon oral examination
       of MARTIN R. FARLOW, M.D., a witness produced and
13     sworn before me, Judith E. Bellinger, RPR, CRR, CSR
       No. 94-R-1044, a Notary Public in and for the
14     County of Marion, State of Indiana, taken on behalf
       of the Plaintiffs at the offices of CONNOR
15     REPORTING, 111 Monument Circle, Suite 4350,
       Indianapolis, Marion County, Indiana, on the 11th
16     day of November, 2017, commencing at the hour
       of 8:59 a.m., pursuant to the Federal Rules of Civil
17     Procedure with written notice as to the time and
       place thereof having been given.
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL

Page 10

[REDACTED]

8 Q   Sorry.  With which people did you prepare for   09:04:25
9       today's deposition?                           09:04:30
10 A   I'm not sure I understand what you're saying.   09:04:33
11 Q   Did you meet with anyone to prepare for today's   09:04:35
12       deposition?                                   09:04:37
13 A   No.                                            09:04:37
14 Q   Okay.  So I think you mentioned that you       09:04:38
15       reviewed your expert report that you submitted   09:04:45
16       in this case in preparation for today's       09:04:47
17       deposition; is that correct?                  09:04:49
18 A   Yes.                                           09:04:52
19 Q   Okay.  And did you review your expert report   09:04:52
20       from the patent litigation for today's        09:04:56
21       deposition?                                   09:04:59
22 A   Yes.                                           09:05:01
23 Q   Did you review Dr. Doody's expert report from   09:05:01
24       the Namenda patent litigation?                09:05:06
25 A   Yes.                                           09:05:11

Page 11

1 Q   Did you review Dr. Doody's opposition report for   09:05:11
2       the patent litigation?                         09:05:14
3 A   I'm not sure.  I don't think so.               09:05:21
4 Q   Okay.  Did you review Dr. Olney's expert report   09:05:22
5       from the Namenda patent litigation?           09:05:28
6 A   No.                                            09:05:30
7 Q   Did you review Dr. Doody's deposition transcript   09:05:36
8       from the Namenda patent litigation?           09:05:39
9 A   No.                                            09:05:42
10 Q   Did you review Dr. Schneider's expert report?   09:05:46
11 A   Yes.                                           09:05:50
12 Q   Do you know Dr. Schneider?                      09:05:52
13 A   Yes.                                           09:05:54
14 Q   How long have you known him?                    09:05:56
15 A   Twenty years.                                  09:06:02
16 Q   Are you familiar with his work?                 09:06:03
17 A   Yes.                                           09:06:06
18 Q   In what way?                                    09:06:06
19 A   He is an academic psychiatrist who has been    09:06:10
20       actively involved in investigational trials and   09:06:19
21       clinical research, and I'm engaged in similar   09:06:24
22       activities and have seen him at meetings.      09:06:30
23 Q   Have you co-authored articles with             09:06:38
24       Dr. Schneider?                                09:06:40
25 A   Yes.                                           09:06:41

Page 12

1 Q   Do you know approximately how many articles    09:06:42
2       you've co-authored with him?                  09:06:44
3 A   Not off the top of my head, but I would guess   09:06:50
4       half dozen, 10.                               09:06:53
5 Q   Would you say that Dr. Schneider is a prominent   09:06:57
6       expert in the field of Alzheimer's disease?    09:07:02
7 A   Yes.                                           09:07:04
8 Q   Would you agree that he is well respected in the   09:07:05
9       field of Alzheimer's disease?                 09:07:09
10 A   Yes.                                           09:07:11
11 Q   Would you agree that Dr. Schneider is          09:07:13
12       knowledgeable about Alzheimer's disease?       09:07:15
13 A   Yes.                                           09:07:18
14 Q   Do you know Dr. Herrmann?                       09:07:20
15 A   No.                                            09:07:23
16 Q   Did you review U.S. patent No. 5061703 in      09:07:26
17       preparing for today's deposition?            09:07:30
18 A   Give me the number again, please.             09:07:35
19 Q   5061703.                                       09:07:37
20 A   '703, yes.                                      09:07:39
21 Q   And if I refer to this patent just as the '703   09:07:41
22       patent for convenience today, will you         09:07:44
23       understand what I'm referring to?            09:07:47
24 A   Yes.                                           09:07:48
25 Q   Okay.  Do you know what the field of medicinal   09:07:49

Page 13

1       chemistry includes?                           09:07:56
2       MR. MAJCHRZAK:  Objection.  Vague.          09:08:02
3 A   I'm not sure what you're asking.  It's a broad   09:08:06
4       question; yes, generally, but it's a very broad   09:08:11
5       question.                                      09:08:14
6 Q   Have you used the term "medicinal chemistry"    09:08:14
7       before?                                        09:08:18
8 A   I do not routinely use that term, no.          09:08:19
9 Q   Let me ask you:  In order to treat or prevent a   09:08:26
10       medical condition, would you agree that a drug   09:08:32
11       must have a therapeutic effect?               09:08:35
12 A   It's almost definitional, but, yes.           09:08:42
13 Q   What do you understand the term "cerebral      09:08:47
14       ischemia" to mean to a person of ordinary skill   09:08:48
15       in the art?                                   09:08:55
16       MR. MAJCHRZAK:  Objection.                  09:08:56
17 A   There is a general meaning now.  There are other   09:08:59
18       meanings that have been assigned by the court in   09:09:03
19       the past with regard to this case.  Which do you   09:09:05
20       want?                                         09:09:08

[REDACTED]

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

4  Q  I would like to go ahead and mark as Exhibit --   09:09:38
5     Farlow Exhibit 1, your expert report.  Make sure  09:09:44
6     I've got the right one.  From this litigation,   09:09:49
7     it's dated October 9th, 2017.           09:09:55
8        (Exhibit 1 was marked for identification.)  09:10:10
9  Q  Do you recognize this document?         09:10:25
10 A  Yes.                          09:10:29
11 Q  And would you agree that this is the expert    09:10:30
12    report that you submitted in this antitrust    09:10:33
13    litigation?                      09:10:36
14 A  Yes.                          09:10:41
15 Q  And if you turn to page -- oh, the pages aren't  09:10:46
16    numbered.  The page after 23.  Is that your    09:10:55
17    signature?                      09:10:58
18 A  Yes.                          09:11:16
19 Q  Okay.  And then I'd like to mark as Exhibit    09:11:18
20    Farlow -- I'm sorry, Farlow Exhibit 2, the     09:11:31
21    opposition expert report of Martin R. Farlow.   09:11:34
22       (Exhibit 2 was marked for identification.)  09:11:50
23 Q  And do you recognize this document?       09:11:54
24 A  Yes.                          09:12:08
25 Q  Okay.  And if you turn to the page after     09:12:09

Page 15

1     page 48, is that your signature?         09:12:13
2  A  Yes.                          09:12:18
3  Q  And this report is dated December 18th, 2009;   09:12:19
4     correct?                       09:12:23
5  A  December 18th, 2009, yes.             09:12:36
6  Q  And so this would have been the expert report   09:12:38
7     that you submitted in the Namenda patent      09:12:40
8     litigation; correct?                09:12:43
9  A  Yes.                          09:12:46
10 Q  Okay.  If you could, turn to paragraph 130 of   09:12:47
11    this report.                     09:12:51
12 A  I'm sorry, which report?              09:12:52
13 Q  Farlow Exhibit 2.                  09:12:54
14 A  (The witness complies.)              09:13:09
15 Q  The first clause of the first sentence of     09:13:10
16    paragraph 130 states "Although, I am not a     09:13:12
17    medicinal chemist."                 09:13:15
18       Do you see that?                09:13:17
19 A  Yes.                          09:13:18
20 Q  What do you understand medicinal chemistry to   09:13:18
21    include?                       09:13:22
22 A  Medicinal chemistry would be, basically, the   09:13:22
23    creation of chemicals or compounds that are    09:13:30
24    therapeutically useful.               09:13:33
25 Q  And you do not claim to be a medicinal chemist  09:13:38

Page 16

1     right?                        09:13:45
2  A  I do not.                      09:13:46
3  Q  Are you an expert in pharmacology?         09:13:46
4  A  It's a broad term.  I'm not a pharmacologist;   09:13:51
5     I'm a clinical neurologist.  I have knowledge of  09:13:53
6     pharmacology.                     09:14:01
7  Q  Okay.  But you would not consider yourself an   09:14:03
8     expert in pharmacology; correct?          09:14:05
9  A  It's not -- it's not the field I've been      09:14:08
10    practicing or educated in.  It's not what I do   09:14:11
11    on a daily basis, no.                09:14:14
12 Q  Do you have any experience determining what the  09:14:17
13    mechanism of action is by which a drug product   09:14:19
14    works?                        09:14:22
15 A  Am I an investigator actively looking at the    09:14:30
16    mechanisms or deriving the mechanisms or the    09:14:37
17    associations that occur with drugs?  No, on the  09:14:43
18    basic level.                     09:14:49
19       On the other hand, am I a clinician who has  09:14:51
20    had -- has been informed of potential mechanisms  09:14:57
21    of actions of drugs?  Has observed the actions   09:15:03
22    of the drugs in clinical drug trials, and in    09:15:07
23    clinical practice, and sometimes made inferences  09:15:12
24    or have opinions about whether a drug works by   09:15:17
25    one mechanism of action or another?  Yes.      09:15:24

