| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1,947 | 1,962 | 1,851 | 1,821 | 1,825 | 1,799 | **7,296** | 1,709 | 1,654 |
| 5,881 | 5,925 | 5,590 | 5,501 | 5,512 | 5,435 | **22,038** | 5,162 | 4,997 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 120,539 | 121,438 | 114,582 | 112,743 | 112,969 | 111,404 | **451,699** | 105,796 | 102,421 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 4,430 | 4,463 | 4,211 | 4,143 | 4,152 | 4,094 | **16,601** | 3,888 | 3,764 |
| 3,498 | 3,524 | 3,325 | 3,272 | 3,278 | 3,233 | **13,108** | 3,070 | 2,972 |
| 91,255 | 91,936 | 86,745 | 85,353 | 85,524 | 84,340 | **341,962** | 80,093 | 77,539 |
| 75 | 76 | 71 | 70 | 70 | 69 | **281** | 66 | 64 |
| 156,873 | 158,044 | 149,120 | 146,727 | 147,022 | 144,985 | **587,854** | 137,685 | 133,294 |
| 90 | 91 | 86 | 84 | 84 | 83 | **337** | 79 | 76 |
| 8,145 | 8,206 | 7,742 | 7,618 | 7,634 | 7,528 | **30,522** | 7,149 | 6,921 |
| 180 | 181 | 171 | 168 | 169 | 166 | **675** | 158 | 153 |
| 6,625 | 6,674 | 6,298 | 6,197 | 6,209 | 6,123 | **24,826** | 5,815 | 5,629 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 6,648 | 6,698 | 6,319 | 6,218 | 6,231 | 6,144 | **24,912** | 5,835 | 5,649 |
| 98 | 99 | 93 | 92 | 92 | 91 | **367** | 86 | 83 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 60 | 60 | 57 | 56 | 56 | 55 | **225** | 53 | 51 |
| 6,545 | 6,594 | 6,222 | 6,122 | 6,134 | 6,049 | **24,526** | 5,744 | 5,561 |
| 23,404 | 23,579 | 22,247 | 21,890 | 21,934 | 21,630 | **87,702** | 20,541 | 19,886 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 360 | 363 | 342 | 337 | 337 | 333 | **1,349** | 316 | 306 |
| 18,581 | 18,720 | 17,663 | 17,379 | 17,414 | 17,173 | **69,629** | 16,308 | 15,788 |
| 361,628 | 364,326 | 343,756 | 338,240 | 338,919 | 334,223 | **1,355,138** | 317,396 | 307,272 |
| 3,038 | 3,061 | 2,888 | 2,842 | 2,847 | 2,808 | **11,384** | 2,666 | 2,581 |
| 372,650 | 375,431 | 354,234 | 348,549 | 349,248 | 344,410 | **1,396,441** | 327,070 | 316,638 |
| 2,035 | 2,050 | 1,934 | 1,903 | 1,907 | 1,881 | **7,626** | 1,786 | 1,729 |
| 24,265 | 24,446 | 23,066 | 22,696 | 22,741 | 22,426 | **90,929** | 21,297 | 20,618 |
| 30 | 30 | 29 | 28 | 28 | 28 | **112** | 26 | 25 |
| 12,429 | 12,522 | 11,815 | 11,625 | 11,648 | 11,487 | **46,576** | 10,909 | 10,561 |
| 16,876 | 17,002 | 16,042 | 15,785 | 15,816 | 15,597 | **63,240** | 14,812 | 14,339 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 1,760 | 1,773 | 1,673 | 1,646 | 1,649 | 1,627 | **6,595** | 1,545 | 1,495 |
| 81 | 82 | 77 | 76 | 76 | 75 | **304** | 71 | 69 |
| 8,917 | 8,984 | 8,476 | 8,340 | 8,357 | 8,241 | **33,415** | 7,826 | 7,577 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 112,468 | 113,307 | 106,910 | 105,194 | 105,405 | 103,945 | **421,454** | 98,712 | 95,563 |
| 45 | 45 | 43 | 42 | 42 | 42 | **169** | 39 | 38 |
| 5,890 | 5,934 | 5,599 | 5,509 | 5,520 | 5,444 | **22,072** | 5,170 | 5,005 |
| 1,456 | 1,467 | 1,384 | 1,362 | 1,365 | 1,346 | **5,456** | 1,278 | 1,237 |
| 19,692 | 19,839 | 18,719 | 18,418 | 18,455 | 18,200 | **73,792** | 17,283 | 16,732 |
| 237 | 239 | 225 | 222 | 222 | 219 | **888** | 208 | 201 |
| 32,614 | 32,857 | 31,002 | 30,505 | 30,566 | 30,142 | **122,215** | 28,625 | 27,712 |
| 1 | 1 | 1 | 1 | 1 | 1 | **4** | 1 | 1 |
| 9,540 | 9,611 | 9,069 | 8,923 | 8,941 | 8,817 | **35,749** | 8,373 | 8,106 |
| 20,190 | 20,341 | 19,192 | 18,884 | 18,922 | 18,660 | **75,659** | 17,720 | 17,155 |
| 159,890 | 161,083 | 151,988 | 149,549 | 149,849 | 147,773 | **599,160** | 140,333 | 135,857 |
| 7,875 | 7,934 | 7,486 | 7,366 | 7,380 | 7,278 | **29,510** | 6,912 | 6,691 |
| 136,306 | 137,323 | 129,570 | 127,490 | 127,746 | 125,977 | **510,783** | 119,634 | 115,818 |
| 3,509 | 3,535 | 3,336 | 3,282 | 3,289 | 3,243 | **13,149** | 3,080 | 2,982 |
| 28,745 | 28,959 | 27,324 | 26,886 | 26,940 | 26,567 | **107,717** | 25,229 | 24,424 |

| | | | | | | | | |
|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| 89 | 90 | 85 | 83 | 83 | 82 | **334** | 78 | 76 |
| 1,446 | 1,457 | 1,375 | 1,352 | 1,355 | 1,336 | **5,419** | 1,269 | 1,229 |
| 1,044 | 1,052 | 992 | 976 | 978 | 965 | **3,912** | 916 | 887 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 10,277 | 10,354 | 9,769 | 9,612 | 9,632 | 9,498 | **38,511** | 9,020 | 8,732 |
| 40 | 40 | 38 | 37 | 37 | 37 | **150** | 35 | 34 |
| 19,573 | 19,719 | 18,606 | 18,307 | 18,344 | 18,090 | **73,346** | 17,179 | 16,631 |
| 60 | 60 | 57 | 56 | 56 | 55 | **225** | 53 | 51 |
| 1,050 | 1,058 | 998 | 982 | 984 | 970 | **3,935** | 922 | 892 |
| 107,683 | 108,487 | 102,361 | 100,719 | 100,921 | 99,523 | **403,523** | 94,512 | 91,497 |
| 1,303,344 | 1,313,069 | ##### | ##### | ##### | ##### | **4,884,055** | ##### | ##### |
| 1,279,914 | 1,289,465 | ##### | ##### | ##### | ##### | **4,796,255** | ##### | ##### |
| 37,400 | 37,679 | 35,552 | 34,981 | 35,051 | 34,566 | **140,150** | 32,825 | 31,778 |
| 15,380 | 15,495 | 14,620 | 14,385 | 14,414 | 14,214 | **57,634** | 13,499 | 13,068 |
| 96,006 | 96,722 | 91,261 | 89,797 | 89,977 | 88,731 | **359,766** | 84,263 | 81,575 |
| 186,983 | 188,378 | 177,742 | 174,890 | 175,241 | 172,813 | **700,686** | 164,113 | 158,878 |
| 44,408 | 44,739 | 42,213 | 41,536 | 41,619 | 41,043 | **166,411** | 38,976 | 37,733 |
| 1,127 | 1,135 | 1,071 | 1,054 | 1,056 | 1,042 | **4,223** | 989 | 958 |
| 52,289 | 52,679 | 49,705 | 48,907 | 49,005 | 48,326 | **195,944** | 45,893 | 44,430 |
| 1,210 | 1,219 | 1,150 | 1,132 | 1,134 | 1,118 | **4,534** | 1,062 | 1,028 |
| 85,193 | 85,829 | 80,983 | 79,683 | 79,843 | 78,737 | **319,246** | 74,773 | 72,388 |
| 874 | 881 | 831 | 817 | 819 | 808 | **3,275** | 767 | 743 |
| 4,095 | 4,126 | 3,893 | 3,830 | 3,838 | 3,785 | **15,345** | 3,594 | 3,479 |
| 3,461 | 3,487 | 3,290 | 3,237 | 3,244 | 3,199 | **12,969** | 3,038 | 2,941 |
| 99,311 | 100,052 | 94,403 | 92,888 | 93,074 | 91,785 | **372,151** | 87,164 | 84,384 |
| 15 | 15 | 14 | 14 | 14 | 14 | **56** | 13 | 13 |
| 152,276 | 153,412 | 144,751 | 142,428 | 142,713 | 140,736 | **570,628** | 133,651 | 129,388 |
| 198 | 199 | 188 | 185 | 186 | 183 | **742** | 174 | 168 |
| 4,640 | 4,675 | 4,411 | 4,340 | 4,349 | 4,288 | **17,388** | 4,072 | 3,943 |
| 3,750 | 3,778 | 3,565 | 3,507 | 3,515 | 3,466 | **14,052** | 3,291 | 3,186 |
| 39,374 | 39,668 | 37,428 | 36,827 | 36,901 | 36,390 | **147,547** | 34,558 | 33,456 |
| 968 | 975 | 920 | 905 | 907 | 895 | **3,627** | 850 | 823 |
| 64,144 | 64,623 | 60,974 | 59,995 | 60,116 | 59,283 | **240,368** | 56,298 | 54,503 |
| 801 | 807 | 761 | 749 | 751 | 740 | **3,002** | 703 | 681 |
| 9,135 | 9,203 | 8,684 | 8,544 | 8,561 | 8,443 | **34,232** | 8,018 | 7,762 |
| 395 | 398 | 375 | 369 | 370 | 365 | **1,480** | 347 | 336 |
| 5,425 | 5,465 | 5,157 | 5,074 | 5,084 | 5,014 | **20,329** | 4,761 | 4,610 |
| 6,732 | 6,782 | 6,399 | 6,297 | 6,309 | 6,222 | **25,227** | 5,909 | 5,720 |
| 480 | 484 | 456 | 449 | 450 | 444 | **1,799** | 421 | 408 |
| 4,293 | 4,325 | 4,081 | 4,015 | 4,023 | 3,968 | **16,087** | 3,768 | 3,648 |
| 72,282 | 72,821 | 68,710 | 67,607 | 67,743 | 66,804 | **270,864** | 63,441 | 61,417 |
| 384 | 387 | 365 | 359 | 360 | 355 | **1,439** | 337 | 326 |
| 80,513 | 81,114 | 76,534 | 75,306 | 75,457 | 74,412 | **301,708** | 70,665 | 68,411 |
| 235 | 237 | 223 | 220 | 220 | 217 | **881** | 206 | 200 |
| 10,381 | 10,458 | 9,868 | 9,710 | 9,729 | 9,594 | **38,901** | 9,111 | 8,821 |
| 633 | 638 | 602 | 592 | 593 | 585 | **2,372** | 556 | 538 |
| 16,410 | 16,532 | 15,599 | 15,349 | 15,379 | 15,166 | **61,494** | 14,403 | 13,943 |
| 17,864 | 17,997 | 16,981 | 16,709 | 16,742 | 16,510 | **66,942** | 15,679 | 15,179 |
| 1,200 | 1,209 | 1,141 | 1,122 | 1,125 | 1,109 | **4,497** | 1,053 | 1,020 |
| 847 | 853 | 805 | 792 | 794 | 783 | **3,174** | 743 | 720 |
| 24,628 | 24,812 | 23,411 | 23,035 | 23,081 | 22,762 | **92,289** | 21,616 | 20,926 |
| 521 | 525 | 495 | 487 | 488 | 482 | **1,952** | 457 | 443 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 48,703 | 49,066 | 46,296 | 45,553 | 45,645 | 45,012 | **182,506** | 42,746 | 41,383 |
| 195 | 196 | 185 | 182 | 183 | 180 | **731** | 171 | 166 |
| 3,660 | 3,687 | 3,479 | 3,423 | 3,430 | 3,383 | **13,715** | 3,212 | 3,110 |
| 26,911 | 27,112 | 25,581 | 25,171 | 25,221 | 24,872 | **100,844** | 23,619 | 22,866 |
| 513,473 | 517,304 | 488,097 | 480,264 | 481,228 | 474,561 | **1,924,151** | 450,669 | 436,294 |
| 470,617 | 474,129 | 447,359 | 440,180 | 441,063 | 434,953 | **1,763,555** | 413,054 | 399,879 |
| 43,015 | 43,336 | 40,889 | 40,233 | 40,314 | 39,755 | **161,191** | 37,754 | 36,549 |
| 1,699 | 1,712 | 1,615 | 1,589 | 1,592 | 1,570 | **6,367** | 1,491 | 1,444 |
| 48,807 | 49,171 | 46,395 | 45,650 | 45,742 | 45,108 | **182,896** | 42,837 | 41,471 |
| 254 | 256 | 241 | 238 | 238 | 235 | **952** | 223 | 216 |
| 66,564 | 67,061 | 63,274 | 62,259 | 62,384 | 61,520 | **249,437** | 58,422 | 56,559 |
| 3,315 | 3,340 | 3,151 | 3,101 | 3,107 | 3,064 | **12,422** | 2,910 | 2,817 |
| 4,401 | 4,434 | 4,184 | 4,116 | 4,125 | 4,067 | **16,492** | 3,863 | 3,739 |
| 69,087 | 69,603 | 65,673 | 64,619 | 64,748 | 63,851 | **258,891** | 60,637 | 58,703 |
| 1,292 | 1,302 | 1,228 | 1,208 | 1,211 | 1,194 | **4,842** | 1,134 | 1,098 |
| 89,738 | 90,408 | 85,303 | 83,934 | 84,103 | 82,938 | **336,278** | 78,762 | 76,250 |
| 4,944 | 4,981 | 4,700 | 4,624 | 4,634 | 4,569 | **18,527** | 4,339 | 4,201 |
| 5,520 | 5,561 | 5,247 | 5,163 | 5,173 | 5,102 | **20,685** | 4,845 | 4,690 |
| 917 | 924 | 872 | 858 | 859 | 848 | **3,436** | 805 | 779 |
| 21,991 | 22,155 | 20,904 | 20,569 | 20,610 | 20,324 | **82,407** | 19,301 | 18,686 |
| 30 | 30 | 29 | 28 | 28 | 28 | **112** | 26 | 25 |
| 64,020 | 64,498 | 60,856 | 59,879 | 60,000 | 59,168 | **239,904** | 56,190 | 54,397 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 2,620 | 2,640 | 2,491 | 2,451 | 2,455 | 2,421 | **9,818** | 2,300 | 2,226 |
| 3,149 | 3,172 | 2,993 | 2,945 | 2,951 | 2,910 | **11,800** | 2,764 | 2,676 |
| 52,321 | 52,711 | 49,735 | 48,937 | 49,035 | 48,356 | **196,064** | 45,921 | 44,457 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 89,257 | 89,923 | 84,846 | 83,484 | 83,652 | 82,493 | **334,475** | 78,340 | 75,841 |
| 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0 | 0 |
| 3,330 | 3,355 | 3,165 | 3,115 | 3,121 | 3,078 | **12,479** | 2,923 | 2,829 |
| 2,566 | 2,585 | 2,439 | 2,400 | 2,405 | 2,372 | **9,616** | 2,252 | 2,180 |
| 100,225 | 100,973 | 95,272 | 93,743 | 93,931 | 92,630 | **375,576** | 87,966 | 85,160 |
| 182 | 183 | 173 | 170 | 171 | 168 | **682** | 160 | 155 |
| 151,401 | 152,531 | 143,919 | 141,609 | 141,893 | 139,928 | **567,349** | 132,883 | 128,644 |
| 227 | 229 | 216 | 213 | 213 | 210 | **851** | 199 | 193 |
| 17,700 | 17,832 | 16,825 | 16,555 | 16,588 | 16,359 | **66,328** | 15,535 | 15,040 |
| 975 | 982 | 927 | 912 | 914 | 901 | **3,654** | 856 | 828 |
| 46,763 | 47,112 | 44,452 | 43,739 | 43,826 | 43,219 | **175,236** | 41,043 | 39,734 |
| 392 | 395 | 373 | 367 | 367 | 362 | **1,469** | 344 | 333 |
| 84,914 | 85,548 | 80,718 | 79,422 | 79,582 | 78,479 | **318,200** | 74,528 | 72,151 |
| 686 | 691 | 652 | 642 | 643 | 634 | **2,571** | 602 | 583 |
| 1,200 | 1,209 | 1,141 | 1,122 | 1,125 | 1,109 | **4,497** | 1,053 | 1,020 |
| 360 | 363 | 342 | 337 | 337 | 333 | **1,349** | 316 | 306 |
| 11,818 | 11,906 | 11,234 | 11,054 | 11,076 | 10,922 | **44,286** | 10,373 | 10,042 |
| 84 | 85 | 80 | 79 | 79 | 78 | **315** | 74 | 71 |
| 16,429 | 16,552 | 15,617 | 15,366 | 15,397 | 15,184 | **61,565** | 14,420 | 13,960 |
| 2,880 | 2,901 | 2,738 | 2,694 | 2,699 | 2,662 | **10,792** | 2,528 | 2,447 |

DC, HI, MI, MN

| |
|---|
| 19,441 |
| 304,702 |
| 4,408 |

| |
|---|
| 530,178 |
| 3,432 |
| 34,460 |

DE, LA, MD

| |
|---|
| 42,880 |
| 637,860 |
| 536,295 |

| 0.1% | -3.9% | | -12.8% | -90.0% | -28.7% | -26.0% | -28.9% |
|---|---|---|---|---|---|---|---|
| Q3 2011 | Q4 2011 | CY2011 | Q1 2012 | Q2 2012 | Q3 2012 | Q4 2012 | Q1 2013 |
| 883 | 848 | **3,525** | 740 | 74 | 53 | 39 | 28 |
| 19,297 | 18,535 | **77,005** | 16,167 | 1,621 | 1,156 | 856 | 609 |
| 18,405 | 17,678 | **73,446** | 15,420 | 1,546 | 1,103 | 816 | 581 |
| 100 | 96 | **397** | 83 | 8 | 6 | 4 | 3 |
| 255 | 245 | **1,019** | 214 | 21 | 15 | 11 | 8 |
| 10,293 | 9,887 | **41,076** | 8,624 | 865 | 617 | 456 | 325 |
| 178,398 | 171,352 | **711,909** | 149,467 | 14,989 | 10,687 | 7,909 | 5,627 |
| 1,343 | 1,290 | **5,358** | 1,125 | 113 | 80 | 60 | 42 |
| 176,143 | 169,187 | **702,911** | 147,578 | 14,800 | 10,552 | 7,809 | 5,556 |
| 1,137 | 1,092 | **4,536** | 952 | 96 | 68 | 50 | 36 |
| 14,878 | 14,290 | **59,372** | 12,465 | 1,250 | 891 | 660 | 469 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 100,857 | 96,874 | **402,477** | 84,501 | 8,474 | 6,042 | 4,471 | 3,181 |
| 51 | 49 | **204** | 43 | 4 | 3 | 2 | 2 |
| 96,091 | 92,296 | **383,459** | 80,508 | 8,074 | 5,756 | 4,260 | 3,031 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 43,364 | 41,652 | **173,049** | 36,332 | 3,644 | 2,598 | 1,923 | 1,368 |
| 828,079 | 795,376 | **3,304,507** | 693,791 | 69,577 | 49,606 | 36,712 | 26,120 |
| 3,627 | 3,484 | **14,475** | 3,039 | 305 | 217 | 161 | 114 |
| 660,387 | 634,306 | **2,635,318** | 553,293 | 55,487 | 39,560 | 29,278 | 20,831 |

1Q09-3Q09 Medi Util

| | | | | | | | |
|---:|---:|---:|---:|---:|---:|---:|---:|
| 4,866 | 4,674 | **19,419** | 4,077 | 409 | 292 | 216 | 153 |
| 25,612 | 24,601 | **102,207** | 21,459 | 2,152 | 1,534 | 1,135 | 808 |
| 3,380 | 3,246 | **13,487** | 2,832 | 284 | 202 | 150 | 107 |
| 70,982 | 68,179 | **283,259** | 59,471 | 5,964 | 4,252 | 3,147 | 2,239 |
| 77 | 74 | **306** | 64 | 6 | 5 | 3 | 2 |
| 71,368 | 68,549 | **284,797** | 59,794 | 5,996 | 4,275 | 3,164 | 2,251 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 2,885 | 2,771 | **11,511** | 2,417 | 242 | 173 | 128 | 91 |
| 10,492 | 10,078 | **41,871** | 8,791 | 882 | 629 | 465 | 331 |
| 144,726 | 139,010 | **577,539** | 121,256 | 12,160 | 8,670 | 6,416 | 4,565 |
| 14 | 13 | **54** | 11 | 1 | 1 | 1 | 0 |
| 143,125 | 137,472 | **571,149** | 119,914 | 12,026 | 8,574 | 6,345 | 4,515 |
| 7,594 | 7,294 | **30,305** | 6,363 | 638 | 455 | 337 | 240 |
| 950 | 912 | **3,789** | 796 | 80 | 57 | 42 | 30 |
| 18,070 | 17,356 | **72,108** | 15,139 | 1,518 | 1,082 | 801 | 570 |
| 539 | 517 | **2,149** | 451 | 45 | 32 | 24 | 17 |
| 13,277 | 12,752 | **52,981** | 11,124 | 1,116 | 795 | 589 | 419 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 1,430 | 1,373 | **5,705** | 1,198 | 120 | 86 | 63 | 45 |
| 2,535 | 2,435 | **10,115** | 2,124 | 213 | 152 | 112 | 80 |
| 52,352 | 50,284 | **208,913** | 43,862 | 4,399 | 3,136 | 2,321 | 1,651 |
| 385 | 369 | **1,535** | 322 | 32 | 23 | 17 | 12 |
| 60,150 | 57,775 | **240,033** | 50,396 | 5,054 | 3,603 | 2,667 | 1,897 |
| 355 | 341 | **1,416** | 297 | 30 | 21 | 16 | 11 |
| 3,680 | 3,535 | **14,686** | 3,083 | 309 | 220 | 163 | 116 |
| 22,900 | 21,996 | **91,385** | 19,187 | 1,924 | 1,372 | 1,015 | 722 |
| 387,913 | 372,593 | **1,547,994** | 325,006 | 32,593 | 23,238 | 17,198 | 12,236 |
| 6,639 | 6,377 | **26,492** | 5,562 | 558 | 398 | 294 | 209 |
| 364,478 | 350,083 | **1,454,473** | 305,371 | 30,624 | 21,834 | 16,159 | 11,497 |
| 5,706 | 5,481 | **22,771** | 4,781 | 479 | 342 | 253 | 180 |
| 25,548 | 24,539 | **101,952** | 21,405 | 2,147 | 1,530 | 1,133 | 806 |
| 916 | 880 | **3,657** | 768 | 77 | 55 | 41 | 29 |
| 28,721 | 27,587 | **114,614** | 24,064 | 2,413 | 1,721 | 1,273 | 906 |
| 256 | 246 | **1,022** | 215 | 22 | 15 | 11 | 8 |
| 37,435 | 35,957 | **149,388** | 31,365 | 3,145 | 2,243 | 1,660 | 1,181 |
| 204 | 196 | **815** | 171 | 17 | 12 | 9 | 6 |
| 5,965 | 5,729 | **23,803** | 4,998 | 501 | 357 | 264 | 188 |
| 26 | 25 | **102** | 21 | 2 | 2 | 1 | 1 |
| 477 | 459 | **1,905** | 400 | 40 | 29 | 21 | 15 |
| 19 | 18 | **75** | 16 | 2 | 1 | 1 | 1 |
| 329 | 316 | **1,314** | 276 | 28 | 20 | 15 | 10 |
| 598 | 575 | **2,387** | 501 | 50 | 36 | 27 | 19 |
| 14,623 | 14,045 | **58,353** | 12,251 | 1,229 | 876 | 648 | 461 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 241,495 | 231,957 | **963,701** | 202,332 | 20,291 | 14,467 | 10,707 | 7,617 |
| 51 | 49 | **204** | 43 | 4 | 3 | 2 | 2 |
| 14,903 | 14,314 | **59,470** | 12,486 | 1,252 | 893 | 661 | 470 |
| 768 | 738 | **3,066** | 644 | 65 | 46 | 34 | 24 |
| 20,451 | 19,643 | **81,609** | 17,134 | 1,718 | 1,225 | 907 | 645 |
| 34,081 | 32,735 | **136,003** | 28,554 | 2,864 | 2,042 | 1,511 | 1,075 |
| 26 | 25 | **105** | 22 | 2 | 2 | 1 | 1 |
| 4,306 | 4,136 | **17,182** | 3,607 | 362 | 258 | 191 | 136 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 27,977 | 26,872 | **111,643** | 23,440 | 2,351 | 1,676 | 1,240 | 882 |
| 294,484 | 282,854 | **1,175,160** | 246,728 | 24,743 | 17,641 | 13,056 | 9,289 |
| 971 | 933 | **3,874** | 813 | 82 | 58 | 43 | 31 |
| 244,539 | 234,882 | **975,850** | 204,883 | 20,547 | 14,649 | 10,841 | 7,714 |
| 1,122 | 1,078 | **4,479** | 940 | 94 | 67 | 50 | 35 |
| 21,921 | 21,055 | **87,477** | 18,366 | 1,842 | 1,313 | 972 | 691 |
| 6,240 | 5,993 | **24,900** | 5,228 | 524 | 374 | 277 | 197 |
| 90,781 | 87,196 | **362,267** | 76,059 | 7,628 | 5,438 | 4,025 | 2,864 |
| 4,115 | 3,952 | **16,421** | 3,448 | 346 | 247 | 182 | 130 |
| 113,764 | 109,271 | **453,981** | 95,315 | 9,559 | 6,815 | 5,044 | 3,588 |
| 3,666 | 3,521 | **14,628** | 3,071 | 308 | 220 | 163 | 116 |
| 17,073 | 16,399 | **68,132** | 14,305 | 1,435 | 1,023 | 757 | 539 |
| 2,298 | 2,208 | **9,171** | 1,926 | 193 | 138 | 102 | 72 |
| 66,803 | 64,165 | **266,583** | 55,970 | 5,613 | 4,002 | 2,962 | 2,107 |
| 17 | 16 | **68** | 14 | 1 | 1 | 1 | 1 |
| 67,316 | 64,658 | **268,631** | 56,400 | 5,656 | 4,033 | 2,984 | 2,123 |
| 7,658 | 7,356 | **30,560** | 6,416 | 643 | 459 | 340 | 242 |
| 1,404 | 1,349 | **5,603** | 1,176 | 118 | 84 | 62 | 44 |
| 4,754 | 4,566 | **18,971** | 3,983 | 399 | 285 | 211 | 150 |
| 1,465 | 1,407 | **5,847** | 1,228 | 123 | 88 | 65 | 46 |
| 77,933 | 74,855 | **310,997** | 65,295 | 6,548 | 4,669 | 3,455 | 2,458 |
| 1,647 | 1,582 | **6,574** | 1,380 | 138 | 99 | 73 | 52 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 12,699 | 12,197 | **50,676** | 10,639 | 1,067 | 761 | 563 | 401 |
| 274,543 | 263,700 | **1,095,582** | 230,021 | 23,068 | 16,446 | 12,172 | 8,660 |
| 89 | 86 | **357** | 75 | 8 | 5 | 4 | 3 |
| 216,382 | 207,836 | **863,487** | 181,292 | 18,181 | 12,962 | 9,593 | 6,825 |
| 128 | 123 | **509** | 107 | 11 | 8 | 6 | 4 |
| 13,563 | 13,028 | **54,125** | 11,364 | 1,140 | 813 | 601 | 428 |
| 2,498 | 2,400 | **9,969** | 2,093 | 210 | 150 | 111 | 79 |
| 31,350 | 30,112 | **125,103** | 26,266 | 2,634 | 1,878 | 1,390 | 989 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 59,462 | 57,113 | **237,286** | 49,819 | 4,996 | 3,562 | 2,636 | 1,876 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 5,616 | 5,394 | **22,411** | 4,705 | 472 | 336 | 249 | 177 |
| 21,253 | 20,414 | **84,811** | 17,806 | 1,786 | 1,273 | 942 | 670 |
| 215,860 | 207,335 | **861,406** | 180,855 | 18,137 | 12,931 | 9,570 | 6,809 |
| 4,446 | 4,270 | **17,742** | 3,725 | 374 | 266 | 197 | 140 |
| 179,801 | 172,700 | **717,508** | 150,643 | 15,107 | 10,771 | 7,971 | 5,671 |
| 525 | 504 | **2,095** | 440 | 44 | 31 | 23 | 17 |
| 20,071 | 19,278 | **80,095** | 16,816 | 1,686 | 1,202 | 890 | 633 |
| 764 | 734 | **3,049** | 640 | 64 | 46 | 34 | 24 |
| 12,292 | 11,807 | **49,052** | 10,299 | 1,033 | 736 | 545 | 388 |
| 38 | 37 | **153** | 32 | 3 | 2 | 2 | 1 |
| 151,814 | 145,818 | **605,825** | 127,195 | 12,756 | 9,094 | 6,731 | 4,789 |
| 8,580 | 8,241 | **34,238** | 7,188 | 721 | 514 | 380 | 271 |
| 13,911 | 13,361 | **55,511** | 11,655 | 1,169 | 833 | 617 | 439 |
| 235,720 | 226,410 | **940,655** | 197,493 | 19,806 | 14,121 | 10,450 | 7,435 |
| 3,193 | 3,067 | **12,744** | 2,676 | 268 | 191 | 142 | 101 |
| 334,956 | 321,727 | **1,336,664** | 280,637 | 28,144 | 20,066 | 14,850 | 10,566 |
| 2,920 | 2,805 | **11,654** | 2,447 | 245 | 175 | 129 | 92 |
| 24,123 | 23,170 | **96,264** | 20,211 | 2,027 | 1,445 | 1,069 | 761 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1,657 | 1,591 | **6,611** | 1,388 | 139 | 99 | 73 | 52 |
| 5,004 | 4,807 | **19,969** | 4,193 | 420 | 300 | 222 | 158 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 102,567 | 98,516 | **409,299** | 85,934 | 8,618 | 6,144 | 4,547 | 3,235 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 3,769 | 3,621 | **15,042** | 3,158 | 317 | 226 | 167 | 119 |
| 2,976 | 2,859 | **11,878** | 2,494 | 250 | 178 | 132 | 94 |
| 77,649 | 74,582 | **309,863** | 65,057 | 6,524 | 4,652 | 3,443 | 2,449 |
| 64 | 61 | **255** | 53 | 5 | 4 | 3 | 2 |
| 133,483 | 128,212 | **532,674** | 111,836 | 11,216 | 7,996 | 5,918 | 4,210 |
| 77 | 74 | **306** | 64 | 6 | 5 | 3 | 2 |
| 6,931 | 6,657 | **27,657** | 5,807 | 582 | 415 | 307 | 219 |
| 153 | 147 | **611** | 128 | 13 | 9 | 7 | 5 |
| 5,637 | 5,415 | **22,496** | 4,723 | 474 | 338 | 250 | 178 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 5,657 | 5,433 | **22,574** | 4,739 | 475 | 339 | 251 | 178 |
| 83 | 80 | **333** | 70 | 7 | 5 | 4 | 3 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 51 | 49 | **204** | 43 | 4 | 3 | 2 | 2 |
| 5,569 | 5,349 | **22,224** | 4,666 | 468 | 334 | 247 | 176 |
| 19,914 | 19,128 | **79,470** | 16,685 | 1,673 | 1,193 | 883 | 628 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 306 | 294 | **1,222** | 257 | 26 | 18 | 14 | 10 |
| 15,811 | 15,186 | **63,093** | 13,247 | 1,328 | 947 | 701 | 499 |
| 307,709 | 295,557 | **1,227,934** | 257,808 | 25,855 | 18,433 | 13,642 | 9,706 |
| 2,585 | 2,483 | **10,316** | 2,166 | 217 | 155 | 115 | 82 |
| 317,088 | 304,565 | **1,265,360** | 265,666 | 26,643 | 18,995 | 14,058 | 10,002 |
| 1,732 | 1,663 | **6,910** | 1,451 | 145 | 104 | 77 | 55 |
| 20,647 | 19,832 | **82,394** | 17,299 | 1,735 | 1,237 | 915 | 651 |
| 26 | 25 | **102** | 21 | 2 | 2 | 1 | 1 |
| 10,576 | 10,158 | **42,204** | 8,861 | 889 | 634 | 469 | 334 |
| 14,360 | 13,793 | **57,304** | 12,031 | 1,207 | 860 | 637 | 453 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 1,498 | 1,438 | **5,976** | 1,255 | 126 | 90 | 66 | 47 |
| 69 | 66 | **275** | 58 | 6 | 4 | 3 | 2 |
| 7,587 | 7,288 | **30,278** | 6,357 | 638 | 455 | 336 | 239 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 95,699 | 91,920 | **381,893** | 80,180 | 8,041 | 5,733 | 4,243 | 3,019 |
| 38 | 37 | **153** | 32 | 3 | 2 | 2 | 1 |
| 5,012 | 4,814 | **20,000** | 4,199 | 421 | 300 | 222 | 158 |
| 1,239 | 1,190 | **4,944** | 1,038 | 104 | 74 | 55 | 39 |
| 16,756 | 16,094 | **66,866** | 14,039 | 1,408 | 1,004 | 743 | 529 |
| 202 | 194 | **805** | 169 | 17 | 12 | 9 | 6 |
| 27,751 | 26,655 | **110,743** | 23,251 | 2,332 | 1,662 | 1,230 | 875 |
| 1 | 1 | **3** | 1 | 0 | 0 | 0 | 0 |
| 8,118 | 7,797 | **32,394** | 6,801 | 682 | 486 | 360 | 256 |
| 17,180 | 16,501 | **68,557** | 14,394 | 1,443 | 1,029 | 762 | 542 |
| 136,050 | 130,677 | **542,918** | 113,987 | 11,431 | 8,150 | 6,032 | 4,291 |
| 6,701 | 6,436 | **26,740** | 5,614 | 563 | 401 | 297 | 211 |
| 115,983 | 111,402 | **462,837** | 97,174 | 9,745 | 6,948 | 5,142 | 3,658 |
| 2,986 | 2,868 | **11,915** | 2,502 | 251 | 179 | 132 | 94 |
| 24,459 | 23,493 | **97,606** | 20,493 | 2,055 | 1,465 | 1,084 | 772 |

| | | | | | | | |
|---:|---:|---:|---:|---:|---:|---:|---:|
| 76 | 73 | **302** | 63 | 6 | 5 | 3 | 2 |
| 1,230 | 1,182 | **4,910** | 1,031 | 103 | 74 | 55 | 39 |
| 888 | 853 | **3,545** | 744 | 75 | 53 | 39 | 28 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 8,745 | 8,399 | **34,896** | 7,327 | 735 | 524 | 388 | 276 |
| 34 | 33 | **136** | 29 | 3 | 2 | 2 | 1 |
| 16,655 | 15,997 | **66,462** | 13,954 | 1,399 | 998 | 738 | 525 |
| 51 | 49 | **204** | 43 | 4 | 3 | 2 | 2 |
| 893 | 858 | **3,565** | 749 | 75 | 54 | 40 | 28 |
| 91,627 | 88,009 | **365,646** | 76,768 | 7,699 | 5,489 | 4,062 | 2,890 |
| # # # # # # | # # # # # # | **4,425,600** | 929,168 | 93,182 | 66,436 | 49,167 | 34,982 |
| # # # # # # | # # # # # # | **4,346,042** | 912,464 | 91,507 | 65,241 | 48,284 | 34,353 |
| 31,824 | 30,567 | **126,994** | 26,663 | 2,674 | 1,906 | 1,411 | 1,004 |
| 13,087 | 12,570 | **52,224** | 10,965 | 1,100 | 784 | 580 | 413 |
| 81,691 | 78,465 | **325,995** | 68,444 | 6,864 | 4,894 | 3,622 | 2,577 |
| 159,104 | 152,820 | **634,914** | 133,302 | 13,368 | 9,531 | 7,054 | 5,019 |
| 37,787 | 36,294 | **150,791** | 31,659 | 3,175 | 2,264 | 1,675 | 1,192 |
| 959 | 921 | **3,827** | 803 | 81 | 57 | 43 | 30 |
| 44,493 | 42,736 | **177,551** | 37,277 | 3,738 | 2,665 | 1,973 | 1,403 |
| 1,030 | 989 | **4,109** | 863 | 87 | 62 | 46 | 32 |
| 72,491 | 69,628 | **289,279** | 60,735 | 6,091 | 4,343 | 3,214 | 2,287 |
| 744 | 714 | **2,968** | 623 | 62 | 45 | 33 | 23 |
| 3,484 | 3,347 | **13,905** | 2,919 | 293 | 209 | 154 | 110 |
| 2,945 | 2,829 | **11,752** | 2,467 | 247 | 176 | 131 | 93 |
| 84,504 | 81,166 | **337,218** | 70,800 | 7,100 | 5,062 | 3,746 | 2,666 |
| 13 | 12 | **51** | 11 | 1 | 1 | 1 | 0 |
| 129,572 | 124,454 | **517,064** | 108,559 | 10,887 | 7,762 | 5,744 | 4,087 |
| 168 | 162 | **672** | 141 | 14 | 10 | 7 | 5 |
| 3,948 | 3,792 | **15,755** | 3,308 | 332 | 237 | 175 | 125 |
| 3,191 | 3,065 | **12,733** | 2,673 | 268 | 191 | 141 | 101 |
| 33,503 | 32,180 | **133,697** | 28,070 | 2,815 | 2,007 | 1,485 | 1,057 |
| 824 | 791 | **3,287** | 690 | 69 | 49 | 37 | 26 |
| 54,580 | 52,425 | **217,806** | 45,729 | 4,586 | 3,270 | 2,420 | 1,722 |
| 682 | 655 | **2,720** | 571 | 57 | 41 | 30 | 21 |
| 7,773 | 7,466 | **31,019** | 6,512 | 653 | 466 | 345 | 245 |
| 336 | 323 | **1,341** | 282 | 28 | 20 | 15 | 11 |
| 4,616 | 4,434 | **18,421** | 3,868 | 388 | 277 | 205 | 146 |
| 5,728 | 5,502 | **22,859** | 4,799 | 481 | 343 | 254 | 181 |
| 408 | 392 | **1,630** | 342 | 34 | 24 | 18 | 13 |
| 3,653 | 3,509 | **14,577** | 3,061 | 307 | 219 | 162 | 115 |
| 61,505 | 59,076 | **245,439** | 51,531 | 5,168 | 3,684 | 2,727 | 1,940 |
| 327 | 314 | **1,304** | 274 | 27 | 20 | 14 | 10 |
| 68,508 | 65,803 | **273,388** | 57,399 | 5,756 | 4,104 | 3,037 | 2,161 |
| 200 | 192 | **798** | 168 | 17 | 12 | 9 | 6 |
| 8,833 | 8,484 | **35,249** | 7,401 | 742 | 529 | 392 | 279 |
| 539 | 517 | **2,149** | 451 | 45 | 32 | 24 | 17 |
| 13,963 | 13,412 | **55,721** | 11,699 | 1,173 | 836 | 619 | 440 |
| 15,200 | 14,600 | **60,659** | 12,735 | 1,277 | 911 | 674 | 479 |
| 1,021 | 981 | **4,075** | 855 | 86 | 61 | 45 | 32 |
| 721 | 692 | **2,876** | 604 | 61 | 43 | 32 | 23 |
| 20,956 | 20,128 | **83,626** | 17,558 | 1,761 | 1,255 | 929 | 661 |
| 443 | 426 | **1,769** | 371 | 37 | 27 | 20 | 14 |

| | | | | | | | |
|---:|---:|---:|---:|---:|---:|---:|---:|
| 41,441 | 39,805 | **165,375** | 34,721 | 3,482 | 2,483 | 1,837 | 1,307 |
| 166 | 159 | **662** | 139 | 14 | 10 | 7 | 5 |
| 3,114 | 2,991 | **12,428** | 2,609 | 262 | 187 | 138 | 98 |
| 22,899 | 21,994 | **91,378** | 19,185 | 1,924 | 1,372 | 1,015 | 722 |
| 436,914 | 419,659 | **1,743,535** | 366,060 | 36,711 | 26,173 | 19,370 | 13,782 |
| 400,448 | 384,633 | **1,598,014** | 335,508 | 33,647 | 23,989 | 17,754 | 12,631 |
| 36,601 | 35,156 | **146,061** | 30,666 | 3,075 | 2,193 | 1,623 | 1,155 |
| 1,446 | 1,389 | **5,769** | 1,211 | 121 | 87 | 64 | 46 |
| 41,530 | 39,890 | **165,728** | 34,795 | 3,489 | 2,488 | 1,841 | 1,310 |
| 216 | 208 | **862** | 181 | 18 | 13 | 10 | 7 |
| 56,639 | 54,402 | **226,023** | 47,454 | 4,759 | 3,393 | 2,511 | 1,787 |
| 2,821 | 2,709 | **11,256** | 2,363 | 237 | 169 | 125 | 89 |
| 3,745 | 3,597 | **14,944** | 3,138 | 315 | 224 | 166 | 118 |
| 58,786 | 56,464 | **234,590** | 49,253 | 4,939 | 3,522 | 2,606 | 1,854 |
| 1,099 | 1,056 | **4,387** | 921 | 92 | 66 | 49 | 35 |
| 76,358 | 73,342 | **304,712** | 63,975 | 6,416 | 4,574 | 3,385 | 2,409 |
| 4,207 | 4,041 | **16,788** | 3,525 | 353 | 252 | 187 | 133 |
| 4,697 | 4,511 | **18,744** | 3,935 | 395 | 281 | 208 | 148 |
| 780 | 749 | **3,114** | 654 | 66 | 47 | 35 | 25 |
| 18,712 | 17,973 | **74,672** | 15,678 | 1,572 | 1,121 | 830 | 590 |
| 26 | 25 | **102** | 21 | 2 | 2 | 1 | 1 |
| 54,475 | 52,323 | **217,385** | 45,641 | 4,577 | 3,263 | 2,415 | 1,718 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 2,229 | 2,141 | **8,896** | 1,868 | 187 | 134 | 99 | 70 |
| 2,679 | 2,574 | **10,693** | 2,245 | 225 | 161 | 119 | 85 |
| 44,520 | 42,762 | **177,660** | 37,300 | 3,741 | 2,667 | 1,974 | 1,404 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 75,949 | 72,949 | **303,079** | 63,632 | 6,381 | 4,550 | 3,367 | 2,396 |
| 0 | 0 | **0** | 0 | 0 | 0 | 0 | 0 |
| 2,833 | 2,722 | **11,307** | 2,374 | 238 | 170 | 126 | 89 |
| 2,183 | 2,097 | **8,713** | 1,829 | 183 | 131 | 97 | 69 |
| 85,281 | 81,913 | **340,321** | 71,451 | 7,166 | 5,109 | 3,781 | 2,690 |
| 155 | 149 | **618** | 130 | 13 | 9 | 7 | 5 |
| 128,827 | 123,739 | **514,093** | 107,935 | 10,824 | 7,717 | 5,711 | 4,064 |
| 193 | 186 | **771** | 162 | 16 | 12 | 9 | 6 |
| 15,061 | 14,466 | **60,102** | 12,619 | 1,265 | 902 | 668 | 475 |
| 830 | 797 | **3,311** | 695 | 70 | 50 | 37 | 26 |
| 39,791 | 38,219 | **158,787** | 33,338 | 3,343 | 2,384 | 1,764 | 1,255 |
| 334 | 320 | **1,331** | 279 | 28 | 20 | 15 | 11 |
| 72,253 | 69,400 | **288,332** | 60,536 | 6,071 | 4,328 | 3,203 | 2,279 |
| 584 | 561 | **2,329** | 489 | 49 | 35 | 26 | 18 |
| 1,021 | 981 | **4,075** | 855 | 86 | 61 | 45 | 32 |
| 306 | 294 | **1,222** | 257 | 26 | 18 | 14 | 10 |
| 10,056 | 9,659 | **40,129** | 8,425 | 845 | 602 | 446 | 317 |
| 71 | 69 | **285** | 60 | 6 | 4 | 3 | 2 |
| 13,979 | 13,427 | **55,786** | 11,712 | 1,175 | 837 | 620 | 441 |
| 2,451 | 2,354 | **9,779** | 2,053 | 206 | 147 | 109 | 77 |

# Exhibit 2

**Lexapro Generic Analysis - MYLAN**
**SHARE OF GENERIC 50%**
($ in 000's)

| | Contract Assumptions | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 9/1-9/7/8 | 9/8-9/30 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Total 1st 6 months | 2nd 6 months | Full Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Sales @ Total Profit** | | | | | | | | | | | | | | | | | | |
| Total Addressable Sales (Branded + Generic) | $189,739 | $192,106 | $185,081 | $184,666 | $188,173 | $190,798 | $186,213 | $50,628 | $139,227 | $190,376 | $183,620 | $195,820 | $191,616 | $177,435 | $1,177,655 | $1,078,104 | $2,255,769 |
| **Branded LEXAPRO Sales**  _Branded % of Total_ | | $96,053 50% | $26,085 15% | $22,993 12% | $21,333 11% | $20,392 11% | $17,366 9% | $44,228 4% | $50,628 4% | $14,107 7% | $11,889 6% | $10,604 5% | $10,179 5% | $8,658 5% | $210,312 18% | $67,063 4% | $277,375 12% |
| Total SKU 7Rx | | 15,987 | 15,387 | 15,243 | 15,387 | 15,623 | 15,828 | 16,430 | 6,212 | 9,217 | 15,756 | 15,285 | 16,182 | 15,790 | 14,614 | 99,818 | 86,845 | 186,663 |
| Branded TRx Share | | 5.46% | 5.46% | 1.46% | 1.46% | 1.28% | 1.05% | 1.05% | 0.94% | 0.94% | 0.94% | 0.73% | 0.61% | 0.56% | 0.51% | 2.00% | 0.68% | 1.59% |
| Branded TRx | | 904 | 904 | 215 | 215 | 200 | 191 | 183 | 59 | 68 | 88 | 132 | 111 | 99 | 75 | 1,996 | 594 | 2,590 |
| Branded Units | | 35,078 | 35,078 | 10,257 | 8,360 | 7,791 | 7,433 | 6,343 | 2,287 | 3,431 | 5,152 | 4,342 | 3,873 | 3,458 | 2,041 | 77,549 | 23,196 | 100,744 |
| **Generic Sales (Assuming Lex Px)**  _Substitution rate_ | | $96,053 80% | $156,996 85% | $161,773 88% | $166,841 89% | $170,446 89% | $168,844 91% | $168,444 90% | $46,400 92% | $127,601 92% | $176,269 93% | $171,732 94% | $185,226 95% | $181,437 95% | $168,777 95% | $967,353 82% | $1,011,041 94% | $1,978,394 88% |
| Total SKU 7Rx | | 15,987 | 15,387 | 15,243 | 15,243 | 15,623 | 15,828 | 16,430 | 6,212 | 9,217 | 15,756 | 15,285 | 16,182 | 15,790 | 14,614 | 99,818 | 86,845 | 186,663 |
| Generic TRx Share | | 5.46% | 9.59% | 9.91% | 10.03% | 10.10% | 10.26% | 10.26% | 10.37% | 10.37% | 10.47% | 10.58% | 10.70% | 10.75% | 10.80% | 9.31% | 10.63% | 9.92% |
| Generic TRx | | 904 | 1,477 | 1,520 | 1,567 | 1,567 | 1,598 | 1,583 | 644 | 966 | 1,650 | 1,606 | 1,731 | 1,697 | 1,578 | 9,234 | 9,229 | 18,522 |
| Generic Units | | 35,078 | 57,135 | 59,079 | 60,930 | 62,246 | 61,662 | 61,662 | 23,141 | 37,712 | 64,478 | 62,818 | 67,754 | 66,487 | 61,847 | 361,471 | 361,096 | 722,566 |
| **Generic Sales (Px Discount Mar-Sept 8)** _40%_ | | $57,632 | $94,198 | $97,064 | $100,104 | $102,267 | $101,307 | $27,840 | $12,760 | | $17,627 | $17,173 | $18,523 | $18,144 | $16,878 | $580,412 | $101,104 | $681,516 |
| Mylan Share of Generic (Apr-Sept 8) _90%_ | | $46,106 | $56,519 | $58,238 | $60,063 | $61,360 | $60,784 | $16,704 | $6,380 | | $8,813 | $8,587 | $9,261 | $9,072 | $8,439 | $359,773 | $50,552 | $410,326 |
| Generic COGS (Lumileds API, Forest manufacturing/packaging) _80% / 60% / 50%_ | | $1,677 | $2,050 | $2,113 | $2,179 | $2,225 | $2,205 | $899 | $1,124 | | $1,021 | $1,072 | $2,019 | $1,981 | $1,843 | $12,344 | $10,761 | $24,105 |
| **Total Profit on Generic** | | $44,433 | $54,468 | $56,135 | $57,884 | $59,135 | $58,579 | $15,805 | $5,256 | | $6,892 | $6,715 | $7,242 | $7,091 | $6,596 | $346,429 | $39,791 | $386,221 |
| **Profit Share** | | | | | | | | | | | | | | | | | | |
| Mylan share _% of Total Profit_ _60%_ | | $26,660 40% | $32,681 60% | $33,675 60% | $34,730 60% | $35,147 60% | $35,147 60% | $9,483 60% | $3,154 60% | | $4,135 60% | $4,029 60% | $4,345 60% | $4,254 60% | $3,957 60% | $207,857 | $23,875 60% | $231,732 60% |
| Forest share _% of Total Profit_ _40%_ | | $17,773 40% | $21,787 40% | $22,450 40% | $23,154 40% | $23,654 40% | $23,432 40% | $6,322 40% | $2,102 40% | | $2,757 40% | $2,686 40% | $2,897 40% | $2,836 40% | $2,638 40% | $138,572 40% | $15,917 40% | $154,488 40% |

**Key Assumptions:**

1. Market Growth – 1%
2. Total Addressable – Branded Product Only ... following generic introduction remains flat at 11.31% of SKU Market
3. Price Increase - Branded Product Only - 7.5% in January 2012 and 2013
4. Substitution rate: Above the ZOLOFT ratio ... for higher substitution rate than ZOLOFT (38%) in month one as generic entry for ZOLOFT came in Aug 18th 2006
5. Generic Pricing - 40% discount March through September 8th; 98% September 9th onward (assumes new generics take 20% of market and Teva takes 30%)
... ANDAs on LEXAPRO (13 sources), 12mg wt. avg pill strength): Forest manufacturing and packaging $0.0146/pill)



# EXHIBIT 278

Walter Wolfgang Fleischhacker, M.D.     September 9, 2009

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------x

FOREST LABORATORIES INC., ET AL., )
                              )
       Plaintiffs,    )
                              )
    vs.            )C.A. No.
                        )08-21-GMS-LPS
                              )
COBALT LABORATORIES INC., ET AL., )
                              )
       Defendants.    )

------------------------------x

VIDEOTAPED DEPOSITION OF
WALTER WOLFGANG FLEISCHHACKER, M.D.
New York, New York
Wednesday, September 9, 2009

Reported by:
Jennifer Ocampo-Guzman
JOB NO. 303128

**2**

 

September 9, 2009
8:21 a.m.

Videotaped Deposition of WALTER
WOLFGANG FLEISCHHACKER, M.D., held at the
offices of Kirkland & Ellis, LLP, 601
Lexington Avenue, New York, New York,
pursuant to subpoena, before Jennifer
Ocampo-Guzman, a Notary Public of the State
of New York.

**3**

1  A P P E A R A N C E S:
2
3    KIRKLAND & ELLIS LLP
4    Attorneys for Plaintiff Forest Laboratories
     Inc. and the Deponent
5      601 Lexington Avenue
6      New York, New York 10022-4611
7    BY:  GERALD J. FLATTMANN, JR., ESQ.
8    (212) 446-4720 gflattmann@kirkland.com
9      -and-
10   BY:  GREGORY A. MORRIS, ESQ.
11   (212) 446-4856 gmorris@kirkland.com
12
13   JONES DAY
14   Attorneys for Plaintiff Merz and the Deponent
15     222 East 41st Street
16     New York, New York 10017-6702
17   BY:  F. DOMINIC CERRITO, ESQ.
18   (212) 326-3939 fdcerrito@jonesday.com
19
20   RAKOCZY MOLINO MAZZOCHI SIWIK LLP
21   Attorneys for Defendant Cobalt
22     6 West Hubbard Street, Suite 500
23     Chicago, Illinois 60610
24   BY:  NEIL A. BENCHELL, ESQ.
25   (312) 222-6346 nbenchell@rmmslegal.com

**4**

1
2  APPEARANCES (Continued):
3
4    BUDD LARNER, PC
5    Attorneys for Defendant Dr. Reddy's
     Laboratories
7      150 JFK Parkway
8      Short Hills, New Jersey 07078
9    BY:  LOUIS WEINSTEIN, ESQ.
10   (973) 379-4800 lweinstein@buddlarner.com
11
12   SCHIFF HARDIN LLP
13   Attorneys for Defendant Lupin Pharmaceuticals
14     1666 K Street, NW, Suite 300
15     Washington, DC 20006
16   BY:  D. CHRISTOPHER OHLY, ESQ.
17   (202) 778-6458 dcohly@schiffhardin.com
18
19   WILLKIE FARR & GALLAGHER, LLP
20   Attorneys for Defendant Teva Pharmaceuticals
21     787 Seventh Avenue
22     New York, New York 10019-6099
23   BY:  EUGENE L. CHANG, ESQ.
24   (212) 728-8988 echang@willkie.com
25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

HIGHLY CONFIDENTIAL

Walter Wolfgang Fleischhacker, M.D.                    September 9, 2009

---

**5**

1
2    APPEARANCES (Continued):
3
4    LATHAM & WATKINS, LLP
5    Attorneys for Defendant Orchid
6    Pharmaceuticals
7         885 Third Avenue
8         New York, New York 10022-4834
9    BY:  TERRENCE J. CONNOLLY, ESQ.
10   (212) 906-1853 terrence.connolly@lw.com
11
12   VIA TELEPHONE:
13   WILSON SONSINI GOODRICH & ROSATI, LLP
14   Attorneys for Mylan Pharmaceuticals and
15   GenPharm Pharmaceuticals
16        12235 El Camino Real
17        San Diego, California 92130
18   BY:  LORI WESTIN, ESQ.
19   (858) 350-2300 lwestin@wsgr.com
20
21   ALSO PRESENT:
22   JUAN TORRES, Videographer
23   CHARLES RYAN, J.D., Ph.D. (Forest Research)
24   PATRICK M. JOCHUM (Merz)
25

---

**6**

1    ---------- EXHIBITS ----------
2    FLEISCHHACKER EXHIBITS          FOR I.D.
3    Exhibit Fleischhacker-1, Document
     Entitled, "Memantine in the Treatment
4    of Senile Dementia of the Alzheimer
     Type"........................................6
5
     Exhibit Fleischhacker-2, Article,
6    [German language]........................6
7    Demonstrative Exhibit Fleischhacker-3,
     Poster, Fleischhacker Exhibit 1 at page 88,
8    "Drug administration"..................6
9    Demonstrative Exhibit Fleischhacker-4,
     Poster, Fleischhacker Exhibit 1 at
10   Page 89...................................6
11   Demonstrative Exhibit Fleischhacker-5,
     Poster, Fleischhacker Exhibit 1 at page 89,
12   "Discussion"..............................6
13   Demonstrative Exhibit Fleischhacker-6,
     Poster, Fleischhacker Exhibit 1 at page 89,
14   "Discussion"..............................6
15   Demonstrative Exhibit Fleischhacker-7,
     Poster, Fleischhacker Exhibit 1 at page 92,
16   "Conclusions".............................6
17   Exhibit Fleischhacker-8, Notice of Subpoena
     Duces Tecum.................................54
18
     Exhibit Fleischhacker-9, Photocopy of
19   United States Patent Number 5,601,703........86
20   Exhibit Fleischhacker-10, Excerpt from 18th
     Symposium of AGNP, Nuremberg 1993,
21   Bates No. MERZ0020116.....................87
22   Exhibit Fleischhacker-2A, Certified
     Translation of Exhibit Fleischhacker-2......110
23
24
25

---

**7**

1         (Exhibit Fleischhacker-1, Document
2    entitled, "Memantine in the Treatment of Senile
3    Dementia of the Alzheimer Type," marked for
4    identification, this date.)
5         (Exhibit Fleischhacker-2, Article,
6    [German language], marked for identification, this
7    date.)
8         (Demonstrative Exhibit Fleischhacker-3,
9    Poster, Fleischhacker Exhibit 1 at page 88, "Drug
10   administration," marked for identification, this
11   date.)
12        (Demonstrative Exhibit Fleischhacker-4,
13   Poster, Fleischhacker Exhibit 1 at page 89, marked
14   for identification, this date.)
15        (Demonstrative Exhibit Fleischhacker-5,
16   Poster, Fleischhacker Exhibit 1 at page 89,
17   "Discussion," marked for identification, this
18   date.)
19        (Demonstrative Exhibit Fleischhacker-6,
20   Poster, Fleischhacker Exhibit 1 at page 89,
21   "Discussion," marked for identification, this
22   date.)
23        (Demonstrative Exhibit Fleischhacker-7,
24   Poster, Fleischhacker Exhibit 1 at page 92,
25   "Conclusions," marked for identification, this

---

**8**

1    date.)
2         THE VIDEOGRAPHER:  This is tape
3    number 1 of the videotaped deposition of Dr. W.
4    Wolfgang Fleischhacker, in the matter Forest
5    Laboratories Inc., et al, versus Cobalt
6    Laboratories Inc., et al., in the United States
7    District Court, for the District of Delaware.
8         This deposition is being held at
9    Kirkland & Ellis, LLP, 601 Lexington Avenue,
10   New York, New York, on September 9, 2009, at
11   approximately 8:21 a.m.
12        My name is the Juan Torres, and I am
13   the legal video specialist.
14        Will counsel please introduce
15   themselves, beginning with the party noticing this
16   proceeding.
17        MR. FLATTMANN:  Gerald Flattmann of
18   Kirkland & Ellis, on behalf of the witness and on
19   behalf of the plaintiffs, Forest Laboratories and
20   Merz.
21        MR. CERRITO:  Nick Cerrito, Jones Day,
22   on behalf of the witness and Merz Pharmaceuticals.
23        MR. MORRIS:  Greg Morris, from Kirkland
24   & Ellis, on behalf of Plaintiffs Forest and Merz
25   and the witness.

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

9

1      DR. RYAN:  Charles Ryan with Forest
2  Laboratories.
3      DR. JOCHUM:  Patrick Jochum with Merz
4  Pharmaceuticals.
5      MR. WEINSTEIN:  Louis Weinstein, with
6  Budd Larner PC, on behalf of Dr. Reddy's
7  laboratories.
8      MR. OHLY:  Chris Ohly, Schiff Hardin,
9  for Lupin.
10     MR. BENCHELL:  Neil Benchell, with
11 Rakoczy Molino Mazzochi Siwik, for Cobalt.
12     MR. CHANG:  Eugene Chang, Willkie Farr
13 & Gallagher, for Teva.
14     MR. CONNOLLY:  Terrence Connolly,
15 Latham & Watkins, for Orchid Pharmaceuticals.
16     MR. FLATTMANN:  And may I ask if anyone
17 is on the telephone line right now?
18     MR. BENCHELL:  Actually, I am just
19 getting an e-mail now.  Apparently there is, and
20 apparently the phone is muted, so.
21     MR. FLATTMANN:  Oh, let's fix that.
22 Let's unmute the phone.
23     Is there anyone joining us on the
24 phone?  We're doing attorney introductions, for
25 the record.

11

1  of the department of psychiatry and psychotherapy.
2      Q.  And what are your principal duties and
3  responsibilities in that role?
4      A.  I have clinical responsibilities in
5  patient care.  I have responsibilities with regard
6  to teaching and research.
7      Q.  How long have you been working at
8  Innsbruck University?
9      A.  Thirty years.
10     Q.  Could you please describe your research
11 at Innsbruck University.
12     A.  My main focus in research is
13 psychopharmacology.
14     Q.  What is psychopharmacology?
15     A.  Psychopharmacology is the science and
16 also the clinical practice of administering drugs
17 to treat psychiatric disorders.
18     Q.  And you mentioned that you teach as
19 well.
20         What do you teach?
21     A.  I teach psychiatry and
22 psychopharmacology.
23     Q.  And what type of students do you teach?
24     A.  Medical students and also students who
25 go for psychology Ph.D. degrees.

10

1      MS. WESTIN:  Good morning, this is Lori
2  Westin, for Mylan and GenPharm.
3      MR. OHLY:  From California?
4      MS. WESTIN:  From California.
5      MR. FLATTMANN:  Okay.
6      THE VIDEOGRAPHER:  Will the court
7  reporter please swear in the witness.
8  W A L T E R   W O L F G A N G
9  F L E I S C H H A C K E R ,  M. D. , called as a
10 witness, having been duly sworn by a Notary
11 Public, was examined and testified as follows:
12 EXAMINATION BY
13 MR. FLATTMANN:
14     Q.  Good morning, Dr. Fleischhacker.
15     A.  Good morning.
16     Q.  Would you please state your full name
17 for the record?
18     A.  Walter Wolfgang Fleischhacker.
19     Q.  What do you do for a living?
20     A.  I'm a psychiatrist.
21     Q.  Where do you work?
22     A.  I work at the Medical University of
23 Innsbruck.
24     Q.  What is your position there?
25     A.  My position there is managing director

12

1      Q.  Let me ask you a few questions about
2  your educational background.
3         Do you hold any degrees?
4      A.  An MD.
5      Q.  An MD.  So you have a medical degree?
6      A.  I have a medical degree.
7      Q.  Do you have any other degrees?
8      A.  Nope.
9      Q.  And where did you receive your medical
10 degree?
11     A.  At the University of Innsbruck.
12     Q.  Do you hold any membership in any
13 professional associations or organizations?
14     A.  Yes.  I'm a member of the European
15 College of Neuropsychopharmacology, of the
16 Schizophrenia Research Society, of the Austrian
17 Society of Psychiatry and psychotherapy.  I'm a
18 foreign correspondent fellow of the American
19 College of Neuropsychopharmacology.  I am a member
20 of the International College of
21 Neuropsychopharmacology.
22     Q.  Are you on the editorial staff of any
23 professional publications?
24     A.  Yes.  I'm on the editorial board of the
25 Journal of Clinical Psychopharmacology, of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

HIGHLY CONFIDENTIAL

Walter Wolfgang Fleischhacker, M.D.                    September 9, 2009

---

169

1    A.   Actually, I'm sorry, I may have mixed
2  that up.  It's the other way around.
3        So one of the tests measures group
4  differences, the other test measures the long-term
5  course of the disorder.  And it's exactly the
6  other way around than I had explained to you.  I
7  apologize.
8    Q.   So the Wilcoxon wilcox is the long-term
9  statistical --
10   A.   Is the long term, and the U-Test is the
11 one that measures the group differences.
12   Q.   Have you used these statistical
13 analyses in any of your other studies?
14   A.   Before or after?
15   Q.   Before or after.
16       MR. FLATTMANN:  Objection, vague as to
17 which analyses.
18   Q.   All right.  Let's take them one at a
19 time.
20       Have you used the Wilcoxon-Wilcox
21 statistical analysis in any of your other studies?
22   A.   After we did this one?
23   Q.   Yes.
24   A.   Yes.
25   Q.   Did you use it in any of the ones

---

170

1  before this study, the memantine study?
2    A.   You know, I'm not sure.
3    Q.   How about the U-Test, have you used the
4  U-Test statistical analysis in any studies before
5  or after the memantine study?
6    A.   After, yes, certainly.  Before, I'm not
7  sure.
8    Q.   Do you currently use memantine to treat
9  Alzheimer's patients?
10   A.   Yes.
11   Q.   Do you believe that memantine works to
12 treat Alzheimer's patients today?
13       MR. OHLY:  Objection.  I object to that
14 question.
15       MR. CERRITO:  You can answer.
16       Go ahead.
17   A.   I don't think it's a matter of belief.
18 There is scientific evidence that it helps people
19 with Alzheimer's disease.
20   Q.   And when did you start prescribing
21 memantine for Alzheimer's patients?
22   A.   I started prescribing that shortly
23 after it was licensed in Austria.
24   Q.   What was it that convinced you to start
25 prescribing memantine for Alzheimer's patients?

---

171

1    A.   The evidence that was available at that
2  time.
3    Q.   Do you recall what evidence that was?
4    A.   Not in detail, but clinical trials that
5  were published.
6    Q.   What kinds of clinical trials were
7  these?
8    A.   They were randomized, controlled
9  clinical trials.
10   Q.   Do you -- earlier you mentioned that
11 the understanding of the mechanism of action of
12 memantine has changed over time.
13       Do you recall that?
14   A.   Yes, I recall that.
15   Q.   When you say that, the actual mechanism
16 of action itself hasn't changed, it's just our
17 understanding of it that's changed, right?
18   A.   Correct.
19   Q.   So every time you give a drug to
20 someone, it operates the same way, regardless of
21 whether people have discovered that interaction?
22       MR. FLATTMANN:  I would like to hear
23 the question one more time, please.
24       I need to hear the entire question.
25       (A portion of the record was read.)

---

172

1        MR. FLATTMANN:  I object to the
2  question as lacking in foundation and vague and
3  ambiguous.  Also calling for an expert opinion.
4    A.   Drugs given to different people
5  generally also work in different ways in different
6  people.  As a general principle, that probably is
7  transferable from one person to the other; but in
8  subtle detail there may be huge intraindividual or
9  interindividual differences.
10   Q.   But for any particular person, every
11 time you give that drug to them, it operates the
12 same way, regardless of whether we understand the
13 mechanism of action, right?
14       MR. FLATTMANN:  Objection, vague and
15 ambiguous, lacks foundation, calls for an expert
16 opinion and is an incomplete hypothetical.
17   A.   I don't think it can be stated in that
18 way.  As I stated before, there are
19 interindividual differences in how people react to
20 drugs.
21   Q.   Let me ask the question a slightly
22 different way, then.
23       Do you believe that, according to what
24 you know sitting here today, that memantine is an
25 NMDA antagonist?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

HIGHLY CONFIDENTIAL                    FRX-AT-04569494

# EXHIBIT 279

HIGHLY CONFIDENTIAL

Page 1

1   ** H I G H L Y   C O N F I D E N T I A L **

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Civil Action No. 1:15-cv-07488-CM

5   ----------------------------------x

6

    IN RE NAMENDA DIRECT PURCHASER

7   ANTITRUST LITIGATION

8

9   ----------------------------------x

                August 29, 2017

10              8:49 a.m.

11

12

13       Videotaped Deposition of FOREST

14   LABORATORIES, LLC; ACTAVIS, PLC; FOREST

15   LABORATORIES, INC.; and FOREST LABORATORIES

16   HOLDINGS LTD., by MARK DEVLIN, taken by

17   Plaintiffs, pursuant to Rule 30(b)(6)

18   Notice, held at the offices of Garwin

19   Gerstein & Fisher LLP, 88 Pine Street, New

20   York, New York, before Todd DeSimone, a

21   Registered Professional Reporter and Notary

22   Public of the State of New York.

23

24

25

Page 43

```
 1                MARK DEVLIN
 2       Q      What is your understanding of that
 3   language?
 4       A      I don't know what
 5   Mr. Samoriski exactly meant with his
 6   statement.
 7       Q      I'm asking for your
 8   understanding when you read this.
 9       A      My understanding is that to
10   transition patients to Namenda XR
11   requires the physician to make the
12   judgment.  That's what they want the
13   patient to be on and to write the
14   prescription for it.
15       Q      And you didn't understand
16   that to mean Forest's transition of
17   patients to XR?
18              MR. TOTO:  Object to form.
19       A      As I said before, my view is
20   Forest does not transition patients.  A
21   physician does that.
22       Q      In the next paragraph, he talks about
23   effective communication.  Do you see that?
24       A      Yes.
25       Q      After you received this
```

HIGHLY CONFIDENTIAL                                    FRX-AT-04533422

Page 44

```
 1                M    ARK DEVLIN
 2   e-mail, did you talk to any of the
 3   accounts for which you had
 4   responsibility, concerning the decision
 5   that Mr. Samoriski writes about here?
 6       A      Yes.  I believe I did.
 7       Q      To whom did you talk in
 8   terms of companies, not individuals?
 9       A      I believe I personally spoke
10   with Express Scripts, silver script
11   division of CVS Caremark, Humana.  Those
12   are three I can recall right now.
13       Q      What did you tell Express
14   Scripts about Forest's decision to
15   discontinue IR?
16       A      I think it was a general
17   discussion about Namenda XR and the
18   acceptance of that and that I think I
19   asked their opinion regarding the
20   possibility of, I guess, the approach we
21   were considering to only sell Namenda XR,
22   the oral solid version.
23       Q      What did ESI say to you
24   about that?
25       A      E SI?
```

HIGHLY CONFIDENTIAL                                    FRX-AT-04533423

Page 45

```
 1                M    ARK DEVLIN
 2       Q      E xpress Scripts.
 3       A      T hey specifically thought it
 4   was a good business decision and said
 5   that they were happy with Namenda XR from
 6   their view.
 7       Q      W hat about CVS?
 8       A      C VS Caremark, I spoke with
 9   the individuals on their -- for their
10   silver script plan which is a Medicare
11   plan.  And they were indifferent, said it
12   wouldn't matter to them.
13       Q      W hat about Humana?
14       A      S imilar story.  I spoke to
15   the Medicare Part D people at Humana.
16   And they also were indifferent, didn't
17   have an opinion, one way or another, as
18   to what their situation would be if we
19   only sold Namenda XR.
20       Q      D id any of these three
21   companies mention to you that they were
22   concerned about moving patients to
23   generic IR if IR was discontinued?
24              M  R. TOTO:  Object to form.
25       A      M ost of the discussions I
```

HIGHLY CONFIDENTIAL                                    FRX-AT-04533424

Page 61

1  modeled, were you asking either of the
2  recipients of this e-mail to do the
3  modeling or make sure it was done?
4      A.    I was suggesting that it be
5  done.
6      Q.    And did you follow up to see
7  that it was done?
8      A.    I don't recall if I did or I
9  did not.
10     Q.    You have no recollection after
11  this you made any effort to find out
12  whether it was actually modeled?
13     A.    I know we -- I know we modeled
14  the conversion back from Namenda XR to
15  generic IR, but I don't -- I don't -- I
16  didn't follow up specifically or I don't
17  recall following up specifically on this
18  suggestion.
19     Q.    And do you believe that either
20  of the recipients of your e-mail would be
21  doing the modeling or did you expect that
22  they would have someone else do the
23  modeling?
24     A.    I don't know.  I don't know who
25  on their team they might have gone to to do

Page 62

1  the modeling or if they would have done it
2  themselves.
3      Q.    Okay.  You can put that aside,
4  sir.
5            MR. TOTO:  When you get to a
6  point, maybe a good time for a break.
7            MR. SORENSEN:  Yeah, one more
8  document?
9            MR. TOTO:  Sure.
10     Q.    If you need a break, we can
11  stop.
12     A.    No, I can do one more.
13     Q.    One more document?
14     A.    I can do one more.
15     Q.    Fair enough.
16           (Devlin Exhibit 7 marked for
17  identification.)
18     Q.    Sir, what I have marked as
19  Exhibit 7 is Bates numbers FRX-AT-03861621.
20  It is titled Namenda XR Roadmap to Launch
21  dated September 13th, 2012.  Do you see
22  that, sir?
23     A.    I do.
24     Q.    Have you seen this before?
25     A.    It does not look familiar, no.

Page 63

1      Q.    If you turn to Bates page 1623.
2            MR. TOTO:  Again, take your
3  time to familiarize yourself with the
4  document.
5      Q.    Sure.  It is just a page that
6  says the word Brand Goals.
7      A.    I see it.
8            MR. TOTO:  I figure you are
9  going to ask something.
10           MR. SORENSEN:  I will.
11     Q.    I just want to orient, take you
12  to it.
13           And then the next page repeats,
14  Brand Goals, this is Bates page that ends
15  1624, and under Brand Goals it says
16  "Namenda XR is a significant brand which is
17  expected to produce net sales over $500
18  million at peak.  Conversion," then it says
19  "30 percent of Rxs" -- that stands for
20  prescriptions, correct?
21     A.    Correct.
22     Q.    -- "from IR in 18 months.
23  Reverse conversion in 3 years post IR LOE,"
24  and then it has various numbers and it has
25  a cumulative number of 30 percent.

Page 64

1            Do you see that?
2      A.    I do.
3      Q.    Now, the conversion number of
4  30 percent of prescriptions in 18 months,
5  do you understand that at this time that
6  was Forest's, quote, "brand goal," at the
7  time?
8            MR. TOTO:  Objection, the
9  document speaks for itself, lacks
10  foundation.
11     A.    Yes, it appears that the 30
12  percent of prescriptions from IR was a
13  brand goal, yes, for conversion.
14     Q.    And apart from staring at this
15  on the page, were you familiar just in your
16  work at Forest around this time that that
17  was the number that Forest was setting as a
18  goal for conversion at this time from IR to
19  XR?
20           MR. TOTO:  I object to form,
21  lacks foundation.
22     A.    Yes.
23     Q.    If you turn -- look at the next
24  page, Bates number 1625, it says Namenda
25  Franchise Forecast, Net Sales in Millions.

Page 69

1  in your role at Forest at this time?  In
2  other words, if we take the document date
3  on the metadata as October 19th, 2012, why
4  would you have seen this in your role at
5  Forest at that time?
6      A.    I may have been in a meeting
7  where Laura Mastrosimone or someone else
8  from the brand team presented this
9  presentation.
10     Q.    Are you saying you may have, or
11 do you recall as you sit here that you
12 actually were?
13           I'm just trying to understand
14 how, you know, how specific your
15 recollection is.
16     A.    No, I don't -- I don't recall a
17 specific meeting.  The document looks
18 familiar to me.
19     Q.    I see, okay.
20     A.    It may have been presented.  I
21 may have been present in a meeting or it
22 may have been sent to me.  I don't know.
23     Q.    Okay, fair enough.
24           And on the page right after
25 that, there is a reference to long-term

Page 70

1  care.  Do you see that?
2      A.    Which page?
3      Q.    This is right after the 30
4  percent, it is Bates page 6056.
5      A.    Okay, yeah.
6      Q.    And that long-term care is
7  often abbreviated in Forest documents as
8  LTC, correct?
9      A.    Correct.
10     Q.    So, for example, on Bates page
11 6058, you see the abbreviation LTC
12 Physicians; do you see that?
13     A.    I do.
14     Q.    And that refers to long-term
15 care physicians, correct?
16     A.    Yes.
17     Q.    And a significant amount of the
18 patient population using Namenda, since
19 it's an Alzheimer's treatment, live in
20 long-term care facilities; is that correct?
21     A.    I don't know how you would
22 define significant percentage, but, yeah,
23 there was a fair amount of use of Namenda,
24 because it is an Alzheimer's medication, in
25 long-term care.

Page 71

1      Q.    And Forest endeavored to study
2  what percentage of the Namenda patient
3  population resided in long-term care
4  facilities, correct?
5      A.    Yes.
6      Q.    If you turn to the Bates page
7  that ends 6061 of this document, it is
8  entitled Master Timeline.  Do you see that?
9      A.    I do.
10     Q.    This kind of timeline giving
11 different events, is that something that
12 you're familiar with?
13     A.    Yes.
14     Q.    And MCO training, what does MCO
15 stand for?
16     A.    Managed care organization.
17     Q.    Okay, you can put that document
18 aside, sir.
19           (Devlin Exhibit 9 marked for
20 identification.)
21     Q.    Sir, what I have marked as
22 Exhibit 9 bears Bates number
23 FRX-AT-03716706.
24           It is an e-mail dated March
25 11th, 2013 from a Lei Meng to Elizabeth

Page 72

1  Fung, with attachment.  Do you see that?
2      A.    I do.
3      Q.    And who is Lei Meng?
4      A.    Lei Meng was a Forest
5  Laboratories employee in our Business
6  Development and Commercial Assessment
7  Group.
8      Q.    Is she still employed by Forest
9  or some corporate successor?
10     A.    Yes.
11     Q.    Was she involved in developing
12 forecasts for Namenda IR/XR?
13     A.    Yes.
14     Q.    So will you now add her to your
15 list that you gave earlier?
16     A.    Yes, I would.
17     Q.    And how about Elizabeth Fung,
18 who is she?
19     A.    She was another person on the
20 Brand Marketing team.
21     Q.    Would Ms. Fung also have been
22 involved in creating forecasts?
23     A.    I don't know.
24     Q.    But Lei Meng was?
25     A.    Yes.

HIGHLY CONFIDENTIAL

Page 93

1    Q.    Other than looking at this
2  document, did you understand that these
3  were among Forest's internal goals in
4  trying to understand the expected
5  conversion rate from branded IR to branded
6  XR?
7          MR. TOTO:  I object to form.
8    A.    That what was Forest's goals?
9    Q.    That what you see in front of
10 you were among Forest's goal in doing
11 analogue analysis?
12         MR. TOTO:  I object to form.
13   A.    No.
14   Q.    I'll start again.
15         Did you understand that Forest
16 was trying to identify analogues, the most
17 appropriate analogues, get IMS data for
18 those analogues, to project, estimate, the
19 expected conversion of branded IR to XR?
20   A.    Yes, that's my understanding.
21   Q.    Okay, fair enough.
22         And when it says in the third
23 bullet "factor Namenda conversion for high
24 Namenda share of LTC (44 percent)," other
25 than looking at this document, are you

HIGHLY CONFIDENTIAL

Page 94

1  aware of the Namenda business that went to
2  patients in long-term care?
3    A.    Yes.
4    Q.    Was it approximately 44 percent
5  at this time?
6    A.    I thought it was lower.
7    Q.    Okay.  Do you have some reason
8  to dispute the 44 percent number?
9          MR. TOTO:  I object to your
10 characterization on 44 percent number.
11         MR. SORENSEN:  Okay.
12   Q.    If you look at the next page,
13 page 7, second bullet, under Methodology,
14 "analogues business breakdown is at least
15 somewhat similar to Namenda's percent of
16 TRXs" -- that stands for total
17 prescriptions?  Do you see TRX?
18   A.    Yes.
19   Q.    Does that stand for total
20 prescriptions?
21   A.    Yes.
22   Q.    -- "in long-term care (44
23 percent)."
24         Do you see that?
25   A.    Yes.

HIGHLY CONFIDENTIAL

Page 95

1    Q.    Do you have some basis to
2  dispute that that's an accurate number at
3  this time?
4    A.    For percentage of prescription,
5  no, I have no basis to dispute it.  We
6  looked at prescriptions or volume.
7  Depending upon what you look at, those
8  percentages could be different.
9    Q.    And as far as you know, or --
10 let me start again.
11         If you go back to the e-mail
12 from Julie Zaidler and the attachment, as
13 you understand it, she sent this document
14 in the course of her business and
15 employment at Forest at the time, correct?
16   A.    I don't know who Julie Zaidler
17 is.  From, you know, where it says from
18 Julie Zaidler, it doesn't say, in
19 parentheses, an FRX e-mail, so I don't
20 really know who she is.
21   Q.    But the other individuals who
22 are receiving this document are all Forest
23 employees, correct?
24   A.    Correct.
25   Q.    At the time?

HIGHLY CONFIDENTIAL

Page 96

1    A.    At the time, correct.
2    Q.    And if you would look back at
3  page 5, it says "Questions?  Contact: Julie
4  Zaidler," and there is an extension.  Does
5  that look like a Forest extension?
6          MR. TOTO:  I object to form.
7    A.    I don't know.
8    Q.    You don't know?
9    A.    I don't know.
10   Q.    Okay.
11         I may have asked this, so I
12 apologize, but the first line of the e-mail
13 is "Attached are the Namenda XR analogues
14 that you requested."
15         This is written to Maria
16 Theodore.  Do you see that?
17   A.    Yes.
18   Q.    Other than looking at this
19 e-mail, do you have any knowledge that
20 Maria Theodore, a Forest employee at this
21 time, was asking for data on different or
22 newer analogues?
23   A.    No, I don't have any knowledge.
24   Q.    You can put that aside, sir.
25         (Devlin Exhibit 11 marked for

HIGHLY CONFIDENTIAL

Page 105

1   19, it says 30 percent.

2            If you flip over to the next

3   page and you keep going on line 64, the

4   numbers start dropping.  Do you see that?

5   29 percent, 28 percent, and so forth.  This

6   is in black and white.  Do you see that?

7        A.    On the page after this --

8        Q.    After the yellow.

9        A.    -- column 18?

10       Q.    Yes, yes.  Instead of month 18,

11  month 19 -- on the page that you were

12  looking at with yellow, month 18 says 30

13  percent, month 19 says 30 percent.

14           Do you see that?

15       A.    Yes.

16       Q.    All right.

17           Now, when you turn the page,

18  now this is all black and white, starting

19  with month 21 and 22 and so forth, that

20  same line, 64, starts at 29 percent, and as

21  you move from left to right, it starts to

22  drop.  Do you see that?

23       A.    Yes.

24       Q.    You can put that document

25  aside, sir.

HIGHLY CONFIDENTIAL

Page 106

1            MR. TOTO:  I move to strike all

2   testimony related to Exhibit 11 based on

3   the fact that the witness testified he

4   cannot read portions of it because the font

5   was too small.

6        Q.    You can put that aside, sir.

7            (Devlin Exhibit 12 marked for

8   identification.)

9        Q.    Sir, what I have marked as

10  Exhibit 12 bears Bates number

11  FRX-AT-01775302.  It is titled Namenda IR

12  to XR Conversion Project, Working Draft,

13  June 2013.  Do you see that, sir?

14       A.    I do.

15       Q.    Have you seen this document

16  before?

17       A.    Parts of it look familiar.

18       Q.    So do you believe you've seen

19  the entire document or you've seen portions

20  of this in other documents?

21       A.    I don't know.

22       Q.    So if you turn to the third

23  page of the document, Bates number ending

24  5304, it is titled Three Potential

25  Scenarios for Namenda IR Commercial

HIGHLY CONFIDENTIAL

Page 107

1   Availability Post XR Launch are Being

2   Considered.  Do you see that?

3        A.    I do.

4        Q.    And underneath that, it says

5   Conventional, Withdrawal, and Limited

6   Distribution.  Do you see that?

7        A.    Yes.

8        Q.    Other than looking at this

9   document, are these terms familiar to you,

10  that is, the terms Conventional, Withdrawal

11  and Limited Distribution, as it relates to

12  Namenda?

13       A.    Yes.

14       Q.    So for Conventional, it says

15  "both Namenda IR and Namenda XR marketed,

16  'soft switch.'"

17           Do you see that?

18       A.    Yes.

19       Q.    Other than looking at this

20  document are you familiar with the term

21  "soft switch"?

22       A.    Yes.

23       Q.    And what does it mean to you?

24       A.    It is a term that is just

25  referring to traditional sales and

HIGHLY CONFIDENTIAL

Page 108

1   marketing effort to convince a physician to

2   prescribe one product over another.

3        Q.    But as indicated in this

4   document, it would also mean that both

5   branded IR and XR are being sold at the

6   same time, correct?

7        A.    Yes.

8        Q.    Now, we go to Withdrawal,

9   underneath that, it says "Namenda withdrawn

10  from the market, 'hard switch.'"  Do you

11  see that?

12       A.    Yes.

13       Q.    Is the term "hard switch"

14  something you're familiar with?

15       A.    Yes.

16       Q.    And what do you understand it

17  to mean?

18       A.    Is that both of those products

19  would not be widely available.

20       Q.    So that under the Withdrawal

21  scenario, once Namenda XR was launched, IR,

22  branded IR would be withdrawn, correct?

23           MR. TOTO:  I object to form,

24  lacks foundation.

25       A.    Correct.

Page 109

1      Q.      And then to the right of that,
2  we have Limited Distribution, with a
3  description underneath it.
4          Other than the description that
5  you see in front of you, do you have any
6  other understanding of what Limited
7  Distribution refers to?
8          MR. TOTO:  I object to form.
9      A.      What was the question, again?
10     Q.      In other words, under Limited
11 Distribution, it says -- it has two
12 bullets.  Do you see those bullets?
13     A.      I do.
14     Q.      Now, other than what you see in
15 front of you, do you have any other
16 understanding of what the term Limited
17 Distribution means in reference to Namenda?
18         MR. TOTO:  I object to form,
19 lacks foundation.
20     A.      Yes.
21     Q.      What other meaning do you
22 understand it to have?
23     A.      Well, insurance companies
24 oftentimes have limited retail distribution
25 networks, and oftentimes limited

Page 110

1  distribution refers to that as well.
2      Q.      Well, in this time period of
3  June 2013, I gather Forest was considering
4  a limited distribution option for Namenda
5  IR; is that correct?
6      A.      Yes.
7      Q.      And what did you -- I'm sorry,
8  were you finished?
9      A.      Yes, I was finished.
10     Q.      And what did you understand
11 Forest was considering under the rubric of
12 limited distribution for IR?
13     A.      We were considering having
14 Namenda IR be available through a specialty
15 pharmacy or mail order pharmacy operation.
16     Q.      And is that ultimately
17 something that Forest did?
18     A.      We did not.
19     Q.      And the two bullets under
20 Limited Distribution on this page, do those
21 comport with your understanding of part of
22 what Limited Distribution meant?
23     A.      Yes.
24     Q.      Now, below that there is a box
25 that says Through FY 2014.  FY refers to

Page 111

1  fiscal year, correct?
2      A.      Yes.
3      Q.      What is Forest's fiscal year,
4  or what was it at this time?  Was it just
5  the calendar year or was it some other
6  period?
7      A.      I'm not sure for this time
8  period of June 2013.  At one point our
9  fiscal year definition changed in the
10 transition from Forest to Actavis.
11     Q.      And when was that transition,
12 again?
13     A.      I think that was -- I think
14 that acquisition closed in July of '14, but
15 I'm not sure when we moved to the fiscal
16 year change from one period to a calendar
17 year.  It was at one point April to March
18 was a fiscal year and then it moved to
19 calendar year.
20     Q.      Is it currently calendar year?
21     A.      It is currently calendar year.
22     Q.      You don't know when that change
23 occurred?
24     A.      I'm not sure.  I don't know the
25 exact date, no.

Page 112

1      Q.      The next bullet says "Decision:
2  Withdrawal or Limited Distribution or
3  Conventional option to be based on degree
4  of success in converting Namenda IR to
5  Namenda XR."
6          Do you see that?
7      A.      I do.
8      Q.      Does that mean that the
9  decision of which to choose would be the
10 one that has the highest degree of success
11 in converting IR to XR?
12     A.      I think it means the decision
13 would be based on how Namenda XR was doing
14 in the market at the time.
15     Q.      All right, you can put that
16 document aside, sir.
17         (Devlin Exhibit 13 marked for
18 identification.)
19     Q.      So this document which I have
20 marked as Devlin Exhibit 13 bears Bates
21 number FRX-AT-01593279.
22         The front of it is an e-mail
23 chain, at the very top is an e-mail from
24 William Meury to a number of individuals,
25 including you, dated August 21, 2013.

HIGHLY CONFIDENTIAL

Page 189

1  discontinuation of IR is going to make the
2  conversion happen, as he says, "without any
3  effort on MHA's part," correct?
4       A.    Yeah, that's what he's saying.
5       Q.    And then on the next page, that
6  is Bates page 7889 at the top, he says, at
7  least as of the date of this e-mail, "The
8  IR/XR conversion of MHA, Forest's largest
9  LTC customer collectively, is a pathetic 6
10 percent and the independent LTC pharmacies
11 have had every incentive to switch to XR,
12 including a rebate since launch.  The
13 conversion rate is half the national
14 average and half the retail conversion
15 rate, and we know retail is doing nothing
16 to switch."
17            Do you see that?  And it
18 continues.
19      A.    Yes.
20      Q.    Now, your response to him at
21 the top of Bates page 7888 is "As I said in
22 my message, we will discuss on Tuesday, so
23 No Need for further e-mails on this subject
24 please."
25            Do you see that?

HIGHLY CONFIDENTIAL

Page 190

1       A.    I do.
2       Q.    And then you have underlined
3  and capitalized "No Need."  Do you see
4  that?
5       A.    I do.
6       Q.    Is that because you didn't want
7  an e-mail record created about this
8  subject?
9       A.    No.
10            MR. TOTO:  Objection, lacks
11 foundation, argumentative.
12      Q.    It's a question.  Go ahead.
13      A.    The answer is no.
14            MR. TOTO:  It's an
15 objectionable question.
16      Q.    So why did you capitalize and
17 underscore "No Need"?
18      A.    Because I was frustrated with
19 Don Robertson's response, and he didn't
20 fully understand what was going on with
21 MHA, that customer, and the reason the
22 conversion was lower there was because they
23 were not doing what we were paying them to
24 do, which we subsequently took care of and
25 conversion accelerated as a result.

HIGHLY CONFIDENTIAL

Page 191

1       Q.    You can put that aside, sir.
2             (Devlin Exhibit 24 marked for
3  identification.)
4       Q.    Sir, what I have marked as
5  Exhibit 24 bears Bates number FRX-AT-016 --
6  let me start again -- FRX-AT-01630961.
7             Do you see that, sir?
8       A.    Yes.
9       Q.    It's an e-mail chain dated
10 February 14th, 2014.
11            At the top, it is from William
12 Meury to you, copied to Jerry Lynch, and
13 below that is an e-mail from you to
14 Mr. Meury, copied to Jerry Lynch.
15            And on the other page, the
16 second page of the document, the e-mail
17 chain starts with an e-mail from Jerry
18 Lynch to Mark -- to you, copied to
19 Mr. Meury.  Do you see that?
20      A.    Yes, I see it.
21      Q.    So the e-mail chain starts on
22 Bates page 0962 with Mr. Lynch, who I
23 believe you identified earlier; is that
24 correct?
25      A.    Yes.

HIGHLY CONFIDENTIAL

Page 192

1       Q.    "Mark," asking you, "What plans
2  do you think we need to contact Tuesday
3  concerning XR?  What's the plan for the
4  RAMs and the NAMs the first part of next
5  week?"  And it continues.
6             Do you see that?
7       A.    Yeah.  I'm just reading the
8  rest of that.
9       Q.    No problem.  Go ahead.
10            (Witness perusing document.)
11      A.    Okay.
12      Q.    And your response on Bates page
13 0961 is "I spoke with Optum last week."
14 What is Optum?
15      A.    Optum is the pharmacy benefit
16 management division of United Healthcare.
17      Q.    "Will send Mike Anderson the
18 press release and call him next week."
19            Who is Mike Anderson?
20      A.    He is a vice president at
21 Optum, or he was at the time.
22      Q.    "Will do the same" -- "Will do
23 same with Humana and Silverscript."
24            What are Humana and
25 Silverscript?

HIGHLY CONFIDENTIAL

Page 193

1     A.      Humana is a health plan.
2  Silverscript is also a Medicare Part D
3  health plan under CVS.
4     Q.      And just for clarification,
5  when you say Medicaid Part D, what did you
6  mean by that?
7     A.      Medicare.
8     Q.      Medicare.  What is that?
9     A.      It's the, in the Medicare
10 program, the Part D component of it is what
11 provides prescription drug coverage for
12 Medicare beneficiaries.
13    Q.      Then you say "NAMs and RAMs."
14 That's, again, just to be clear, national
15 account managers and regional account
16 managers?
17    A.      That's correct.
18    Q.      "NAMs and RAMs were informed
19 yesterday and I coached them to speak to
20 their accounts."
21            Do you see that?
22    A.      Yes, I see that.
23    Q.      When you say in this e-mail "I
24 coached them to speak to their accounts,"
25 you mean you spoke to the NAMs and RAMs to

HIGHLY CONFIDENTIAL

Page 194

1  in turn then speak to their customers, or
2  who exactly are you talking about?
3     A.      Yeah, so they would -- the RAMs
4  and NAMs, their accounts were Humana and
5  Silverscript and others like that.
6     Q.      Oh, I see.  So you talked to
7  other Forest people, and, as you put it,
8  coached them to then talk to the outside
9  customers; is that correct?
10    A.      Correct.
11    Q.      And then you continue on about
12 MHA, and you say "Have a plan for them.
13 Would be taking admin fee and chargeback
14 percentage and move some of that to rebate
15 for their member pharmacies to help convert
16 to XR."
17            Do you see that?
18    A.      Yes.
19    Q.      Good idea, I think.
20            "Draws attn" -- that means
21 attention, correct?
22    A.      Correct.
23    Q.      -- "to XR and saves us some
24 money.  MHA may not like it, but they're
25 doing little for us anyway."

HIGHLY CONFIDENTIAL

Page 195

1            The plan that you are referring
2  to is the same plan that earlier e-mail
3  chain was talking about, correct?
4     A.      Correct.
5     Q.      You can put that aside, sir.
6            (Devlin Exhibit 25 marked for
7  identification.)
8     Q.      Sir, what I have marked as
9  Exhibit 25 bears Bates number
10 FRX-AT-03793470.
11           It is titled Namenda Tablets,
12 Discontinuation of Sale, Sales Force
13 Training, Webex - Tuesday, February 18,
14 2014.
15           Do you see that, sir?
16    A.      Yes, I see that.
17    Q.      Have you seen this document
18 before?
19    A.      I don't believe so.
20    Q.      Did you have any involvement in
21 training of the sales force as of this date
22 going forward with respect to the
23 discontinuation plan for IR?
24    A.      No, I did not.
25    Q.      Do you know who would have been

HIGHLY CONFIDENTIAL

Page 196

1  in charge of that particular area?
2     A.      Yes.
3     Q.      Who?
4     A.      Jerry Lynch.
5     Q.      And did you have day to day
6  encounters with Jerry Lynch around this
7  time?
8     A.      Yes.
9     Q.      And as part of your work at
10 Forest dealing with your clients and the
11 RAMs and the NAMs, I think it is, that you
12 were testifying about earlier, did you also
13 talk with Jerry Lynch about what he was
14 doing with the sales force folks in terms
15 of communicating and getting the message
16 out about discontinuation of IR?
17    A.      Sometimes, yes, not day to day,
18 but sometimes.
19    Q.      If you could turn to slide 6
20 for a second, please.  Tell me when you're
21 there, sir.  It is Bates page 3475,
22 internal page 6.
23    A.      3475 Bates number?
24    Q.      3475, yes.
25    A.      Okay, I got it.

Page 197

1      Q.    It states "We are communicating
2  the withdrawal immediately and over the
3  next six months."
4            Then it states "Over 150,000
5  physicians will receive letters, e-mails
6  and all our messages.  Over 200,000
7  pharmacists will receive letters, e-mails
8  and chain announcements."  And then it
9  continues.  Do you see that?
10     A.    I do.
11     Q.    Other than looking at this
12 document, were you familiar with the scope
13 of the communication plan and program that
14 Forest initiated with respect to -- with
15 respect to withdrawal of IR?
16     A.    Like I said before, I knew we
17 had a broad communication campaign.  I
18 wasn't familiar with the exact scope of
19 numbers, 150, 200,000.  I just knew we were
20 communicating to all stakeholders.
21     Q.    All right.  You can put that
22 document aside, sir.
23           Just one more question on that
24 document, 3494, if you look at Bates page
25 3494.  Tell me when you're there, sir.

Page 198

1      A.    Okay.
2      Q.    Are you there?
3            Do you know what POA stands
4  for?
5      A.    Plan of action.
6      Q.    Thank you.  All right.  You can
7  put that document aside.
8            Do you know what the
9  abbreviation SCRAM stands for, S-C-R-A-M?
10     A.    Yes.
11     Q.    What does it stand for?
12     A.    I believe it is senior care
13 regional account manager.
14     Q.    And would you have had any
15 responsibility communicating with them?
16     A.    Yeah, I may have.
17           (Devlin Exhibit 26 marked for
18 identification.)
19     Q.    We have marked as Exhibit 26,
20 it bears Bates number FRX-AT-03801380.
21 It's an e-mail from a Ermie Fan dated
22 February 18th, 2014, with attachment, and
23 it starts with "Dear SCRAM Team," SCRAM,
24 all capital letters.
25           Do you see that, sir?

Page 199

1      A.    I see it.
2      Q.    Now looking at this document
3  and seeing SCRAM, do you understand that
4  SCRAM has the meaning you just testified
5  to?
6      A.    Yes.
7      Q.    And who is Ermie Fan?
8      A.    It is Emmie Fan.
9      Q.    I'm sorry, Emmie.
10     A.    That's all right.  She worked
11 on the Namenda brand team.
12     Q.    Were you familiar with this
13 kind of communication attached going to
14 skilled nursing faculty staff?
15           MR. TOTO:  With this particular
16 one?
17           MR. SORENSEN:  Or something
18 like it.
19           MR. TOTO:  I object to form.
20     A.    Yes, I'm familiar with it.
21     Q.    So she writes to others --
22 well, who are these people who are the
23 recipients of this?  Do they have a
24 particular job in common with each other?
25     A.    Yeah, they were the SCRAMs.

Page 200

1      Q.    Is that the to -- I'm sorry, go
2  ahead.
3      A.    Under to, the SCRAMs were
4  Cloonan, Roth, Desautels, Bley managed
5  them, and Sheldon managed Bley.
6      Q.    And the CCs, are they different
7  types of folks?
8      A.    I'm not really sure who Jade
9  Cantor is.  Jacqueline D'Onofrio was on the
10 brand team.  Jason Wong was in the Payor
11 Marketing Group, as was Ellis and Williams.
12 Peter Maher I believe was on the brand
13 team, and Will Kane, brand team.
14     Q.    In the body of this, it says,
15 under "Dear SCRAM Team," there is a
16 paragraph that starts "Furthermore."
17           "Furthermore, the Namenda Brand
18 Team has begun sending out communications
19 to a wide range of HCPs and caregivers,
20 including the LTC audience, starting
21 today."
22           What does HCP stand for?
23     A.    Healthcare practitioner.
24     Q.    Other than dealing with your
25 folks and clients, the managed healthcare

HIGHLY CONFIDENTIAL

Page 209

1  being reported inside Forest?
2      A.    No.
3      Q.    You weren't aware of it?
4      A.    No, I was aware that we were
5  seeing rapid increases in our Namenda XR
6  business primarily because of the changes
7  we made, improvements we made in Medicare
8  Part D access and the changes that we made
9  in terms of sales force compensation, sales
10 force promotion.  That's what I recall.
11     Q.    I see.
12           Were you copied on reports
13 following February -- let me start again.
14           Following the February 14th
15 announcement -- let me start one more time.
16           Following the February 2014
17 announcement of the withdrawal of IR, were
18 you regularly copied on internal Forest
19 reports tracking the transition from IR to
20 XR?
21     A.    Before that date as well, yes,
22 and after that date.
23     Q.    Right.  I'm just focused on
24 after that date.  You were copied on
25 reports after that date?

HIGHLY CONFIDENTIAL

Page 210

1      A.    Yes.
2      Q.    You can put that aside, sir.
3            (Devlin Exhibit 30 marked for
4  identification.)
5      Q.    Sir, I have marked as Exhibit
6  30, it's a document Bates numbered
7  FRX-AT-04038657.  It has a metadata
8  appendix attached to it.  The metadata
9  appendix states a document date of and a
10 creation date of April 29th, 2014.
11           Do you see that, sir?
12     A.    Yes.
13     Q.    And it says "File Name: SCC
14 Notes 4-30."  Sender/author is named Julie
15 Snyder.  Do you see that?
16     A.    Yes.
17     Q.    Julie Snyder, that's someone
18 you identified earlier, correct?
19     A.    Correct.
20     Q.    And what does SCC stand for; do
21 you know?
22     A.    Senior Commercial Committee.
23     Q.    And what is that?
24     A.    It's a -- it's a committee that
25 was established by Bill Meury of a bunch of

HIGHLY CONFIDENTIAL

Page 211

1  senior people in the various brand teams as
2  well as Sales, Managed Markets, Compliance
3  and --
4      Q.    I'm sorry?
5      A.    Compliance, and other
6  departments that were involved in
7  commercialization of our products.
8      Q.    And was the SCC something that
9  preexisted -- well, let me start again.
10           Do you know when the SCC first
11 came into existence?
12     A.    I don't recall, no.
13     Q.    Do you know how many members it
14 had, 2, 10, 20?
15     A.    It varied from meeting to
16 meeting.  It was not a set committee.
17     Q.    Then the attached notes talks
18 about performance.  Number 1, it says
19 "Conversion remains on the upswing."
20           Do you see that?
21     A.    Yes.
22     Q.    Number 2, below that, it says
23 "New Namenda XR writers are over 1,000 per
24 week."  Below that, it says "Was trending
25 around 700 or so for several weeks/months

HIGHLY CONFIDENTIAL

Page 212

1  and now has increased each week since end
2  of February and is at over 1,000 new XR
3  writers per week."
4            Do you see that?
5      A.    I do.
6      Q.    Then down below that, under
7  Driving Conversion, it says "Just to touch
8  on a few initiatives that will help us
9  continue to drive conversion to XR."
10           Underneath, it says that --
11 underneath that, it says "The
12 discontinuation communications continue to
13 go out to physicians, caregivers and
14 pharmacies weekly (caregivers) and monthly
15 (physicians)."
16           Do you see that?
17     A.    Yes, I see that.
18     Q.    All right.  You can put that
19 aside, sir.
20           MR. SORENSEN:  Let me take a
21 short break.  I'm very close to being done.
22           THE VIDEOGRAPHER:  We are going
23 off the record at 2:10 p.m.
24           (Recess taken.)
25           (Devlin Exhibit 31 marked for

Page 233

```
 1        A.    Yes.
 2        Q.    Then if you scroll to the right
 3   there, the second-year total, it shows over
 4   $48 million of profit share for Forest in
 5   the second year under this Lexapro generic
 6   analysis, correct, sir?
 7        A.    Yes.
 8        Q.    And you have no reason to doubt
 9   the accuracy of this spreadsheet, correct?
10        A.    No reason to doubt it.
11        Q.    Okay.  Switching topics,
12   throughout your testimony today, a couple
13   of times you used the term "access."  Do
14   you recall that?
15        A.    Yes.
16        Q.    You talked about Part D access
17   and plan access.  Do you recall that?
18        A.    Yes.
19        Q.    Can you explain what you mean
20   by access?
21        A.    Yeah.  Access is a term that
22   refers to formulary coverage, and, you
23   know, the health plans and payors generally
24   are in commercial markets or Medicare Part
25   D, as the case with Namenda, because they
```

Page 234

```
 1   had a large percentage of the business, a
 2   large majority that is paid for through the
 3   Medicare Part D program, and there's just a
 4   small number of approved plan sponsors that
 5   we negotiate with for formulary coverage or
 6   access to our products.
 7        If you don't have that access,
 8   you get literally no business in Medicare.
 9   And if you have that access, you get a lot
10   of business.  So you have to, in order to
11   gain that access, you have to negotiate and
12   discount your price, and those companies
13   are very formidable negotiators.  That's
14   their sole job, is to negotiate the lowest
15   price possible for them and the highest
16   discounts or rebates back from the
17   manufacturer.
18        Q.    And did you in fact negotiate
19   with these plans to gain access for Namenda
20   XR?
21        A.    We did.  We did.  They were --
22   those plans, the access and our success
23   came on over time, and the largest Medicare
24   plan sponsor we were able to gain access in
25   January of 2014, which had a large impact
```

Page 235

```
 1   on our Namenda XR uptake.
 2        Q.    And who was that plan?
 3        A.    That was United Healthcare
 4   AARP, some may call it Optum, you may see
 5   it Optum in the spreadsheet, that's the
 6   PBM, but it is all owned by United
 7   Healthcare, which has the large majority of
 8   Medicare beneficiaries.
 9        Q.    Can you describe how the
10   concept of access is related to formulary
11   coverage?
12        MR. SORENSEN:  I will just note
13   an objection.  This is outside the scope of
14   the 30(b)(6).  But go ahead.
15        MR. TOTO:  It is certainly in
16   the scope of what you asked him.  Go ahead.
17        MR. SORENSEN:  I disagree with
18   that, too.  I'm not stopping you from
19   testifying, I'm just noting objections.  Go
20   ahead.
21        A.    Yeah, so those companies such
22   as United AARP or Silverscript or Humana
23   that I had testified to maintain a
24   formulary, and there can be products on
25   that formulary that are preferred by that
```

Page 236

```
 1   plan sponsor, and preferred means that's
 2   the product that they receive the best
 3   price for, the product that they then
 4   charge the lowest out-of-pocket co-pay for
 5   the patient, or they can have a product
 6   that will be nonpreferred brand, which will
 7   have a higher co-pay for the patient.
 8        They can put restrictions in
 9   place and barriers to physicians
10   prescribing one product over another
11   through generic step requirements at the
12   point of sale, prior authorizations from
13   physicians, or they can choose to simply
14   not cover the product and force the
15   patient, the Medicare patient to pay full
16   price and reject it.
17        Q.    Do plans negotiate for
18   preferential pricing in the form of
19   discounts in return for preferential
20   formulary placement?
21        A.    Yes.
22        MR. SORENSEN:  Same objections.
23   Go ahead.
24        A.    Yes, they do.
25        Q.    And did you in fact have those
```

HIGHLY CONFIDENTIAL

Page 257

1  irrelevant.  We never -- we never limited
2  physician or patient choice to IR, XR, any
3  form of Namenda, memantine.  We were not
4  allowed -- we were prevented from
5  implementing any withdrawal, so it becomes
6  irrelevant.
7      Q.    And do you recall there were
8  questions, and in this document there was
9  something called an acceleration factor?
10     A.    Yes, Counselor had asked me
11 about that.
12     Q.    Do you believe the February
13 14th announcement of the then plan to
14 withdraw Namenda IR caused an acceleration
15 in conversion?
16         MR. SORENSEN:  Objection,
17 leading.  Objection, this witness has
18 already demonstrated he can't answer that
19 question with knowledge, he is an
20 inadequate witness.  But go ahead.
21     A.    Well, I object to what the
22 Counselor just said.  I think I have a high
23 degree of competence about my job
24 responsibility, as evidenced by my record
25 over 30 years.

HIGHLY CONFIDENTIAL

Page 258

1          And in my estimation, with the
2  majority of the market being in Medicare
3  Part D and the largest player in Medicare
4  Part D restricting access to Namenda XR
5  prior to January of 2014, we had a slower
6  time then in getting business.
7          Once we changed that and opened
8  up preferred brand low co-pay access at
9  United Healthcare in January of 2014, that
10 was a major accelerant to our conversion.
11 That along with the sales force changes,
12 putting more resources, efforts, and
13 changing the sales force compensation to
14 100 percent on the Namenda XR, allowed us
15 to optimize that message and the
16 reimbursement and formulary coverage, and
17 those were catalysts and accelerants that,
18 in my estimation, were responsible for the
19 increase in conversion rate.
20          And the other thing, I'm going
21 to say it --
22     Q.    Go ahead.
23     A.    It is part of my testimony,
24 Namenda XR was an innovative product
25 improvement.  It was memantine dosed once a

HIGHLY CONFIDENTIAL

Page 259

1  day, and we specifically priced it at a
2  lower price to payors and obtained
3  formulary access so the price out of pocket
4  for the patient was the same or less than
5  Namenda IR.
6          It was a fantastic product.  We
7  put a lot of money, effort and resources
8  behind the conversion in how we promoted it
9  and how we priced it, and for every
10 prescription that we moved from Namenda IR
11 to Namenda XR, it was a lower price and we
12 didn't make as much money, but the patients
13 and caregivers benefited because it was
14 convenient.
15          That was part of the
16 progression and the story and the
17 innovation of the molecule, of memantine.
18 We started with evidence and data that told
19 us combination therapy was more effective
20 than any product used by itself, and so we
21 launched originally with twice-a-day
22 memantine, which is Namenda IR.  We
23 innovated and improved that to make it more
24 convenient in once-a-day dosing in Namenda
25 XR, and ultimately launched the fixed-dose

HIGHLY CONFIDENTIAL

Page 260

1  combination, which, as I stated, the
2  clinical evidence supports that as the
3  treatment standard, that that was donepezil
4  and memantine once a day in one pill, the
5  ultimate convenience for the caregiver and
6  the patient, and we did it at pricing for
7  Namenda XR and Namzaric that was less than
8  Namenda IR.
9          MR. SORENSEN:  Move to strike
10 that entire speech as nonresponsive and
11 beyond the scope.
12         (Devlin Exhibit 37 marked for
13 identification.)
14     Q.    Do you have Exhibit 37 in front
15 of you, sir?
16         MR. TOTO:  And I oppose the
17 motion to strike.
18     Q.    Do you have that exhibit in
19 front of you?
20     A.    I do.
21     Q.    You see this is an e-mail
22 chain, the top e-mail is dated December
23 18th, 2013?
24     A.    Yes.
25     Q.    Now, by definition, that's just

Page 261

1   prior to the January or early 2014 period
2   that you just mentioned, correct?
3       A.      Correct.
4       Q.      And if you go to the attachment
5   to the e-mail chain, you see the heading
6   says "Great News!  Key Namenda XR Wins:
7   Four New Formularies Added."
8           Do you see that?
9       A.      I do.
10      Q.      And you received this e-mail
11  and attachment in the ordinary course of
12  business; is that correct?
13      A.      That's correct.
14      Q.      And can you explain what this
15  attachment is summarizing?
16      A.      Yeah, it's an announcement to
17  the sales team.  It is summarizing the
18  Medicare Part D formulary coverage that
19  changed as of January 1st, 2014, and the
20  national accounts listed down the left side
21  of the table of the document are in
22  descending order of the importance of those
23  Medicare Part D plan sponsors or health
24  plans in terms of the percentage of market
25  volume that they account for.

Page 262

1           And so this document is
2   speaking to the changes and the
3   improvements in access that my team was
4   able to generate through negotiations and
5   heavy discounts to these health plans to
6   where we were able to gain preferred brand
7   access for Namenda XR with Optum/United
8   Healthcare AARP, which is the largest Part
9   D plan sponsor, representing over 25
10  percent of all volume for Namenda IR.
11          We also gained access at Aetna,
12  WellPoint Anthem and Prime Therapeutics,
13  which are also strong Part D plan sponsors,
14  in the top ten list of all those plan
15  sponsors.  So it was a major change in
16  access, and we were announcing that to the
17  sales force.
18      Q.      Based on your experience and
19  your work in this area, did these wins
20  accelerate conversion to Namenda XR from
21  Namenda IR?
22          MR. SORENSEN:  Objection,
23  leading.  Objection, beyond the scope.
24      A.      Yes, without a doubt.
25      Q.      Would those -- would that

Page 263

1   acceleration be felt immediately as of
2   January 1st, 2014 or would it accelerate
3   over time?
4           MR. SORENSEN:  Same objections.
5       A.      There usually is -- it could be
6   a few weeks or a month or so lag.  It's not
7   precise to the first day of the month.
8           Medicare patients oftentimes
9   will move in and out of plans or change
10  plans.  There is a little bit of
11  disruption, sometimes confusion at the
12  change of the benefit year, which is
13  January 1st.  Sometimes there are
14  deductibles that the patients have to pay
15  and work through in the early couple of
16  months.
17          So there could be a little bit
18  of a lag in terms of when you start to see
19  effect, not much, but --
20      Q.      Okay.  Now, Mr. Sorensen asked
21  you a lot of questions about the period
22  2014 and earlier, right?
23      A.      Yes.
24      Q.      He didn't really ask you any
25  questions about after the injunction, in

Page 264

1   other words, you know, after December 2014
2   into 2015; is that right?
3           MR. SORENSEN:  Objection,
4   leading.  Go ahead.
5       A.      That's about right.
6           MR. TOTO:  I think the record
7   will reflect that.
8           MR. SORENSEN:  It doesn't make
9   it not leading.
10      Q.      Now, after the injunction
11  issued, is there any reason that a patient
12  that was on XR at that point in time
13  couldn't switch back to Namenda IR prior to
14  the loss of exclusivity of Namenda IR?
15          MR. SORENSEN:  Objection,
16  leading, beyond the scope.
17      A.      No.  I think as I testified
18  before, the patients had, and physicians,
19  had the choice, they could have changed
20  from XR back to IR if they wanted to, or IR
21  to XR, both were available, there was no --
22  there was no withdrawal.  There was no
23  limited distribution or restriction of any
24  kind.
25      Q.      After the injunction issued,

Page 269

```
 1        A.     Yes.
 2        Q.     And did Forest make some effort
 3   to send out communications to all its
 4   stakeholders telling them about the lawsuit
 5   by the New York Attorney General?
 6        A.     I don't recall if we sent out
 7   letters to stakeholders informing them.  I
 8   recall having conversations with my
 9   customers about it.
10        Q.     My question was, did it send
11   out thousands and thousands of e-mails and
12   other forms of communication announcing
13   that the New York Attorney General had sued
14   it?
15        A.     No, I'm not aware of that.
16        Q.     The injunction that you were
17   asked about was issued when?
18        A.     I believe that was in December
19   of 2014.
20        Q.     So approximately what, ten
21   months or so after the announcement of the
22   withdrawal of IR, correct?
23        MR. TOTO:  I object to form,
24   assumes facts, lacks foundation.
25        Q.     Well, you testified about an
```

Page 270

```
 1   injunction, correct?
 2        A.     Correct.
 3        Q.     You also testified earlier
 4   about a press release announcing Forest's
 5   announcement of the withdrawal of IR which
 6   was dated in February 2014, correct?
 7        A.     Correct.
 8        Q.     The difference between, in
 9   days, between February 2014 and December
10   2014, is approximately ten months, correct?
11        A.     Correct.
12        MR. TOTO:  Your prior question
13   said withdrawal, which we established never
14   happened, so try to ask a precise question,
15   Counsel.
16        MR. SORENSEN:  Move to strike
17   your commentary and testimony, Counselor.
18        Q.     Now, after Judge Sweet's
19   opinion issuing the injunction, we can take
20   a step back, have you ever read Judge
21   Sweet's opinion?
22        A.     His complete opinion, I do not
23   believe I have read that.
24        Q.     Did Forest make any effort to
25   send Judge Sweet's complete opinion to its
```

Page 271

```
 1   thousands of potential customers -- let me
 2   start again.
 3        Did Forest make any effort to
 4   distribute copies of Judge Sweet's opinion
 5   to its customers?
 6        MR. TOTO:  Objection,
 7   relevance.
 8        Q.     Go ahead.
 9        A.     Not to my knowledge.
10        Q.     In communicating with
11   customers/stakeholders after the injunction
12   was issued, isn't it correct that Forest
13   noted in such letters that it was appealing
14   that decision?
15        A.     In such letters to whom?
16        Q.     To -- well, I could show you
17   some of them, and I guess I will if you
18   don't remember this, but in sending out
19   letters to stakeholders of various types,
20   didn't Forest note that it was appealing
21   the injunction?
22        MR. TOTO:  We have to clarify
23   the time frame here, because that's not
24   clear.
25        Q.     Can you answer that question?
```

Page 272

```
 1        MR. TOTO:  Vague as to time.
 2        A.     I don't -- I don't know about
 3   the document.  I will be happy to look at
 4   it.
 5        Q.     Okay.  I will show you
 6   something about that.
 7        (Devlin Exhibit 38 marked for
 8   identification.)
 9        Q.     Sir, I have marked as Exhibit
10   38 a document that bears Bates number
11   FRX-AT-04288486.
12        It's an e-mail and attachment
13   dated January 13th, 2015.  Do you see that?
14        A.     Yes, I see it.
15        Q.     And you see attached to this is
16   two form letters.  If you look at Bates
17   page 8490, "Dear Customer."
18        Tell me when you're there, sir.
19        A.     I am there.
20        Q.     It says "Dear Customer:  Forest
21   Laboratories, a wholly-owned subsidary of
22   Actavis, Inc., plans to continue the sale of
23   of Namenda (memantine HCL) tablets in
24   accordance with a court order, which we are
25   appealing."
```

# EXHIBIT 282

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE
ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK )

       Plaintiff, )

       v. )

ACTAVIS, PLC et al, )

       Defendants. )

CASE NO. 14-CV-7473 (RWS)



DEPOSITION
EXHIBIT

Harper 13

BAL 11/5/14

### DECLARATION OF

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE
ORDER

HIGHLY CONFIDENTIAL

FRX-AT-01750246

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE
ORDER

-3-

HIGHLY CONFIDENTIAL

FRX-AT-01750247

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE
ORDER

-4-

HIGHLY CONFIDENTIAL

FRX-AT-01750248

# EXHIBIT
# 285

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4

5     ------------------------|

6     IN RE:  NAMENDA DIRECT    |

7     PURCHASER ANTITRUST       | C.A. 1:15-cv-07488-CM

8     LITIGATION                |

9     ------------------------ |

10

11

12                 ** HIGHLY CONFIDENTIAL **

13

14         Videotaped oral deposition of NATHAN HERMANN,

15     MD, called by the Forest Entity Defendants herein,

16     held before a stenographic court reporter at the

17     offices of Lenczner Slaght Royce Smith Griffin LLP,

18     130 Adelaide St. West, Ste. 2500, Toronto, Ontario,

19     on Thursday, the 2nd day of November, 2017, at 9:00

20     a.m.

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 45



```
14          You would agree with me that those words
15   don't appear here on page 8 in the construction of
16   "treatment of cerebral ischemia," right?  By "those
17   words," I mean "achieving therapeutic effects."
18          A.   So, "treatment of cerebral ischemia"
19   and "antagonistic intervention with regard to NMDA
20   receptor channels," if you look at claim 7,
21   "reconstructed" -- or, sorry, the construction on
22   point 7:  (as read)
23              "The term 'imbalance of neuronal
24              stimulation after -- excuse me --
25              after Alzheimer's disease' means a
26              pathophysiological situation
```

HIGHLY CONFIDENTIAL

Page 46

```
 1              characterized by an excessive
 2              inflow of calcium through the NMDA
 3              receptor channel."
 4              (Query by reporter)
 5   Sorry.
 6              (Query by reporter)
 7   Sorry. (as read)
 8              "The term 'imbalance of neuronal
 9              stimulation after Alzheimer's
10              disease' in claim 17 means a
11              pathophysiological situation
12              characterized by an excessive
13              inflow of calcium through the NMDA
14              receptor channels after Alzheimer's
15              disease."
16          And then goes on to state that "the term
17   imbalance of neuronal stimulation" -- so these are,
18   again, using the same terms after Alzheimer's
19   disease in claim 17:  (as read)
20              "-- means an antagonistic
21              intervention with regard to the
22              excessive inflow of calcium through
23              NMDA receptor channels after
24              Alzheimer's disease."
25          The fact that he continuously refers to
```

HIGHLY CONFIDENTIAL

Page 47

```
 1   Alzheimer's disease here is to me an indication that
 2   this is for a therapeutic benefit.
 3          Q.   Mm-hm.  Does the same hold true for
 4   the claim term "effective amount"?
 5          A.   It would be an "effective amount" to
 6   treat Alzheimer's disease by antagonizing the NMDA
 7   receptor.
 8          Q.   Mm-hm.  So "achieving therapeutic
 9   effects," that's part of "effective amount" as well?
10          A.   Yes.
11          Q.   Okay.  Now, you moved over to the
12   claim term --
13          A.   Actually -- sorry, to interrupt, but
14   if you look at the "effective amount" term, he --
15   the constructed claim says "an amount shown to cause
16   improvement in comparison to placebo."
17          Q.   Mm-hm?
18          A.   So there's clearly a linkage of
19   "effective amount" to improvement.
20          Q.   Mm-hm.  And the --
21          A.   Or to therapeutic effect.
22          Q.   Okay.  Now, I was asking you about
23   the term "treatment of cerebral ischemia."  And you
24   started answering me with reference to the term
25   "imbalance of neuronal stimulation after Alzheimer's
```

HIGHLY CONFIDENTIAL

Page 48

```
 1   disease."
 2          Now, that term "imbalance of neuronal
 3   stimulation after Alzheimer's disease," that's not
 4   one of the terms you identified in paragraph 33 of
 5   your report as non-infringed, right?  I'm in
 6   paragraph 33 now, Dr. Herrmann, not 36.  I think
 7   it's set out more clearly there in 33.  33 says:
 8   (as read)
 9              "Forest wouldn't have been able
10              to prove that Mylan infringed three
11              claim terms.  Those terms were "the
12              prevention or treatment of cerebral
13              ischemia," the "treatment of
14              cerebral ischemia," and the
15              'treatment of neuronal stimulation
16              after Alzheimer's disease.'"
17          Right?  Those are the three terms you
18   identified in paragraph 33, correct?
19          A.   Correct.
20
```



EXHIBIT
287

```
                                        Page 1
 1   ** H I G H L Y   C O N F I D E N T I A L **
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Civil Action No. 1:15-cv-07488-CM
 5   -----------------------------------x
 6

     IN RE NAMENDA DIRECT PURCHASER
 7   ANTITRUST LITIGATION
 8
 9   -----------------------------------x
                    October 26, 2017
10                   8:58 a.m.
11
12
13       Videotaped Deposition of GEORGE W.
14   JOHNSTON, JR., taken by Defendants,
15   pursuant to Notice, held at the offices of
16   Gibbons, P.C., One Gateway Center, Newark,
17   New Jersey, before Todd DeSimone, a
18   Registered Professional Reporter and Notary
19   Public of the State of New Jersey.
20
21
22
23
24
25
```

Page 133

1 ████████████████████████
2 ███████████████████████████
3 ██████████████████████████
4 ████████████████████████████
5 ███████████████████████
6 █████████████████████████████
7 ████████████████████████████
9 Q. Okay.
10 A. Fair enough?
11 Q. I understand your position.
12 A. Sounds good.
13 ████████████████████████████
   ██████████████████████
   ████████████████████
   ████████
   ██████████████████████████
   ██████████████████████████
   ████████████████████████████
   ████████████████████████
24 Q. And enablement is a conclusion
25 of law, right?

Page 134

1 A.     As I understand it, yes.  But,
2 again, for clarity, we had two enablement
3 arguments.  One was the unproven
4 hypothesis, and the other one was did they
5 enable the full scope.
6 Q.     I got it.
7 A.     And I assume you are talking
8 about the unproven hypothesis approach that
9 we have articulated in this report, in my
10 report.
11 Q.     Well, all I've asked you so far
12 is just whether enablement is a conclusion
13 of law.
14 A.     Okay.
15 Q.     And your recollection is that
16 it is, right?
17 A.     Right.
18 Q.     So when you are opining that
19 Mylan was likely to prevail on enablement,
20 you are reaching a legal conclusion there,
21 right?
22 MR. CHORUSH:  Objection.
23 A.     No, I don't think so.
24 Q.     Why not?
25 A.     I'm going to leave that to the

Page 135

1 judge.
2        What I'm suggesting is, again,
3 I go back to what it is I was asked to do,
4 I was asked to basically handicap for
5 management of each one of these companies
6 what's the likelihood of success at the
7 time of settlement, and whether the judge
8 agrees with me or not is really not
9 relevant.
10        The whole point is what I felt
11 as a reasonable patent attorney sitting in
12 a room with management and advising them as
13 their chief patent counsel, and based upon
14 that, my assessment simply was that for
15 both enablement arguments, since we're not
16 speaking for one of them, that both of them
17 were at 60 percent, and I hope I got the
18 numbers right this time.
19 Q.     I don't even remember, to be
20 honest with you.
21        But I guess so we are in that,
22 let's pretend we are in that board room,
23 right, and this hypothetical reasonable and
24 competent patent lawyer is advising the
25 management of either Forest or Mylan about

Page 136

1 the likelihood of success on enablement,
2 okay?
3 A.     Fair enough.
4 Q.     They are advising their clients
5 on the likelihood that a court will reach a
6 particular legal conclusion?
7 A.     No.  They are asking for my
8 opinion based upon my professional
9 judgment, what's the likelihood of success.
10 Q.     And success means which way the
11 Court comes out?
12 A.     That's fair.  That's fair.
13 Q.     And on enablement, it's a
14 question of law, so it is the likelihood of
15 success with regard to a particular legal
16 conclusion, right?
17 A.     Well, it's applying the law to
18 the facts and to the differences in the
19 facts between the two parties, and then the
20 additional secret sauce of my putting my
21 professional judgment into the mix to come
22 out with a percentage.
23 Q.     I understand.
24 ████████    ████    ██████    ████████
   ██████  ██████████████████████████████

Page 165

1  ▆▆▆▆ ▆▆▆▆ ▆▆▆▆ ▆▆▆ ▆▆▆▆
2  ▆▆
3  ▆▆▆
4  ▆▆▆▆ ▆▆
5  ▆▆▆ ▆▆▆▆ ▆▆▆▆ ▆▆▆▆
6  ▆▆▆▆▆ ▆▆ ▆▆▆▆
7  ▆▆▆ ▆▆▆▆▆ ▆▆▆
8  ▆▆▆▆ ▆▆▆▆ ▆▆▆▆
9  ▆▆▆▆ ▆▆▆▆
10 ▆▆
11     Q.    Okay.  Do you think you are
12 more qualified than Judge McKelvie to opine
13 on the likely outcome of the '703 patent
14 litigation were there a trial?
15     A.    Let me, if you don't mind, let
16 me rephrase that a little bit based on what
17 I was asked to do.
18           Going back to what I was asked
19 to do is to consider what a reasonable
20 patent attorney would do to come up with
21 some sort of a quantifiable number in terms
22 of overall likelihood of success, which
23 could be communicated to the client, either
24 of the two litigants, at the time of
25 settlement.  And I do think -- I know that

Page 166

1  I would be more qualified than Judge
2  McKelvie because that's what I did at
3  Roche.  That was one of the aspects that
4  was my job for 16 years.
5       Q.    You don't think Judge McKelvie
6  has extensive experience counseling clients
7  on the potential outcome of a pending
8  patent litigation?
9       A.    Well, let's see what he says.
10      Q.    I don't think we have marked
11 his report as an exhibit yet, so can you
12 answer that without looking at his report?
13      A.    If you want me to, but I prefer
14 to have the best information in front of
15 me.
16      Q.    Let's try for now to do it
17 without his report.
18      A.    Okay.  And if you would be
19 gracious enough to repeat the question.
20      Q.    Sure.  The question was you
21 don't think Judge McKelvie has extensive
22 experience counseling clients on the
23 potential outcome of a pending patent
24 litigation?
25      A.    Well, I understand he worked at

Page 167

1  Covington & Burling for a number of years.
2  I don't know specifically how many clients
3  he was involved with at that time as
4  related to patent litigations.  I don't
5  know if his clients asked him to opine on
6  those type of things.  Normally those
7  questions are handled by inside counsel.
8  They are the type of questions that a chief
9  patent counsel would be required to provide
10 information to senior management.
11      Q.    Okay.
12      A.    So I guess the answer is no, I
13 think I would be better qualified with
14 regard to that specific issue.
15      Q.    Okay.  Can you remind me, sir,
16 of your undergraduate degree?
17      A.    Yeah.  I received a bachelor of
18 engineering, concentration in chemical
19 engineering, from Stevens Institute of
20 Technology in Hoboken.
21      Q.    Do you think your technical
22 background in terms of your undergraduate
23 degree makes you better suited than Judge
24 McKelvie to opine on the issues in this
25 case?

Page 168

1       A.    And "these issues," we are
2  talking about likelihood of success, just
3  to make sure we're on the same page?
4       Q.    Yes.
5       A.    I do, in conjunction with my
6  experience of 36 years at Hoffmann-LaRoche
7  interfacing on a regular basis with the
8  scientists, yes.  My understanding is, and,
9  again, without looking at the report, that
10 Judge McKelvie has no scientific background
11 whatsoever.
12      Q.    And the judge who would have
13 decided the '703 patent case did not have a
14 technical background either, did he?
15      A.    Judge Sleet?
16      Q.    Yes.
17      A.    I don't know.  I just don't
18 know.
19 
23

Page 173

1 ████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████
7      Q.      I'm going to ask you a couple
8 of similar questions though.
9      A.      Sure.
10      Q.      Would you agree with me that
11 you did not have the specialized technical
12 expertise required to opine on what a
13 person of ordinary skill in the art
14 understood about memantine in 1989?
15      A.      Let me just clarify.  Again, it
16 goes back to why I was there, not to be a
17 technical expert, but review the evidence
18 established by the technical experts and
19 make a determination of what a reasonable
20 patent attorney would do.
21           Now, probably you are going to
22 ask me similar questions, so instead of me
23 repeating that each time, if you do ask me
24 similar questions, please consider that
25 that's the thrust, that I had a different

Page 174

1 role than that of the technical experts.  I
2 had a very focused role in terms of what a
3 reasonable patent attorney, often
4 considered, say, a chief patent counsel,
5 because we did it all the time, would have
6 perceived as the likelihood of success at
7 the time of settlement.
8      Q.      And one of the issues on which
9 you rendered an opinion as to the relative
10 likelihood of success of Forest and Mylan
11 was the issue of infringement, right?
12      A.      Yes, I did.
13      Q.      And you would agree with me
14 that if the '703 patent litigation had gone
15 to trial it would have been technical
16 experts that testified on the issues of
17 infringement, correct?
18      A.      Yes, technical experts would be
19 the ones who presented the evidence to
20 Judge Sleet to make a determination on.
21      Q.      The same with validity,
22 correct?
23      A.      Yes.
24      Q.      And your expertise, sir, is
25 patent law; is that correct?

Page 175

1           MR. CHORUSH:  Objection.
2      A.      Patent law -- I've got to slow
3 down -- patent law, licensing, my expertise
4 based upon being a chief patent counsel for
5 16 years at a major pharmaceutical
6 organization whereby on a regular basis we
7 would do these interpretations of
8 likelihood of success, I should say
9 perceived likelihood of success.  We would
10 do the handicapping.
11      Q.      Sure.  You're not an economist,
12 correct?
13      A.      No.
14      Q.      You don't have any degrees in
15 economics that I'm not aware of?
16      A.      No, sir.
17      Q.      You don't have any expertise in
18 economic modeling?
19      A.      No, I do not.
20      Q.      You don't consider yourself
21 qualified to testify as an expert regarding
22 economics, do you?
23      A.      You are correct.
24      Q.      And just to, because I have it
25 written here, you didn't do any economic

Page 176

1 modeling in this case, did you?
2      A.      Absolutely not.  That was not
3 what I was asked to do.
4      Q.      I understand.  Do you plan to
5 testify at trial in this case?
6      A.      I will testify at trial if
7 asked to do so.
8      Q.      And if you are asked to do so,
9 do you plan to testify about patent law?
10      A.      Well, what I plan to testify
11 would be, number one, what I'm asked to do
12 in terms of at that time, and, number two,
13 is I believe it would have to be consistent
14 with what's in my briefs, I should say my
15 report, the opening report and the reply
16 report.
17           So that means I would be
18 testifying on three or four items, the
19 likelihood of success, the timing, the
20 cost, and I'm sure I'm forgetting one, but
21 I think you got the drift.  It is all
22 identified in the report.


# EXHIBIT 290

Page 1

1            UNITED STATES DISTRICT COURT

             SOUTHERN DISTRICT OF NEW YORK

2          Civil Action No. 1:15-cv-07488-CM

3    ------------------------------

4    IN RE NAMENDA DIRECT PURCHASER

     ANTITRUST LITIGATION

5

     ------------------------------

6

7

8

9

10

11           VIDEOTAPED DEPOSITION of ROBERTO

12   MALINOW, M.D., Ph.D., taken at White &

13   Case, 1221 Avenue of the Americas, New

14   York, New York at 9:11 a.m., Wednesday,

15   November 8, 2017, before Debra Stevens,

16   Certified Realtime and Registered

17   Professional Reporter and Notary Public of

18   the State of New York.

19

20

21

22

23

24

25

R. MALINOW, M.D., PH.D.

Page 21

```
1   ████████████████████████        ████
█   █████████████████████████       ████
3   ███████████                      ████
█       ████   ██████                ████
5        Q.    And you have reviewed their       09:30
6   reports and CV's.  Correct?                  09:30
7        A.    Yes, I did.                        09:30
8        Q.    You are aware that both of them    09:30
9   have been practicing medicine for the        09:30
10  treatment of Alzheimer's disease for more    09:30
11  than 10 years.  Correct?                     09:30
12       A.    I believe so.  I don't remember    09:30
13  exactly the number of years that they have   09:30
14  been doing this, but I know that they have   09:30
15  been practicing for a number of years.       09:30
16  10 years is probably a reasonable guess.     09:30
17       Q.    You would agree that Dr. Herman    09:30
18  is a clinical expert in the treatment of     09:30
19  Alzheimer's disease.  Correct?               09:30
20       MR. JOHNSON:  Objection.                09:30
21       A.    He is -- I mean, he's a           09:30
22  clinician and he -- I believe he treats     09:30
23  patients with Alzheimer's disease, and so   09:31
24  I assume he could be considered an expert   09:31
25  in that field.                               09:31
```

R. MALINOW, M.D., PH.D.

Page 22

```
1        Q.    Similarly, you would agree that    09:31
2   Dr. Schneider -- strike that.                09:31
3        You would agree that                     09:31
4   Dr. Schneider is a clinical expert in the    09:31
5   treatment of Alzheimer's disease.            09:31
6   Correct?                                     09:31
7        MR. JOHNSON:  Objection.                09:31
8        A.    I think that it's basically the    09:31
9   same question, so I will give the same       09:31
10  answer.  Whatever I said for Dr. Herman, I   09:31
11  will say or I will let you write whatever    09:31
12  I said for Dr. Herman, I also mean for       09:31
13  Dr. Schneider.                               09:31
14       Q.    Well, the answer for Dr. Herman    09:31
15  was yes, he is an expert clinician.          09:31
16  Correct?                                     09:31
17       MR. JOHNSON:  Objection.                09:31
18       A.    I don't think I said those words   09:32
19  exactly in that order, but generally the     09:32
20  meaning was, yes, he's practiced medicine    09:32
21  sufficiently and treated patients for        09:32
22  Alzheimer's so as to be considered an        09:32
23  expert.                                      09:32
24       Q.    Do you have a laboratory?         09:32
25       A.    I run a laboratory, yes.          09:32
```

R. MALINOW, M.D., PH.D.

Page 23

```
1        Q.    Have you ever used memantine in    09:32
2   any study or experiment in your              09:32
3   laboratory?                                  09:32
4        A.    We have used it.  We have never    09:32
5   published a paper with it.  We have          09:32
6   published papers with compounds that are     09:32
7   not too dissimilar to memantine.             09:32
8        Q.    What compounds, in your view,      09:32
9   are not too dissimilar to memantine?         09:32
10       A.    Well, I would say that MK-801,     09:33
11  although I would say that there is           09:33
12  significant differences, it has some         09:33
13  similarities.  And we have used magnesium,   09:33
14  which again has some similarities but also   09:33
15  some differences.                            09:33
16       Q.    Describe for me the experimental   09:33
17  work that your laboratory has undertaken     09:33
18  with respect to memantine.                   09:33
19       A.    As I mentioned, it was            09:33
20  unpublished, and I'd have to think about     09:33
21  that because that was probably some          09:33
22  20 years ago.  And what were we doing?  I    09:33
23  think the results were inconclusive and      09:34
24  so, you know, I wouldn't be able to tell     09:34
25  you what the results were.                   09:34
```

R. MALINOW, M.D., PH.D.

Page 24

```
1        Q.    What was being studied?           09:34
2        A.    Something about synaptic          09:34
3   transmission.  I can tell you that.  That    09:34
4   is all I was studying at the time.          09:34
5        Q.    Is that the only instance that    09:34
6   you can recall in which your laboratory      09:34
7   undertook studies relating to memantine?     09:34
8        A.    Well, when you say "relating to    09:34
9   memantine," or are you asking using          09:34
10  memantine?                                   09:34
11       Q.    Using memantine.                  09:34
12       A.    Okay.  Those are the only         09:34
13  studies that I can remember where we used    09:34
14  memantine, but there are a number of other   09:34
15  studies in some ways related to memantine,   09:34
16  that we were using these drugs that I        09:35
17  mentioned to you.                            09:35
█   ███    █████████████████              ████
█   █  ████████████████████████          ████
█   ████████████████████████             ████
█   ████  ██████████                     ████
█   ████████  ███████████████            ████
█   ███  ████████████████                ████
█   ██████████████████████████           ████
```

1 ▮▮▮ ▮▮▮▮▮
2 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮
3 ▮ ▮▮▮▮▮▮ ▮▮▮
4 ▮ ▮▮▮▮▮ ▮▮▮
5 ▮ ▮

6     Q.    So, you write, about six lines    15:23
7 or seven lines from the bottom of           15:23
8 paragraph 64, so about halfway in the        15:23
9 middle -- in paragraph 64 of your 2017       15:23
10 report you write, "A person of ordinary      15:23
11 skill in the art in April 1989 would have    15:23
12 known that overstipulation of NMDA           15:23
13 receptors causes an excess of calcium        15:23
14 entry and neuronal death and therefore       15:23
15 would have understood, based on the          15:23
16 disclosures of the '703 patent, that the     15:23
17 mechanism of action for memantine's          15:23
18 neuroprotective effect results from its      15:23
19 NMDA receptor antagonism."                   15:24
20     Do you see that?                         15:24
21     A.    Yes.                               15:24
22     Q.    So is it your opinion that at      15:24
23 the target daily dose memantine provides a   15:24
24 neuroprotective effect by antagonizing       15:24
25 NMDA receptors?                              15:24

1     A.    I believe that's the generally    15:24
2 accepted view.                               15:24
3     Q.    And is it your view?              15:24
4     A.    My view is that of the generally  15:24
5 accepted view, generally.                    15:24
6     Q.    If you were correct that the      15:24
7 target daily dose of memantine provides a    15:24
8 neuroprotective effect, memantine would      15:24
9 slow neurodegeneration in Alzheimer's        15:24
10 disease patients.  Correct?                  15:24
11     A.    Presumably.  Now, again, I am     15:24
12 not a clinician, so I don't want to say      15:25
13 anything about relations between the         15:25
14 amounts of neuroprotection and the           15:25
15 progression of the disease.  I don't want    15:25
16 to get into that at all.                     15:25
17     But the idea, I believe, is that        15:25
18 neuroprotection is the basis of              15:25
19 memantine's action on Alzheimer's disease    15:25
20 patients.                                    15:25
21     Q.    Let me reask my question without  15:25
22 the clinical -- trying to avoid the          15:25
23 clinical stuff.                              15:25
24     A.    Okay.                             15:25
25     Q.    Achieving neuroprotection would   15:25

1 slow neurodegeneration; correct?             15:26
2     MR. JOHNSON:  Objection.                 15:26
3     A.    Is this in animals?  In people?    15:26
4 I mean, I certainly know that in animals,    15:26
5 and I assume that would also be the case     15:26
6 in people.                                   15:26
7     Q.    Well, I am really just trying to   15:26
8 piece together things you have told me.      15:26
9 But, in essence, you have told me            15:26
10 neuroprotection protects against neuronal    15:26
11 loss or death by limiting the flow of        15:26
12 calcium into the neuron.  Correct?           15:26
13     A.    That is one form of               15:26
14 neuroprotection.  Yes.                       15:26
15     Q.    And that would, therefore,        15:26
16 save -- that would therefore spare neurons   15:26
17 from death.  Correct?                        15:26
18     A.    Yes.                              15:26
19     Q.    And sparing neurons from death    15:26
20 would slow neurodegeneration.  Correct?      15:26
21     A.    Yes.                              15:27
22     Q.    So by definition,                 15:27
23 neuroprotection would cause slowing of       15:27
24 neurodegeneration.  Correct?                 15:27
25     A.    Yes.  I think I agreed to that    15:27

1 earlier, but yes.                            15:27
2     Q.    You know, one of the problems      15:27
3 with us lawyers is we have to have a clear   15:27
4 record.  Sometimes -- and this is not to     15:27
5 criticize you, but when there are long       15:27
6 answers or I don't phrase a question the     15:27
7 way I might have wanted it, the record       15:27
8 isn't always completely clear.               15:27
9     A.    Okay.                             15:27
10     Q.    Will you agree with me that the   15:27
11 most striking neurochemical disturbance in   15:27
12 Alzheimer's disease is the deficiency of     15:27
13 acetylcholine in the brain?                  15:27
14     MR. JOHNSON:  Objection.                15:27
15     A.    That is a clinical question and   15:27
16 I don't feel comfortable answering that.     15:27
17     Q.    Your laboratory has shown that    15:28
18 excessive amounts of beta amyloid decrease   15:28
19 glutamatergic synaptic transmission.         15:28
20 Right?                                       15:28
21     A.    Yes.                              15:28
22     Q.    Glutamatergic synaptic            15:28
23 transmission includes, among other things,   15:28
24 signal transmission through NMDA             15:28
25 receptors.  Correct?                         15:28

**Page 197**

| | | |
|---|---|---|
| 1 | A.    Yes. | 15:28 |
| 2 | Q.    During the course of the Namenda | 15:28 |
| 3 | patent litigation, Dr. John Olney | 15:29 |
| 4 | submitted a report on behalf of Mylan. | 15:29 |
| 5 | Correct? | 15:29 |
| 6 | A.    Yes. | 15:29 |
| 7 | Q.    I am going to hand you a copy of | 15:29 |
| 8 | Dr. Olney's report. | 15:29 |
| 9 | MR. JOHNSON:  Would you like to | 15:29 |
| 10 | take a break?  It's been about | 15:29 |
| 11 | 55 minutes. | 15:29 |
| 12 | Q.    Would you like a break? | 15:29 |
| 13 | A.    Let's do it now. | 15:29 |
| 14 | THE VIDEOGRAPHER:  Going off the | 15:29 |
| 15 | record at 3:25 p.m.  This marks the | 15:29 |
| 16 | end of media 4. | 15:29 |
| 17 | (Recess.) | 15:48 |
| 18 | THE VIDEOGRAPHER:  We are back | 15:48 |
| 19 | on the record at 3:50 p.m.  This marks | 15:50 |
| 20 | the beginning of media 5. | 15:50 |
| 21 | Q.    Dr. Malinow, I am handing you a | 15:50 |
| 22 | copy of Exhibit 10. | 15:50 |
| 23 | (So marked for identification as | 15:50 |
| 24 | Plaintiff's Malinow Exhibit 10.) | 15:50 |
| 25 | Q.    Dr. Malinow, you recognize | 15:50 |

**Page 198**

| | | |
|---|---|---|
| 1 | Exhibit 10 as an expert report submitted | 15:51 |
| 2 | by Dr. Olney on behalf of Mylan in the | 15:51 |
| 3 | Namenda patent litigation.  Correct? | 15:51 |
| 4 | A.    Yes. | 15:51 |
| 5 | Q.    And your supplemental report | 15:51 |
| 6 | submitted in 2010 responded to the Olney | 15:51 |
| 7 | report.  Correct? | 15:51 |
| 8 | A.    Yes. | 15:51 |
| 9 | Q.    If I refer to Exhibit 10 as the | 15:51 |
| 10 | "Olney report," is that acceptable to you? | 15:51 |
| 11 | A.    Yes. | 15:51 |
| 12 | Q.    Dr. Olney has now passed away. | 15:51 |
| 13 | Correct? | 15:51 |
| 14 | A.    Yes. | 15:51 |
| 15 | Q.    Dr. Olney was an extremely | 15:51 |
| 16 | well-regarded expert on neuropharmacology. | 15:51 |
| 17 | Correct? | 15:52 |
| 18 | A.    Yes. | 15:52 |
| 19 | Q.    Dr. Olney's science group had | 15:52 |
| 20 | published numerous articles on NMDA | 15:52 |
| 21 | receptor antagonists.  Correct? | 15:52 |
| 22 | A.    Yes. | 15:52 |
| 23 | Q.    Dr. Olney's group had published | 15:52 |
| 24 | several articles on the effects of | 15:52 |
| 25 | memantine.  Correct? | 15:52 |

**Page 199**

| | | |
|---|---|---|
| 1 | A.    Yes.  I should say that he | 15:52 |
| 2 | didn't -- he wasn't -- they didn't do much | 15:52 |
| 3 | electrophysiology, I should mention, which | 15:52 |
| 4 | is really the strength of my expertise. | 15:52 |
| 5 | But yes, he had done work with NMDA | 15:52 |
| 6 | antagonists, including memantine. | 15:52 |
| 7 | Q.    The term "Olney lesions" is a | 15:52 |
| 8 | term named after Dr. Olney.  Correct? | 15:52 |
| 9 | A.    Yes. | 15:52 |
| 10 | Q.    Dr. Olney also coined the term | 15:52 |
| 11 | "excitotoxicity" that is commonly used to. | 15:53 |
| 12 | Correct? | 15:53 |
| 13 | A.    Yes. | 15:53 |
| 14 | Q.    In your reports that you | 15:53 |
| 15 | submitted in the Namenda patent litigation | 15:53 |
| 16 | and in this litigation, you have not | 15:53 |
| 17 | identified any reason to doubt the | 15:53 |
| 18 | qualifications of Dr. Olney.  Correct? | 15:53 |
| 19 | A.    Not the qualifications, no. | 15:53 |
| 20 | Q.    You disagree with some of his | 15:53 |
| 21 | opinions.  Correct? | 15:53 |
| 22 | A.    Right. | 15:53 |
| 23 | Q.    Is it your opinion -- and I | 15:53 |
| 24 | understand that you agree with | 15:53 |
| 25 | Dr. Olney's -- some of his opinions at | 15:53 |

**Page 200**

| | | |
|---|---|---|
| 1 | least.  Is it your opinion that | 15:53 |
| 2 | Dr. Olney's opinions as set forth in the | 15:53 |
| 3 | Olney report are unreasonable? | 15:53 |
| 4 | MR. JOHNSON:  Objection. | 15:53 |
| 5 | A.    I think you'd have to point to | 15:54 |
| 6 | something very specific, and then I would | 15:54 |
| 7 | tell you if there is a reason involved and | 15:54 |
| 8 | what it would be.  I think that's a little | 15:54 |
| 9 | bit too vague, open-ended question. | 15:54 |
| 10 | Q.    As you sit here right now, are | 15:54 |
| 11 | you aware of any opinions offered by | 15:54 |
| 12 | Dr. Olney in the Olney report that you | 15:54 |
| 13 | believe are scientifically unreasonable? | 15:54 |
| 14 | MR. JOHNSON:  Objection. | 15:54 |
| 15 | A.    Scientifically unreasonable? | 15:54 |
| 16 | Well, if I don't agree with them, does | 15:54 |
| 17 | that mean that I think they are | 15:54 |
| 18 | unreasonable? | 15:54 |
| 19 | Q.    No.  And I am not meaning to | 15:54 |
| 20 | suggest that.  To be clear, I understand | 15:54 |
| 21 | that you disagree with a number of | 15:54 |
| 22 | Dr. Olney's opinions. | 15:54 |
| 23 | A.    Yes. | 15:55 |
| 24 | ████████████████████████ ██ | |
| 25 | ██ | |

# EXHIBIT 292

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3    -------------------------------:

     IN RE NAMENDA DIRECT PURCHASER  :

4                                    :No. 15-cv-7488-CM-JCF

     ANTITRUST LITIGATION            :

5    -------------------------------:

6                              Washington, D.C.

7                         Wednesday, October 18, 2017

8                    ***CONFIDENTIAL***

9    Videotaped Deposition of:

10                   RODERICK McKELVIE,

11   called for oral examination by counsel for

12   Plaintiff, pursuant to notice, at the office of

13   White & Case, LLP, 701 13th Street, N.W., before

14   SUSAN L. CIMINELLI, CRR, RPR, of Veritext Legal

15   Solutions, a Notary Public in and for the District

16   of Columbia, beginning at 9:06 a.m., when were

17   present on behalf of the respective parties:

18

19

20

21

22

CONFIDENTIAL

Page 49

1 ███████████████████████████

2 ███████████████████████████

3 ███████████████████████████

4 ███████████████████████████

5 ████████

6      Q.   Did you ever enforce that rule by

7 excluding expert testimony that was not properly

8 described in an expert report?

9      A.   I did, but I didn't -- I don't think I

10 ever excluded an expert totally.   I would draw a

11 circle around what the expert's opinion was, and say

12 that he or she may have wandered off what the report

13 was, but I've seen cases reported now where judges

14 exclude it.   I saw that -- you've seen certain

15 judges just exclude a witness entirely.   It's like

16 cutting off a gladiator's arm before a fight.   It's

17 not really a fair thing to do.   I think what you

18 want to do is allow the expert report in, but

19 contain it to what reasonably put the other on

20 notice about what the witness was going to say.

21      I do remember Judge Posner had his

22 decision that was -- I think shocked a lot of

CONFIDENTIAL

Page 50

1 lawyers in our community, where he excluded experts

2 completely.   You can go -- imagine trying to go to

3 trial without your expert witness.   It's going to

4 very hard to do in patent litigation.

5      Q.   I think I understand what you've told me.

6 I want to circle back and make sure.   When you were

7 a Federal District Court judge, you might allow an

8 expert to offer clarification or additional

9 description for an opinion that was explicitly set

10 forth in his or her report, correct?

11      A.   That's pretty correct.

12      Q.   But when you were a Federal District

13 Court judge, you would not allow an expert to offer

14 an entirely new opinion that wasn't set forth in his

15 or her report, correct?

16      A.   I think -- I think that's the general

17 practice that trial judges have, and lawyers should

18 expect, is that you have some leeway when you go

19 into a trial, to get an expert to explain his or her

20 opinion.

21      It may be that that encompasses opinions

22 that aren't explicitly set out in the report, but

CONFIDENTIAL

Page 51

1 the other side's on fair notice of it.   So we saw

2 that with Malinow, that he -- Forest filed his

3 report out of time, but gave the other side time to

4 take his testimony.   And the issue was still open

5 with the judge when they went into the pretrial

6 conference about whether Malinow would be allowed to

7 testify to the matters included in his reply report,

8 supplemental report.

9      Q.   So that was one of the uncertainties that

10 the parties had at the time that they settled the

11 Namenda patent litigation, correct?

12      A.   That was one of the uncertainties.

13      Q.   All of the opinions that you intend to

14 offer at trial are set forth in your report,

15 correct?

16      A.   Yes, I hope so.

17      Q.   Do you agree not to offer any opinions at

18 trial that are not set forth in your report?

19      A.   No.

20      Q.   Why not?

21      A.   Because my report is in response to

22 Mr. Johnston's report.   So I'll follow Mr. Johnston

CONFIDENTIAL

Page 52

1 at trial maybe.   If I follow him at trial, and he

2 testifies to something that wasn't in his report,

3 I'd like a fair opportunity to respond to that.   But

4 I'll let counsel decide what fair notice is, and

5 what the boundaries are for my opinions.

6      Q.   You are aware that Mr. Johnston expressed

7 opinions on the litigation costs that Forest and

8 Mylan saved by settling the Namenda patent

9 litigation, correct?

10      A.   Yes.

11      Q.   Your report does not respond to any of

12 those opinions relating to litigation costs,

13 correct?

14      A.   Correct.

15      Q.   You're aware that Mr. Johnston expressed

16 opinions relating to the validity of the patent term

17 extension that was granted with respect to the '703

18 patent, correct?

19      A.   Correct.

20 ████████████████████████████████████████

21 ██  ██████████████████████████████████

22 ██  ████████████████████████████





**Page 55**

18   Q.   Yeah, I'm just trying to get the timeline
19   that you described.  It sounded like the post trial
20   briefing process is a roughly three-month process,
21   is that correct?
22        A.   No, four-month.

**Page 56**

1    Q.   Four-month process.
2        A.   About a month to get the transcripts.
3    Maybe 45 days -- maybe it's three to four months.
4        Q.   Okay.
5        A.   You have to get the trial transcripts
6    from the court reporter.  You have to take a break,
7    and then go about writing your brief, get the
8    associates at the law firm to write the draft of the
9    brief while you take vacation.  And the other side
10   needs 30 days to digest that.  And then you get 15
11   days for the associates to draft a reply.



**Page 109**



**Page 110**

18      greater than 50 percent, correct?

19      A.   At least.

20      Q.   Now, does likely mean 100 percent?

21      A.   Nope.

22      Q.   Okay.  What's the range?  You've told me

**Page 111**

1    that likely means greater than 50 percent, but below

2    what?

3         A.   Just likely.  You speak French.  I speak

4    German.

21        Q.   So when you say likely -- strike that.

22             When you say Forest likely would have

**Page 112**

1    prevailed on infringement, do you mean something

2    between 51 percent and 80 percent?

3         A.   I mean likely.  I don't think percentages

4    are helpful.

5



```
1
2
3
4
5
6
7
8
10   BY MR. CHORUSH:
11       Q.   So what is the significance of the word
12   high?
13       A.   Not higher than 50.
14
```



```
1
2
3        Q.   Meaning less than 50 percent likelihood
4    of success?
5        A.   Starting at less than 50 percent.
6        Q.   But with no further refinement of the
7    numerical percentage than that, correct?
8        A.   Right.  That's a weak case.
9
```



```
1
3
18       Q.   Okay.  What do you mean by substantially
19   less than 50 percent?
20       A.   Substantially less than 50 percent.
21       Q.   Does that mean 40 percent?
22       A.   I don't think numbers are helpful.
```

```
1        Q.   I understand, but you're using the term
2    substantially, and I'm trying to understand what you
3    mean by that?
4        A.   It's a weak defense.  They're not likely
5    to prevail on it.
6
15       Q.   And by unlikely to prevail, you mean
16   something less than 50 percent correct?
17       A.   Correct.
18           MR. JOHNSON:  Objection.
19   BY MR. CHORUSH:
20       Q.   Please turn to paragraph 124.
21       A.   Right.
22
```

CONFIDENTIAL

Page 117



21    Q.    Those defenses were set forth in the

22  pretrial order, correct?

CONFIDENTIAL

Page 118

1         A.    But they were listed in the pretrial

2   order.  They weren't really advanced in the pretrial

3   order.  By advanced meaning moving forward.

4



10        Q.    Does that mean something less than 50

11  percent?

12             MR. JOHNSON:  Objection.

13             THE WITNESS:  Yes.

14  BY MR. CHORUSH:

15        Q.    Can you be any more specific than that?

16        A.    No, because they didn't really set out

17  their case.  It just didn't look like they were even

18  going to pursue it.

19

CONFIDENTIAL

Page 119

1



15        Q.    And by unlikely, you mean something less

16  than 50 percent, correct?

17             MR. JOHNSON:  Objection.

18             THE WITNESS:  Yes.

19  BY MR. CHORUSH:

20

CONFIDENTIAL

Page 120

1   BY

9   BY MR. CHORUSH:

10        Q.    And by unlikely, you mean something less

11  than 50 percent, correct?

12        A.    Yes.

13             MR. JOHNSON:  Objection.

14  BY MR. CHORUSH:

15        Q.    And you can't be any more specific than

16  that, is that correct?

17             MR. JOHNSON:  Objection.

18             THE WITNESS:  More specific than

19  unlikely.  No.

20  BY MR. CHORUSH:

21        Q.    Or more specific than less than 50

22  percent?

CONFIDENTIAL

Page 121

```
1          MR. JOHNSON:  Objection.
2          THE WITNESS:  That's not my opinion.  My
3   opinion is unlikely.
4          MR. JOHNSON:  Russ, let us know when it's
5   time for a break.  I think it's been more than an
6   hour or so.
7          MR. CHORUSH:  Oh, have we been going an
8   hour?
9          MR. JOHNSON:  I think, but someone can
10  correct me if I'm wrong.
11         MR. CHORUSH:  All right.  Let's take a
12  break.
13         VIDEO TECHNICIAN:  We are going off the
14  record.  The time is 11:21.
15         (Recess.)
16         VIDEO TECHNICIAN:  We are back on the
17  record at 11:32.
18              (McKelvie Exhibit No. 8 was
19              marked for identification.)
20  BY MR. CHORUSH:
21
```

CONFIDENTIAL

Page 122

```
6   BY MR. CHORUSH:
```

CONFIDENTIAL

Page 123

```
1     Q.   Let me ask my question again.  I'm not
2   sure that you answered it.  At the time of the
3   settlement of the Namenda patent litigation, Forest
4   -- strike that.
5          At the time of the Namenda patent
6   litigation, the trial court had not ruled on the
7   merits of any of Mylan's eight defenses, correct?
8          MR. JOHNSON:  Objection.
9          THE WITNESS:  Correct.
10  BY MR. CHORUSH:
11    Q.   At the time of the settlement of the
12  Namenda patent litigation, Forest had not requested
13  summary judgment on any of the eight defenses that
14  Mylan had raised, correct?
15         MR. JOHNSON:  Objection.
16         THE WITNESS:  I haven't seen any summary
17  judgment motions.
18  BY MR. CHORUSH:
19    Q.   Forest could have sought summary judgment
20  on any of those eight motions if it believed that
21  any of Mylan's defenses was so weak that Forest was
22  entitled to summary judgment, correct?
```

CONFIDENTIAL

Page 124

```
1          MR. JOHNSON:  Objection.
2          THE WITNESS:  I'm not familiar with what
3   Judge Sleet ordered about summary judgment, but I
4   assume they could have filed a motion for summary
5   judgment.
6   BY MR. CHORUSH:
7     Q.   Mylan only needed to succeed on one of
8   the eight defenses shown on Exhibit 8 in order to
9   prevail in the Namenda patent litigation, correct?
10    A.   Correct.
11    Q.   In order to prevail in the patent
12  litigation, Forest had to succeed on all eight of
13  the defenses that Mylan had raised, as shown in
14  Exhibit 8, correct?
15         MR. JOHNSON:  Objection.
16         THE WITNESS:  To the extent that Mylan
17  pursued them at trial.
18  BY MR. CHORUSH:
19
```

CONFIDENTIAL

Page 177

1    Q.    Do you agree with me that claims that are
2  broadened in re-examination are invalid?
3    A.    I didn't give an opinion on that.
4    Q.    What is your understanding of the law?
5    MR. JOHNSON:  Objection, outside the
6  scope.
7    THE WITNESS:  I prefer not to give
8  opinions on the law.
9  BY MR. CHORUSH:
10    Q.    Have you ever seen a case that addressed
11  whether or not claims that are broadened in
12  re-examination are valid?
13    MR. JOHNSON:  Same objection.
14    THE WITNESS:  I've seen cases where
15  claims are broadened within the two-year period
16  after a patent was issued.  I have seen cases, but
17  that's my answer.
18  BY MR. CHORUSH:
19    Q.    That refers to reissue proceedings, not
20  re-examination proceedings, right?
21    A.    Right.
22    Q.    But there was no reissue proceeding in

---

CONFIDENTIAL

Page 178

1  the '703 patent, correct?
2    A.    Correct.
3    Q.    There was just a re-examination
4  proceeding, correct?
5    A.    Correct.
6    Q.    Have you read the statute relating to
7  re-examination of patents?
8    A.    I'm sure I have.
9    MR. JOHNSON:  Objection.
10  BY MR. CHORUSH:
11    Q.    Have you ever seen a case that addresses
12  whether a patent owner can obtain claims in
13  re-examination that are broader than the originally
14  issued claims?
15    A.    I've seen cases like that.  I'm just not
16  prepared to give an opinion on the broadening
17  reissue.
18    Q.    Do you agree with me that if an
19  independent claim is not infringed, that dependent
20  claims cannot be infringed either?
21    MR. JOHNSON:  Objection.
22    THE WITNESS:  That's correct.

---

CONFIDENTIAL

Page 179

1  BY MR. CHORUSH:
2    Q.    And in the originally issued '703 patent,
3  there was only one independent claim, correct?
4    A.    I don't recall.
5    MR. JOHNSON:  Objection.
6  BY MR. CHORUSH:
7    Q.    Let's take a look.
8    MR. JOHNSON:  We should break for lunch
9  at some point soon, I think.
10    MR. CHORUSH:  Okay.  Let's break for
11  lunch, then.
12    VIDEO TECHNICIAN:  Going off the record.
13  The time is 12:39.
14    (Whereupon, at 12:39, a
15    luncheon recess was taken.)
16
17
18
19
20
21
22

---

CONFIDENTIAL

Page 180

1    A F T E R N O O N   S E S S I O N
2    (1:39 p.m.)
3  Whereupon,
4    RODERICK McKELVIE,
5  was called for continued examination, and having
6  been previously duly sworn was examined and
7  testified further as follows:
8    EXAMINATION BY COUNSEL FOR PLAINTIFF CONTINUED
9    VIDEO TECHNICIAN:  We are back on the
10  record at 13:39.
11  BY MR. CHORUSH:
12

CONFIDENTIAL

Page 181



19    Q.    Please turn to Exhibit B for your report.

20    A.    Okay.

21    Q.    Exhibit B to your report is titled

22  "materials considered by Roderick McKelvie."

CONFIDENTIAL

Page 182

1  Correct?

2    A.    Correct.

3    Q.    And you break the materials considered

4  into several different categories, correct?

5    A.    Yes.

6

11    Q.    And you list a number of the pleadings by

12  ECF number in that portion of Exhibit B, correct?

13    A.    Correct.

14    Q.    What does ECF refer to?

15    A.    I assume it's a docket item number.

16    Q.    Okay.  And you place those in order of

17  the docket control numbers, starting with number 1

18  up to number 498, correct?

19    A.    Yes.

20

CONFIDENTIAL

Page 183

6    MR. JOHNSON:  Counsel, I would note that

7  it appears that what's appended here to Judge

8  McKelvie's report is his original Exhibit B, not the

9  revised Exhibit B that we've served on you.  I'm

10  just noting that for the record.

11    MR. CHORUSH:  Okay.  Just so we'll know,

12  because I printed this out beforehand, does the

13  revised Exhibit B change Exhibit B with respect to

14  either Mylan's answering claim construction brief or

15  the -- Mylan's objection to the report and

16  recommendation on claim construction.

17    MR. JOHNSON:  No, I don't believe it did.

18  I think we have copies of that if it would help you,

19  but --

20    MR. CHORUSH:  If you'd like to introduce

21  the amended Exhibit B at some point, that's fine.

22  This is the copy that I have.

CONFIDENTIAL

Page 184

1    MR. JOHNSON:  Okay.

2  BY MR. CHORUSH:

3

# EXHIBIT 315

DAVID L. ROSEN, J.D.

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK

2

3    - - - - - - - - - - - -+
                            |

4                           |

     IN RE: NAMENDA DIRECT  |

5                           | No: 15-cv-7488-CM(JF)

     PURCHASER ANTITRUST    |

6                           |

     LITIGATION             |

7                           |
                            |

8    - - - - - - - - - - - -+

9

10

11      Videotaped Deposition of David L. Rosen, J.D.

12                 Washington, D.C.

13            Thursday, October 26, 2017

14                   9:13 a.m.

15

16

17

18

19

20

21

22

23    Job No. 2732014

24    Reported by:  Laurie Donovan, RPR, CRR, CSR

25

Page 57

[REDACTED]

5  BY MR. ENGER:
6      Q    Mr. Rosen, do you realize you're still
7  under oath?
8      A    Yes, I do.
9      Q    Is there any testimony from earlier this
10  morning you need to correct or amend at this time?
11      A    Not that I'm aware of.

[REDACTED]

19      Q    Mr. Rosen, you've just been handed
20  Exhibit 3, which is 35 U.S.C. Section 282.
21           Have you ever seen this statute before?
22      A    No.
23      Q    This is the statute for patent defenses.
24  Do you see that from the title?
25      A    Yes.

Page 58

1      Q    You've never read this statute?
2      A    No.
3      Q    You wouldn't consider yourself to be an
4  expert on this statute?
5      A    No.
6      Q    Direct your attention to the second
7  page.  See right about here where it says
8  "Invalidity of the extension"?
9           Do you see that?
10      A    Yes, I do.
11      Q    Let me read it to you.
12           This statute, 35 U.S.C. Section 282,
13  states that "Invalidity of the extension of a
14  patent term or any portion thereof under Section
15  154(b) or 156 of this Title because of the
16  material failure by the applicant for the
17  extension, or by the Director, to comply with the
18  requirements of such section shall be a defense in
19  any action involving the infringement of a patent
20  during the period of the extension of its term and
21  shall be pleaded."
22           Do you see that?
23      A    Yes.
24      Q    So you would agree that if you violate
25  the portion of the statute where an applicant for

Page 59

1  the extension or the Director does a material
2  failure to comply with the requirements, then the
3  patent term extension is invalid?
4           MR. MAJCHRZAK:  Objection.  Calls
5      for a legal conclusion.  Outside the scope of
6      Mr. Rosen's report.
7           THE WITNESS:  You know, I can just
8      read the words, but I can't draw any
9      conclusions from that.
10  BY MR. ENGER:
11      Q    Do you see the word "material failure"
12  in that portion of the statute?
13      A    Yes.
14      Q    What is a "material failure" under 35
15  U.S.C. Section 282?
16           MR. MAJCHRZAK:  Objection.  Calls
17      for a legal conclusion.  Outside the scope.
18           THE WITNESS:  I'm not able to opine
19      on that.
20  BY MR. ENGER:
21      Q    Are you aware of any case law that
22  interprets Section 282's "material failure"
23  language?
24           MR. MAJCHRZAK:  Same objection.
25           THE WITNESS:  It's outside the

Page 60

1      scope.  I'm not able to opine on that.
2  BY MR. ENGER:
3      Q    My question was:  Are you aware -- yes
4  or no -- of any case law that interprets Section
5  282's "material failure" language?
6      A    No.
7      Q    Per the statute, whose material failure
8  triggers the defense?
9           MR. MAJCHRZAK:  Objection.  Calls
10      for a legal conclusion.  Outside the scope.
11           THE WITNESS:  Just the plain
12      reading of the statute, the language says "by
13      the applicant for the extension or by the
14      Director."
15  BY MR. ENGER:
16      Q    Does the applicant file the extension
17  with the Patent Office?
18      A    I'm not 100 percent sure of that.
19      Q    Whenever it says "the Director," does
20  that refer to the Director of the Patent Office?
21      A    I'm not, I'm not going to opine on that
22  either.
23      Q    Are you aware of any other directors
24  relating to patent term extension?
25      A    No.

Page 61

1    Q    Would you agree that 35 U.S.C. Section
2  282 is a statute about the Patent Office?
3            MR. MAJCHRZAK:  Objection.  Calls
4    for a legal conclusion.
5            THE WITNESS:  It's a, it's a
6  statute -- it's a -- appears to be a statute
7  on "remedies for infringement of patent and
8  other actions," by its title.
9            (Exhibit 4 was marked for
10            identification.)
11  BY MR. ENGER:
12    Q    I'm going to hand you what's been marked
13  as Exhibit 4.
14    Mr. Rosen, Exhibit 4 is 35 U.S.C.
15  Section 156.  You said this was one of the things
16  you reviewed in preparation for your deposition
17  today?
18    A    Yes.
19    Q    And you've seen this before?
20    A    Yes.
21    Q    Have you read it from cover to cover?
22    A    I have read it.  I don't know if I've
23  read it cover to cover, but I have read it.
24    Q    How many times have you read it?
25    A    I don't know.

Page 62

1    Q    More than five?
2    A    Possibly.
3    Q    More than ten?
4    A    Probably not.
5    Q    Would you consider yourself to be an
6  expert on this statute?
7    A    No.
8    Q    Let me direct you to the second page to
9  Section (d)(1).
10            Do you see that?  It's kind of at the
11  top right of the second column.
12    A    Yes.
13    Q    So 35 U.S.C. Section 156(d)(1) states
14  that "To obtain an extension of the term of a
15  patent under this section, the owner of record of
16  the patent or its agent shall submit an
17  application to the Director," right?
18    A    That's what the language says, yes.
19    Q    And then two sentences later, the
20  statute lists the contents of the application;
21  fair?
22    A    I'm not exactly following you.
23    Q    See at the end of this paragraph where
24  it says "the application shall contain"?
25    A    Yes.

Page 63

1    Q    And it has a list of subsumed
2  paragraphs, A, B, C, et cetera?
3    A    Yes.
4    Q    So this statute lists what the contents
5  of the application "shall contain"; fair?
6    A    Yes.
7    Q    Does the application have to have each
8  of the five things labeled A through E in the
9  statute?
10            MR. MAJCHRZAK:  Objection.  Calls
11    for a legal conclusion.
12            THE WITNESS:  The language of the
13    word says "shall contain," so generally,
14    yeah, that is a -- it's language that says
15    that an application "shall contain" things.
16  BY MR. ENGER:
17    Q    Must contain.
18    A    It says "shall contain."
19    Q    Is there any difference in your mind
20  between "shall contain" and "must contain"?
21    A    No.
22    Q    Is it acceptable for an application -- a
23  patent term extension application, I should say --
24  to contain only two of those five things?
25            MR. MAJCHRZAK:  Objection.

Page 64

1            THE WITNESS:  I'm not, I'm not
2    capable of rendering an opinion on that
3    situation.
4  BY MR. ENGER:
5    Q    Is it acceptable for a patent term
6  extension application to contain only four out of
7  those five things?
8            MR. MAJCHRZAK:  Objection.
9            THE WITNESS:  I'm not able to
10    render an opinion with respect to that.
11  BY MR. ENGER:
12    Q    Is it a material failure under Section
13  282 if a patent term extension application does
14  not contain each of the five things enumerated in
15  Section 156(d)(1)?
16            MR. MAJCHRZAK:  Objection.
17            THE WITNESS:  I'm not able to
18    render an opinion on that situation.
19  BY MR. ENGER:
20    Q    Do you see (d)(1)(C)?
21    A    I see that.
22    Q    Do you see that one of the things that
23  the application shall contain is "information to
24  enable the Director to determine under subsections
25  (a) and (b) the eligibility of a patent for

Page 65

1  extension and the rights that will be derived from
2  the extension"?
3          Do you see that?
4      A   Yes.
5      Q   Per this statute, who is it that
6  determines the eligibility of a patent for
7  extension and the rights that will be derived from
8  the extension?
9          MR. MAJCHRZAK:  Objection.
10         THE WITNESS:  Yeah, I'm not able to
11     render an opinion with respect to that.
12  BY MR. ENGER:
13     Q   Can you not see where it says that the
14  Director is who must be enabled to determine the
15  eligibility of a patent for extension?
16     A   That's the language that appears to be
17  in the statute, yes.
18     Q   Do you have any reason to doubt that it
19  is not the Director who is, in fact -- determines
20  whether a patent is eligible for -- an application
21  is eligible for a patent term extension?
22     A   Well, it talks about "information to
23  enable the Director and the Secretary of Health
24  and Human Services or the Secretary of
25  Agriculture."

Page 66

1      Q   Do you see what the information that has
2  to enable the Director and Secretary of Health and
3  Human Services or the Secretary of Agriculture,
4  uh, that information has to determine the period
5  of extension under Subsection (d), right?  Under
6  Subsection (g)?
7      A   That appears to be the language of the
8  statute, yes.
9      Q   So the Director is who determines the
10  eligibility of the patent for extension and the
11  rights that will be derived, and the Director and
12  the Secretary of Health and Human Services or the
13  Secretary of Agriculture determines the period of
14  extension under Subsection (g)?
15     A   That appears to be the plain language of
16  the statute.
17     Q   What information must be included in the
18  application to enable the Director to determine
19  the eligibility of a patent for extension and the
20  rights that will be derived from the extension?
21     A   I'm not able to answer that question.
22     Q   Do you believe it's the information
23  specified in 37 C.F.R. Section 1.740?
24         MR. MAJCHRZAK:  Objection.
25         THE WITNESS:  I haven't reviewed

Page 67

1          that to come to that conclusion.
2  BY MR. ENGER:
3      Q   Let's direct your attention to the next
4  subsection, specifically 156(d)(1)(D).
5          Are you there?
6      A   Yes.
7      Q   Per this statute, does the application
8  also have to include "a brief description of the
9  activities undertaken by the applicant during the
10  applicable regulatory review period with respect
11  to the approved product and the significant dates
12  applicable to such activities"?
13     A   Yes, I see that.
14     Q   What type of information is submitted as
15  part of the "brief description of the activities
16  undertaken by the applicant during the applicable
17  regulatory review period"?
18     A   That's a chronology of events relative
19  to both the IND and the NDA.
20     Q   Anything else?
21     A   That's -- a brief description of the
22  activities, that's correct.
23     Q   Does the chronology have to -- that's
24  submitted have to cover the entire review period
25  or just a part of the review period?

Page 68

1      A   It says "during the applicable
2  regulatory review period and significant dates."
3      Q   So does that mean that the chronology
4  that's submitted has to be, just cover part of the
5  review period or the entirety of the review
6  period?
7      A   "A brief description of activities
8  during the applicable regulatory review period."
9      Q   And I'm asking if that means a portion
10  of the applicable regulatory review period or the
11  entirety of the applicable regulatory review
12  period.
13     A   It says "during the applicable
14  regulatory review period," and so I would -- you
15  know, not being -- having reviewed these for other
16  people, we have tried to make those as, you know,
17  as complete as possible to make a regulatory
18  determination.
19     Q   You would never advise a client to
20  submit a chronology of events that just covers a
21  portion of the applicable regulatory review
22  period, would you?
23     A   I don't believe I would do that, no.



Page 73



1      ████████   ████ .

3      Q    Let me read you my question so that we

4 have a clear record.

Page 74

20      Q    I'm handing you what's been marked as

21 Exhibit 5.

22      Mr. Rosen, Exhibit 5 is 37 C.F.R.

23 Section 1.740. Have you ever seen this regulation

24 before?

25      A    No.

Page 75

1      Q    You can see from the title, this is the

2 regulation governing the formal requirements of a

3 patent term extension application, correct?

4      A    From the language of the C.F.R., that

5 appears to be correct, yes.

6      Q    You've never read this regulation,

7 correct?

8      A    That's correct.

9      Q    You wouldn't consider yourself an expert

10 on this regulation?

11      A    That is correct.

12      Q    Does this regulation require -- and I'm

13 looking in the first paragraph -- that "a formal

14 application for the extension of patent term must

15 include" a number of things, enumerated 1 through

16 15?

17      MR. MAJCHRZAK: Objection. Legal

18 conclusion. Outside the scope.

19      THE WITNESS: I've never read that,

20 but just let me -- is there 15 of these

21 things?

22      That appears to be the case, just

23 from looking at this document.

24 BY MR. ENGER:

25      Q    So per this regulation, does an

Page 76

1 application for patent term extension have to

2 include each of these 15 things?

3      MR. MAJCHRZAK: Same objection.

4      THE WITNESS: I can't draw a

5 conclusion. All I can do is just read the

6 plain language of the C.F.R., and it says

7 "must."

8 BY MR. ENGER:

9      Q    You've read a lot of government

10 regulations in your practice, correct?

11      A    Correct.

12      Q    And you don't know any other way to

13 interpret this other than that the patent term

14 extension application must include the 15 things

15 enumerated in Section 1.740?

16      MR. MAJCHRZAK: Objection. Legal

17 conclusion. Outside the scope.

18      THE WITNESS: Again, having read

19 numerous other C.F.R. provisions, I'm not --

20 you know, I have not read this one, but yeah,

21 I'm just looking at the language here, and it

22 says "must include."

23 BY MR. ENGER:

24      Q    Is it a material failure not to include

25 each of the 15 things enumerated in 37 C.F.R.

DAVID L. ROSEN, J.D.

Page 77

1  Section 1.740?

2       MR. MAJCHRZAK:  Same objection.

3       THE WITNESS:  I'm not in a position

4    to offer an opinion on that.

5  BY MR. ENGER:

6       Q    If Mr. Johnston offers an opinion that

7  it is a material failure to not include each of

8  the items in 37 C.F.R. Section 1.740, you're in no

9  position to rebut that; fair?

10      A    I'm not in a position to rebut that.

11      Q    Direct your attention to the second

12 page, please.  Do you see Section 1.740(a)(10)?

13 It's about in the middle of the first column.

14      A    Yes.

15      Q    This says that one of the things that

16 the patent term extension application must contain

17 is "a statement beginning on a new page of the

18 relevant dates and information pursuant to

19 35 U.S.C. 156(g) in order to enable the Secretary

20 of Health and Human Services or the Secretary of

21 Agriculture, as appropriate, to determine the

22 applicable regulatory review period."

23      Do you see that?

24      A    Yes, I see that.

25      Q    And for patents that claim a human drug,

DAVID L. ROSEN, J.D.

Page 78

1  such as the '703 patent, the information that must

2  be included is, A, the effective date of the

3  investigational new drug (IND) application and the

4  IND number; B, the date on which a new drug

5  application (NDA) was initially submitted and the

6  NDA number; and C, the date on which the NDA was

7  approved, correct?

8       A    Yes.

9       Q    When completing this portion of the

10 patent term extension application, how does one

11 determine, A, "the effective date of the

12 investigational new drug (IND) application"?

13      A    There's correspondence with FDA.

14 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

15 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

16 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

17 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

18 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19 ■ ▬▬▬▬▬▬▬▬▬

20

21

22      Q    So who determines the effective date of

23 the IND application?

24      A    It's set forth in the letter from FDA to

25 the applicant, the IND applicant.

DAVID L. ROSEN, J.D.

Page 79

1       Q    And what criteria does the FDA use to

2  write that letter and set that date?

3       A    It's the date that the application is

4  received, and then the IND becomes effective 30

5  days from the day of receipt.

6       Q    So it's pretty ministerial?

7       A    Yeah.

8       Q    You submit an IND.  30 days later -- I'm

9  sorry.  It's ministerial in the fact that you

10 submit an IND, it's received, and 30 days later,

11 that's the effective date?

12      A    Unless FDA says that you're on clinical

13 hold.

14      Q    Could you elaborate, please?

15      A    A clinical hold is something where the,

16 the -- there's a substantial risk of harm to

17 patients, and you can't start a study as proposed

18 under the IND until you address those situations

19 and FDA allows you to proceed with the

20 investigations.

21      Q    So if the FDA puts your IND on clinical

22 hold, then the IND's effective date is not 30 days

23 from its initial submission but some other date?

24      A    That's correct.

25      Q    And what's that other date?

DAVID L. ROSEN, J.D.

Page 80

1       A    Whenever FDA says that you can start the

2  study.

3       Q    Back to Exhibit 5, please, the bottom of

4  page 163.

5       A    Mm-hmm.

6       Q    Do you see 37 C.F.R. Section

7  1.740(a)(11)?

8       A    Yes.

9       Q    Another of the things that the patent

10 application must contain is, 11, "a brief

11 description beginning on a new page of the

12 significant activities undertaken by the marketing

13 applicant during the applicable regulatory review

14 period with respect to the approved product and

15 the significant dates applicable to such

16 activities," correct?

17      A    I see that, yes.

18 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

20 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

21 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬

22 ■ ▬▬▬▬▬▬▬▬▬▬▬▬

23 ■ ▬▬▬▬▬▬▬▬▬▬▬▬

24 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

25 ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Page 85

6       If the applicant believed that the
7  applicable regulatory review period was one
8  period, was one length -- are you with me?
9       A    I'm with you.
10      Q    Would you ever advise that client to
11 only submit a description of the significant
12 activities that occurred during a portion of the
13 applicable regulatory review period as the client
14 understood it at that time?
15      A    No.  I would want them to provide
16 information, but in this situation they
17 disclosed -- when the original IND was submitted,
18 they disclosed the activities under the IND, they
19 disclosed when the IND was inactivated, they also
20 disclosed when the IND was reactivated, and they
21 also provided information on the foreign studies
22 that were conducted during the time of
23 inactivation.
24      Q    So no, you would never advise a client
25 to only submit a description of the significant

Page 86

1  activities that occurred during a portion of the
2  applicable regulatory review period as the client
3  understood it at that time; fair?
4            MR. MAJCHRZAK:  Objection.
5            THE WITNESS:  I think I answered
6       the question.
7  BY MR. ENGER:
8       Q    Let me direct your attention to Exhibit
9  5, the twelfth requirement for a patent term
10 extension application.
11      Do you see it?
12      A    Yes.
13      Q    Here it says in the regulation that
14 another of the things that the patent term
15 extension application must contain is, 12, "a
16 statement beginning on a new page that in the
17 opinion of the applicant the patent is eligible
18 for the extension and a statement as to the length
19 of extension claimed, including how the length of
20 extension was determined," correct?
21      A    That's what the -- that's what that
22 provision reads, yes.
23      Q    Why is it important to include that
24 information in the application?
25           MR. MAJCHRZAK:  Objection.  Legal

Page 87

1  conclusion.  Speculation.
2            THE WITNESS:  It's to help
3       determine the regulatory review period.
4  BY MR. ENGER:
5       Q    How does the applicant determine the
6  length of the extension that's claimed?
7       A    They count the number of days in the IND
8  phase or the testing phase and the number of days
9  in the review phase, and they -- there's a, a
10 formula to calculate the regulatory review period.
11      Q    And that formula takes into account the
12 number of days during that review period whenever
13 they were not diligent?
14      A    I didn't say that they were -- you know,
15 there's a calculation on what they determine to be
16 the regulatory review period.  I don't believe
17 that there's, uh, that they make a determination
18 at that time whether or not they're not diligent
19 or not or what -- or they would say that -- you
20 know, I don't think there's a diligence
21 calculation figured into that at that point.
22      Q    You're not aware of patent term
23 extension applications here in this section where
24 they explicitly state the number of days whenever
25 they were not diligent?

Page 88

1       A    Oh, there were, there were some
2  inactivations and things of that sort and, you
3  know, what they were claiming for patent
4  extensions in this situation.  The applicant
5  decided that they determined that the extension
6  was calculated under certain -- you know, at a
7  later date when the IND was reactivated as opposed
8  to when the IND was originally submitted.
9       Q    So let's take a step back.  Let's
10 divorce from the facts of this case.  I just want
11 to understand your general understanding of the
12 statutes and what's the requirements of the patent
13 term extension application, okay?
14      A    Yes.
15      Q    In general, the applicant, as part of a
16 patent term extension application, is required to
17 affirmatively state, under the section where it
18 determines how the requested patent term extension
19 is calculated, an affirmative statement about the
20 number of days in which it was not diligent,
21 right?
22      A    No.  It's, it states when the IND was
23 active, when it become -- when it became in
24 effect, and then it became when it was -- uh,
25 during the inactivation period, they could at

Page 89

1   least note that, and just because it was inactive
2   doesn't mean that, doesn't mean that somebody was
3   not diligent in the course of the testing phase.
4      Q   In general, not on the facts of this
5   case, you're telling me that there's no
6   requirement that an applicant affirmatively state
7   the number of days in which it was diligent and
8   not diligent?
9      A   I would want to go back and review that
10   one more time, but I don't know if there's a,
11   there's something that is a specific statement
12   that says that you have to state that you were not
13   diligent. You could say that there was no
14   activity during this particular time frame, and
15   somebody else would draw the conclusion as to
16   whether or not there was diligence or not
17   diligence during that time frame.
18      Q   You've never prepared a patent term
19   extension application?
20      A   I didn't say that.
21      Q   Have you?
22      A   I have participated in the preparation
23   of patent term extension applications.
24      Q   Have you participated in the drafting of
25   a patent term extension application involving this

Page 90

1   Section (12), which is the statement that the
2   patent is eligible for the extension, a statement
3   as to the length of the extension claim,
4   including, importantly, how the length of the
5   extension was determined?
6      A   I did not, never -- I never prepared
7   that particular statement.
8      Q   So it's entirely possible that you are
9   required to make an affirmative statement in a
10   patent term extension application as to the number
11   of days which you were not diligent; you don't
12   know?
13      A   I can't draw a conclusion to that
14   effect.
15      Q   Because you just don't know?
16      A   That's correct.
17      Q   I want to direct your attention to the
18   thirteenth requirement for a patent term extension
19   application.
20      Do you see that?
21      A   Yes.
22      Q   Another of the things that the patent
23   term extension application must contain is, 13,
24   "a statement that applicant acknowledges a duty to
25   disclose to the Director of the United States

Page 91

1   Patent and Trademark Office and the Secretary of
2   Health and Human Services or the Secretary of
3   Agriculture any information which is material to
4   the determination of entitlement to the extension
5   sought," correct?
6      A   That's what that statement says.
7      Q   This duty; is it set forth in 37 C.F.R.
8   Section 1.765?
9      A   I can't say. I have not read that
10   section.
11      Q   Do you know why the government requires
12   patent term extension applicants to acknowledge
13   their duty to disclose material information?
14         MR. MAJCHRZAK: Objection.
15      Speculation.
16         THE WITNESS: Not particularly, no.
17   BY MR. ENGER:
18      Q   That never came up while you were at the
19   FDA?
20      A   No.
21      Q   And it's never come up in your practice?
22      A   Not this particular situation, because I
23   have not been involved in the preparation of those
24   statements.
25      Q   Why is it important that the Patent

Page 92

1   Office have all the material information before it
2   when determining patent term extension
3   eligibility?
4         MR. MAJCHRZAK: Objection.
5      Speculation. Outside the scope.
6         THE WITNESS: I'm not a patent
7      officer. I don't practice in front of the
8      USPTO.
9   BY MR. ENGER:
10      Q   If the Patent Office didn't have all the
11   material information before it, it might make a
12   wrong determination; fair?
13         MR. MAJCHRZAK: Objection.
14      Speculation. Outside the scope.
15         THE WITNESS: I can't say, but it
16      makes some sense that they could come to a
17      different conclusion, perhaps.
18   BY MR. ENGER:
19      Q   That makes a lot of sense, doesn't it?
20         MR. MAJCHRZAK: Objection.
21         THE WITNESS: Not necessarily, but
22      it just makes sense.
23   BY MR. ENGER:
24      Q   It makes, it makes sense that the Patent
25   Office should have all the material information

DAVID L. ROSEN, J.D.

Page 97

```
 1        A    Yes.
 2        Q    Another person who owes the Patent and
 3   Trademark Office a duty of candor and good faith
 4   is "each attorney or agent who represents the
 5   patent owner"; fair?
 6             MR. MAJCHRZAK:  Objection.  Legal
 7        conclusion.  Outside the scope.
 8             THE WITNESS:  That's what the, the
 9        language of the C.F.R. says.
10   BY MR. ENGER:
11        Q    And "every other individual who is
12   substantively involved on behalf of the patent
13   owner in a patent term extension proceeding" also
14   owes that same duty of candor and good faith,
15   right?
16             MR. MAJCHRZAK:  Same objection.
17             THE WITNESS:  That's what the
18        C.F.R. says.
19   BY MR. ENGER:
20        Q    Do you see the second sentence of
21   Section (a)?
22        A    Starting with?
23        Q    "All such individuals."
24        A    I see that sentence, the beginning of
25   that sentence, yes.
```

DAVID L. ROSEN, J.D.

Page 98

```
 1        Q    Why don't you read that sentence in your
 2   head, and then I want to ask you a few questions
 3   about it.
 4             (Witness peruses document.)
 5             THE WITNESS:  Okay.
 6   BY MR. ENGER:
 7        Q    Per this regulation, what, what steps
 8   are individuals who are aware of material
 9   information adverse to a determination of
10   entitlement to the patent term extension sought
11   required to do?
12             MR. MAJCHRZAK:  Objection.  Legal
13        conclusion.  Outside the scope.
14             THE WITNESS:  I'm only reading from
15        the C.F.R. that the -- if they become aware
16        -- "if they are aware, or become aware, of
17        material information adverse to a
18        determination of entitlement . . . which has
19        not been previously made of record in the
20        patent term extension proceeding must bring
21        [that] to the attention of the Office or the
22        Secretary . . . as soon as it is practical to
23        do so after the individual becomes aware of
24        the information," and "Information is
25        material where there is a substantial
```

DAVID L. ROSEN, J.D.

Page 99

```
 1        likelihood that the Office or the Secretary
 2        would consider it important in determinations
 3        to be made in the patent term extension
 4        proceeding."
 5   BY MR. ENGER:
 6        Q    So individuals involved in a patent term
 7   application -- patent term extension application
 8   have to disclose material information to the
 9   Patent Office; fair?
10             MR. MAJCHRZAK:  Objection.  Legal
11        conclusion.  Outside the scope.
12             THE WITNESS:  This is not an area
13        that I practice in, so it's very hard for me
14        to opine on any of this information.
15   BY MR. ENGER:
16        Q    What if, after a patent term extension
17   application is submitted, one of these individuals
18   who owes the duty of candor and good faith becomes
19   aware of material information?  What are they
20   required to do?
21             MR. MAJCHRZAK:  Objection.  Legal
22        conclusion.  Outside the scope.
23             THE WITNESS:  I can only read it's
24        material information "where there is a
25        substantial likelihood that the Office or the
```

DAVID L. ROSEN, J.D.

Page 100

```
 1        Secretary would consider it important in
 2        determinations," and the patent determination
 3        would be to bring it to the Secretary as soon
 4        as possible.
 5   BY MR. ENGER:
 6        Q    So this duty to disclose material
 7   information exists before you file the application
 8   and also continues to exist after you file the
 9   application; fair?
10             MR. MAJCHRZAK:  Objection.
11             THE WITNESS:  Again, I'm not an
12        expert in this area, and it's very hard for
13        me to render any conclusions other than just
14        to read the plain language of the statute --
15        of the regulations.
16   BY MR. ENGER:
17        Q    And when you read the plain language,
18   you would agree that the duty of candor and duty
19   to disclose material information exists both
20   before the application is filed and after the
21   application is filed; fair?
22             MR. MAJCHRZAK:  Objection.
23             THE WITNESS:  It appears that to be
24        the case.
25
```











DAVID L. ROSEN, J.D.

Page 113



DAVID L. ROSEN, J.D.

Page 114



DAVID L. ROSEN, J.D.

Page 115



DAVID L. ROSEN, J.D.

Page 116

BY MR. ENGER:

DAVID L. ROSEN, J.D.

**Page 121**



DAVID L. ROSEN, J.D.

**Page 122**



```
12      Q    How many pages of entries do you see
13   that fall in that stated testing phase of
14   October 9, 1997 until December 19, 2002?
15      A    One, two, three, four, five, six -- are
16   you counting fronts and backs?
17      Q    Yes, sir.  Front and back would count as
18   a separate page.
19      A    Okay.  Well, then let me go back and
20   recalculate my counts here.
21           What day in 1992?
22      Q    December 19, 2002.
23      A    Approximately 26 or so.
24
```

DAVID L. ROSEN, J.D.

**Page 123**



```
12   BY MR. ENGER:
13      Q    Are you saying that there was no other
14   activity taking place between February 7, 1990 and
15   October 9, 1997 that should have been included on
16   this chronology?
17      A    I'm not saying that.  I'm just saying
18   that there's just -- this is the log, the
19   submissions logged that went back and forth
20   between the company and the Agency.
21      Q    I'm just asking now about Exhibit J --
22      A    All right.
23      Q    -- this chronology in a vacuum.  Are you
24   with me?
25      A    Yes.
```

DAVID L. ROSEN, J.D.

**Page 124**

















13   BY MR. ENGER:

14      Q    When you read the statutes and the
15   regulations earlier this morning, you didn't see
16   any exception to the duty of good faith and candor
17   or the duty to disclose material information if
18   you seek less time than the FDA initially later
19   says you're entitled to, right?

20      A    I very quickly perused those with you,
21   so I really would have to go back and look to see
22   if there was any exceptions in that regard or
23   whether or not there was exceptions someplace else
24   in the regulation.

25



---

9  Q  Really the only people that would know
10 if they were diligent during the entirety of the
11 study is the study's participants?
12 A  It would be the applicant as well as the
13 principal investigators, as well as the actual
14 patients that were included in the trial, but
15 again there's a lot of activities that are
16 supportive with respect to review and analysis of
17 data, data entry, data quality situations that
18 would be a part of the conduct of any clinical
19 trial.  So just not -- just necessarily not seeing
20 patients on a given day would not mean that a
21 company was not being diligent in the conduct of a
22 clinical trial.
23 Q  Let's look at the last column of this
24 chart.  What information is indicated that would
25 be included in that last column?

---

1  A  Document location for report, data
2 listings, case report forms, technical study
3 report, or synopsis.

---

15 Q  What do you mean by the "regulatory
16 review period determination"?
17 A  That's the -- it's the information that
18 we've talked about today with respect to the
19 testing phase and the review phase, the
20 applications.
21 Q  This statute only permits the FDA to
22 consult its records and experts to determine the
23 length of the product's regulatory review period,
24 right?
25 A  I believe so, yes.

---

1  Q  It doesn't authorize the FDA to consult
2 its records or experts to verify the diligence of
3 a, of an applicant during a patent term extension?
4 MR. MAJCHRZAK:  Objection.
5 BY MR. ENGER:
6 Q  Right?
7 A  I don't believe it does.
8 Q  In the next sentence, you cite 21 C.F.R.
9 Section 60.36(a).
10 Do you see that?
11 A  Yes.
12 Q  And you cite it for the proposition that
13 the FDA consider -- can consider the "applicant's
14 actions" to determine whether it was diligent?
15 A  Yes.
16 Q  Does that regulation -- when is that
17 regulation considered?
18 A  In looking at the entire regulatory
19 review period.
20 Q  Isn't that regulation actually under
21 Subpart D relating to due diligence petitions?
22 MR. MAJCHRZAK:  Objection.
23 THE WITNESS:  I would have to
24 review that in its entirety and look at that
25 portion of the regulations.  I don't know it

DAVID L. ROSEN, J.D.

Page 153

```
1        offhand.
2   BY MR. ENGER:
3        Q    Let me represent to you that this
4   regulation is under Subpart D relating to due
5   diligence petitions.
6             Are you with me?
7        A    No.  I would have to read it.  I would
8   like to read it for myself.
9                  (Exhibit 10 was marked for
10                  identification.)
11  BY MR. ENGER:
12       Q    I've just handed you what's been marked
13  as Exhibit 10.  This is 21 C.F.R. 60.36.
14       A    Correct.
15       Q    Do you see -- I guess it's a little
16  difficult.  Do you see that Section 60.40
17  corresponds to Subpart E, due diligence hearings?
18       A    Yes.
19       Q    So the regulations under Subpart E only
20  apply if a due diligence hearing occurs, right?
21             MR. MAJCHRZAK:  Objection.  Legal
22        conclusion.
23             THE WITNESS:  That's under "Request
24        For Hearing."  It appears that to be the
25        case, yes, yes.
```

DAVID L. ROSEN, J.D.

Page 154

```
1   BY MR. ENGER:
2        Q    And I apologize that this Exhibit 10
3   doesn't include subsequent regulations, but can't
4   you tell that Section 60.36 is part of Subpart D?
5        A    I would presume that would be the case,
6   yes.
7        Q    And do you know that Subpart D
8   corresponds to due diligence petitions?
9        A    I will take your word for that.
10       Q    So 60.36 under Section, Subpart D
11  related to due diligence petitions only comes into
12  effect if somebody actually files a due diligence
13  petition, right?
14             MR. MAJCHRZAK:  Objection.  Legal
15        conclusion.
16             THE WITNESS:  I am not ready to
17        opine on this without further evaluation and
18        study.
19  BY MR. ENGER:
20       Q    That makes sense, though, what I'm
21  saying, right?
22       A    It may make sense.
23       Q    You know that no one filed a due
24  diligence petition in the Namenda patent term
25  extension, right?
```

DAVID L. ROSEN, J.D.

Page 155

```
1        A    I believe that to be the case.
2        Q    So 60.36 doesn't really have any
3   applicability to the Namenda patent term extension
4   application, does it?
5             MR. MAJCHRZAK:  Objection.  Legal
6        conclusion.
7             THE WITNESS:  Although FDA may
8        evaluate that.  I mean they, they can't
9        divorce themselves from looking at these
10       types of standards and making these types, in
11       any of the determinations.
12  BY MR. ENGER:
13       Q    Are you aware of any statute or
14  regulation that specifically authorizes the FDA to
15  consider all of its files and not just the things
16  in the patent term extension application to
17  determine due diligence?
18       A    I'm not aware of that.
19
```

DAVID L. ROSEN, J.D.

Page 156



# EXHIBIT 318

HIGHLY CONFIDENTIAL

Page 331

1   ** H I G H L Y   C O N F I D E N T I A L **

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Civil Action No. 1:15-cv-07488-CM

5   ----------------------------------x

6

    IN RE NAMENDA DIRECT PURCHASER

7   ANTITRUST LITIGATION

8

9   ----------------------------------x

                    November 7, 2017

10                  9:02 a.m.

11

12

13       Continued Videotaped Deposition of

14   FOREST LABORATORIES, LLC; ACTAVIS, PLC;

15   FOREST LABORATORIES, INC.; and FOREST

16   LABORATORIES HOLDINGS LTD., by CHARLES

17   RYAN, Ph.D., taken by Plaintiffs, pursuant

18   to Notice, held at the offices of White &

19   Case LLP, 1221 Avenue of the Americas, New

20   York, New York, before Todd DeSimone, a

21   Registered Professional Reporter and Notary

22   Public of the State of New York.

23

24

25

**Page 341**

[REDACTED]

```
17      Q.    Were later versions of this
18 document prepared?
19      A.    I don't believe so.  I'm not
20 sure what you mean by that.
21            MR. TOTO:  I mean, there is two
22 to begin with.  I'm sorry to interrupt.
23 Maybe we cn break it down if you are going
24 to talk about different versions or
25 something.
```

**Page 342**

```
 1            MR. OPPER:  Right.
 2      Q.    Dr. Ryan, you are also an
 3 attorney; is that correct?
 4      A.    Yes.
 5      Q.    And what is your understanding
 6 of what a Rule 30(b)(6) witness is?
 7      A.    So a 30(b)(6) witness is an
 8 individual who is testifying on behalf of
 9 the corporate entity, in this case Forest
10 Laboratories, and you give a 30(b)(6)
11 notice to someone when you are not giving a
12 name, but you are giving a topic and you
13 are saying please bring somebody forward
14 who can testify on behalf of, in this case,
15 the entity for a particular subject.
16      Q.    Okay.  And today you are
17 testifying on behalf of Forest Labs; is
18 that correct?
19      A.    Right.
20      Q.    What did you do in preparation
21 for today's deposition?
22      A.    I met with counsel.
23      Q.    By "counsel"?
24      A.    From White & Case.
25      Q.    Mr. Toto and --
```

**Page 343**

```
 1      A.    Mr. Johnson.
 2      Q.    -- Mr. Johnson?
 3      A.    Uh-huh.
 4      Q.    Did you speak with Eric Agovino
 5 about this document?
 6      A.    Yes.
 7      Q.    When did you speak with him?
 8      A.    Yesterday.
 9      Q.    Was this a face-to-face
10 meeting?
11      A.    No.  He lives in California, so
12 it was by phone.
13      Q.    Did you speak with David
14 Solomon about this -- let me withdraw that
15 and just ask you, who did you speak with in
16 preparation for today's deposition other
17 than Mr. Agovino and counsel you've already
18 identified?
19      A.    Those are the three individuals
20 I spoke with.
21      Q.    So you didn't speak to David
22 Solomon, correct?
23      A.    I did not speak to David
24 Solomon.
25      Q.    You did not speak to Rachel
```

**Page 344**

```
 1 Mears?
 2      A.    No.
 3      Q.    You did not speak to Herschel
 4 Weinstein?
 5      A.    No.
 6      Q.    You didn't speak to any of
 7 Forest's outside counsel?
 8      A.    That's correct.
 9            MR. TOTO:  Well, except the
10 ones mentioned I guess.
11            MR. OPPER:  Yes.
12
```

[REDACTED]

```
20      Q.    And when was that meeting?
21      A.    That meeting would have been in
22 February of 2010.
23      Q.    Was there a meeting on February
24 11th, 2010?
25      A.    I don't know if it was
```

HIGHLY CONFIDENTIAL

**Page 345**

```
1    specifically on February 11th or not.
2         Q.    But there was a meeting ████████
3    ██████████████ on or about 2010 with
4    respect to settling the patent litigation?
5         A.    That's right.
6
```



```
24        Q.    Did you attend that meeting?
25        A.    Yes.
```

HIGHLY CONFIDENTIAL

**Page 346**

HIGHLY CONFIDENTIAL

**Page 347**



HIGHLY CONFIDENTIAL

**Page 348**



**Page 357**

```
1    ███████  ███████  ███████  ███████
2    ███.
3         Q.      Dr. Ryan, in your role as an
4    attorney, you are a litigator; is that
5    correct?
6         A.      Yes.
7         Q.      And isn't your understanding
8    that FRE 408 has to do with settlement
9    negotiations between a party?
10        A.      Yes.
11        Q.      And the fact that any
12   settlement negotiations, to the extent they
13   are covered by 408, are confidential?
14        MR. TOTO:   I object to form.
15   You may answer.
16        A.      Yes.
17   ████████████████████████████████████████
```

24        Q.      Well, why would it -- why was
25   there an endorsement of subject to FRE 408

**Page 358**

```
1    on ███  ███?
2         A.      Because in the event that we
3    felt that we needed to share it, we wanted
4    to have the document properly marked.
5    ████████████████████████████████████████
```

17        A.      And there are I count six
18   bullet points underneath?
19        A.      Yes.
20        Q.      The first bullet point says
21   "Sixteen ANDA filers since October 2007,
22   fourteen were 'first filers.'"
23             Was that an accurate statement
24   as of February 11, 2010?
25        A.      I believe so, yes.

**Page 359**

```
1    ████████████████████████████████████████
```

8         A.      The next bullet point says
9    "Eight defendants have settled for a total
10   of 7.75 million for attorney fees, three
11   months early entry, and MFN."
12             Do you see that, sir?
13        A.      Yes.
14        Q.      What is MFN?
15        A.      Most favored nation.
16   ████████████████████████████████████████

20   ████████████████████████████████████████

**Page 360**

```
1         Q.      The next bullet point says "Two
2    defendants settled for no early entry and
3    no attorney fees."
4             Is that a correct statement?
5         A.      I believe so, yes.
6         Q.      The next bullet point, "Three
7    defendants withdrew their ANDAs."
8             Is that a correct statement?
9         A.      I believe so, yes.
10        Q.      And the last bullet point is
11   "One defendant entered into a consent
12   judgment."
13             Is that a correct statement as
14   of February 11, 2010?
15        A.      Yes.
16   ████████████████████████████████████████
```

Page 361

1    Q.    Would you turn to the next
2 slide, please.  It says Case Calendar.
3    A.    Yes.
4    Q.    And there are three bullet
5 points?
6    A.    Yes.
7    Q.    Do you see those?
8    A.    I do.
9    Q.    Are those three bullet points
10 accurate as of February 11, 2010?
11    A.    I believe so, yes.
12



Page 362

2    Q.    The information provided on
3 this page refers to Forest's current
4 settlement offer as of February 11, 2010?

9    A.    Yes.

Page 364



**Page 365**



**Page 366**

```
 4        Q.     Who told you that, sir?
 5              MR. TOTO:  Objection,
 6     argumentative, lacks foundation.
 7        A.     So it has always been the
 8     philosophy of the senior management team at
 9     Forest that we're not going to do business
10     transactions with people that we're in
11     litigation with.
12
```



**Page 368**





Page 374



3     Q.     But what about the settlement
4   agreement that is contained in this
5   document that is dated February 11, 2010,
6   did you put that together?
7          MR. TOTO:  Objection, misstates
8   the document.  You may answer.
9     A.     I did not put this slide
10  together, no.
11    Q.     But you reviewed it, correct?
12    A.     Yes, I saw it.
13    Q.     And you didn't make any changes
14  to it; is that correct?
15    A.     I did not make changes to it,
16  no.
17

Page 375

1
2
3     Q.     Would you explain that to me,
4   please?
5     A.     Sure.  So under the
6   Hatch-Waxman statute, first filers share
7   180 days of market exclusivity, and there
8   are different events that will trigger
9   that.  One would be that if the patent is
10  found invalid, for example, by the Federal
11  Circuit, then that would allow all of those
12  first filers to enter the market, meaning
13  to sell their generic in the marketplace.
14

Page 376



# EXHIBIT 319

HIGHLY CONFIDENTIAL

Page 1

1    ** H I G H L Y   C O N F I D E N T I A L **

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Civil Action No. 1:15-cv-07488-CM

5    ----------------------------------x

6

     IN RE NAMENDA DIRECT PURCHASER

7    ANTITRUST LITIGATION

8

9    ----------------------------------x

                 September 7, 2017

10               8:15 a.m.

11

12

13        Videotaped Deposition of FOREST

14   LABORATORIES, LLC; ACTAVIS, PLC; FOREST

15   LABORATORIES, INC.; and FOREST LABORATORIES

16   HOLDINGS LTD., by CHARLES RYAN, Ph.D.,

17   taken by Plaintiffs, pursuant to Rule

18   30(b)(6) Notice, held at the offices of

19   Garwin Gerstein & Fisher LLP, 88 Pine

20   Street, New York, New York, before Todd

21   DeSimone, a Registered Professional

22   Reporter and Notary Public of the State of

23   New York.

24

25

Page 121



```
14        Q.      In 274, Forest is discussing
15   the study number ███████      .  Do you
16   see that?
17        A.      Yes.
18        Q.      And in paragraph 275, it's the
19   same study?
20        A.      The same study, yeah.
21        Q.      In paragraph 276, the same
22   study?
23        A.      Same study.
24        Q.      Paragraph 277, same study?
25        A.      Yes.
```

Page 122

```
12              But in terms of studies that --
13   these are the two that are identified, yes.
14        Q.      So in those paragraphs that
15   appear on the pages that you identified,
16   there are no other studies referenced,
17   correct?
18        A.      That's what I was looking for.
19   It doesn't appear that they reference other
20   studies in there, no.
21
22
24              MR. JOHNSON:  Objection, lacks
25   foundation.
```

Page 123

```
1         A.      Are you asking what was
2    Forest's calculation that they submitted to
3    the FDA?
4         Q.      Correct.
5         A.      Let's see if -- I don't recall
6    it off the top of my head.  I apologize.  I
7    will see if I can find it in this document.
8
24              MR. JOHNSON:  Objection.
25
```

Page 124



Page 125

```
 1  [redacted]
 2  [redacted]
 3  [redacted]
 4  [redacted]
 5  [redacted]
 6  [redacted]
 7  [redacted]
 8  [redacted]
 9  [redacted]
10  [redacted]
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
```

23   MR. JOHNSON:  Counsel, I don't
24  know if it is a decent time for a break or
25  not.  It has been a little bit over an hour

Page 126

```
 1  we have been going.
 2       MS. JONES:  Sure, we can take a
 3  break if you are ready to.
 4       THE VIDEOGRAPHER:  We are going
 5  off the record.  The time is 10:50.  This
 6  ends disk two.
 7       (Recess taken.)
 8       THE VIDEOGRAPHER:  We are back
 9  on the record.  The time is 11:03.  This is
10  disk three.
11  BY MS. JONES:
12       Q.   I would like to go ahead and
13  mark as Ryan Exhibit 11 a document entitled
14  Supplemental Scheduling Order.
15       (Ryan Exhibit 11 marked for
16  identification.)
17       Q.   And just to provide a little
18  context, this is in connection with topic
19  10 on which you have been designated, which
20  is your estimate at or before the time of
21  settlement of the likely future timing of
22  the Namenda patent litigation absent
23  settlement.
24       And so Ryan Exhibit 11 is
25  Document No. 117, filed July 17th, 2008.
```

Page 127

```
 1  Do you see that?
 2       A.   I do.
 3       Q.   And in this Supplemental
 4  Scheduling Order, it says that "It is
 5  ordered that this matter is scheduled for a
 6  five-day bench trial beginning 9 a.m. on
 7  April 5th, 2010 before Chief Judge Gregory
 8  M. Sleet."
 9       Do you see that?
10       A.   I do.
11       Q.   And then I would like to go
12  ahead and hand you what has previously been
13  marked Mears 10, Mears Exhibit 10.
14       And this document is a letter
15  that was sent to the Court dated March
16  16th, 2010.  Do you see that?
17       A.   I do.
18       Q.   And it is addressed to Chief
19  Judge Sleet?
20       A.   Yeah.
21       Q.   And in this letter, Mylan's
22  counsel is requesting that the Court
23  preserve the April 5th trial date.  Do you
24  see that?
25       A.   Yes.
```

Page 128

```
 1       Q.   And this letter states that it
 2  was submitted with the consent of
 3  plaintiffs, correct?
 4       A.   Yes.
 5       Q.   And plaintiffs would have
 6  included Forest, correct?
 7       A.   Yes.
 8       Q.   So this letter was sent with
 9  the consent of Forest?
10       A.   Yes.
11  [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted]
    [redacted].
```

Page 173

```
 1   ████████   ███████
 █
 █      █████  ██████████  █████  ███████
 █   ████████  █████████████████  ██████
 █   ██████████████  ███████  ███████████
 █   █████████  ██████  ██████████
 █   ██  ████  ██████  ████████████
 9      Q.     And the extension, the patent
10   term extension that was ultimately granted
11   by the FDA was the maximum extension
12   allowable; is that correct?
13          MR. JOHNSON:  Objection to
14   form, foundation.
15      A.     So we were granted five years
16   of patent term extension which statutorily
17   is the longest period of time available,
18   yes.
19      Q.     And do you have any reason to
20   doubt that that extension -- that patent
21   term extension extended the '703 patent to
22   April 15th, 2015?
23      A.     No.
24      Q.     Does that sound right to you?
25      A.     Yes.
```

Page 174

```
 1   ████████  ███████████  ██████
 █   █████████  ███████████  █████████
 █   ███████████████  ██████████  ████
 █   ██████████  ████████████  ████████
 █   ████████  █████████  █████████
 █   ███████  ██████████████  ██████████
 █   ████████████  ██████  █████████
 █   █████████  ███████████  ████
10      Q.     If the pediatric exclusivity
11   has been granted prior to that four-year
12   date?
13      A.     That's right.
14      Q.     And is it correct that the
15   four-year date, in your understanding, the
16   four-year date is for a generic who is
17   filing a Paragraph IV certification ANDA?
18      A.     Yes.
19      Q.     And if it were -- well, let's
20   back up a little bit.
21          Could you explain your
22   understanding of what a Paragraph IV
23   certification is?  I know I used the term,
24   but I think we know what we are talking
25   about, but I would like you to explain the
```

Page 175

```
 1   meaning.
 2          MR. JOHNSON:  Objection, calls
 3   for expert testimony.
 4      A.     Sure.  Under the Hatch-Waxman
 5   statute it is pretty comprehensive in terms
 6   of the roles and responsibilities of both
 7   parties, and one of them is that when a
 8   generic chooses to pursue an ANDA as part
 9   of that, if there is a patent listed in the
10   Orange Book, they can file at, and if it is
11   a five-year NCE, they can file at year
12   four.
13          If there is not a patent they
14   have to wait until the fifth year.  But in
15   so doing one of the obligations is to send
16   a fairly detailed letter to the patent
17   holder and the NDA applicant, an
18   explanation as to their view about the
19   patents that have been listed in the Orange
20   Book, the validity, infringement.
21      Q.     Why the generic believes the
22   patent is either invalid or the generic
23   product, proposed generic product, does not
24   infringe the patent?
25      A.     That's right.
```

Page 176

```
 1      Q.     Or patents, if there are more
 2   than one, right?
 3      A.     Correct.
 4      Q.     And so if a generic is filing
 5   an ANDA on the fourth day -- I'm sorry, on
 6   the four-year anniversary of NCE that would
 7   be a Paragraph IV certification ANDA; is
 8   that right?
 9      A.     That's right.
10
```



```
16      Q.     And do you have any
17   understanding of what the incentives or
18   benefits might be for a generic ANDA filer
19   to file an ANDA with a Paragraph IV
20   certification on the first day that they
21   are eligible to file it?
22      A.     Sure.
23          MR. JOHNSON:  Objection to
24   form, also legal conclusion, expert
25   testimony.
```

Page 177

1    Q.    I'm asking your understanding
2  of the 180-day exclusivity period.
3          MR. JOHNSON:  Same objections.
4    A.    Again, as I stated before,
5  under the Hatch-Waxman statute, there's a
6  number of guidance and standards about
7  things and one of them, that if the first
8  filer, so someone who files in this case on
9  year four of a five-year, they get 180 days
10 of market exclusivity before any other
11 subsequent filers.  So they get six months
12 essentially to be, assuming their ANDA gets
13 approved, to be on the market.
14   Q.    Exclusive of other generics?
15   A.    Correct.
16   Q.    The brand would have the right
17 to continue selling the brand?
18   A.    Yeah, you can always sell your
19 product.
20   Q.    And in the context of Namenda,
21 where there were a dozen or so generics who
22 filed ANDAs with Paragraph IV
23 certifications on that first day, do you
24 have any understanding of how that works
25 with the generic, with the 180-day

Page 178

1  exclusivity period?
2          MR. JOHNSON:  Dr. Ryan, I think
3  he is asking you a general question.  It's
4  not calling for privilege.  But just let me
5  caution you not to reveal any privileged
6  communications or attorney work product in
7  answering the question, which I will also
8  object to as calling for expert testimony.
9    A.    So under the statute, all the
10 first filers that would file on that
11 four-year anniversary date, the first
12 available date that you could file an ANDA,
13 they would share that market exclusivity
14 period of 180 days with the other filers,
15 again, assuming their ANDA gets approved.
16   Q.    And is it generally true to
17 your knowledge, if you don't know I'm sure
18 you'll tell me, that the more generic
19 competitors there are on the market with an
20 AB rated equivalent product, the lower the
21 generic price would be in the market?
22          MR. JOHNSON:  Objection,
23 speculation, expert testimony.
24   A.    So it's not an area that I work
25 in, but it is my understanding that with

Page 179

1  greater competition on the market, it
2  impacts price.
3    Q.    And the more generic
4  competitors in the market, the more the
5  market is divided among those various
6  competitors typically; is that correct?
7          MR. JOHNSON:  Same objections,
8  also vague.
9    A.    Yes.  So the more generics that
10 are on the market, the more the market, you
11 know, is fragmented between the various
12 generics.
13   Q.    You would expect the market
14 share of each generic to be less, correct?
15          MR. JOHNSON:  Same objections.
16   A.    Not necessarily.  I don't work
17 in the generic industry, but it's not as if
18 it's a piece -- a slice of pizza and
19 everyone has the same size.  So someone
20 could capture much more market share than
21 somebody else for any number of reasons.
22   Q.    And those reasons would
23 typically be related to competition in the
24 market as far as you know?
25          MR. JOHNSON:  Same objections.

Page 180

1    A.    It could be related to lots of
2  things, quality, previous relationships,
3  any number of reasons why someone would
4  choose one generic over another.
5    Q.    When the dozen or so generics
6  filed their Paragraph IV certification
7  ANDAs for Namenda did you have any
8  expectations that the market would behave
9  any differently than it typically did, the
10 generic market I'm talking about?
11          MR. JOHNSON:  Objection, vague,
12 speculation, expert testimony.
13   A.    To be honest with you, it's not
14 something I ever thought about.
15   Q.    Do you recall which of --
16 periodically for the rest of the afternoon
17 I may refer to those dozen or so generics
18 who filed on the first day they were
19 eligible as first filers.
20   A.    Okay.
21   Q.    Is that okay?
22   A.    Sure.
23   Q.    So do you recall which of the
24 first filers Forest sued for patent
25 infringement?

Page 181

```
 1        A.      I think we sued all of them.
 2        Q.      Do you remember which ones they
 3   were?  Again, it's not a quiz.
 4        A.      No.
 5        Q.      I will show you some documents
 6   later.
 7        A.      No.
 8        Q.      And you mentioned the Paragraph
 9   IV certification notice to Forest.  Each
10   one of those first filers provided a notice
11   to Forest that they had filed an ANDA with
12   a Paragraph IV certification.
13        A.      Yes.
14        Q.      And in each one of those
15   notices to Forest explained that the
16   generic either contended that the patent,
17   the '703 patent, was invalid or that their
18   proposed product wouldn't infringe the '703
19   patent; is that correct?
20        MR. JOHNSON:  Objection to
21   form.
22        Q.      Or both.
23        A.      Typically it is almost always
24   the same, which is that we don't infringe
25   and if we do infringe the patent is
```

Page 182

```
 1   invalid.
 2        Q.      You don't recall any exceptions
 3   for any of the first filer notices that you
 4   received for Namenda?
 5        A.      I don't recall an exception
 6   ever.
 7        Q.      Do you recall if there were any
 8   generic companies that filed Paragraph IV
 9   ANDAs after the first filers did?
10        A.      My recollection is that there
11   were maybe one or two, but there were a
12   couple of people that did file after.
13        Q.      Do you recall who they were?
14        A.      No, I don't recall who they
15   were.
16        Q.      Do you know if Forest filed
17   patent infringement suits against them?
18        A.      I think we did, but I -- I
19   would imagine we did but I can't say for
20   sure.
21        Q.      Are you familiar with the term
22   30-month stay in the context of
23   Hatch-Waxman litigation?
24        A.      Yes.
25        Q.      What's your understanding of
```

Page 183

```
 1   what a 30-month stay is?
 2        MR. JOHNSON:  Objection, expert
 3   testimony.  Go ahead.
 4        A.      So a 30-month stay is a period
 5   of time in which the FDA is not going to
 6   approve, and while you are litigating it
 7   you have essentially like a year and a half
 8   without concern about the ANDA getting
 9   approved.
10        Q.      Two and a half years?
11        A.      Two and a half years, sorry.
12        Q.      Do you know or recall when the
13   30-month stays that were triggered by
14   Forest's patent infringement suits with
15   respect to Namenda IR were set to expire?
16        MR. JOHNSON:  Objection,
17   foundation.
18        A.      I'm trying to think of the
19   year.  So it was April -- it was almost a
20   year after the last settlement, so whatever
21   month we settled with Mylan, was July, I
22   think it was April the following year.  I
23   think that's right.
24        Q.      Did, I probably should have
25   asked this first, or before the last
```

Page 184

```
 1   question, did Forest file its patent
 2   infringement suits against all of the first
 3   filers in time to trigger a 30-month stay
 4   for each as far as you recall?
 5        MR. JOHNSON:  Objection,
 6   foundation.
 7        A.      I don't actually recall.
 8        Q.      Earlier this morning you
 9   identified two firms that represented
10   Forest as outside counsel in the patent
11   infringement litigations, Kirkland & Ellis
12   and Jones Day, are those the two?
13        A.      Yes.
14
```



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

Page 194



15    Q.    To your knowledge, were there
16    any negotiations with any of the generic
17    ANDA filers that did not result in a
18    settlement of the patent litigation
19    involving that generic?
20         MR. JOHNSON:  Objection.  You
21    can answer.
22         A.    No.
23

HIGHLY CONFIDENTIAL

Page 195



HIGHLY CONFIDENTIAL

Page 196



14    Q.    Dr. Ryan, take your time to
15    review that document.  My first question is
16    if you recognize it.  Answer when you're
17    ready.
18         I will represent, while you are
19    looking at that, that the document is a
20    printout from the Securities and Exchange
21    Commission website.
22         MR. JOHNSON:  I will just
23    object to the extent this document hasn't
24    been produced in this case and we haven't
25    had the opportunity to review it before

HIGHLY CONFIDENTIAL

Page 197

1  Dr. Ryan's being examined on it.
2      A.    So it appears to be a 10-Q for
3  the quarter ending September 30th, 2009 for
4  Forest Laboratories, Inc.
5      Q.    Do you know what a 10-Q is,
6  Dr. Ryan?
7      A.    Yes.
8      Q.    Did you have any role in
9  preparing this -- well, strike that.
10         You were at Forest, correct,
11  during the quarterly period ended September
12  29th -- sorry, September 30th, 2009,
13  correct?
14     A.    Yes.
15     Q.    Do you recall having any role
16  in drafting any portion of this document?
17     A.    Yes.
18     Q.    And which portions?
19     MR. JOHNSON:  Well, objection.
20     A.    So with any public
21  communication by Forest, whether it is a
22  10-Q, 10-K, press release, any language
23  with respect to intellectual property would
24  either have been provided by me, or, at the
25  very least, have been reviewed by me.

HIGHLY CONFIDENTIAL

Page 198

1      So I see that there are things
2  with respect to, for example, on page 14,
3  legal proceedings, talking about the
4  Lexapro patent infringement dispute, I
5  would have either provided that language,
6  or, at the very least, reviewed it before
7  it was disclosed, but I don't recall
8  anything in particular relative to this
9  filing.
10     Q.    And you pointed out some
11  language on page 14, it's the Legal
12  Proceedings section, number 12, and it
13  continues on to page 15 and there is some
14  language there about the Namenda patent
15  lawsuits.  Do you see that?
16     A.    Yes.
17     Q.    Do you recall having any role
18  in preparing or reviewing this prior to the
19  filing?
20     A.    I would have had a role.
21  Sitting here today, I can't recall
22  specifically this filing or this particular
23  passage, but I would have -- I would have
24  participated in this, or at least reviewed
25  it.

HIGHLY CONFIDENTIAL

Page 199

1      Q.    Do you have any reason to
2  believe that any of the representations in
3  this section are incorrect?
4      MR. JOHNSON:  Objection.
5      Q.    Or inaccurate?
6      A.    No.
7      Q.    Okay.  You can set the document
8  aside.
9      Dr. Ryan, during settlement
10  negotiations with the various generics, do
11  you recall discussions about when the
12  generic companies would be permitted to
13  launch their generic versions of Namenda
14  IR?
15     MR. JOHNSON:  You mean
16  discussions with the generics?
17     MR. RAPHAEL:  Yes.
18     A.    Yes.
19     Q.    Can you tell me what you recall
20  about those discussions?
21     A.    I recall that we had taken the
22  position that they could come onto the
23  market three months earlier than the expiry
24  of the patent.
25     Q.    And at the time of the

HIGHLY CONFIDENTIAL

Page 200

1  negotiations, Forest had not applied for or
2  been granted pediatric exclusivity, is that
3  correct, for the '703 patent?
4      A.    I don't recall.
5      Q.    Do you recall any generics
6  attempting to negotiate for an earlier
7  launch date than three months prior to the
8  expiration of the '703 patent?
9      A.    So we certainly had in any
10  settlement negotiation we talked about a
11  variety of things including launch date.  I
12  would be surprised if none of them -- none
13  of them ever tried to advance for more.  I
14  don't really recall.  It was something that
15  we were pretty firm on out of the gate.
16     Q.    Do you recall generics
17  expressing concern to you about other
18  generics getting better deals or earlier
19  launch dates in negotiations with Forest?
20     A.    Yes.
21



**Page 201**



```
18    Q.    So it was an option?
19    A.    It was an option, yes.
20    Q.    That they requested and Forest
21  granted?
22    A.    They demanded.
23    Q.    Do you recall any specifics
24  with other generics concerning -- strike
25  that.
```

**Page 202**

```
1          Do you recall any discussions
2   with other individual generics about
3   concerns regarding other generics getting
4   better deals or earlier launch dates?
5     A.    Yes.
6          MR. JOHNSON:  Objection.
7
```



**Page 203**



```
12    Q.    Was Forest concerned about any
13  one or more of the generics prevailing in
14  the patent litigation?
15          MR. JOHNSON:  Objection to
16  form.  And I'm going to instruct you not to
17  answer on grounds of attorney-client
18  privilege and work product.
19          THE WITNESS:  Okay.
20    Q.    You are going to follow that
21  instruction?
22    A.    Yes.
23
```

**Page 204**

```
7     Q.    Do you know what at-risk entry
8   refers to?
9     A.    Yes.
10    Q.    What is that?
11          MR. JOHNSON:  Objection.
12    A.    So it's when a generic company
13  has an approved ANDA, but there has not
14  been a final disposition by the court on
15  the patent dispute, so they call it an at
16  risk, because if the generic decides to go
17  ahead and launch and then loses that patent
18  challenge, they risk subsequent damages
19  from the branded company for basically
20  infringing the patent.
21    Q.    As a result of the infringing
22  sales?
23    A.    Correct.
24
```







**Page 209**



**Page 210**

```
14        Q.      In settlement negotiations with
15   the generics, did Forest tell any of the
16   generics that it wanted them to acknowledge
17   that the '703 patent was valid?
18        A.      Yes.
19        Q.      Do you recall specific
20   discussions about that?
21        A.      I recall that we had
22   discussions about that.  I don't recall the
23   specifics of it, but it is something that I
24   remember did come up as part of the
25   settlement discussion.
```

**Page 211**



```
17        Q.      You don't remember specific
18   details?
19        A.      No.
```

**Page 212**



```
 5        Q.      Do you recall if they did in
 6   fact acknowledge that in the settlement
 7   agreements?
 8        A.      I don't recall specifically.
 9   It's in there.  They did.
```

Page 213

1　████　██████
2　　　　THE VIDEOGRAPHER:  We are going
3　off the record.  The time is 1:40.  This
4　ends disk three.
5　　　　(Recess taken.)
6　　　　(Ryan Exhibit 16 marked for
7　identification.)
8　　　　THE VIDEOGRAPHER:  We are back
9　on the record.  The time is 1:55.  This is
10　disk four.
11　BY MR. RAPHAEL:
12　　　Q.　Dr. Ryan, you have been handed
13　what the reporter has marked as Exhibit 16.
14　　　　My first question, again, is if
15　you recognize the document.  I will give
16　you a minute to review.
17　　　　And while you do that, I will
18　note for the record that it has Bates
19　numbers FRX-AT-04304905 through 914.
20　　　　Do you recognize this document,
21　Dr. Ryan?
22　　　A.　Yes.
23　　　Q.　It appears to be -- it appears
24　to be meetings of minutes -- strike that.
25　　　　It appears to be minutes of a

Page 214

1　meeting of the Forest Laboratories Holding,
2　Ltd. board of directors; is that correct?
3　　　A.　Yes.
4　　　Q.　And that meeting was held it
5　appears on March 12th, 2008; do you see
6　that?
7　　　A.　Yes.
8　　　Q.　In Bermuda; do you see that?
9　　　A.　Yes.
10　　　Q.　Do you recall being present at
11　that meeting?
12　　　A.　I recall that I was
13　participating by phone.
14　　　Q.　Oh, I see.  Hopefully you were
15　in a nicer place than Bermuda.
16　　　A.　I don't think so.
17　　　MR. JOHNSON:  I'm not sure
18　there are.
19　　　Q.　Did you have any role or
20　participate in the drafting of these
21　minutes, Dr. Ryan?
22　　　A.　The preparation of the minutes,
23　yes.
24　　　Q.　And I will note that there are
25　large portions of this exhibit that are

Page 215

1　redacted, so there are only -- I guess
2　we're talking about the portions that
3　aren't redacted.
4　　　　Which portions did you have a
5　role in preparing?
6　　　MR. JOHNSON:  I just caution
7　you, Dr. Ryan, not to reveal any privileged
8　information in answering.  But go ahead.
9　　　A.　So I would have provided
10　just --
11　　　MR. JOHNSON:  Again, a caution
12　regarding privilege or work product, but if
13　you can answer without that.
14　　　THE WITNESS:  So can I answer
15　in terms of what I would have done?
16　　　MR. JOHNSON:  I think you can
17　answer generally as to what you would have
18　done, but if you provided any legal advice
19　to Forest or the board regarding these
20　minutes or if you counseled anyone on what
21　they should say, then please don't discuss
22　the substance of any such attorney-client
23　communications.
24　　　THE WITNESS:  Okay.
25　　　A.　I would have drafted the

Page 216

1　paragraph on page 7 and may have -- may
2　have participated in drafting what's on
3　page 3.
4　　　Q.　Page 7 is the page with Bates
5　ending 911, correct?
6　　　A.　Right.
7

HIGHLY CONFIDENTIAL

Page 249



11    (Ryan Exhibit 23 marked for
12  identification.)
13        Q.    It has Bates numbers
14  FRX-AT-04269110 through 9434.
15        Do you recognize this document,
16  Dr. Ryan?  And I will give you a while to
17  look at it, as long as you need.
18        A.    It looks like an e-mail with
19  settlement agreements attached.
20

---

HIGHLY CONFIDENTIAL

Page 250

1        Q.    And the date is August 24th,
2  2009; do you see that?
3        A.    Yes.
4        Q.    And any reason to believe that
5  you didn't receive this e-mail from Eric
6  Agovino on the date shown here?
7        A.    No.
8        Q.    With the exception of the
9  settlement chart, which I believe was
10  withheld from production, it appears that
11  the attachments to this e-mail follow, and
12  specifically they are draft agreements,
13  settlement and license agreements for
14  Wockhardt, Apotex, Amneal, Cobalt, Lupin,
15  Mylan, Orchid, Sun, Teva and Upsher-Smith.
16        Do you agree with that?
17        A.    Yes.
18        Q.    Do you know why Mr. Agovino is
19  sending these draft agreements to
20  Mr. Jochum?
21        MR. JOHNSON:  Dr. Ryan, you can
22  answer that yes, no, I don't know.
23        A.    I don't know.
24        Q.    Are these, are the attachments
25  to the e-mail, are they all draft

---

HIGHLY CONFIDENTIAL

Page 251

1  agreements that Forest sent to the
2  respective generics in August 2009?
3        A.    It appears so.
4        Q.    Other than having not read each
5  one, is there anything that stands out that
6  would make you think that's not what the
7  attachments are?
8        A.    No.
9        Q.    And were each of these draft
10  agreements prepared by Forest or someone
11  acting on Forest's behalf?
12        A.    Yes.
13



---

HIGHLY CONFIDENTIAL

Page 252

1
2
3        Q.    Do you know if each of the
4  generics requested each of those
5  provisions?
6        And I say, by each of the
7  generics, I'm referring to the generics
8  whose agreements are attached to this
9  e-mail.
10        A.    Yes.
11

22        Q.    Do you have any reason to doubt
23  that these were the amounts of attorneys'
24  fees that Forest offered to each respective
25  generic as of the date of this e-mail in

Page 253

1  settlement of the patent litigation?

2      A.    No.

3



13            (Ryan Exhibit 24 marked for

14  identification.)

15      Q.    Exhibit 24 has Bates numbers

16  FRX-AT-03626726 through 763.

17            Do you recognize this document,

18  Dr. Ryan?

19      A.    It's an e-mail.

20

Page 254

1      Q.    And the date is August 27th,

2  2009.  Do you recall receiving this e-mail

3  in August 27th, 2009?

4      A.    No.

5      Q.    Any reason to believe that you

6  didn't?

7      A.    No.

8      Q.    Is this a document that Forest

9  maintains on its e-mail server in the

10  ordinary course?

11      MR. JOHNSON:  Objection.

12      A.    I assume so.

13

Page 255



1

2

6

8      Q.    Why did Forest need to be able

9  to disclose the license agreement terms to

10  other defendants?

11      A.    My recollection is that the

12  other defendants are fierce competitors and

13  they don't trust each other, and so it was

14  something that was put in there in the

15  event that we had to actually, you know,

16  show an agreement to another defendant.

17

Page 256



1

15            Do you recognize this document?

16  And it's a long one, so you can take your

17  time to review.

18      A.    It appears to be an e-mail with

19  two settlement agreements attached.

20

25

**Page 261**



**Page 262**



**Page 263**

**Page 264**

**Page 293**



**Page 294**

**Page 295**

6       (Ryan Exhibit 36 marked for
7   identification.)
8       Q.    This is document 36, which has
9   Bates numbers FRX-AT-04320734 and it ends
10  with 736.
11          Do you recognize this document?
12      A.    It appears to be an e-mail and
13  a single sheet that says Status of
14  Memantine Patent Litigation.



21      Q.    Do you have any reason to
22  believe that you didn't receive this
23  e-mail?
24      A.    No.
25      Q.    Is this a document that Forest

**Page 296**

1   would maintain in the ordinary course on
2   its e-mail server?
3           MR. JOHNSON:   Objection.
4       A.    I assume so.
5       Q.    And the subject -- so the date
6   of this e-mail is January 21st, 2010.  Do
7   you see that?  The first page at the top.
8       A.    Yeah.



HIGHLY CONFIDENTIAL

**Page 317**

```
 1        Q.      Do you know what the Alphapharm
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17        Q.      Exhibit 44 has Bates numbers
18   FRX-AT-04247293 to 95.
19             Mr. Ryan, the exhibit appears
20   to be three separate letters dated the same
21   date.  Do you see that?
22        A.      Yes.
23        Q.      Do you recognize these letters?
24        A.      Not really.  That's what I find
25   funny.
```

HIGHLY CONFIDENTIAL

**Page 318**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10        Q.      Do you know, are these
11   documents that would be maintained by
12   Forest in the ordinary course of business?
13             MR. JOHNSON:  Objection.
14        A.      I believe so.
15        Q.      And were prepared by Forest
16   employees in the ordinary course of
17   business?
18        A.      I believe so, yes.
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

**Page 319**

```
 1
 2
 3
 4
 5
 6
 7
 8        Q.      No one exercised the most
 9   favored nation option?
10        A.      Right.
11             MR. JOHNSON:  Objection.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

**Page 320**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# EXHIBIT 320

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| IN RE: NAMENDA ANTITRUST LITIGATION | 1:15-cv-07488-CM-JCF |
|---|---|

## NOTICE OF RULE 30(b)(6) DEPOSITION OF DEFENDANTS FOREST LABORATORIES, LLC; ACTAVIS, PLC; FOREST LABORATORIES, INC.; AND FOREST LABORATORIES HOLDINGS LTD.

**PLEASE TAKE NOTICE THAT**, pursuant to Federal Rule of Civil Procedure 30(b)(6), Direct Purchaser Plaintiffs in the above-captioned litigation, by and through their counsel, will take the videotaped deposition upon oral examination of **Defendants Forest Laboratories, LLC; Actavis, plc; Forest Laboratories, Inc.; and Forest Laboratories Holdings Ltd.** (hereinafter and in Exhibit A referred to as "Forest"). The deposition, which will be stenographically recorded and videotaped before an officer duly authorized to administer oaths, will be held on July 19, 2017 at 9 am at the offices of Garwin Gerstein & Fisher LLP, 88 Pine Street, 10th Floor, New York, NY 10005. All counsel are invited to participate and cross examine.

**NOTICE IS HEREBY GIVEN** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Defendants are required to present one or more representatives to testify on their behalf and to give testimony on topics set forth in Exhibit A hereto. The person or persons so designated shall be required to testify concerning the matters known or reasonably available to Defendants with respect to each topic.

Dated: July 10, 2017                     Respectfully submitted,

**Rochester Drug Co-Operative, Inc. and the Proposed Class**

**JM Smith Corporation d/b/a Smith Drug Company and the Proposed Class**

*/s/ Dan Litvin*



David F. Sorensen
Daniel C. Simons
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (fax)
dsorensen@bm.net
dsimons@bm.net


Peter Kohn
Joseph T. Lukens
Faruqi & Faruqi, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com
jlukens@faruqilaw.com

Bruce E. Gerstein
Joseph Opper
Kimberly M. Hennings
Dan Litvin
Garwin Gerstein & Fisher LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
bgerstein@garwingerstein.com
jopper@garwingerstein.com
khennings@garwingerstein.com
dlitvin@garwingerstein.com


David C. Raphael, Jr.
Erin R. Leger
Smith Segura & Raphael, LLP
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
draphael@ssrllp.com


Stuart E. Des Roches
Andrew W. Kelly
Odom & Des Roches, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
stuart@odrlaw.com


Russ Chorush
Miranda Jones
Heim Payne & Chorush, LLP
600 Travis, Suite 6710
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
rchorush@hpcllp.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2017, I served the foregoing Notice of Rule 30(b)(6) Deposition of Defendants Forest Laboratories, LLC; Actavis, plc; Forest Laboratories, Inc.; and Forest Laboratories Holdings Ltd. on counsel for Defendants via email.

/s/ Dan Litvin

**TOPICS FOR EXAMINATION**

## EXHIBIT A

### DEFINITIONS

1.      "'703 Patent" means U.S. Patent No. 5,061,703, and its corresponding *ex parte* reexamination certificate.

2.      "ANDA" means Abbreviated New Drug Application as defined in 21 U.S.C. § 355(j).

3.      "At-Risk Launch" means the launch of an FDA-approved drug (based on FDA review and approval) prior to a final judgment from which no appeal can be, or has been, taken in a patent litigation involving the FDA-approved drug.

4. ·      "Authorized Generic" means a listed drug, as defined in 21 U.S.C. § 355(j), that has been approved under subsection 21 U.S.C. § 355(c); and is marketed, sold, or distributed directly or indirectly under different labeling, packaging, product code, labeler code, trade name or trade mark than the listed drug.

5.      "Authorized Generic Namenda IR" means an Authorized Generic version of Namenda IR.

███ ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

7.      "Generic," "AB-rated generic," "generically equivalent product," or "generic drug equivalent" means a pharmaceutical or drug product that has been submitted to, or deemed by, the FDA as meeting the necessary requirements to be an AB-rated alternative to a Reference Listed Drug as such is defined by 21 CFR § 314.94(a)(3) and identified by the FDA.

8.      "Generic Namenda ANDA" means any of ANDA nos. 90-042 (Cobalt), 90-051 (Lupin), 90-044 (Orchid), 90-052 (Teva), 90-043 (Upsher), 90-073 (Wockhardt), 90-045 (Barr), 90-048

4

(Dr. Reddy's), 90-050 (Genpharm), 90-041 (Interpharm), 79-225 (Mylan), 79-236 (Ranbaxy), 90-058 (Sun India and Kendle), 90-044 (Orgenus), 90-244 (Apotex), and any other ANDA that is, or at any time was, seeking FDA approval to market an AB-rated generic version of Namenda IR.

9. "Generic Namenda Competitor" means any entity seeking to produce, market, sell or promote a Generic Namenda Product, including but not limited to Barr Pharmaceuticals, Inc. ("Barr"); Teva Pharmaceuticals USA, Inc. ("Teva"); Cobalt Laboratories, Inc. ("Cobalt"); Orchid Chemicals & Pharmaceuticals Ltd. ("Orchid"); Lupin Pharmaceuticals, Inc. ("Lupin"); Upsher-Smith Laboratories, Inc. ("Upsher-Smith"); Wockhardt Limited (Wockhardt"); Mylan Pharmaceuticals, Inc. ("Mylan"); Genpharm ULC and Genpharm, L.P. (jointly, "Genpharm"); Interpharm Holdings, Inc. and Interpharm Inc. (jointly, "Interpharm") (whose interests in the suit were soon to be acquired by a wholly owned subsidiary of Amneal Pharmaceuticals, LLC ("Amneal"); Sun India Pharmaceuticals Industries, Ltd. ("Sun"); and Dr. Reddy's Laboratories Ltd. and/or Dr. Reddy's Laboratories, Inc. (jointly, "Dr. Reddy's").

10. "Generic Namenda Product" means a drug product that is or was the subject of a Generic Namenda ANDA.

11. "Lexapro" means any drug product that is or was described and the subject to NDA No. 21-323 (or any variant thereof), or any generic pharmaceutical product in which Lexapro is the Reference Listed Drug, regardless of, among other things, the dosage strength, dissolution rate, package size.

14.     "Namenda IR" means the branded oral pharmaceutical containing the active ingredient memantine hydrochloride, marketed and sold under the trademark or name "Namenda," "Namenda®," "Namenda 5mg," or "Namenda 10mg," that is the subject of NDA No. 21-487. For avoidance of doubt, "Namenda IR" does not refer to "Namenda Oral Solution" "Namenda XR," or any generic equivalent to those drugs.

15.     "Namenda Patents" means collectively, the '703 Patent and any other patent You contend would have affected any Generic Namenda Competitor's right, ability or willingness to market its Generic Namenda Product.

16.     "Namenda Patent Litigation" means any patent infringement litigation involving a Generic Namenda Product or Generic Namenda ANDA including the following patent infringement lawsuits: (1) all lawsuits consolidated in *Forest Laboratories, Inc. v. Cobalt Laboratories Inc. et al.*, Civil Action No. 08-cv-0021-GMS-LPS (D. Del.) (consolidated); (2) *Forest Laboratories, Inc. et al. v. Orgenus Pharma, Inc. et al.* Civil Action No. 09-05105-MLC-DEA; *Forest Laboratories, Inc., et al v. Aurobindo Pharma USA, Inc., et al.*, Civil Action No. 1:14-cv-00833-LPS; and (3) any other patent infringement lawsuit against a Generic Namenda Competitor.

17.     "Namenda XR" means the branded oral pharmaceutical containing the active ingredient memantine hydrochloride, marketed and sold under the trademark or name "Namenda XR" or Namenda XR®," that is the subject of NDA No. 22-525.

18.     "Paragraph IV ANDA Certification" means a certification under section 505(j)(2)(A)(vii) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. that a relevant patent is invalid, unenforceable, or will not be infringed.

6

20.     "Pediatric Exclusivity" means the period of regulatory exclusivity as described in 21 U.S.C. § 355a, and analogous provisions.

21.     "Reference Listed Drug" means the listed drug identified by the FDA as the drug product upon which the applicant relies in seeking approval of its Abbreviated New Drug Application as defined in 21 U.S.C. § 355(j).

22.     "Teflaro" means any drug product that is or was described and the subject to NDA No. 20-327 (or any variant thereof), or any generic pharmaceutical product in which Teflaro is the Reference Listed Drug, regardless of, among other things, the dosage strength, dissolution rate, package size.

23.     "You," "Your," and "Forest" mean Forest Laboratories, LLC; Actavis, plc; Forest Laboratories, Inc.; and Forest Laboratories Holdings Ltd. and any of their parents, subsidiaries, divisions, subdivisions, affiliates, predecessor and successor entities, partners, officers, directors, employees, agents, independent contractors, legal counsel, or any other person acting, or purporting to act, on its (or their) behalf.

24.     The terms "and," "or," and "and/or" shall be construed in the conjunctive or the disjunctive, whichever makes the meaning more inclusive.

## TOPICS FOR EXAMINATION

### A. Patent Related Topics

1.     The identity of the Namenda Patents.

2.      Your subjective views and beliefs at the time of the Patent Litigation Settlements as to the strengths and weaknesses of the Namenda Patents in terms of (a) claim scope, (b) validity, (c) enforceability, (d) infringement by any Generic Namenda Product(s) and/or Generic Namenda ANDA(s), and (e) the validity and effect of any patent term extension.

3.      Your subjective views and beliefs at the time of the Patent Litigation Settlements regarding the strength of Your position in the Namenda Patent Litigation regarding claim construction, infringement, validity, and patent term extension validity, including Your perceived likelihood of success with respect to each of those issues.

4.      The positions You took, including the legal arguments You made and the factual evidence You relied upon, in the following document: Exhibit 11 to Document No. 474-1 in *Forest Laboratories, Inc. v. Cobalt Laboratories Inc. et al.*, Civil Action No. 08-cv-0021(D. Del.).

5.      Your basis for refuting the legal arguments and factual evidence offered by Mylan Pharmaceuticals, Inc. in the following document: Exhibit 12 to Document No. 474-1 in *Forest Laboratories, Inc. v. Cobalt Laboratories Inc. et al.*, Civil Action No. 08-cv-0021(D. Del.).

6.      The factual and legal basis for Your contention in the Namenda Patent Litigation that the asserted Generic Namenda Products were infringing or would directly or indirectly infringe the '703 Patent.

7.      The factual and legal basis for Your contention in the Namenda Patent Litigation that the claims of the '703 Patent: (1) were patentable subject matter under 35 U.S.C. § 101; (2) were novel and non-obvious under 35 U.S.C. § 102-103; (3) satisfied the enablement, definiteness, and written description requirements of 35 U.S.C. § 112; and (4) were not illegally broadened under 35 U.S.C. § 305.

8

8.    The factual and legal basis for Your contention in the Namenda Patent Litigation that the patent term extension for the '703 Patent was valid.

9.    Your estimate, budget, or forecast, at or before the time of settlement, of the amount of litigation expenses that You saved by settling the Namenda Patent Litigation.

10.    Your estimate, at or before the time of settlement, of the likely future timing of the Namenda Patent Litigation absent the settlement.

# EXHIBIT 323

# In The Matter Of:

*THE PEOPLE OF THE STATE OF NEW YORK, v.*
*ACTAVIS, PLC, and FOREST LABORATORIES, LLC,*

*November 11, 2014*

*Southern District Court Reporters*

Original File EBBDACTF.txt
Min-U-Script® with Word Index

| Ebbdact1 Hearing | Saunders - direct | Page 217 |
|---|---|---|

1    our business works.
2    Q.  You agree that it was a key priority of Forest in
3    January 2014 to continue fueling the shift of Namenda to
4    Namenda XR, right?
5    A.  We were and remain focused on promoting our newer, more
6    innovative product, which is Namenda XR.
7    Q.  And Namenda XR, according to the models we saw, has only a
8          chance of losing sales to generics whereas Namenda
9    IR has a ›          chance, right?
10   A.  I don't know.  My personal view is that it is not that
11   easy, but there are probably models that show that, as we have
12   established.
13   Q.  Now, this gets a bit confusing because the numbers are the
14   same but I want t now talk about a different conversion number.
15   The percentages are the same.  But now instead of talking about
16   the Namenda XR conversion to generic Namenda IR, right, the
17   kind of reverse conversion, I want to talk about your efforts
18   to convert patients on Namenda IR to Namenda -- to branded
19   Namenda XR, OK?
20   A.  OK.
21   Q.  And the reason I did that preamble is because the
22          number comes up again.  I don't want people to get
23   confused that it is the same number but it is a different
24   concept.
25          When you started as CEO, Forest was predicting that it

| Ebbdact1 Hearing | Saunders - direct | Page 218 |
|---|---|---|

1    could switch approximately        of the Namenda IR
2    patients to Numidia XR before generic entry without a forced
3    switch, right?
4    A.  Before I started as CEO, I believe that was their
5    projection.
6    Q.  And Forest expected that implementing a forced switch would
7    allow the company to achieve a higher level of switching to
8    Namenda XR than it would be able to achieve otherwise, correct?
9    A.  I believe that we thought if we did that, we would put
10   ourselves in a more competitive situation to do that but no
11   guarantee.
12   Q.  If the hard switch were properly executed, Forest would
13   achieve significantly higher levels of conversion from Namenda
14   IR to Namenda XR than it would have achieved absent the forced
15   switch, right?
16   A.  That was the goal.
17   Q.  And in order to take advantage of the lower generic erosion
18   rate for Namenda XR, you had to accomplish that switching
19   before generics enter the market, correct?
20   A.  That is correct.
21   Q.  And it's more difficult and expensive for you to promote XR
22   once generic IR enters the market, right?
23   A.  It would be very, very difficult.
24   Q.  And you felt it was important that any -- strike that.
25          A forced switch could result in          of

| Ebbdact1 Hearing | Saunders - direct | Page 219 |
|---|---|---|

1    Namenda IR patients switching to XR prior to generic entry,
2    right?
3    A.  It could.
4    Q.  And doing the forced switch would help the Namenda sales
5    stream -- doing the forced switch would help preserve the
6    Namenda sales stream after Namenda IR generic manufacturers
7    enter the market, right?
8    A.  Not necessarily.  It would make us more competitive to be
9    able to compete against generics, absolutely.
10   Q.  And to help preserve the --
11   A.  That would be the goal.  We'll see how it plays out.
12   Q.  And so by doing the hard switch, Forest hopes to hold on to
13   a large share of its bases instead of losing them to generic
14   competition?
15   A.  That would be the hope as well but up against lots of
16   barriers and obstacles.
17   Q.  And Forest modeled the improvements to its bottom line that
18   would result from the hard switch, right?
19   A.  It certainly did, yes.
20   Q.  Let's look at one of those documents.
21          Before we do, what is Merz, M-e-r-z?
22   A.  Merz is a German pharmaceutical company.
23   Q.  And Merz developed Namenda, right?
24   A.  Well, Merz developed memantine, which is the chemical name
25   for Namenda.  Forest actually developed Namenda in the United

| Ebbdact1 Hearing | Saunders - direct | Page 220 |
|---|---|---|

1    States, did the clinical studies, did the clinical development
2    and regulatory work with the FDA and the like.  Merz did not do
3    that.
4    Q.  OK.  And Merz licenses Forest the right to Namenda?
5    A.  No, to the chemical memantine, which we then turned into
6    Namenda.
7    Q.  Thank you.  Thank you.
8          And you pay Merz a royalty for Namenda sales, is that
9    right?
10   A.  We have, almost        or thereabouts.
11   Q.  OK.  Let me show you a presentation that was developed to
12   send to Merz in January 2014.  In your binder it is tab 6.  We
13   can turn to the PowerPoint that's on the third.
14          If you could go to page 6 of that PowerPoint.
15          Now, on page 6, it says that Namenda XR
16   from the hard switch, right?
17   A.  Yes.
18   Q.  Does that sound about right to you?
19   A.  I think that was the forecast that was put into this model.
20   We'll see if it happens.
21   Q.  And it says sales from a soft switch would only be
22          but sales from the hard switch would be
23          right?
24   A.  That's what it says.
25   Q.  Does that seem right to you?

HIGHLY CONFIDENTIAL          FRX-AT-01750637

# EXHIBIT 328

HIGHLY CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF NEW YORK

3    C.A. No.  1:15-cv-07488-CM

     ----------------------------------x

4

     IN RE:

5

     NAMENDA DIRECT PURCHASER

6    ANTITRUST LITIGATION

7    ----------------------------------x

8                    1221 Avenue of the Americas

                     New York, New York

9

                     October 11, 2017

10                   10:36 a.m.

11

                 *** HIGHLY CONFIDENTIAL ***

12

13

14          VIDEOTAPED 30(b)(6) DEPOSITION of

15   FOREST LABORATORIES (now ALLERGAN) and its

16   Representative JULIE A. SNYDER, taken by the

17   Plaintiffs, held at the aforementioned time and

18   place, before Sherri Flagg, a Registered

19   Professional Reporter, Certified LiveNote

20   Reporter, and Notary Public.

21

                      *    *    *

22

23

24

25

7   BY MR. ENGER (continuing):
8        Q.     Ms. Snyder, you've just been
9   handed Exhibit Number 1.  Have you seen this
10  July 10, 2017, deposition notice relating to
11  patent topics before?
12       A.     No.
13       Q.     Are you aware that this notice
14  requires Forest to produce a representative to
15  testify on behalf of the company about the
16  listed topics?
17       A.     Yes.
18       Q.     Will you turn to page 9, please.
19            MS. McDEVITT:  Counsel, I'd just
20       like to interject for the record that
21       pursuant to the agreement to produce
22       Ms. Snyder for this deposition on the
23       three identified and in some instances
24       narrow topics, I think those are the
25       topics that we ought to be working off,

1   not the notice which has been modified by
2   our subsequent agreement.
3            MR. ENGER:  Understood.
4   BY MR. ENGER (continuing):
5        Q.     Are you Forest's designated
6   representative for topic number 9, which
7   relates to Forest's estimate, budget or
8   forecast at or before the time of the
9   settlement of the amount of litigation expenses
10  that Forest saved by settling the Namenda
11  patent litigation?
12            MS. McDEVITT:  I'm just going to
13       interpose the same objection that I just
14       stated.
15       A.     Can you repeat the question?
16       Q.     Are you Forest's designated
17  representative to testify on behalf of the
18  company about topic number 9, which is Forest's
19  estimate, budget or forecast at or before the
20  time of settlement of the amount of litigation
21  expenses that Forest saved by settling the
22  Namenda patent litigation?
23       A.     That is related to one of the
24  topics that I'm prepared to talk about.
25





Page 13



7    Q.    If you can.  What are the things
8    that Mr. Coletti told you about the things that
9    go into litigation?
10        A.    Sure.  I mean, to -- litigation
11   fees, attorney fees; there are, you know, a
12   number of witnesses, fact witnesses, expert
13   witnesses, that we would -- you know, that we'd
14   incur costs related to those.  I mean, there's
15   everyday things like copying and graphic -- you
16   know, graphics people to prepare things for
17   court, there's hotel rooms, there's food; a
18   number of different pieces of -- a number of
19   different costs.
20        Q.    Do you recall any other things
21   that go into litigation besides attorneys'
22   fees, fact witnesses, expert witnesses,
23   copying, graphics personnel, hotel rooms and
24   food?
25        A.    That's what I recall off the top

Page 14

1    of my head.
2         Q.    What did Mr. Coletti tell you
3    about things related to litigation costs?
4              MS. McDEVITT:  Objection to form.
5         A.    Litigation costs.  I mean, we
6    talked about, you know, how they can vary.  I
7    mean, they can vary for a number of -- you
8    know, a number of things, like all the things I
9    provided there in the list.  The costs vary,
10   you know, depending on the case, depending on
11   the time frame that they're -- the time frame
12   for litigation.  There's a lot of varying
13   costs.
14        Q.    Apart from certain costs can vary
15   on a case-to-case basis and on a time-frame
16   basis, did Mr. Coletti tell you anything else
17   about things related to litigation costs?
18        A.    I'm sure there were other things
19   that we discussed in the conversation.  But
20   like I said, it's a very broad question.
21        Q.    Nothing else comes to mind?
22        A.    Nothing else comes to mind, off
23   the top of my head.
24        Q.    You also reviewed some documents
25   in preparation for your deposition, correct?

Page 15

1         A.    Yes, that's correct.

23        Q.    Could you briefly tell me your
24   education history since high school?
25        A.    Sure.  I -- after high school I

Page 16

1    went to college, Drew University, with a degree
2    in applied math; and then I got an MBA from
3    Rutgers University with a concentration in
4    marketing.
5         Q.    What year did you receive your
6    degree from Drew University?
7         A.    Are you asking my age now?  1996.
8         Q.    I apologize.  What year did you
9    receive your MBA from Rutgers University?
10        A.    I believe it was 2001.
11        Q.    Briefly, again, tell me your
12   employment history since graduating from
13   University.
14        A.    Sure.  I spent a few months as a
15   math teacher and that was probably about three
16   months; and then I went to Prudential, worked
17   in their actuarial department for about three
18   years.
19             Then I -- I don't remember what
20   was next.  I went to the National Exchange
21   Carrier Association and worked in their --
22   doing statistics for statistical modeling; and
23   after that I went to Health Products Research
24   and I did pharmaceutical analytic consulting
25   about two years.

Page 17

1          Then I went to Schering-Plough and
2    spent about three years there in their business
3    analytics group as well as marketing.  And then
4    I've been at Forest/Actavis/Allergan since
5    2007, working in the marketing group for the
6    entire time.
7       Q.    Have you ever had any
8    responsibilities for overseeing litigation?
9       A.    No.
10      Q.    What are your responsibilities
11   since you've been at Forest, Actavis and
12   Allergan since 2007, briefly?
13      A.    I worked on the Namenda marketing
14   team for the first three to four years, then
15   moved over to launch one of our other products
16   for about three years; and then came back to
17   head up the Namenda franchise marketing team
18   starting in -- I believe that was 2014.
19      Q.    Did you work closely with
20   attorneys involved in litigation?
21      A.    Not really, no.  I've had
22   conversations with them when I have a question
23   but I don't really work closely with them.
24      Q.    Do you have any personal
25   experience with litigation costs?

Page 18

1       A.    Personal experience, no.
2       Q.    You understand that this lawsuit
3    involves the drug Namenda, correct?
4       A.    Yes.
5       Q.    Apart from your work on the
6    marketing team for Namenda, have you ever had
7    any other Namenda-related responsibilities?
8       A.    It's all been on the marketing
9    team, yeah.
10      Q.    At a high level, what were your
11   marketing responsibilities for Namenda?
12      A.    You know, it varied over the
13   years, but I worked with the sales force
14   communications creating materials with our ad
15   agency, forecasting, non-personal promotion.
16   Pretty much, you know, everything related to
17   the brand from a marketing capacity.
18      Q.    Were you involved with the Namenda
19   patent litigation?
20      A.    No.
21      Q.    Apart from preparing for this
22   deposition today, did you ever speak with
23   anyone about the Namenda patent litigation?
24      A.    Not that I can remember.
25      Q.    Are you aware that there was a

Page 19

1    settlement in principle of the Namenda patent
2    litigation between Forest and Mylan in
3    approximately March of 2010?
4       A.    I'm aware there was a settlement.
5    I didn't know the date but that sounds right.
6       Q.    At the time of the settlement in
7    principle with Mylan and assuming that the
8    Namenda patent litigation had not settled, how
9    much did Forest expect to spend on attorneys'
10   fees through trial and post-trial briefing?
11         MS. McDEVITT:  Objection to form.
12      A.    Can you repeat that?  That was
13   long, that question.
14      Q.    Yes, ma'am.  Just to roadmap where
15   we're going, we're going to talk about
16   attorneys' fees and litigation savings
17   associated with attorneys' fees.
18      A.    Okay.
19

Page 20



**Page 21**





---

**Page 22**



---

**Page 23**



6      Q.      At the beginning you told me a
7   number of things that go into a litigation,
8   things like fees, fact witnesses, expert
9   witnesses, copying, graphics, hotel rooms and
10  food.
11          Did the number that Mr. Coletti
12  provided you include each of those things?
13      A.      Include -- it would include
14  estimates of those things, but there are things
15  that could be, you know -- my understanding
16  there are things that could happen during the
17  trial that would require additional expert
18  witnesses, additional fact witnesses.  There
19  could be other costs on top of what that was,
20  an estimate, merely an estimate.
21      Q.      But the high single million dollar
22  estimate that you were provided, it didn't
23  carve out certain things like exclusive of
24  hotel rooms, exclusive of food, to the best of
25  your knowledge?

---

**Page 24**

1          MS. McDEVITT:  Objection to form.
2      A.      My understanding is that that was
3   the total -- you know, his estimate as of
4   yesterday when we talked, his estimate as to
5   what it could potentially cost.
6



HIGHLY CONFIDENTIAL

Page 85



7     Q.     Ms. Snyder, can you answer my
8  question?  I intend to move on as soon as you
9  answer this question.
10     A.     Ask me -- please ask me the
11  question again.
12          MR. LETTER:  Please read it back.
13          (Requested portion read.)
14          MS. McDEVITT:  And I'm going to
15     object to the question and instruct the
16     witness not to answer as outside the
17     scope of the agreed-upon topics that
18     she's here to testify about today.
19  BY MR. LETTER (continuing):
20     Q.     Are you going to follow your
21  counsel's instruction?
22     A.     I am.
23          MR. LETTER:  I'll note for the
24     record that I disagree with the
25     instruction not to answer.  It's not a

HIGHLY CONFIDENTIAL

Page 86

1  privilege issue.
2  BY MR. LETTER (continuing):
3     Q.     So, Ms. Snyder, back to Solomon
4  Exhibit 1, the list of previous
5  Forest-authorized generics in topic 3.  Were
6  you able to confirm that these were, in fact,
7  either launched by Forest or licensed to
8  another company to launch authorized generic
9  versions of these particular drugs?
10     A.     What are you looking at now?
11     Q.     Yes, topic 3.  It is on page 8,
12  which I believe is the last page.
13     A.     So I mean, some of -- some of
14  these products were Forest products, some of
15  them may not have been Forest products based
16  on, you know, some of the acquisitions -- like
17  Carafate looks like something we acquired from
18  another company so maybe -- so while it's
19  listed under Forest, I don't know if these were
20  Forest NDAs.

HIGHLY CONFIDENTIAL

Page 87



HIGHLY CONFIDENTIAL

Page 88



Page 105

1  ▮▮▮▮  ▮▮▮▮▮▮▮

2      Q.      Since July 2015 -- and when I say
3  "July 2015," that's when generic Namenda
4  Immediate-Release products came on the market,
5  so we're on the same page.
6      A.      Um-hmm.
7      Q.      Since July 2015, has Forest ever
8  been unable to supply its customers' needs for
9  Namenda Immediate-Release, either tablets, oral
10 solution or authorized generic?
11     A.      Not that I'm aware.
12     Q.      In time periods that preceded July
13 2015, has Forest ever had a supply shortage for
14 Namenda Immediate-Release tablets?
15     A.      Not that I'm aware.  I mean, I
16 can't guarantee that there was never something
17 on a backorder list or anything.  You know, to
18 the best of my knowledge, there was not a
19 supply shortage.
20     Q.      Are you familiar with the FDA's
21 list of drug shortages?
22     A.      Yes.
23     Q.      I will represent to you that I
24 searched for drug shortages related to
25 memantine hydrochloride and I never saw an

Page 106

1  appearance by Namenda Immediate-Release.  Do
2  you have any reason to doubt the results of
3  that search?
4      A.      No.
5      Q.      Has Forest ever had -- has Forest
6  ever encountered a supply shortage for
7  memantine hydrochloride API?
8      A.      Not that I'm aware.
9      Q.      Does Forest always attempt to meet
10 customer demand across all products?
11         MS. McDEVITT:  Objection to form.
12     A.      I can't speak to all products.
13 Obviously Forest would want to supply their
14 customers with the products they need.
15     Q.      Until the launch of generic
16 Immediate-Release Namenda in July 2015, was
17 Forest able to supply the entire memantine
18 hydrochloride market by itself?
19         MS. McDEVITT:  Objection to form.
20     A.      Can you say that again?  I mean, I
21 didn't -- can you read that back?
22         (Requested portion read.)
23     A.      It's a broad question.  I'm not
24 sure what you're asking.
25     Q.      Sure.  So when I say "memantine

Page 107

1  hydrochloride market," I'm referring to that
2  list that we went over earlier of Namenda
3  Immediate-Release tablets, Namenda
4  Immediate-Release oral solution, Namenda
5  Extended-Release capsules, and Namzaric.  Are
6  we on the same page?
7      A.      I'm just not sure what you're
8  asking.  Are you asking was there ever a
9  shortage of any of those products?  I'm not
10 sure what you're asking.
11     Q.      Sure, if you'd like to
12 characterize it that way.  Can you think of a
13 shortage of any of those products ever?
14     A.      Yes.  There were times when there
15 were products on backorder, absolutely.
16     Q.      Were any of those Namenda
17 Immediate-Release products?
18     A.      Like I said before, I mean, I
19 don't recall a situation where there was an
20 issue supplying Namenda Immediate-Release, but
21 I -- you know, there could have been a
22 backorder at some time that I was not aware of.
23         Backorders are very common, you
24 know, so I don't know.
25     Q.      Does Forest attempt --

Page 108

1  Forest/Actavis/Allergan, do they attempt to
2  rectify backorders as soon as possible?
3      A.      Of course.
4      Q.      I am now going to switch gears
5  into the personal capacity declaration topic.
6  Shall we take a break?
7          MS. McDEVITT:  Do you want to take
8      a break.
9          THE WITNESS:  Sure.
10         MS. McDEVITT:  Why don't we.
11         VIDEO TECHNICIAN:  The time on the
12     video monitor is 1:01 p.m.  We're off the
13     record.
14         (Lunch recess taken.)
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL

Page 117

1    Q.    Ms. Snyder, please review that.
2  While you're doing so, I will read for the
3  record that this was a document produced by
4  Forest to plaintiffs in this litigation bearing
5  the Bates stamp FRX-AT-03794674.  And let me
6  know when you've had an opportunity to review.
7    A.    (Perusing exhibit.)
8    Okay.
9    Q.    So, Ms. Snyder, very early on in
10 this deposition when Mr. Enger was asking you
11 questions, you said that, as part of the
12 Namenda marketing team, one of the duties that
13 you undertook was to write sales force
14 communications.  Do you recall that?
15   A.    Yes.
16   Q.    Is this a communication to sales
17 representatives that you wrote?  And the reason
18 I ask that is because it says "Thanks Julie"
19 down at the bottom.
20   A.    Right.  I mean, it looks like
21 something that, you know, I drafted based on
22 this.  But there's no information on whether I
23 sent this or whether someone, you know, wrote
24 it and I reviewed it.  You know, people
25 write -- on my team would write communications

HIGHLY CONFIDENTIAL

Page 118

1  for me as well, so I'd have to see more detail
2  to know for sure.
3    Q.    Is it fair to say that if someone
4  on your team wrote this communication and it
5  says "Thanks Julie," you would probably have
6  reviewed it before it went out?
7    A.    Yes.
8    Q.    Are you familiar with something
9  called metadata?
10   A.    Not much but yes.
11   Q.    Essentially it's data about the
12 electronic file that the document comes from?
13   A.    Um-hmm.
14   Q.    And the metadata for this
15 particular document indicates that it's from
16 January of 2015.  Do you have any reason to
17 dispute that on the face of the document?
18   A.    No.
19   Q.    So under the bold Important
20 Message there, there's a paragraph that begins
21 "As you know, the District Court."  Do you see
22 that?
23   A.    Yes.
24   Q.    And then it references the Court
25 entering a preliminary injunction requiring

HIGHLY CONFIDENTIAL

Page 119

1  Actavis to continue distribution of Namenda
2  Immediate-Release tablets.  Do you see that?
3  And that's the same thing that is referenced in
4  the Declaration of Julie Snyder that we talked
5  about earlier, right, the injunction order?
6    A.    Yes.
7    Q.    The second sentence in that
8  paragraph that begins "As you know," says
9  (as read):
10              We are appealing this decision.
11         Do you see that?
12   A.    Yes.
13   Q.    Why did Forest include information
14 about appealing the injunction order?
15   A.    I don't remember the details, but
16 it's factual.
17



HIGHLY CONFIDENTIAL

Page 120

1



HIGHLY CONFIDENTIAL

**Page 121**



HIGHLY CONFIDENTIAL

Page 122



```
23          Q.      Is this document prepared and
24   maintained in the ordinary course and scope of
25   Forest's business?
```

HIGHLY CONFIDENTIAL

Page 123

1        A.      Yes.  We regularly communicate

2   with sales representatives.

3       ██        ████████████████████████

    ██  █████████████████████

    ██      ████████████    ████████████

    ██    ████████████████████████████

    ██    ██████████████████████████

    ██    ████████████████████

    ██   ███████████████████

10       Q.      And, Ms. Snyder, while you're

11  reviewing that, I will read for the record that

12  this was a document produced to us by Forest in

13  this case bearing the Bates stamp

14  FRX-AT-03983932 through 935.  And let me know

15  when you've had an opportunity to review it.

16       A.      (Perusing exhibit.)

17               Okay.

18       Q.      Ms. Snyder, do you recognize this

19  document?

20       A.      It looks familiar.

21       Q.      Is this an e-mail from Amanda

22  Seeff?  Is that how you say that, Seeff-Charny?

23       A.      Yes, Amanda Seeff-Charny.

24       Q.      To Lou-Ellen Barkan, Jed Levine

25  and Carol Berne dated January 14, 2015?

1          A.     Yes.

2          Q.     And it's got -- similar to what we

3    saw in Solomon Exhibit 3, I believe it was,

4    there is what appears to be an attachment that

5    says "Dear Customer..1.13.15.pdf."  Right?

6          A.     Yes.

7          Q.     Do you believe what is attached to

8    this e-mail to be that attachment, that is,

9    Dear Customer..1.13.2015?

10         A.     I would assume so, yes.

11         Q.     You see that Ms. Charny is listed

12   as senior director healthcare alliance

13   development for Actavis.  Do you see that?

14         A.     Yes.

15         Q.     Would that fall in the marketing

16   department?

17         A.     No.

18         Q.     So it's safe to assume that

19   Ms. Seeff-Charny does not report to you?

20         A.     That's correct.

21         Q.     So turning to the attachment that

22   begins on page Bates ending 934.  Are you with

23   me?

24         A.     Yes.

25         Q.     It says from E-Pharm/Alert at the

HIGHLY CONFIDENTIAL

Page 125

1  top.  Do you see that?

2          A.    Yes.

3          Q.    Is that a vehicle through which

4  Forest communicates to certain entities?  Is

5  that a fair assessment?

6          A.    Yes.  That would be -- yes, that

7  would be a company that we would use to send

8  out communications to in this case it would be

9  pharmacies.

10         Q.    So going back to Snyder Exhibit 6

11 for a moment, the entities that we discussed on

12 internal page 2, paragraph five, this would be

13 the template for communications about the

14 continued availability of Namenda

15 Immediate-Release to pharmacists, correct?

16         A.    Yes, this would be to pharmacists.

17         Q.    If you look in the body of that

18 e-mail after the salutation Dear Customer, it

19 starts "Forest Laboratories."  Do you see that?

20         A.    Yes.

21         Q.    And the end of that first sentence

22 says Forest is appealing the court order to

23 continue the sales of Namenda Immediate-Release

24 tablets.  Right?

25         A.    Yes.

HIGHLY CONFIDENTIAL

Page 126

1        Q.      If you now turn to the next page,

2    Bates ending 935, at the top it says from

3    E-LTC.  Do you see that?

4        A.      Yes.

5        Q.      And, again, this is another entity

6    through which Forest disseminates

7    communications?

8        A.      Yes.

9        Q.      Is this related to any specific

10   entity as delineated in Snyder Exhibit 6?

11       A.      Yes, long-term care facilities.

12       Q.      And under the salutation Dear

13   Customer, the first sentence again says that

14   Forest is appealing the court order about

15   continued sales of Namenda Immediate-Release

16   tablets?

17       A.      It says (as read):

18               Forest plans to continue the sale

19       of Namenda tablets in accordance with the

20       court order, which we are appealing.

21       Q.      Is this e-mail and attachment

22   prepared and maintained in the ordinary course

23   and scope of Forest's business?

24       A.      What do you mean by that?

25       Q.      So it's a bit of like magic words

Page 127

1   for lawyers.  What I'm getting at is Amanda
2   Seeff-Charny wasn't off doing her own thing
3   that wasn't related to Actavis's business when
4   she put together this e-mail and sent it to
5   these various people, correct?
6          A.     Her job was working with the
7   associations, this one in particular goes to
8   the Alzheimer's Association, so that would have
9   been in the normal course of business that she
10  would communicate with them.
11         Q.     I see.  So if you could turn to
12  the first page again, Bates ending 932, you
13  mentioned Alzheimer's.  I think you said
14  society?
15         A.     Association.
16         Q.     Association, I'm sorry.  So that
17  would explain the alznyc.org e-mail addresses?
18         A.     Yes.
19         Q.     I have a few more documents like
20  this, but I'm going to try to short-circuit
21  this by asking the question this way:  All of
22  the templates, as we talked about earlier, that
23  discuss the continued availability of Namenda
24  IR that went to the various entities, as
25  delineated in paragraph five on internal page 2

HIGHLY CONFIDENTIAL

Page 128

1   of Snyder Exhibit 6, did any of them not

2   mention the fact that Forest was appealing the

3   court order on the injunction?

4           MS. McDEVITT:  Objection to form.

5       A.    I'd have to see all of them.  I

6   can't guarantee that every one said it.  I

7   mean, there was a -- there was a template but

8   there were a number of different communications

9   going out, so I don't know.

10      Q.    Let me try it this way:  Do you,

11  as you sit here right now, recall any that did

12  not contain that language about appealing the

13  court order on the injunction?

14      A.    We sent 900,000 communications.  I

15  don't have every one memorized.  I don't know.

16      Q.    I certainly appreciate that

17  answer.  But you did say that you reviewed

18  templates related to them.

19      A.    Yes, yes.

20      Q.    I would imagine there probably

21  weren't that many templates, right?

22      A.    Right, right.  It was also several

23  years ago so I -- I mean, I can't guarantee

24  that every one had that language in it, but the

25  ones that we have here did.

# EXHIBT
# 330

Page 1

```
 1
 2   * H I G H L Y   C O N F I D E N T I A L *
 3   UNITED STATES DISTRICT COURT
 4   SOUTHERN DISTRICT OF NEW YORK
 5   Civil Action File No. 14-CV-7473
 6   -----------------------------------x
 7   THE PEOPLE OF THE STATE OF NEW YORK, by
 8   and through ERIC T. SCHNEIDERMAN, Attorney
 9   General of the State of New York,
10
11              Plaintiff,
12
13      - against -
14
15   ACTAVIS, PLC and FOREST LABORATORIES, LLC,
16
17              Defendants.
18   -----------------------------------x
19              October 22, 2014
20              10:26  a.m.
21
                Videotaped Deposition of DAVID
22   SOLOMON, pursuant to Notice, held at the
     offices of White & Case LLP, 1155 Avenue
23   of the Americas, New York, New York,
     before Jineen Pavesi, a Registered
24   Professional Reporter, Registered Merit
     Reporter, Certified Realtime Reporter and
25   Notary Public of the State of New York.
```

Page 54

1    SOLOMON - HIGHLY CONFIDENTIAL

11    Q.    Can you explain what you mean  11:32:17AM
12  by compliance.                           11:32:18AM
13    A.    Sure.                            11:32:22AM
14         In the pharmaceutical industry, 11:32:22AM
15  compliance is focused on compliance with   11:32:24AM
16  legal and regulatory standards around the  11:32:29AM
17  development, sale, distribution of our    11:32:35AM
18  products, very focused on issues related  11:32:37AM
19  to marketing practices, also focused on   11:32:41AM
20  the FCPA, the Foreign Corrupt Practices   11:32:48AM
21  Act, and making sure we were in compliance 11:32:51AM
22  with that, focused on certain quality    11:32:54AM
23  measures, making sure that our          11:32:58AM
24  manufacturing met certain quality        11:32:59AM
25  measures.                               11:33:01AM

Page 56

1    SOLOMON - HIGHLY CONFIDENTIAL
2         So there was a committee of the 11:33:02AM
3  board responsible for overseeing all of    11:33:04AM
4  those compliance activities and that was   11:33:06AM
5  called the compliance committee.         11:33:09AM
6    Q.    We're going to discuss Namenda  11:33:16AM
7  today probably at length.                11:33:20AM
8         I am going to use the term       11:33:24AM
9  Namenda IR to refer to the original       11:33:26AM
10  formulation of Namenda that was branded    11:33:28AM
11  just as Namenda, unless you have a       11:33:31AM
12  suggestion for a better way to refer to   11:33:35AM
13  it.                                     11:33:37AM
14    A.    No, that's fine.               11:33:38AM
15         MR. TOTO:  Does that include    11:33:39AM
16  the oral solution?                      11:33:40AM
17    Q.    Let's refer to the tablets as  11:33:50AM
18  Namenda IR and if you want to talk about   11:33:52AM
19  the oral solution, let's mention the oral  11:33:54AM
20  solution specifically.                  11:33:56AM
21    A.    Okay, I can do that.           11:33:59AM

21    Q.    Was it from within the company? 11:35:46AM
22    A.    I think so, yes.              11:35:57AM

15 (Pages 54 - 57)

Page 70

1    SOLOMON - HIGHLY CONFIDENTIAL

15   Q.    By activity, do you mean the    11:52:26AM
16   chemical activity or biological activity;    11:52:28AM
17   I'm sorry, can you explain that, please.    11:52:33AM
18   A.    Well, I am not a Ph.D. in this    11:52:35AM
19   area, so I have a fairly rudimentary    11:52:39AM
20   understanding of it.    11:52:42AM
21        Any two chemicals are going to    11:52:44AM
22   interact differently with your body, so    11:52:46AM
23   these are chemicals that are targeting the    11:52:50AM
24   brain and so, you know, any two chemicals    11:52:55AM
25   that, you know, that are used are going to    11:52:58AM

Page 71

1    SOLOMON - HIGHLY CONFIDENTIAL
2    interact differently just because they are    11:53:01AM
3    different, you know, they are different    11:53:03AM
4    structurally.    11:53:04AM
5         So does Namenda act differently    11:53:06AM
6    from Aricept in the brain, Aricept would    11:53:16AM
7    act differently from memantine, they are    11:53:19AM
8    different chemicals so each of them has    11:53:25AM
9    their own -- that's why the FDA makes --    11:53:27AM
10   you can't just go to the FDA and say, hey,    11:53:30AM
11   this is kind of like this other drug you    11:53:32AM
12   approved and so can I go sell it, the FDA    11:53:33AM
13   says no, the fact it is similar to    11:53:36AM
14   something else, you still have to go and    11:53:39AM
15   you still have to do that whole    11:53:40AM
16   development program I described to you    11:53:42AM
17   before, you have to characterize it, you    11:53:43AM
18   have to do all of the pharmacokinetics,    11:53:45AM
19   you have to do all the toxicology, all the    11:53:47AM
20   pharmacology work, you have to do all the    11:53:50AM
21   clinical studies, because little    11:53:51AM
22   differences can, you know, be the    11:53:54AM
23   difference between a drug that, you know,    11:53:56AM
24   saves your life and one that kills you.    11:53:59AM
25        So any difference in a    11:54:01AM

Page 72

1    SOLOMON - HIGHLY CONFIDENTIAL
2    molecule -- but from, how to put it,    11:54:03AM
3    from -- as we think about the Alzheimer's    11:54:10AM
4    market and the products that are being    11:54:17AM
5    used for these patients, these are the    11:54:18AM
6    products that are being used and they are    11:54:21AM
7    being used to treat the symptoms of    11:54:23AM
8    Alzheimer's disease that's being exhibited    11:54:28AM
9    by these patients.    11:54:31AM
10        I think you know none of these    11:54:31AM
11   cure it, right, tragically we don't have    11:54:33AM
12   anything that cures Alzheimer's disease,    11:54:35AM
13   but both of these drugs, Aricept and    11:54:37AM
14   Namenda, are effective, you know,    11:54:42AM
15   ameliorating some of the symptomology of    11:54:47AM
16   the disease.    11:54:50AM
17   Q.    You understand the term    11:54:53AM
18   AB-rated?    11:54:55AM
19   A.    Yes.    11:54:56AM
20   Q.    Can you explain it to me.    11:54:57AM
21   A.    AB-rated is a term that's used    11:55:01AM
22   for generic products.    11:55:04AM
23        So what a generic company is    11:55:08AM
24   looking to do is seek approval of a drug    11:55:10AM
25   which they say is in fact chemically the    11:55:17AM

Page 73

1    SOLOMON - HIGHLY CONFIDENTIAL
2    same as a prior approved branded drug and    11:55:19AM
3    an AB rating from the FDA is the FDA's way    11:55:23AM
4    of saying, yes, that drug that the generic    11:55:26AM
5    is selling is in fact chemically identical    11:55:29AM
6    and therefore can be directly substituted    11:55:33AM
7    without further intervention from a    11:55:38AM
8    physician for the product.    11:55:41AM
9    Q.    Is instant release memantine    11:55:47AM
10   AB-rated to extended release memantine?    11:56:08AM
11   A.    No.    11:56:12AM
12   Q.    Can it be?    11:56:14AM
13        MR. TOTO:  Object to form.    11:56:16AM
14   A.    No, because in order to be AB    11:56:22AM
15   rating you have to have the same dosing    11:56:24AM
16   schedule as the drug -- AB rating isn't    11:56:26AM
17   ever used in this context.    11:56:32AM
18        It is used for a specific    11:56:35AM
19   generic equivalent, so, no, it would not    11:56:37AM
20   be AB-rated.    11:56:40AM

19 (Pages 70 - 73)

# EXHIBIT 331

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: NAMENDA ANTITRUST LITIGATION** | **1:15-cv-07488-CM-JCF** |

### NOTICE OF RULE 30(b)(6) DEPOSITION OF DEFENDANTS FOREST LABORATORIES, LLC; ACTAVIS, PLC; FOREST LABORATORIES, INC.; AND FOREST LABORATORIES HOLDINGS LTD.

**PLEASE TAKE NOTICE THAT**, pursuant to Federal Rule of Civil Procedure 30(b)(6), Direct Purchaser Plaintiffs in the above-captioned litigation, by and through their counsel, will take the videotaped deposition upon oral examination of **Defendants Forest Laboratories, LLC; Actavis, plc; Forest Laboratories, Inc.; and Forest Laboratories Holdings Ltd.** (hereinafter and in Exhibit A referred to as "Forest"). The deposition, which will be stenographically recorded and videotaped before an officer duly authorized to administer oaths, will be held on July 18, 2017 at 9 am at the offices of Garwin Gerstein & Fisher LLP, 88 Pine Street, 10th Floor, New York, NY 10005. All counsel are invited to participate and cross examine.

**NOTICE IS HEREBY GIVEN** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Defendants are required to present one or more representatives to testify on their behalf and to give testimony on topics set forth in Exhibit A hereto. The person or persons so designated shall be required to testify concerning the matters known or reasonably available to Defendants with respect to each topic.

Dated:  June 14, 2017                          Respectfully submitted,

**Rochester Drug Co-Operative, Inc. and the Proposed Class**

**JM Smith Corporation d/b/a Smith Drug Company and the Proposed Class**

*/s/ Dan Litvin*



EXHIBIT
Solomon  1
DATE: 9|7|17
Cathi Irish, RPR, CRR

David F. Sorensen
Daniel C. Simons
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (fax)
dsorensen@bm.net
dsimons@bm.net


Peter Kohn
Joseph T. Lukens
Faruqi & Faruqi, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com
jlukens@faruqilaw.com

Bruce E. Gerstein
Joseph Opper
Kimberly M. Hennings
Dan Litvin
Garwin Gerstein & Fisher LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
bgerstein@garwingerstein.com
jopper@garwingerstein.com
khennings@garwingerstein.com
dlitvin@garwingerstein.com


David C. Raphael, Jr.
Erin R. Leger
Smith Segura & Raphael, LLP
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
draphael@ssrllp.com


Stuart E. Des Roches
Andrew W. Kelly
Odom & Des Roches, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
stuart@odrlaw.com


Russ Chorush
Miranda Jones
Heim Payne & Chorush, LLP
600 Travis, Suite 6710
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
rchorush@hpcllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2017, I served the foregoing Notice of Rule 30(b)(6) Deposition of Defendants Forest Laboratories, LLC; Actavis, plc; Forest Laboratories, Inc.; and Forest Laboratories Holdings Ltd. on counsel for Defendants via email.

/s/ Dan Litvin

**TOPICS FOR EXAMINATION**

## EXHIBIT A

### DEFINITIONS

1.       "'703 Patent" means U.S. Patent No. 5,061,703, and its corresponding *ex parte* reexamination certificate.

2.       "ANDA" means Abbreviated New Drug Application as defined in 21 U.S.C. § 355(j).

3.       "At-Risk Launch" means the launch of an FDA-approved drug (based on FDA review and approval) prior to a final judgment from which no appeal can be, or has been, taken in a patent litigation involving the FDA-approved drug.

4.       "Authorized Generic" means a listed drug, as defined in 21 U.S.C. § 355(j), that has been approved under subsection 21 U.S.C. § 355(c); and is marketed, sold, or distributed directly or indirectly under different labeling, packaging, product code, labeler code, trade name or trade mark than the listed drug.

5.       "Authorized Generic Namenda IR" means an Authorized Generic version of Namenda IR.

██ ███████████████████████████████████████████████████████ █

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ █

██████████████████████████████

7.       "Generic," "AB-rated generic," "generically equivalent product," or "generic drug equivalent" means a pharmaceutical or drug product that has been submitted to, or deemed by, the FDA as meeting the necessary requirements to be an AB-rated alternative to a Reference Listed Drug as such is defined by 21 CFR § 314.94(a)(3) and identified by the FDA.

8.       "Generic Namenda ANDA" means any of ANDA nos. 90-042 (Cobalt), 90-051 (Lupin), 90-044 (Orchid), 90-052 (Teva), 90-043 (Upsher), 90-073 (Wockhardt), 90-045 (Barr), 90-048

(Dr. Reddy's), 90-050 (Genpharm), 90-041 (Interpharm), 79-225 (Mylan), 79-236 (Ranbaxy), 90-058 (Sun India and Kendle), 90-044 (Orgenus), 90-244 (Apotex), and any other ANDA that is, or at any time was, seeking FDA approval to market an AB-rated generic version of Namenda IR.

9.     "Generic Namenda Competitor" means any entity seeking to produce, market, sell or promote a Generic Namenda Product, including but not limited to Barr Pharmaceuticals, Inc. ("Barr"); Teva Pharmaceuticals USA, Inc. ("Teva"); Cobalt Laboratories, Inc. ("Cobalt"); Orchid Chemicals & Pharmaceuticals Ltd. ("Orchid"); Lupin Pharmaceuticals, Inc. ("Lupin"); Upsher-Smith Laboratories, Inc. ("Upsher-Smith"); Wockhardt Limited (Wockhardt"); Mylan Pharmaceuticals, Inc. ("Mylan"); Genpharm ULC and Genpharm, L.P. (jointly, "Genpharm"); Interpharm Holdings, Inc. and Interpharm Inc. (jointly, "Interpharm") (whose interests in the suit were soon to be acquired by a wholly owned subsidiary of Amneal Pharmaceuticals, LLC ("Amneal"); Sun India Pharmaceuticals Industries, Ltd. ("Sun"); and Dr. Reddy's Laboratories Ltd. and/or Dr. Reddy's Laboratories, Inc. (jointly, "Dr. Reddy's").

10.     "Generic Namenda Product" means a drug product that is or was the subject of a Generic Namenda ANDA.

11.     "Lexapro" means any drug product that is or was described and the subject to NDA No. 21-323 (or any variant thereof), or any generic pharmaceutical product in which Lexapro is the Reference Listed Drug, regardless of, among other things, the dosage strength, dissolution rate, package size.



13.     "Namenda IR" means the branded oral pharmaceutical containing the active ingredient memantine hydrochloride, marketed and sold under the trademark or name "Namenda," "Namenda®," "Namenda 5mg," or "Namenda 10mg," that is the subject of NDA No. 21-487. For avoidance of doubt, "Namenda IR" does not refer to "Namenda Oral Solution" "Namenda XR," or any generic equivalent to those drugs.

14.     "Namenda Patents" means collectively, the '703 Patent and any other patent You contend would have affected any Generic Namenda Competitor's right, ability or willingness to market its Generic Namenda Product.

15.     "Namenda Patent Litigation" means any patent infringement litigation involving a Generic Namenda Product or Generic Namenda ANDA including the following patent infringement lawsuits: (1) all lawsuits consolidated in *Forest Laboratories, Inc. v. Cobalt Laboratories Inc. et al.*, Civil Action No. 08-cv-0021-GMS-LPS (D. Del.) (consolidated); (2) *Forest Laboratories, Inc. et al. v. Orgenus Pharma, Inc. et al.* Civil Action No. 09-05105-MLC-DEA; *Forest Laboratories, Inc., et al v. Aurobindo Pharma USA, Inc., et al.*, Civil Action No. 1:14-cv-00833-LPS; and (3) any other patent infringement lawsuit against a Generic Namenda Competitor.

16.     "Namenda XR" means the branded oral pharmaceutical containing the active ingredient memantine hydrochloride, marketed and sold under the trademark or name "Namenda XR" or Namenda XR®," that is the subject of NDA No. 22-525.

17.     "Paragraph IV ANDA Certification" means a certification under section 505(j)(2)(A)(vii) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. that a relevant patent is invalid, unenforceable, or will not be infringed.

18.     "Patent Litigation Settlement" means any agreement(s) to settle any or all claims in the Namenda Patent Litigation(s) including any agreement that Forest disclosed to the Federal Trade

Commission under MMA § 1112 pertaining to Namenda Patent Litigation(s), the Lexapro Amendment, and the Ceftaroline Agreement.

19.     "Pediatric Exclusivity" means the period of regulatory exclusivity as described in 21 U.S.C. § 355a, and analogous provisions.

20.     "Reference Listed Drug" means the listed drug identified by the FDA as the drug product upon which the applicant relies in seeking approval of its Abbreviated New Drug Application as defined in 21 U.S.C. § 355(j).

21.     "Teflaro" means any drug product that is or was described and the subject to NDA No. 20-327 (or any variant thereof), or any generic pharmaceutical product in which Teflaro is the Reference Listed Drug, regardless of, among other things, the dosage strength, dissolution rate, package size.

22.     "You," "Your," and "Forest" mean Forest Laboratories, LLC; Actavis, plc; Forest Laboratories, Inc.; and Forest Laboratories Holdings Ltd. and any of their parents, subsidiaries, divisions, subdivisions, affiliates, predecessor and successor entities, partners, officers, directors, employees, agents, independent contractors, legal counsel, or any other person acting, or purporting to act, on its (or their) behalf.

23.     The terms "and," "or," and "and/or" shall be construed in the conjunctive or the disjunctive, whichever makes the meaning more inclusive.

**TOPICS FOR EXAMINATION**

**A. Causation and Regulatory Related Topics**

1.     Your efforts to develop, manufacture, prepare for commercial marketing, and ultimately launch Authorized Generic Namenda including, but not limited to, Your efforts to obtain regulatory approval from the FDA, Your efforts to obtain raw materials and manufacture launch

quantities of Authorized Generic Namenda, and the impact of any Patent Litigation Settlement(s) on Your efforts and decision to develop, manufacture, prepare for commercial marketing, and ultimately launch Authorized Generic Namenda.

2.      Your forecasts relating to Authorized Generic Namenda's unit and/or dollar sales, costs, and profits, as well as any planned, expected, or forecasted impact on Your sales, price(s), erosion rate(s), and/or profits from launching or abstaining from launching an Authorized Generic Namenda.

3.      Your contemplated and/or actual launch dates and/or conditions of launch for Authorized Generic Namenda. Your historical policies and practices with respect to launching an Authorized Generic, including the reasons You decide, or You in the past have decided, whether to launch, or not launch, an Authorized Generic with respect to each of Your brand-name products, including, without limitation, Carafate Tablets, Flumadine Tablets, Lexapro Oral Solution, Lexapro Tablets, Namenda Tablets, Tessalon Capsules, and Urso Tablets.

4.      Your efforts to obtain Pediatric Exclusivity for Namenda IR.

5.      Communications with FDA concerning Pediatric Exclusivity for Namenda IR, including Communications interpreting and/or explaining Pediatric Exclusivity's effect on FDA approval of any Generic Namenda Competitor's Generic Namenda Product.

6.      Your internal Communications concerning Pediatric Exclusivity for Namenda IR, including Communications concerning Pediatric Exclusivity's effect on FDA approval of any Generic Namenda Competitor's Generic Namenda ANDA(s).

7.      Your beliefs concerning the effects of the any Patent Litigation Settlement(s) on any Generic Namenda Competitor's regulatory approval, manufacturing, launch preparations, launch, marketing, and/or sales of any Generic Namenda Product.

8

# EXHIBIT 347

1
2

----------------------------------------x

3
4      In Re:  Namenda 343 Statement
5

----------------------------------------x

6
7              State of New York
8          Office of the Attorney General
9      120 Broadway, 26th Floor, Antitrust Bureau
10           New York, New York 10271
11
12                 July 10, 2014
13                  9:10 a.m.
14
15
16   Witness:  William Meury
17   Reported By:  Anthony Giarro
18
19
20
21      *      TRANSCRIPT OF PROCEEDINGS   *
22
23
24
25

HIGHLY CONFIDENTIAL                                    FRX-AT-01768934





1

So based on your experience
at Forest, is this common, that when
generic entry occurs, that Forest looses
substantial sales?

MR. TOTO:  Object to form:
vague, ambiguous.

A       Yeah.  As I said earlier,
you can look at these things on a
case-by-case basis.  Generally, direct
generic competition has a significant
impact on sales of a branded product.

--

--

-- generally, when there's
direct generic competition, whether it's
a Forest product or any product, there's
an 80 to 90 percent reduction in sales.



WILLIAM MEURY

It's a fairly well-understood dynamic in
the industry.  I can't go back and recall
each product.  Again, assuming that there
aren't other market factors that could
impact it, it's not unusual to see them.



Q       Do you know how much less?
A       Well, like I said, there's a
pretty close correlation between sales
and volume.  Assuming that these are net
sales, assuming that these are fiscal
years, you would see a correlation
between this picture and actual volume of
that was being manufactured.

HIGHLY CONFIDENTIAL

FRX-AT-01768950

# EXHIBIT 355

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

IN RE NAMENDA DIRECT PURCHASER
ANTITRUST LITIGATION

No. 15 Civ. 7488 (CM)

_____ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/23/2017

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR COLLATERAL ESTOPPEL AND PARTIAL SUMMARY JUDGMENT ON COUNT ONE; DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON COUNT FIVE

McMahon, C.J.:

This action is a sequel to a 2014 antitrust lawsuit brought by the State of New York

against Defendants Actavis PLC (now known as Allergan PLC) and Forest Laboratories, LLC

(collectively, "Forest"), a pharmaceutical manufacturer. In the earlier case, New York asserted

that Forest was attempting to effectuate an illegal "hard switch" product hop by removing its

twice-daily Alzheimer's medication, Namenda IR, from the market prior to the entry of generic

competition in order to force patients and their physicians to switch to its once-daily version of

the same drug, Namenda XR. New York alleged that this hard switch would permit Forest to

extend its monopoly over a leading treatment for moderate-to-severe Alzheimer's disease

through the end of Namenda XR's patent exclusivity period in 2029.

On December 11, 2014, my colleague the Hon. Robert Sweet issued a preliminary

injunction in that prior action, blocking Forest from restricting access to Namenda IR for the

remainder of Namenda IR's patent exclusivity period and requiring Forest to affirmatively undo

the effects of its announcement of the withdrawal. That ruling was upheld on appeal by the

Second Circuit.

1

Plaintiffs J M Smith Corporation d/b/a Smith Drug Company ("Smith") and Rochester

Drug Co-Operative, Inc. ("RDC," collectively with Smith, "Plaintiffs") are direct purchasers of

Namenda, and allege that they (along with their proposed classes) were forced to pay

supracompetitive prices due to Forest's anticompetitive conduct.

Before the Court are three motions: (1) Plaintiffs' motion for collateral estoppel and

partial summary judgment on Count One (Dkt. No. 134); (2) Plaintiffs' motion for partial

summary judgment on Count Five (Dkt. No. 138); and (3) Defendants' cross-motion for partial

summary judgment on Count Five (Dkt. No. 161).[1]

According to Plaintiffs, the anticompetitive nature of Forest's hard switch was thoroughly

litigated in the prior action brought by New York, and the Court should apply the principles of

offensive non-mutual collateral estoppel to avoid relitigating those issues again. If Forest is

estopped from relitigating the issues decided in Judge Sweet's opinion, they argue, Plaintiffs are

entitled to summary judgment on the question of Forest's liability (but not causation or damages)

with respect to Count One, which alleges a violation of Section 2 of the Sherman Act, 15 U.S.C.

§ 2. This motion is granted in part and denied in part.

In Plaintiffs' second motion, they assert that Forest, along with Defendants Forest

Laboratories, Inc., and Forest Laboratories Holdings Ltd. (collectively with Forest,

"Defendants"), entered into settlement agreements with various generic drug manufacturers to, in

effect, delay market entry of generic versions of Namenda IR until three months after Namenda

IR's patent exclusivity period expired. These agreements, they argue, illegally extended Forest's

---

[1] Plaintiffs' motion at Dkt. No. 138 and Forest's cross-motion at Dkt. No. 161 were initially
styled as motions addressing Count Three. After an inquiry from the Court (Dkt. No. 187), the
parties clarified that both motions were intended to address Count Five (Dkt. Nos. 188, 194), a
representation that the Court accepted. (*See* Dkt. No. 195.) All references to "Count Five" in this
opinion correspond to references to "Count Three" in the motion papers.

patent license beyond the term of the patent and constituted a "naked restraint of trade" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs seek partial summary judgment on Count Five solely on the issue of whether the settlement agreements constitute a *per se* restraint of trade (and again, not on issues of causation or damages). Defendants cross-move on the same issue, arguing that the settlement agreements were not *per se* anticompetitive, and seek summary judgment dismissing Count Five in its entirety. Both of these motions are denied.

## Background

The basic facts of this case were thoroughly reviewed in Judge Sweet's opinion granting a preliminary injunction to New York, *New York v. Actavis, PLC* (*Namenda I*), No. 14 Civ. 7473, 2014 WL 7015198, at *1 (S.D.N.Y. Dec. 11, 2014),[2] the Second Circuit's decision affirming Judge Sweet's opinion, *New York ex rel. Schneiderman v. Actavis PLC* (*Namenda II*), 787 F.3d 638 (2d Cir.), *cert. dismissed*, 136 S. Ct. 581, 193 (2015), as well as in a prior decision of this Court denying Forest's motion to dismiss, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC* (*Namenda III*), Nos. 15 Civ. 6549, 15 Civ. 7488, 2016 WL 4992690, at *1-*8 (S.D.N.Y. Sept. 13, 2016). The summary of facts in the following pages is drawn from *Namenda I*, *Namenda II*, and *Namenda III*, as well as from Plaintiffs' Rule 56.1 Statement of Material Facts on Count One ("Pls.' Count One 56.1"), Dkt. No. 137, and Defendants' Response ("Defs.' Count One 56.1"), Dkt. No. 158, and Plaintiffs' Rule 56.1 Statement of Material Facts on Count Five ("Pls.' Count Five 56.1"), Dkt. No. 141, and Defendants' Response and Counter-Statement ("Defs.' Count Five 56.1"), Dkt. No. 164. Unless otherwise noted, these facts are

---

[2] Unless otherwise noted, all references to the *Namenda I* opinion are to the public, redacted version.

undisputed, and I summarize the factual and procedural history of this litigation only to the extent necessary to decide the instant motions.

## I.      The Parties

Forest manufactures and sells brand-name pharmaceutical products, including the prescription pharmaceutical memantine hydrochloride ("memantine"), which is sold in the United States under the trade names "Namenda" (referred to here as "Namenda IR" to distinguish from Namenda XR) and "Namenda XR." (Defs.' Count Five 56.1 ¶ 1). Memantine is a treatment for moderate-to-severe forms of Alzheimer's disease. Forest developed Namenda IR pursuant to a license and cooperation agreement with Merz GmbH & Co. KGaA, Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH (collectively, "Merz Entities"), which owned the relevant patent for a memantine-based drug.[3]

Plaintiff Smith is a South Carolina corporation that purchased Namenda IR directly from Forest and alleges that, during the class period, it paid prices higher than it would have absent Defendants' anticompetitive conduct. Plaintiff RDC is a New York corporation that also asserts that it purchased Namenda IR directly from Forest at supracompetitive prices.

## II.     The Regulatory Scheme

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, governs the manufacture, sale, and marketing of pharmaceuticals in the United States. Under the FDCA, a pharmaceutical company must submit a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") before it may bring a new drug to market. *See generally* 21 U.S.C.

---

[3] The Merz Entities were originally named defendants to some of the counts in the amended complaint, but per a stipulation of the parties, the Merz Entities were terminated as defendants and replaced by Defendants Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd., which are named as defendants to Counts Three, Four, and Five of the amended complaint. (*See* Dkt. No. 207.)

4

§ 355. Because the NDA must provide the FDA with sufficient scientific data to demonstrate that the new drug is safe and effective, the testing and approval process is generally "long, comprehensive, and costly." *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2228 (2013).

Once approved, though, a patented drug enjoys a period of market exclusivity. That period ends when the drug's patent expires and one or more low-cost generic versions of the drug enter the market and compete with the brand-name drug – what is referred to as going off the "patent cliff." *Namenda II*, 787 F.3d at 643. Generic versions of a drug, or "generics," are "copies of brand-name drugs and are the same as those brand-name drugs in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use." FDA, *Understanding Generic Drugs*, http://1.usa.gov/1SjEIso (last visited May 22, 2017).

### A.     The Hatch-Waxman Act

In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98–417, 98 Stat. 1585, to serve the dual purposes of incentivizing pharmaceutical innovation (by granting patent extensions to brand-name drug manufacturers) and lowering drug prices for consumers (by encouraging competition from generic drugs). *Namenda II*, 787 F.3d at 643-44. To encourage innovation, the Hatch-Waxman Act provides brand-name drug manufacturers the opportunity to extend their exclusivity period beyond the standard 20-year patent term. To encourage competition from generics, the Hatch-Waxman Act makes it easier for generic manufacturers to get their drugs approved by the FDA.

As relevant here, the Hatch-Waxman Act provides two methods by which a brand-name drug manufacturer can extend its period of market exclusivity.

First, a manufacturer can seek an extension of its patent from the U.S. Patent and Trademark Office ("PTO") to account for the time the manufacturer spent obtaining approval

from the FDA for its brand-name drug. 35 U.S.C. § 156. That extension can last no more than

five years. *Id.* § 156(g)(6).

Second, a brand-name drug manufacturer can obtain a six-month period of "pediatric

exclusivity" if it conducts certain pediatric studies and the FDA determines that use of the drug

in children may produce health benefits. 21 U.S.C. § 355a. A grant of pediatric exclusivity does

not extend the length of the underlying patent, but can operate to exclude generic competition by

delaying the date by which the FDA may approve generics for sale.

Under the Hatch-Waxman Act, the manufacturer of a generic version of an FDA-

approved drug may file an Abbreviated New Drug Application ("ANDA"), which allows the

generic manufacturer to rely upon the studies submitted by the brand-name drug manufacturer in

connection with the original NDA to prove that the generic version of the drug is safe and

effective. The ANDA filer must certify that its generic drug, among other things, has the same

active ingredient as, and is "bioequivalent" to, the previously-approved drug. 21 U.S.C.

§ 355(j)(2)(A)(ii), (iv); *Namenda II,* 787 F.3d at 644. A generic drug is bioequivalent to the

brand-name drug if it has the same "rate and extent of absorption" of the active ingredient as that

of the brand-name drug. 21 U.S.C. § 355(j)(8)(B)(i). "In other words, two drugs are

bioequivalent if they deliver the same amount of the same active ingredient content into a

patient's blood stream over the same amount of time." *Namenda II,* 787 F.3d at 644.

When a generic drug manufacturer files an ANDA, it must certify one of four things:

(1) that the brand-name drug is not patented; (2) that the brand-name drug's patent has expired;

(3) that the brand-name drug's patent will expire prior to manufacture of the generic drug; or

(4) that the brand-name drug's patent is invalid or will not be infringed by manufacture of the

generic drug. 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV). This final route is called "Paragraph IV Certification." *Namenda III*, 2016 WL 4992690, at *4.

The first manufacturer to file an ANDA with a Paragraph IV Certification may be granted a 180-day exclusive marketing period for its generic drug by the FDA. 21 U.S.C. § 355(j)(5)(B)(iv). This means that no other generic manufacturer's ANDA may become effective until "180 days after the date of the first commercial marketing of the drug" by the first ANDA filer. *Id.* § 355(j)(5)(B)(iv)(I).

Because the 180-day exclusivity period can be quite lucrative, generic manufacturers are incentivized to file an ANDA with a Paragraph IV Certification quickly, even if the brand-name drug's patent is ultimately found to be valid. However, the Hatch-Waxman Act provides that a Paragraph IV Certification is treated as an act of patent infringement and gives the holder of the brand-name drug patent the right to sue the prospective generic manufacturer within forty-five days of being notified of the filing of a Paragraph IV Certification. *Id.* § 355(j)(5)(B)(iii). If the brand-name manufacturer fails to bring suit during the forty-five-day period, the FDA's approval of the ANDA will become effective immediately. *Id.*

If the brand-name manufacturer brings such suit within the forty-five day period, the FDA cannot make the ANDA approval effective until after a thirty-month stay, unless a court first decides that the patent is invalid or not infringed by the generic manufacturer's drug – in which case the FDA will follow that determination and approve the ANDA. *Id.* If the patent infringement litigation is not resolved by the conclusion of the thirty-month stay, the FDA's approval of the ANDA becomes effective automatically unless the court handling the infringement litigation alters the length of the stay. *Id.*

7

The pediatric exclusivity statute, 21 U.S.C. § 355a, provides that, if a brand-name manufacturer performs certain studies requested by the FDA regarding the effects of the drug on children, the FDA may award the brand-name manufacturer a six-month period of "market exclusivity" following the date of the patent's expiration. During the six-month period, the FDA may not approve any new ANDA, but the statute does not provide for automatic revocation of any already-approved ANDAs. *Id.* § 355a(c)(1)(B)(ii). However, if there is a pending ANDA with a Paragraph IV Certification, the six-month pediatric-exclusivity period only attaches if, "in the patent infringement litigation resulting from the certification[,] the court determines that the patent is valid and would be infringed." *Id.*

### B.     State Drug Substitution Laws

Various state laws seek to encourage competition from generics as well. All fifty states and the District of Columbia have drug substitution laws, which are laws that either permit or require pharmacists to dispense a therapeutically equivalent, lower-cost generic drug in place of a brand-name drug unless the prescribing physician expressly directs that the prescription must be dispensed as written. *Namenda II*, 787 F.3d at 644. Drug substitution laws give a preference to generic drugs because generics are generally cheaper than their brand-name counterparts. (Pls.' Count Five 56.1 ¶ 26.)

However, all substitution laws require the generic drug to be "therapeutically equivalent" to the brand-name drug for which it is substituted, and prohibit the substitution of drugs that are not therapeutic equivalents. Unfortunately, not all states define therapeutic equivalence in the same manner. Thirty states and the District of Columbia have adopted the FDA's definition of therapeutic equivalence and only allow generic substitution if the FDA designates the generic as therapeutically equivalent in a publication commonly referred to as the "Orange Book." *Namenda II*, 787 F.3d at 645; *see* N.Y. Educ. Law § 6816–a(1); N.Y. Pub. Health Law

8

§ 206(1)(*o*); U.S. Food & Drug Admin., Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book") (37th ed. 2017). Other states take other approaches, such as "develop[ing] formularies that list permissible or impermissible drug substitutes" or "giv[ing] discretion to individual pharmacists as long as the drugs are pharmaceutically equivalent." *Namenda II*, 787 F.3d at 645 n.9.

The FDA assigns a number of ratings to therapeutically-equivalent drugs. Drugs for which there are no known or suspected bioequivalence problems are assigned ratings of AA, AN, AO, AP, or AT, depending on the dosage form, and drugs for which "actual or potential bioequivalence problems have been resolved with adequate *in vivo* and/or *in vitro* evidence supporting bioequivalence" are given the rating AB. U.S. Food & Drug Admin., *Preface to Thirty Seventh Edition*, Orange Book, at xiii. Any of these therapeutically-equivalent ratings would appear to satisfy, for example, New York's requirements for generic substitution. N.Y. Educ. Law § 6816–a(1); N.Y. Pub. Health Law § 206(1)(*o*)(2).

According to the FDA, two drugs are considered therapeutic equivalents "only if they are pharmaceutical equivalents for which bioequivalence has been demonstrated, and they can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling." U.S. Food & Drug Admin., *Preface to Thirty Seventh Edition*, Orange Book, at vii. Two drugs are considered pharmaceutical equivalents if they "contain the same active ingredient(s), are of the same dosage form, route of administration and are formulated to contain the same amount of active ingredient, and to meet the same or compendial or other applicable standards (i.e., strength, quality, purity, and identity)." *Id.*; *see also Namenda II*, 787 F.3d at 645. The FDA considers two drugs to be bioequivalent when they display comparable bioavailability ("the rate and extent to which the active ingredient or active

moiety is absorbed from a drug product and becomes available at the site of drug action") when studied under similar experimental conditions. U.S. Food & Drug Admin., *Preface to Thirty Seventh Edition*, Orange Book, at viii.

The requirement that substituted drugs meet therapeutic equivalence standards, although intended to protect patients, allows brand-name drug manufacturers to "game the system" through a practice known as "product hopping." *Namenda II*, 787 F.3d at 645. Before the patent on a brand-name drug expires and its manufacturer loses market share to cheaper generic competitors – the patent cliff – the manufacturer develops a follow-on version of the drug with a later patent expiration date and encourages patients and their physicians to switch to that version. Because the generic version of the follow-on drug is not "therapeutically equivalent" to the original brand-name drug, pharmacies cannot substitute a generic version of the original drug for the follow-on version – even if the pharmacological difference between the original and the follow-on drugs is negligible. *Namenda III*, 2016 WL 4992690, at *3.

Brand-name drug manufacturers can use a variety of tactics to encourage patients and physicians to convert from the original brand-name drug to the follow-on version prior to the patent cliff. In what has been termed a "soft switch," a manufacturer may aggressively promote and market the follow-on drug to patients and doctors, or may reduce its price compared to the original drug, in order to incentivize voluntary conversions. *Id.* at *4. In what has been termed a "hard switch" (sometimes called a "forced switch"), a manufacturer may stop selling the original drug prior to the expiration of its patent term, in order to force patients and physicians to switch to the follow-on drug in order to ensure continuity of treatment. *Id.* If, after briefly switching from the original brand-name drug to the follow-on brand-name drug, a patient switches back to

a generic version of the original drug, this process is known as "reverse commuting." *Namenda II*, 787 F.3d at 649.

## III.   Factual History

In June 2000, Forest entered into a license and cooperation agreement with the Merz Entities, German pharmaceutical companies, to give Forest the exclusive right to market a memantine-based drug in the United States under the Merz Entities' patent, U.S. Patent No. 5,061,703 (the "'703 Patent"). (Pls.' Count One 56.1 ¶¶ 3-4.) Pursuant to that agreement, Forest developed Namenda IR, a twice-daily immediate-release memantine-based tablet. *Namenda III*, 2016 WL 4992690, at *2. In December 2002, Forest submitted an NDA to the FDA, seeking approval to market Namenda IR for the treatment of Alzheimer's disease. (Pls.' Count One 56.1 ¶ 5.) The FDA approved that NDA on October 16, 2003, and Forest commercially launched Namenda IR in the United States in January 2004. (*Id.* ¶¶ 6-7.)

Forest then submitted an application to the PTO for a five-year extension to the '703 Patent (originally set to expire on April 11, 2010), to account for the time Forest spent obtaining FDA approval for Namenda IR, as permitted by 35 U.S.C. § 156. (*Id.* ¶¶ 9-10.) The PTO granted that request in March 2009, extending the term of the '703 Patent until April 11, 2015. (*Id.* ¶ 10.)

In January 2014, Forest sought six months of pediatric exclusivity for Namenda IR from the FDA, pursuant to 21 U.S.C. § 355a, and the FDA granted that request in June 2014. (*Id.* ¶ 11; Defs.' Count One 56.1 ¶ 11 (admitting same); *but see* Defs.' Count Five 56.1 ¶¶ 13-15 (disputing that Forest "requested" the pediatric exclusivity period).) That six-month exclusivity period ran from the expiration of the term of the '703 Patent on April 11, 2015 to October 11, 2015. (Pls.' Count One 56.1 ¶ 12.)

Namenda IR was the first medication in the United States approved for individuals with moderate or severe forms of Alzheimer's disease and quickly became one of Forest's best-selling

drugs. *Namenda II*, 787 F.3d at 647. It generated approximately $1.5 billion in annual sales in 2012 and 2013. *Id.*

At least seventeen generic drug manufacturers filed ANDAs seeking to market generic versions of Namenda IR. (*See* Solomon Decl. ¶ 2, Dkt. No. 146-11.)[4] At issue in this case are seven of those companies (the "Generic Competitors"): (1) Interpharm Holdings, Inc. and Interpharm, Inc., which were acquired by a wholly-owned subsidiary of Amneal Pharmaceuticals, LLC (collectively, "Amneal"); (2) Dr. Reddy's Laboratories Ltd. and Dr. Reddy's Laboratories, Inc. (collectively, "Dr. Reddy's"); (3) Lupin Pharmaceuticals, Inc. ("Lupin"); (4) Mylan Pharmaceuticals, Inc. ("Mylan"); (5) Orchid Chemicals & Pharmaceuticals Ltd. ("Orchid"); (6) Sun India Pharmaceuticals Industries, Ltd. ("Sun"); and (7) Teva Pharmaceuticals USA, Inc. ("Teva"). (Pls.' Count Five 56.1 ¶ 16.)

In the fall of 2007, each of these seven Generic Competitors submitted its ANDA to the FDA along with a Paragraph IV Certification. (*Id.* ¶¶ 17-20 (Amneal), 31-34 (Dr. Reddy's), 45-48 (Lupin), 59-62 (Mylan), 73-76 (Orchid), 86-89 (Sun), 100-103 (Teva).) Defendants timely brought suits for patent infringement against each Generic Competitor. (*Id.* ¶¶ 21-22 (Amneal), 35-36 (Dr. Reddy's), 49-50 (Lupin), 63-64 (Mylan), 77-78 (Orchid), 90-91 (Sun), 104-105 (Teva).) Between September 2009 and July 2010, Defendants reached settlement agreements with all seven manufacturers. (*Id.* ¶¶ 23 (Amneal), 37 (Dr. Reddy's), 51 (Lupin), 65 (Mylan), 79 (Orchid), 92 (Sun), 106 (Teva).)

Each settlement agreement contained a virtually identical provision that Plaintiffs assert was anticompetitive. In each case, Defendants granted the Generic Competitor a license to begin

---

[4] Many of those generic manufacturers have been named defendants in a related suit before this Court, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, No. 15 Civ. 6549, but none is a named defendant in the instant action.

12

selling a generic version of Namenda IR beginning three months prior to the later of (1) the expiration of the '703 Patent or (2) the end of any pediatric exclusivity period attached to the '703 Patent. (*Id.* ¶¶ 25-26 (Amneal), 39-40 (Dr. Reddy's), 53-54 (Lupin), 67-68 (Mylan), 81-82 (Orchid), 94-95 (Sun), 108-109 (Teva).) This meant that, under the settlements, had Forest not obtained the six-month pediatric exclusivity period under 21 U.S.C. § 355a, the seven Generic Competitors would have been able to begin selling generic versions of Namenda IR on January 11, 2015. However, because the FDA granted Forest the six-month pediatric exclusivity period after the settlement agreements were executed, the Generic Competitors could not begin selling their drugs until July 11, 2015. (*See* Pls.' Count One 56.1 ¶ 13; Defs.' Count One 56.1 ¶ 13.)

In June 2010, Forest obtained approval from the FDA for a second memantine drug, a once-daily extended-release memantine capsule called Namenda XR. *Namenda II*, 787 F.3d at 647. Forest began marketing Namenda XR in July 2013. *Id.* Namenda IR and Namenda XR contain the same active ingredient and have the same therapeutic effect, but Namenda IR is a tablet taken twice a day that releases directly into the bloodstream and Namenda XR is a capsule that is taken once a day and releases gradually. *Id.* Namenda IR and Namenda XR are not, therefore, "therapeutic equivalents" under the FDA's definition of that term, and so cannot be substituted for one another under any drug substitution law that requires substitutes to be certified by the FDA as "therapeutic equivalents." Likewise, generic drugs that are therapeutic equivalents of Namenda IR cannot be substituted for Namenda XR under the same standards. (Pls.' Count One 56.1 ¶¶ 43-44; Defs.' Count One ¶¶ 43-44.)

The key non-pharmacological difference between Namenda IR and Namenda XR relates to their patent protection. Namenda XR's period of patent exclusivity does not expire until 2029, while Namenda IR's expired in 2015. *Namenda II*, 787 F.3d at 647.

When Forest brought Namenda XR to market in 2013, it engaged in a variety of soft-switch tactics to encourage patients and physicians to convert from Namenda IR to Namenda XR before Namenda IR went off the patent cliff in 2015. *See id.* at 647-48. Forest priced Namenda XR below Namenda IR. (Defs.' Count One 56.1 ¶ 66.) Forest stopped actively marketing Namenda IR and heavily promoted the benefits of Namenda XR, including its lower price and once-daily dosage. (Pls.' Count One 56.1 ¶¶ 66-68; Defs.' Count One 56.1 ¶¶ 66-68.)

The parties disagree about whether Forest's soft-switch tactics were effective. (*See* Pls.' Count One 56.1 ¶¶ 69-71; Defs.' Count One 56.1 ¶¶ 69-71.) In *Namenda I*, Judge Sweet concluded that Forest executives were concerned that an insufficient number of patients would switch to Namenda XR before generic versions of Namenda IR entered the market, making a hard switch necessary. *Namenda I*, 2014 WL 7015198, at *18.

It is undisputed that, on February 14, 2014, Forest announced (via a press release, notice to the FDA, and letters to physicians and patients) that it would discontinue sales of Namenda IR on August 15, 2014. (Pls.' Count One 56.1 ¶ 80; Defs.' Count One 56.1 ¶ 80.) In June of 2014, Forest announced that, due to manufacturing issues with Namenda XR, it would continue selling Namenda IR through the fall of 2014. (Pls.' Count One 56.1 ¶ 85; Defs.' Count One 56.1 ¶ 86.)

IV.    **Procedural History**

On September 15, 2014, the New York Attorney General filed an initial complaint against Forest in this court, alleging that the hard switch from Namenda IR to Namenda XR violated federal and state antitrust laws. *See* Complaint, *Namenda I*, 2014 WL 7015198 (No. 14 Civ. 07473), Dkt. No. 1. Shortly thereafter, the Attorney General sought a preliminary injunction to block the discontinuation of Namenda IR sales. *See* Mot. for Prelim. Inj., *Namenda I*, 2014 WL 7015198 (No. 14 Civ. 07473), Dkt. No. 27. Judge Sweet held a five-day evidentiary hearing on the preliminary injunction motion, during which time the court heard testimony from twenty-

four witnesses and received over 1,400 exhibits. *Namenda III*, 2016 WL 4992690, at \*6. Based on this evidence, Judge Sweet made 167 factual findings and ultimately concluded that a preliminary injunction should issue. *See Namenda I*, 2014 WL 7015198, at \*4-\*33.

A few of Judge Sweet's key factual findings can be summarized here. Judge Sweet concluded that, prior to the entry of generic versions of Namenda IR, brand-name Namenda IR and Namenda XR were the only memantine therapies available to Alzheimer's patients. *Id.* at \*5. He concluded that all other medications then-approved for the treatment of Alzheimer's disease were acetylcholinesterase inhibitors ("CIs"), which are not considered therapeutic equivalents for memantine-based drugs but instead are considered complements (*i.e.*, memantine and CIs are often prescribed together). *Id.* at \*5, \*14-\*15.

Judge Sweet concluded that, after various soft-switch tactics failed, Forest decided to pursue a hard switch in order to preserve its market share. *Id.* at \*16-\*22. That hard switch began on February 14, 2014, when Forest publicly announced that it would discontinue sales of Namenda IR on August 15, 2014. *Id.* at \*18. Judge Sweet concluded that, for a variety of reasons, patients and physicians were reluctant to switch to Namenda XR absent being forced to do so by a hard switch – for instance, because most Alzheimer's patients are in long-term care facilities and take, on average, nine pills per day, moving from a twice-daily form of Namenda to a once-daily form is not particularly beneficial. *Id.* at \*19. Once converted, however, there was a relatively low risk that patients would reverse commute to generic versions of Namenda IR, because Alzheimer's patients are "especially vulnerable" and physicians are therefore reluctant to change their medications, even if it results in cost savings. *Id.* at \*28-\*31.

Judge Sweet concluded that Forest's hard switch would result in "dramatically higher drug costs for insurers and patients." *Id.* at \*31. He also found that Forest had presented no

15

evidence of economic harm that would result from continuing sales of Namenda IR until the entry of generic competition – aside, of course, from the "harm" to Forest's bottom line. *Id.* at *32-*33.

Judge Sweet ultimately determined that New York had raised "substantial questions" regarding the merits of its antitrust claims because the court concluded that Forest's planned hard switch was anticompetitive, Forest's proposed justifications were pretextual, and any procompetitive effects were outweighed by the anticompetitive impact of the hard switch. *Id.* at *37-*41. Because New York also demonstrated the potential for irreparable harm, and equities favored an injunction, Judge Sweet entered the injunction on December 15, 2014. *See* Order, *Namenda I*, 2014 WL 7015198 (No. 14 Civ. 07473), Dkt. No. 84. That injunction prevented Forest from halting sales of Namenda IR and required Forest to affirmatively undo the effects of its February 2014 announcement by informing patients and physicians that Namenda IR

In May 2015, the Second Circuit affirmed Judge Sweet's ruling on appeal. Significantly, the Circuit also characterized the hard switch as beginning on February 14, 2014 – the date of Forest's public announcement of a planned withdrawal of Namenda IR – concluding that "announcing the imminent discontinuation of a drug is tantamount to withdrawal." *Namenda II*, 787 F.3d at 648.

Pursuant to this decision, Forest kept Namenda IR on the market through July 2015.

On September 22, 2015, Smith filed its initial complaint in the instant case, alleging largely analogous antitrust claims as presented in the original litigation brought by New York. On December 28, 2015, RDC filed its complaint in a separate action, which was then consolidated with this action and recaptioned on January 26, 2016. (Dkt. No. 65). At least two other antitrust actions have been filed against Forest on the same grounds. *See A.F. of L. - A.G.C.*

*Building Trades Welfare Plan v. Actavis, PLC*, No. 15 Civ. 4406; *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, No. 15 Civ. 6549.

On February 16, 2017, Plaintiffs moved for collateral estoppel and partial summary judgment on Count One (Dkt. No. 134) and for partial summary judgment on Count Five (Dkt. No. 138). On March 16, 2017, Defendants cross-moved for partial summary judgment on Count Five (Dkt. No. 161).

### Applicable Legal Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute concerning material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Anderson*, 477 U.S. at 248. In making its determination, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255.

To defeat summary judgment, it is not sufficient for the nonmoving party to present evidence that is conclusory or speculative, with no basis in fact. *See Anderson*, 477 U.S. at 249-50. Instead, the nonmoving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006).

17

"Summary judgment is designed . . . to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

**Discussion**

**I.    Plaintiffs' Motion for Collateral Estoppel and Partial Summary Judgment on Count One Is Granted in Part and Denied in Part**

Plaintiffs seek a partial summary judgment of liability on Count One, which asserts that Forest's February 2014 announcement of the upcoming withdrawal of Namenda IR from the market constituted a violation of Section 2 of the Sherman Act. Plaintiffs argue that Forest's antitrust liability for the February 2014 announcement was already determined in the prior *Namenda I* and *Namenda II* litigation and therefore Forest is collaterally estopped from relitigating the issue now. Even though Judge Sweet entered a preliminary injunction in *Namenda I*, Plaintiffs argue that the Second Circuit treated that injunction as permanent in *Namenda II*, and, therefore, that decision constitutes a "final judgment" entitled to collateral estoppel effect.

Plaintiffs' motion is granted in part and denied in part. While key facts regarding Forest's violation of Section 2 were previously litigated and are entitled to preclusive effect, Plaintiffs' injury was not a subject of the prior litigation and therefore the Court cannot enter a "partial summary judgment of liability" in Plaintiffs' favor.

**A.    Plaintiffs Have Satisfied the Elements of Collateral Estoppel as to Forest's Violation of Section 2**

"Collateral estoppel, or issue preclusion, prevents the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991). In order to establish that an issue was determined in a former adjudication, a party asserting collateral estoppel must establish four things: (1) the issues in the prior proceeding and the current proceeding are identical; (2) the

18
