**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**All Direct Purchaser Actions** | **Case No. 1:15-cv-07488-CM-RWL** |

<u>**DIRECT PURCHASER CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO FOREST'S MOTION TO EXCLUDE CERTAIN OPINIONS AND PROPOSED TESTIMONY OF PROF. EINER ELHAUGE**</u>

<u>**FILED UNDER SEAL**</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ..................................................................................................... 6

    A.  Professor Elhauge's Opinion Fits *Actavis* .................................................... 6

        i.   Prof. Elhauge Does Not Presume All Reverse-Payments Are Anticompetitive, He First Asks Whether the Payment Exceeded Avoided Litigation Costs ....... 6

        ii.  Only After Determining That the Payment Exceeded Avoided Litigation Costs, Did Prof. Elhauge Assess a Possible Alternate Date .......................... 10

    B.  Prof. Elhauge Uses a Valid Methodology to Estimate the Economically-Predicted But-For Entry Date ................................................................................... 12

        i.   The But-for-World Must Employ Objective Criteria, Not Defendants' Post-Hoc, Self-Serving Statements About What Was Possible ............................ 12

        ii.  The But-For Entry Date Predicted by the Parties' Actual Bargaining Power Is Within the Feasible Range of Possible But-For Entry Dates......................... 16

        iii. Professor Elhauge's Model Does Not Lead to Irrational Outcomes and His Opinions Do Not Conflict with Those of Plaintiffs' Other Experts .............. 21

    C.  Prof. Elhauge Deals with the Economically-Predicted But-For Entry Date, Not the Ultimate Jury Issue of When But-For Entry Would Have Occurred....................... 23

III. CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Am. Bearing Co. v. Litton Indus., Inc.*,
540 F. Supp. 1163 (E.D. Pa. 1982) ......................................................................20

*Am. Sales Co. v. AstraZeneca LP (In re Nexium (Esomeprazole)*,
842 F.3d 34 (1st Cir. 2016) ................................................................................15

*Apotex, Inc. v. Cephalon, Inc.*,
2017 U.S. Dist. LEXIS 76327 (E.D. Pa. May 18, 2017) .......................................12

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital*,
2017 U.S. Dist. LEXIS 20715 (S.D.N.Y. Feb. 10, 2017) .......................................2

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) ...................................................................................12, 15

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ..............................................................................12

*Castro v. Sanofi Pasteur Inc.*,
134 F. Supp. 3d 820 (D.N.J. 2015) .......................................................................1

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
1987 U.S. Dist. LEXIS 2763 (D. Mass. Mar. 31, 1987) .......................................20

*Davis v. Goord*,
2004 U.S. Dist. LEXIS 7036 (S.D.N.Y. Apr. 23, 2004) ......................................7, 9

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
773 F.2d 1506 (9th Cir. 1985) ............................................................................15

*Figueroa v. Bos. Sci. Corp.*,
254 F. Supp. 2d 361 (S.D.N.Y. 2003) ...................................................................18

*FTC v. Actavis, Inc.*,
133 S. Ct. 2223 (2013) ..............................................................................3, 6-7

*FTC v. Foster*,
2007 U.S. Dist. LEXIS 47606 (D.N.M. May 29, 2007) .......................................20

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
2008 U.S. Dist. LEXIS 37331 (S.D.N.Y. May 7, 2008) .......................................20

*In re Mushroom Direct Purchaser Antitrust Litig.*,
2015 U.S. Dist. LEXIS 120892 (E.D. Pa. July 29, 2015) .......................................1

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) .....................................................................13

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................................................25

*In re Wellbutrin XL Antitrust Litig.*,
   133 F. Supp. 3d 734 (E.D. Pa. 2015) ....................................................................19

*Kamerman v. Steinberg*,
   744 F. Supp. 59 (S.D.N.Y. 1990) .........................................................................20

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
   791 F.3d 388 (3d Cir. 2015) ................................................................4, 12, 13, 19

*Laumann v. NHL*,
   117 F. Supp. 3d 299 (S.D.N.Y. 2015) ..............................................16, 17, 18, 20

*Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ..................................................................21, 22, 23

*Media Sport & Arts S.r.L. v. Kinney Shoe Corp.* ,
   1999 U.S. Dist. LEXIS 16035 (S.D.N.Y. Oct. 18, 1999) ......................................25

*Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   2008 U.S. Dist. LEXIS 37331 (S.D.N.Y. May 7, 2008) ........................................16

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003) ..............................................................................9

*Monetti, S.p.A. v. Anchor Hocking Corp.*,
   1992 U.S. Dist. LEXIS 8163 (N.D. Ill. June 9, 1992) ..........................................20

*Murphy Tugboat Co. v. Crowley*,
   658 F.2d 1256 (9th Cir. 1981) ..................................................................... 15-16, 20

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
   247 F.R.D. 253 (D. Mass. 2008) .............................................................................1

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
   2009 U.S. Dist. LEXIS 86435 (D. Mass. Sept. 21, 2009) .......................................1

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
   556 F. Supp. 825 (D.D.C. 1982) ...........................................................................20

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, Pub. Ltd. Co.* ,
   2016 U.S. Dist. LEXIS 128349 (S.D.N.Y. Sept. 13, 2016) ...........................3, 6, 9

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ..............................................................................................15

*U.S. SEC v. Mudd*,
   2016 U.S. Dist. LEXIS 59273 (S.D.N.Y. May 3, 2016) .......................................21

*United Food & Commer. Workers Local 1776 v. Teikoku Pharm. USA* ,
   2017 U.S. Dist. LEXIS 182940 (N.D. Cal. Nov. 3, 2017) ............................................. *passim*

*Walker v. Gordon*,
   46 F. App'x 691 (3d Cir. 2002) ...........................................................................................9, 11

**Other Authorities**

AREEDA & HOVENKAMP, IIA ANTITRUST LAW ¶ 394 (3d ed. 2007);  ..............................11, 13, 17

ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC
ISSUES 54-55 (2d ed. 2010)..................................................................................................... 13, 17

