**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**All Direct Purchaser Actions** | **Case No. 1:15-cv-07488-CM-RWL** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 8: PRECLUDE FOREST FROM ASSERTING IMPROPER ARGUMENTS CONCERNING THE SIZE OF ITS REVERSE PAYMENT AND PURPORTED SAVED LITIGATION COSTS**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. ARGUMENT ............................................................................................................... 1

A. Comparisons to Forest’s Brand Profits Are Improper ........................................... 1

B. Forest’s Reliance on Saved Litigation Costs Above $3.5 Million Is Improper ...... 7

III. CONCLUSION ........................................................................................................ 11

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013)............................................................................................ 1, 2, 3, 4

*FTC v. Watson Pharm., Inc.*,
677 F.3d 1298 (11th Cir. 2012) ............................................................................................ 4

*In re K-Dur Antitrust Litig.*,
No. 01-cv-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) ...................................................... 6

*In re Lidoderm Antitrust Litig.*, 3:14-md-02521,
2018 WL 7814761 (N.D. Cal. Feb. 7, 2018) ............................................................................ 6

*In re Loestrin 24 Fe Antitrust Litig.*,
814 F.3d 538 (1st Cir. 2016) ................................................................................................... 6

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018).............................................................................. 1, 2

*In re Niaspan Antitrust Litig.*,
MDL No. 2460, 2014 WL 4403848 (E.D. Pa. Sept. 5, 2014) .................................................. 3

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................................................. 6, 7

*King Drug Co. of Florence v. Cephalon, Inc.*,
88 F. Supp. 3d 402 (E.D. Pa. 2015) ........................................................................................ 6

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015)..................................................................................................... 5

*Reilly v. NatWest Mkts. Group*,
181 F.3d 253 (2d Cir. 1999)................................................................................................... 11

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis*, PLC,
No. 15-CV-6549 (CM), 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016).................................... 2

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*,
74 F. Supp. 3d 1052 (N.D. Cal. 2014) ...................................................................................... 6

*Valley Drug Co. v. Geneva Pharm., Inc.*,
344 F. 3d 1294 (11th Cir. 2003) .............................................................................................. 4

**Rules**

Fed. R. Civ. P. 30(b)(6) .......... 9, 10, 11

**Other Authority**

Aaron S. Edlin, C. Scott Hemphill, Herbert J. Hovenkamp, Carl Shapiro, *Activating Actavis*, 26 ANTITRUST 16 (Fall 2013) .......... 3

Fed. Trade Comm'n, *Pay-For-Delay: How Drug Company Pay-Offs Cost Consumers Billions* (Jan. 2010) .......... 5

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2046d6 (4th ed. 2013) .......... 7

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2046d6 (4th ed. Supp. 2015) .......... 7

## I. INTRODUCTION

Plaintiffs respectfully move for an order precluding Forest from asserting legally inadmissible arguments to suggest that its payment to Mylan was not "large" within the meaning of *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013). First, Forest appears set to argue that the size of its payment can be judged by comparing it to the billions of dollars in sales that Forest enjoyed on branded Namenda, but, as this Court noted in its opinion denying summary judgment, *Actavis* focuses on a comparison between the size of the payment on the one hand, and the brand's saved litigation costs and/or Mylan's potential profits on generic Namenda on the other hand. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174, 196, 199 (S.D.N.Y. 2018).

Also, Forest is belatedly arguing that its saved litigation costs were greater than $3.5 million. Forest stymied Plaintiffs' discovery attempts, however, concerning its saved litigation costs and then presented belated hearsay claiming it saved up to $10 million in litigation costs. Such gamesmanship should not be permitted and such untimely hearsay should be excluded.

## II. ARGUMENT

### A. Comparisons to Forest's Brand Profits Are Improper

Forest may argue that the $32.5 million reverse payment was not a "large" payment because it was just a fraction of Defendants' profits from branded Namenda. *See, e.g.*, Forest's Proposed Charge at 53 (ECF No. 704-2). Such a purported justification is contrary to the law and should be excluded.

