**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re Namenda Direct Purchaser Antitrust Litigation | Case No. 1:15-cv-07488-CM (RWL) |

**MEMORANDUM IN SUPPORT OF FOREST'S MOTION *IN LIMINE* 5 TO
EXCLUDE DPP WHOLESALERS' OVERCHARGE DAMAGES METHODOLOGY**

**WHITE & CASE** LLP

*Counsel for Defendants Actavis plc, Forest
Laboratories, LLC, Forest Laboratories, Inc., and
Forest Laboratories Holdings Ltd*

## TABLE OF CONTENTS

BACKGROUND ...................................................................................................................3

ARGUMENT .......................................................................................................................4

    I.   The Proper Measure of Damages for DPP Wholesalers is Lost Profits, and DPPs'
        "Overcharge" Damages Methodology Should Be Excluded as Unreliable...................4

        A.   Overcharge Damages Are Wholly Inappropriate for DPP Wholesalers'
               Hard-Switch Claim Because the Calculation Is Based on the Pricing of
               *Different* Products.............................................................................................5

        B.   Overcharge Damages Are Also Inappropriate for DPP Wholesalers'
               Reverse-Payment Claim Because the Calculation is Based on the Pricing
               of *Different* Products .......................................................................................8

        C.   DPP Wholesalers' Overcharge Methodology Does Not Reliably Measure
               Economic Harm Because DPPs May Have *Benefitted* Financially from
               Any Purported Delay in Generic Entry ............................................................9

    II.  In the Alternative, if DPP Wholesalers Are Permitted to Seek Overcharge
        Damages, Forest Must Be Permitted to Offer Evidence to Rebut Alleged Injury.......12

        A.   The Cost-Plus Exception to *Hanover Shoe* Applies and Forest Should Be
               Allowed to Present Evidence That DPP Wholesalers Passed On
               Overcharges to Customers...............................................................................13

        B.   Forest Should Be Allowed To Present Evidence of No Injury-in-Fact..........14

CONCLUSION..................................................................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946)....................................................................................6

*Eastman Kodak Co. v. Image Techn. Servs., Inc.*,
  504 U.S. 451 (1992)....................................................................................9

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968)...................................................................1, 5, 11, 13

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  424 F.3d 363 (3d Cir. 2005).......................................................................5

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)...........................................................10, 11, 16

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ...........................................................15

*In re K-Dur Antitrust Litig.*,
  686 F.3d 197 (3d Cir. 2011).......................................................................9

*In re K-Dur Antitrust Litig.*,
  No. 01-1652, 2008 U.S. Dist. LEXIS 118396 (D.N.J. Apr. 14, 2008) ...................................16

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  No. 11-MDL-2262, 2016 U.S. Dist. LEXIS 175929 (S.D.N.Y. Dec. 20, 2016) .....................14

*In re Namenda Direct Purchaser Antitrust Litig.*,
  331 F. Supp. 3d 152 (S.D.N.Y. 2018)........................................................4

*In re Namenda Direct Purchaser Antitrust Litig.*,
  No. 15-cv-7488, 2017 U.S. Dist. LEXIS 95796 (S.D.N.Y. June 21, 2017) .............................4

*In re Neurontin Antitrust Litig.*,
  No. 02-1390, 2011 U.S. Dist. LEXIS 7453 (D.N.J. Jan. 25, 2011).........................................16

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  No. 1:12-md-2343, 2014 U.S. Dist. LEXIS 66707 (E.D. Tenn. May 15, 2014) ....................15

*In re Terazosin Hydrochloride Antitrust Litig.*,
  203 F.R.D. 551 (S.D. Fla. 2001)...........................................................9, 16

*In re Wellbutrin XL Antitrust Litig.*,
No. 08-2431, 2011 U.S. Dist. LEXIS 90075 (E.D. Pa. Aug. 11, 2011) ................................16

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
244 F.R.D. 79 (D. Mass. 2007)................................................................................................14

*Oscar Gruss & Son, Inc. v. Hollander*,
337 F.3d 186 (2d Cir. 2003)......................................................................................................4

*Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, et al.*,
No. 15-cv-06549-CM-RWL (S.D.N.Y.) ..................................................................................12

*Simon v. Keyspan Corp.*,
694 F.3d 196 (2d Cir. 2012)....................................................................................................14

