IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION | Case No. 1:15-cv-07488-CM (RWL) |

**FOREST'S OPPOSITION TO PLAINTIFFS' MOTION**
***IN LIMINE* NO. 13: EXCLUDE MENTION OF DOWNSTREAM EFFECTS**

**WHITE & CASE LLP**

*Counsel for Defendants Actavis plc, Forest Laboratories, LLC, Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd*

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................3

    I.   Generic Bypass Is Not a Downstream Effect, and Forest Must Be Permitted to Offer Evidence that DPPs Were Not Injured ................................................................3

    II.  Forest Should Be Permitted to Offer Evidence that Overcharges Were Passed On to Downstream Customers Under *Hanover Shoe*'s Cost-Plus Exception .....................5

    III. *Hanover Shoe*'s Rationale for Barring Pass-On Evidence Is Outdated .........................6

    IV. Forest Must Be Allowed to Introduce Evidence of Downstream Effects on the Issue of Hard-Switch Causation and to Rebut DPPs' Theory of Hard-Switch Injury… ........................................................................................................................7

CONCLUSION ...........................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apple, Inc. v. Pepper*,
   139 S. Ct. 1514 (2019) ...........................................................................................................7

*Drug Mart Pharm. Co. v. Am. Home Prods. Corp.*,
   472 F. Supp. 2d 385 (E.D.N.Y. 2001) ...................................................................................5

*Hanover Shoe v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ....................................................................................................2, 5, 6

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) ..................................................................................................2, 5

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 297 (E.D. Mich. 2001) ........................................................................................4

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018) ...................................................................................8

*In re Namenda Direct Purchaser Antitrust Litig.*,
   No. 15-cv-7488, 2017 U.S. Dist. LEXIS 95796 (S.D.N.Y. June 21, 2017) ...........................1

*Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*,
   937 F. Supp. 276 (S.D.N.Y. 1996) ........................................................................................3

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
   No. 15-cv-06549-CM-RWL, 2016 U.S. Dist. LEXIS 128349 (S.D.N.Y. Sept.
   13, 2016) ............................................................................................................................6, 7

*Simon v. Keyspan Corp.*,
   694 F.3d 196 (2d Cir. 2012) ...................................................................................................6

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
   No. 03-cv-4578, 2005 U.S. Dist. LEXIS 9705 (E.D. Pa. May 19, 2005) ...............................4

*United States v. Silver*,
   184 F. Supp. 3d 33 (S.D.N.Y. 2016) .....................................................................................9

**STATUTES AND RULES**

28 U.S.C. § 1332 .............................................................................................................................6

28 U.S.C. § 1453 ..........................................................................................................................6

28 U.S.C. §§ 1711–1715 ............................................................................................................6

## MISCELLANEOUS

Phillip E. Areeda, Herbert Hovenkamp, Roger D. Blair & Christine Piette
   Durrance, *Antitrust Law: An Analysis of Antitrust Principles and Their
   Application* ¶ 346k (3d ed. 2007)................................................................................7

28 U.S.C. § 1453 ..........................................................................................................................6

28 U.S.C. §§ 1711–1715 ............................................................................................................6

## MISCELLANEOUS

Phillip E. Areeda, Herbert Hovenkamp, Roger D. Blair & Christine Piette
   Durrance, *Antitrust Law: An Analysis of Antitrust Principles and Their
   Application* ¶ 346k (3d ed. 2007)................................................................................7

Forest has moved to exclude DPP Wholesalers' overcharge methodology as an unreliable measure of damages in this case, which Forest incorporates here by reference. ECF No. 767, Mem. in Supp. of Forest's Mot. *In Limine* 5 to Exclude DPP Wholesalers' Overcharge Damages Methodology ("Forest MIL 5"). As explained in Forest's motion, overcharge damages do not make economic sense where DPP Wholesalers improperly seek to measure the difference in prices between *different products*, and where DPP Wholesalers may have *benefited* from the alleged delay in generic entry based on their business models as "middlemen." *Id*. at 5-12. Accordingly, the correct measure of damages is lost profits. DPPs misstate that Judge Francis has already rejected lost profits as the proper measure of damages. ECF No. 751, Mem. in Supp. of Pls.' Mot. *In Limine* No. 13: Exclude Mention of Downstream Effects ("DPPs' MIL 13") at 3. Judge Francis did *not* decide the substantive issue of the correct measure of damages, instead deferring that determination to this Court. *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 U.S. Dist. LEXIS 95796, at *21 (S.D.N.Y. June 21, 2017) ("[I]f Judge McMahon were ultimately to decide that lost profits are the proper measure of damages, the plaintiffs could not recover on the Section 2 claim.") (emphasis added). Forest's motion to exclude DPP Wholesalers' overcharge damages models should be granted, and DPPs' motion to exclude downstream effects should be denied.

