**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**All Direct Purchaser Actions** | **Case No. 1:15-cv-07488-CM-RWL** |

**OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* 5 TO EXCLUDE**
**DPP WHOLESALERS' OVERCHARGE DAMAGES METHODOLOGY**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................... 4

III.  ARGUMENT ...................................................................................................... 6

    A.    PLAINTIFFS ARE ENTITLED TO SEEK OVERCHARGES ............................ 6

        1.    Forest's Argument Is Foreclosed by Controlling Law .............................. 6

        2.    Forest's "Different Products" Argument Has Been Rejected.................... 9

    B.    FOREST IS NOT PERMITTED TO INTRODUCE EVIDENCE REGARDING PLAINTIFFS' SALES OR PROFITS......................................... 12

        1.    The Cost-Plus Exception to *Hanover Shoe* Does Not Apply ................. 12

        2.    Forest's Proffered Example Is Not a "Cost Plus" Contract ..................... 15

        3.    Forest's "Bypass" Argument Has Been Rejected ..................................... 19

        4.    Forest Provides No Basis to Reconsider This Court's Ruling That "Brand-Only" Purchasers Suffered Injury ................................................ 22

IV.   CONCLUSION.................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019) .......................................................................................................... 12

*Arizona v. California*,
  460 U.S. 605 (1983) ............................................................................................................... 6

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ................................................................................................ 11

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946) .............................................................................................................. 11

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) .............................................................................................................. 11

*Bogosian v. Gulf Oil Corp.*,
  561 F.2d 434 (3d Cir. 1977) .................................................................................................. 9

*Chattanooga Foundry & Pipe Works v. City of Atlanta*,
  203 U.S. 390 (1906) ......................................................................................................... 8, 10

*City of Philadelphia v. Public Employees Ben. Servs. Corp.*,
  842 F. Supp. 827 (E.D. Pa. 1994) ....................................................................................... 14

*County of Oakland v. City of Detroit*,
  866 F.2d 839 (6th Cir. 1989) .......................................................................................... 7, 14

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  424 F.3d 363 (3d Cir. 2005) ................................................................................................ 11

*Glynn-Brunswick Hosp. Auth. v. Becton Dickinson & Co.*,
  159 F. Supp. 3d 1361 (S.D. Ga. 2016) ................................................................................ 17

*Hanover Shoe v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) ...................................................................................................... passim

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972) ............................................................................................................... 7

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ...................................................................................................... passim

*In re Buspirone Patent Litig.*,
  210 F.R.D. 43 (S.D.N.Y. 2002) ........................................................................................... 14

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) ........................................................................... 21

*In re Cardizem CD Antitrust Litig.,*
332 F.3d 896 (6th Cir. 2003) ............................................................................... 9, 10

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009)........................................................................ 2, 9, 10, 12

*In re Hypodermic Prods. Direct Purchaser Antitrust Litig.*,
No. 05-CV-1602, 2006 WL 6907107 (D.N.J. Sept. 7, 2006) ...................................... 14, 16, 18

*In re K-Dur Antitrust Litig.*,
686 F.3d 197 (3d Cir. 2012)........................................................................ 8, 10, 20, 22

*In re Lidoderm Antitrust Litig.*,
No. 14-MD-02521-WHO, 2018 WL 7814761 (N.D. Cal. Feb. 7, 2018) ................................ 21

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993).................................................................................... 10

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018).................................................................... 1, 5, 22

*In re Namenda Direct Purchaser Antitrust Litig.*,
No. 15 civ 7488-CM-JCF, 2017 WL 2693713 (S.D.N.Y. June 21, 2017) ...................... passim

*In re Niaspan Antitrust Litig.,*
No. 13-MD-2460, 2015 WL 4197590 (E.D. Pa. July 9, 2015).................................... 21

*In re OSB Antitrust Litig.*,
No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ........................................ 14

*In re Prograf Antitrust Litig.,*
No. 1:11-MD-02242-RWZ, 2014 WL 7641156 (D. Mass. Dec. 23, 2014)........................... 21

*In re Relafen Antitrust Li*tig.,
218 F.R.D. 339 (D. Mass. 2003)........................................................................ 10, 20

*In re Relafen Antitrust Litig.*,
346 F. Supp. 2d 349 (D. Mass. 2004) .................................................................. 3, 7, 19, 21

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
292 F.R.D. 544 (E.D. Tenn. 2013)........................................................................ 20

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. CV 14-MD-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017) .................................. 10

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
    64 F. Supp. 3d 665 (E.D. Pa. 2014) ........................................................................ 4

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ............................................................................. 21

*In re Wyoming Tight Sands Antitrust Cases*,
    866 F.2d 1286 (10th Cir. 1989) ............................................................................. 17

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990)......................................................................... 13, 16, 17, 19

*Lee-Moore Oil Co. v. Union Oil*,
    599 F.2d 1299 (4th Cir. 1979) ............................................................................. 10

*Lefrak v. Arabian Am. Oil Co.*,
    487 F. Supp. 808 (E.D.N.Y. 1980) ....................................................................... 17

*Maxon Hyundai Mazda v. Carfax, Inc.*,
    No. 13–CV–2680 (AJN)(RLE), 2015 WL 4510416 (S.D.N.Y. July 24, 2015) ....................... 8

*McCarthy v. Recordex Serv., Inc.*,
    80 F.3d 842 (3d Cir. 1996)............................................................................ 14, 16

*Meijer, Inc. v. Abbott Labs.*,
    251 F.R.D. 431 (N.D. Cal. 2008)........................................................................... 14

*Meijer, Inc. v. Barr Pharm. Inc.*,
    572 F. Supp. 2d 38 (D.D.C. 2008)............................................................. 14, 18, 21

*Merck & Co. v. Louisiana Wholesale Drug Co.*,
    570 U.S. 913 (2013)............................................................................................. 8

*Paper Sys., Inc. v. Nippon Paper Indus. Co.*,
    281 F.3d 629 (7th Cir. 2002) ............................................................................... 11

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)............................................................................................. 8

*Russul Corp. v. Zim Am. Integrated Shipping Servs. Co.*,
    No. 06 CIV 0037JCF, 2009 WL 3247141 (S.D.N.Y. Oct. 5, 2009).......................... 6

*Simon v. KeySpan Corp.*,
    694 F.3d 196 (2d Cir. 2012)........................................................................ *passim*

*Skelaxin (Metaxalone) Antitrust Litig.*,
    No. 1:12-md-2343, 2014 WL 2002887 (E.D. Tenn. May 15, 2014) ........................ 21

