**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION |

Case No. 1:15-cv-07488-CM (RWL)

**FOREST'S OPPOSITION TO PLAINTIFFS'**
**MOTION *IN LIMINE* NO. 8:  PRECLUDE FOREST FROM**
**ASSERTING IMPROPER ARGUMENTS CONCERNING THE SIZE**
**OF ITS REVERSE PAYMENT AND PURPORTED SAVED LITIGATION COSTS**

**WHITE & CASE** LLP

*Counsel for Defendants Actavis plc, Forest Laboratories, LLC, Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd.*

## **TABLE OF CONTENTS**

ARGUMENT ........................................................................................................................ 2

    I.    Determination of Whether the Alleged Payment is "Large" Under *Actavis* Requires an Evaluation of Many More Factors than DPPs Propose ..................... 2

    A.   The "Large" Inquiry Is Not Limited to the Factors DPPs Claim ................... 2

    B.   The Jury Should Consider Whether the Alleged Payment Is Large by Comparing it to, In Part, the Expected '703 Patent Revenues........................ 5

    II.   DPPs' Belated Discovery Sanction Motion is Baseless and Must Be Rejected ..... 7

CONCLUSION................................................................................................................... 11

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bank of N.Y. v. Meridien Biao Bank Tanz. Ltd.*,
   171 F.R.D. 135 (S.D.N.Y. 1997) ...........................................................7

*Barba v. Shire US, Inc.*,
   No. 13-cv-21158, 2016 U.S. Dist. LEXIS 182548 (S.D. Fla. Jan. 19, 2016) .......................3, 6

*FTC v. Actavis, Inc.*,
   570 U.S. 136 (2013)...........................................................1, 2, 4, 5

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018).......................................................6

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
   No. 14-md-2503 (D. Mass. Mar. 8, 2018), ECF No. 1089 ...................................3, 5

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007)...........................................................3

*MLB Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008)...........................................................4

*Nemec v. Shrader*,
   No. 09-cv-07466, 2015 U.S. Dist. LEXIS 51221 (S.D.N.Y. Apr. 13, 2015) .........................11

*Reilly v. NatWest Mkts. Group, Inc.*,
   181 F.3d 253 (2d Cir. 1999)...........................................................7

*United States v. Benedict*,
   104 F. Supp. 2d 175 (W.D.N.Y. 2000) .......................................................9

*United States v. DeLillo*,
   620 F.2d 939. (2d Cir. 1980)...........................................................9

### STATUTES AND RULES

Fed. R. Evid. 403 ...........................................................9

Fed. R. Evid. 602 ...........................................................10

### MISCELLANEOUS

Trial Transcript, *Apotex, Inc. v. Cephalon, Inc.*,
   No. 06-cv-02768 (E.D. Pa. July 6, 2017)...........................................................6

Trial Transcript, *In re Nexium (Esomeprazole) Antitrust Litig.*,
   No. 12-md-02409 (D. Mass. Dec. 3, 2014) ..............................................................................6

DPPs' attempt to limit Forest's arguments as to whether the alleged payment to Mylan was "large" is a premature effort to argue jury instructions that must be rejected.  DPPs argue that the only relevant factors for assessing whether the alleged payment was large are (1) Forest's saved litigation costs, and (2) whether the payment induced Mylan to settle the patent litigation.  DPPs' MIL 8 at 1-2.  But DPPs' position has no basis in the Supreme Court's *Actavis* decision.  In fact, the Supreme Court held that antitrust defendants can offer "other convincing justification[s]" for the alleged payment beyond avoidance of its "anticipated future litigation costs."  *FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013).  Nor are DPPs correct that the innovator's expected patent revenues are *per se* irrelevant to the issue of whether the alleged payment was large.  In fact, several courts have addressed and rejected the same argument made by DPPs here.

