**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC
DOCUME...
ELECTRONICALLY FILED
DOC #:_____
DATE        8|2|2019

In re Namenda Direct Purchaser Antitrust Litigation

No. 15 Civ. 7488 (CM)

## ORDER DISPOSING OF MOTIONS *IN LIMINE*

McMahon, C.J.:

The Court, for its rulings on the motions *in limine*:

### I.   Forest's Motions *in Limine*

#### A.   Forest's Motion *in Limine* No. 1 (to exclude expert testimony that Forest's post-injunction notifications created doubt and confusion about the continued availability of Namenda IR)

The motion is DENIED.  Forest argues that Drs. Lamb and Berndt, both economists, are not qualified to testify to the medical community's interpretation of and reaction to Forest's post-injunction notices that it was appealing Judge Sweet's preliminary injunction, and that Forest was "optimistic" the decision would be overturned.  However, the Court has already ruled that Forest's arguments go to the weight—not the admissibility—of Dr. Lamb's and Dr. Berndt's opinions.  *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 179–80 (S.D.N.Y. 2018) ("*Namenda V*").  The evidence reviewed by these experts—including the post-injunction communications themselves—combined with the doctors' expertise in the fields of pharmaceutical economics, qualifies them to testify on how this would have affected the behaviors of both prescribers and consumers.  Forest can follow up on cross, by asking if they actually conducted or reviewed any studies looking at the announcement's effects.

1

Of course, to the extent the experts plan to testify that the post-injunction notices were "intended" or "designed" to sow confusion, such testimony is precluded as speculative. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). They may testify about the notices' effects, not Forest's motivation for issuing them.

**B.**     **Forest's Motion *in Limine* No. 2 (to exclude general statistical evidence of outcomes in unrelated pharmaceutical patent litigations)**

The motion is DENIED. Forest protests that, "Generalized evidence of the outcomes for brand and generic companies in *all* Hatch-Waxman litigations throughout the United States has no bearing on the merits of the specific patent case brought by Forest against Mylan and the other generic manufacturers." (Dkt. No. 757 at 1 (emphasis in original).) Certainly, however, it bears on how a reasonable patent holder might have evaluated its chances of success at trial. This, in turn, would be a key consideration in determining whether the reverse payments to Mylan were "large" and unjustified, or instead represented "traditional settlement considerations, such as avoided litigation costs or fair value for services," *F.T.C. v. Actavis*, 570 U.S. 136, 156 (2013). In addition, this general statistical evidence is neither hearsay nor unduly prejudicial.

Forest, of course, remains free argue its point about the presumption of patent validity and the need to overcome that presumption by "clear and convincing evidence." *See Namenda V*, 331 F. Supp. 3d at 189. It will, I suppose, be a battle of legal doctrine versus empirics.

**C.**     **Forest's Motion *in Limine* No. 3 (to exclude evidence about foreign tribunals' findings of patent invalidity for foreign patents corresponding to the '703 patent)**

The motion is DENIED.

Were this a patent lawsuit, the alleged infringer might well not be permitted to introduce evidence of a foreign tribunal's finding that a foreign patent was invalid in order to support an inference that a U.S. patent corresponding to the same invention was invalid under U.S. law. The

2

proposition is obvious—"the language and laws of other countries differ substantially from those in the United States," *Lindemann Maschinenfabrik GMBH v. Am. Hoist and Derrick Co.*, 730 F. 2d 1452, 1458 n.2 (Fed. Cir. 1984), and so "corresponding foreign patents are of no relevance to the question of the granting of a U.S. patent." *Timely Prods. Corp. v. Arron*, Civ. No. 11,864, 1974 U.S Dist LEXIS 6916, at *14–*15 (D. Conn Sept 3, 1974), *aff'd*, 523 F. 2d 288, 295 (2d Cir. 1975).

However, this is an antitrust case. The question is why Forest decided to settle the patent infringement case. Forest has refused to waive attorney-client privilege and has indicated that it will not rely on its subjective belief about the strength of its case in the patent action. The plaintiffs may introduce evidence about what a reasonable patent holder would have believed about the strength of Forest's patent case. For that purpose, the DPPs may introduce evidence about things a reasonable patent holder or its attorney would have taken into account. This might include, for example, evidence that a reasonable patent holder would have closely monitored foreign invalidation activity. The jury is not being asked to decide the issue of patent validity, and the Court will give an instruction about the limited purpose for which the evidence is being offered.

### D.    Forest's Motion *in Limine* No. 4 (to (strike Rochester Drug Co-Operative as a Class Representative if not called at trial)

The motion is DENIED.

