## GARWIN GERSTEIN & FISHER LLP

88 Pine Street, 10th Floor, New York, NY 10005 | Telephone: (212) 398-0055 | Fax: (212) 764-6620

Bruce E. Gerstein   Kimberly M. Hennings   Anna Tydniouk
Scott W. Fisher      Elena K. Chan          Aakruti G. Vakharia
Joseph Opper         Dan Litvin
Noah H. Silverman    Jonathan M. Gerstein

Sender's e-mail:    bgerstein@garwingerstein.com

October 9, 2019

*Via ECF*

The Honorable Colleen McMahon
United States District Court
Southern District of New York
500 Pearl Street, Room 2550
New York, New York 10007

    RE:    *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-07488-CM-RWL

Dear Judge McMahon:

In advance of the final pre-trial conference, and for the Court's convenience, enclosed please find four summary schedules:

**Schedule A**:  a summary table of Plaintiffs' responses to Defendants' objections to Plaintiffs' Phase 1 exhibits.

**Schedule B**: a summary table of Plaintiffs' objections to Defendants' Phase 1 exhibits.

**Schedule C**: a summary table of Plaintiffs' responses to Defendants' objections to Plaintiffs' Phase 2 exhibits; and

**Schedule D**: a summary table of Plaintiffs' objections to Defendants' Phase 2 exhibits.

                        Respectfully submitted,


                        */s/ Bruce E. Gerstein*
                        Bruce E. Gerstein

**SCHEDULE A**

**PLAINTIFFS' RESPONSES TO DEFENDANTS' OBJECTIONS**

**TO PLAINTIFFS' PHASE 1 EXHIBITS**

| PTX Nos. | Defs' Objections | Bases for Admissibility |
|---|---|---|
| PTX-12 | 402, 403 | This email string demonstrates the connection and overlap between the Namenda IR patent litigation and related antitrust issues raised by Mylan during negotiations of the agreements at issue.  Counsel for Mylan has admitted that some or all of the money received by Mylan from the Lexapro Amendment was to release the patent-related antitrust claims via the Namenda IR settlement agreement. |
| PTX-141 | 402, 403, 602, 802 | This except of Forest's privilege log, compiled by or on behalf of Forest by its lawyers and produced in this case, states 12 times that David Solomon is the "author" of the January 2010 "Mylan Deal Concept" memos (PTX Nos. 162 and 165) that link the Namenda patent litigation with the Lexapro Amendment.  Mr. Solomon has denied being the author and made no efforts to determine who was the author, despite being the 30(b)(6) witness designated by Forest to testify about these documents.  PTX 141 is both relevant and an admission by Forest. |
| PTX-156 | 802 | This report prepared by the American Intellectual Property Law Association provides details on the typical costs of litigation.  It is not relied upon for the truth of the matter asserted.  Rather, it is relied upon by Plaintiffs' expert for what a reasonable litigant would expect in terms of litigation costs. |

| PTX Nos. | Defs' Objections | Bases for Admissibility |
|---|---|---|
| PTX-174 PTX-175 PTX-632 PTX-1520 PTX-1636 | 402, 403 | These financial spreadsheets demonstrate the actual performance of the sales of Forest's Lexapro authorized generic drug.  This Court has ruled that this type of evidence "appears to the Court to be admissible evidence…"  MIL Rulings at p. 7. |
| PTX-181 | Illegible, 602, 802 | The legible portions of this Mylan document demonstrate the relative costs of Mylan manufacturing the Lexapro authorized generic product.  A Mylan witness gave testimony about this document. |
| PTX-396 | 402, 403, 802 | This FTC study titled "Generic Drug Entry Prior to Patent Expiration: An FTC Study" reports on historical patent owner win rates in Hatch-Waxman litigation.  The Court has already rejected Forest's 802 and 403 objections to the admissibility of this document.  ECF No. 859 at 2 ("[T]his general statistical evidence is neither hearsay nor unduly prejudicial."). |

| PTX Nos. | Defs' Objections | Bases for Admissibility |
|---|---|---|
| PTX-433 PTX-434 PTX-435 PTX-436 PTX-437 | 802 | These scientific documents are admissible for a non-hearsay purpose: irrespective of the truth of the statements they contain, they provide a readily understandable explanation for why Forest was willing to pay Mylan to drop its non-infringement defense. In addition, PTX-436 was drafted by Forest's scientists acting within the scope of their employment with Forest and is therefore not hearsay under FRE 801(d)(2)(D). In addition, at trial Plaintiffs' expert will provide the foundation for the "learned treatise" exception to the hearsay rule under FRE 803(18). |
| PTX-619 | 802 | This email string does not constitute hearsay.  It is a business record maintained by Forest as part of its normal business operations and was produced in this case.  This email string was forwarded to Forest during the negotiations between Forest and Mylan concerning the Namenda patent litigation and associated antitrust claim threatened by Mylan.  See, e.g., PTX 159 (demonstrating that PTX 619 was forwarded to Forest's in-house lawyers, Eric Agovino and Charles Ryan, who were overseeing the patent litigation and involved in negotiations with Mylan). |