Page 17

1  Q  Have you ever undertaken experiments to      09:15:27
2     determine what the mechanism of action is of any  09:15:29
3     particular drug?                  09:15:32
4  A  No.                          09:15:39
5  Q  And have you ever undertaken experiments to    09:15:41
6     determine what the mechanism of action is of    09:15:44
7     memantine, in particular?             09:15:48
8  A  Have I personally?                 09:16:13
9  Q  Yes.                          09:16:15
10 A  Undertaken those mechanisms, no.  Have I been   09:16:16
11    associated with work -- have done reports that   09:16:20
12    propose different mechanisms of actions for     09:16:28
13    drugs, yes.                      09:16:32
14 Q  And can you describe for me what kind of reports  09:16:32
15    you've done that propose different mechanisms of  09:16:35
16    action?                       09:16:39
17 A  Not with (verbatim) review of having the      09:16:39
18    material in front of me.              09:16:43
19 Q  Are these reports that were submitted in the   09:16:45
20    Namenda patent litigation?             09:16:48
21 A  No.                          09:16:49
22 Q  Are these published reports?            09:16:50
23 A  Yes.                          09:16:56

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 54

3 Q  Claim 1 claims, "A composition which influences   10:34:47
4     the central nervous system and is especially   10:34:50
5     useful in the treatment of hyperkinesis, having   10:34:52
6     an active ingredient an effective   10:34:56
7     antihyperkinesic amount of   10:35:02
8     1-amino-3,5-dimethyladamantane."   10:35:05
9        Do you see that?   10:35:12
10 A  I was not aware of that.   10:35:13
11 Q  And so when you offered your opinions in this   10:35:14
12    case and in the Namenda patent litigation, you   10:35:18
13    were not aware of that; correct?   10:35:23
14 A  Correct.   10:35:24
15 Q  Before 1989, would a person of ordinary skill   10:35:33
16    have known that memantine could be administered   10:35:36
17    orally?   10:35:39
18 A  Yes.   10:35:43
19 Q  And so would you agree that as of April 1989,   10:35:46
20    there was nothing novel about administering   10:35:49
21    memantine orally?   10:35:53
22       MR. MAJCHRZAK:  Objection.  Vague.   10:35:56
23 A  Yes.   10:36:11
24 Q  Would you agree that before April 1989,   10:36:15
25    memantine was commercially available in some   10:36:18

Page 55

1     countries in oral form?   10:36:23
2 A  I don't know the exact dates it was available.   10:36:30
3     It was available in the early '90s in the 19 --   10:36:33
4     I believe in the 1990s, but I'm not sure of the   10:36:37
5     dates.  I would have to review other documents   10:36:40
6     in front of me.   10:36:42
7 Q  Are you familiar with the drug product called --   10:36:45
8 A  A-k.   10:36:48
9 Q  -- Akatinol?   10:36:50
10 A  Akatinol.  Yeah.   10:36:52
11 Q  Okay.   10:36:54
12 A  It's a European product, though; it's not a U.S.   10:36:54
13    product.   10:36:57
14 Q  Right.  And were you aware that Akatinol was   10:36:58
15    available in Germany in the 1980s?   10:37:04
16 A  Yes.   10:37:07
17 Q  And do you know the year in which Akatinol   10:37:09
18    became available in Germany?   10:37:15
19 A  No.   10:37:17
20 Q  How did you become aware of Akatinol?   10:37:24
21 A  I believe I first became aware of Akatinol in   10:37:43
22    discussions with -- I'm trying to decide his   10:37:51
23    exact role -- employees of the Merz company when   10:38:04
24    I had interactions with them in the 1990s.   10:38:09
25 Q  And do you remember the name of the Merz   10:38:16

Page 56

1     employee?   10:38:19
2 A  Moebius.  Yeah, I think Hans Moebius.   10:38:24
3 Q  Okay.  And would you agree that the active   10:38:32
4     ingredient of Akatinol is memantine?   10:38:35
5 A  I believe they both contain memantine.  In terms   10:38:47
6     of whatever other constituents are part of the   10:38:50
7     product, you know, diluents and other additives,   10:39:01
8     I don't know the differences.   10:39:10
9 Q  I would like to go ahead and mark as Farlow   10:39:11
10    Exhibit 6, a document that bears Bates numbers   10:39:15
11    Torrent-Memantine 00008902 through 8909.   10:39:18
12       (Exhibit 6 was marked for identification.)   10:39:45
13 Q  Are you familiar with this document, Dr. Farlow?   10:40:32
14 A  I've seen it, yes.   10:40:35
15 Q  And this is the Rote Liste; correct?   10:40:38
16 A  Yes.   10:40:44
17 Q  And it's dated 1986; correct?   10:40:45
18 A  Yes.   10:40:50
19 Q  And this is a German document that has been   10:40:50
20    interpreted; correct?   10:40:54
21 A  Yes.   10:40:57
22 Q  And it relates to, if you look at page 906, an   10:40:59
23    entry for Akatinol memantine; do you see that?   10:41:05
24 A  Yes.   10:41:11
25 Q  And it describes under Akatinol memantine   10:41:12

Page 57

1     tablets; do you see that?   10:41:18
2 A  I do.   10:41:19
3 Q  And it states the composition is "1 tablet   10:41:20
4     contains memantine hydrochloride 10 milligrams."   10:41:24
5        Do you see that?   10:41:29
6 A  Yes.   10:41:30
7 Q  And so do you understand the active ingredient   10:41:31
8     of the drug product Akatinol was memantine, or   10:41:36
9     memantine hydrochloride?   10:41:42
10 A  Yes.   10:41:44
11 Q  And then under "use," do you see that it   10:41:46
12    references organic brain syndrome?   10:41:52
13 A  Yes.   10:42:11
14 Q  And do you see under "use," it also references   10:42:12
15    Parkinson's syndrome?   10:42:16
16 A  Yes.   10:42:22

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 62

███████
████████████████
████████████████████
████████████████
██████████    ████████
████████████████████████
██████████████████
█████    ████████████
██████    ██████████
███

11 Q  Would you agree that it's highly likely that a   10:53:30
12     patient with Alzheimer's disease was given   10:53:33
13     Akatinol before 1989?            10:53:35
14 A  I agree that it's a possibility, but the --   10:53:45
15     there's a distinction between a patient who has   10:53:50
16     Alzheimer's disease and a patient specifically   10:53:54
17     diagnosed with Alzheimer's disease, and I'm --   10:53:57
18     I'm -- I'm not sure that the patient   10:54:03
19     specifically diagnosed with Alzheimer's disease   10:54:07
20     was given Akatinol as a therapy for their   10:54:09
21     Alzheimer's disease before 1989.   10:54:14
22 Q  When you say "you agree it's a possibility," are   10:54:19
23     you talking 50/50, 70/30?  What kind of   10:54:22
24     possibility?            10:54:27
25 A  I don't -- I don't know.            10:54:29

Page 63

1 Q  You don't know the range of that possibility?   10:54:31
2 A  No.            10:54:33
3 Q  Let's put aside the concept that the patient has   10:54:37
4     to be specifically diagnosed with Alzheimer's   10:54:41
5     disease and talk about a patient that is just   10:54:43
6     diagnosed -- or, sorry -- a patient that has   10:54:48
7     Alzheimer's disease, may or may not be   10:54:52
8     diagnosed.            10:54:54
9         Would you agree that at least one patient   10:54:55
10     who had Alzheimer's disease was given Akatinol   10:54:58
11     before 1989?            10:55:03
12         MR. MAJCHRZAK:  Objection.  Speculation.   10:55:05
13 A  I would -- I would agree that it is a   10:55:11
14     possibility that a patient with Alzheimer's   10:55:14
15     disease was given the Akatinol before 1989.   10:55:20
16 Q  Do you have any opinions about how many --   10:55:33
17     strike that.            10:55:37
18         Do you have any opinion about what   10:55:38
19     percentage of patients who had organic brain   10:55:39
20     syndrome had Alzheimer's disease?   10:55:42
21 A  It's such a broad term, organic brain syndrome,   10:55:56
22     and the way it's been used by different   10:56:01
23     physicians in different countries is so -- so   10:56:06
24     variable, and includes so many patients.  It's   10:56:08
25     difficult to -- it would be speculative.   10:56:12

Page 64

1 Q  Before April 1989, had you diagnosed patients   10:56:43
2     with Alzheimer's disease in your practice?   10:56:48
3 A  Yes.            10:56:53
4 Q  And what criteria did you use to diagnose   10:56:54
5     patients with Alzheimer's disease in your   10:56:59
6     practice before 1989?            10:57:02
7 A  NINCDS-ADRDA McKhann criteria from 1983 or '84.   10:57:03
8 Q  And were the criteria that you used based on the   10:57:13
9     patient's symptoms?            10:57:19
10 A  The criteria were based on the patient's   10:57:29
11     symptoms, on a clinical evaluation of the   10:57:36
12     patient with cyclometric testing, actually,   10:57:42
13     being obtained on a -- in part of that   10:57:53
14     evaluation -- a physical neurological   10:58:01
15     examination to exclude other systemic causes of   10:58:05
16     cognitive impairment, secondarily causing   10:58:14
17     cognitive impairment, and a neurological   10:58:19
18     examination to help exclude other   10:58:23
19     neurodegenerative conditions, and -- as this   10:58:28
20     was, you're saying, before 1989 --   10:58:34
21 Q  Correct.            10:58:37
22 A  -- would have been an imaging study of the head,   10:58:37
23     at that time, a CT scan of the -- of the brain   10:58:41
24     to specifically exclude structural conditions   10:58:54
25     that might, such as normal pressure   10:59:01

Page 65

1     hydrocephalus of multiple strokes, et cetera,   10:59:05
2     that might cause dementia.            10:59:08
3         So -- and those would be the -- the ways in   10:59:12
4     which the information was acquired to then apply   10:59:18
5     the diagnostic criteria, the DSM -- or excuse   10:59:23
6     me -- the NINCDS-ADRDA criteria to make a   10:59:28
7     diagnosis.            10:59:34
8 Q  Did anything in the McKhann criteria require a   10:59:37
9     CT scan of the brain?            10:59:40
10 A  I would like to see the McKhann criteria to   10:59:44
11     answer that specifically.  The   10:59:49
12     1983-'84 criteria, which are not currently   10:59:51
13     used -- or are not used by me in my practice.   10:59:56
14 Q  Do you recall sitting here today whether or not   11:00:00
15     it required a CT scan?            11:00:02
16 A  I believe the goal was to exclude other causes   11:00:05
17     of dementia, and in practice, CT scans at that   11:00:16
18     time were done.            11:00:21
19         At the time the McKhann criteria were being   11:00:25
20     derived, CT scanning would have been a very   11:00:28
21     young technology, to say the least.  I suspect   11:00:37
22     it may not have specifically mentioned CT scans   11:00:45
23     in the original criteria.            11:00:48