## I.    INTRODUCTION

In seeking to exclude Professor Einer Elhauge's expert economic analysis, Defendants recycle the same arguments that failed last month in another reverse-payment Hatch-Waxman antitrust case. *See United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA (In re Lidoderm Antitrust Litigation)* ("*Lidoderm*"), No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 182940, at \*122-26 (N.D. Cal. Nov. 3, 2017). Defendants dismissively refer to Professor Elhauge simply as a "law professor." Def. Br. at 1. While it is true that Prof. Elhauge is the Petrie Professor of Law at Harvard University, he is also an expert in antitrust economics and a leading scholar on the economics of reverse-payment settlements. Sixteen courts have found Prof. Elhauge qualified to provide expert economic analysis, with several hailing him as an "antitrust titan." *See Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 830 (D.N.J. 2015) (Prof. Elhauge is "a preeminent antitrust scholar" who is "eminently qualified" on antitrust economics and has "been described as a 'highly qualified antitrust titan.'"); *In re Mushroom Direct Purchaser Antitrust Litigation*, No. 06-0620, 2015 U.S. Dist. LEXIS 120892, at \*19 (E.D. Pa. July 29, 2015) ("courts have admitted Prof. Elhauge as an expert in antitrust economics generally . . . Prof. Elhauge has been described as a 'highly qualified antitrust titan[].'"); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 273 (D. Mass. 2008) (describing Prof. Elhauge as a "highly qualified antitrust titan"); *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, Civil Action No. 05-12024 PBS, 2009 U.S. Dist. LEXIS 86435, at \*11 (D. Mass. Sep. 21, 2009) (qualifying Professor Elhauge as an expert in antitrust economics).

Plaintiffs retained Prof. Elhauge to address, among other things, what economic analysis would predict about: (a) whether the reverse payment delayed entry; (b) whether Forest and ███ would have reached a profitable, economically rational settlement without a reverse payment, and what the predicted entry date would be in such a no-payment settlement. *See* Hamburger Decl.,

Ex. 1 (Revised Expert report of Prof. Einer Elhauge, dated Sept. 20, 2017) ("Elhauge Rpt.") ¶ 1. To address the first issue, Prof. Elhauge established that the reverse payment amount (net of the value of any return services) exceeded the payor's future anticipated litigation costs and that there were no offsetting procompetitive justifications. *See* Elhauge Rpt. ¶¶ 10-11, 20, 43-50, 89-100; Declaration of Joseph Opper ("Opper Decl.") Ex. 1 (Rebuttal Expert Report of Prof. Einer Elhauge, dated October 25, 2017) ("Elhauge Rebuttal") ¶¶ 13-35, 65-73. His methodology for assessing reverse payment settlements was approved in two recent cases. *See Lidoderm*, 2017 U.S. Dist LEXIS 182940, at *66-70, *122-26; *King Drug v. Celphalon, Inc.,* No. 2:06-cv-01797-MSG, Dec. 22, 2015, Order on Motions to Exclude Plaintiff's Economic Experts ¶¶ 13-14 (rejecting *Daubert* motion to exclude Prof. Elhauge's testimony and finding his "methodologies to be reliable"). To address the second issue, Prof. Elhauge established that there was a range of no-payment settlement entry dates that would be more profitable to both parties than continued litigation, and that by using the actual settlement to calculate the parties' actual bargaining power, one could economically predict the settlement entry date they would have reached in a no-payment settlement. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 53-88; Opper Decl. Ex. 1, Elhauge Rebuttal ¶¶ 36-64. His use of this same methodology was approved in *Lidoderm*, 2017 U.S. Dist LEXIS 182940, at *66-70, *122-26.

This "purported Daubert motion, like so many such motions, is nothing more than a 'we do not agree with his opinion so it is junk science' motion, of the sort that causes this and many judges to view all Daubert motions with a certain degree of skepticism." *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital*, 2017 U.S. Dist. LEXIS 20715, at *2 (S.D.N.Y. Feb. 10, 2017) (McMahon, J.).

2

Defendants' attack on Prof. Elhauge is wholly reliant on a gross misrepresentation of his analysis. *First*, Defendants argue that Prof. Elhauge's opinion does not fit *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013) based on their false assertion that he ignored whether the reverse payment of ███████ ████████ ██████████████████████ ) from Forest to Mylan was large and unjustified and instead simply presumed that, regardless of size or justification, *any* reverse-payment caused delay and is therefore anticompetitive. Def. Br. at 1, 5-7. Defendants are wrong. Prof. Elhauge's two-step analysis did precisely the opposite.

Prof. Elhauge's first step was to establish as a matter of economics that the reverse payment was large enough to exceed Forest's avoided litigation costs and was thus anticompetitive.[1] *See* Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 10-11, 20, 43-50; Opper Decl. Ex. 1, Elhauge Rebuttal ¶¶ 13-35. Only because the reverse payment exceeded that threshold (here, greatly), did Prof. Elhauge proceed to the second step, of assessing the separate *causation* issue of the *degree of anticompetitive* delay the reverse payment caused, which required determining what economic rationality would predict the but-for outcome *without the anticompetitive* reverse payment would have been. Opper Decl. Ex. 2, Excerpts from the Sept. 29 and Nov. 10, 2017 depositions of Prof. Elhauge ("Elhauge Dep.") 95:8-96:13, 323:11-20, 357-58:19. He found that economics would

---

[1] The Supreme Court explained that anticompetitiveness can be inferred from payments that exceed avoided litigation costs because such a payment costs the payor more than proceeding to a verdict on the patent merits. *Actavis*, 133 S. Ct. at 2236-37.  In other words, no brand company would pay its generic competitor more than it would pay its patent lawyers to enforce its patent *unless* the brand were buying more protection from competition than it concluded its patent alone would provide. As this and other courts have held, however, this does not necessarily mean that *per se* legality applies to a payment below avoided litigation costs or even to a no-payment settlement with a delayed entry date, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis,* PLC, No. 15-cv-6549 (CM), 2016 U.S. Dist. LEXIS 128349, at *42-43 (S.D.N.Y. Sep. 13, 2016) ("MTD Op."); *Lidoderm*, 2017 U.S. Dist. LEXIS 182940, at *65 & n.19. But there is no need to address such issues here since Prof. Elhauge is inferring anticompetitive effects from the fact that the actual reverse payment greatly exceeded Forest's saved litigation costs.

3

predict (1) that the but-for outcome would have been a no-payment settlement because it would be mutually profitable to settle without a payment, and (2) that with such a settlement the parties would have agreed to an earlier entry date that could be economically predicted from a calculation of their actual bargaining power. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 53-88; Opper Decl. Ex. 1, Elhauge Rebuttal ¶¶ 36-64. He also analyzed what economics would predict about the entry delay under an alternative causation analysis that assumed an alternate settlement would have had a payment equal to any plausible estimate of Forest's avoided litigation costs. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 82 & Figure 16; Opper Decl. Ex. 1, Elhauge Rebuttal ¶¶ 8, 42-43; Opper Decl. Ex. 2, Elhauge Dep. 75:4-77:11, 97:4-98:22, 209:2-25, 355:5-359:17. Finally, he showed that the reverse payment had no procompetitive justification and analyzed and disputed Defendants' experts' purported procompetitive justifications. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 89-100; Opper Decl. Ex. 1, Elhauge Rebuttal ¶¶ 65-73; Opper Decl. Ex. 2, Elhauge Dep. 26:1-27:2, 62:11-63:23.