This Court, in the opinion denying summary judgment, has already defined "large" by comparing Forest's $32.5 million payment to the litigation costs Forest avoided by settling, and/or the generic profits Mylan would have earned by launching – not the billions Forest stood to earn in brand profits by prolonging its Namenda monopoly. *Namenda*, 331 F. Supp. 3d at 174 (Prof. Elhauge's method of evaluating largeness via comparison to avoided litigation costs "is

fully consistent with *Actavis*."); *id*. at 196 ("Plaintiffs have offered sufficient evidence such that a reasonable juror could find that Forest's payments to generics did not merely compensate them for avoided litigation costs or fair value for services — and thus were large and unjustified reverse payment[s] in violation of the antitrust laws."); *id*. at 199 (payment was large because it was "ten times Forest's saved litigation costs of $3.5 million"). *See also Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis*, PLC, No. 15-CV-6549 (CM), 2016 WL 4992690, at *14 (S.D.N.Y. Sept. 13, 2016) (*Actavis* "instruct[s] courts . . . to compare a payment to the payor's future litigation costs as a measure of scale to determine if it was 'large'[.]").

In so doing, the Court adhered to *Actavis*'s instruction that the appropriate benchmark for evaluating whether the reverse payment is "large" is "its scale in relation to the payor's anticipated future litigation costs." *Actavis*, 570 U.S. at 159. As the Supreme Court explained, there may be no competitive injury where the payment is "no more than a rough approximation of the litigation expenses saved through the settlement." *Id*. at 156. *Actavis* also focuses on whether the payment induced the generic to delay generic entry, explaining that a reverse payment may "provide strong evidence that the patent holder seeks to *induce* the generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market." *Id.* at 154 (emphasis added); *see also id.* at 157 ("Neither is a firm without [market power] likely to pay 'large sums' to *induce* 'others to stay out of its market.'") (emphasis added).

In short, a rational brand will not pay its generic competitor more than it would pay its own patent lawyers to litigate its patent *unless* the brand were buying more protection from competition than it would expect to obtain by paying its patent lawyers. This is because:

> [W]hen bargaining for an early entry date alone, the parties are likely to agree on a date that reasonably approximates each party's relative strength in the

> infringement litigation. In contrast, a reverse payment of cash by the brand name manufacturer to the potential generic manufacturer is likely to induce the generic to agree to enter the market at a date later than that to which it would otherwise agree based solely on the estimated strength of its litigation position.

*In re Niaspan Antitrust Litig*., MDL No. 2460, 2014 WL 4403848, at *11 (E.D. Pa. Sept. 5, 2014). *See also* Aaron S. Edlin, C. Scott Hemphill, Herbert J. Hovenkamp, Carl Shapiro, *Activating Actavis*, 26 ANTITRUST 16, 21 (Fall 2013) (proposing jury instructions emphasizing the significance of avoided litigation costs: "In assessing whether this payment is unreasonably large, you may consider whether the payment is no greater than the patent holder's anticipated litigation costs that are avoided through settlement.").

*Actavis* unambiguously rejected the idea that a payment should not be actionable if it was small in relation to branded drug revenues:

> Solvay's patent, if valid and infringed, might have permitted it to charge drug prices sufficient to recoup the reverse settlement payments it agreed to make to its potential generic competitors. And we are willing to take this fact as evidence that the agreement's "anticompetitive effects fall within the scope of the exclusionary potential of the patent." But we do not agree that that fact, or characterization, can immunize the agreement from antitrust attack.

570 U.S. at 147 (internal citation omitted). Notably, the payments made by the brand to the generics in *Actavis* were a few percentage points of the total brand revenues over the period of delay. *Id*. at 145. Yet, the Supreme Court concluded the "earning potential" of the drug at issue was *not* a relevant comparator:

> In short, rather than measure the length or amount of a restriction solely against the length of the patent's term *or its earning potential* . . . this Court answered the antitrust question by considering traditional antitrust factors such as likely anticompetitive effects, redeeming virtues, market power, and potentially offsetting legal considerations present in the circumstances, such as here those related to patents.

*Id.* at 148-49 (emphasis added).

The Eleventh Circuit justified its "scope-of-the patent" test for reverse payments by reasoning, like Forest, that a desire to protect large brand profits could justify "substantial" reverse payments: "When hundreds of millions of dollars of lost profits are at stake, 'even a patentee confident in the validity of its patent might pay a potential infringer a substantial sum in settlement.'" *FTC v. Watson Pharm., Inc.*, 677 F.3d 1298, 1313 (11th Cir. 2012) (quoting *Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F. 3d 1294, 1310 (11th Cir. 2003)), *rev'd*, *Actavis*, 570 U.S. 136 (2013). In overruling the Eleventh Circuit, the Supreme Court expressly rejected this exact reasoning:

> The owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely seeks to prevent the risk of competition. And, as we have said, that consequence constitutes the relevant anticompetitive harm.

*Actavis*, 570 U.S. at 157. *See also id.* at 148-49 (declining to "measure the length or amount of a restriction solely against the length of the patent's term or its earning potential").