*Stanacard, LLC v. Rubard LLC*,
No. 12-cv-5176-CM, 2016 U.S. Dist. LEXIS 162903 (S.D.N.Y. Nov. 10,
2016) ..........................................................................................................................................5

*Valley Drug Co. v. Geneva Pharms., Inc.*,
350 F.3d 1181 (11th Cir. 2003) ..............................................................................................15

*West Virginia v. Chas. Pfizer & Co.*,
440 F.2d 1079 (2d Cir. 1971)..................................................................................................13

## STATUTES AND RULES

15 U.S.C. § 16 ......................................................................................................................................9

28 U.S.C. § 1332(d) ............................................................................................................................12

28 U.S.C. § 1453 ................................................................................................................................12

28 U.S.C. §§ 1711–1715......................................................................................................................12

Clayton Act § 4 .....................................................................................................................................9

## MISCELLANEOUS

Food & Drug Admin., Guidance for Industry: Statistical Approaches to
Establishing Bioequivalence 2 (Jan. 3 2001) ..........................................................................8

Herbert Hovenkamp, et al., *IP and Antitrust: An Analysis of Antitrust Principles
Applied to Intellectual Property Law* § 6.03 (3d ed., 2018 Supp.) ...........................................7

Forest moves to exclude all testimony and opinions relating to Direct Purchaser Plaintiffs' ("DPPs" or "DPP Wholesalers") overcharge damages methodology.   In the alternative, Forest moves for permission to offer evidence relevant to the extent to which DPP Wholesalers suffered actual injury, including but not limited to evidence of downstream sales, margins, and pass-on of overcharges.

DPP Wholesalers are not entitled to recover damages for injuries that they did not suffer. Like all wholesalers, DPPs purchase pharmaceuticals from manufacturers and sell them to their customers at a profit.  Yet, DPP Wholesalers' proffered overcharge damages models disregard the economic realities of the pharmaceutical wholesaler business and provide a potential windfall—more than $20 billion after trebling—to DPPs even though they may have *actually benefitted* financially from any alleged delayed generic entry.   As Forest has consistently maintained, the correct measure of damages in this case is lost profits.   DPP Wholesalers' overcharge damages models are unreliable for a number of reasons.

First, DPP Wholesalers' damages models purport to measure overcharges by comparing prices of *different* products, brand Namenda IR, brand Namenda XR, and generic Namenda IR— an approach that contravenes the definition of an overcharge.   Overcharges are only an appropriate measure of injury when comparing differences in pricing between the *same* products. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 487 (1968) ("[I]f United had sold its important machines, the cost to Hanover would have been less than the rental paid for leasing *these same machines*.") (emphasis added).

Second, the overcharge models ignore that DPP Wholesalers' business consists of simply adding a fixed mark-up to their purchase price, also called wholesaler acquisition cost ("WAC"), and selling the product downstream to their customers at a profit.   So DPP Wholesalers may

have *benefitted* from any delay in generic entry depending on the size of the mark-up on the brand versus generic product.

Third, DPP Wholesalers' overcharge models do not take into account that many generic manufacturers sell directly to retail pharmacies bypassing wholesalers, thus reducing the amount of generic Namenda IR that DPPs would have purchased in the but-for world.  In this context, an "overcharge" calculation is meaningless because DPP Wholesalers would not have made all of the generic purchases in the but-for world that they are claiming were subject to an overcharge. In fact, several DPP Wholesalers did not purchase *any* generic Namenda IR, which creates a threshold question for those entities regarding whether they suffered *any* injury at all.

DPP Wholesalers have expressly disavowed that they lost profits or would seek damages for lost profits.  ECF No. 254, Pls. Opposition to Mot. to Compel ("DPPs' Mot. to Compel Opp'n") at 16 ("Plaintiffs do not claim to have lost profits as a result of Forest's anticompetitive scheme, nor will Plaintiffs seek to prove that they have lost profits.").  As such, they are now judicially estopped from seeking to use lost profits in this case, having used that representation to avoid discovery into their sales downstream, margins and profitability. The reason for DPP Wholesalers' steadfast position that overcharge damages are appropriate is obvious:  DPPs know that measuring damages through lost profits likely would have resulted in *zero injury*. Nevertheless, given DPP Wholesalers' failure to proffer a reliable damages model to accurately measure the harm from the alleged anticompetitive conduct, the Court should preclude DPPs' overcharge damages models.