Even if the Court were to determine that overcharge damages are appropriate, DPPs' motion must be denied as overbroad, vague, and imprecise as to the scope of the evidence sought to be excluded. DPP Wholesalers seek to exclude evidence of generic bypass—the practice whereby generic manufacturers sell directly to retail customers, not through wholesaler intermediaries—by mischaracterizing it as a "downstream effect." DPPs' MIL 13 at 2-3. But generic bypass is a distinct issue, unrelated to pass-on of overcharges, and is relevant to whether

DPP Wholesalers actually suffered injury. *See* Forest MIL 5 at 10-11, 14-17. Forest has a constitutional right to raise issues of injury-in-fact at trial, including generic bypass. *See, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51, 58 (1st Cir. 2018) (reversing grant of class certification and confirming constitutional right to press "genuine challenges to allegations of injury-in-fact" and avoid paying damages for sales that caused no injury).

Contrary to DPPs' assertion, Forest's economic expert, Pierre Cremieux, did not "concede[]" that bypass would be relevant only if DPPs were pursuing lost profits. DPPs' MIL 13 at 3. Dr. Cremieux's opinion explicitly finds that generic bypass is relevant to DPPs' overcharge theory and necessitates analysis of DPP Wholesalers' individual purchasing patterns and business models to determine the extent of injury, if any. *See* Ex. 1, Expert Rep. of Pierre-Yves Cremieux ("Cremieux Rep.") ¶¶ 34-35, 81-83, 106-08.

Furthermore, as discussed in Forest's motion, *Hanover Shoe* recognized an exception to the bar on pass-on evidence where direct purchasers had "cost-plus" agreements. *See Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968) ("[T]here might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present."); *see also* Forest MIL 5 at 13-14. The cost-plus exception directly applies here to allow presentation of evidence of downstream pass-on of any alleged overcharge. *See* Forest MIL 5 at 13-14.

"Downstream effects" are also relevant and admissible on the issue of hard-switch causation and injury. DPP Wholesalers bear the burden of proving that they were injured from having to purchase more Namenda XR because patients were coerced into switching to XR due to the February 2014 discontinuation announcement. Therefore, Forest must be allowed to

2

present "downstream" evidence that patients switched to Namenda XR because they preferred it, or due to lawful marketing efforts. DPP Wholesalers also intend to use their position as intermediaries to argue that there is no need to look at downstream patient preferences to prove antitrust injury. Thus, as a matter of fundamental fairness, Forest must be given an opportunity to introduce evidence of DPP Wholesalers' business models as intermediaries who sell downstream to retailers, to rebut DPPs' claims of alleged injury.

For these reasons, the vague exclusion of "downstream effects" that DPPs seek should be denied.

## ARGUMENT

I. **Generic Bypass Is Not a Downstream Effect, and Forest Must Be Permitted to Offer Evidence that DPPs Were Not Injured**

DPPs' motion to exclude "mention of downstream effects" is overbroad, vague, and imprecise as to the scope of the evidence sought to be excluded, and should be denied on that basis alone. *See, e.g.*, *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996) (denying motion *in limine* where it was lacking the "necessary specificity with respect to the evidence to be excluded or the purported reason for the introduction of such evidence"). For example, generic bypass is not a downstream effect at all, but rather refers to a phenomenon *upstream* from wholesalers, where certain generic manufacturers choose to bypass wholesalers altogether, and sell directly to pharmacies. Ex. 1, Cremieux Report ¶¶ 34-35. DPPs do not dispute that generic bypass would have resulted in a lower volume of overall memantine purchases for DPP Wholesalers if generic entry had happened earlier. Instead, DPPs merely claim that such generic bypass should be lumped together with other "downstream effects" evidence, and barred under *Hanover Shoe*. *See* DPPs' MIL 13 at 2-3. Unlike downstream pass-

3

on of overcharges, generic bypass concerns which purchases even give rise to damages in the first place; a DPP Wholesaler is not injured and suffers no damages on any purchases of brand Namenda XR or Namenda IR that it would not have replaced with purchases of generic memantine. Forest MIL 5 at 14-17.