*Small v. Sec'y of Health & Human Servs.*,
  892 F.2d 15 (2d Cir. 1989) ........................................................................... 4

*Sports Racing Servs., Inc. v. Sports Car Club of America, Inc.*,
  131 F.3d 874 (10th Cir. 1997) ..................................................................... 7

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharm. Inc.*,
  244 F. Supp. 3d 705 (M.D. Tenn. 2017) ................................................... 17

*Teva Pharm. USA, Inc. v. Abbott Labs.*,
  252 F.R.D. 213 (D. Del. 2008) ................................................................... 10

*The Fair v. Kohler Die & Specialty Co.*,
  228 U.S. 22 (1913) ....................................................................................... 8

*United States v. Teva Pharm. USA, Inc.*,
  Civ. No. 13-cv-3702, 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019) ........... 2

*Valley Drug Co. v. Geneva Pharms., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ................................................................. 21

*Warren Gen. Hosp. v. Amgen Inc.*,
  643 F.3d 77 (3d Cir. 2011) ......................................................................... 20

*West Virginia v. Chas. Pfizer & Co.*,
  440 F.2d 1079 (2d Cir. 1971) ....................................................................... 7

**Statutes**

15 U.S.C. § 15 .................................................................................................... 6

**Rules**

Fed. Rule Civ. P. 72(a) ...................................................................................... 4

**Other Authority**

Herbert Hovenkamp, *A Primer on Antitrust Damages* (2011) ...................... 12

Herbert Hovernkamp, et al., *IP and Antitrust* § 6.03 (3d ed. 2018 Supp.) ... 12

## I.    INTRODUCTION

Forest claims that Plaintiffs should be prohibited from recovering overcharges and be forced (over their objection) to plead and prove "lost profits" instead.  The Court has rejected this same argument at least twice before because it is flatly contrary to controlling law.  This should be strike three.

During discovery, Magistrate Judge Francis rejected Forest's requests for discovery into Plaintiffs' own sales and profits, holding that "[c]ase law does not support" Forest's argument that "lost profits are the measure of damages."  *In re Namenda Direct Purchaser Antitrust Litig*., No. 15 civ 7488-CM-JCF, 2017 WL 2693713, at *6 (S.D.N.Y. June 21, 2017) (Francis, M.J.).  Forest never appealed Judge Francis's decision and so has waived any challenge.  Nevertheless, in opposing class certification, Forest again argued that the proper measure of damage was lost profits, and stated that it was "up to this Court to resolve[.]"  *See* Forest's Opp'n to Direct Purchaser Pls.' Mot. for Class Certification at 34 (refiled Jan. 22, 2019) (ECF No. 619) ("Class Opp'n").  This Court, however, certified the class to seek *overcharges*.  *In re Namenda Direct Purchaser Antitrust Litig*., 331 F. Supp. 3d 152, 212 (S.D.N.Y. 2018) (McMahon, C.J.) ("*Namenda V*") ("[m]onopolist overcharges are the classic antitrust injury.").  Forest offers no basis to alter the law of the case.  Forest asks the Court to exclude Dr. Lamb's damages opinion (Defs.' Mem. at 5), but the Court also already denied Forest's prior motion to exclude Dr. Lamb's testimony.  *Namenda V*, 331 F. Supp. 3d at 174-81, 217-21.  It is too late for a motion for reconsideration, or for another *Daubert* motion.  *See* S.D.N.Y.R. 6.3 ("Unless otherwise provided by the Court or by statute or rule . . . a notice of motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the Court's determination of the original motion . . ."); Third Am. Case Mgmt. Order (ECF No. 397) at 2 ("Last date to file summary judgment and *Daubert* motions" was November

17, 2017); *United States v. Teva Pharm. USA, Inc.*, Civ. No. 13-cv-3702, 2019 WL 1245656, at

*12 (S.D.N.Y. Feb. 27, 2019) (McMahon, J.) ("As far as this court is concerned, the Parties have

waived any *Daubert* arguments by not raising them at summary judgment. *If I can consider an*

*expert's [testimony] at summary judgment, a jury can consider it at trial*.") (emphasis added).

On its third try, Forest cites *no case* requiring direct purchasers to seek lost profits instead

of overcharges.  Forest's motion is frivolous and completely foreclosed by controlling Supreme

Court and Second Circuit law.  *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481

(1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) together hold that a direct

purchaser's payment of an unlawful overcharge constitutes injury under Section 4 of the Clayton

Act equal to the "full amount" of the overcharge, regardless of the overcharge's effect on the

direct purchaser's own profits.  The basis for the Supreme Court's holding was "an

unwillingness to complicate treble-damages actions with attempts to trace the effects of the

overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables

would have behaved differently without the overcharge."  *Illinois Brick*, 431 U.S. at 725.  The

sort of lost profits evidence that Forest seeks to put before the jury is irrelevant and inadmissible

(*see* Pls' Mem. of Law in Supp. of Motion *in Limine* No. 13 to Exclude Mention Downstream

Effects (ECF No. 751)).  Although Forest says the product subject to the overcharge and the

excluded, less expensive product must be literally identical, courts have repeatedly confirmed

that in Hatch Waxman antitrust cases like this one, the direct purchaser's overcharge is the

difference in price between the brand product and the less expensive generic that would have

been substituted.  *See*, *e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688

(2d Cir. 2009) (brand-generic overcharge is "an injury plainly [] of the type the antitrust laws

were intended to prevent.").  Class members were injured the moment they purchased branded or

generic Namenda at an inflated price.

Forest is not entitled to reduce its liability because of so-called "bypass" effects – whereby some wholesalers (members of the Class) may lose volumes after generic entry because some entities buy brand products from a wholesaler but buy generic products directly from the manufacturer ("bypassing" the wholesaler).  Courts have uniformly excluded such "bypass" evidence and argument because it effectively violates the no pass-on rule of *Hanover Shoe*, unanimously concluding that direct purchasers' overcharge damages should not be reduced to account for bypass because otherwise "a substantial portion of the harm attributed to [defendant's] conduct would go completely unredressed[.]"  *In re Relafen Antitrust Litig*., 346 F. Supp. 2d 349, 368-69 (D. Mass. 2004).

Courts also have repeatedly rejected Forest's argument that pharmaceutical wholesalers are subject to the so-called "cost-plus" exception to the direct purchaser rule.  *Illinois Brick* confirms that any such theoretical exception has only a "narrow scope" and applies only where the "pre-existing cost-plus contract" obligates the downstream customer to, *inter alia*, buy "a **fixed quantity** regardless of price," so that the effect of an illegal overcharge "is essentially determined in advance[.]"  *Ill. Brick*, 431 U.S. at 736 (emphasis added).  Forest has not identified any such "fixed quantity" contract here, and Judge Francis already held that the class representatives' contracts do not meet the cost-plus exception.  *Namenda*, 2017 WL 2693713, at *7-8.  Forest never appealed that ruling, and it is the law of the case.