Alternatively, DPPs seek the extraordinary sanction that the Court preclude Forest from offering evidence that Forest's anticipated saved litigation costs exceed the $3.5 million figure favored by DPPs' experts, even though multiple Forest witnesses testified during fact discovery that Forest's avoided litigation costs were much greater than $3.5 million — up to $10 million.  DPPs' MIL 8 at § II.B.  But DPPs never moved to compel additional testimony nor moved for sanctions due to any purported discovery violation while fact or expert discovery was open.  And the reason is clear: DPPs were afforded every opportunity to obtain discovery on the issue, including questioning three different witnesses on the topic — two 30(b)(6) designees as well as Forest's in-house counsel from the relevant patent litigation time period (Charles Ryan).  Incredibly, DPPs also took the deposition of another Forest witness, Eric Agovino, and noticed but then canceled the deposition of a fifth witness, Peter Armenio, each of whom likely had relevant knowledge on this topic.  Having ***chosen*** not to take further fact discovery on this issue, DPPs'

claim that they were somehow denied discovery is baseless.  As such, DPPs' untimely and meritless motion must be denied.

## ARGUMENT

### I.  Determination of Whether the Alleged Payment is "Large" Under *Actavis* Requires an Evaluation of Many More Factors than DPPs Propose

DPPs' argument seeking to limit what Forest can argue (and the jury can consider) with respect to whether the alleged payment from Forest to Mylan was "large" has no basis in *Actavis*, and thus has been rejected by numerous courts.  This Court, too, should reject DPPs' motion.

#### A.  The "Large" Inquiry Is Not Limited to the Factors DPPs Claim

DPPs' argument that a payment is necessarily large from the brand's perspective if it exceeds the brand's saved litigation costs is based on a misquotation of *Actavis*.  DPPs claim that *Actavis* defined "large" from the brand's perspective as "its scale in relation to the payor's anticipated future litigation costs" (ECF No. 746, Mem. in Supp. of Pls.' Mot. *In Limine* No. 8: Preclude Forest from Asserting Improper Arguments Concerning the Size of its Reverse Payment and Purported Saved Litigation Costs ("DPPs' MIL 8") at 2), but the full sentence from *Actavis* shows that the "size" of the payment is a ***separate*** factor to consider from the "scale in relation to the payor's anticipated future litigation costs":

> That is because the likelihood of a reverse payment bringing about anticompetitive effects depends upon its ***size***, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of ***any other convincing justification***.

*Actavis*, 570 U.S. at 159 (emphasis added).  The Supreme Court was clear that it was providing a non-exhaustive list of factors that should be considered by the factfinder under the rule of reason.  *Id.* (allowing for "any other convincing justification").  For "size" in this passage to mean "scale in relation to the payor's anticipated future litigation costs," (DPPs' MIL 8 at 2) the Supreme Court

would have been repeating itself without explanation. It did not; "size" and "scale in relation to the payor's anticipated future litigation costs" mean different things.

Several other courts have rejected DPPs' attempt to characterize *Actavis* as limiting the analysis of the size of the payment from the brand's perspective to a comparison of the brand's saved litigation costs. For example, in *Solodyn*, the court rejected the same *in limine* motion brought here and held that "large" was not limited to a comparison of just the brand's saved litigation costs. *See* Text Order, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503 (D. Mass. Mar. 8, 2018), ECF No. 1089 (denying plaintiffs' motion to preclude evidence regarding what constitutes a "large" payment because "whether a reverse payment was 'large and unjustified' requires viewing the payment in its factual context, which may include certain business realities") (citation omitted).