This Court knows of no requirement that all class representatives testify at a trial—particularly in a case like this one, in which the conduct of the defendant, rather than what happened to the plaintiffs, is the crux of the matter. Such a requirement, if it existed, would often lead to the introduction of cumulative testimony. And, in a trial at which the parties are going to be strictly time-limited in their presentations, it would consume time more profitably spent on matters that relate to the merits—which class representation does not. I am not requiring the DPPs

to call every class representative to the stand—indeed, if they tried to do so, I would likely prohibit it—nor am I going to dictate which class representative they can choose to call.

Forest has several Rochester Drug Co-Operative employees on its witness list. To forestall the issue from arising, I rule that the DPA does not bear on the issues that are to be tried. It has nothing to do with whether Forest violated the antitrust laws in connection with the drug Namenda. The jury does not get to rule on the adequacy of class representatives, and Forest cannot call witnesses for the purpose of testifying about irrelevant issues.

### E. Forest's Motion *in Limine* No. 5 (to exclude DPP wholesalers' overcharge damages methodology)

The motion is DENIED for substantially the reasons articulated in the DPPs' responsive brief. Magistrate Judge Francis ruled on this issue years ago, and Forest took no appeal. I intend to allow the Plaintiff Class to prove damages as overcharges—not lost profits—because that is the proper measure of damages in this case. *See In re Namenda Direct Purchase Antitrust Litigation*, No. 15-cv-7488, 2017 WL 2693713, at *6 (S.D.N.Y. June 21, 2017).

### F. Forest's Motion *in Limine* No. 6 (to preclude testimony by Dr. Russell Lamb regarding undisclosed damages opinions based on alternative entry dates)

To the extent that Forest seeks to preclude Dr. Lamb from offering damage calculations based on alternative "but for" generic entry dates that are not specifically identified in his Expert Report, the motion is GRANTED without opposition; the DPPs assert that they do not intend to elicit such testimony.

To the extent that Forest seeks to preclude Dr. Lamb from testifying that his damages methodology could be used to calculate damages for an alternative entry date, the motion is DENIED. In his expert report, Dr. Lamb indicated that his methodology could be used to calculate damages for any date of entry into the marketplace. (*See* Am. Expert Report of Russell L. Lamb,

4

Dkt. No. 771-3, at ¶ 6 n. 9.) The cases cited by Forest concerning the failure to disclose information in an expert report are, therefore, entirely inapposite. Dr. Lamb also testified about this at his deposition. (*See* EBT of Russell L. Lamb dated Oct. 6, 2017, Dkt. No. 771-1, at 208:22–25.) It cannot come as a surprise to Forest that Lamb's methodology is not date-specific.

Forest's argument that allowing the jury to use Dr. Lamb's methodology to calculate damages for generic entry dates other than the two that Dr. Lamb himself used in his expert report will lead to "impermissible speculation" is off the mark. If the jury decides on a different entry date for generic competitors, it is perfectly capable of adjusting the amount of damages in the expert's model, and there is nothing inherently speculative about its so doing. A finding otherwise "denigrates the historic and practical abilities of the jury." *Medcom Holding v. Baxter Travenol Labs. Inc.*, 106 F. 3d 1388, 1398 (7th Cir. 1997); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 739 F. Supp. 2d 576, 605 & n.180 (S.D.N.Y. 2010).

G.     **Forest's Motion** *in Limine* **No. 7 (regarding that all witnesses testify only once)**

Forest did not need to make this motion. It is standard practice at all my civil jury trials that witnesses are allowed to testify only once—which means, in many cases, that defense testimony is heard out of order. This will not present a problem at the stage when motions for a directed verdict are to be presented, as there is not the slightest chance of the Court's granting such a motion. I know the record in this case well enough to know that the case is going to the jury.

H.     **Forest's Motion** *in Limine* **No. 8 (to remove redactions about privilege from trial exhibits)**

I find it almost impossible to believe that the Court is being bothered with this nonsense. Redactions will be shown with the word "REDACTED"; there will be no indication about why

the redaction was done.  The Court gives jurors a standard instruction about redactions and tells them that they are not to speculate about why material was redacted; it is not germane to their task.