| PTX Nos. | Defs' Objections | Bases for Admissibility |
|---|---|---|
| PTX-1065 | 402, 403, 802 | This is a government report from the FTC on the effects of reverse payment agreements, and is publicly available from their website.  This report will be used in connection with Dr. Lamb and/or other expert witnesses.  Forest has already tried – and failed -- to exclude this study under FRE 402 and 403 in their Motion in Limine No. 14 (ECF No. 796 at 1-3), which the Court denied.  Order, ECF No. 859 at 10.  Moreover, the document is not hearsay as it is a government report pursuant to FRE 803(8).  The FTC Act authorizes it to conduct such studies, see 15 U.S.C. §46(f), and the FTC report sets forth both its findings and methodology in copious detail and has not been shown to be untrustworthy.  Indeed, Chief Judge Young, presiding over another reverse payment trial, specifically overruled a hearsay objection to the same report (though he excluded it for other reasons).  *See In re Nexium (Esomeprazole) Antitrust Litigation*, No. 12-md-02409 (D. Mass.), Trial Tr. Dec. 2, 2014 (ECF No. 1438), at 40-43 ("Their [plaintiffs'] argument is that it comes in under 803(3), government report…. Of course it is."). [*attached*].  Moreover, the report qualifies as a learned treatise under FRE 803(18), and so can be used by expert witnesses. |
| PTX-1090 | 802 | This is another government study like PTX-1065.  In this report, the FDA studied the effects of competition from multiple generics.  Plaintiffs will use the report at trial with Dr. Lamb and/or other expert witnesses.  The FDA has broad authority to conduct studies relating to drugs, see 21 U.S.C. 393(d)(2)(C), and the FDA report details how it collected data and analyzed price declines associated with the addition of generic competitors.  The report has not been shown to be untrustworthy and is therefore admissible under FRE 803(8).  It also qualifies as a learned treatise. |
| PTX-1137 | 602, 802 | This Forest email and attached investor reports discuss the 2010 approval of Namenda XR, the expected delayed launch of that product in light of the on-going settlements with the generics in the Namenda IR patent case, and that settlement was wise in order to avoid potential generic entry to Namenda IR prior to 2015 which was the agreed-upon launch date with the generics.  This email and attachments, all of which were produced by Forest in this case, are business records of Forest. |

| PTX Nos. | Defs' Objections | Bases for Admissibility |
|---|---|---|
| PTX-1157 | 602, 802 | This is an expert report by Mr. Cameron Weiffenbach originally proffered by Mylan in the Namenda Patent Litigation, but subsequently withdrawn.  Mr. Weiffenbach was not going to testify in the Namenda Patent Litigation trial scheduled for April 5, 2010 and Plaintiffs are not relying upon this document for the truth of the matter asserted.  Instead, Plaintiffs are relying on PTX-1157 as proof of (1) notice to Forest of Mylan's fraud theory based on the patent term extension; and (2) the fact that Mylan had admissible evidence in support of that fraud theory.  Mylan's fraud theory was asserted in a draft antitrust complaint whose admissibility has already been agreed to by the parties. See PTX-0009.  Forest's personal knowledge of PTX-1157, for purposes of FRE 602, is demonstrated by Forest's privilege log, which shows an entry for PTX-1157 on January 26, 2010 at the time Forest and Mylan were negotiating the settlement. |
| PTX-1166 | 402, 403, 802 | This stipulation and proposed order was filed by Forest, Mylan, and other litigating generics to modify certain discovery deadlines but to maintain the April 5, 2010 trial date in the Namenda IR patent case.  That date held firm until Forest and Mylan reached an agreement in principle in mid-March 2010.  The document is relevant to demonstrate the context in which Forest and Mylan were negotiating and is likely not hearsay because it was filed by Forest's lawyer-agents and likely maintained by them and Forest's in-house lawyers overseeing the case and thus is a business record.  If used at trial, counsel for Plaintiffs will examine Forest's former in-house counsel who oversaw the patent litigation and settlement with Mylan about the docment. |

| PTX Nos. | Defs' Objections | Bases for Admissibility |
|---|---|---|
| PTX-1174 PTX-1202 PTX-1203 PTX-1205 | 802 | The last three of these references are all prior art to the '703 Patent and are therefore legally operative documents.  Their relevance is not the truth of the matter asserted but rather the proof of what had been publicly disclosed prior to the filing of the patent.<br><br>In addition, each of these four documents qualifies under the "ancient documents" exception to the hearsay rule under FRE 803(16) because each of them was published (and therefore clearly prepared) prior to January 1, 1998.<br><br>In addition, if necessary, at trial Plaintiffs' experts will provide the foundation for the "learned treatise" exception to the hearsay rule under FRE 803(18). |
| PTX-1210 PTX-1212 PTX-1214 PTX-1216 | 402, 403 for PTX-1210<br><br>602 for PTX-1212, 1216<br><br>402, 403, 602 for PTX-1214 | These Forest and Merz documents provide descriptions of how Forest and/or Merz interpreted the prior art.  They will only be addressed by Plaintiffs' expert, and therefore the 602 objection is moot.  FRE 602.  Forest has not yet identified the bases for its 403 objections, and therefore Plaintiffs are unable to address them here. |
| PTX-1534 | 402, 403 | This email from in-house Forest lawyer Eric Agovino, who participated in overseeing and negotiating in the Namenda patent case, attaches the Lexapro Amendment and describes it as a "side deal in the Namenda patent case."  Forest denies there was a connection between the two.  It is clearly relevant. |

| PTX Nos. | Defs' Objections | Bases for Admissibility |
|---|---|---|
| PTX-1352 | 402, 403, 602, 802, 901 | These historical statistics regarding the length of time the Federal Circuit takes to decide cases were taken directly from the Federal Circuit's website.  They are not relied upon for the truth of the matter asserted.  Instead, they are relied upon by Plaintiffs' expert for what a reasonable litigant would expect in terms of litigation timing. These were downloaded in 2017; the current version is available at http://www.cafc.uscourts.gov/the-court/statistics (towards the bottom of the under the heading "Median Disposition Time for Cases Terminated After Hearing or Submission"). |