███████████    ████████
██████████████████████

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 94

7 Q  Do you understand that the court construed the   12:08:10
8      term "ineffective amount" to mean an amount   12:08:13
9      shown to cause improvement in comparison to a   12:08:16
10    placebo?                                        12:08:19
11 A  Yes.                                            12:08:22
12 Q  And what do you understand the word             12:08:23
13    "improvement" to refer to in the court's claim  12:08:29
14    construction?                                   12:08:37
15 A  That a patient is therapeutically benefited, has 12:08:39
16    improvement, and has been demonstrated by       12:08:54
17    evidence-based trials in global performance,    12:08:57
18    cognition, and functioning activities of daily  12:09:03
19    living, but that's my -- the -- the language of 12:09:08
20    just improvement, I think, means is clinically  12:09:19
21    beneficial.  I don't know that it would         12:09:23
22    necessarily encompass all of those domains.     12:09:26
23 Q  If you look at claim 1 in the patent, which is  12:09:30
24    reexamined claims, the very last page.          12:09:36
25 A  The ex parte reexamination?                     12:09:44

Page 95

1 Q  Right.                                           12:09:50
2 A  Hm?                                              12:09:50
3 Q  Yes.  Correct.                                   12:09:50
4 A  Okay.                                            12:09:53
5 Q  So you see claim 1?                              12:09:53
6 A  Claim 1.                                         12:09:54
7 Q  And do you see where claim 1 recites an          12:09:55
8      effective amount?                              12:09:57
9 A  Method for prevention or treatment of cerebral  12:10:01
10    ischemia comprising this step of orally         12:10:04
11    administering to a patient diagnosed with       12:10:07
12    Alzheimer's disease an effective amount of the  12:10:10
13    general formula, yes.                           12:10:11
14 Q  Okay.  And so do you understand effective amount 12:10:14
15    to refer back to the prevention or treatment of 12:10:17
16    a cerebral ischemia?                            12:10:21
17        MR. MAJCHRZAK:  Objection.                  12:10:32
18 A  Well, prevention or treatment of cerebral       12:10:47
19    ischemia, yes.                                  12:10:52
20 Q  Turning to -- sorry to flip back to you --      12:10:55
21    but -- back and forth between exhibits -- but   12:11:00
22    turning to paragraph 51 of Dr. Doody's report.  12:11:02
23 A  51.  Okay.                                      12:11:06
24 Q  So there's a part of paragraph 51 that continues 12:11:21
25    on to the following page.  And towards the      12:11:23

Page 96

1    middle of that paragraph, she says, "For        12:11:27
2    example, a person weighing 20 kilograms,        12:11:30
3    approximately 44 pounds, and taking 5 milligrams 12:11:33
4    per day would be taking 0.25 milligrams per     12:11:36
5    kilogram.  A patient weighing 200 kilograms,    12:11:40
6    approximately 444 pounds, taking 20 milligrams  12:11:44
7    per day would receive a dose of 0.1 milligrams  12:11:48
8    per kilogram."                                  12:11:52
9        Do you see that?                            12:11:53
10 A  Yes.                                            12:11:54
11 Q  And do you agree with that statement?          12:11:54
12 A  Yes.                                           12:12:04
13 Q  Turning to paragraph 54, she states, "Oral     12:12:07
14    administration to patients of memantine        12:12:24
15    hydrochloride at daily doses of 10 milligrams  12:12:27
16    and 20 milligrams per day" --                  12:12:30
17 A  Hold on a second.  Hold on a second.           12:12:33
18 Q  Sorry.                                         12:12:35
19 A  Where are you?                                 12:12:36
20 Q  It's the sentence starts "As discussed above." 12:12:38
21        Do you see that?                            12:12:41
22 A  Okay.  "As discussed."  I found it.            12:12:41
23 Q  Okay.  So it states, "Oral administration to   12:12:44
24    patients of memantine hydrochloride at daily   12:12:48
25    doses of 10 milligrams and 20 milligrams per day 12:12:51

Page 97

1    has been shown in clinical studies to benefit   12:12:54
2    global performance, cognition, and function in  12:12:56
3    comparison to placebo treatment."               12:12:59
4        Do you see that?                            12:13:01
5 A  Yes.                                            12:13:01
6 Q  And do you agree with that statement?          12:13:01
7 A  Yes.                                           12:13:05
8 Q  And then later in the paragraph, she states,    12:13:07
9    "The persistent activation of the NMDA receptors 12:13:13
10    that is treated by memantine corresponds to the 12:13:18
11    imbalance of neuronal stimulation recited in    12:13:22
12    this claim element."                            12:13:26
13        Do you see that?                            12:13:28
14 A  Yes.                                            12:13:28
15 Q  And do you agree with that statement?          12:13:28
16 A  Yes.                                           12:13:31
17 Q  Turning to paragraph 73.  There's a part of 73  12:13:50
18    that continues on to the next page.             12:14:09
19 A  (Indiscernibly reading from the document.)      12:14:13
20    Okay.                                           12:14:28
21 Q  The first sentence on the next page says        12:14:29
22    "Memantine provides an antagonistic intervention 12:14:31
23    with regard to this excessive inflow of         12:14:36
24    calcium."                                       12:14:39
25        Do you see that?                            12:14:40

25 (Pages 94 - 97)

Page 98

1 A  Yes.                          12:14:41
2 Q  And do you agree with that statement?      12:14:41
3 A  Yes.                          12:14:42
4 Q  And would that statement be true for memantine  12:14:43
5    administered at 20 milligrams regardless of   12:14:51
6    whether it was administered before 1989 or after 12:14:57
7    1989?                       12:15:00
8 A  Say what you just said again.        12:15:15
9 Q  Would it be true that memantine provides an   12:15:18
10   antagonistic intervention with regard to this  12:15:22
11   excessive inflow of calcium whether or not    12:15:26
12   memantine was administered before April 1989 or 12:15:30
13   after April 1989?                12:15:35
14 A  Yes.                        12:15:38
15 Q  And wouldn't it be true that oral administration 12:15:47
16   to patients of memantine hydrochloride, of daily 12:15:50
17   doses between 10 milligrams and 20 milligrams  12:15:55
18   per day, would benefit global performance,    12:15:58
19   cognition, and function whether it had been   12:16:00
20   administered before 1989 or after 1989?     12:16:03
21 A  Yes.                        12:16:20
22 Q  And would oral administration of patients of  12:16:21
23   memantine hydrochloride at daily doses of    12:16:26
24   10 milligrams and 20 milligrams per day have   12:16:28
25   shown the persistent activation of NMDA     12:16:33

Page 99

1    receptors whether or not it was administered   12:16:37
2    before April 1989 or after April 1989?      12:16:42
3 A  The persistent say again.          12:16:47
4 Q  Persistent activation of NMDA receptors?     12:16:49
5 A  So I'm sorry, can you repeat the question?    12:17:04
6 Q  Sure. Let me try it again.  Is it true that   12:17:07
7    oral administration of memantine to patients at 12:17:11
8    daily doses between 10 milligrams and      12:17:16
9    20 milligrams would have shown persistent    12:17:18
10   activation of NMDA receptors whether it was   12:17:23
11   administered before 1989 or after 1989?     12:17:27
12 A  My source of confusion here is persistent    12:17:44
13   activation of NMDA receptors by excitatory amino 12:17:49
14   acid and glutamate is the -- contributes to the 12:17:59
15   symptomatology of Alzheimer's disease.     12:18:03
16   Memantine doesn't activate the receptors, per  12:18:05
17   se --                       12:18:08
18 Q  Okay.                       12:18:09
19 A  -- it actually blocks that effect. So you're   12:18:09
20   stating the positive, and I don't know if that's 12:18:13
21   what you intend to do or what you're doing.   12:18:15
22 Q  Is it true that the oral administration of    12:18:31
23   memantine to patients at daily doses of     12:18:35
24   10 milligrams or 20 milligrams per day would be 12:18:38
25   an effective cerebral ischemia alleviating or  12:18:45

Page 100

1    preventive amount whether or not it would have  12:18:51
2    been administered before April 1989 or after  12:18:53
3    April 1989?                    12:18:56
4 A  Yes.                        12:19:01
5 Q  Is it true that the oral administration of    12:19:08
6    memantine to patients at daily doses of     12:19:10
7    10 milligrams or 20 milligrams per day would   12:19:12
8    have been provided an antagonistic intervention 12:19:17
9    with regard to an excessive inflow of calcium  12:19:21
10   whether or not it was administered before    12:19:24
11   April 1989 or after April 1989?         12:19:26
12 A  Yes.                        12:19:32
13     MS. JONES:  I think now would be a good    12:19:46
14   time to break for lunch before we go on to    12:19:48
15   another topic.                  12:19:50
16     THE WITNESS:  Okay.             12:19:52
17     THE VIDEOGRAPHER:  We're off the record at 12:19:53
18   12:19 p.m.                    12:19:54
19     (A lunch recess was taken from 12:19 p.m.  12:19:55
20   to 12:57 p.m.)                  12:19:55
21
22
23
24
25