This approach is fully consistent with *Actavis*, which expressly envisions an analysis of the entry date without an anticompetitive payment. *See King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 403 (3d Cir. 2015) quoting *Actavis*, 133 S. Ct. at 2236-37 ("parties may still find other ways to settle, such as 'by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior that point."). Forest's sleight of hand is to ignore Prof. Elhauge's first step (analysis of whether payments exceeding the brand's avoided litigation costs cause *anticompetitive* delay), and conflate it with his separate causation analysis. Forest falsely attributes to Professor Elhauge the opinion, which he does not espouse, that *any* reverse payment is anticompetitive.

*Second*, Defendants argue that Prof. Elhauge used an invalid method to estimate the economically-predicted but-for entry date. But as Defendants admit, his method was approved in *Lidoderm,* 2017 U.S. Dist LEXIS 182940, at *66-70, *122-26. Def. Br. at 10. Defendants make three unavailing arguments to try to distinguish *Lidoderm.* First, they assert that Prof. Elhauge ignored their self-serving testimony that they would not have accepted an earlier entry date. This argument invents out of whole-cloth an end-around to *Actavis* whenever the defendant's witnesses assert *ex post facto* that the defendant would never have accepted any settlement terms other than the actual ones. Further, as detailed below, the testimony Defendants cite showed only that they would not have accepted an earlier entry date *with* a reverse payment, and Prof. Elhauge showed that the evidence affirmatively indicated that rational economic actors would have done the opposite *without* a reverse payment. The law is clear that a but-for world should be constructed *without* the challenged conduct. Second, Defendants claim that Prof. Elhauge's but-for settlement entry date "conflicts" with his acknowledgement that it would have been ████████████ ████████████████████. This argument rests on Defendants' erroneous premise that the but-for settlement entry date turns only on feasibility, when in fact it also turns on the bargaining power that determines where within the feasible range parties settle. Third, Defendants wrongly assert that Prof. Elhauge's method conflicts with economic rationality because it predicts that if Forest had 0% bargaining power, the entry delay would be less. But his method rests on sound economics showing the more bargaining power a patent holder has, the more entry delay it can buy. Third, Defendants claim that Prof. Elhauge improperly usurps the role of the jury by opining on the entry date. Def. Br. at 1, 11. But Prof. Elhauge opines only on what economics would predict the but-for entry date would be, leaving to the jury whether to accept that economics prediction or

not, and he offers a range of economically rational possibilities depending on what the jury concludes about the relevant factors.

## II.  ARGUMENT[2]

### A.  Professor Elhauge's Opinion Fits *Actavis*

Defendants' primary argument rests on their inaccurate assertion that Prof. Elhauge ignored whether the reverse payment was large and unjustified and instead simply presumed that, regardless of size or justification, any reverse payment causes anticompetitive delay. *See* Def. Br. at 1, 5-6. As explained below, Prof. Elhauge did the opposite. Moreover, whether Forest's purported Medicaid savings are a benefit received from Mylan, and whether Forest truly expected a large second year royalty from Mylan are hotly contested factual issues in this case, and an expert is entitled to analyze the proponent's version of the disputed facts. *See infra* at 8-9.

#### i.   *Prof. Elhauge Does Not Presume All Reverse-Payments Are Anticompetitive, He First Asks Whether the Payment Exceeded Avoided Litigation Costs*

This Court stated that under *Actavis*, a large and unjustified reverse payment could be anticompetitive, and that "[i]n *Actavis*, the Court did not say what constitutes a 'large' or 'unjustified' reverse payment, but it instructed courts (1) to compare a payment to the payor's future litigation costs as a measure of scale to determine if it was 'large,' and (2) to consider whether a payment 'reflects traditional settlement considerations, such as avoided litigation costs or fair value for services' to determine if it was justified." MTD Op.,2016 U.S. Dist. LEXIS 128349, at *45); *see also Actavis*, 133 S. Ct. at 2237 ("the likelihood of a reverse payment bringing

---

[2] Pursuant to this Court's Individual Practices, Plaintiffs have omitted in this brief a discussion of the legal standards on *Daubert* motions. *See* Individual Practices and Procedures of Chief Judge Colleen McMahon at 8. The relevant standards are referenced in Plaintiffs' other *Daubert* opposition briefs, filed contemporaneously herewith.

about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification.").

Prof. Elhauge's analysis tracks this direction. It first establishes that the reverse payment was ████████, carefully taking into account all arguments that this payment amount should be reduced by the fair value of other services (Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 10-11, 23 n.55; Opper Decl. Ex. 1, Elhauge Rebuttal ¶¶ 13-35), a heavily contested factual and legal issue in this litigation and one that is Defendants' burden to prove.[3] He then noted that the best available estimate of Forest's anticipated future litigation costs was ████████. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 20. This ████████ estimate came from another expert for the Plaintiffs. *See* Hamburger Decl. Exhibit 12, Johnston Rpt. ¶ 18. Defendants, who have cited avoided litigation costs as their 33rd affirmative defense (Answer, ECF No. 107 at 60), have not offered an alternate estimate. *See Davis v. Goord*, 2004 U.S. Dist. LEXIS 7036, at *12 (S.D.N.Y. Apr. 23, 2004) ("As with any affirmative defense, the burden is on the defendant . . .").

Prof. Elhauge then proved that, as a matter of economics, reverse payments that exceed the patent holder's anticipated future litigation costs anticompetitively delay entry, regardless of whether the but-for outcome (without a payment) would have been litigation or settlement, and regardless of the bargaining strength of the parties. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 43-50. He further explained that as a matter of economics this made the payment sufficiently "large" to have anticompetitive effects, while stressing it was up to the judge or jury to determine the ultimate issue of whether this made the payment sufficiently large under the law. *See* Opper Decl.

---

[3] *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, *In re Namenda Antitrust Litigation*, 15-cv-07488-CM-RWL (S.D.N.Y. Dec. 11, 2017).

Exhibit 2, Elhauge Dep. Tr. at 61:8-62:10. Finally, after weighing the facts, Prof. Elhauge carefully

established that as a matter of economics there was no procompetitive justification for the reverse

payment. *See, e.g.,* Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 89-100; Opper Decl. Ex. 1, Elhauge

Rebuttal ¶¶ 65-73; Opper Decl. Ex. 2, Elhauge Dep. 26:1-27:2, 62:11-63:23.