This makes sense. Because a brand's profits far exceed a generic's, a brand need not pay a "large" portion of its patent-protected profits to induce anticompetitive delay. On average, generic prices quickly fall to a fraction of the brand price. The FTC, for example, found that generic prices on average were 85% below brand prices within a year of generic entry. *See* Declaration of Dan Litvin ("Litvin Decl."), Ex. 29, PX-1065, Fed. Trade Comm'n, *Pay-For-Delay: How Drug Company Pay-Offs Cost Consumers Billions*, at 8 (Jan. 2010). Thus, a payment to a generic company need not be anywhere close to the amount of the brand's monopoly profits for it to induce the generic to abandon the patent fight and thereby inflict massive anticompetitive harm.

In *Actavis* itself, the Supreme Court assumed that Solvay (the brand) had agreed to pay Paddock $12 million, Par $60 million, and Actavis between $19 million and $30 million per year over nine years (between $171 million and $270 million total). *See* 570 U.S. at 145. Androgel's total sales over seven of those nine years were in excess of $6 billion. *See* Litvin Decl. Ex. 30 (excerpts from http://www.drugs.com listing best-selling drugs for 2006-2013). But the fact that the payments from Solvay to the generic defendants as then alleged by the FTC were at most 5% of Androgel's sales at risk over that period did not compel judgment for defendants.

Therefore, courts interpreting *Actavis* have *not* used the value of the brand (*viz.*, expected brand profits) as the benchmark to assess whether a reverse payment is large. The Third Circuit, for instance, focused on the brand's saved litigation costs. *See King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp*., 791 F.3d 388, 411 (3d Cir. 2015) ("Here, the District Court thought the no-AG agreement was 'justified' because, *although the settlement amount was likely greater than litigation costs*, 'the consideration which the parties exchanged in the settlement [wa]s reasonably related to the removal of the uncertainty created by the dispute.' *That conclusion is in tension with Actavis* in that, without proper justification, the brand cannot pay the generic simply to eliminate the risk of competition.") (citation omitted) (emphasis added); *id.* ("[P]laintiffs plausibly allege this no-AG promise was of considerable value and thus designed to protect GSK's patents against the risk of invalidation or noninfringement, rather *than reimburse litigation costs or compensate for services*.") (emphasis added).

Other courts have expressly rejected reading *Actavis* to mean that payment size is judged in comparison to value of the patent monopoly. In *Provigil*, the defendants had proposed that

"large" meant the reverse payment was to be judged by "the brand manufacturer's expected monopoly profits in the absence of generic competition." *King Drug Co. of Florence v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 417 (E.D. Pa. 2015) (Goldberg, J.) ("*Provigil*"). The court rejected that view, holding instead that "a reverse payment is sufficiently large if it exceeds saved litigation costs and a reasonable jury could find that the payment was significant enough to induce a generic challenger to abandon its patent claim." *Id*.

Similarly, the Court in *Lidoderm* barred argument whether the reverse payment was large as compared to the brand's profits: "*Actavis* instructs that 'large' is hinged to anticipated saved litigation costs and its independence from payments for other services. The Court's analysis in *Actavis*, in rejecting the scope of the patent [test], teaches away from considering at the very least the defendant's profits from the drug at issue." *In re Lidoderm Antitrust Litig.*, 3:14-md-02521, 2018 WL 7814761, at *7 (N.D. Cal. Feb. 7, 2018).

Rather, courts have consistently agreed that a reverse payment is "large" if it exceeds the brand's ongoing saved litigation costs. *See also In re Loestrin 24 Fe Antitrust Litig*., 814 F.3d 538, 551 (1st Cir. 2016) (*Actavis* "emphasizes . . . the size of the reverse payment, particularly as it relates to potential litigation expenses"); *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2016 WL 755623, at *12 (D.N.J. Feb. 25, 2016) (describing plaintiffs' initial burden to show whether "consideration exchanged in the settlement exceeded the estimated cost of litigation"); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 718 (N.D. Ill. 2016) ("A 'large' payment is anything more than the value of the avoided litigation costs plus any other services provided from the generic."); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1072 (N.D. Cal. 2014) (holding that allegation that large payments had "no rational connection to, and far