If the Court is inclined to permit DPP Wholesalers to seek overcharge damages, however, fairness requires that the Court also permit Forest to offer evidence that DPPs were not actually injured by the alleged anticompetitive conduct.  To be clear, Forest does not seek to reopen

discovery to obtain information about DPP Wholesalers' downstream sales. The Court, however, should allow Forest to present all relevant evidence at trial relating to DPP Wholesalers' business model to prove that DPPs' alleged injury, if any, is greatly overstated in their damages calculation.

## **BACKGROUND**

DPPs retained economist Dr. Russell Lamb to calculate the alleged damages in this case. Dr. Lamb has two distinct damages models: (1) "No Reverse-Payment" model; and (2) "No Hard-Switch" model. ECF No. 699-1, Revised Pls.' Contentions ("DPPs' Cont.") at ¶¶ 215-16. Despite its name, the No Reverse-Payment model includes damages relating to *both* the alleged reverse payment and the hard switch. *Id*. at ¶ 216 (Dr. Lamb "calculated hard switch damages as part of his calculation of overcharges from the reverse payment"). Dr. Lamb calculates damages based on purported "overcharges" that DPP Wholesalers suffered from the alleged anticompetitive conduct in both models. *Id*. at ¶¶ 215-16

During discovery, Forest moved to compel DPP Wholesalers to produce downstream sales data as relevant to DPPs' alleged injury and class certification issues. *See generally* ECF No. 246, Forest's Memo. of L. in Supp. of Mot. to Compel. Forest argued that DPP Wholesalers' damages theory based on "overcharges" was inappropriate because it required a comparison of the prices of *different* products. *Id*. at 9. Forest highlighted that DPP Wholesalers' allegation of anticompetitive conduct closely mirrored an antitrust action based on a refusal to sell and that, as such, the correct measure of damages was lost profits, not overcharges. *Id*. at 9-10. In opposition, DPPs asserted that they were exclusively seeking to recover overcharge damages, and specifically disavowed that they lost profits or would seek damages for lost profits. ECF No. 254, DPPs' Opp'n to Mot. to Compel at 16 ("*Plaintiffs do not*

3

*claim to have lost profits* as a result of Forest's anticompetitive scheme, nor will Plaintiffs seek to prove that they have lost profits.") (emphasis added).

Relying on DPP Wholesalers' representation that they were not seeking lost profit damages, Magistrate Judge Francis denied Forest's motion to compel downstream discovery, but did *not* decide the substantive issue of the correct measure of damages. *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 U.S. Dist. LEXIS 95796, at *20-21 (S.D.N.Y. June 21, 2017). Critically, in framing the Court's order, Judge Francis concluded: "if Judge McMahon were ultimately to decide that lost profits are the proper measure of damages, *the plaintiffs could not recover on the Section 2 claim*." *Id.* at 21 (emphasis added).

In opposition to class certification, Forest again argued that DPP Wholesalers' proposed overcharge damages was the wrong measure of damages. ECF No. 619, Forest's Opp'n to Pls.' Mot. for Class Certification at 34-35. While the Court granted DPPs' motion to certify the class, the Court did not specifically address the issue of the correct measure of damages in its opinion. *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 201-21 (S.D.N.Y. 2018) ("*Namenda III*"). Thus, this threshold question of the correct measure of damages has not yet been resolved.

## **ARGUMENT**

**I.      The Proper Measure of Damages for DPP Wholesalers Is Lost Profits, and DPPs' "Overcharge" Damages Methodology Should Be Excluded as Unreliable**

The correct measure of damages is a question of law that must be determined prior to trial. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) ("Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law.") (internal quotation omitted). When an expert

4

proffers the wrong measure of damages, the court should preclude that expert's testimony because the damages opinion is unreliable.  *See, e.g.*, *Stanacard, LLC v. Rubard LLC*, No. 12-cv-5176-CM, 2016 U.S. Dist. LEXIS 162903, at *12-13 (S.D.N.Y. Nov. 10, 2016) (McMahon, C.J.) (precluding expert from offering testimony on an improper measure of damages).  Dr. Lamb's overcharge damages methodology should be excluded and DPP Wholesalers should not be allowed to present evidence on overcharge damages to the jury.