At a minimum, generic bypass is relevant to the quantum of damages, if any, DPPs suffered from the alleged delay in generic entry because DPP Wholesalers necessarily paid no "overcharges" on any generic sales that bypassed them. *See, e.g., In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 317 (E.D. Mich. 2001) (Plaintiffs may not "ignore the effect of the . . . by-pass phenomenon" and may "consider[] overcharges only for the quantity of generics that were actually substituted for Cardizem CD purchases after generic entry. The by-pass phenomenon will thus be reflected in the reduced quantity of generic substitutions by some wholesaler class members . . . ."); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 U.S. Dist. LEXIS 9705, at *29-30 (E.D. Pa. May 19, 2005) (direct purchasers "recognize that [their expert's damage] estimate should be reduced by 20% to account for generic bypass").

Generic bypass is also relevant to whether certain DPP Wholesalers suffered any injury at all. Certain DPP Wholesalers' business models focus exclusively or primarily on brand pharmaceutical sales. Ex. 1, Cremieux Rep. at ¶¶ 34-35. As such, any delay in generic entry will affect DPP Wholesalers to different degrees based on the extent to which they purchased generic Namenda IR. *Id*. In fact, several DPP Wholesalers did not make *a single purchase* of generic Namenda IR—raising the likelihood that the alleged delayed generic entry did not injure these purchasers at all. Ex. 1, Cremieux Rep. at ¶¶ 107-08. Whether these brand-only DPP Wholesalers suffered injury is a threshold question of injury-in-fact that Forest has a

constitutional right to explore at trial. *Asacol*, 907 F.3d at 51, 58 (confirming constitutional right to press "genuine challenges to allegations of injury-in-fact" and avoid paying damages for sales that caused no injury).

**II.    Forest Should Be Permitted to Offer Evidence that Overcharges Were Passed On to Downstream Customers Under *Hanover Shoe*'s Cost-Plus Exception**

Forest maintains that overcharge damages are inappropriate in this case so *Hanover Shoe* does not apply at all. *See* Forest MIL 5 at 5-12. Nevertheless, even assuming that *Hanover Shoe* does apply, it expressly provides an exception to the general bar on pass-on evidence when a reseller has a cost-plus contract. *See Hanover Shoe*, 392 U.S. at 494 ("[T]here might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present."). Pharmaceutical wholesalers enter into contracts with their customers that provide pricing on such a cost-plus basis. *See* Forest MIL 5 at 13-14; *see also* Ex. 2, Cardinal Health Prime Vendor Agreement §4 ("Buyer will pay a purchase price for all Merchandise purchased under this Agreement in an amount equal to Cardinal Health's Cost for such Merchandise, plus the percentage specified in the pricing matrix . . ."); *Drug Mart Pharm. Co. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 393 (E.D.N.Y. 2001) (quoting deposition testimony from a representative of Amerisource Bergen, a class member here, that for "all classes of trade" the company sells pharmaceutical products on a "cost-plus basis").

While the Second Circuit has held that the cost-plus contract exception typically requires that the contract quantity be determined prior to the overcharge, the rationale for that limitation is that the direct purchaser may suffer injury based on a lower volume of sales caused by the price

5

increase, even if it passes on the entire overcharge. *See Simon v. Keyspan Corp.*, 694 F.3d 196, 202 (2d Cir. 2012) ("A direct purchaser that passes on all of its costs may still suffer an antitrust injury if passing on increased costs decreased its sales and therefore its profits."). This concern does not apply here because DPPs have expressly conceded that they did not lose profits based on Forest's actions. ECF No. 254, Mem. in Opp'n to Forest's Mot. to Compel the Prod. of Docs. ("DPPs' Mot. to Compel Opp'n.") at 16 ("Plaintiffs do not claim to have lost profits as a result of Forest's anticompetitive scheme . . . ."). In other words, there is no possibility here that DPP Wholesalers may respond to proof of their cost-plus pricing practices by claiming that they still suffered injury in the form of lost profits—DPPs have confirmed that they experienced no such lost profits—and thus there is no reason to require that cost-plus sales occur pursuant to fixed quantity contracts in this case for the *Hanover Shoe* exception to apply.