Finally, Forest belatedly seeks reconsideration of this Court's ruling that a direct purchaser is a member of the class, even if in the actual world – tainted as it was by Forest's conduct – it did not purchase generic Namenda.  This Court already rejected Forest's argument in certifying the class.  Nothing has changed.  Forest's untimely motion for reconsideration

3

should be denied.

## II.   FACTUAL BACKGROUND

During discovery, Forest moved to compel Plaintiffs to produce documents relating to Plaintiffs' profits and profitability, making the same arguments it makes here, namely that an overcharge theory is not cognizable for allegedly "*different* products" and that the supposed "correct" measure of damages "is not overcharges, but rather lost profits."  *See*, *e.g.*, Mem. of Law in Supp. of Forest's Mot. to Compel the Production of Documents by the Direct Purchaser Plaintiffs at 9, 10 (ECF No. 246) ("Mot. to Compel") (emphasis in original).

Judge Francis denied Forest's Mot. to Compel.  Citing *Hanover Shoe*, he held that "in an action brought by a direct purchaser of goods sold at an increased price as a result of anticompetitive conduct, the proper measure of damages is the full amount of the overcharge, and the purchaser's actual lost profit is generally irrelevant."  *Namenda*, 2017 WL 2693713, at *6 (citing *Hanover Shoe*, 392 U.S. at 488-89; *Ill. Brick*, 431 U.S. at 731-32).  Judge Francis also rejected Forest's "different" products argument, observing "[c]ase law does not support this argument."  *Namenda*, 2017 WL 2693713, at *6 (citing *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 672 (E.D. Pa. 2014)).  He also concluded that because Plaintiffs "do not have contracts with customers obligating them to purchase specific quantities of products at a fixed markup," the contracts "cannot" be the "basis for the cost-plus exception" to *Illinois Brick*.  *Namenda*, 2017 WL 2693713, at *7.  Forest never appealed that ruling under Fed. Rule Civ. P. 72(a).  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) ("We have adopted the rule that failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

In opposing Plaintiffs' motion for class certification, Forest again argued that "the Proper

4

Measure of Damages is Lost Profits."  Class Opp'n at 34.  The Court, however, certified the class to pursue overcharges, not lost profits.  *See*, *e.g.*, *Namenda V*, 331 F. Supp. 3d at 212 (observing that "[m]onopolist overcharges are 'the classic antitrust injury.'") (citation omitted); *id.* at 216 (discussing proof of "Brand-Generic overcharges"); *id.* at 207 (noting class members "separately purchased (and were *overcharged* for) the[] product," and that "[a]ny *overcharges* they paid for their own purchases of memantine are separately and distinctly applicable to them.") (emphasis added); *id.* at 213 (rejecting argument that it was "too speculative to estimate the alleged overcharge") (citation omitted).

The Court subsequently approved a form of class notice (to which Forest stipulated) that expressly advised class members that Plaintiffs were seeking to recover overcharges.  *See* ECF No. 589-1 at 4 (proposed form of class notice stating that "Direct Purchaser Class Plaintiffs further allege that they and the other members of the Class were injured by being overcharged"); at 6 ("The Court has identified the following classwide issues: . . . (c) Whether the challenged conduct caused antitrust injury-in-fact to the Class, in the form of overcharges; and (d) The amount of overcharge damages, if any, owed to the Class in the aggregate");  ECF No. 599 at 1 ("Defendants do not oppose Plaintiffs' proposed form or manner of notice to the direct purchaser class"); ECF No. 602 (Order approving form of notice); ECF No. 606-1 (declaration of notice administrator stating that Court-approved notice had been mailed on December 14, 2018).

The Court need go no further to deny Forest's motion.  We provide additional discussion below if the Court's wishes to review this issue further.

### III.     ARGUMENT

#### A.     Plaintiffs Are Entitled to Seek Overcharges

##### 1.     Forest's Argument Is Foreclosed by Controlling Law

Forest claims that direct purchasers here should be prohibited from recovering overcharges and be forced (over their objection) to plead and prove "lost profits" instead.  This Court has rejected this argument at least twice, however, which is foreclosed by controlling Supreme Court and Second Circuit law, and the law of the case.  *See*, *e.g.*, *Russul Corp. v. Zim Am. Integrated Shipping Servs. Co*., No. 06 CIV. 0037JCF, 2009 WL 3247141, at *3 (S.D.N.Y. Oct. 5, 2009) (The law of the case doctrine holds that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Arizona v. California,* 460 U.S. 605, 618 (1983)).

In *Hanover Shoe,* the Supreme Court held that a direct purchaser's payment of an illegal overcharge *is* injury under Section 4 of the Clayton Act, 15 U.S.C. § 15:  "Hanover proved injury and the amount of its damages for the purposes of its treble-damage suit when it proved that United had overcharged it during the damage period and showed the amount of the overcharge[.]"  392 U.S. at 494.  The defendant in *Hanover Shoe* argued – just as Forest does here – that the plaintiff had suffered "no legally cognizable injury" because the overcharge had not harmed the plaintiff's own profits.  *Id*. at 487-88.  The Supreme Court rejected the argument: "As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. [. . .] United was not entitled to assert a passing-on defense."  *Id.* at 489, 494.

*Illinois Brick* reaffirmed *Hanover Shoe*'s holding that payment of an illegal overcharge *is* injury under Section 4 of the Clayton Act:

> a direct purchaser suing for treble damages under § 4 of the Clayton Act ***is injured within the meaning of § 4 by the full amount of the overcharge paid by it***.

6

*Illinois Brick*, 431 U.S. at 724-25 (emphasis added). *Illinois Brick* rejected and overruled prior

decisions (including Forest's citation, *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079 (2d

Cir. 1971)) where antitrust plaintiffs were found not to have been harmed because the wrongful

conduct allegedly caused them to make more money. *Illinois Brick*, 431 U.S. at 743-44 & n.28

(citing fixed percentage markup cases, including *West Virginia*, where the conduct, albeit

resulting in an overcharge, causes the middleman to make more money on the resale). Forest

fails to mention that *West Virginia* was overruled.