Similarly, in *Barba v. Shire US, Inc.*, No. 13-cv-21158, 2016 U.S. Dist. LEXIS 182548 (S.D. Fla. Jan. 19, 2016), the court rejected plaintiffs' argument that *Actavis* "establishes an '*unambiguous mandate* that a reverse payment's largeness *must* be determined by comparing the payment's size to the branded manufacturer's anticipated litigation costs.'" *Id.* at *8-10 (emphasis in original). Instead, the court held that, "as did the courts in *Aggrenox, Cephalon* and *Effexor* . . . there is no bright-line test for 'largeness.'" *Id.* (citing *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 243 (D. Conn. 2015); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 416-17 (E.D. Pa. 2015), and *In re Effexor XR Antitrust Litig.*, No. 11-5479, 2014 U.S. Dist. LEXIS 142206, at *75-76 (D.N.J. Oct. 6, 2014), *rev'd on other grounds by In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017)).

Indeed, this reasoning is consistent with the understanding that the rule of reason requires a searching and broad-ranging inquiry into the nature of the restraint and its context. *See Leegin*

*Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007) ("Under [the rule of reason], the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."); *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 316-17 (2d Cir. 2008) ("[T]he rule of reason requires the fact-finder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition . . . .").

Common sense also supports the conclusion that the "large" inquiry is not limited to a comparison of the brand's saved litigation costs. Under *Actavis*, a patentee's avoided litigation costs are not a "reverse payment" at all because the innovator-patentee loses nothing by paying its opponents what it would otherwise have paid its lawyers, paid its experts, or otherwise wasted through the expensive litigation process. Repurposing these costs to permit a settlement thus cannot suggest any anticompetitive harm; it is a normal, unremarkable way to settle. *See Actavis*, 570 U.S. at 156 ("Where a reverse payment reflects traditional settlement considerations, such as avoided litigation costs . . . there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement."). But under DPPs' proposed formulation, if a patentee paid its opponent $1 more than its saved litigation costs, that payment would be "large" from the brand's perspective, and thus actionable, on the supposition that the $1 suggested that the patentee was concerned that its patent was invalid and generally must have had anticompetitive intent. *See id.* at 156-58; *see also* DPPs' MIL 8 at 6 (arguing that a payment is "'large' if it exceeds the brand's ongoing saved litigation costs"). This makes no sense. Instead, the portion of the payment that exceeds saved litigation costs (and any other explanation, such as fair value) must ***itself*** be large to be cognizable under *Actavis*, as only this amount could suggest the presence of a reverse payment that may have caused anticompetitive harm.

4

**B.     The Jury Should Consider Whether the Alleged Payment Is Large by Comparing it to, In Part, the Expected '703 Patent Revenues**

DPPs are similarly incorrect that *Actavis* forecloses evidence of patent revenues to determine whether a payment is large.  In support, DPPs cite two passages from *Actavis*.  DPPs' MIL 8 at 3.  However, both passages discuss the issue of whether a payment is ***immunized*** based on its size in relation to the patent-derived revenues.  DPPs' MIL 8 at 3 (quoting *Actavis*:  "But we do not agree that that fact, or characterization, ***can immunize*** the agreement from antitrust attack.") (emphasis added); *id.* (quoting *Actavis*:  "In short, rather than measure the length or amount of a restriction ***solely*** against the length of the patent's term or its earning potential . . . .") (emphasis added, emphasis omitted).  Forest does not intend to argue to the jury that the alleged payment is ***immunized*** from scrutiny because it is smaller than the revenues Forest expected to receive from the '703 patent, or that its size must be considered "***solely***" against the patent's earning potential. Instead, the size of the payment relative to the revenues derived from the '703 patent is just one factor the jury can and should consider when determining whether the alleged payment is large under the rule of reason.  Despite DPPs' claim to the contrary, the Supreme Court never held that the earning potential of the patent was irrelevant in determining whether the payment was large.

Forest's position that patent revenues are a relevant factor for the jury to consider is consistent with that of numerous courts in reverse payment cases.  Indeed, post-*Actavis* courts in at least three reverse payment antitrust cases have permitted evidence of a patent's earning potential.