## I.  Forest's Motion *in Limine* No. 9 (to preclude evidence of speculative less restrictive alternatives)

The motion is DENIED.  The DPPs have not alleged that the Lexapro Amendment was an independent, unlawful restraint of trade in the Lexapro market.  Thus, we will not be applying the "rule of reason" framework to Lexapro, and Plaintiffs have no burden to show that any procompetitive effects of the Lexapro Amendment could have been achieved through less restrictive alternatives.  The issue with the Lexapro Amendment is whether it represented "fair value for services," or, instead, an inducement to Mylan to delay its generic version of Namenda (which Forest has the burden to prove under *Actavis*)—*not* whether the Lexapro Amendment constrained or promoted Lexapro competition.

The DPPs are also correct that any procompetitive benefits to *Lexapro* consumers do not justify any anticompetitive harms to *Namenda* consumers, particularly because Forest has not (and, at this stage, could not) argue that the two markets are linked.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610–11 (1972) ("Topco has no authority under the Sherman Act to determine the respective values of competition in various sectors of the economy."); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994), *as amended on denial of reh'g* (Oct. 26, 1994) ("[C]ourts should . . . maintain some vigilance by excluding justifications that are so unrelated to the challenged practice that they amount to a collateral attempt to salvage a practice that is decidedly in restraint of trade.").

**J.      Forest's Motion *in Limine* No. 10 (to exclude evidence and argument regarding the post-agreement subsequent sales history of the Lexapro authorized generic)**

The motion is DENIED.  The fact that Forest and Mylan made no profit, rather than the supposedly anticipated $73 million in profit, from sales of Lexapro in the two years after the Lexapro Amendment appears to the Court to be admissible evidence to counter Forest's argument that the Mylan reverse payment represented "fair value for services."  True, "Projections which turn out to be inaccurate are not fraudulent simply because later events show that a different projection would have been more reasonable." *Grassi v. Info. Res., Inc.*, 63 F.3d 596, 599 (7th Cir. 1995).  At the same time, a forecast's radical departure from the actual outcome, where foreseeable, can be evidence of its unreliability. *See, e.g., Dolgow v. Anderson*, 53 F.R.D. 664, 670 (E.D.N.Y. 1971), aff'd, 464 F.2d 437 (2d Cir. 1972) (finding that "the subsequent failure of earnings to meet predictions was due to market and other changes that a reasonable businessman would not have foreseen or would have discounted in making predictions").

**K.      Forest's Motion *in Limine* No. 11 (to preclude DPPs from offering testimony or argument that memantine does not act as an NMDA receptor antagonist)**

The motion is DENIED.  The class of drugs of which memantine (Namenda) is a member— an antitrust concern about market definition—is distinct from memantine's biological mechanism of action—an IP law concern about the claims of the '703 patent. (Dkt. No. 836 at 4–8.)

Dr. Herrmann's argument appears to be that the patent's claims are incorrect as a matter of science—he says that memantine is not, in fact, acting as an NMDA receptor at the relevant dose (20 mg per day) in Alzheimer's patients—and, therefore, Mylan's drug could not have directly infringed the '703 patent, which claims a method for blocking NMDA receptors.  He concedes that memantine exhibits NMDA receptor antagonism at higher dosages.

7

With this *in limine* motion (and the next), I fear we are already far down the rabbit hole. The parties would do well to keep in mind that this is a jury trial, that both sides have limited time, and that we will under no circumstances be conducting a trial within a trial.

### L.     Forest's Motion *in Limine* No. 12 (to preclude Dr. Herrmann from using a claim construction that is contrary to the settled claim construction of the patent court)

The motion is GRANTED.  Dr. Herrmann must confine his testimony to opinions about the patent as it was construed by the patent court.  However, that does not seem to limit his testimony in the manner Forest thinks it does.  My review of Dr. Herrmann's report suggests to me that he has accepted the patent court's claim construction in its entirety—including specifically its construction of "effective amount" as being an "amount shown to cause improvement, in comparison to placebo."

My understanding of the Delaware litigation is as follows:  following Judge Sleet's claim construction decision, the parties still disagreed whether the patent, as construed, (*i*) merely required that memantine cause improvement generally in Alzheimer's patients, in comparison to placebo and irrespective of the mechanism of action, or, instead, (*ii*) actually required that memantine cause improvement in Alzheimer's patients by preventing or minimizing cerebral ischemia.  (Dkt. No. 837 at 8.)  This stemmed from a disagreement about whether the term "effective amount" in claim 1 of the '703 patent referred to the treatment of "Alzheimer's disease" (a more general method) or, instead, referred to the "treatment of cerebral ischemia" (a more specific method).