**SCHEDULE B**

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PHASE 1 EXHIBITS**

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-15 DTX-16 | 403 | These two exhibits are judicial opinions on claim construction.  Plaintiffs have no objection to admitting evidence reflecting whose claim constructions were ultimately adopted in the Namenda Patent Litigation, and would not oppose the admission of a chart designed to accomplish that objective (showing Mylan's proposed construction, Forest's proposed construction, and the construction ultimately adopted). <br><br> But these judicial opinions are highly prejudicial.  First, Judge Sleet's opinion (DTX-16) chastises some of the generics regarding the briefing they submitted.  See DTX-16 at 3 n.5.  Second, this Court has already held that Forest's self-serving interpretation of DTX-16 and the Report and Recommendation on claim construction (DTX-15) was "wishful thinking on Forest's part."  ECF No. 859 at 9.  There is simply no telling what mischief Forest intends for these documents.  Third, in patent infringement cases, courts routinely instruct the jury on the ultimate claim interpretations but never disclose the reasoning set forth in the claim construction opinion. |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-19 | 802, 403, 602, no verification | DTX-19 is an unverified interrogatory response by Mylan in the Namenda Patent Litigation.  On its face it is hearsay.  Moreover, because it is unverified, it would not even have been admissible in the Namenda Patent Litigation.  *Cavanagh v. Ford Motor Co.*, No. 13-CV-4584, 2017 WL 2805057, at *7 (E.D.N.Y. June 9, 2017), *report and recommendation adopted*, No. 13-CV-4584, 2017 WL 2804934 (E.D.N.Y. June 28, 2017) ("Neither unverified answers to interrogatories nor a complaint that plaintiff has not sworn to can constitute admissible evidence."); *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968) (holding that unverified answers to interrogatories could not be considered in opposition to summary judgment motion). <br><br> If admitted, these interrogatory responses would be unfairly prejudicial because a jury cannot reasonably be expected to differentiate between unverified interrogatories and verified interrogatories, and therefore would mistakenly assume that Mylan expressed the views set forth in the interrogatory responses even though Mylan did not. |
| DTX-23 | 402, MIL | Forest elected not to present subjective views of the patent merits and Forest's settlement strategy was necessarily informed by those subjective views.  Forest will likely improperly use this document to inferentially establish its subjective views.  See MIL Ruling at p. 12 (discussing election), and at p. 15 (preventing use of expert evidence to inferentially establish prohibited subjective views). |
| DTX-51<br>DTX-306<br>DTX-307<br>DTX-320<br>DTX-445 | 402 for all<br><br>403, 802, 901 for DTX-445 | Incurred patent litigation attorney's fees and expenses of the generics are not relevant to the analysis of "large" under *Actavis*.  Only the prospective saved litigation fees and expenses of Forest are relevant. |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-71 | 402, 403, MIL | After-the-fact disagreements between Forest and Dr. Reddy's over Forest's agreements with Mylan are not relevant and could only serve to confuse the jury.  Also, suggestions of FTC review and/or approval of the agreement between Forest and Mylan are prohibited.  See MIL Rulings at p. 18. |
| DTX-186 | 802 | This analysis report from an unknown and unverified source is hearsay. |
| DTX-238 DTX-323 DTX-361 DTX-765 | 402 for all  403 for DTX-238 and 323  403, 404, 802 For DTX-765 | Forest's agreements with Dobfar and Orchid over the drug product ceftaroline are not relevant to any issues in this case and could serve only to confuse the jury.  Also, as to DTX-765, suggestions of FTC review and/or approval of the agreement between Forest and Mylan are prohibited.  See MIL Rulings at p. 18. |
| DTX-360 | 402 | Forest elected not to rely on subjective evidence to establish "fair value."  See MIL Rulings at p. 12. |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-414 | 403, 602, 802 | This is a Mylan document and no exception to the hearsay rule applies.  To the extent Forest seeks to have a Forest fact witness address the document, the witness lacks personal knowledge because it is a Mylan document.  The document is prejudicial because (1) it reflects statements Mylan was essentially required to make rather than Mylan's actual beliefs; and (2) although undated, it was presumptively authored in 2007 when Mylan submitted its ANDA and before Mylan uncovered Dr. Olney's work in 2009.  As a result, a jury would likely be confused into thinking the document reflected Mylan's beliefs as of 2009, when in fact there is no evidence it did. |
| DTX-448 DTX-450 DTX-478 DTX-479 DTX-480 DTX-483 DTX-484 DTX-488 DTX-500 DTX-503 DTX-504 DTX-505 DTX-507 DTX-515 DTX-516 DTX-517 | 402, 403 for all 602, 802, 1006 for DTX-480 602, MPT, 30(b)(6) for D484 901 for DTX-504 602, 901 for DTX-515 | The ANDA status of these generics (Orgenus, Teva, Torrent, and Wockhardt) is not relevant in this case as Plaintiffs do not allege that these particular generics would have entered the market earlier "but for" the pay-for-delay agreement between Forest and Mylan. DTX 480 and 484 are Teva documents;  there is no Teva employee on the witness list of either party; DTX 504 is a Torrent document; there are no Torrent employees on any party's witness list DTX 515 is a Wockhardt document; there are no Wockhardt employees on any party's witness list |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-632 | 602, 802 | This document was prepared by Plaintiffs' counsel (possibly edited based on a document originally prepared by Plaintiffs' expert) and introduced as a demonstrative at the deposition of Mr. Patrick Jochum.  It is classic hearsay and none of Defendants' fact witnesses has personal knowledge of the document.  To plaintiffs' knowledge, none of Defendants' experts addresses the document either. |
| DTX-636 | 402, 403 | Anticipated patent litigation attorney's fees and expenses of the generic company Wockhardt are not relevant to the analysis of "large" under *Actavis*.  Only the prospective saved litigation fees and expenses of Forest are relevant.<br><br>Forest elected not to present subjective views of the patent merits and Forest's settlement strategy was necessarily informed by those subjective views.  Forest will likely improperly use this document to inferentially establish its subjective views.  See MIL Ruling at p. 12 (discussing election), at p. 15 (preventing use of expert evidence to inferentially establish prohibited subjective views). |
| DTX-777<br>DTX-778<br>DTX-779<br>DTX-780<br>DTX-781 | Untimely | Forest listed these documents as DTX's in October 2019, well after submission of the Revised Pre-Trial Order on April 30, 2019. |