Page 101

1      AFTERNOON SESSION             12:19:55
2      THE VIDEOGRAPHER:  We are back on the
3    record at 12:57 p.m.
4 DIRECT EXAMINATION (Continuing),
5    QUESTIONS BY MS. MIRANDA JONES:
6 Q  Dr. Farlow, would you agree that oral       12:57:36
7    administration of memantine at daily doses of  12:57:39
8    10 milligrams or 20 milligrams per day would   12:57:42
9    prevent an imbalance of neuronal stimulation   12:57:45
10   whether it was administered before 1989 or after 12:57:49
11   April 1989?                    12:57:52
12 A  Yes.                        12:58:12
13 Q  Would you agree that oral administration of   12:58:13
14   memantine at daily doses of 10 milligrams or   12:58:16
15   20 milligrams per day would provide antagonistic 12:58:19
16   intervention with regard to NMDA receptor    12:58:24
17   channels whether it was administered before   12:58:28
18   April 1989 or after April 1989?         12:58:30
19 A  Say it again.                   12:58:35
20 Q  Would you agree that oral administration of   12:58:37
21   memantine at daily doses of 10 milligrams or   12:58:40
22   20 milligrams per day would provide antagonistic 12:58:44
23   intervention with regard to NMDA receptor    12:58:49
24   channels whether it was administered before   12:58:52
25   April of 1989 or after April of 1989?      12:58:55

26 (Pages 98 - 101)

Page 102

1 A  So what does "antagonistic intervention" mean?   12:58:58
2 Q  Do you have any understanding of what   12:59:03
3  "antagonistic intervention" means?   12:59:04
4 A  I understand antagonist, but I don't know how   12:59:07
5  you're using "intervention."  Is it -- you're   12:59:10
6  using it in implying it has an antagonistic   12:59:13
7  effect with regard to the receptors, the NMDA   12:59:18
8  receptors?   12:59:21
9 Q  Correct.   12:59:22
10 A  Yes, I agree.   12:59:23
11 Q  Would you agree that oral administration of   12:59:24
12  memantine at daily doses of 10 milligrams or   12:59:28
13  20 milligrams per day would have treated or   12:59:31
14  eliminated an imbalance of neuronal stimulation   12:59:36
15  whether it was administered before April 1989 or   12:59:39
16  after April of 1989?   12:59:43
17 A  Yes.   12:59:46
18 Q  Would you agree that oral administration of   12:59:48
19  memantine at daily doses of 10 milligrams or   12:59:51
20  20 milligrams per day would provide an   12:59:54
21  antagonistic intervention with regard to the   12:59:57
22  excessive inflow of calcium through NMDA   13:00:00
23  receptor channels after Alzheimer's disease,   13:00:04
24  whether it was administered before April 1989 or   13:00:07
25  after April of 1989?   13:00:09

Page 103

1 A  Let me hear your construction again.   13:00:13
2 Q  Would you agree that oral administration of   13:00:16
3  memantine at daily doses of 10 milligrams or   13:00:18
4  20 milligrams per day would provide an   13:00:21
5  antagonistic intervention with regard to the   13:00:25
6  excessive inflow of calcium through an NMDA   13:00:28
7  receptor channel after Alzheimer's disease,   13:00:32
8  whether it was administered before April of 1989   13:00:36
9  or after April of 1989?   13:00:39
10 A  So "after Alzheimer's disease," does that mean   13:00:41
11  associated with Alzheimer's disease?   13:00:46
12 Q  Correct.   13:00:47
13 A  Yes.   13:00:49
14 Q  So, yes, you agree with that statement?   13:00:54
15 A  Yes.   13:00:56
16 Q  Okay.  Earlier today we were discussing the   13:00:57
17  claims of the '703 patent, and I neglected to   13:01:00
18  ask you about claim 12.  So if you could turn   13:01:04
19  back to the '703 patent.   13:01:07
20 A  The reexamination or the original patent?   13:01:12
21 Q  Claim 12 appears in the original patent,   13:01:14
22  column 14.   13:01:21
23 A  Okay.   13:01:23
24 Q  All right.  And --   13:01:33
25 A  Okay.   13:01:35

Page 104

1 Q  -- claim 12 recites "wherein the adamantane   13:01:35
2  derivative in administered in the form of   13:01:38
3  composition containing the same together with a   13:01:43
4  pharmaceutically acceptable carrier or diluent."   13:01:45
5     Do you see that?   13:01:49
6 A  Yes.   13:01:50
7 Q  And would Akatinol dosage form have memantine   13:01:51
8  administered in the form of a composition   13:01:57
9  containing memantine with a pharmaceutically   13:02:00
10  acceptable carrier or diluent?   13:02:03
11     MR. MAJCHRZAK:  Objection.  Speculation.   13:02:09
12 A  Yeah, I don't know what the constituents of   13:02:10
13  Akatinol are.   13:02:16
14 Q  Do you have the Rote Liste?   13:02:18
15 A  It doesn't list any diluents.  I don't think.  I   13:02:21
16  could be wrong.   13:02:27
17 Q  So on page 906.   13:02:44
18 A  Okay.   13:02:45
19 Q  It lists the different dosage forms of Akatinol,   13:02:46
20  and it list tablets as one of the dosage forms.   13:02:49
21     Do you see that?   13:02:53
22 A  Right.   13:02:54
23 Q  And what do you understand a tablet to be?   13:02:54
24 A  A tablet is composed of a solid, typically a   13:03:01
25  compressed powder that primarily consists of a   13:03:06

Page 105

1  drug, but it may have a binder.  It may be --   13:03:10
2  have a diluent or a form that does not have   13:03:14
3  pharmaceutical activity that has various   13:03:20
4  properties that may influence the rate the   13:03:22
5  tablet will dissolve or the solubility of how it   13:03:27
6  gets into the system, what the half-life ends up   13:03:34
7  being.   13:03:37
8 Q  And would a tablet contain a pharmaceutically   13:03:39
9  acceptable carrier?   13:03:42
10 A  Typically they do.   13:03:46
11 Q  And with respect to the Akatinol memantine   13:03:48
12  solution, would that include diluent?   13:03:55
13     MR. MAJCHRZAK:  Objection.   13:04:00
14 A  I don't know.  All that's listed on this list   13:04:01
15  that you've presented to -- before me is   13:04:05
16  memantine hydrochloride for all of the different   13:04:08
17  forms.  It doesn't really specify -- or I don't   13:04:10
18  see the binder or diluent that may be there.   13:04:13
19 Q  Would you expect the solution to include a   13:04:20
20  diluent?   13:04:24
21     MR. MAJCHRZAK:  Objection.  Speculation.   13:04:26
22 A  It is speculation.  I would expect that it   13:04:26
23  would.   13:04:30

27 (Pages 102 - 105)

Page 142

1 Q  Okay.  In 1985 did you consider organic brain   14:07:08
2   syndrome to include patients diagnosed with   14:07:18
3   Alzheimer's disease?   14:07:20
4 A  Say it again.   14:07:26
5 Q  In 1985 did you consider organic brain syndrome   14:07:28
6   to include patients with Alzheimer's disease?   14:07:36
7 A  In 1985 I had been on faculty at Indiana   14:07:54
8   University for two years and was approached by   14:07:57
9   Dr. Hugh Henry who was the chairman of the   14:08:02
10   department of psychiatry about starting a   14:08:04
11   dementia clinic, which we did.  I do not   14:08:07
12   specifically remember thinking about it or   14:08:13
13   discussing the relative relationship between   14:08:19
14   organic brain syndrome and Alzheimer's disease   14:08:26
15   at that time.   14:08:29
16 Q  If you turn to page 92 of the document that's   14:08:30
17   placed before you?   14:08:36
18 A  92.  Okay.   14:08:37
19 Q  Do you see at the bottom around line 22, you   14:08:44
20   were asked a question?   14:08:46
21 A  Okay.   14:08:50
22 Q  "Back in 1985, did you consider organic brain   14:08:50
23   syndrome to include patients diagnosed with   14:08:57
24   Alzheimer's disease?"   14:08:58
25     Do you see that?   14:08:58

Page 143

1 A  I see it.   14:08:59
2 Q  And your answer is, "Yes"; correct?   14:08:59
3 A  Answered yes.  Yes, I did.   14:09:02
4 Q  And so today, do you agree that in 1985 you   14:09:04
5   considered organic brain syndrome to include   14:09:09
6   patients diagnosed with Alzheimer's disease?   14:09:09
7 A  Yes.   14:09:16
8 Q  Okay.  Are you aware of any definition of   14:09:17
9   organic brain syndrome that would exclude   14:09:22
10   patients with Alzheimer's disease?   14:09:26
11 A  No.   14:09:27
12 Q  Are you aware of any definition of organic brain   14:09:27
13   syndrome that would not include patients with   14:09:30
14   Alzheimer's disease?   14:09:33
15 A  Any definition of organic brain syndrome that   14:09:42
16   would not include patients diagnosed with   14:09:43
17   Alzheimer's disease?   14:09:45
18 Q  Yes.   14:09:46
19 A  No.  Well, to be -- they wouldn't necessarily be   14:09:50
20   diagnosed with Alzheimer's disease, but they may   14:09:58
21   actually have Alzheimer's disease.   14:10:02
22 Q  Looking at page 96, around line 18.  You   14:10:05
23   asked --   14:10:15
24 A  Hold on a second.   14:10:16
25 Q  Sorry.   14:10:17