 Defendants' own expert explicitly acknowledged that Prof. Elhauge's methodology was

the *opposite* of what Defendants now claim in their brief. Defense expert Dr. Lona Fowdur stated:

> Professor Elhauge's approach involves several steps. First, he considers whether
> payments under the patent settlement exceeded avoided litigation costs from
> continued litigation. Professor Elhauge indicates that this initial analysis is intended
> to screen out cases in which payments are below litigation costs. In contrast,
> settlements with payments exceeding avoided litigation costs trigger additional
> inquiry . . . Conditional on his finding that the settlement payment exceeded avoided
> litigation costs, Professor Elhauge attempts to estimate delay caused by the reverse
> payment relative to a but-for world in which the challenged settlement is assumed
> not to have occurred, but another hypothetical settlement without any payments did.
> Professor Elhauge also asks whether there were procompetitive justifications for
> reverse payments when such payments exceeded litigation costs …

*See* Hamburger Decl., Ex. 5, Fowdur Report ¶ 34. Despite their expert's explicit concession,

Defendants attack Prof. Elhauge by purposefully conflating reverse payments that cause

*anticompetitive* delay with reverse payments, below avoided litigation costs, that result in

potentially *lawful* delay.

 Specifically, Defendants inaccurately claim that Prof. Elhauge simply deemed any

payment, regardless of size (and including a purely hypothetical ████████ payment equal to

Forest's saved litigation costs), as anticompetitive. Def. Br. at 5-6. They cite only two things in

support of this false claim. First, they cite an inaccurate assertion by their own expert Dr. Fowdur

that simply contradicts her above-quoted admission that Prof. Elhauge's causation analysis was

"conditional" on first showing the reverse payment exceeded avoided litigation costs. Def. Br. at

6; Fowdur Report ¶¶ 64-65. Second, they cite to a snippet from Prof. Elhauge's deposition that

actually says only that his causation analysis was based on the difference between a no-payment settlement and a reverse payment settlement. Def. Br. at 5; Opper Decl. Ex. 2, Elhauge Dep. 23:14-20. Defendants simply ignore other parts of his deposition where, despite their repeated attempts to get Prof. Elhauge to say that a delay occasioned by a payment equal to or below a brand's saved litigation costs would be *anticompetitive*, he repeatedly rejected that premise, stating that the threshold, step one in his analysis would "screen out the cases" where the "payment is less than avoided litigation costs." Opper Decl. Ex. 2, Elhauge Dep. 95:8-96:13 (saying he would thus not find anticompetitive delay for payments of ▮▮▮▮▮ or ▮▮▮▮▮); *id.* at 357:13-358:1 (same for payment of ▮▮▮▮▮ because "I imposed a constraint that the screen is that first you have to have a payment that exceeds avoided litigation costs to trigger my analysis."); *see also id.* at 323:18-20 ("I do impose a constraint throughout my analysis that the reverse payment exceeds the avoided litigation costs.").

Prof. Elhauge's position is entirely in line with this Court's statement that "a reverse payment is not presumptively unlawful." MTD Op., 2016 U.S. Dist. LEXIS 128349, at *41-42 (citing *Actavis*, 133 S. Ct. at 2231, 2233, 2237). Moreover, whether the payment exceeded litigation costs is a hotly contested legal and factual issue and Prof. Elhauge is entitled to apply generally accepted economic analysis to the disputed facts. *See, e.g., Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) (an expert may apply an accepted methodology to the proponent's version of the disputed facts); *Walker v. Gordon*, 46 F. App'x 691, 695-96 (3d Cir. 2002) ("An expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury."); *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1265 (S.D. Fla. 2012) (declining to exclude expert where "the defendants argue[d] that [the expert] . . . credits the plaintiff's recitation of the events over the defendants'

version" because 'An expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury.'"); quoting *Walker*, 46 F. App'x at 695-66.

Defendants' hypothetical where the settlement allowed Forest to evade ████████ in Medicaid rebates (Def. Br. at 6) attributable to Forest's continued sales of branded Lexapro after generic competition began is pure fantasy. Even the defense experts only claimed Medicaid gains of roughly half of ████████, which would still make Forest's reverse payment ████████, far in excess of avoided litigation costs. Opper Decl. Ex. 1, Elhauge Rebuttal ¶ 25. Moreover, Prof. Elhauge showed that Forest's Medicaid gains from the settlement were actually $0 if defense experts were right that the manufacturing shift actually lowered Mylan's Lexapro costs, thereby increasing both sides' Lexapro profits (███████████████████████████████████ ██████████████████████████████████), Opper Decl. Ex. 2, Elhauge Dep. 267:12-268:25, 344:3-25, 350:19-351:9, and otherwise only ███████. Opper Decl. Ex. 1, Elhauge Rebuttal ¶¶ 23-24; Opper Decl. Ex. 2, Elhauge Dep. 352:10-353:15. And, while Defendants assert that Prof. Elhauge agreed with their hypothetical (that a negative $10 million payment results in a similar delay), in the cited testimony he agrees only that a chart *created by defense counsel* makes that claim. Hamburger Decl. Ex. 15, Elhauge Dep. 320:22-23.

### ii. Only After Determining That the Payment Exceeded Avoided Litigation Costs, Did Prof. Elhauge Assess a Possible Alternate Date

As Forest's expert concedes, Prof. Elhauge's causation analysis was conditional on his first finding that the delay was anticompetitive. *See* Hamburger Decl. Ex. 5, Fowdur Report ¶ 34 ("*Conditional* on his finding that the settlement payment exceeded avoided litigation costs, Professor Elhauge attempts to estimate delay *caused* by the reverse payment . . .") (emphasis added.); Opper Decl. Ex. 2, Elhauge Dep. 96:5-13 ("Part 2 establishes that payments that exceed

avoided litigation costs are anticompetitive . . . And then the rest of it figures out how do you quantify the delay caused by the payment. But if it didn't exceed the litigation costs, then Part 2 would not conclude it's necessarily anticompetitive at all."). The analysis in step two is to estimate what economics would predict would have occurred "but for" the illegal reverse payment. Thus, Prof. Elhauge was properly given the assignment of calculating the entry delay by comparing the actual settlement entry date to what economics predicts would have been the entry date in such a but-for no-payment settlement, Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 1, and he showed that the answer was an entry delay of ███████. *Id.* ¶¶ 2, 53-65. Going yet further, he also showed what economics would predict for the entry delay if one subtracted from the ████████ reverse payment any amount from $0 to $10 million (whether for avoided litigation costs or any other reason) and showed that the predicted entry delay would have been substantial regardless.[4]

As Judge Orrick ruled in *Lidoderm*, once proof of a payment in excess of litigation costs is established, it is appropriate to determine causation by comparing the payment-influenced entry date to a predicted no-payment entry date. *See Lidoderm*, 2017 U.S. Dist LEXIS 182940, at *66-70, *122-26; *see also* Areeda & Hovenkamp, IIA *Antitrust Law* ¶ 394 (3d ed. 2007) (to determine injury, "the plaintiff's actual profits are compared to what they would have been *but for* the antitrust violation") (emphasis added). Defendants cite no law holding the contrary.