exceed, any approximation of the costs of continuing the patent litigation" was sufficient); Litvin Decl., Ex. 31, Nexium Trial Tr. (excerpt) Jury Charge, 12/3/2014 at 35:18-36:2 ("But was the value transferred to Ranbaxy, was that large? Well, it's got to be at least more than the . . . money that they saved by not paying . . . the lawyers who were in on the patent case, and that costs money, substantial money. So the value has to be at least more than that. Whether a payment is 'large' depends upon the specific circumstances of a particular case. As I said, it's got to be at least more than AstraZeneca's reasonably estimated save[d]-litigation costs."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis Of Antitrust Principles And Their Application* ¶ 2046d6 (4th ed. 2013 & Supp. 2015) (*Actavis* "does not require evidence of a payment of a particular size, but only a payment in excess of reasonably anticipated litigation costs."); PHILLIP E. AREEDA & HERBERT HOVENKAMP, *Antitrust Law: An Analysis Of Antitrust Principles And Their Application* ¶ 2046d6 (4th ed. Supp. 2015) ("[A] plaintiff … must provide a sufficient basis for believing that the value of the agreement exceeds anticipated litigation costs.").

Plaintiffs respectfully request that the Court rule on this issue before openings so that Plaintiffs do not need to object during an opening and risk having such improper and prejudicial arguments be made to the jury.

**B. Forest's Reliance on Saved Litigation Costs Above $3.5 Million Is Improper**

Forest also should be barred from presenting at trial any evidence that Forest believes its patent litigation settlement generated more than $3.5 million in saved litigation costs, because Forest stymied Plaintiffs' discovery attempts and then presented belated hearsay of $10 million in alleged saved litigation costs.

Throughout this antitrust litigation, Plaintiffs sought evidence related to the amount of litigation costs Forest saved by settling its patent infringement litigation with Mylan. For

example, Plaintiffs' interrogatory no. 14 sought Forest's estimate of "the litigation costs that [it] saved by virtue of your Settlement Agreement with Mylan." *See* Litvin Decl. Ex. 32, Forest's Responses and Objections to the Second Set of Interrogatories, June 12, 2017, at 28-29. Forest declined to answer that interrogatory, citing its election not to waive privilege pursuant to its June 2, 2017 election. *See id*. Forest subsequently amended its interrogatory response to state that "the costs it incurred through the Settlement Agreements were less than costs, fees, and expenses that Forest likely would have incurred in connection with multiple, complex and lengthy litigations." *See* Litvin Decl. Ex. 33 (Forest's Supplemental Responses and Objections to the Second Set of Interrogatories, July 12, 2017, at 24). Forest still declined, however, to provide a specific amount of its purportedly saved litigation costs, or any explanation or rationale for the alleged savings.

Although Forest refused to disclose an estimate of its saved litigation costs in response to Plaintiffs' interrogatory, Forest did produce a March 23, 2009 letter from its counsel, Kirkland & Ellis, estimating Forest's total litigation costs going forward in the Namenda actions (then pending against Barr, Amneal, Upsher-Smith, Apotex, Wockhardt, Genpharm, Sun, Cobalt, Teva, Dr. Reddy, Lupin, Mylan). Litvin Decl. Ex. 34 (PX-0153, Letter from Kirkland & Ellis to Charles S. Ryan and Patrick Jochum, dated Mar. 23, 2009). Mylan (the last generic to settle) and Forest reached an agreement in principle to settle the patent litigation on March 15, 2010, two weeks before commencement of a one-week trial. *See* Johnston Report at 19 (ECF No. 680-66 at 81). According to the Kirkland & Ellis estimate, the cost for trial and post-trial work would have been $3.5 million (for 12 different generic defendants). *See id.* This $3.5 million figure included the law firm's estimate of costs for trial, post-trial briefing, and appeal. *Id*. And the estimate was

provided to Forest at a time when twelve different generics were anticipated to participate in the trial.

Late in the fact discovery period in this case, Forest designated Mr. Solomon to testify as its corporate representative regarding Plaintiffs' Rule 30(b)(6) notice topic seeking Forest's "estimate, budget, or forecast, at or before the time of settlement, of the amount of litigation expenses that [Forest] saved by settling the Namenda Patent Litigation." *See id*. Mr. Solomon was unable to explain why its counsel's estimate was unreliable or inaccurate but instead offered that his "understanding is our internal projections were we had, you know, probably another 10 million dollars of legal expenses and associated costs left." *See* Litvin Decl. Ex. 6, David Solomon Dep., Sept. 7, 2017, at 237:14-24. But when asked to explain the basis for the $10 million figure, he refused:

> Q. Tell me everything that you can remember about the 10 million dollar estimate of litigation savings at Forest.
>
> A. That's a very open-ended question so I'm not going to answer it.