A.     **Overcharge Damages Are Wholly Inappropriate for DPP Wholesalers' Hard-Switch Claim Because the Calculation Is Based on the Pricing of *Different* Products**

An overcharge is simply the difference between the price that a plaintiff paid for a product and an estimate of the price that plaintiff would have paid for that *same* product absent the alleged anticompetitive conduct.  *See, e.g.*, *Hanover Shoe*, 392 U.S. at 487, 494 (holding "that Hanover proved injury and the amount of its damages . . . when it proved that United had overcharged it during the damages period and showed the amount of overcharge" based on comparing prices of the *same* shoe machinery); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 374 (3d Cir. 2005) (defining an overcharge as "the difference between the price paid for goods actually purchased [artificial teeth] and the price that would have been paid [for the same artificial teeth] absent the illegal conduct").  Therefore, overcharge damages make sense in cases such as *Hanover Shoe* where anticompetitive conduct allegedly raised the price of a product purchased in the actual world that the plaintiff would have purchased at a lower price in the but-for world.

Here, however, DPP Wholesalers are impermissibly seeking overcharges relating to their hard-switch claim based on differences in the prices of *two different products*: Namenda XR and generic Namenda IR.  DPPs' Cont. at ¶ 216.  DPP Wholesalers concede that Namenda XR is

"significantly different" from generic Namenda IR and that the two products are not AB-rated. ECF No. 29, First Am. Compl. ("Compl.") at ¶ 187 ("generic Namenda IR would not and could not be considered 'AB-rated' to branded Namenda XR, and thus pharmacists would not and could not legally substitute the less-expensive generic Namenda IR when presented with a prescription for Namenda XR"). Accordingly, an "overcharge" analysis that compares the price paid for Namenda XR to the price paid for generic Namenda IR is outside *Hanover Shoe* and inappropriate to measure alleged damages. Ex. 1, Expert Rep. of Pierre-Yves Cremieux ("Cremieux Rep.") at ¶ 40.

When a reseller has been denied access to a product by virtue of an antitrust violation, the proper method of evaluating harm is to assess the lost profits, if any, associated with the unavailability of the product. *See, e.g.*, *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 263-64 (1946) (lost profits proper measure of injury where exclusionary conduct prevented access to certain films, even though plaintiff had access to other films in the actual world); *see also* Compl. at ¶ 226 (alleging that "Defendants' anticompetitive conduct, which delayed introduction into the United States marketplace of generic versions of Namenda IR, has caused plaintiff and the Class to pay more than they would have paid for memantine hydrochloride absent defendants' illegal conduct"). The fundamental importance of the correct measure of damages is evident in the following example:

- Consider a car dealer (a reseller, like DPPs) that sells Mercedes and Chevrolets.

- Assume that, as a result of an illegal agreement among auto manufacturers, the dealer can no longer procure Chevrolets and is relegated to selling only more expensive Mercedes.

- Common sense, as well as fundamental economics, dictates that it would be illogical to measure the dealer's damages as overcharges by taking the difference in the price the dealer paid for the Mercedes and the Chevrolet he would have purchased absent the illegal agreement—especially because the dealer likely would make more on the resale of the Mercedes than on the resale of the Chevrolet.

- The proper measure of damages (if any) clearly would be to estimate the economic loss to the dealer from being unable to sell Chevrolets, i.e., by comparing the profits the dealer earned by reselling the substitute products (the Mercedes) with its likely profit from reselling the unavailable products (the Chevrolets) had they not been withheld.

The exact same rationale applies here when comparing the distinct memantine products relating to DPP Wholesalers' hard-switch claim. *See, e.g.*, Herbert Hovenkamp, et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 6.03 (3d ed., 2018 Supp.) (for "direct purchaser/reseller[s] . . . lost profits (or lost sales) rather than the overcharge would be a much more accurate proxy for . . . damages").  In fact, DPP Wholesalers' entire theory of harm is predicated on Namenda XR being a "significantly different" product and therefore not automatically substitutable for generic Namenda IR.  Compl. at ¶ 187.

Forest is aware of no authority that has found it permissible to apply an overcharge methodology to a hard-switch claim involving non-AB rated pharmaceutical products.  The flaws with DPP Wholesalers' approach to measuring overcharges between Namenda XR and generic Namenda IR impacts both of Dr. Lamb's damages models since the "No Reverse-

7

Payment" model includes alleged impact from the hard-switch violation.  DPPs' Cont. at ¶ 216.