As such, *Hanover Shoe*'s cost-plus exception is directly applicable here, and Forest must be allowed to present evidence that DPP Wholesalers passed on any alleged overcharges to their downstream customers. *See* Forest MIL 5 at 13-14.

## III. *Hanover Shoe*'s Rationale for Barring Pass-On Evidence Is Outdated

One of the primary rationales underpinning *Hanover Shoe* was the Court's desire to avoid burdening federal court proceedings with the complexity arising from downstream pass-on issues. *See* 392 U.S. at 492-93. That rationale is no longer applicable—many states now permit indirect purchaser suits, and federal courts must grapple with this complexity because the Class Action Fairness Act practically guarantees that those state law indirect purchaser suits will be brought in federal court, as has happened here with the filing of the parallel indirect purchaser action. *See* 28 U.S.C. §§ 1332(d), 1453, 1711–1715; *see also Sergeants Benevolent Association*

*Health & Welfare Fund v. Actavis, plc, et al.*, No. 15-cv-06549-CM-RWL (S.D.N.Y.) (Namenda indirect purchaser action).

Given the emergence of these indirect purchaser suits in federal courts, leading antitrust commentators have been vocal about the need to overturn *Hanover Shoe* and *Illinois Brick* as no longer applicable and economically outdated. *See, e.g.*, Phillip E. Areeda, Herbert Hovenkamp, Roger D. Blair & Christine Piette Durrance, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 346k, at 189, 197 (3d ed. 2007) ("Thus the indirect purchaser rule greatly overcompensates intermediaries . . . . [Section 4] of the Clayton Act awards damages to the person who is 'injured,' and *Illinois Brick* frequently gives the award to the wrong person.").

While DPPs point to the recent decision in *Apple, Inc. v. Pepper* as upholding the *Illinois Brick* indirect purchaser rule (DPPs' MIL 13 at 1), that Supreme Court decision actually raises serious questions about the continuing viability of the indirect purchaser rule and any commentary on *Hanover Shoe* was dicta. *See* 139 S. Ct. 1514, 1530-31 (2019) (Gorsuch, J., dissenting).

As explained above, this Court should not apply *Hanover Shoe* to bar evidence of downstream pass-on here. But if the Court concludes that *Hanover Shoe* applies to bar evidence of pass-on and generic bypass, Forest reserves the right to challenge both the applicability and continuing viability of *Hanover Shoe*.

## IV. Forest Must Be Allowed to Introduce Evidence of Downstream Effects on the Issue of Hard-Switch Causation and to Rebut DPPs' Theory of Hard-Switch Injury

DPPs' motion is also arguably broad enough to exclude evidence of downstream patient or prescriber level data that is directly relevant to whether Forest's discontinuation announcement caused antitrust injury. *See Sergeants Benevolent Ass'n Health & Welfare Fund*

7

*v. Actavis, PLC*, No. 15-cv-06549-CM-RWL, 2016 U.S. Dist. LEXIS 128349, at *38-39 (S.D.N.Y. Sept. 13, 2016) (finding that in order to succeed on hard-switch claim DPPs must "prove that these patients switched to Namenda XR because of the announced withdrawal of Namenda IR"). For example, if patients switched to Namenda XR because they simply preferred a once-daily formulation, because it was cheaper than Namenda IR, or because Namenda XR was covered by their health plans—and not because of the discontinuation announcement—DPPs were not injured by those purchases of Namenda XR. To receive a fair trial, Forest must be permitted to introduce evidence of the reasons for downstream patient switching.