Because payment of an illegal overcharge *is* injury and a plaintiff is entitled to recover

the "full amount" of the overcharge, and because a defendant is *not* permitted to argue that a

plaintiff's profits were unaffected by the overcharge, whether a plaintiff purportedly "benefitted"

from the overcharge is irrelevant. *See Hanover Shoe,* 392 U.S. at 492-95; *Illinois Brick,* 431

U.S. at 730, 746. *See also Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 264 n.14 (1972)

("[D]amages are established by the amount of the overcharge [and] [u]nder § 4, courts will not

go beyond the fact of this injury to determine whether the victim of the overcharge has partially

recouped its loss in some other way."); *Sports Racing Servs., Inc. v. Sports Car Club of America,*

*Inc.,* 131 F.3d 874, 884-85 (10th Cir. 1997) (argument that plaintiff lacked antitrust injury

because it allegedly benefited from unlawful conduct "is directly contrary to the Supreme

Court's holding in *Hanover Shoe.*"); *County of Oakland v. City of Detroit,* 866 F.2d 839, 849

(6th Cir. 1989) (*Illinois Brick* "repudiated" earlier Sixth Circuit decision that overcharged direct

purchaser suffered no injury because it profited from defendant's challenged conduct); *In re*

*Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 367-70 (D. Mass. 2004) (barring defense attempt to

show that plaintiffs profited or benefited due to defendants' illegal behavior).

Forest erroneously imagines *Hanover Shoe* engaged in some sort of lost profits analysis,

but the Supreme Court required no proof of lost profits and has found injury independent of any resale.  *See Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906) (Holmes, J.); *Reiter v. Sonotone Corp*., 442 U.S. 330, 340 (1979) ("the Court's holding in *Chattanooga Foundry* was deliberately grounded on the premise that the city had been injured in its 'property' – independent of any injury it had sustained in its 'business of furnishing water' […] monetary injury, standing alone, may be injury in one's 'property' within the meaning of § 4").

Thus, the only Court of Appeals to consider Forest's argument – that bypass effects in pharmaceutical sales compels some form of lost profits analysis – has rejected it.  *See In re K-Dur Antitrust Litig*., 686 F.3d 197, 220 (3d Cir. 2012) ("Defendants' lost profits argument is unavailing because it is simply a version of the so-called "passing-on defense" that was rejected by the Supreme Court in *Hanover Shoe*"), *cert. granted, judgment vacated on other grounds sub nom.*, *Merck & Co. v. Louisiana Wholesale Drug Co*., 570 U.S. 913 (2013), *reinstatement granted*, No. 10-2077, 2013 WL 5180857 (3d Cir. Sept. 9, 2013).  *See also Maxon Hyundai Mazda v. Carfax, Inc.*, No. No. 13–CV–2680 (AJN)(RLE), 2015 WL 4510416, *2 (S.D.N.Y. July 24, 2015) (rejecting discovery into purchasers' lost profits; "in anti-trust cases where Plaintiffs allege an 'overcharge' theory of damages, events farther down the stream of commerce are irrelevant.").  Here too, Plaintiffs chose to pursue overcharges, and Plaintiffs are masters of their complaint.  *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913).

Limiting inquiry to the direct purchasers' overcharge (and eliminating pass-on and profit issues) also avoids burdening the parties and courts with expensive downstream discovery and "massive evidence and complicated theories[,]" which would diminish the effectiveness of private antitrust suits as an important weapon in antitrust enforcement.  *Hanover Shoe*, 392 U.S.

8

at 493-94; *Illinois Brick*, 431 U.S. at 745.  *See also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), (requiring proof of "loss of profit" could be "enormously complicated" and pose a "tremendous burden" to the plaintiff,  "[*b*]*ut it is precisely for this reason that the Supreme Court eliminated the 'passing-on defense' in Hanover Shoe, Inc.*") (emphasis added).

### 2.      Forest's "Different Products" Argument Has Been Rejected

Forest argues that *Hanover Shoe* does not apply because that case supposedly involved an overcharge for the same products while here there are "different" products.  Judge Francis rejected this precise argument, too.  *See Namenda*, 2017 WL 2693713, at *6 ("Case law does not support this argument").  That is the law of the case.

Forest's argument also is foreclosed by the Second Circuit's decision in *DDAVP*, which acknowledged that a brand-generic overcharge is "an injury plainly [] of the type the antitrust laws were intended to prevent."  585 F.3d at 688.  *See also In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 910 (6th Cir. 2003) (direct purchasers of brand drug alleging overcharges because of wrongfully delayed generic competition have alleged "the type of injury" the prevention of which "was undoubtedly a *raison d'etre* of the Sherman Act when it was enacted in 1890") (emphasis in original).

A brand drug and its FDA-approved generic are essentially identical, as confirmed by the FDA (*see* https://www.fda.gov/drugs/generic-drugs/generic-drug-facts), state statutes (*see* Declaration of Joseph Opper Ex. 17 (table of state statutes)), and courts.  Generics are substantially less expensive, however.  By unlawfully impairing generic competition, Forest prevented the substantial cost savings that generic entry brings.  That is an overcharge.  Forest has conceded that "[w]here injury stems from purchasing a brand drug and its AB-rated equivalent, measuring the difference in price between the two may be an appropriate means to proving damages because the two drugs are effectively the same product." Class Opp'n at 34.

Forest offers no rationale for treating purchases of follow-on products like Namenda XR differently, and Forest's "different products" argument has been rejected in product hopping cases. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *7 (D. Mass. Oct. 16, 2017) (direct purchasers harmed by reverse payment and subsequent hop to new drug formulation injured in form of overcharges); *Teva Pharm. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213, 229-32 (D. Del. 2008) (direct purchasers harmed by brand manufacturer's hop to new drug formulation in form of overcharges). As in a traditional overcharge case, the gravamen of the claim is that the purchaser was forced to buy a more expensive product instead of a less costly alternative. Plaintiffs are entitled to sue for "the difference between the price paid and the market or fair price that [they] would have had to pay under natural conditions." *Chattanooga Foundry*, 203 U.S. at 396.

Every court to consider the issue has agreed that where generic competition is wrongfully impaired, direct purchasers may recover the brand-generic price difference as an overcharge. *See, e.g., DDAVP*, 585 F.3d at 688; *K-Dur*, 686 F.3d at 220; *Cardizem*, 332 F.3d at 910; *In re Relafen Antitrust Litig.*, 218 F.R.D. 339, 343-44 (D. Mass. 2003). *See also In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167-70 (3d Cir. 1993) (overcharges recoverable based on price difference between transportation services by rail and cheaper, illegally excluded services by truck); *Lee-Moore Oil Co. v. Union Oil,* 599 F.2d 1299, 1306 (4th Cir. 1979) (there is "no difference in principle between the *Hanover Shoe* situation" and a situation where the allegedly illegal conduct "has forced [the plaintiff] to purchase alternative products elsewhere at a higher price.").