First, Judge Casper in *Solodyn* rejected plaintiffs' request to limit defendants at trial to the two factors (saved litigation costs and inducement of the generic to settle) that DPPs propose here. *See* Text Order, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503 (D. Mass. Mar. 8, 2018), ECF No. 1089 (denying plaintiffs' motion to preclude evidence regarding

what constitutes a "large" payment because "whether a reverse payment was 'large and unjustified' requires viewing the payment in its factual context, which may include certain business realities" including using the patent profits as a factor).

Second, in *Modafinil*, Judge Goldberg permitted the parties to offer evidence of the patent's revenues both through defendants' expert, Dr. Bell, and at closing. *See* Ex. 1, Trial Tr. at 31-32, *Apotex, Inc. v. Cephalon, Inc.*, No. 06-cv-02768 (E.D. Pa. July 6, 2017) (at closing argument: "What does Dr. Bell have to say? If you have got the power to take away 5 billion of profits away from [the brand], I don't understand why you agree to that just for 25.8 million. . . . That is common sense. The case [plaintiffs] proved . . . was that [the generic] had the power to take $5 billion away from [the brand]. . . . And they settled for [$25.8 million] . . . . It just makes no sense.").

Third, while Judge Young in the *Nexium* litigation instructed the jury that the payment had to "be at least more than [the brand's] reasonably estimated save[d]-litigation costs," he did not limit the jury's consideration to only that factor. Ex. 2, Trial Tr. at 44, *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-02409 (D. Mass. Dec. 3, 2014); *see also Barba*, 2016 U.S. Dist. LEXIS 182548, at *14-15 (admitting expert testimony that "emphasizes an analysis of 'largeness' based on the brand's perspective, from which he derived the opinion that it was essential to compare the alleged payment to the operating income of the brand derived from the drug at issue").

Finally, while this Court held that "Plaintiffs . . . offered sufficient evidence that a reasonable juror ***could*** find" that the alleged payment from Forest to Mylan was large, there is no support in this Court's summary judgment decision for the proposition that Forest should be barred from offering evidence of other factors indicating that the payment was not large. *See In re*

*Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 196 (S.D.N.Y. 2018) (emphasis added).

This Court should permit Forest to present to the jury evidence of the revenues Forest derived from the '703 patent as part of the full context for the payment to be evaluated under the rule of reason.

## II.   DPPs' Belated Discovery Sanction Motion is Baseless and Must Be Rejected

In the alternative, DPPs make the incredible argument that Forest "stymied" DPPs' discovery attempts to obtain information on Forest's anticipated avoided litigation costs, and make the hyperbolic claim that allowing Forest to testify that its anticipated avoided litigation costs at the time of the settlement were approximately $10 million would be "trial by ambush."   DPPs' MIL 8 at 7, 10.   Such argument ignores the discovery DPPs received (and elected ***not*** to take), misstates the record, and is an untimely request for an extraordinary discovery sanction that must be rejected.

The sanction DPPs seek here is saved for instances of "flagrant discovery abuses."   *See Bank of N.Y. v. Meridien Biao Bank Tanz. Ltd.*, 171 F.R.D. 135, 151-52 (S.D.N.Y. 1997) (denying motion for preclusion of testimony at trial as sanction despite finding that the Rule 30(b)(6) witness was wholly unprepared and whose "performance amount[ed] to non-appearance").   Not only have DPPs not even attempted to make this showing, but also the record evidence belies the suggestion that Forest committed any discovery abuse, let alone a "flagrant" one.

The *Reilly* case DPPs rely on is inapposite.   DPPs' MIL 8 at 11 (citing *Reilly v. NatWest Mkts. Group, Inc.*, 181 F.3d 253 (2d Cir. 1999)).   In *Reilly*, a witness's testimony was precluded as a sanction where a violation of both Rule 30(b)(6) and an explicit discovery order were shown. *Id.* at 268-69.   Any such sanctions are inappropriate here because DPPs do not even claim that Forest violated any court order, and, as detailed below, Forest's 30(b)(6) corporate designees and

7

other witnesses were adequately prepared to address Forest's anticipated litigation costs and were extensively questioned by DPPs; it is the content of that testimony that DPPs do not like because it contradicts the opinions of DPPs' experts.