Fast forwarding to today, Forest would like to prevent the DPPs' expert Dr. Herrmann from testifying that the patent specifically requires improvement with respect to ischemia, so its motion *in limine* attempts to argue that Dr. Herrmann's conclusions are contrary to Judge Sleet's claim

construction decision. That is wishful thinking on Forest's part. Moreover, Forest seeks to have this Court reach an issue that Judge Sleet did not. In the Delaware litigation, both parties' experts started from the same premise, *i.e.*, that the patent court's claim construction of "effective amount" (which was defined as "an amount shown to cause improvement, in comparison to placebo") meant that the drug confer some "therapeutic benefit by way of improvement." (Dkt. No. 837 at 7.) But that did not resolve their dispute, which was, in so many words, "improvement *how*?" The Delaware litigation settled before the experts could offer competing opinions, let alone before the Court weighed the evidence and reached a verdict. It is only fair that we pick up where they left off.

In any event, I personally see no tension between the term "improvement" and the more clinically technical phrase "therapeutic benefit." The two terms appear to me to be congruent, and for purposes of this trial I intend to treat them as such. The fact that the patent court used the former rather than the latter is of no moment to this Court, especially since Forest does not point to any substantive difference between the two. Of course, I expect that Forest will inform the jury that Judge Sleet adopted its proposed claim constructions, and not those of Mylan.

**M.    Forest's Motion *in Limine* No. 13 (to preclude prejudicial and irrelevant evidence and argument about Forest's Medicaid Rebate Savings)**

At trial, Forest intends to argue—and the DPPs intend to refute—that the Lexapro Amendment represents fair value for services rendered by Mylan to Forest.

Under the Medicaid Drug Rebate Program and the Deficit Reduction Act ("DRA"), Medicaid effectively enjoys "most favored nation" status with respect to brand drug pricing, and price-matching is accomplished through manufacturer rebates. In 2005, the DRA was amended to require brand manufacturers to price-match any authorized generic of the brand drug *that it manufactures*; however, if the brand manufacturer is merely a licensor of an authorized generic,

the amendment does not apply.  Therefore, brand manufacturers are incentivized to farm out production of their authorized generics, in order to minimize their Medicaid rebate liability.

Forest seeks to preclude the DPPs from arguing that there is a licensing "loophole," that Forest violated the spirit of the DRA, and that Forest is taking money from the federal healthcare programs and their beneficiaries.  The motion is DENIED AS MOOT.  "Plaintiffs reiterate that they do not intend to present argument or evidence that the Lexapro Amendment illegally, fraudulently or illicitly deprived Medicaid or its beneficiaries of money."  (Dkt. No. 838 at 9.)  However, the DPPs should steer a wide berth around suggesting that Forest's licensing arrangement with Mylan was somehow unlawful or illegal under the DRA.  It is irrelevant.

### N.   Forest's Motion *in Limine* No. 14 (to exclude use of inflammatory evidence and argument about drug pricing trends and patent settlement agreements)

The motion to exclude evidence of general drug pricing trends in the pharmaceutical industry is DENIED for substantially the reasons set out in the opposition brief.  This evidence "will likely aid in the jury in understanding the context in which the case arises" and is "background information."  *Novartis Pharm. Corp. v. Teva Pharm. USA, Inc.*, No. 05-cv-1887, 2009 U.S. Dist. LEXIS 103104, at *13 (D.N.J. Nov. 5, 2009).

Forest has also moved to preclude the DPPs from using the words "bribe," "bribery," or "payoff" to describe the settlement agreements, as the former are terms of art that refer to federal crimes.  However, as "plaintiffs do not presently intend to use [the words 'bribe' or 'bribery'] before the jury" (Dkt. No. 839 at 8), a blanket prohibition would be premature.  Defendants have not shown that the term "payoff"—which the DPPs do intend to use—suffers from the same infirmities, so it may be used.  *See, e.g.*, *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 715 (N.D. Ill. 2016) (using the term "payoff" to describe the holding in *Actavis*).  The remaining part of Forest's motion is similarly denied as premature.

**O.     Forest's Motion *in Limine* No. 15 (to exclude the NYAG Namenda decisions)**

I do not permit decisions to be entered into evidence.  Period.  However, the fact that decisions were rendered, and a brief précis of what those decisions were, will be placed before the jury as background information, and, if the parties cannot stipulate to such a brief statement, I will write it myself.