**SCHEDULE C**

**PLAINTIFFS' RESPONSES TO DEFENDANTS' OBJECTIONS**

**TO PLAINTIFFS' PHASE 2 EXHIBITS**

| Phase 2 Exhibit | Objections | Responses |
|---|---|---|
| PTX 151 | CE, 402, 403 | This document is relevant to rebut any assertion by Forest that it believed the market preferred XR for its benefits, as it shows that Forest delayed introduction of the XR product for three years for tactical reasons (page 5).  If Forest claims in this trial that its product truly was a benefit for patients, delaying entry for tactical purposes is inconsistent with those claims. |
| PTX 469 | CE, MIL 16 | This document shows that the conversion from IR to XR would have a lasting effect.  Switching would impede reverse commute from XR to generics.<br><br>Mr. Devlin notes: "Managed care and LTC tells us that anyone converted is likely to stay converted...new patients could be hard to get for XR after IR LOE though."  This goes directly to showing the impact of and lingering effect and damages from the Hard Switch.<br><br>Plaintiffs' experts cite these and similar materials to support the continuing harm resulting from the Hard Switch. |
| PTX 476 | CE, MIL 16 | Cited in Summary Judgment opinion, slip op. 27, citing Berndt Op. Rep. Par. 32, 34<br><br>This shows how a hard and soft switch are different, and how each is associated with a different expected level of conversion from IR to XR, |

| | | |
|---|---|---|
| | | which is the main issue in Phase 2.[1]  Whether to even do a Hard Switch was based at least in part on whether the soft switch was failing or succeeding to convert IR prescriptions to XR.  If it was having difficulty meeting 30% line, they would do the Hard Switch.  It shows that the soft switch tactics were on track for 20-30%.<br><br>Slide 3: "Decision (Withdrawal or Limited Distribution or Conventional option) to be based on degree of success in converting Namenda IR to Namenda XR".<br><br>Plaintiffs' experts cite these and similar materials to support the reliability of the forecasts they use for impact and damages and to show that Forest was on track for achieving just 30% conversion from a soft switch. |
| PTX 477 | CE, MIL 16 | This is relevant to impact and damages as it shows that Forest understood that the soft switch was not going well.  The level of IR to XR conversion — which is the main damages issue in Phase 2 — was lower than expected without the Hard Switch.<br><br>This shows that Forest had good formulary coverage for XR by August 2013, very shortly after launch.  This rebuts Forest's expert opinion that the reason IR to XR conversion increased in 2014 was not the hard switch, but instead because XR's poor formulary coverage changed in January 2014.  Well, that coverage was already good, this document shows.<br><br>It shows that by September 2013, Forest already knew that patient satisfaction was at a high level, which would have factored into their contemporaneous forecasts that were projecting 30% conversion. This |

---

[1] This is without prejudice to Plaintiffs' position, as reflected in our submission regarding facts already found regarding Forest's unlawful hard swtich, *see* ECF 883.

| | | |
|---|---|---|
| | | rebuts Forest's argument that unexpected patient and physician satisfaction, and not the hard switch, was responsible for higher IR to XR conversion.<br><br>Plaintiffs' experts cite these and similar materials to support the reliability of the forecasts they use for impact and damages. |
| PTX 478 | CE, MIL 16 | This is relevant to impact and damages as it shows that as of September 2013, using the soft switch tactics, Forest was struggling to stay on track for 30% conversion, and may even have lowered its sights to 20% before deciding it needed to do the hard switch.  The reason for the increased IR-to-XR conversion after the hard switch, and what the conversion would have been without the hard switch, is the primary issue in Phase 2.<br><br>"Namenda XR conversion is on the upturn but we need to accelerate our efforts in order to meet our FY14 goal of 20%."<br><br>Plaintiffs' experts cite this and similar materials to support the reliability of the forecasts they use for impact and damages and to show that Forest was on track for achieving just 30% conversion from a soft switch. |
| PTX 509 | CE, MIL 16 | This is relevant to impact and damages as it shows the conversion rate as of November 2013 is at approximately 15% using soft switch tactics, and that Forest's expected peak IR to XR conversion absent a hard switch was just 20-30%.  That expected conversion rate absent the hard switch is the main damages issue in Phase 2.<br><br>Plaintiffs' experts cite this and similar materials to support the reliability of the forecasts they use for impact and damages and to show that Forest was on track for achieving just 30% conversion from a soft switch. |
| PTX 531 | CE, MIL 16, 802 | This is relevant to impact and damages as it shows the impact on managed care of Forest's discontinuation statements. |

| | | |
|---|---|---|
| | | It shows that Forest was telling the market about discontinuation before February 2014.<br><br>It shows that a key Managed Care Organization, Optum, agreed to add XR to its formulary only after being told of the discontinuation.<br><br>It also shows that as a result of that discontinuation communication, Optum agreed to tell its members about the discontinuation.  The document rebuts Forest's argument that Optum had already agreed to cover XR before it was told about discontinuation of IR.  Optum says it was waiting for a response from Forest as of 10/29/13 after already learning about the hard switch.<br><br>This goes directly to demonstrating impact from the discontinuation campaign.<br><br>Plaintiffs' experts cite this and similar materials to show that the Hard Switch conduct in fact predated, and had an impact before, the February 14, 2014 official announcement.<br><br>802: This is not hearsay.  It reflects an agreement from Optum, which are words of operative legal effect.  It shows Forest's state of mind about the negotiations with Optum.  It also shows that Forest told Optum about the discontinuation. It shows Optum's state of mind – in reaction to Forest's communication about discontinuation, and waiting for a response from Forest before adding XR to the formulary. |
| PTX 533 | 602 | This is a document, not testimony.  It is an analog analysis reflecting Forest employees' analysis of the market.  It is offered to show Forest's expectations of IR-XR conversion (not for the truth of the matter), and is 703 reliance material for Drs. Lamb and Berndt. |

| PTX 564 | CE, MIL 16 | Cited in Summary Judgment opinion, slip page 28, citing Lamb Op. Rep. Par. 154 |
|---|---|---|
| | | This is relevant to impact and damages as it shows Forest's 30% share expectation from the soft switch, absent the hard switch, and the fact that it was relied upon within the company.  If Forest wants to say that the jury has to take the 30% but-for IR-XR conversion as established, we will accept that, and will propose a binding jury instruction.