Page 144

1 A  So is it the pages at the bottom or where's   14:10:18
2   the --   14:10:22
3 Q  I'm going by the transcript pages.  I think that   14:10:23
4   might be easier.  So page 96 of the transcript.   14:10:26
5     MR. MAJCHRZAK:  It's in the bottom   14:10:32
6   right-hand corner of that box kind of thing.   14:10:32
7 A  Here (indicating)?   14:10:37
8     MR. MAJCHRZAK:  A little higher.   14:10:38
9 A  Okay.  Got it.  Got it.  Sorry.   14:10:40
10 BY MS. JONES:   14:10:43
11 Q  Okay.  Around line 18?   14:10:43
12 A  Okay.   14:10:46
13 Q  You were asked, "And then how much money" -- I'm   14:10:47
14   sorry -- "And then how much with respect to   14:10:49
15   money that the university received in the form   14:10:53
16   of contracts?"   14:10:54
17     And you answered, "It's probably   14:10:56
18   approximately one million."   14:10:58
19 A  Okay.   14:11:01
20 Q  And does this refresh your recollection about   14:11:01
21   approximately how much the University of Indiana   14:11:04
22   received in connection with clinical studies   14:11:07
23   that you conducted for Forest?   14:11:11
24 A  What did I say previously here?   14:11:14
25 Q  I think earlier today you testified that you   14:11:19

Page 145

1   couldn't quite remember.   14:11:21
2 A  I don't remember.  So that was probably about   14:11:23
3   right.   14:11:24
4 Q  Okay.  And so one million is approximately   14:11:25
5   correct?   14:11:29
6 A  Well, it's probably -- yeah, that would be a lot   14:11:30
7   closer to the time that the money was received.   14:11:33
8   Yeah.   14:11:35
9 Q  All right.  Have you completed any   14:11:39
10   neurotransmitter research as of today?   14:11:43
11 A  That's a broad -- what are you referring to by   14:12:02
12   "neurotransmitter research"?   14:12:10
13 Q  Have you done any research in terms of actually   14:12:13
14   studying, I guess, mechanisms of   14:12:17
15   neurotransmitters?   14:12:21
16 A  I've not -- I've not done research that   14:12:22
17   specifically focused on early sedating   14:12:26
18   mechanisms.   14:12:36

37 (Pages 142 - 145)

Page 190

9  Q  So you would agree that those prior art     15:33:52
10     references disclosed has the effective amount as  15:33:54
11     used in the '703 patent; correct?     15:33:57
12  A  Yes.                                    15:33:59
13  Q  Okay. And you mentioned a caveat with respect  15:34:00
14     to oral administration of memantine. Would you  15:34:03
15     agree that Ambrozi, Marcea, Tempel, and Schäfer  15:34:08
16     each disclosed oral administration of memantine?  15:34:15
17  A  Yes, they do. I don't -- yes.          15:34:19
18  Q  And when you refer to the IV administration of  15:34:24
19     memantine, you're referring to Fleischhacker;  15:34:29
20     correct?                               15:34:33
21  A  Correct.                               15:34:33
22  Q  Okay. Do you agree that 20 milligrams of  15:34:43
23     memantine would be considered an effective  15:35:07
24     amount as that term is used in claim 1?  15:35:12
25  A  So what page are the claims on?         15:36:34

Page 191

1  Q  The claims are -- the reexamined claims are at  15:36:36
2     the very back of the patent. And the --    15:36:41
3  A  Okay. Here we go. (Indiscernibly reading from  15:36:52
4     the document.) And ask your question again.  15:36:59
5  Q  Do you agree that 20 milligrams of memantine per  15:37:06
6     day would be considered an effective amount of  15:37:08
7     memantine as that term is used in claim 1?  15:37:12
8  A  Yes.                                    15:37:15
9  Q  Okay. And you understand that the court  15:37:16
10     interpreted an "effective amount" to mean an  15:37:20
11     amount shown to cause improvement in comparison  15:37:23
12     to a placebo; correct?                  15:37:26
13  A  Yes.                                   15:37:28
14  Q  Okay. And so do you agree that Ambrozi  15:37:28
15     specifically discloses an amount of memantine  15:37:32
16     that is an effective amount as used in claim 1?  15:37:37
17  A  That's the one paper I don't have.      15:37:54
18     MR. MAJCHRZAK: No. 11.               15:37:57
19  A  Excuse me. I've got it. Never mind.     15:37:58
20  Q  And so if you look at the bottom of the second  15:38:00
21     column, it notes that Akatinol memantine is  15:38:04
22     being administered in this study; correct?  15:38:12
23  A  Says the doses of memantine and placebo carried  15:38:51
24     out by (indiscernibly reading from the  15:38:54
25     document.) Sometimes -- what is -- where's the  15:39:01

Page 192

1     dose?                                  15:39:11
2  Q  So it refers to Akatinol memantine?      15:39:11
3  A  Says lot No. 0101?                     15:39:15
4  Q  Correct.                               15:39:18
5  A  It doesn't tell me the dose though.     15:39:19
6  Q  Do you recall earlier today when you were  15:39:22
7     looking at the Rote Liste that the dose of  15:39:23
8     Akatinol memantine was 20 milligrams per day?  15:39:27
9  A  Akatinol memantine. (Indiscernibly reading from  15:39:36
10     the document.) All right. Dosage. Starts with  15:40:22
11     10 milligrams in the first week increased by  15:40:35
12     10 milligrams may be in 20 milligrams per day.  15:40:38
13     Yes. They say 20 to 30 milligrams per day.  15:40:45
14     The article lists a lot, but I don't see a  15:40:52
15     specific dose listed.                   15:40:54
16  Q  And would you understand that the doses of  15:40:56
17     Akatinol started at 10 milligrams per day?  15:40:59
18  A  Yes.                                   15:41:03
19  Q  Okay. And so would you expect that at least  15:41:03
20     10 milligrams per day was administered of  15:41:05
21     memantine?                             15:41:08
22  A  Yes.                                   15:41:09
23  Q  Looking at the Fleischhacker reference.  15:41:09
24  A  Okay. Yes.                             15:41:13
25  Q  Would you agree that Fleischhacker discloses an  15:41:15

Page 193

1     effective amount of memantine as that term's  15:41:19
2     used in claim 1?                       15:41:23
3  A  20 or 30 milligrams. Yes.              15:41:29
4  Q  Do you agree that Fleischhacker discloses an  15:41:35
5     effective amount that is from 0.01 to     15:41:42
6     100 milligrams per kilogram?            15:41:46
7  A  Yes. But the -- my understanding is, is the  15:41:53
8     effective amount, as per the Namenda patent,  15:41:57
9     refers to oral medication not to IV, and there  15:42:03
10     may or may not be equivalence to IV.    15:42:07
11  Q  Okay. Do you understand that the only  15:42:09
12     difference between the Fleischhacker reference  15:42:11
13     and claim 1 is the oral administration?  15:42:15
14     MR. MAJCHRZAK: Objection.            15:42:18
15  A  I do understand that a difference between the  15:42:26
16     Fleischhacker reference and the claim 1 is the  15:42:27
17     oral administration versus the IV administration  15:42:34
18     in the Fleischhacker reports.           15:42:37
19  Q  Do you know of any other differences between  15:42:41
20     claim 1 and the Fleischhacker reference?  15:42:43
21  A  Not sitting here. I can read very carefully and  15:42:49
22     see if something would appear, but that's the  15:42:52
23     one difference that stands out.         15:42:54
24  Q  And so sitting here today, the only difference  15:42:58
25     that you're aware of between the Fleischhacker  15:43:04

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

1  reference and claim 1 is the oral administration 15:43:07
2  of memantine; correct? 15:43:10
3 A  For the '703, yes. 15:43:17
4 Q  Earlier today, we talked about oral 15:43:20
5  administration; correct? 15:43:22
6 A  We did discuss oral administration. 15:43:25
7 Q  And if I recall correctly, you agreed that oral 15:43:27
8  administration was known in the prior art before 15:43:30
9  April 1989; correct? 15:43:33
10 A  Yes. 15:43:36
11 Q  And so wouldn't it be obvious for a person of 15:43:38
12  ordinary skill in the art to use orally 15:43:42
13  administered memantine in combination with the 15:43:48
14  Fleischhacker reference? 15:43:50
15 A  I would say no. Particularly because the -- in 15:43:54
16  the Fleischhacker study, the results were 15:44:01
17  reported as being negative and not showing any 15:44:07
18  benefit from the drug. The presumed 15:44:11
19  medication -- mechanism of action people 15:44:16
20  generally still talked about a dopaminergic 15:44:19
21  mechanism of action that didn't appear to do 15:44:22
22  anything. 15:44:25
23     So I'm not sure from the point of view of 15:44:26
24  having a negative IV study why somebody would 15:44:30
25  make the leap and say "It didn't work with IV. 15:44:34

Page 195

1  Yes, I'm going to go ahead and do a study with 15:44:37
2  an oral medication now." 15:44:41
3 Q  Now, you say the results reported were negative, 15:44:45
4  but isn't it true that Fleischhacker reported 15:44:50
5  results that were inconclusive? 15:44:53
6     MR. MAJCHRZAK: Objection. 15:44:56
7 A  All right. You can substitute the word 15:45:08
8  "inconclusive" for negative in the previous 15:45:10
9  response to the question. 15:45:17
10 Q  Doesn't Fleischhacker himself suggest that 15:45:21
11  additional studies should be conducted? 15:45:23
12 A  That's kind of a general thing that 15:45:30
13  investigators say when they have a study that is 15:45:34
14  not positive. It doesn't show what they 15:45:37
15  originally wanted to justify, or as to try to 15:45:42
16  continue some enthusiasm for research along 15:45:49
17  similar lines, but, I mean, that's -- that's 15:45:54
18  what I would cite. 15:46:00
19 Q  Specifically, he says "Long-term studies could 15:46:02
20  probably rule out these biases and show clearer 15:46:04
21  distinctions between the two groups"; correct? 15:46:10
22 A  What he's saying is that this is a small trial 15:46:13
23  with relatively small number of patients that 15:46:17
24  makes it difficult to definitively make a 15:46:19
25  statement that the results were negative, that 15:46:23