---

[4] Avoided litigation costs could not plausibly exceed ████████████████████████ for litigation costs for a complete patent litigation from beginning to end even in an expensive jurisdiction such as New York. *See* Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 82. Prof. Elhauge explained that the economically predicted entry delay from using a but-for settlement with a payment equal to litigation costs estimated ████████████████████████████████████████, which he showed would still produce an economically predicted entry delay ranging from ███ to ██ ████ Opper Decl. Ex. 2, Elhauge Dep. 75:4-77:11, 97:4-98:22; Hamburger Decl. Ex. 1, Elhauge Rpt., Figure 16.

**B. Prof. Elhauge Uses a Valid Methodology to Estimate the Economically-Predicted But-For Entry Date**

The *Lidoderm* court not only approved Prof. Elhauge's method of establishing causation based on the difference between the actual settlement entry date and the economically predicted entry date in a no-payment settlement, but it also approved Prof. Elhauge's method of using calculations of the parties' actual bargaining strength to predict the entry date in a no-payment settlement. *Lidoderm*, 2017 U.S. Dist LEXIS 182940, at *66-70, *122-26. Defendants acknowledge as much, but try to distinguish *Lidoderm* on three grounds, all of which fail. Def. Br. at 10.

**i.   The But-for-World Must Employ Objective Criteria, Not Defendants' Post-Hoc, Self-Serving Statements About What Was Possible**

Antitrust damages are determined "by comparison of [] prices [] as affected by the [antitrust violation], with what they would have been in its absence under freely competitive conditions." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946). In other words, the but-for world is "free of the restraints and conduct alleged to be anticompetitive." *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005). *See also Apotex, Inc. v. Cephalon, Inc.*, No. 2:06-cv-2768, 2017 U.S. Dist. LEXIS 76327, at *38 (E.D. Pa. May 18, 2017) ("When recreating a but-for world to establish antitrust damages, a plaintiff must create a world 'characterized by the absence of the . . . challenged practices'.") (citation omitted); *King Drug Co. of Florence, Inc.*, 791 F.3d at 403 (3d Cir. 2015) quoting *Actavis*, 133 S. Ct. at 2236-37 ("parties may still find other ways to settle, such as 'by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior that point."); *Lidoderm*, 2017 U.S. Dist LEXIS 182940, at *66-70, *122-26; *Procaps S.A. v. Pantheon Inc.*, 141 F. Supp. 3d 1246 (S.D. Fla. 2015) ("the but-for world (i.e., absent the allegedly anticompetitive agreement"); ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic*

12

*Issues,* 54-55 (2d ed. 2010) ("To isolate the effect of the violation . . it is important to modify the defendants' conduct in the but-for world only to the extent necessary to comply with the law."); Areeda & Hovenkamp, IIA *Antitrust Law* ¶ 394 (3d ed. 2007) (to determine injury, "the plaintiff's actual profits are compared to what they would have been *but for* the antitrust violation").

Yet Defendants contend that Prof. Elhauge should be excluded precisely because he models a mutually-beneficial but for world entry date earlier than the actual entry date, while Forest self-servingly claims that it would have never agreed to such an earlier entry date. Def. Br. at 7-8, 10. Defendants' argument assumes away the ultimate legal question – whether Forest attained Mylan's assent to the actual settlement date only *because of* the additional inducement (payment) Mylan received. *See King Drug Co. of Florence, Inc.*, 791 F.3d at 405 ("when the parties' settlement includes a [payment], the generic also presumably agrees to an early entry date that is later than it would have otherwise accepted."); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751-52 (E.D. Pa. 2014) (a reverse payment "is likely to induce the generic to agree to enter the market at a date later than that to which it would otherwise agree . . . ").

In any event, Defendants offer ***zero*** evidence in support of their claim that they would not have agreed to an earlier entry date ***without*** a reverse payment. Their so-called "undisputed" evidence consists only of post-hoc testimony by Forest and Mylan witnesses that in the actual ***reverse-payment*** settlement, Defendants took the position that a settlement entry date three months before patent expiration was non-negotiable. Def. Br. at 7-8. Defendants cite no evidence at all, let alone undisputed evidence, that in a ***no-payment*** settlement negotiation, Defendants could have successfully insisted on the same entry date. Indeed, such a claim affirmatively conflicts with the evidence that this settlement entry date did ***not*** alone suffice to induce Mylan to settle, and that the

only way Defendants were able to secure such a settlement entry date was to give Mylan a reverse payment.[5]

There is a clear tension in Defendants' position. On the one hand, they argue that the Lexapro Amendment was a stand-alone agreement unrelated to the Namenda patent settlement, and therefore the actual Namenda patent settlement reflected a split of the patent term based solely on the perceived strength of the '703 patent and bargaining power. On the other hand, Defendants' assert that even if Plaintiffs establish that Forest made a large and unjustified payment to Mylan in connection with the Namenda patent settlement, in a non-payment settlement, Forest would not alter its negotiating position one iota regardless of Mylan's bargaining power.

Forest's claim that it would not have entertained a no-payment settlement also conflicts with the evidence that, according to Defendants' own profit projections, in a no-payment settlement it would have been economically irrational for Defendants to insist on this settlement entry date rather than accept the earlier but-for settlement entry date that he predicts. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 64 (showing that both sides would profit from the but-for no-payment settlement as compared to continued litigation).

---

[5] *See* Opper Decl. Ex. 2, Elhauge Rebuttal ¶ 13, citing Opper Decl. Ex. 3, ████████████ 0, FRX-AT-03882414 at 17 ████████████ ████████████ and citing Opper Decl. Ex. 4, Deposition of ████████████ ████████████ ); *See also* Opper Decl. Ex. 5, Deposition of Charles Ryan, November 7, 2017, 362-370 ████████████ ; Opper Decl. Ex. 6, ████████ FRX-AT-04621895 ████████ Opper Decl. Ex. 6, ████████████ , FRX-AT-04621898 ████████

14

In addition, Defendants' argument that Prof. Elhauge's testimony must be excluded because they now claim they would have never settled for other than the actual terms of the settlement impermissibly attempts to use the fruits of Defendants' own wrongful conduct to their advantage:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoers not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see also Bigelow*, 327 U.S. at 265 ("most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created . . . Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.").