*Id*. at 240:3-7. And when asked, "What's the factual basis behind that 10 million dollar estimate?", he responded, "That's an estimate that again, this is eight years ago so you're going to have to live with the best memory I've got." Ex. 6, David Solomon Dep., Sept. 7, 2017, at 239:12-15. Mr. Solomon also failed to provide answers in follow-up questioning. *See id*. at 241:8-242:14.

Recognizing that Mr. Solomon's testimony did not satisfy Forest's Rule 30(b)(6) obligations, Forest then offered a new witness, Ms. Julie Snyder, on Forest's saved litigation costs. Ms. Snyder is a marketing employee for Forest. Litvin Decl. Ex. 35, Julie Snyder Dep., Oct. 31, 2017, at 17:10-18. She testified that she was not involved in the underlying litigation, has no personal experience with litigation costs, and never spoke with anyone about the case

until preparing for her deposition. *Id*. at 17:19-18:1. The only basis for her testimony that Forest would have saved approximately $10 million was a one hour conversation with another Forest employee, Ryan Coletti, the day before her deposition. *Id*. at 10:25-11:25. She was unable to explain or justify how Forest arrived at the $10 million figure and testified she was unaware of any projections of savings other than what Mr. Coletti told her. *Id*. at 21:2-22.

Forest should be precluded from offering any testimony that Forest's saved litigation costs were $10 million. Mr. Solomon refused to explain the basis for the figure, and Ms. Snyder, who had no personal knowledge about the issue, merely relayed what she had been told by another person and could not answer even the most basic questions about how Forest calculated its saved costs. Further, allowing Forest to attempt to explain for the first time at trial how it estimated litigation savings of $10 million would be unfairly prejudicial to Plaintiffs under Rule 403 because Forest failed to present a knowledgeable witness on the topic during discovery, and any such testimony would constitute trial by ambush. When asked how Mr. Coletti calculated $10 million, Ms. Snyder responded, "I'd be speculating what he did. I mean, he – based on his experience, that was the estimate he provided." *Id*. at 21:6-8. When pressed, she could not provide any detail about the specifics of the estimate. For example, she did not know how many attorneys or experts Forest intended to send to trial, nor did she have any knowledge of basic logistical costs such as graphics personnel or room and board. *Id*. at 33:5-34:10. Nor have other witnesses provided more information.

Forest's original 30(b)(6) designee told Plaintiffs, after refusing to provide any explanation, that "you're going to have to live with the best memory I've got." Litvin Decl. Ex. 6, David Solomon Dep., Sept. 7, 2017, at 239:12-15. It would be unfairly prejudicial to Plaintiffs if Forest were to offer new testimony at trial to try to support the $10 million figure after offering

two thoroughly unprepared witnesses on the topic of saved litigation costs. *See Reilly v. NatWest Mkts. Group*, 181 F.3d 253, 268-69 (2d Cir. 1999) (affirming decision to preclude additional trial testimony from new witnesses when the corporation offered an unprepared Rule 30(b)(6) witness for deposition). *See also* Plaintiffs' Motion *in Limine* No. 3, filed contemporaneously herewith (discussing prohibition on belated modification of Rule 30(b)(6) testimony).

## III. CONCLUSION

For these reasons, Plaintiffs' motion should be granted.

Dated: May 24, 2019

Respectfully Submitted:

/s/ *Dan Litvin*
Bruce E. Gerstein
Joseph Opper
Kimberly M. Hennings
Dan Litvin
Garwin Gerstein & Fisher LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
bgerstein@garwingerstein.com
jopper@garwingerstein.com
khennings@garwingerstein.com
dlitvin@garwingerstein.com

David F. Sorensen
Ellen T. Noteware
Daniel C. Simons
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
dsorensen@bm.net
enoteware@bm.net
dsimons@bm.net

David C. Raphael, Jr.
Erin R. Leger
Smith Segura & Raphael, LLP
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
draphael@ssrllp.com
eleger@ssrllp.com

Peter Kohn
Joseph T. Lukens
Faruqi & Faruqi, LLP
1617 John F Kennedy Blvd., Suite 1550
Philadelphia, PA 19103
Tel: (215) 277-5770
Fax: (215) 277-5771
pkohn@faruqilaw.com
jlukens@faruqilaw.com

Stuart E. Des Roches
Andrew W. Kelly
Odom & Des Roches, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
stuart@odrlaw.com
akelly@odrlaw.com

Russ Chorush
Heim Payne & Chorush, LLP
1111 Bagby, Suite 2100
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
rchorush@hpcllp.com

***Counsel for the Direct Purchaser Class Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2019, I electronically filed the above by CM/ECF system.

Respectfully submitted,

/s/ *Dan Litvin*
Dan Litvin