As such, the Court should exclude both of Dr. Lamb's overcharge damages models as unreliable.

B.    **Overcharge Damages Are Also Inappropriate for DPP Wholesalers' Reverse-Payment Claim Because the Calculation is Based on the Pricing of *Different* Products**

For the exact same reasons discussed above, overcharge damages are inappropriate for

DPP Wholesalers' reverse-payment claim.  While generic IR is AB-rated to brand Namenda IR,

that only means it meets the FDA's bioequivalence standards, not that they are *identical*

products.  Indeed, the FDA allows a margin of error in the generic product's absorption rate even

for products deemed bioequivalent to a brand.  *See* Food & Drug Admin., Guidance for Industry:

Statistical Approaches to Establishing Bioequivalence 2 (Jan. 3 2001), *available at*

https://www.fda.gov/media/70958/download (bioequivalence requires only that the generic must

be absorbed by the bloodstream at *approximately* the same rate (80% - 125%) as the brand).

Brand Namenda IR is manufactured by Forest, while generic drug companies

manufacture their versions of generic IR.  The two distinct products are manufactured under

completely different cost structures:  Forest invested hundreds of millions of dollars to research

and prove the safety and efficacy of Namenda, while the generic companies shouldered none of

the burdens of upfront research and took advantage of the Hatch-Waxman framework to market

copycat generic versions.  *See, e.g.*, Defendants' Corrected Statement of Undisputed Material

Facts in Support of Defendants' Motion for Summary Judgment at ¶ 43 ("Since 2000, Forest has

expended hundreds of millions of dollars researching and developing Namenda.").

Unsurprisingly, brand Namenda IR and generic IR are priced in vastly different ways.  After the

initial effect of generic entry, a brand and an AB-rated generic product do not really compete at

all, with the brand maintaining a relatively high price, and being sold to brand loyalists only.

8

Forest recognizes that some courts have found that it may be appropriate to use overcharges as the measure of injury in the reverse-payment context where the price comparison is between AB-rated equivalents.  *See, e.g.*, *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 223-24 (3d Cir. 2011); *In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 557-58 (S.D. Fla. 2001).  The Second Circuit, however, has not addressed this inappropriate use of overcharges, and this Court should focus on the fundamental economics of the claim when deciding the correct measure of damages.  Because DPP Wholesalers' reverse-payment damages are based on the price disparity between two products sold by multiple different companies, the Court should exclude Dr. Lamb's reverse-payment damages methodology on this independent ground.

### C.    DPP Wholesalers' Overcharge Methodology Does Not Reliably Measure Economic Harm Because DPPs May Have *Benefitted* Financially from Any Purported Delay in Generic Entry

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages *by him sustained*…." 15 U.S.C. § 16 (emphasis added).  In this case, DPP Wholesalers seek to employ an overcharge model to secure substantial damages—more than $20 billion after trebling—when in fact they may not have suffered any harm at all.  To justify this vastly overstated measure of purported injury, DPP Wholesalers rely entirely on their position as "direct purchasers" while seeking to evade the realities of the pharmaceutical wholesale market.  Such a formalistic approach to the measure of damages is, however, not appropriate under the antitrust laws.  *See Eastman Kodak Co. v. Image Techn. Servs., Inc*., 504 U.S. 451, 466-67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.").

9

By virtue of their business model as pharmaceutical wholesalers, DPPs may have actually *benefitted* from any "delay" in generic entry for at least two reasons.  First, DPP Wholesalers, who simply resell product with a percentage mark up, may have benefited from the alleged delay because they may make more money per-unit reselling the more expensive brand, than a less expensive generic.  Ex. 1, Cremieux Rep. at ¶¶ 36-37.

As DPP class representative Jim Benton of Smith Drug testified:  "All we are are middlemen.  You know, we buy the product from the manufacturer.  We ship product to the pharmacy.  So, we have service arrangements more so than anything else with manufacturers." Ex. 2, Benton (Smith Drug) Tr. at 122:21-25.  To use the car dealer analogy above, if the car dealer has a higher markup on Mercedes than Chevrolets, it may benefit from the exclusion of Chevrolets from the market.