DPPs' economist, Dr. Russell Lamb, also intends to testify that the hard switch began before the February 2014 discontinuation announcement and that the alleged anticompetitive effects continued past the December 2014 injunction. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 179-80 (S.D.N.Y. 2018) ("*Namenda III*"). As the Court has already determined, Forest's "difference of opinion" on the expanded period "is fair ground for cross examination." *Id*. at 179. Having declared that these are contested trial issues, the Court must allow Forest to offer evidence of the downstream impact on physicians and patients from its direct-to-consumer marketing campaign and other legal soft-switch marketing efforts to drive conversion to Namenda XR post-injunction. *See* Ex. 3, Expert Rep. of Lona Fowdur ("Fowdur Rep.") ¶¶ 116-21.

Forest also must be permitted to introduce evidence related to DPP Wholesalers' business models, including downstream sales to their customers, to rebut their theory of hard-switch injury. DPP Wholesalers intend to use their position as intermediaries to insulate themselves from having to prove individual patient switching on their hard-switch claim. *See* ECF No. 701, Pls.' Revised Proposed Jury Instruction at 100 ("[Y]ou must recall that the Class here is

8

comprised of 'wholesalers and other direct purchasers,' and that Defendants 'deal[] with wholesalers, not patients.' Accordingly, for Plaintiffs and the Class to establish they were injured or to prove damages, they need not 'show that individual patient decisions were the result of [D]efendant[s'] alleged conduct.'") (internal citations omitted).

Forest disagrees with DPPs' position that patient behavior is irrelevant to determine hard-switch injury—DPP Wholesalers would be harmed, if at all, only derivatively by patient switching downstream due to the discontinuation announcement. Nevertheless, if DPP Wholesalers are permitted to use their position as intermediaries to argue patient-level data and switching is irrelevant, fundamental fairness requires that Forest be allowed to introduce evidence to fully explain DPP Wholesalers' business models at trial, including their purchasing, resale, and pricing of pharmaceuticals. *See United States v. Silver*, 184 F. Supp. 3d 33, 53 n.10 (S.D.N.Y. 2016) (holding that "otherwise inadmissible evidence is admissible to rebut a false impression created by the opposing party's evidence, whether the opposing party's evidence was properly admissible or not").

DPPs' argument that patient or prescriber level data is irrelevant to their hard-switch injury will create the false impression that the relevant inquiry is whether *DPP Wholesalers were coerced* because of Forest's discontinuation announcement. DPPs have conceded, however, that their demand is derived entirely from downstream patient demand. DPPs' Mot. to Compel Opp'n. at 12-13 ("If a Plaintiff's sales of Namenda decreased, for example, there is no way to determine if such lost sales represent patients who stopped taking the drug, began taking a different drug, or started getting their prescriptions filled at a pharmacy served by a different wholesaler. Nor would a record of Plaintiffs' sales reveal why a pharmacy chose to place an order for Namenda, let alone why a doctor chose to prescribe it."). Forest must be able to

9

introduce evidence related to DPP Wholesalers' business models, including the fact that their purchases are derived entirely from downstream patient demand to explain that the coercion, if any, must be analyzed from downstream data at the patient and prescriber level.

## CONCLUSION

For the foregoing reasons, the Court should deny DPPs' Motion *In Limine* No. 13: Exclude Mention of Downstream Effects.

Dated: June 14, 2019

Respectfully submitted,

**WHITE & CASE LLP**

By: */s/ John H. Chung*

| | |
|---|---|
| Beth Wilkinson | Martin M. Toto |
| Rakesh Kilaru | Heather K. McDevitt |
| Kieran Gostin | John H. Chung |
| WILKINSON WALSH + ESKOVITZ | Michael E. Hamburger |
| 2001 M Street NW, 10th Floor | William H. Bave, III |
| Washington, D.C. 20036 | Kristen O'Shaughnessy |
| Telephone: (202) 847-4000 | Kevin C. Adam |
| | WHITE & CASE LLP |
| **Counsel for Defendants Actavis plc, Forest Laboratories, LLC, Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd.** | 1221 Avenue of the Americas |
| | New York, New York 10020 |
| | Telephone: (212) 819-8200 |

J. Mark Gidley
Christopher M. Curran
Eric Grannon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600

Heather M. Burke
Eric E. Lancaster
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Ste. 900
Palo Alto, CA 94306
Telephone: (650) 213-0300

**Counsel for Defendants Actavis plc, Forest Laboratories, LLC, Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd.**