The brand/generic price difference also represents the illicit gain by defendants who wrongfully block generic entry. Allowing direct purchasers to recover overcharges for all of

10

their purchases of Namenda thus matches the market harm caused by Forest's conduct and serves

a key purpose of allowing antitrust recovery:  to "deter violators and deprive them of the fruits of

their illegal actions[.]"  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982).  Prohibiting

recovery of such overcharges would permit Forest to keep its ill-gotten gain.  *See Berkey Photo,*

*Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295-96 (2d Cir. 1979) (each purchase from the

monopolist at monopoly price constitutes injury because "[a]n unlawful monopolist must be

'deprived of the fruits' of its wrongful conduct, and one of the forbidden fruits is an excessive

price") (internal quotes and citation omitted); *Paper Sys., Inc. v. Nippon Paper Indus. Co.,* 281

F.3d 629, 632-33 (7th Cir. 2002) (Supreme Court established bright line rule to "maximize

deterrence").  Significantly, Forest does not argue that some *other* purchaser in the chain of

distribution should be permitted to recover overcharges under federal antitrust law.

A plaintiff's recovery of overcharge damages also vindicates the anticompetitive harm –

supracompetitive prices.  As Judge Francis observed, "'the standard method of measuring

damages in price enhancement cases is overcharge, not lost profits[.]'"  *Namenda*, 2017 WL

2693713, at *7 (quoting *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363,

374-75 (3d Cir. 2005)).

Forest cites *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946), in which the plaintiff

was an excluded *competitor*, not a purchaser.  Am. Bar Ass'n, *Proving Antitrust Damages* 90-91

(3d ed. 2016) ("a direct purchaser . . . would typically seek overcharge damages . . . In contrast,

for competitors prevented from fully competing . . . the but-for premise may require comparing

the competitor-plaintiffs' actual profits versus the profits the plaintiff would have earned in a

world free of the market restraint – as was the case in . . . *Bigelow*.").  Forest's hypothetical

regarding Mercedes and Chevrolets is beside the point, as the proper framework for damages is

the overcharge, not lost profits.  *See, e.g.*, *DDAVP*, 585 F.3d at 689 ("The defendants'

competitors, unlike the [direct purchaser] plaintiffs, would be seeking lost profits, not

overcharges.").

Also unavailing is Forest's citation of certain antitrust texts, which simply express the

authors' disagreement with controlling law.  *See* Herbert J. Hovenkamp, *A Primer on Antitrust*

*Damages* 28 (2011) ("Today the overcharge method of computing damages is well established . .

. The case has been made for a return to the lost profits method of damages . . . [b]ut courts have

declined the invitation, and the Supreme Court's adoption of the indirect purchaser rule in

Illinois Brick Co. v. Illinois makes such a rule unlikely") (italics removed in original); Herbert

Hovernkamp, et al., *IP and Antitrust* § 6.03 (3d ed. 2018 Supp.) (disagreeing with *Illinois Brick*).

The Supreme Court, however, recently reiterated that it has "consistently stated" that *Illinois*

*Brick* remains controlling.  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019).

### B.   Forest Is Not Permitted to Introduce Evidence Regarding Plaintiffs' Sales or Profits

#### 1.   The Cost-Plus Exception to *Hanover Shoe* Does Not Apply

Forest attempts to avoid the holding of *Hanover Shoe* by citing the so-called "cost-plus"

exception and seeks to present a baseless argument to the jury that some class members "passed

on" the overcharge to their customers.  If it exists at all, the exception for a pre-existing, cost-

plus contract for a fixed quantity of the overcharged product is exceedingly narrow and has no

possible application here.

As a preliminary matter, Forest's "cost-plus" argument is a non sequitur.  Judge Francis

already held that the class representatives' contracts do not meet the cost-plus exception.

*Namenda*, 2017 WL 2693713, at *7-8.  Forest never appealed that ruling, and it is the law of the

case.  Forest suggests that absent class members might have "cost plus" contracts with their own

customers, but the one contract they offer (not contained in Forest's exhibit list) plainly does not qualify. And even if Forest could proffer a genuine cost plus contract – it cannot – it would only affect the internal allocation of damages after trial among class members. If a class member's own customer purchased under such a contract, it might be eligible to share in the allocation, but aggregate class damages would be the same. Hence, Forest's "cost plus" argument is not only foreclosed and wrong, but irrelevant.

The Supreme Court has suggested it "***might***" permit indirect purchaser claims where it is "easy to prove" the direct purchaser was not damaged under a "pre-existing cost-plus contract[.]" *Hanover Shoe*, 392 U.S. at 494 (emphasis added). Any such exception has only a "narrow scope" and could apply only where a "pre-existing cost-plus contract" obligates the downstream customer to buy "a ***fixed quantity*** regardless of price," so that the effect of an illegal overcharge "is essentially determined in advance[.]" *Ill. Brick*, 431 U.S. at 736 (emphasis added). But the Supreme Court has refused to apply the exception even when the direct purchaser passed on 100% of the overcharge. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 218 (1990).

The Second Circuit has similarly refused to apply any exception, even where 100% of the overcharge was passed on to the direct purchaser's customer. In *Simon v. KeySpan Corp.*, the Court recognized that "[t]he cost-plus contract exception to the indirect purchaser bar is a narrow one that is only appropriate when the contract ***has removed all doubts*** about who bore the antitrust injury." 694 F.3d 196, 202 (2d Cir. 2012) (emphasis added). Despite plaintiff's claim that the quantity was pre-fixed because the plaintiff committed to "[t]he quantity of installed capacity" and the expected quantity was known, the court found the plaintiff "was not contractually obligated in advance to purchase a fixed quantity of electricity each month," and thus did not qualify for any cost-plus exception. *Id*. at 203-04 (alteration in original). Hence,

13

one "cannot say with any certainty what would have occurred in the absence of an overcharge." *Id*. at 203.

After *UtiliCorp*, courts have doubted whether the cost-plus exception continues to exist at all. *See*, *e.g.*, *McCarthy v. Recordex Serv., Inc*., 80 F.3d 842, 855 (3d Cir. 1996) ("The vitality of the 'pre-existing cost-plus contract' exception is doubtful, however, in light of *UtiliCorp*"); *County of Oakland v. City of Detroit*, 866 F.2d 839, 849 (6th Cir. 1989) (expressing doubt as to existence of cost-plus exception); *Meijer, Inc. v. Barr Pharm. Inc.,* 572 F. Supp. 2d 38, 65 (D.D.C. 2008); *In re OSB Antitrust Litig*., No. 06-826, 2007 WL 2253418, at *9 (E.D. Pa. Aug. 3, 2007) ("Courts have almost never applied this exception, however . . . the exception's viability is doubtful, at best."); *City of Philadelphia v. Public Employees Ben. Servs. Corp*., 842 F. Supp. 827, 833 (E.D. Pa. 1994) ("the pre-existing cost-plus exception . . . is so eviscerated that it is virtually non-existent").