As DPPs admit, Forest produced in discovery documents bearing on its anticipated future litigation costs, including a March 2009 memorandum it received from outside counsel, Kirkland & Ellis.  DPPs' MIL 8 at 8 [hereinafter "Kirkland Memorandum"].  During the depositions of Mr. Solomon and Ms. Snyder, Forest's two 30(b)(6) corporate representatives on the issue of saved litigation costs, DPPs engaged in extensive questioning of both witnesses — lasting over 75 transcript pages and over 1:25 hours of deposition time.  DPPs contend that neither Mr. Solomon's nor Ms. Snyder's explanations of Forest's avoided litigation costs are sufficient because (1) "Mr. Solomon refused to explain the basis for the figure, and" (2) "Ms. Snyder, who has no personal knowledge about the issue, merely relayed what she had been told by another person."  DPPs' MIL 8 at 10.  Both are misleading characterizations.

As DPPs admit (*id.* at 9), Mr. Solomon explained that Forest's in-house counsel at the time told Forest's management that there were approximately $10 million in total expenses potentially left.  Ex. 3, Sept. 7, 2010 Dep. of David Solomon ("Solomon (Sept. 7, 2010) Dep.") 236:2-239:15 ("My understanding is our internal projections were we had, you know, probably another 10 million dollars of legal expenses and associated costs left.").  He further clarified that the Forest-Mylan patent litigation was expected to be "expensive and complicated" with "teams of people moving to Delaware." *Id.* at 238:2-21.  As such, Mr. Solomon did not believe the $3.5 million estimate from the Kirkland Memorandum was accurate, and pointed out that the Kirkland Memorandum was drafted more than a year before the settlement was reached and itself indicated those "estimates [were] preliminary and subject to change based on changes in the case schedule,

8

the conduct of our adversaries and various other factors that impact litigation." *See id.* at 236:2-237:24, 242:20-243:23.

DPPs' citation to one portion of Mr. Solomon's testimony to claim that Mr. Solomon "refused" to answer their questions is misleading. DPPs' MIL 8 at 9. As was explained at the deposition, Mr. Solomon could not answer DPP counsel's question because of the form of the question. Solomon (Sept. 7, 2010) Dep. 240:3-25. When DPP counsel rephrased the question, Mr. Solomon indicated "it was his recollection that that was what we [Forest's management] were told at the time." *Id.* at 241:2-6. Ms. Snyder, Forest's second corporate representative on the topic, confirmed Mr. Solomon's testimony. Ms. Snyder further explained that there were 30 to 35 attorneys working on the matter (Ex. 4, Oct. 11, 2017 Dep. of Julie Snyder 32:23-33:4), and that trial would involve substantial expenses including, for example, securing 40 to 50 hotel rooms (*see id.* at 34:1-7).

DPP's argument that testimony about Forest's actual saved litigation costs would be an "ambush" is nonsensical because DPPs have known about Forest's $10 million estimate since they deposed Mr. Solomon over *1.5 years ago*. The only "prejudice" DPPs identify is that Forest's testimony is contrary to their preferred theory of the case. *See, e.g.*, *United States v. DeLillo*, 620 F.2d 939, 947 n.2. (2d Cir. 1980) ("The prejudice resulting to [a party] from the fact that introduction of the evidence was damaging to their case is, of course, not the kind of prejudice against which Fed. R. Evid. 403 protects . . . ."). Any question as to the credibility of, or foundation for, Mr. Solomon's or Ms. Snyder's testimony is an issue left for trial. *See United States v. Benedict*, 104 F. Supp. 2d 175, 184 (W.D.N.Y. 2000) (leaving matters of credibility to cross-examination at trial).