**P.     Forest's Motion *in Limine* No. 16 (to prevent improper use of the Court's collateral estoppel decision)**

The parties have submitted overlong briefs in support of and in opposition to a motion that was not necessary.  The motion is DENIED.  The court will tell the jury that there has been prior litigation concerning Namenda and will instruct the jury on what was established and what it must therefore accept as found fact.  In other words, the Court, and no one else, will advise the jury about issues as to which collateral estoppel has been found.  Forest should read the collateral estoppel opinion carefully; it will be precluded from asserting that the "hard stop" announcement was not anticompetitive, as found by Judge Sweet and affirmed by the Second Circuit.  *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 WL 4358244, at *16 (S.D.N.Y. May 23, 2017).  I agree with the DPPs that, in connection with the "hard stop" part of this case, what remains to be litigated is the extent to which Forest's activity in connection with the "hard stop" actually injured the DPP class.  *Id.*  I am not reviewing jury instructions at the moment, or any time soon; but Forest should be aware that I meant what I said in the collateral estoppel order, and I am not going to change my mind.

## II.   Direct Purchaser Plaintiffs' ("DPPs") Motions *in Limine*

### A.   DPPs' Motion *in Limine* No. 1 (to preclude Forest from asserting subjective beliefs concerning the '703 patent)

This keeps coming up, for no good reason.  So let me rule and put it to an end—probably to neither side's liking.

Magistrate Judge Francis ably presided over the numerous discovery disputes in this case. (*See, e.g.*, Dkt. No. 249.)  I do not intend to undo anything that he did.  Therefore:

Forest is bound by its Disclosure (*see* Dkt. No. 761-1) pursuant to Magistrate Judge Francis' May 19, 2017 Order.  (Dkt. No. 249.)  For that reason, Forest may offer evidence of its subjective belief about the independence of the Lexapro Amendment from the then-pending patent litigations and settlement agreements.  (*See* Dkt. No. 761-1 at 4.)  However, Forest may not offer any evidence about its subjective beliefs to rebut any of the following DPP arguments:  that its position in the patent cases was weak (*id.* at 5); that any alleged payment to the generic competitors was large (*id.*); that Forest did not act in good faith (*id.*); and that the settlements were not *bona fide* and for fair value (*id.*).  Since Forest affirmatively stated to Magistrate Judge Francis that it would not offer evidence that its position in the patent cases was not weak (*id.*), it stands to reason that it cannot offer evidence about its subjective belief that its position in the patent cases was strong.  It has long been this court's understanding that Forest did not intend to rely on evidence from its executives about their personal opinions (which were, obviously, informed by the advice of counsel).  What that means for Forest's case will be discussed below.

To the extent that Magistrate Judge Francis has ruled that privilege has been waived with respect to certain documents (*see* Dkt. Nos. 394, 405), those documents, which have been produced, may be used by either side at trial.  Forest witnesses may be questioned about those documents by the DPPs.  If the DPPs open the door at trial, Forest may ask appropriate follow-up

questions. Forest may not affirmatively ask questions about those documents that would call for an answer based on subjective beliefs; only if the DPPs open the door—with their questions, not simply by introducing the documents—may Forest follow up. Forest may, however, ask questions about the "independence" of the Lexapro Amendment from the then-pending patent litigations and settlement agreements.

It is not entirely clear to this Court where the line between what was affirmatively waived and what was not waived lies. I will have to rule on a question by question basis. However, I can read the Disclosure pursuant to the May 19, 2017 Order, and I will not read it out of the case.

In short, I am not changing the rules on the eve of trial.

**B.     DPPs' Motion *in Limine* No. 2 (to preclude use in this case of discovery Forest took in the IPP case)**

Neither party will be allowed to add documents produced in the IPP case discovery to its exhibit list. *Cf. Abdelal v. Kelly*, No. 13-cv-4341, 2018 U.S. Dist. LEXIS 135149, at *7 (S.D.N.Y. Aug. 10, 2018) ("The Court will not reopen discovery now simply because Plaintiff made a strategic decision during the discovery process not to depose a high-ranking official who likely has knowledge about the NYPD's investigatory practices.").

We will deal with cross examination as it occurs; prior to the beginning of cross of any witness, if either party intends to use a document that was produced in the IPP case but not in this case, it must make its intention known to the Court and opposing counsel, and I will rule on the propriety of that use before cross commences. But the ordinary rule is that a party may use pretty much anything to cross-examine.

**C.** **DPPs' Motion *in Limine* No. 3 (to preclude testimony from new witnesses about the Mylan deal concept and Forest-Mylan meeting presentation documents)**

The motion is GRANTED.  Forest may not call witnesses at trial to testify about these documents if those witnesses were not produced during discovery relating to these documents.  As far as I am concerned, this is yet another instance of Forest's engaging in what I call sharp practice. In particular, Eric Agovino, who was not produced as a witness but who apparently authored several key documents, will not be permitted to testify.  *See Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 269 (2d Cir. 1999).  Forest may not cure the problem by seeking to reopen discovery.