Page 5: Says "the objective is to convert at least 30% of Namenda to Namenda XR prior to Namenda LOE in 2015."

Plaintiffs' experts cite this and similar materials to support the reliability of the forecasts they use for impact damages. |
| PTX 789 | CE, MIL 16 | This is relevant to impact and damages as it shows that the decision to do the Hard Switch was done before 2014.  This rebuts Defendants' expert and fact testimony that the Hard Switch decision was only made in February 2014.  This is relevant because Forest argues that there could be no impact from the Hard Switch until the official Feb. 14, 2014 Hard Switch announcement because the decision had not even been made until February 2014; but evidence showing that Forest was already revealing its Hard Switch intention in 2013 is relevant to rebut that argument.

Plaintiffs' experts cite this and similar materials to show that the Hard Switch conduct in fact predated the February 14, 2014 official announcement. |
| PTX 831 | CE, MIL 16 | Cited in Summary Judgment opinion, slip page 28, citing Lamb Op. Rep. Par. 154

This is relevant to impact and damages as it shows that Forest believed, and was communicating outside the company through its public investor |

| | | |
|---|---|---|
| | | call statements, that without the hard switch, IR-XR conversion would only reach around 30%.  What the IR-XR conversion would be absent the hard switch is the main damages issue in Phase 2.<br><br>Plaintiffs' experts cite this and similar materials to show that the Hard Switch conduct in fact predated the February 14, 2014 official announcement. |
| PTX 850 | CE, MIL 16 | Cited in Summary Judgment opinion, slip page 27, citing Berndt Op. Rep. Par. 34<br><br>This is relevant to impact and damages as it shows at slide 8 that, as of December 2013, the "Conversion rate is at 15% but on track to reach 20%-30%" demonstrating that the soft switch approach was in line with 20-30% based on their actual experience up to December.  The IR-XR conversion percentage absent the hard switch (i.e., with only a soft switch) is the main damages issue in Phase 2 of the case.<br><br>It also shows that by December 2013, Forest already knew that patient satisfaction was at a high level, which would have factored into their contemporaneous forecasts that were projecting 20-30% conversion. This rebuts Forest's argument that unexpected patient and physician satisfaction, and not the hard switch, was responsible for higher IR to XR conversion.<br><br>Plaintiffs' experts cite this and similar materials to support the reliability of the forecasts they use for impact and damages and to show that Forest was on track for achieving just 30% conversion from a soft switch. |
| PTX 883 | CE, MIL 16 | This is relevant to impact and damages as it is an early version of the analog analysis that Forest used to predict IR-XR conversion absent the hard switch.  It is relevant to show that the analog analysis was a serious project conducted over a long time – reflecting that the forecasts, based |

| | | |
|---|---|---|
| | | in part on the analog analyses – were careful efforts to predict IR-XR conversion absent the hard switch, rendering the forecasts reliable.  The IR-XR conversion absent the hard switch, using Forest's forecasts, is the main damages issue in Phase 2 of the trial.<br><br>Plaintiffs' experts cite this and similar materials to show that the forecasts that they rely upon for impact and damages were based upon significant consideration and input and therefore are reliable. |
| PTX 884 | CE, MIL 16 | This document is quoted in the Summary Judgment opinion at slip. op. page 21.<br><br>This is relevant to impact and damages as it shows that Forest had good formulary coverage dating to May of 2013, even before launch.<br><br>This rebuts Forest's expert opinion that the cause of IR to XR conversion increased in 2014 was not the hard switch, but instead because XR's poor formulary coverage changed in January 2014.  Well, it was already good, this document shows. |
| PTX 887 | CE, MIL 16 | Cited in Summary Judgment opinion, slip page 27, citing Berndt Op. Rep. Par. 34<br><br>This is relevant to impact and damages as it shows that Forest's forecaster of IR-XR conversion (the main damages issue in Phase 2) was already aware of the doctor and caregiver surveys when she created September and October 2013 forecasts predicting 30% IR-XR conversion using "conventional" (soft switch) tactics. This shows Forest expected 30% IR-XR conversion absent the hard switch.<br><br>Plaintiffs' experts cite this and similar materials to show that the forecasts that they rely upon for impact and damages were reliable and to |

| | | show that Forest's forecasts were based upon extensive consideration and input. |
|---|---|---|
| PTX 893 | CE, MIL 16 | This is relevant to impact and damages as it shows the impact of the hard switch on IR-XR conversion, that it would be difficult for generic IR to get patients and physicians to reverse commute back from XR to generic IR.  The IR-XR conversion percentage is the main damages issue in Phase 2.<br><br>Mr. Saunders states, on Page 17, "if we do the hard switch and we've converted patients and caregivers to once-a-day therapy versus twice a day, it's very difficult for the generics then to reverse commute back, at least with the existing Rxs. They don't have the sales force, they don't have the capabilities to go do that. It doesn't mean that it can't happen, it just becomes very difficult" |
| PTX 899 | CE, MIL 16 | This document is relevant to impact and damages. On January 7, 2014, Forest's CEO says that IR-XR conversion is acting as a barrier to protect Forest from generic Namenda IR automatic substitution in July of 2015 (page 8).  The extent to which the conversion is impeding generic substitution, and would have been less under the soft switch than the hard switch, is a main driver of damages from the hard switch product hop.<br><br>Plaintiffs' experts cite this and similar materials to show that generic erosion of brand sales is typically very high, and that the impact of the Hard Switch was to reduce that typical erosion. |
| PTX 902 | CE, MIL 16 | Cited in Summary Judgment opinion, slip page 27, citing Berndt Op. Rep. Par. 34<br><br>(This is another version of PTX 850, which was included out of abundance of caution as Dr. Lamb cited one version, Dr. Berndt cited another). |