Page 196

1  results did not show statistical benefit or 15:46:31
2  didn't show benefit. But you couldn't rule out 15:46:36
3  the possibility that there would be benefit from 15:46:38
4  a longer and better conducted study with more 15:46:43
5  patients. 15:46:46
6     But, again, the fact that this study was 15:46:46
7  done didn't, you know, even if it's a 15:46:50
8  preliminary study, didn't show anything. The 15:46:54
9  fact that it didn't show anything would be more 15:46:58
10  motivation not to pursue further research, or to 15:47:03
11  administer memantine as an -- or to consider it 15:47:10
12  as going forward in a trial with an incentive to 15:47:14
13  proceed along those lines with an oral 15:47:18
14  medication. 15:47:20
15 Q  Well, do you agree that it showed improvement in 15:47:22
16  both patient groups? And when I say "both 15:47:27
17  patient groups," I mean the patient groups that 15:47:33
18  were given memantine and the control patient 15:47:36
19  group? 15:47:39
20 A  Okay. So improvement, you know, versus what? I 15:47:43
21  mean, it's typically -- in clinical trials you 15:47:49
22  look at how a group of patients who were on 15:47:55
23  medications do versus placebo. You do that 15:48:01
24  because a number of factors may influence the 15:48:08
25  results as they occur in measurements. There 15:48:12

Page 197

1  may be learning effects that occur. There 15:48:17
2  certainly is -- and particularly with an IV 15:48:22
3  administered medication, there is a -- the 15:48:24
4  potential for a placebo effect as a general 15:48:27
5  rule. The more invasive, as it were, a 15:48:32
6  procedure that's done, and it applies to all 15:48:37
7  basic research, the more aggressive the approach 15:48:43
8  of a therapy is, the more potential there is for 15:48:45
9  placebo effect to believe by the patient and 15:48:48
10  their family that there's some benefit, and 15:48:52
11  there may actually be some benefit for a period 15:48:54
12  of time. 15:48:56
13 Q  Right. And Dr. Fleischhacker reports that no 15:48:58
14  significant differences between the two groups 15:49:03
15  could be calculated by statistical evaluation; 15:49:05
16  correct? 15:49:09
17 A  Correct. 15:49:09

50 (Pages 194 - 197)

Q Is there any -- I guess, so apart from your opinion that someone would not pursue, I guess, further development of the Fleischhacker study, is there any reason that a person of ordinary skill in the art wouldn't have known about oral administration of memantine and combined that with the teachings of Fleischhacker to arrive at, I guess, essentially what's claimed in claim 1? 15:58:55 15:59:04 15:59:08 15:59:11 15:59:15 15:59:18 15:59:23 15:59:28 15:59:33

MR. MAJCHRZAK: Objection. 15:59:34

A So I'm not sure what the teachings of Fleischhacker are that would motivate one to proceed with oral memantine. It's a study that had inconclusive results, so it doesn't provide any motivation to proceed. 15:59:36 15:59:40 15:59:43 15:59:47 15:59:51

Q Let's look at the problem a different way. So if you start with Akatinol that teaches the oral administration to patients having organic brain syndrome and recognize that organic brain syndrome includes Alzheimer's disease, wouldn't a person of ordinary skill in the art be motivated to give memantine to a patient having Alzheimer's disease? 16:00:01 16:00:05 16:00:11 16:00:15 16:00:19 16:00:23 16:00:26 16:00:32



A The mechanism of action of Akatinol that was most generally accepted was the dopaminergic mechanism. The Alzheimer's disease, it was understood, was not -- was not -- although there were people suggesting around the edges that something may have to do with dopaminergic. The general thought process was that it was something that had to do with the cholinergic system. And with regard to Alzheimer's disease as being a component of organic brain syndrome, again, it was a component. There were various other disease processes that were part of organic brain syndrome. The evidence in terms of Akatinol, none of that has been discussed here, is truly by moderate criteria having a significant beneficial effect in patients with Alzheimer's disease was, you know, had not really truly met moderate regulatory criteria. The studies had not been -- had not been done to do that. The motivation going forward for all the reasons that I just elucidated and to do a study on Alzheimer's disease would have been relatively weak, which was why -- or probably one of the reasons it wasn't done through the '80s in terms of administering oral, other than the four trials, the very small pilot trials that are mentioned. It wasn't something that was actively pursued in a big study that would meet regulatory approval by a major pharmaceutical company during that period of time. 16:00:48 16:00:55 16:00:59 16:01:09 16:01:13 16:01:17 16:01:21 16:01:24 16:01:29 16:01:33 16:01:36 16:01:40 16:01:45 16:01:48 16:01:57 16:02:04 16:02:07 16:02:14 16:02:18 16:02:22 16:02:24 16:02:31 16:02:36 16:02:40 16:02:43 16:02:51 16:02:53 16:02:55 16:02:59 16:03:02 16:03:04



Q Isn't it true that Merz obtained approval for Akatinol, its memantine product in Germany, for use in organic brain syndrome, and then -- 16:03:06 16:03:11 16:03:19

A And the date that that was done? 16:03:27

Q -- and then tried to develop a memantine product in the United States for an indication that was defined differently in the United States, but essentially fell within organic brain syndrome? 16:03:28 16:03:35 16:03:37 16:03:40

MR. MAJCHRZAK: Objection. 16:03:45

A I mean, okay. That's sort of a broad -- that's a very broad construction. Okay. Akatinol was approved at a very early date in Germany. The regulatory that were -- that were applied in Europe allowed the approval of a lot of medications with relatively weak evidence by today's standards. 16:03:51 16:03:54 16:04:01 16:04:04 16:04:11 16:04:13 16:04:16

HIGHLY CONFIDENTIAL

1    Many of these medications were felt by a    16:04:18
2    person, I think, whatever the phrase is we're    16:04:25
3    using, ordinary skill by psychiatrists and    16:04:29
4    neurologists, not to be truly effective.    16:04:32
5    Memantine was regarded by -- or Akatinol was    16:04:36
6    regarded by many physicians in the same light    16:04:40
7    as -- whatchamacallit -- the plant extract --    16:04:44
8    Ginkgo biloba -- and was looked at in the same    16:04:48
9    way as something that was given but which is --    16:04:55
10   they did not regard that as being effective    16:04:57
11   either.    16:05:00
12       The Merz -- it was a product that Merz had    16:05:05
13   been selling. They were interested in    16:05:13
14   developing the product. Certainly, there was a    16:05:16
15   broad interest amongst pharmaceutical companies    16:05:19
16   that grew -- that grew larger as -- with the    16:05:21
17   development of cholinesterase inhibitors, in    16:05:26
18   particular by pharmaceutical companies in the    16:05:30
19   United States. There was -- there was the -- as    16:05:32
20   it were -- the development of a pathway that    16:05:39
21   they could see for development of drugs that    16:05:43
22   would be approved by FDA, and by that time, the    16:05:45
23   European community regulatory authorities where    16:05:50
24   you could actually -- you knew what the goals    16:05:55
25   were, what the stepping-stones you had to    16:05:57

1    achieve to reach drug approval. And so there    16:06:00
2    was interest in obviously Merz into promoting    16:06:06
3    their drug and interest by Forest in having a    16:06:12
4    potential product, and so they decided in the    16:06:18
5    early to mid-'90s to pursue development of this    16:06:20
6    drug using modern criteria for Alzheimer's    16:06:24
7    disease.    16:06:28
8        And to see if in that specific    16:06:29
9    subpopulation there really was an effect of the    16:06:32
10   drug as a therapy for Alzheimer's disease.    16:06:37
11       But with regards -- you know, I think you    16:06:44
12   had some language that sort of said a subset or    16:06:45
13   equate or something. But, I mean, they are sort    16:06:50
14   of different things. Yes, Alzheimer's disease    16:06:53
15   is a subset, but as OBS was applied generally in    16:06:55
16   Europe, and to some extent in the United States,    16:07:01
17   depending upon the country, the locations, and    16:07:04
18   the physicians involved, be it neurologists or    16:07:07
19   psychiatrists. The populations of patients were    16:07:11
20   composed of a big variety of other diagnoses    16:07:17
21   that met, potentially, the criteria for OBS.    16:07:25
22   And in some places, you know, a big chunk of    16:07:28
23   patients here had schizophrenia, and some may    16:07:33
24   have been traumatic things, and some vascular    16:07:36
25   dementia. It's hard to say what specific -- the    16:07:38

1    etiology of the -- of the symptoms that were    16:07:45
2    classified of OBS, the specific etiologies.    16:07:49
3        It was a -- more or less a general    16:07:54
4    wastebasket term that I think -- I mean,    16:07:56
5    honestly, likely inhibited, to some extent, drug    16:08:01
6    development because it had such a heterogenous    16:08:07
7    composition.    16:08:14
8  Q I want to break that down a little bit. Is it    16:08:15
9    your opinion that in Germany in the early 1980s    16:08:17
10   when Akatinol was approved, physicians didn't    16:08:23
11   distinguish between organic brain syndrome and    16:08:30
12   Alzheimer's disease?    16:08:34
13 A  That would be my opinion.    16:08:38
14 Q  And so if a physician in Germany in the early    16:08:43
15   1980s had a patient that had Alzheimer's    16:08:48
16   disease, but perhaps wasn't diagnosed with    16:08:52
17   Alzheimer's disease, would that physician have    16:08:56
18   given the patient Akatinol?    16:08:59
19       MR. MAJCHRZAK: Objection.    16:09:04
20 A  Possibly. I don't know the answer to that    16:09:11
21   question. They -- you know -- you know, the    16:09:13
22   question being did they diagnose the patient as    16:09:20
23   having Alzheimer's disease? And then because    16:09:23
24   they had Alzheimer's, administering Akatinol. I    16:09:26
25   don't know that that was the case.    16:09:29