With the *Story Parchment* and *Bigelow* principles in mind, the but-for-world – a construct necessitated by the antitrust violators' perversion of free market conditions – is devised using objective evidence, in this instance, what lawful, economically rational settlement agreement profit-maximizing companies would have made. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 60-61 (1st Cir. 2016) ("the test here is an objective test."); *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985) (plaintiffs "must presume the existence of rational economic behavior in the hypothetical free market"); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981) (a "reasonable jury could not . . . indulge in the assumption that a competitor would follow a course of behavior other than that which it believed would maximize its profits."); *Lidoderm*, 2017 U.S. Dist. LEXIS 182940, at *69, *105-106. For

15

example, in *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, Nos. 1:00-1898, MDL 1358 (SAS), M21-88, 2008 U.S. Dist. LEXIS 37331, at *39-41 (S.D.N.Y. May 7, 2008), the court, while stating that "expert testimony is not admissible if it is 'based on assumptions that are . . . unrealistic,'" refused to exclude plaintiffs' expert in that case because he opined that entering into alternative hypothetical contracts "would have been economically rational."); *cf. Laumann v. NHL*, 117 F. Supp. 3d 299, 324 (S.D.N.Y. 2015) (crediting expert analysis that in a but for world prices would "settle to a competitive, profit-maximizing equilibrium.").

**ii.** **The But-For Entry Date Predicted by the Parties' Actual Bargaining Power Is Within the Feasible Range of Possible But-For Entry Dates**

Defendants inaccurately assert that Prof. Elhauge's but-for settlement entry date "conflicts" with his acknowledgement that it would have been "feasible" for Mylan to have also accepted a later entry date. Def. Br. at 8-10. There is no conflict. The feasible range of no-payment settlement entry dates is the entire range of dates that would be more profitable for both parties than litigation. Bargaining power does not determine the range of feasible entry dates, but instead determines where, within that range, parties ultimately settle. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 56. Defendants' argument rests on the false premise that Prof. Elhauge's but-for entry date is based "on nothing more" that the fact that it is one of the many dates in that range that would be "feasible." Def. Br. at 7. Instead, Prof. Elhauge calculated the *actual* bargaining power and showed what but-for entry date that bargaining power would have produced *within* the feasible range.

Prof. Elhauge's method was straightforward. Parties rationally enter into agreements only if each thinks the agreement makes it better off than nonagreement. Each party thus gets an individual gain from agreement (the difference between the expected profits with and without agreement), and the sum of their individual gains are their joint gains from agreement. Although Defendants attempt to muddle it (Def. Br. at 8-10), a well-established economic method is to

16

calculate each party's "bargaining power" as the percentage of joint gains it received from the bargain: that is, its individual gain divided by the joint gains. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 55 (collecting economic literature). Although it is difficult to predict bargaining power from scratch, Prof. Elhauge observed that here one did not need to do so because "the parties reached an actual settlement, from which one can determine the share of joint gains each side was actually able to attain in bargaining, which reveals their actual bargaining powers on this precise topic." *Id.*

Prof. Elhauge calculated each party's payoff from the actual settlement given its own profit projections, the settlement entry date, and the reverse payment amount. *Id.* ¶¶ 54-62. He calculated each party's litigation payoff given those profit projections and estimates of patent strength and other litigation factors. *Id.* From that it was straightforward to calculate each party's actual bargaining power as its individual gain from the actual settlement (its settlement payoff minus its litigation payoff) divided by the joint settlement gains. *Id.*

To predict the entry date on which the parties would have settled "but for" the challenged reverse payment, one must assume a but-for world where everything is the same except for the absence of the reverse payment. AREEDA & HOVENKAMP, IIA ANTITRUST LAW ¶ 394 (3d ed. 2007); ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 54-55 (2d ed. 2010). This means one must assume the parties would have the same bargaining power in the but-for world as they had in the actual world. As Prof. Elhauge explained, this standard economic methodology for but-for analysis "makes economic sense because all the things that affect bargaining power would be the same in the but-for world: the but-for settlement would involve precisely the same parties as the actual settlement, with precisely the same bargaining abilities and weaknesses; precisely the same estimates of the '703 patent strength, litigation length

17

and costs, and the timing of generic entry; and precisely the same estimates about what the other party thought about any of these issues." Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 63.

The but-for settlement entry date without a reverse payment is accordingly the date that would produce the same percentage split of settlement gains (*i.e.*, the same bargaining power) as the actual settlement did. *Id.* ¶¶ 64-65.[6] Although defendants claim that Prof. Elhauge's work has not been tested or peer-reviewed, Def. Br. at 10, as the *Lidoderm* court held: "both the components of his model (estimating parties' bargaining strengths and expectations of patent strength) and the assumptions that go with it (the parties' own pre-settlement forecasts) are consistent with accepted economic theory and well-established principles." *Lidoderm,* 2017 U.S. Dist. LEXIS 182940, at *125. Moreover, *Daubert* factors, including peer-review publications, are "helpful, not definitive." *Figueroa v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 368 (S.D.N.Y. 2003), quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).

Prof. Elhauge's feasibility analysis reflects the fact that he did not simply assume that but-for the illegal reverse payment, the parties would have entered into a no-payment settlement rather than litigating. Instead, he proved that without the reverse payment, it would have been economically rational for the parties to have entered into a no-payment settlement rather than litigating. Opper Decl. Ex. 1, Elhauge Rebuttal ¶ 36 ("I did not merely assume that a no-payment settlement would have occurred in the but-for world; instead I proved that 'a no-payment settlement would necessarily have been feasible regardless of patent strength perceptions.' The reason is that, regardless of how the parties perceived the patent strength, there existed a no-payment settlement entry date which would make both Forest and Mylan better off than if they

---

[6] He also used the same method to predict the but-for settlement entry with a reverse payment no greater than avoided litigation costs. *See supra* Part A.

18

continued the litigation. In such a circumstance, it would be irrational for them to have not reached

a no-payment settlement in the but-for world."). This approach is entirely consistent with *Actavis*,

wherein the Supreme Court explicitly stated that without resorting to reverse-payment settlements,

"parties may still find other ways to settle, such as 'by allowing the generic manufacturer to enter

the patentee's market prior to the patent's expiration, without the patentee paying the challenger

to stay out prior that point." *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791

F.3d 388, 403 (3d Cir. 2015); quoting *Actavis*, 133 S. Ct. at 2236-37. Accordingly it has been

upheld in other antitrust cases. *See Lidoderm*, 2017 U.S. Dist. LEXIS 182940, at *68-70.