For this reason, a leading antitrust commentator has concluded that any potential economic harm to a direct-purchasing reseller based on an alleged antitrust violation can only be accurately measured as the *difference in profits* based on the purchase and resale of the products in question.  *See, e.g*, Herbert J. Hovenkamp, A Primer on Antitrust Damages 27 (2011) ("As a result, at least in those situations where the victim is itself a business, lost profits rather than the monopoly overcharge might be a more correct measure of damages.").  DPPs should not be allowed to hide behind their position as "direct purchasers" to evade the economic realities of their purchasing and sales practices and claim damages for transactions on which they suffered no injury.  *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 55 (1st Cir. 2018) (in pharmaceutical antitrust actions a lack of "injury reduces the amount of the possible total damage").

Second, DPP Wholesalers' volume of generic Namenda IR purchases in the but-for world would have been lower because generic manufacturers often sell their generic products directly

to retail customers, not through wholesaler intermediaries.  In other words, the volume of generic purchases by DPP Wholesalers that would have occurred in the but-for world (that would be subject to alleged overcharges) would be lower than the volume of brand purchases that occurred in the actual world.  Ex. 1, Cremieux Rep. at ¶ 34 (discussing that a wholesaler's business model may focus primarily or exclusively on branded drug products).  As such, DPPs would not have replaced all of their brand Namenda IR or brand XR purchases with generic IR purchases.  As to each brand Namenda purchase by a wholesaler that would not have converted into a generic IR purchase by that wholesaler in the but-for world, calculating an "overcharge" is a meaningless concept because there is no price that the wholesaler would have paid in the but-for world.

In short, in each instance where a wholesaler would not have replaced a brand purchase with a purchase of the allegedly delayed generic, it suffered no injury: it simply bought and resold the brand, earning profit on that sale, when in the but-for world it would have done nothing.  Again, to use the car dealer analogy, if Mercedes are always sold through dealers, but a substantial portion of Chevrolets bypass dealers, the dealer might benefit from the exclusion of Chevrolets from the market.  Under *Hanover Shoe*, there must be a determination that the DPP Wholesaler would have replaced each brand purchase for which it claims overcharges with generic Namenda IR if it had been available earlier before determining overcharges are appropriate.  392 U.S. at 487 (finding that "Hanover would have bought rather than leased from United had it been given the opportunity to do so").  Such wholesalers are not harmed on these brand purchases any more than brand loyalist consumers who never would have purchased the generic at all.  *See Asacol*, 907 F.3d at 51, 58 (holding brand-loyalist purchasers were uninjured and must be excluded from the class).

*   *   *

11

For these reasons, DPP Wholesalers' proffered overcharge damages methodology does not reliably measure the damages allegedly suffered from the anticompetitive conduct, and should be excluded from trial.  If the Court concludes that overcharges are the correct measure of damages, Forest reserves the right to challenge both the applicability and continuing viability of *Hanover Shoe*.  The rationale for barring pass-on evidence no longer holds as many states permit indirect purchaser suits.  As such, the injection of complexity into federal court proceedings underpinning the bar on pass-on evidence is now unavoidable because the Class Action Fairness Act practically guarantees those suits will be brought in federal court, as has happened here with the filing of the parallel indirect purchaser action.  28 U.S.C. §§ 1332(d), 1453, 1711–1715; *see also Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, et al.*, No. 15-cv-06549-CM-RWL (S.D.N.Y.) (Namenda indirect purchaser action).

## II.      In the Alternative, if DPP Wholesalers Are Permitted to Seek Overcharge Damages, Forest Must Be Permitted to Offer Evidence to Rebut Alleged Injury

DPPs have revealed their intent to use their position as wholesalers to insulate themselves from having to prove individual patient switching on their hard-switch claim.  *See* ECF 701, Pls.' Revised Proposed Jury Instruction at 63 ("[Y]ou must recall that the Class here is comprised of 'wholesalers and other direct purchasers,' and that Defendants 'deal[] with wholesalers, not patients.' Accordingly, for Plaintiffs and the Class to establish they were injured or to prove damages, they need not 'show that individual patient decisions were the result of [D]efendant[s'] alleged conduct.'") (internal citations omitted).  While Forest disagrees with DPPs' proposed jury instruction—DPP Wholesalers would be harmed if at all only derivatively by patient switching downstream, and cannot claim damages where they did not suffer injury— DPPs should not be allowed to have it both ways.  If DPP Wholesalers intend to use their role as

intermediaries to suggest that individual patient switching is irrelevant because wholesalers buy based on aggregate demand, fairness requires that Forest be allowed to explore how DPP Wholesalers do business at trial, including their purchasing, resale and pricing of pharmaceuticals.  As DPPs themselves concede in their proposed jury instruction above, these issues are relevant to whether they were injured at all.