Courts uniformly have held that pharmaceutical wholesaler agreements do not qualify for the cost-plus exception. *See*, *e.g.*, *Meijer,* 572 F. Supp. 2d at 65 (rejecting argument that pharmaceutical wholesaler contracts qualified under cost plus exception absent evidence that the "referenced contracts are for a fixed quantity" or "operate so as to make the effect of any overcharge preordained.") (internal quotes omitted); *Meijer, Inc. v. Abbott Labs.,* 251 F.R.D. 431, 433-36 (N.D. Cal. 2008) (cost-plus "pricing" insufficient); *In re Buspirone Patent Litig*., 210 F.R.D. 43, 60 (S.D.N.Y. 2002) ("There is no evidence that [McKesson and others] had cost-plus contracts that fell within the *Hanover Shoe* exception.  Rather, the defense BMS raises would reintroduce the complications that the Supreme Court in *Hanover Shoe* and *Illinois Brick* directed to be avoided."). *Cf. In re Hypodermic Prods. Direct Purchaser Antitrust Litig*., No. 05-CV-1602, 2006 WL 6907107, at *6 (D.N.J. Sept. 7, 2006) ("the cost-plus exception is only

applicable where there is a contract requiring the indirect purchaser to buy a fixed quantity of products. That does not appear to be the case with this putative class member.").

### 2.    Forest's Proffered Example Is Not a "Cost Plus" Contract

Forest cites a redacted Vendor Agreement between Cardinal Health and Fred's Stores of Tennessee, a document that is not on Forest's trial exhibit list, and which Forest apparently pulled from a Cardinal Health Securities and Exchange Commission filing.  This Vendor Agreement plainly does not qualify as a cost-plus contract.  The Vendor Agreement nowhere creates a "pre-existing" commitment by Fred's Stores of Tennessee to purchase a "fixed quantity" of Namenda IR or XR.

Contrary to Forest's suggestion (Defs.' Br. at 14), the Supreme Court, the Second Circuit, and Judge Francis in this case have all deemed a "fixed quantity" provision to be an indispensable element of a cost-plus contract.  *See Illinois Brick*, 431 U.S. at 736; *Simon*, 694 F.3d at 202 (customer agrees "in advance [of the challenged conduct] to purchase a fixed quantity [of the product at issue], paying the direct purchaser's costs plus a predetermined additional fee.") (citation omitted); *Namenda,* 2017 WL 2693713, at *7 ("fixed quantity" required).  The Cardinal Vendor Agreement that Forest cites fails this test for at least two reasons.

***First***, the contract contains absolutely no requirement by Cardinal Health's customer to buy any form of Namenda.  The provision that Fred's Stores of Tennessee must buy an unknown amount ("***") of pharmaceuticals from Cardinal (Vendor Agreement ¶ 2.1) is not specific to Namenda IR or XR purchases.  Rather, this provisions only require purchases of some product from Cardinal Health – whether Namenda IR or XR or another drug.  Such orders could be of another of Forest's drugs, or indeed, made by any manufacturer.  Thus, because the provisions encompass products other than Namenda, they do not satisfy the exception.  "Fixed quantity" means a set amount of the product subject to the overcharge, not some other product that a

wholesaler might sell.  *Illinois Brick* spoke of a "fixed quantity" in the context of attempting to trace the effects of the overcharge, since a commitment to buy a set amount of product means the customer was locked in to making purchases of the impacted product at the outset of the contract period.  431 U.S. at 736.  Subsequent cases identify the "fixed quantity" as the specific product affected by the alleged anticompetitive conduct.  *See*, *e.g., UtiliCorp*, 497 U.S. at 218 ("[t]he utility customers made no commitment to purchase any *particular quantity of gas*") (emphasis added); *Simon*, 294 F.3d at 204 (plaintiff "was not contractually obligated in advance to purchase a *fixed quantity of electricity* each month") (emphasis added); *McCarthy*, 80 F.3d at 855 ("plaintiffs have failed to show the existence of a pre-existing agreement to purchase *a fixed quantity of photocopies*") (emphasis added); *Hypodermic Prods.*, 2006 WL 6907107, at \*6 (similar).

In *Glynn-Brunswick Hospital Authority v. Becton Dickinson & Co.*, the (indirect purchaser) plaintiff likewise alleged it satisfied the "fixed quantity" requirement because it made a "volume commitment" to buy various products from its wholesaler rather than hypodermic syringes and IV catheters, the products subject to the anticompetitive behavior, but this was insufficient:

> Nor do Plaintiffs' allegations satisfy the second requirement of the cost-plus exception, mandating that a distribution agreement contemplate the sale of a fixed quantity of goods. *See Illinois Brick*, 431 U.S. at 735-36 (cost-plus contract must obligate the indirect purchaser to purchase a "fixed quantity regardless of price"). . . .  The Distribution Agreement, Plaintiffs allege, includes a "volume commitment" according to which Plaintiffs must buy "not less than $7 million a year [in] syringes, IV catheters, and other healthcare supplies" from Owens and Minor for a period of five years. *Id*. at ¶ 118. In other words, Plaintiffs have agreed to purchase a minimum dollar amount of assorted healthcare supplies from Owens and Minor—not a fixed quantity or dollar amount of supplies, not just hypodermic syringes and IV catheters, and not just supplies manufactured by Defendant. As such, Plaintiffs' factual allegations do not suggest that they have given Owens and Minor any guarantee that they will purchase any of Defendant's hypodermic syringes and IV catheters at all, much less a fixed quantity thereof.