9

DPPs' motion *in limine* completely fails to mention that they also deposed Charles Ryan and Eric Agovino, two of Forest's in-house IP counsel who oversaw the patent litigation. DPPs questioned Dr. Ryan about Forest's anticipated saved litigation costs, including questioning Dr. Ryan about the Kirkland Memorandum. As DPPs acknowledge, Mr. Ryan was the recipient of the Kirkland Memorandum. DPPs' MIL 8 at 8. In explaining that the document was "flawed," Dr. Ryan also explained that Kirkland & Ellis's estimate "doesn't [include] expert fees or any of those additional costs." Ex. 5, Sept. 7, 2017 Dep. of Dr. Charles Ryan 137:12-138:6, 142:10-143:1.

Further, despite the fact that Forest attorney Mr. Agovino likely had relevant knowledge on this issue as a member of the in-house counsel team overseeing the patent litigation, DPPs never asked Mr. Agovino during his deposition about Forest's anticipated litigation costs or showed Mr. Agovino the Kirkland Memorandum.

DPPs' passing reference that Forest's testimony on avoided legal fees would be "hearsay" is unsupported and incorrect. DPPs' MIL 8 at 1. Multiple Forest witnesses have personal knowledge about Forest's anticipated litigation costs. As such, their testimony is not hearsay and is admissible. *See* Fed. R. Evid. 602.

DPPs also fail to mention that DPPs noticed the deposition of Peter Armenio, a former partner at Kirkland & Ellis — the law firm who litigated the Forest-Mylan patent case on Forest's behalf — and a member of the team that authored the Kirkland Memorandum. Ex. 6, Subpoena to Peter J. Armenio, dated June 22, 2017. DPPs, however, cancelled the deposition. Ex. 7, Email from D. Litvin to K. O'Shaughnessy, re: Namenda – Armenio, dated July 11, 2017. This would have been the *fifth* opportunity to question a witness about Forest's anticipated future litigation costs and the Kirkland Memorandum.

Finally, DPPs' motion is untimely.  To the extent DPPs felt "stymied," they should have moved to compel Forest — a motion DPPs would have lost given the numerous opportunities they had to obtain information — and sought to resolve this issue before discovery closed years ago. *See, e.g.*, *Nemec v. Shrader*, No. 09-cv-07466, 2015 U.S. Dist. LEXIS 51221, *7 (S.D.N.Y. Apr. 13, 2015) (denying motion for discovery sanctions where the party "cloaked the issue in the sheep's clothing of a so-called *in limine* motion rather than call it what it is—a motion for discovery sanctions filed nearly 17 months after the close of discovery").  DPPs' extraordinary, unwarranted, and late request to preclude Forest from introducing testimony DPPs elicited from multiple witnesses should be rejected.

## CONCLUSION

For the foregoing reasons, the Court should deny DPPs' Motion *In Limine* No. 8.

Dated: June 14, 2019

Respectfully submitted,

**WHITE & CASE** LLP

By:   */s/ Martin M. Toto*

| |
|---|
| Beth Wilkinson |

Beth Wilkinson
Rakesh Kilaru
Kieran Gostin
WILKINSON WALSH + ESKOVITZ
2001 M Street NW, 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000

**Counsel for Defendants Actavis plc, Forest Laboratories, LLC, Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd.**

Martin M. Toto
Heather K. McDevitt
John H. Chung
Michael E. Hamburger
William H. Bave, III
Kristen O'Shaughnessy
Kevin C. Adam
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200

J. Mark Gidley
Christopher M. Curran
Eric Grannon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600

Heather M. Burke
Eric E. Lancaster
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Ste. 900
Palo Alto, CA 94306
Telephone: (650) 213-0300

**Counsel for Defendants Actavis plc, Forest Laboratories, LLC, Forest Laboratories, Inc., and Forest Laboratories Holdings Ltd.**