**D.** **DPPs' Motion *in Limine* No. 4 (to preclude or limit Forest's use of expert testimony as a surrogate for evidence of Forest's state of mind)**

The motion, for now, is DENIED, since the DPPs do not identify any portion of Judge McKelvie's testimony that implicates any privileged attorney-client information, or otherwise runs afoul of its earlier election not to rely on its "subjective beliefs."  Moreover, Forest appears to concede that neither Judge McKelvie nor any other expert will break this rule at trial.  (Dkt. No. 853 at 13 ("In light of this Court's guidance at the June 4, 2019 hearing" that subjective evidence cannot "com[e] in through experts . . . Forest withdraws its intention to rely at trial on evidence of its subjective beliefs regarding the '703 patent's strength.").)

However, it bears repeating:  Forest took the position that it would not offer any evidence at trial about the subjective beliefs of its current or former executives relating to whether its position in the patent case was weak (which as far as I am concerned also means their beliefs about whether Forest's position was strong—in other words, evidence about the strength of Forest's case in the infringement suit).  It is well settled that an expert cannot offer evidence about a party's state of mind, *Rezulin*, 309 F. Supp. 2d at 546, and that rule will be followed in this case.  Judge McKelvie may not offer evidence about Forest's intent, or otherwise testify in any way that "puts

14

at issue attorney-client information." *In re Lidoderm Antitrust Litig.*, No. 14-md-02521, 2016 U.S. Dist. LEXIS 105619, at *95 (N.D. Cal. Aug. 9, 2016).

Moreover, that ruling cannot be circumvented by asking the jury to infer from Judge McKelvie's testimony what Forest's intent actually was.  The jury will be so instructed.  In other words, if Judge McKelvie testifies about his views on the strength of the patent, the litigation and the settlement, the jury will be specifically advised that it cannot draw the conclusion that Forest actually held the same views as Judge McKelvie's.[1]

### E.    DPPs' Motion *in Limine* No. 5 (to exclude deposition testimony from witnesses deposed only in the Namenda patent litigation)

Forest has designated testimony from depositions taken in 2009 and 2010 in the Delaware patent litigation.  These include depositions of four Mylan experts and one Mylan fact witness, three third-party fact witnesses, and six Forest and Merz fact witnesses.  Counsel for Mylan was present at all depositions.  Forest argues that "in this case, DPPs stand in the shoes of Mylan, who had a similar motive to develop testimony from its witnesses on the same infringement and validity issues[.]"

I will start from the following two propositions:  first, we are not going to retry the '703 patent case in this lawsuit, *see F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 157 (2013); and second, we are not going to permit testimony from that case to be admitted unless the witness whose testimony is sought to be introduced was identified in response to Rule 26 disclosures, such that the DPPs had the opportunity to examine or cross-examine them in the context of *this* lawsuit. Fed. R. Civ. P. 32(a)(1), 32(a)(8), 32(b); Fed. R. Evid. 804(b)(1)(B).   Apparently, the witnesses whose

---

[1]    I do not believe this *in limine* ruling affects Forest's ability to satisfy the rule in *Actavis*, and allowing expert testimony to prove success on the patent merits *objectively* comports with the framework announced in *Lidoderm* and adopted by Magistrate Judge Francis.

deposition testimony from the underlying patent litigation is sought to be introduced were not identified in the initial Rule 26 disclosures in this case.  Therefore, the motion is GRANTED.

The deposition testimony Forest proposes to offer is rank hearsay—out-of-court statements offered to prove the truth of the matter asserted.  Fed R. Evid. 801(c).  It also does not meet any of the hearsay exceptions, even though two of the declarants are dead and therefore unavailable, because Mylan, who litigated the patent case, is not the predecessor-in-interest of the DPPs, who are litigating an antitrust case.  Fed. R. Evid. 804(b)(1)(B).  The fact that Mylan was able to cross-examine these witnesses is no substitute for the DPPs' inability to do so.  If Forest wanted to test its theory that the deposition testimony was admissible without tendering those witnesses for deposition in this lawsuit, it should have raised the issue before now.

### F.   DPPs' Motion *in Limine* No. 6 (to preclude "litigation risk" or "risk aversion" or purported "early entry" as procompetitive justifications)

The motion is DENIED.