| | | |
|---|---|---|
| PTX 938 | CE, MIL 16, 602, 802 | Cited in Summary Judgment opinion, slip page 23, citing Lamb Op. Rep. Par. 102<br><br>This email attaches a draft Letter from Optum to patients which is an example of what Optum will send out to support discontinuation; this shows impact on MCOs from discontinuation: it causes MCOs to push patients to XR thereby increasing the IR-XR conversion percentage, which is the main damages issue in Phase 2.  It also shows that Optum was told of discontinuation prior to putting XR on its Part D formulary, which rebuts Forest's argument that Optum had already agreed to cover XR before it was told about discontinuation of IR.  Recall that in PTX-531 Optum says it was waiting for a response on a 43% rebate demand it made of Forest as of 10/29/13 after already learning about the hard switch.<br><br>Plaintiffs' experts cite this and similar materials to show the impact from the discontinuation communications, and to show that Optum was told of discontinuation in October 2013.<br><br>602: This is a document, not testimony.<br><br>802: This is not hearsay, the Forest statements are admissions; the Optum letter is a draft, not offered for the truth, offered to show it was said.  The relevant nonhearsay purpose is to show Optum's reasons for putting XR on formulary (discontinuation) and the fact of its intending to help with the IR-XR conversion effort. |
| PTX 940 | CE, MIL 16 | This email reflects that as of February 2014, just before the official discontinuation announcement, despite certain recent additions of XR onto GPO formularies, IR to XR conversion was still "underwhelming", and that IR-XR conversion was stagnating. |

| | | |
|---|---|---|
| | | This rebuts Forest's expert opinion that the reason IR to XR conversion increased in 2014 was not the hard switch, but instead because XR's formulary coverage changed in January 2014.  This document shows that the formulary gains caused "underwhelming" conversion, so it must have been the hard switch.<br><br>Plaintiffs' experts cite this and similar materials to support the reliability of the forecasts they use for impact and damages and to show that Forest was on track for achieving just 30% conversion from a soft switch. |
| PTX 942 | 802 | The statements by CCO/EVP Elaine Hochberg are admissions under 801d2D. |
| PTX 969 | CE, MIL 16 | It also shows that by March 2013, Forest already planned a number of promotional efforts, which would have already factored into their contemporaneous forecasts that were projecting peak 30% IR-XR conversion (e.g., slide 46). This rebuts Forest's argument that unplanned promotion/Diret To Consumer advertibing, and not the hard switch, was responsible for higher IR to XR conversion.  The promotion/DTC was already planned and already factored into the peak IR-XR conversion percentage.<br><br>Plaintiffs' experts cite this and similar materials to show that the forecasts that they rely upon for impact and damages were based upon significant consideration and input and therefore are reliable. |
| PTX 970 | 602, 802 | 602: This is a document, not testimony.<br><br>802: This is a report prepared for Forest and is an admission containing Forest own statements (other than Forest no way for S&H to know what Forest's current conversion or target is). |
| PTX 979 | 602, 802 | 602: This is a document, not testimony. |

| | | |
|---|---|---|
| | | 802: This is not hearsay.  This is an admission.  These are all Forest (Actavis) employees talking about how Omnicare (GPO) removed IR from formulary and there are no IR sales through that GPO any longer. |
| PTX 989 | 402, 403, 602, 802 | This document is part of the analog analysis from April 2012 showing that Forest's forecasting effort was a long term project that was through, and renders the forecasts reliable.  The analog forecasts that Forest used to predict IR-XR conversion absent the hard switch are the primary damages issue in Phase 2.<br><br>Plaintiffs' experts cite this and similar materials to show that the forecasts that they rely upon for impact and damages were based upon significant consideration and input and therefore are reliable.<br><br>602: This is a document, not testimony.<br><br>802: This is not hearsay, it is an admission.  These are all Forest employees' statements. |
| PTX 991 | CE, MIL 16, 602, 802 | This document from November 2013 shows the existence and effect of Forest's public statements about discontinuation.  Listeners interpreted it as showing Forest would be doing a hard switch, which creates doubt and provokes IR-XR conversion, even before the official announcement in February 2014.<br><br>Plaintiffs' experts cite this and similar materials to show that the Hard Switch conduct in fact predated, and would be expected to have an impact before, the February 14, 2014 official announcement.<br><br>602: This is a document, not testimony.  The author's personal knowledge is irrelevant, it is used to show the message is being spread, right or wrong. |

| | | |
|---|---|---|
| | | 802: This is not hearsay, it is not offered for the truth, but to show the fact of Forest's hard switch communications and the effect that Forest's communications are having, and that Forest's message is being disseminated by others to a broader segment of the market. |
| PTX 1093 | 402, 403, 602, 802 | This document shows that Saunders is talking publicly about both appealing the injunction, as well as that Forest intends to seek a stay of the injunction (page 8), communications that have the effect of creating doubt about continued availability of IR.<br><br>Plaintiffs' experts cite this and similar materials to show that the statements about the injunction and continued availability of Namenda IR were accompanied by statements that Forest was appealing the injunction, which fostered uncertainty and doubt about whether IR would still be discontinued.<br><br>This is relevant to rebut Forest's assertion that the injunction erased the acceleration of IR-XR conversion caused by the hard switch announcement. It shows that Forest clearly said the injunction was being appealed and a stay was being sought, both of which mean that the injunction erased nothing.<br><br>602: This is a document, not testimony.  He is the CEO, he has knowledge.<br><br>802: Saunders' statements are admissions. |
| PTX 1095 | CE, MIL 16, 402; 403; 602; 802, 901 | CEO Saunders says that reverse commuting would not work following IR-XR conversion (page 7). This is relevant to rebut Forest's argument that IR-XR conversion could be erased through reverse commuting.  IR-XR conversion is the main damages issue in a Phase 2 trial. |

| | | |
|---|---|---|
| | | Plaintiffs' experts cite these and similar materials to support the continuing harm resulting from the Hard Switch.<br><br>602: This is a document, not testimony.  Saunders was speaking within his area of expertise<br><br>802:  This is an admission.<br><br>901: The attributes of the document, on their face, reflect that it is an authentic document put out by an established financial publisher, available from Bloomberg on the internet. |
| PTX 1521 | CE, MIL 16, 402; 403; 602; 802 | These are emails reflecting letters that were sent out about the discontinuance, showing some of the extent of the discontinuation campaign.<br><br>Plaintiffs' experts cite these and similar materials to demonstrate the scope and breadth of the discontinuation campaign.<br><br>602:  This is a document, not testimony.  These employees are acting in the scope of their jobs.<br><br>802:  Forest's statements are admissions.  The third party statements, offered not for the truth of any matter, but instead to prove that it was said and to understand Forest's statements: they asked for copies of what was sent out, and these attachments are in response to that request. |