1  Q  But in a jurisdiction where physicians don't    16:09:30
2    separately recognize Alzheimer's disease, is it    16:09:34
3    your opinion that that cannot constitute an    16:09:39
4    invalidating prior use because they didn't make    16:09:45
5    that distinction even though they gave memantine    16:09:49
6    to patients who had Alzheimer's disease?    16:09:53
7        MR. MAJCHRZAK: Objection. Legal    16:09:56
8    conclusion.    16:09:57
9  A  I kind of lost the question in that.    16:10:01
10 Q  Okay. In a jurisdiction where physicians don't    16:10:03
11   separately recognize Alzheimer's disease from    16:10:09
12   organic brain syndrome, is it your opinion that    16:10:13
13   the use of memantine in that jurisdiction cannot    16:10:18
14   constitute an invalidating prior use because    16:10:25
15   they didn't recognize that they were actually    16:10:29
16   administering memantine to a patient who had    16:10:33
17   Alzheimer's disease?    16:10:36
18       MR. MAJCHRZAK: Same objection.    16:10:37
19 A  I don't know whether they were administering    16:10:39
20   memantine to patients with Alzheimer's disease    16:10:42
21   or not. They didn't make that diagnosis.    16:10:44

# EXHIBIT
# 276

HIGHLY CONFIDENTIAL

Page 1

1                  UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF NEW YORK

3       * * * * * * * * * * * * *

4       In Re:                    *

5       Namenda Direct Purchaser  * C.A. 1:15-cv-07488-CM

6       Antitrust Litigation      *

7       * * * * * * * * * * * * *

8

9

10

11                   HIGHLY CONFIDENTIAL

12

13

14

15          Video Deposition of James J. Finchen

16             Tuesday, November 21, 2017

17                  White & Case LLP

18             75 State Street - 24th Floor

19             Boston, Massachusetts 02109

20

21

22

23

24     ----------- J. Edward Varallo, RMR, CRR  ----------

25          Registered Professional Reporter

HIGHLY CONFIDENTIAL

Page 30

1    Q.    The time is a little off on your email
2  to Mr. Carnevale.  It says 1:23 a.m. whereas in
3  Exhibit 2, it was 9:23 a.m.  But would you agree
4  that it's the same email?  9:23 p.m.  I'm sorry.
5          MR. TOTO:  Yeah, right.
6    A.    Yeah.  I mean, I don't know why it's
7  stamped differently.
8    Q.    Were you and Mr. Carnevale in different
9  time zones at the time, if you remember?
10   A.    I don't.  I don't remember, yeah.
11   Q.    And if you'd turn to the Medicaid best
12 price analysis that is appended to this document, do
13 you see that the Medicaid best price liability shows
14 a $24 million liability between scenario 1 and
15 scenario 2 over two years?
16   A.    It's closer to --
17         MR. TOTO:  Sorry; hold on.  Object to
18 the form.  You may answer.
19   A.    I was just going to say it's closer to
20 $25 million, but I do see that.
21   Q.    And between the email that you sent to
22 Mr. Carnevale at 1:23 a.m. or 9:23 p.m., whichever
23 the case may be, and the following most recent in
24 time email in Exhibit 2, which is another email from
25 you to Robert Carnevale twelve hours later, so

Page 31

1  eleven or twelve hours later, did you work with
2  anyone to try to create an analysis that increased
3  the additional liability between scenario 1 and 2?
4          MR. TOTO:  Object to form, lacks
5  foundation, argumentative, assumes facts, calls for
6  speculation.  You may answer.
7    A.    It's hard to say what I did on that day,
8  who I talked to.  I would -- I would be hard-pressed
9  to agree with the supposition that we would work to
10 increase the Medicaid liability.  I think we were
11 just -- We went through a process of trying to
12 refine the analysis to make sure it reflected the
13 company's, you know, best understanding and
14 reasonable expectations of what should factor into
15 that type of analysis.  So it looks like from the
16 Exhibit 2 latest email that there was a revision to
17 the profit share amount or forecast and there was
18 possibly a latest brand projection that was used to
19 update the Medicaid units.
20   Q.    And the profit share is relevant because
21 it's a component of the transfer price.  Is that
22 correct?
23   A.    Under scenario 1, that's correct.
24   Q.    And I think you mentioned earlier, is
25 transfer price generally the manufacturing cost plus

Page 32

1  any royalty or profit share?
2          MR. TOTO:  Under the 2005 agreement,
3  you're asking?
4    Q.    Under the Deficit Reduction Act.
5    A.    So it was my understanding and my role
6  at the time that that's how transfer price should be
7  calculated.
8    Q.    In scenario 2 where Mylan manufactures
9  the authorized generic, there's no transfer price.
10 Is that correct?
11   A.    It was my understanding there would be
12 no transfer price, that is correct.
13   Q.    So profit share is only relevant to
14 scenario 1?
15   A.    In the analysis, that is correct.
16   Q.    And you don't know what the -- You don't
17 have any independent knowledge of what the
18 appropriate number for profit share should be.
19 Right?
20         MR. TOTO:  Object to form, vague and
21 ambiguous.
22   A.    Could you clarify the question?
23   Q.    In scenario 1, do you know if profit
24 share under the contract was 40 percent, a 40/60
25 split between Forest and Mylan?

Page 33

1          MR. TOTO:  And feel free to look at the
2  analysis if it helps you answer.
3    A.    It does appear to be the case that under
4  the original contract Forest's profit share was
5  40 percent whereas Mylan's was 60 percent.
6    Q.    But in the analysis that is Exhibit 1 to
7  your declaration, didn't you apply a different
8  profit share arrangement to scenario 1?
9    A.    Again, it's hard to say what we did, you
10 know, nearly eight years ago in this spreadsheet,
11 but I believe if memory serves me correctly that we
12 used the profit share calculations that were in the
13 profit share model or otherwise came from the
14 business development team to calculate the transfer
15 price that was used to calculate in part the
16 Medicaid rebate liability in scenario 1.
17   Q.    And the business development team, did
18 that include Robert Carnevale?
19   A.    It did.
20   Q.    And did that include David Solomon?
21   A.    It did.
22   Q.    And Rachel Mears?
23   A.    It did.
24   Q.    Okay.  I'd like to wrap up the
25 deposition with one last line of questioning that

9 (Pages 30 - 33)

Page 42

1    Q.   Now, can you switch to FRX-AT-04617767,
2 which is the Lexapro market share analysis.
3    A.   I'm there.
4    Q.   Now, do you see a tab, the third tab,
5 which says "Profit per unit calculation new"?
6    A.   I do.
7    Q.   And do you agree that the profit per
8 unit is 52 cents for the first quarter, roughly 62
9 cents for the second quarter, and roughly 56-1/2
10 cents for the third quarter?
11   A.   I do agree that's what this shows.
12        MR. TOTO:  And that's all 2012, right?
13        MR. LITVIN:  Yes, that's all 2012.
14 BY MR. LITVIN:
15   Q.   And those numbers correspond to the
16 profit set forth in the Medicaid liability workbook
17 that we just looked at.  Is that correct?
18   A.   They do.
19   Q.   And do the profit figures in this
20 spreadsheet represent Forest's profit per unit on
21 Mylan's sales of authorized generic Lexapro?
22        MR. TOTO:  Object to form.
23   A.   They represent, it appears, the profit
24 per unit that we would've used for the transfer
25 price calculation.

Page 43

1    Q.   And that is in accordance with a profit
2 share percentage arrangement.  Is that correct?
3        MR. TOTO:  Object to form.
4    A.   I understand -- It's my understanding
5 that they reflect the profit share arrangement.
6    Q.   Now if you switch to the tab entitled
7 "Auth generic years 1 and 2," you already testified
8 that under scenario 1 and scenario 2 you don't know
9 what the actual agreement says the profit share
10 percentages are.  Is that correct?
11        MR. TOTO:  Object to form.
12   A.   I don't know what the actual agreement
13 has, you know, what the drafting of it says and what
14 the requirements of the agreement were.
15   Q.   But under this spreadsheet authorized
16 generic years one and two, does it appear that there
17 is a graduated scale for Mylan from 70 percent to
18 60 percent and for Forest from 30 to 40 percent?
19   A.   It appears so.
20   Q.   What I'd like you to do is change cells
21 B34 through 36 to 60 percent.
22   A.   B34 through 36 to 60 percent?  Okay.
23        MR. TOTO:  Give us a second here.
24        MR. LITVIN:  Sure, take your time.  It
25 is 60 percent already.

Page 44

1        MR. LITVIN:  Under the tab "Authorized
2 generic years 1 and 2."
3        MR. TOTO:  Oh, okay.
4        (Pause)
5        MR. LITVIN:  Just let me know when
6 you're ready, counsel.  I'm just waiting for --
7        THE WITNESS:  I'm ready.
8        MR. LITVIN:  Okay.
9 BY MR. LITVIN:
10   Q.   And then if you change, I'll ask you to
11 change B38 to B40 to 40 percent.
12   A.   Okay.
13   Q.   Now if you switch back to the third tab,
14 "Profit per unit calculation new" --
15   A.   Okay.
16   Q.   -- now you see that the profit per unit
17 is now 69.3, roughly 69.3 cents for the first and
18 second quarters?
19   A.   I do.
20   Q.   So by changing the profit share to
21 60 percent for Mylan and 40 percent for Forest,
22 we've increased the Forest profit and therefore the
23 transfer price.  Is that correct?
24   A.   We have.
25   Q.   Now if you could switch back one more

Page 45

1 time to the other spreadsheet, which is the Medicaid
2 best price spreadsheet ending in 768.
3    A.   Mm-hmm, okay.
4        MR. TOTO:  Give us a second here,
5 counsel.
6        MR. LITVIN:  Yes.
7        (Pause)
8        MR. TOTO:  Okay.
9 BY MR. LITVIN:
10   Q.   And if you could go to the BP calc tab
11 and if you could replace the profit numbers in S14,
12 16 and 18 with 0.69347.
13        MR. TOTO:  16?
14        MR. LITVIN:  14, 16 and 18.
15        (Pause)
16        THE WITNESS:  Okay.
17        MR. TOTO:  Hold on.  Give us a second,
18 counsel.
19        MR. LITVIN:  You want me to repeat
20 the -- ?
21        MS. O'SHAUGHNESSY:  No, I have it,
22 I think.  Okay.
23 BY MR. LITVIN:
24   Q.   And in addition, if you could change
25 T14, T16 and T18 to 0.69347.  And so to clarify what