The detailed economic expert proof in this case stands in stark contrast with that in *In re

Wellbutrin XL Antitrust Litig.*, a case Forest relies on. Def. Br. at 8. While the district and appellate

courts in *Wellbutrin XL* agreed that an alternate settlement scenario can support causation, they

found the evidence there insufficient to support the theory. Specifically, unlike here, the expert

there "offer[ed] no testimony in support of a contention that an alternate settlement would have

been reached" and "did not '[try] to answer the question of what specifically some alternative form

of settlement would have looked like." *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734,

757-758 (E.D. Pa. 2015).

This case is distinguishable from *Wellbutrin XL* in the same manner as *Lidoderm* was. In

fact, *Lidoderm* stressed that *Wellbutrin* accepted the but-for no-payment settlement method for

proving causation. *Lidoderm*, 2017 U.S. Dist. LEXIS 182940, at *64-65. In *Lidoderm*, Judge

Orrick pointed out that the *Wellbutrin* decisions only rejected the no-payment settlement method

on the facts of that case because it was not supported by any facts or expert testimony, unlike here.

*Id.* at *69 (Prof. Elhauge's "analys[i]s – applying accepted principles of antitrust law and

settlement analysis to evidence in this case – [is] different than what happened in *Wellbutrin*").

Here, Professor Elhauge did not blindly choose a but-for entry date, but instead based his opinion on identifying a but-for settlement outcome that would have been financially beneficial to both parties and reflect the same bargaining power as their actual settlement. *See* Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 54-65. In doing so, Prof. Elhauge applied an "approach[] [that is] fully consistent with the principles applied in but-for damage calculations," namely, that it must be presumed in constructing a but-for world that the parties would engage in "rational economic behavior." *Lidoderm*, 2017 U.S. Dist. LEXIS 182940, at *69, citing *Dolphin Tours, Inc.*, 773 F.2d at 1511 and *Murphy Tugboat Co. v. Crowley*, 658 F.2d at 1262. *See also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 37331, at *39-41; *Laumann v. NHL*, 117 F. Supp. 3d at 324; *Kamerman v. Steinberg*, 744 F. Supp. 59, 63 (S.D.N.Y. 1990) (plaintiffs' reliance on circumstantial evidence failed because it ran counter to a "rational profit-maximizing approach."); *FTC v. Foster*, 2007 U.S. Dist. LEXIS 47606, *103 (D.N.Mex., May 29, 2007) (disapproving of theories that *failed* to presume that firms act in profit maximizing ways); *Monetti, S.p.A. v. Anchor Hocking Corp.*, 1992 U.S. Dist. LEXIS 8163, *8 (N.D. Ill., June 10, 1992) ("[i]t is not overly speculative to assume that a company will take measures to maximize its profits."); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 1987 U.S. Dist. LEXIS 2763, *12 (D. Mass, March 31, 1987) (granting summary judgment because plaintiff's "[e]xpert affidavits, however, cannot overcome the posited assumptions of economic rationality."); *American Bearing Co. v. Litton Industries, Inc.*, 540 F. Supp. 1163, 1173-1174 (E.D. Pa., 1982) (crediting *Murphy Tugboat* and the assumption that competitors would act in profit maximizing ways); *Southern Pac. Communications Co. v. American Tel. & Tel. Co.*, 556 F. Supp. 825, 1080-1081 (D.D.C. 1982) (competitors must be presumed to act in a competitively rational manner.).

Any disagreement over the correctness of Prof. Elhauge's assumptions goes to the weight, not the admissibility of his opinion. It matters not that the "comparisons are not those that the [opponent] would choose to make," as long as "the methodology is sound, and the evidence relied upon [is] sufficiently related to the case at hand." *United States SEC v. Mudd*, 2016 U.S. Dist. LEXIS 59273, at *14 (S.D.N.Y. May 3, 2016), quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). "[D]isputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *Id.*

### iii. *Professor Elhauge's Model Does Not Lead to Irrational Outcomes and His Opinions Do Not Conflict with Those of Plaintiffs' Other Experts*

Defendants erroneously assert that Prof. Elhauge's method conflicts with economic rationality because it predicts that if Mylan had 100% bargaining power, the entry delay would be less (and the entry date later, since delay is the difference between the actual date and the but-for date). Def. Br. at 9-10. To the contrary, this relationship is precisely what economics predicts because the greater the bargaining power of the entrant (here, Mylan), the lower the bargaining power of the patent holder, and thus the less delay of entry the patent holder can purchase with the same reverse payment. The problem with Defendants' logic is that it wrongly assumes that bargaining power has nothing to do with the actual settlement or the patent strength. Given the actual settlement, Prof. Elhauge's analysis does not indicate Mylan had 100% bargaining power, but only ███ of it. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 64.  Mylan's low actual bargaining power reflects, among other things, the lateness of the actual settlement entry date relative to the estimated patent strength and that Forest had significantly more profits to gain from avoiding patent litigation than Mylan did, given that Forest was gaining monopoly profits and Mylan could only gain the small profits from being one of many competing generics.  Prof. Elhauge addressed the unrealistic hypothetical where Mylan had 100% bargaining power in order to address the

question of what the **lower bound** on entry delay would be if one assumed whatever patent strength (however unrealistic) would minimize that entry delay. *Id.* n.92; Opper Decl. Ex. 2, Elhauge Dep. 50-51. If Mylan actually had 100% of the bargaining power, this would mean that Forest's expected litigation payoff was as high as its actual settlement payoff, which necessarily implies that it believed its patent was extremely (indeed unrealistically) strong.[7] Such an extremely strong patent strength estimate would necessarily set a high floor on the minimum entry date that Forest would accept in a no-payment settlement, which would make the but-for settlement entry date later, even though Forest would not (in this hypothetical) have any bargaining power to get an entry date above this floor. *See* Opper Decl. Ex. 2, Elhauge Dep. 41:15-42:17 (explaining that a party's bargaining position reflects a combination of its reservation value (which would reflect its patent strength estimate) and its bargaining power to get a share of gains above that reservation value); *see also* Hamburger Decl. Ex. 1, Elhauge Rpt. ¶ 56.