To be clear, although Forest did not have an opportunity to explore DPP Wholesalers' downstream sales data during the discovery period, Forest does not intend to re-open discovery. Forest's position is simply that it must have the opportunity to offer evidence and testimony that DPPs' alleged injury is overstated based on the pharmaceutical wholesaler business model.

### A.   The Cost-Plus Exception to *Hanover Shoe* Applies and Forest Should Be Allowed to Present Evidence That DPP Wholesalers Passed On Overcharges to Customers

While the Supreme Court generally barred pass-on defenses in *Hanover Shoe*, it recognized that "there might be situations — for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged — where the considerations requiring that the passing-on defense not be permitted in this case would not be present."  *Hanover Shoe*, 392 U.S. at 494.  Pharmaceutical wholesalers sell to their own customers on such a cost-plus basis using their WAC pricing plus their profit margin to pass on any "overcharges" to their customers.  *See, e.g.*, Ex. 3, Cardinal Health Prime Vendor Agreement § 3.1 ("Buyer will pay a purchase price for all branded Rx Products purchased under this Agreement in an amount equal to Cardinal Health's Cost for such Merchandise, plus/minus the percentage specified in the pricing matrix . . . ("Cost Plus Pricing").");  *see also West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1088 (2d Cir. 1971) ("[T]he arrangements under which the wholesalers and retailers resold these products were, in virtually all cases, cost plus a set

13

percentage markup . . . ."); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 244 F.R.D. 79, 82 (D. Mass. 2007) ("[w]holesalers sell drugs to retail pharmacies based on WAC plus or minus a factor that generates a margin for the wholesaler").  As such, *Hanover Shoe*'s cost-plus exception applies here and Forest should be permitted to offer evidence that DPPs suffered no injury from the alleged antitrust violation because they passed on any "overcharge" to their customers.

While the Second Circuit has held that the cost-plus contract exception typically requires that the contract quantity be determined prior to the overcharge, the rationale for that limitation is because the direct purchaser may suffer injury based on a lower volume of sales caused by the price increase, even if it passes on all of the overcharge.  *See Simon v. Keyspan Corp.*, 694 F.3d 196, 202 (2d Cir. 2012) ("A direct purchaser that passes on all of its costs may still suffer an antitrust injury if passing on increased costs decreased its sales and therefore its profits.").  This concern does not apply here because DPPs have expressly conceded that they did not lose profits based on Forest's actions.  ECF No. 254, DPPs' Mot. to Compel Opp'n at 16 ("Plaintiffs do not claim to have lost profits as a result of Forest's anticompetitive scheme . . . .").  In other words, there is no possibility here that DPP Wholesalers may respond to proof of their cost-plus pricing practices by claiming that they still suffered injury in the form of lost profits—DPPs have confirmed they experienced no such lost profits—and thus there is no reason to require that cost-plus sales occur pursuant to fixed quantity contracts in this case.

## B.    Forest Should Be Allowed To Present Evidence of No Injury-in-Fact

An antitrust plaintiff is entitled to recover only the net injury it proximately suffered due to the anticompetitive act, which requires removing any resulting benefits received from the alleged violation.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262,

2016 U.S. Dist. LEXIS 175929, at *52 (S.D.N.Y. Dec. 20, 2016) (finding that "plaintiffs may ultimately recover only to the extent of their net injury, given that plaintiffs may well have benefited from LIBOR suppression in the same transaction or in a different transaction") (citing *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 489 (S.D.N.Y. 1987) ("[A]n award of damages should put a plaintiff forward into the position it would have been [in] 'but for' the defendant's violation of the law. . . . An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.") (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986)).