16

159 F. Supp. 3d 1361, 1372-73 (S.D. Ga. 2016).

*Second*, contracts obligating the customer to buy its "requirements" of the affected product do not contain a "fixed quantity" term.  By necessity, under a requirements contract, the volume of purchases can vary, and a purchaser can opt to reduce (or even eliminate entirely) its purchases of Namenda products, rendering its demand elastic.  Such "requirements contracts" – where the customer purchases its needs of the affected product from a middleman but without a pre-existing commitment to a particular amount – have been deemed not to meet the "fixed quantity" requirement.  *See, e.g.*, *UtiliCorp*, *supra*; *Simon*, *supra*; *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharm., Inc*., 244 F. Supp. 3d 705, 714 (M.D. Tenn. 2017) (downstream purchaser's contract with McKesson to supply the customer's "requirements" deemed not to satisfy deemed to satisfy "fixed quantity" element); *Lefrak v. Arabian Am. Oil Co.*, 487 F. Supp. 808, 819, 822 (E.D.N.Y. 1980) ("Fixed quantity thus involves a relationship whereby a party is locked into buying a fixed amount regardless of price fluctuations and with no recourse in the open market for buying a greater or lesser quantity at competitive prices.  In this way, the effect of the overcharge is 'determined in advance, without reference to the interaction of supply and demand'  . . . On the other hand, where a fixed quantity does not exist, and an indirect purchaser is free to vary the amount of its purchases in response to price changes, the evidentiary problems incident to allocation the amount of the overcharges arise . . .  A fixed quantity commitment is . . . essential to establishing the cost-plus exception") (quoting *Hanover Shoe*, 431 U.S. at 736); *In re Wyoming Tight Sands Antitrust Cases*, 866 F.2d 1286, 1292 (10th Cir. 1989) (claim that requirements contract suffices "would amount to fitting a square peg into a round hole" because "[t]here exists no contract between the utilities and their residential consumers for any particular quantity."), *aff'd sub nom. Kansas v. UtiliCorp United,*

*Inc.,* 497 U.S. 199 (1990).

Accordingly, where the drug wholesaler agreement lacks any pre-existing requirement by its customer to buy a fixed quantity of the affected product, courts, including this one, consistently hold the cost-plus exception does not apply. *See Namenda*, 2017 WL 2693713, at *7-8; *Barr Pharm.,* 572 F. Supp. 2d at 65 (pharmaceutical wholesaler contracts did not meet exception without evidence the "referenced contracts are for a fixed quantity") (internal quotes omitted). *See also Hypodermic Prods.*, 2006 WL 6907107, at *6 (wholesaler contract did not "require[e] the indirect purchaser to buy a fixed quantity of products" so exception was unmet).

The Vendor Agreement also flunks the requirement that a downstream customer must agree to pay a fixed markup over the wholesaler's own acquisition cost.

***First***, the base price used in the cited Vendor Agreement to calculate what customers pay Cardinal Health is not the same as Cardinal Health's own costs. But under the cost-plus exception, the indirect purchaser must agree to "pay[] the *direct purchaser's costs* plus a predetermined additional fee." *Simon*, 694 F.3d at 202 (citation omitted; emphasis added). According to the provision Forest quotes (Defs.' Br. at 13), the price a customer pays is not based on Cardinal Health's purchase price but rather on "Cost," which is defined as the "manufacturer's published acquisition cost ["Wholesale Acquisition Cost" or "WAC"] . . . at the time the Buyer's order is submitted[.]" Vendor Agreement ¶ 3.1. Because of the time differential, the price at which Cardinal Health buys product may be different from the prevailing WAC at the time a customer places its orders for Namenda. In other words, a customer may be buying at a price higher or lower than Cardinal Health's own acquisition costs for the product.

Similar concerns that the price *might* vary between the time the direct purchaser bought the product and the time it was resold to the customer led the Supreme Court to refuse to apply

the cost-plus exception in *Utilicorp*, as the direct purchaser might not have been able to raise its prices before the resale, leaving it unclear whether "the passing-on process in fact had allowed [the direct purchaser] to shift the entire overcharge to its customers."  497 U.S. at 211.  Here as well, variations in price over time could make it difficult to determine whether Cardinal Health bore all or some of the overcharge.  Forest invites the complex issues of allocation and proof of damages the Supreme Court commanded courts to avoid.

 ***Second***, there is no "fixed markup" here. While the actual plus/minus percentages in the pricing matrix are redacted, the provision Forest references in ¶ 3.1 of the Vendor Agreement reference possible negative markups, that is, downstream customers may pay on a "cost minus" basis *below* Cardinal Health's prevailing cost.  *See id*. ("plus/minus percentage specified in the pricing matrix attached hereto as **Exhibit B**") (emphasis in original).  A potential fixed mark*down* is not a "fixed mark*up*," and the latter is what the law requires.  Forest has also presented no evidence that the markup is "fixed."  *See Simon*, 694 F.3d at 202 (indirect purchaser must agree to "pay[] the direct purchaser's costs plus a predetermined additional fee.") (citation omitted); *Namenda*, 2017 WL 2693713, at *7-8 (pharmaceutical wholesaler agreements like the one here that did not require "customers . . . to purchase specific quantities at a fixed markup" did not qualify for cost-plus exception).

### 3. Forest's "Bypass" Argument Has Been Rejected

 The "bypass effect" is an extension of Forest's meritless "lost profits" argument and so is irrelevant and, moreover, should not be deducted from overcharges, because otherwise "a substantial portion of the harm attributed to [Forest's] conduct would go completely unredressed" – an outcome contrary to the deterrent purposes of the Clayton Act.  *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 367-70 (D. Mass. 2004).

 As the *Relafen* Court explained in rejecting a similar argument as made here:

> ***The direct purchaser plaintiffs, however, assert injuries in the form of overcharges, not economic harm.*** Overcharges, the difference between the actual price and the presumed competitive price multiplied by the quantity purchased, provide what the Supreme Court has long recognized as the principal measure of damages for plaintiffs injured as customers rather than as competitors. . . . Consistent with the rule of Hanover Shoe, the direct purchaser plaintiffs here seek damages in the form of overcharges, ***rendering [defendant's] arguments regarding actual economic harm irrelevant.***

218 F.R.D. at 344 (emphasis added, internal citation and quotes omitted).

As the Third Circuit held in *K-Dur,* these same principles control here, where direct purchasers of a brand drug are seeking overcharges resulting from unlawfully delayed generic competition.  *K-Dur*, 686 F.3d at 220-21.  Accordingly, "[t]he law establishing the measure of damages for the DPPs, should they prevail in their anti-trust action against defendants, is long settled: the measure of their damages will be the difference between the price paid for [brand] and the price they would have paid for generic . . .  (the overcharge) had defendants not delayed generic . . . entry into the market."  *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 551 (E.D. Tenn. 2013) (citations omitted).