With respect to "litigation risk" or "risk aversion," Forest may offer evidence of its ostensible business reasons, including "business uncertainty" or "litigation risk," for settling the patent litigation.  (*See* Disclosure at 4.)  *Actavis* itself provides that a reverse payment can be justified by "traditional settlement considerations, such as avoided litigation costs," or "may amount to no more than a rough approximation of the litigation expenses saved through the settlement."  570 U.S. at 156.

However, there are two important caveats.

First, Forest may offer "litigation risk" as a justification as long as it "implicate[s] only business decisions and could have been theoretically reached without attorney-client input." *Lidoderm*, 2016 U.S. Dist. LEXIS 105619, at *48.  In other words, Forest may discuss "litigation risk" insofar as it refers generally to shareholder risk borne by all publicly-traded companies.  *See*

16

*id.* at \*78–\*79 (testimony on "reduced litigation expenses and business distractions" could be "shown exclusively through testimony of executives without implicating attorney-client privileged information"). Forest may not, however, offer subjective evidence of litigation risk related specifically to the Delaware patent litigation, *see id.* at \*54, as a way of getting around its refusal to waive privilege in order to put evidence of its beliefs about the strength or weakness of the patent before the jury. "Subjective beliefs that necessarily rely on what defendants have been told regarding the outcome of the patent litigation put attorney-client information at issue." *Id.* at \*70.

Second, "litigation risk" is very different from "competition risk," which the U.S. Supreme Court (accurately) has labeled the "relevant anticompetitive harm" in reverse payment cases such as these. *Actavis*, 570 U.S. at 157. By definition, "competition risk" can *never* justify, "offset[]," or "redeem[]" the anticompetitive consequences of a reverse payment. *Id.* at 156. It is the very evil the antitrust laws seek to prevent.

The latter part of the DPPs' motion is also DENIED. Forest apparently intends to present evidence that the settlement provided Mylan with earlier entry than it would have been able to secure had it prosecuted the patent litigation to the end—a procompetitive result. There is nothing wrong with Forest's arguing this; the rule of reason requires consideration of the "existence and degree of any anticompetitive consequence." *Id.* at 159. Of course, Forest can argue this point only through objective evidence. *See Lidoderm*, 2016 U.S. Dist. LEXIS 105619, at \*77. And, ultimately, the jury will determine if allowing Mylan to enter three months before patent expiration constituted "early" entry in any meaningful, procompetitive sense—and, if so, whether that outweighs the anticompetitive effects.

### G.   DPPs' Motion *in Limine* No. 7 (to preclude improper justifications for the Lexapro Amendment)

The motion is DENIED.  The question is whether the Lexapro Amendment represents "fair value for services," which is a cognizable procompetitive justification under *Actavis*, 560 U.S. at 156.  The jury will be allowed to consider evidence of the value of the Lexapro Amendment to Forest—whatever the "source" of that value—in its evaluation of whether the settlement payment was "large" or "for fair value."

### H.   DPPs' Motion *in Limine* No. 8 (to preclude Forest from asserting improper arguments concerning the size of its reverse payment and purported saved litigation costs)

The motion is DENIED, for substantially the same reasons as the DPPs' Seventh *in Limine* Motion.

The DPPs' motion to preclude Forest from presenting evidence that it saved more than $3.5 million in litigation costs is also DENIED.  Forest's fact witnesses, who testified during discovery that Forest had saved $10 million in litigation costs, may be cross-examined at trial about their pre-trial testimony.

### I.   DPPs' Motion *in Limine* No. 9 (to exclude evidence and argument that the FTC or the patent court "approved" of the Namenda agreements)

The motion is DENIED AS MOOT because Forest does not intend to introduce such evidence or argument.  Should it attempt to do so, it will be foreclosed from doing so.

### J.   DPPs' Motion *in Limine* No. 10 (to exclude hearsay statements from the New York Attorney General)

The motion is DENIED.  The DPPs stipulated in this case that they would not object to the admissibility of "all press releases and other public statements made by the parties to the [New York Attorney General] Action regarding the possible withdrawal and continuing availability of

Namenda IR." (Dkt. No. 849 at 2.) I reject the DPPs' effort to characterize that stipulation as meaning anything other than what the words plainly say.

### K. DPPs' Motion *in Limine* No. 11 (to exclude evidence and/or argument regarding the opioid crisis and past or present litigation involving class representatives)

The Court has already ruled on this issue in connection with Forest's Fourth *in Limine* Motion. The motion is GRANTED.

### L. DPPs' Motion *in Limine* No. 12 (to exclude evidence of any DPP's size or financial condition)

The motion is GRANTED in part.