**SCHEDULE D**

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PHASE 2 EXHIBITS**

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-25 | 802 | This is a declaration by a Forest employee, Julie Snyder, prepared for this case. Ms. Snyder may testify live. Her declaration is hearsay. |
| DTX-27 | 802, 103, 602, 701, 402, 403 | Plaintiffs preserve these objections for appeal. |
| DTX-28 | 802, HS w/in HS, 402, 403, 602 | Plaintiffs preserve these objections for appeal. |
| DTX-129 | 802, hearsay within hearsay | This document is an anonymous survey and is hearsay.  Forest is not in the business of conducting surveys, so it does not a business record.  Insofar as it presents the views of survey respondents, it contains hearsay within hearsay. |
| DTX-134 | 802 | This email chain contains hearsay within hearsay (*i.e.*, the initial email from Dr. Morris to Dr. Lah.). |
| DTX-142 | 402, 403, 701, 802 | This document is not relevant, would waste time, and contains improper lay opinion testimony as to purported challenges Forest had in manufacturing Namenda XR and how Forest went about solving them. |
| DTX-150 | 802, hearsay within hearsay | This document is an anonymous survey and contains hearsay within hearsay. Forest is not in the business of conducting surveys, so it is not a business record. |

| DTX-155 | 402, 403, 602, 702, 802 | This is the expert report of Forest's medical expert scheduled to testify at trial, Dr. Bruce Kohrman.  Forest has designated cumulative expert reports from defense witnesses Dr. Jacobs and/or Dr. Rovner. |
|---|---|---|
| | | The issue of whether XR is safe or preferred is not relevant given the prior findings in the NYAG action that Forest compelled the switch to Namenda XR, and that physicians were reluctant to switch back, and the Court's collateral estoppel ruling. |
| | | The report contains statements about other medications (¶¶ 17-19, 23) which are not relevant given the collateral estoppel ruling on Forest's monopoly power. |
| | | Paragraph 39 states that: |
| | | "I do not believe that it is medically necessary to have [Namenda IR] as an option.  If a doctor did have a patient for whom he felt Namenda IR was medically necessary, Namenda IR solution will be available and I understand that the twice-a-day Namenda tablets will also continue to be available for prescription on a limited distribution basis through a specialty pharmacy.  With these options in place, a doctor would be able to continue to prescribe twice-a-day Namenda." |
| | | This testimony is precluded by the prior findings in the NYAG action, and this Court's collateral estoppel ruling. *See, e.g., In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 4358244 at *11 (S.D.N.Y. Dec. 11, 2017) ("'[A]nnouncing the imminent discontinuation of a drug is tantamount to withdrawal.'"). The Second Circuit expressly rejected the argument that limited IR availability through a specialty pharmacy meant Forest had not withdrawn Namenda IR.  *Namenda II*, 787 F.3d 638, 648 (2d Cir. 2015) ("Although the agreement with Foundation Care makes IR available to a limited number of patients, Defendants' actions effectively withdrew Namenda IR form the market."). And whether a doctor thinks it was "medically necessary" to keep Namenda IR tablets available is irrelevant because it was necessary under the antitrust laws. |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| | | Paragraphs 32-33, 36, and 40-45 discuss switching between IR and XR and back to IR and generic IR, suggesting such switching is easy or unproblematic. Paragraphs 32-33, 36, and 40-45 are precluded by the Second Circuit's holding that once patients and physicians switched from IR to XR, they "would be very unlikely to switch back to twice-daily [Namenda] IR therapy even after less-expensive generic IR bec[ame] available, due to the high transactions costs associated with Alzheimer's patients first switching from" IR to XR and then back to IR. *Namenda II*, 787 F.3d at 649. |
| DTX-167 | 402, 403, 602, 701, 802, CE | This declaration contains statements precluded by the Court's collateral estoppel ruling and the prior NYAG decisions: ¶ 2, fourth bullet (limited availability of Namenda IR through specialty pharmacy); ¶ 2, fifth bullet (relevant market); paragraph 14 (alleged procompetitive justification); ¶¶ 18-19 (suggesting it was "acceptable" if Namenda IR were no longer available); ¶ 20 (Forest's alleged beliefs underlying the hard switch); 25-29 (limited availability through specialty pharmacy); and 30 (relevant market). And ¶ 6 (alleged research and development costs) also is not relevant. <br><br> This declaration attaches an anonymous survey that contains hearsay within hearsay. It is not a business record because Forest is not in the business of conducting surveys. <br><br> The issue of whether XR is safe or preferred is not relevant given the prior findings in the NYAG action that Forest compelled the switch to Namenda XR, and that physicians were reluctant to switch back, and the Court's collateral estoppel ruling. |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-172 | 402, 403, 602, 702, 802, CE | This document is the expert report of Forest's medical expert who is not scheduled to testify at trial, Dr. Alan R. Jacobs. Defendants have designated cumulative expert reports from defense witnesses Dr. Kohrman and/or Dr. Rovner.<br><br>The issue of whether XR is safe or preferred is not relevant given the prior findings in the NYAG action that Forest compelled the switch to Namenda XR, and that physicians were reluctant to switch back, and this Court's collateral estoppel ruling.<br><br>Paragraph 23 discusses other drugs and so is precluded by the estoppel ruling that Forest had monopoly power.<br><br>Paragraph 32 contains hearsay within hearsay.<br><br>Paragraphs 5-6, 33-45 discuss switching between IR and XR and back to generic IR, suggesting such switching is easy or unproblematic. Paragraphs 5-6, 33-45 are precluded by the Second Circuit's holding that once patients and physicians switched from IR to XR, they "would be very unlikely to switch back to twice-daily [Namenda] IR therapy even after less-expensive generic IR bec[ame] available, due to the high transactions costs associated with Alzheimer's patients first switching from" IR to XR and then back to IR.  *Namenda II*, 787 F.3d at 649. |