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1 we just did, we changed the profit share in the
2 Medicaid spreadsheet to reflect the same profit per
3 unit that we changed in the Lexapro generic
4 analysis.
5          MR. TOTO: Object to form, lacks
6 foundation, and this whole exercise assumes that
7 nothing else would have changed under this
8 hypothetical world where we're changing just parts
9 of these spreadsheets on the fly. But you may
10 answer.
11     A.    Yes, we have, so I agree with what you
12 said that we changed, yes.
13     Q.    And just to clarify, all we've changed
14 is the profit share arrangement, is that correct,
15 reflected in off generic year one and two?
16     A.    That would -- That appears to be the
17 case.
18     Q.    If you now switch to the tab titled
19 Liability under the Medicaid liability sheet, the
20 additional liability decreases from 30,437,000 to
21 28,550,000. Is that correct?
22     A.    It is.
23          MR. TOTO: Hold on. Give me a second.
24          MR. LITVIN: Sure, take your time.
25          MR. TOTO: So you're comparing what you

Page 47

1 changed to what? To the original which was Exhibit
2 1 of his declaration. Is that right?
3          MR. LITVIN: Yes.
4          MR. TOTO: All right, let me just....
5 BY MR. LITVIN:
6     Q.    So just to clarify --
7          MR. TOTO: Okay, I just want to check
8 it. Okay.
9 BY MR. LITVIN:
10     Q.    Just to clarify, there's a line on this
11 liability spreadsheet that says "Additional
12 liability for scenario 1 versus scenario 2" and then
13 there's a number. Correct?
14     A.    That is correct.
15     Q.    And the number dynamically updated to
16 reflect the changes that we made. Is that correct?
17     A.    That is correct.
18     Q.    And applying the royalty rate change
19 that we just did results in a decrease in the
20 savings, Medicaid liability savings in this
21 analysis, by roughly 1,887,000. Is that correct?
22          MR. TOTO: Object to form, same reasons
23 as my prior objection.
24     A.    That's correct.
25     Q.    And I wonder if you can tell if that

Page 48

1 same 1,887,000 difference would hold if we just
2 focused on the first five quarters, so quarter one
3 2012 through quarter one 2013?
4     A.    So can you please clarify -- ?
5          MR. TOTO: Please hold on. Go ahead.
6     A.    Could you please clarify what you're
7 asking?
8     Q.    Yes. So the liability spreadsheet shows
9 the additional liability savings for quarter one
10 2012 through quarter one 2014. Correct?
11     A.    That is correct.
12     Q.    And we made some changes and pursuant to
13 those changes, the liability savings is $1.887
14 million less. Is that correct?
15          MR. TOTO: Object to form.
16     Q.    Over the course of the entire period of
17 analysis, which is Q1 '12 through Q1 '14. Is that
18 correct?
19     A.    Yes, but it's still $28-1/2 million, a
20 little more than that.
21     Q.    Yes. And I just wanted to -- Strike
22 that. If you just focused on the first five
23 quarters, which is Q1 2012 through Q1 2013 --
24     A.    Okay.
25     Q.    -- would the savings also be under the

Page 49

1 changes we made $1.887 million less?
2     A.    It should not have affected any quarters
3 other than the ones that we changed.
4     Q.    And that's because -- Well, that's
5 because the best price for the subsequent quarters
6 has not been changed. Is that correct?
7     A.    That is correct.
8          MR. LITVIN: Okay, I have no further
9 questions at this time.
10          MR. TOTO: Okay. I have a few
11 questions.
12          EXAMINATION
13 BY MR. TOTO:
14     Q.    So just picking up where we left off
15 here with all these changes that counsel asked you
16 to do on the fly here on the spreadsheets, what is
17 the total amount of savings that Forest would have
18 realized on best price for switching the
19 manufacturing of the generic Lexapro, authorized
20 generic Lexapro, from Forest to Mylan?
21          MR. LITVIN: Objection, leading. And
22 over the entire period of time or just the first
23 five quarters?
24 BY MR. TOTO:
25     Q.    Can you answer the question?

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 58

1 2012." Did I read that correctly?
2   A.   Yes, you did.
3   Q.   Is that a true and accurate statement?
4   A.   It is.
5   Q.   "D, Forest's expected cost of goods
6 sold, COGS, to provide finished authorized generic
7 Lexapro product to Mylan under scenario 2, which
8 impacts the net transfer" -- I think I misread that,
9 so let me start again.  This is Section 13(d) of
10 your declaration talking about the key assumptions:
11 "Forest's expected cost of goods sold, COGS, to
12 provide finished authorized generic Lexapro product
13 to Mylan under scenario 1, which impacts the net
14 transfer price.  I was provided with information
15 that Forest's COGS would be the API price plus the
16 manufacturing cost plus the packaging cost."  Did
17 I read that correctly?
18   A.   You did.
19   Q.   Is that a true and accurate statement?
20   A.   It is.
21   Q.   13(e), "For iterations of the model
22 after January 14, 2010, calculation of expected
23 profit share payments from Mylan to Forest in
24 scenario 1, which impacts the net transfer price.
25 Bob Carnevale provided this information to me based

Page 59

1 upon the Lexapro generic analysis forecasts, an
2 example of which can be found at FRX-AT-04617114,
3 attached hereto as Exhibit 2."  Did I read that
4 correctly?
5   A.   You did.
6   Q.   Is that a true and accurate statement?
7   A.   It is.
8   Q.   "Expected quarterly change in CPI, the
9 Consumer Price Index, which affects the average
10 rebate per unit, RPU."  And that was Section 13(f)
11 of your declaration.  Did I read that correctly?
12   A.   You did.
13   Q.   Is that a true and accurate statement?
14   A.   It is.
15   Q.   Okay.
16       Section paragraph 14 of your declaration
17 reads: "Between January 2010 and March 2010, I
18 created more than ten iterations of the Lexapro
19 Medicaid best price liability analysis as I received
20 updated information on assumptions, including
21 Lexapro unit and price forecasts, transfer price and
22 profit share.  To the best of my recollection, in
23 each case I calculated that Forest would incur at
24 least 20 million less in Medicaid best price
25 liability under scenario 2 as compared to scenario

Page 60

1 1."  Did I read that correctly?
2   A.   You did.
3   Q.   Is there anything in today's deposition
4 that causes you to believe that that is no longer an
5 accurate statement?
6   A.   No.
7   Q.   Paragraph 15: "To the best of my
8 knowledge, based on my review of several versions of
9 the analysis, Exhibit 1 appears to be the latest
10 Lexapro Medicaid best price analysis conducted in
11 advance of execution of the Lexapro amendment on
12 July 21, 2010, and it appears to reflect the final
13 assumptions and inputs available at that time.
14 Exhibit 1 forecasts that Forest would have reduced
15 its Medicaid best price liability by $30.4 million
16 under scenario 2 as compared to scenario 1.
17 Further, this calculation does not include the
18 additional best price liability savings Forest would
19 accrue in the event that Mylan continued to
20 manufacture and sell an authorized generic version
21 of Lexapro for longer than nine quarters."  Did
22 I read that correctly?
23   A.   You did.
24   Q.   Is that a true and accurate statement?
25   A.   It is.

Page 61

1   Q.   To the best of your knowledge, sir, what
2 was the purpose for which this best price analysis
3 that you talk about in your declaration was created?
4   A.   To evaluate a proposed change in the
5 arrangement with Mylan.
6   Q.   Are you aware of any effort to prepare
7 fake or fraudulent forecasts at Forest?
8   A.   No.
9       MR. TOTO:  I have no further questions.
10      MR. LITVIN:  Two follow-up questions.
11          FURTHER EXAMINATION
12 BY MR. LITVIN:
13   Q.   With reference to paragraph 15, are you
14 sure that Exhibit 1 to your declaration used
15 accurate profit share assumptions to arrive at the
16 $30.4 million savings between scenario 1 and
17 scenario 2?
18      MR. TOTO:  Object to form.
19   A.   I can't speak to the profit share
20 assumptions.  They were provided to me by folks that
21 had experience analyzing those deals and I relied on
22 their experience to prepare those assumptions.  And,
23 I mean, maybe you could talk to those people.
24   Q.   Robert Carnevale?
25   A.   Yes.

16 (Pages 58 - 61)

EXHIBIT
277

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE NAMENDA DIRECT PURCHASER
ANTITRUST LITIGATION

Case No. 1:15-CV-07488-CM-JCF

## DECLARATION OF JAMES FINCHEN

I, James Finchen, hereby declare as follows:

1.  I am currently employed at Alkermes, Inc. as Director, Contracts Counsel.  My current responsibilities include providing legal advice to the Government Pricing, Payer, and Trade functions, as well as overseeing the U.S. Contracting function.

2.  I was employed by Forest Laboratories, Inc. ("Forest") from October 2000 until March 2014.

3.  From October 2000 through June 2006, I held various positions in the Sales Administration department.

4.  From July 2006 through May 2010, I worked in the Commercial and Government Contracting group as an Associate Manager of Contract Development and Analysis (July 2006 – June 2007), a Manager of Contract Development and Analysis (July 2007 – June 2009), and a Senior Manager of Contract Development and Analysis (July 2009 – May 2010).  My responsibilities within the Commercial and Government Contracting group included overseeing calculation of government rebates and pricing, and developing contracts for various trade channels (such as PBMs, Medicaid, Medicare, and GPOs).

PENGAD 800-631-6989

EXHIBIT
Finchen
1
11-21-17 EV