Defendants also inaccurately claim that Prof. Elhauge's use of  assumed by Mr. Johnston and Dr. Lamb. Def. Br. at 9-10. Again, there is no conflict. Prof. Elhauge accurately cites Mr. Johnston as concluding that reasonable parties would have expected an appellate decision from the Federal Circuit sometime between ███████ and ██████████. Hamburger Dec. Ex. 1, Elhauge Rpt. ¶ 19. Given that the settlements allowed

---

[7] It would have to be the 94.9% patent strength that defendants stress is the maximum that Prof. Elhauge showed could possibly be consistent with the actual settlement. Def. Daubert at 10. But the fact that such a patent strength could possibly be consistent with the actual settlement does not mean it is a realistic possibility. Nor, contrary to defendants' assertion, does it mean that a no-payment settlement with an entry date at 93% of the remaining patent terms would have occurred. *Id.* Rather, such a patent strength estimate could be consistent with the actual settlement *only* if Mylan's bargaining strength were 100%, in which case a no-payment settlement would have had an entry date of ██████████, which is █████ of the remaining patent term.

entry by all generics after an appellate victory by any generic, *excluding* any petition for *certiorari*, *id.* at n.8, and given that Forest's pre-settlement forecast projected generic entry in ██████████, while Mylan's projected it in ██████████, *id.* ¶¶ 13-14, Prof. Elhauge reasonably adopted the conservative assumption that at the time of settlement the parties would estimate that with continued litigation generic entry would occur in ██████████ after an appellate decision. The ██████████ date used by Dr. Lamb instead reflects the latest date in the ██████ to ██████ range that Mr. Johnston estimated a petition for *certiorari* to the Supreme Court would be resolved. The fact that when modelling damages Dr. Lamb used the most conservative possible post-certiorari date for when ***actual*** entry would occur does nothing to change the parties' ***pre-settlement*** expectations that generic entry would occur following an appellate decision, and such expectations are what is relevant for predicting the but-for settlement. Nevertheless, even if a factfinder were to conclude that the parties did not expect entry until ██████████, that is no reason to exclude Prof. Elhauge's testimony, as he demonstrates the predicted no-payment entry date that would correspond to a wide range of expected entry timing following litigation, including ██████████. Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 78-80.

### C. Prof. Elhauge Deals with the Economically-Predicted But-For Entry Date, Not the Ultimate Jury Issue of When But-For Entry Would Have Occurred

Defendants assert that "Prof. Elhauge intends to use the model to usurp the role of the jury and opine that Forest and Mylan *actually would have settled* the patent litigation for 'no payment' and generic entry as of November 2, 2012." Def. Br. at 1, 11 (emphasis in original). Defendants again saddle Prof. Elhauge with false attributions that they failed to elicit from him. Defendants specifically asked Prof. Elhauge whether he was going to opine on the ultimate issue of the but-for settlement that parties *would* have reached, and he responded that he would not. He explained

that he would opine only on what economics and rationality would predict (as the law envisions,
*see* 15-16, 20, *supra*), precisely because he did not want to usurp the role of the jury:

> **Q**. Is it your opinion that a no-payment settlement would have occurred here
> in the but-for world?
>
> **A**. It's my opinion that it would have been economically rational for both
> parties to have entered into one rather than continue the litigation.
>
> **Q**. Okay. So your opinion is that it would have been economically rational,
> not that it in fact would have happened. Correct?
>
> **A**. Yeah, I can only talk about the economics. So as a matter of economics,
> one would predict that they would, but I guess it's up to the jury to make the
> ultimate decision about whether they would or not.

Opper Decl. Ex. 2, Elhauge Dep. 225:18-227:18 (repeating the same distinction a number of
times). This should put the issue to rest, but to clarify, given that all of Prof. Elhauge's opinions
are based on predictions from economics analysis given the assumption of economic rationality,
all references in his reports to what the but-for outcome "would have" been without the reverse
payment are about what economics predicts would have occurred. That is implicit throughout his
analysis. Further, Prof. Elhauge also explains in detail precisely how the economically predicted
entry dates would change to the extent the jury reaches different conclusions about the underlying
factors, including different conclusions about patent strength, risk aversion, litigation costs, reverse
payment amount, timing of generic entry with litigation, and odds of pediatric exclusivity.
Hamburger Decl. Ex. 1, Elhauge Rpt. ¶¶ 67-88. His approach is the opposite of usurping any jury
role. Thus, Prof. Elhauge's testimony is clearly consistent with the limitations set forth in
*Lidoderm*. He intends to testify only that "the parties would have been rationally motivated to
agree to settlement allowing . . . early entry by specific dates," *not* "that the parties *would have*
agreed to entry on a date certain." *Lidoderm,* 2017 U.S. Dist. LEXIS 182940, at *126 (emphasis
in original). Prof. Elhauge's testimony thus fits within the principle that "an expert may opine on

the ultimate issue of fact," as long as the expert does "not give testimony stating ultimate legal conclusions based on those facts." *Media Sport & Arts S.r.L. v. Kinney Shoe Corp.*, 95 Civ. 3901 (PKL), 1999 U.S. Dist. LEXIS 16035, at *4 (S.D.N.Y. Oct. 18, 1999). *See also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) ("factual conclusions on an ultimate issue to be decided by the jury are permissible."). Moreover, a *Daubert* motion provides no basis to exclude an expert based on testimony that he expressly stated he does *not* intend to offer.

### III.   CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendants' motion to exclude Prof. Elhauge.

Dated: December 11, 2017

_____
Dan Litvin

**Rochester Drug Co-Operative, Inc. and the Proposed Class**

**JM Smith Corporation d/b/a Smith Drug Company and the Proposed Class**

David F. Sorensen
Daniel C. Simons
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (fax)
dsorensen@bm.net
dsimons@bm.net

Bruce E. Gerstein
Joseph Opper
Dan Litvin
Garwin Gerstein & Fisher LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
bgerstein@garwingerstein.com
jopper@garwingerstein.com
dlitvin@garwingerstein.com

Peter Kohn
Joseph T. Lukens
Faruqi & Faruqi, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com
jlukens@faruqilaw.com

David C. Raphael, Jr.
Erin R. Leger
Smith Segura & Raphael, LLP
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
draphael@ssrllp.com

Stuart E. Des Roches
Andrew W. Kelly
Odom & Des Roches, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
stuart@odrlaw.com

Russ Chorush
Miranda Jones
Heim Payne & Chorush, LLP
1111 Bagby St. Ste. 2100
Houston, TX 77002
Tel:  (713) 221-2000
Fax:  (713) 221-2021
rchorush@hpcllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2017, I served the foregoing on counsel of record via email.

Respectfully submitted,

Dan Litvin