If DPPs are allowed to present an overcharge methodology, Forest should be permitted to offer evidence that the quantum of damages should be reduced to reflect the benefit that DPPs received from a higher volume of brand purchases for a longer period, and to account for the generic sales that bypassed the wholesalers and on which they necessarily suffered no "overcharges." *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 317 (E.D. Mich. 2001) ("Defendants' by-pass and offsetting benefits arguments relate to the quantum of damages."); *see also Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1191 (11th Cir. 2003) ("[S]eems likely that the national wholesalers lose both margin and volume with generic competition. Thus, these class members appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off when branded drugs dominate the market.").

Forest recognizes that some district courts in other jurisdictions have held that direct purchasers can recover damages even with respect to bypassed generic units. *See, e.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-md-2343, 2014 U.S. Dist. LEXIS 66707, at *20-

15

27 (E.D. Tenn. May 15, 2014).  Those decisions are neither correctly decided nor binding on this Court.  First, as discussed above, *Hanover Shoe*'s ban on pass-on evidence should not apply in this case given DPP wholesalers' business models of selling downstream at WAC plus a certain percentage.

Moreover, even if the Court does not allow the pass-on defense, whether and to what extent DPP Wholesalers would have purchased generic Namenda IR in the but-for world relates to which purchases even give rise to damages in the first place.  In fact, several DPP class members did not make *a single purchase* of generic Namenda IR raising the possibility that the alleged delayed generic entry did not injure these purchasers at all.  Ex. 1, Cremieux Rep. at ¶¶ 107-08.  Many other courts expressly exclude such direct purchasers from certified classes precisely because there is no common proof that they were injured, given that they did not make any of the generic purchases necessary for injury to have occurred.  *See, e.g.*, *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2011 U.S. Dist. LEXIS 90075, at *40-41 (E.D. Pa. Aug. 11, 2011); *In re Neurontin Antitrust Litig.*, No. 02-1390, 2011 U.S. Dist. LEXIS 7453, at *33-38 (D.N.J. Jan. 25, 2011); *In re K-Dur Antitrust Litig.*, No. 01-1652, 2008 U.S. Dist. LEXIS 118396, at *70–71 (D.N.J. Apr. 14, 2008), *aff'd*, 686 F.3d 197, 220 n.13 (3d Cir. 2012); *In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 559 n.11 (S.D. Fla. 2001).  If a brand-only purchaser suffers no injury on any of its purchases, it cannot be the case that a brand purchaser that makes even a single generic purchase is injured on all of its brand purchases.

Whether certain DPP Wholesalers suffered injury is a threshold question of injury-in-fact that Forest has a right to explore at trial.  In *Asacol*, the First Circuit confirmed that defendants' constitutional rights guarantee them the opportunity to press "genuine challenges to allegations of injury-in-fact" and avoid paying damages for sales that caused no injury.  907 F.3d at 51, 58

16

(reversing order certifying a class for failure to meet the predominance requirement where the class included uninjured members "who would have continued to purchase a brand drug for various reasons, even if a cheaper, generic version had been available"). DPPs should not be permitted to block Forest from challenging injury-in-fact by hiding behind formulaic rules that disregard the economic realities of the wholesaler pharmaceutical business.

## CONCLUSION

For the foregoing reasons, the Court should grant Forest's Motion to Exclude DPPs' Wholesalers' Overcharge Damages Methodology, or alternatively, permit Forest to offer evidence to rebut DPPs' claims of actual injury and to prove that DPPs' alleged overcharge damages are overstated.

Dated: May 24, 2019                                    Respectfully submitted,

                                                       **WHITE & CASE** LLP

                                                       By: */s/ John Chung*
                                                       Martin M. Toto
                                                       Heather K. McDevitt
                                                       John H. Chung
                                                       Michael E. Hamburger
                                                       William H. Bave, III
                                                       Kristen O'Shaughnessy
                                                       Kevin C. Adam
                                                       WHITE & CASE LLP
                                                       1221 Avenue of the Americas
                                                       New York, New York 10020
                                                       Telephone: (212) 819-8200

                                                       J. Mark Gidley
                                                       Christopher M. Curran
                                                       Eric Grannon
                                                       WHITE & CASE LLP
                                                       701 Thirteenth Street, NW
                                                       Washington, DC 20005
                                                       Telephone: (202) 626-3600

17

Heather M. Burke
Eric E. Lancaster
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Ste. 900
Palo Alto, CA 94306
Telephone: (650) 213-0300

**Counsel for Defendants Actavis plc, Forest Laboratories, LLC, Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd.**