Critically, the wholesaler is the direct purchaser of the brand, and under *Illinois Brick*, the direct purchaser – and only the direct purchaser – has standing to recover unlawful overcharges under the Clayton Act.  In contrast, the wholesaler's customers who do the "bypassing" (large retail chains) are *indirect* purchasers, and so lack standing under the Clayton Act.  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 85 (3d Cir. 2011) ("only the *direct purchaser* of an illegally overcharged good, and not others in the chain of manufacturing or distribution, is the party 'injured' within the meaning of Section 4 of the Clayton Act") (emphasis in original).

The gap in antitrust enforcement and recovery that Forest asks this Court to create is completely at odds with the enforcement scheme of the Clayton Act.  Thus, in every case where the issue of bypass was decided, courts have ruled that defendants may *not* reduce their damages

20

liability by subtracting for bypass and direct purchasers *are entitled* to recover on all brand units purchased as a matter of law.  *See In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2018 WL 7814761, at *6 (N.D. Cal. Feb. 7, 2018) ("Defendants may not argue that DPP damages should be reduced because of the potential of generic bypass in the but-for world."); *In re Niaspan Antitrust Litig.,* No. 13-MD-2460, 2015 WL 4197590, at *1-2 (E.D. Pa. July 9, 2015); *ln re Skelaxin (Metaxalone) Antitrust Litig.,* No. 1:12-md-2343, 2014 WL 2002887, at *4 (E.D. Tenn. May 15, 2014); *In re Prograf Antitrust Litig.,* No. 1:11-MD-02242-RWZ, 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014); *In re Relafen Antitrust Litig.,* 346 F. Supp. 2d 349, 368-69 (D. Mass. 2004).  This case should be no different.

Forest cites to *Cardizem* (Defs.' Br. at 15), but the direct purchaser class in that case *voluntarily* advanced "an overcharge damage estimate that considers the by-pass phenomenon Defendants highlight."  *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 317 (E.D. Mich. 2001).  Forest also cites, without discussion, the Eleventh Circuit's decision in *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1192 (11th Cir. 2003).  But *Valley Drug* was a decision about class certification, an issue already resolved here and not one for trial.  And that decision confirmed that a direct purchaser "may sue to recover damages regardless of whether he actually profited from the defendants' conduct."  *Id*. at 1192.

In *Valley Drug*, the Eleventh Circuit hypothesized that generic bypass could disparately impact members of a direct purchaser class, potentially leading to an intra-class conflict regarding whether some class members lost profits while others did not.  But this theory (which was never supported by evidence) has been roundly rejected by other courts (including courts in this Circuit), and is contrary to *Hanover Shoe* and *Illinois Brick*.  *See, e.g., Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 279 F.R.D. 90, 104

21

(E.D.N.Y. 2012) ("Other courts that have considered this issue have also declined to follow *Valley Drug*, finding it irreconcilable with *Hanover Shoe*.") (collecting cases).  *See K-Dur*, 686 F.3d at 223 (expressly rejecting *Valley Drug*).

### 4. Forest Provides No Basis to Reconsider This Court's Ruling That "Brand-Only" Purchasers Suffered Injury

Finally, Forest impermissibly attempts to revisit the Court's class certification ruling, referring to unidentified evidence that Forest claims shows that "brand-only" buyers who have not bought generic IR suffered no antitrust injury.  Forest has already lost on this issue too.  *See Namenda V*, 331 F. Supp. 3d at 209 ("But Defendants are not entitled to the benefit of that doubt when the very reason we cannot know the answer to that question is because of their alleged wrongdoing.") (citation omitted).  Forest filed no motion for reconsideration, and the Second Circuit denied its 23(f) petition on November 20, 2018.  *See Forest Labs. v. JM Smith*, No. 18-2421, No. 2438753 (2d Cir. Nov. 20, 2018).  Forest is foreclosed from making this argument now.

As Plaintiffs previously explained, had generic entry occurred in 2012, as plaintiffs allege it would have, and without the illegal hard switch, the 90% generic substitution rate would have applied to a substantially larger base of purchases of branded IR, and thus would have resulted in greater purchases of generic Namenda IR.  Reply Mem. in Support of Direct Purchaser Pls.' Mot. for Class Certification at 3 (ECF No. 620) (refiled Jan. 22, 2019).  As Plaintiffs' damages expert Dr. Lamb concludes, common evidence shows that these "brand-only" class members, too, would have purchased generic IR had been it been available, and so were injured by Forest's pay-for-delay deal with Mylan.  *Id.*

## IV.    CONCLUSION

For these reasons, Forest's Motion *in limine* 5 should be denied.  Instead, the Court should grant Plaintiffs' Motion *in limine* 13.


Dated: June 14, 2019                           Respectfully Submitted:


David F. Sorensen                              /s/ *Dan Litvin*
Ellen T. Noteware                              Bruce E. Gerstein
Daniel C. Simons                               Joseph Opper
Nick Urban                                     Kimberly M. Hennings
Berger Montague PC                             Dan Litvin
1818 Market Street – Suite 3600                Garwin Gerstein & Fisher LLP
Philadelphia, PA 19103                         88 Pine Street, 10th Floor
(215) 875-3000                                 New York, NY 10005
(215) 875-4604 (fax)                           Tel: (212) 398-0055
dsorensen@bm.net                               Fax: (212) 764-6620
enoteware@bm.net                               bgerstein@garwingerstein.com
dsimons@bm.net                                 jopper@garwingerstein.com
nurban@bm.net                                  khennings@garwingerstein.com
                                               dlitvin@garwingerstein.com


Peter Kohn                                     David C. Raphael, Jr.
Joseph T. Lukens                               Erin R. Leger
Faruqi & Faruqi, LLP                           Smith Segura & Raphael, LLP
1617 John F Kennedy Blvd., Suite 1550          3600 Jackson Street, Suite 111
Philadelphia, PA 19103                         Alexandria, LA 71303
(215) 277-5770                                 Tel: (318) 445-4480
(215) 277-5771 (fax)                           Fax: (318) 487-1741
pkohn@faruqilaw.com                            draphael@ssrllp.com
jlukens@faruqilaw.com                          eleger@ssrllp.com

                                               Stuart E. Des Roches
                                               Andrew W. Kelly
                                               Odom & Des Roches, LLC
                                               650 Poydras Street, Suite 2020
                                               New Orleans, LA 70130
                                               Tel: (504) 522-0077
                                               Fax: (504) 522-0078
                                               stuart@odrlaw.com
                                               akelly@odrlaw.com

Russ Chorush
Heim Payne & Chorush, LLP
1111 Bagby, Suite 2100
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
rchorush@hpcllp.com

**Counsel for the Direct Purchaser Class Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2019, I electronically filed the above by CM/ECF system.

Respectfully submitted,

/s/ *Dan Litvin*
Dan Litvin