Forest represents that it plans to use evidence of the DPPs' size and financial condition in two ways: *first*, "to explore on cross-examination whether [Dr. Lamb's] damages model is unsuitable for certain purchasers," since the class members vary in size and, correspondingly, in bargaining power; and, *second*, to argue that some larger class members successfully mitigated damages by negotiating discounts and rebates. Forest concedes—as it must—that information about the size or relative financial condition of the DPPs has no relevance to liability. Accordingly, I GRANT the DPPs' motion with respect to the first phase of the trial ("pay to delay" liability).

The issue of bargaining power, however, is relevant to damages. *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88–89 (D. Conn. 2009). During the second phase of the trial, which includes both "hard switch" liability and overall damages, the jury can and will be instructed about the limited relevance of the size and financial condition of the DPPs, and will be reminded that their size does not mean they cannot be injured in an antitrust sense.

**M.      DPPs' Motion *in Limine* No. 13 (to exclude mention of downstream effects)**

As I have already held in connection with Forest's Fifth *in Limine* Motion, overcharges—not lost profits—are the proper measure of damages. (*See supra.*)  Accordingly, to the extent the DPPs seek to prevent Forest from introducing evidence that downstream customers of the DPPs paid higher prices due to "pass on" effects, their motion is GRANTED.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 724–25 (1977); *see also In re Lidoderm Antitrust Litig.*, No. 14-md-02521, 2018 WL 7814761, at *3 (N.D. Cal. Feb. 7, 2018) ("Defendants may not solicit or introduce evidence solely for the purpose of showing that DPPs pass-on damages or that DPP damages should be reduced.").

Relatedly, Forest may not raise as a defense to liability, or to mitigate damages, the phenomenon of "generic bypass."  This refers to a situation in which, after generic entry, "manufacturers of generic drugs often bypass [] wholesalers and sell directly to retail stores, HMOs, hospitals, and other customers." *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 368 (D. Mass. 2004).  One potential effect of "generic bypass" is that "Wholesalers that would otherwise lose sales to bypass may [actually] benefit from conduct that delays generic entry." *Id.* The Court agrees with other district courts that have held that this theory is "inconsistent with *Hanover Shoe*[*, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968)] and its progeny," and therefore not an appropriate defense to anticompetitive conduct. *In re Niaspan Antitrust Litig.*, No. 13-md-2460, 2015 WL 4197590, at *2 (E.D. Pa. July 9, 2015); *Relafen*, 346 F. Supp. 2d at 369; *In re Prograf Antitrust Litig.*, No. 11-md-02242, 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343, 2014 WL 2002887, at *5 (E.D. Tenn. May 15, 2014); *see also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 316 (E.D. Mich. 2001).

Finally, Magistrate Judge Francis previously held that the class representatives' contracts do not meet the narrow cost-plus exception to the "no pass-on damages" rule of *Illinois Brick*. The time to object to that ruling—which is now law of the case—was back in 2017. *Namenda*, 2017 WL 2693713, at *7–*8.

### N.  DPPs' Motion *in Limine* No. 14 (to exclude mention of treble damages, attorney's fees, or costs)

The jury will not be told about treble damages or attorney's fees or costs of this action. The motion is GRANTED to that extent. However, to the extent that exemplary damages or fee awards presented possible reasons for settling the patent litigation with Mylan, evidence about them is relevant, and the jury may be told about why. Explanations will be carefully cabined.

### O.  DPPs' Motion *in Limine* No. 15 (to preclude Forest from relying upon patents other than the '703 patent as affecting generic Namenda IR)

The motion is DENIED AS MOOT, since Forest does not intend to introduce any such evidence.

### P.  DPPs' Motion *in Limine* No. 16 (to preclude reference to Forest's expert Roderick McKelvie as "Judge" or "The Honorable")

Judge McKelvie's experience on the bench will be apparent from his explanation of his credentials; that is, the jurors will know that he was once a judge. However, he will testify as "Mr. McKelvie." The man is no longer a judge, and he will not be addressed by his honorific while on the witness stand.

### CONCLUSION

This constitutes the decision and order of the Court.

The Clerk of Court is respectfully requested to close the motions at Docket Numbers 685, 721, 722, 723, 724, 725, 726, 727, 728, 729, 730, 731, 732, 733, 734, 735, 736, 737, 756, 759, 763, 766, 769, 772, 775, 778, 781, 784, 787, 792, 795, 789, and 799.

Dated: August 2, 2019

_____

Chief Judge

BY ECF TO ALL PARTIES