| DTX-174 | 402, 403, 602, 702, 802, CE | This document is the expert report of Forest's medical expert who is scheduled to testify at trial, Dr. Barry Rovner.  Defendants have designated cumulative expert reports from defense witnesses Dr. Kohrman and/or Dr. Jacobs.<br><br>The issue of whether XR is safe or preferred is not relevant given the prior findings in the NYAG action that Forest compelled the switch to Namenda XR, and that physicians were reluctant to switch back, and this Court's collateral estoppel ruling.<br><br>Paragraph 26 discusses other drugs and is precluded by the Court's collateral estoppel ruling on Forest's monopoly power. |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| | | Paragraphs 45-46 contain hearsay within hearsay. <br><br> Paragraphs 6, 34-35, 49, and 51 discuss switching between IR and XR and back to generic IR, suggesting such switching is easy or unproblematic. Paragraphs 6, 34-35, 49 and 51 are precluded by the Second Circuit's holding that once patients and physicians switched from IR to XR, they "would be very unlikely to switch back to twice-daily [Namenda] IR therapy even after less-expensive generic IR bec[ame] available, due to the high transactions costs associated with Alzheimer's patients first switching from" IR to XR and then back to IR. *Namenda II*, 787 F.3d at 649. <br><br> Paragraph 48 discusses the limited availability of IR through a specialty pharmacy and is precluded. The Second Circuit expressly rejected the argument that limited IR availability through a specialty pharmacy meant Forest had not withdrawn Namenda IR. *Namenda II*, 787 F.3d at 648. |
| DTX-190 | 802 | The document attaches a third-party document that is hearsay. |
| DTX-192 | 802, hearsay within hearsay | This document is an anonymous survey and is hearsay. It is not a business record because Forest is not in the business of conducting surveys. Insofar as it purports to present the views of survey respondents, it contains hearsay within hearsay. |
| DTX-286 | 802, hearsay-within-hearsay | This document is an anonymous survey by a third party (Gfk) and is hearsay. It is not a business record because Forest is not in the business of conducting surveys. Insofar as it purports to present the views of survey respondents, it contains hearsay within hearsay. |
| DTX-298 | 802, hearsay-within-hearsay | This document is an anonymous survey by a third party (Gfk) and is hearsay. It is not a business record because Forest is not in the business of conducting surveys. Insofar as it purports to present the views of survey respondents, it contains hearsay within hearsay. |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-303 | 802, hearsay-within-hearsay | This document is an anonymous survey and is hearsay.  It is not a business record because Forest is not in the business of conducting surveys.  Insofar as it purports to present the views of survey respondents, it contains hearsay within hearsay. |
| DTX-451 | 402, 403 | This document reflects downstream pricing and is therefore not relevant.  The Court has barred any evidence of pass-on effects.  *See* Order Disposing of Motions *In Limine*, at p. 20 (Dkt. No. 859). |
| DTX-646 | 402, 403, 802 | Defendants seek to admit this document in order to tie some advertising done by Forest to XR sales.  Forest employees, however, are not in the business of ascribing causal relationships and it is thus hearsay.  Rather, such statements are opinion and therefore not admissible under any exception to the hearsay rule. |
| DTX-647 | 402, 403, 802 | No foundation has been laid for this document.  Defendants seek to admit this document in order to tie some direct to consumer promotion to XR sales.  Forest employees, however, are not in the business of ascribing causal relationships and it is thus hearsay.  Rather, such statements are opinion and not admissible. |
| DTX-649 | 402, 403, 802 | This is a presentation about another Forest product – Namzaric – which is irrelevant to this case.<br><br>This document is an anonymous survey and is hearsay.  It is not a business record as Forest is not in the business of conducting surveys.  Insofar as it purports to present the views of survey respondents, it contains hearsay within hearsay.  Defendants seek to admit this document in order to tie some direct to consumer promotion to XR sales.  Forest employees, however, are not in the business of ascribing causal relationships and it is thus hearsay.  Rather, such statements are opinion and therefore not admissible under any exception to the hearsay rule. |
| DTX-655 | 802 | This is a transcript of an investor call containing statements of Forest's own executives.  It is hearsay. |

| DTX# | Plaintiffs' Objections | Plaintiffs' Position |
|---|---|---|
| DTX-658 | 802 | No foundation has been laid for this document.  Appears to be a third-party document from an advertising agency. |
| DTX-667 | 402, 403, 802 | Defendants seek to admit this document in order to tie some advertising done by Forest to XR sales.  Forest employees, however, are not in the business of ascribing causal relationships and it is thus hearsay.  Rather, such statements are opinion and therefore not admissible under any exception to the hearsay rule. |
| DTX-684 | 802 | This document is an email to Forest from an outside organization asking questions about pricing and availability of Namenda products.  The document contains hearsay within hearsay, and is not clear who made what comments. |
| DTX-697 | 402, 802, hearsay-within-hearsay | This document was written by a third party, outside analyst and is comprised of statements by various third parties. |
| DTX-732 | 802 | This document contains email traffic from a third party, a public relations firm, and is hearsay. |
| DTX-762 | 402, 403, 802 | Defendants seek to admit this document in order to tie some advertising done by Forest to XR sales.  Forest employees, however, are not in the business of ascribing causal relationships and it is thus hearsay.  Rather, such statements are opinion and therefore not admissible under any exception to the hearsay rule. |
| DTX-764 | 802 | This document contains email traffic from a third party, an advertising agency, and is hearsay. It also discusses an anonymous survey and is hearsay.  It is not a business record as Forest is not in the business of conducting surveys.  To the extent that the document purports to present the views of survey respondents, it contains hearsay within hearsay. |