# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>All Direct Purchaser Actions | Case No. 1:15-cv-07488-CM-RWL |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS**

## TABLE OF CONTENTS

I.   INTRODUCTION                                                                          1

II.   SUMMARY OF CLASS COUNSEL'S LITIGATION EFFORTS                          7

A.   PRE-FILING INVESTIGATION                                                         7

B.   PROSECUTION OF THE CASE                                                         8
   1.   THE MOTION TO DISMISS                                                          8
   2.   DISCOVERY                                                                           9
   3.   CLASS CERTIFICATION                                                            10
   4.   EXPERTS                                                                            10
   5.   SUMMARY JUDGMENT AND *DAUBERT* MOTIONS                                 11
   6.   TRIAL PREPARATION                                                              12
   7.   MEDIATION AND SETTLEMENT                                                     13

III.  ARGUMENT                                                                             13

A.   CLASS COUNSEL SHOULD BE AWARDED REASONABLE ATTORNEYS' FEES
                                                                                            13

B.   THE *GOLDBERGER* FACTORS SUPPORT CLASS COUNSEL'S FEE REQUEST 15
   1.   THE TIME AND LABOR EXPENDED BY COUNSEL                                  15
   2.   THE MAGNITUDE AND COMPLEXITIES OF THE LITIGATION                     16
   3.   THE RISK OF THE LITIGATION                                                   18
   4.   THE QUALITY OF REPRESENTATION                                             19
   5.   THE REQUESTED FEE IN RELATION TO THE SETTLEMENT                       20
   6.   PUBLIC POLICY CONSIDERATIONS                                               22

C.   A LODESTAR CROSS-CHECK CONFIRMS THE REASONABLENESS OF THE
REQUESTED FEE                                                                           23

D.   CLASS COUNSEL'S COSTS AND EXPENSES ARE REASONABLE AND WERE
NECESSARY TO THE RESULT                                                             24

E.   INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES ARE
APPROPRIATE AND REASONABLE                                                         24

IV.  CONCLUSION                                                                           25

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) ..........................23

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982). .......................................22

*Ark. Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98 (2d Cir. 2010)......................6

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467 (S.D.N.Y. 2013).......................................................23

*Boeing v. Van Gemert*, 444 U.S. 472 (1980)................................................................................13

*Christine Asia Co. v. Jack Yun Ma*, 2019 U.S. Dist. LEXIS 179836 (S.D.N.Y. Oct. 16, 2019)....
...................................................................................................................................3, 18, 19, 23

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ...................................................23

*Dial Corp. v. News Corp.,* 317 F.R.D. 426 (S.D.N.Y. 2016).................................................19, 24

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ........................................................................6, 17, 18

*In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34 (1st Cir. 2016)...................................7

*Fresno Cty. Emps.' Retirement Assoc. v. Isaacson/Weaver Family Trust,* 925 F.3d 63 (2d Cir. 2019)...............................................................................................................................14, 15

*Garcia v. Pancho Villa's of Huntington Vill., Inc.,* 2012 U.S. Dist. LEXIS 144446 (E.D.N.Y. Oct. 4, 2012) ..............................................................................................................................16

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ................................................14

*In re Actos End Payor Antitrust Litig.*, 2015 U.S. Dist. LEXIS 127748 (S.D.N.Y. Sep. 22, 2015)
...................................................................................................................................................6

*In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 138479 (E.D.N.Y. Oct. 9, 2015)....................................................................................................................................16

*In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71 (S.D.N.Y. 2000) .......................................21

*In re Beacon Assocs. Litig.*, 2013 U.S. Dist. LEXIS 82192 (S.D.N.Y. May 9, 2013) .............4, 20

*In re Buspirone Patent Litigation*, No. 01-MD-1410 (S.D.N.Y. Apr. 17, 2003) .............21, 22, 23

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011)........................21

*In re Cipro Cases I & II*, 348 P.3d 845 (Cal. 2015) ......................................................................6

*In re Cipro Cases I & II*, 2018 Cal. App. Unpub. LEXIS 3258 (Cal. Ct. App. May 14, 2018)......6

*In re Credit Default Swaps Antitrust Litig.*, 2016 U.S. Dist. LEXIS 54587 (S.D.N.Y. Apr. 25, 2016)............................................................................................................................22

*In re Effexor XR Antitrust Litig.*, 2014 U.S. Dist. LEXIS 142206 (D.N.J. Oct. 6, 2014) ..............6

*In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013).............................................16

*In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y. 2004)............................20

*In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009)...................14, 15, 20

*In re K-Dur Antitrust Litig.,* Civil Action No. 01-1652 (D.N.J. Oct. 5, 2017)............................25

*In re Lamictal Direct Purchaser Antitrust Litig.*, 18 F. Supp. 3d 560 (D.N.J. 2014) ...................6

*In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521-WHO (N.D. Cal. Sept. 20, 2018)..............25

*In re Lipitor Antitrust Litig.*, 46 F. Supp. 3d 523 (D.N.J. 2014) ..................................................6

*In re Loestrin 24 Fe Antitrust Litig.*, 45 F. Supp. 3d 180 (D.R.I. 2014) ........................................6

*In re Marsh ERISA Litig.*, 265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................24

*In re Modafinil Antitrust Litig.*, Civil Action No. 2:06-cv-01797 (MSG) (E.D. Pa. Oct. 15, 2015) ............................................................................................................................................25

*In re Motorsports Merch. Antitrust Litig.,* 112 F. Supp. 2d 1329 (N.D. Ga. 2000) .....................16

*In re Namenda Direct Purchaser Antitrust Litig.*, 2017 U.S. Dist. LEXIS 76675 (S.D.N.Y. May 19, 2017)..............................................................................................................................9

*In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018)............12

*In re Neurontin Antitrust Litig.,* Civil Action No. 02-1830 (FSH) (D.N.J. Aug. 6, 2014)............25

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 U.S. Dist. LEXIS 216796 (E.D.N.Y. Dec. 16, 2019) ...........................................................................................14

*In re Syngenta AG MIR 162 Corn Litig.*, 2018 U.S. Dist. LEXIS 206840 (D. Kan. Dec. 7, 2018) ............................................................................................................................................21

*In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570 (S.D.N.Y. 2008) ........................................14, 23

*In re Urethane Antitrust Litig.,* 2016 U.S. Dist. LEXIS 99839 (D. Kan. July 29, 2016)..............21

*In re Veeco Instruments Sec. Litig.*, 2007 U.S. Dist. LEXIS 85554 (S.D.N.Y. Nov. 7, 2007) .....20

*In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067 (D.D.C. July 16, 2001)...............21

*In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734 (E.D. Pa. 2015)....................................6

*La. Wholesale Drug Co. v. Sanofi-Aventis*, 2009 U.S. Dist. LEXIS 77206 (S.D.N.Y. Aug. 28, 2009)..........................................................................................................................................7

*Moreno v. Deutsche Bank Ams. Holding Corp.*, 2019 U.S. Dist. LEXIS 36942 (S.D.N.Y. Mar. 7, 2019)..........................................................................................................................................3

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421 (3d Cir. 2016).......................6

*New Eng. Carpenters Health Benefits Fund v. First Databank*, 2009 U.S. Dist. LEXIS 68419 (D. Mass. Aug. 3, 2009) .......................................................................................................................24

*Velez v. Novartis Pharms. Corp.*, 2010 U.S. Dist. LEXIS 125945 (S.D.N.Y. Nov. 30, 2010)…
………………………………………………………………………………………………4, 20

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 369 F.3d 96 (2d Cir. 2005) .......................................14

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 U.S. Dist. LEXIS 132515 (S.D.N.Y. Aug. 18, 2017)........................................................................................................................................18

**Statutes**

Fed. R. Civ. P. 23(h).....................................................................................................................14

## I.    INTRODUCTION

Class counsel representing Direct Purchaser Class Plaintiffs J M Smith Corp. (d/b/a Smith Drug Co.) ("Smith Drug"), Rochester Drug Co-Operative, Inc. ("RDC"), and the direct purchaser class (collectively, "Plaintiffs") respectfully submit this memorandum in support of their Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for the Class Representatives.  The declarations of Bruce E. Gerstein, Esq. ("Gerstein Decl.") and Professor Charles Silver ("Silver Decl.") accompany this memorandum.

For over four-and-a-half years, Class counsel aggressively prosecuted this uniquely complicated antitrust case against a determined defendant.  The evening prior to jury selection, Class counsel reached an agreement in principle with Forest to settle this matter for $750 million, the largest ever settlement of a drug antitrust case against a single defendant under Section 4 of the Clayton Act, as news outlets observed.  *See* Jeff Overley, *Allergan's $750M Deal Among Pharma's Top Antitrust Payouts*, Law360 (Oct. 29, 2019) ("among the most eye-popping sums ever shelled out by a drugmaker for allegedly thwarting generic competition").

Class counsel had been investigating this possible "pay for delay" case in earnest since the summer of 2014.  Gerstein Decl. ¶ 2.  This case was initially filed in mid-2015, and the ensuing litigation focused on the 2010 Namenda patent settlement agreement and a side deal involving a different drug (the "Lexapro Amendment") between Forest and its would-be competitor Mylan.  That patent settlement was a condition precedent to Forest's later attempt to switch the market from Namenda IR to XR to further suppress generic competition.  Class counsel filed the first action challenging that Forest-Mylan deal as a violation of Sections 1 and 2 of the Sherman Act under the standards set forth in *FTC v. Actavis*, 570 U.S. 136 (2013).  No government enforcement agency or other direct purchaser pursued the pay-for-delay theory that Class counsel here did, and to Class counsel's knowledge no government enforcement agency or

other lawyers investigated this case before Class counsel did.  Gerstein Decl. ¶¶ 3-4.

Class counsel pursued this case on a wholly contingent basis without any guarantee of success or compensation.  The unprecedented result in this case was the result of their unique skill and experience gained from a 20-plus year history of handling similar cases, and perseverance in this case in the face of vigorous defenses advanced by some of the best defense firms in the country who have worked in the area of pharmaceutical antitrust for many years.

From case investigation through preliminary approval of the Settlement, Class counsel expended over 52,000 hours of uncompensated professional time equating to nearly $35 million based on 2019 rates, and incurred over $5.8 million in unreimbursed out-of-pocket expenses. Gerstein Decl. ¶ 70.  As compensation for their efforts, Class counsel seek an award of attorneys' fees in the amount of $206.25 million, *i.e.*, 27.5% of the settlement amount (including an equal percentage of any interest accrued since the settlement amount was escrowed), and reimbursement of litigation expenses in the amount of $5,823,928.91.  *Id.* ¶¶ 71-73.  Class counsel also seek incentive awards in the amount of $150,000 each for class representatives Smith Drug and RDC.  This request is justified for several reasons.

**First,** the size of the recovery is unquestionably substantial.  It is the largest ever paid by a single defendant in a pharmaceutical class action brought under Section 4 of the Clayton Act.

**Second,** the Class here is unique and relatively small.  The Class members are not individuals, but rather are sophisticated business entities, including some of the largest companies in the world.  ECF No. 570 at 99.  Class counsel are largely the same legal team that have been litigating direct purchaser Hatch-Waxman antitrust cases since 1998.  As a result of Class counsel's efforts, the core members of these classes have received substantial recoveries. These same entities have in the past provided letters and declarations attesting to the

reasonableness of fees well above 27.5%.  *See* Gerstein Decl. Ex. H (letters); Silver Decl. ¶ 57.

Class members' prior support of a fees well above 27.5% in risky drug antitrust cases suggests

that this same percentage is appropriate for this record-setting recovery; courts have routinely

granted similar requests.  *See* Silver Decl. ¶ 70.

 ***Third,*** the sought fee is consistent with "a baseline reasonable fee by reference to other

common fund settlements of a similar size, complexity and subject matter."  *Moreno v. Deutsche*

*Bank Ams. Holding Corp.*, 2019 U.S. Dist. LEXIS 36942, at *4 (S.D.N.Y. Mar. 7, 2019).  *See*

*also Christine Asia Co. v. Jack Yun Ma*, 2019 U.S. Dist. LEXIS 179836, at *61 (S.D.N.Y. Oct.

16, 2019) (McMahon, J.) ("When determining whether a fee request is reasonable in relation to a

settlement amount, the court compares the fee application to fees awarded in similar securities

class-action settlements of comparable value.") (quotation omitted).  Here, Class counsel's

requested fee is consistent with numerous prior Hatch-Waxman antitrust cases, virtually all of

which Class counsel here prosecuted:

| Case | Settlement | Fee |
|---|---|---|
| *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 14-md-2503 (D. Mass. Jul. 18, 2018) | $72.5MM | 33⅓% |
| *Am. Sales Co., LLC v. Pfizer, Inc.*, 14-cv-361 (E.D. Va. Apr. 18, 2018) | $94MM | 33⅓% |
| *In re Asacol Antitrust Litig.*, No. 15-12730 (D. Mass. Dec. 7, 2017) | $15MM | 33⅓% |
| *In re Lidoderm Antitrust Litig.*, No. 14-md-02521 (N.D. Cal. Sept. 20, 2018) | $166MM | 27½% |
| *In re K-Dur Antitrust Litig.,* No. 01-1652 (D.N.J. Oct. 5, 2017) | $60MM | 33⅓% |
| *In re Modafinil Antitrust Litig.,* No. 07-1979 (E.D. Pa. Oct. 16, 2015) | $512MM | 27½% |
| *In re Prograf Antitrust Litig.,* No. 11-md-2242 (D. Mass. May 20, 2015) | $98MM | 33⅓% |
| *In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-12141 (E.D. Mich. Jan. 20, 2015) | $19MM | 33⅓% |
| *In re Doryx Antitrust Litig.,* No. 12-3824 (E.D. Pa. Sept. 15, 2014) | $15MM | 33⅓% |
| *In re Neurontin Antitrust Litig.,* No. 02-1830 (D.N.J. Aug. 6, 2014) | $191MM | 33⅓% |
| *In re Skelaxin (Metaxalone) Antitrust Litig.,* No. 12-cv-83 (E.D. Tenn. June 30, 2014) | $73MM | 33⅓% |

| Case | Settlement | Fee |
|------|------------|-----|
| *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150MM | 33⅓% |
| *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | $37.5MM | 33⅓% |
| *Rochester Drug Co-Op. v. Braintree Labs., Inc.*, No. 07-142 (D. Del. May 31, 2012) | $17.25MM | 33⅓% |
| *In re Metoprolol Succinate Antitrust Litig.*, No. 06-52 (D. Del. Jan. 11, 2012) | $20MM | 33⅓% |
| *In re DDAVP Antitrust Litig.*, No. 05-2237 (S.D.N.Y. Nov. 28, 2011) | $20.25MM | 33⅓% |
| *In re Wellbutrin SR Antitrust Litig.*, No. 04-5525 (E.D. Pa. Nov. 21, 2011) | $49MM | 33⅓% |
| *Meijer, Inc. v. Abbott Labs.*, No. 07-5985 CW (N.D. Cal. Aug. 11, 2011) | $52MM | 33⅓% |
| *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | $35MM | 33⅓% |
| *In re Oxycontin Antitrust Litig.*, No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | $16MM | 33⅓% |
| *In re Tricor Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250MM | 33⅓% |
| *Meijer, Inc. v. Barr Pharms., Inc.*, 05-2195 (D.D.C. Apr. 20, 2009) | $22MM | 33⅓% |
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | $75MM | 33⅓% |
| *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) | $74MM | 33⅓% |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175MM | 33⅓% |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220MM | 33⅓% |
| *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110MM | 30% |

**Fourth,** as a general matter, "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater." *Velez v. Novartis Pharms. Corp.*, 2010 U.S. Dist. LEXIS 125945, at *59 (S.D.N.Y. Nov. 30, 2010) (McMahon, J.) (collecting cases); *In re Beacon Assocs. Litig.*, 2013 U.S. Dist. LEXIS 82192, at *44 (S.D.N.Y. May 9, 2013) (McMahon, J.) ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund.").

**Fifth,** the fee sought equates to a 5.9 multiplier of the total lodestar, which is reasonable

and within the range of multipliers approved by courts in similar cases. Here, a simple investment of hours alone would not have sufficed to achieve what this litigation has accomplished, as the task at hand — addressing myriad novel substantive, procedural and expert issues — was extraordinarily intellectually demanding. Only a modest number of plaintiffs' firms have the experience and resources to prosecute and finance direct purchaser Hatch-Waxman antitrust cases like this one, and set new precedents for recoveries on behalf of classes like this one. Class counsel have worked in this area of the law for over 20 years and brought indispensable expertise and contributions in areas of antitrust law, patent law, and regulatory law. *See* Gerstein Decl. Exs. A-F (declarations of counsel).

**Sixth,** while all antitrust cases are complex and involve risk, this case — even more so than the several previous pharmaceutical antitrust cases handled by Class counsel — was atypically so. It not only involved complex fact patterns and rapidly evolving law, but also required expenditures of large out-of-pocket expenses and time that were borne solely by Class counsel. Class counsel faced a thicket of complex facts involving drug manufacturing and multiple contracts, in dense legal frameworks at the intersection of antitrust law, patent law, Hatch-Waxman drug approval laws and regulations, and Medicaid Drug Rebate Program laws and regulations as modified through the Deficit Reduction Act of 2007. Layered atop these complex questions of fact and law, Class counsel also had to prove (1) what would have occurred in the absence of the challenged reverse payment (*i.e.*, whether and when Mylan would have won its patent challenge, and whether and when Mylan would have entered the market under a reverse-payment free settlement), (2) the damages to the Class from the reverse payment, and (3) how much in additional damages Forest's hard switch caused.

Compounding these unique complications was unique risk. Previous reverse-payment

cases were dismissed after significant outlays of time and expenses by Class counsel because of intervening judicial decisions.  Gerstein Decl. ¶¶ 59-66.  For instance, in 2010, over the Honorable Rosemary Pooler's dissent, the Second Circuit, *en banc*, affirmed a district court's grant of summary judgment in a case alleging a $400 million cash reverse payment concerning the drug Cipro, because of the then-emerging "scope-of-the-patent" test.  *See Ark. Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98 (2d Cir.), *reh'g denied*, 625 F.3d 779 (2d Cir. 2010).  Three years later, after denying *certiorari* in *Cipro*, the Supreme Court issued *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), enabling a later-filing group of Cipro indirect purchasers to reach settlements in California state court worth hundreds of millions of dollars.  *See In re Cipro Cases I & II*, 348 P.3d 845 (Cal. 2015), *on remand*, 2018 Cal. App. Unpub. LEXIS 3258, at *3 (Cal. Ct. App. May 14, 2018) (settlement described).  The direct purchasers made no recovery despite significant expenditures of time and money by Class counsel.

Even after *Actavis* was decided, dismissals of other cases at the Rule 12 and Rule 56 stages quickly revealed that *Actavis* was not a panacea for the risk these cases present.  *See In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734 (E.D. Pa. 2015) (summary judgment in reverse payment case); *In re Actos End Payor Antitrust Litig.*, 2015 U.S. Dist. LEXIS 127748 (S.D.N.Y. Sep. 22, 2015) (pre-answer dismissal in reverse payment case); *In re Effexor XR Antitrust Litig.*, 2014 U.S. Dist. LEXIS 142206 (D.N.J. Oct. 6, 2014) (same); *In re Lipitor Antitrust Litig.*, 46 F. Supp. 3d 523 (D.N.J. 2014) (same); *In re Loestrin 24 Fe Antitrust Litig.*, 45 F. Supp. 3d 180 (D.R.I. 2014) (same); *In re Lamictal Direct Purchaser Antitrust Litig.*, 18 F. Supp. 3d 560 (D.N.J. 2014) (same).  *Wellbutrin XL* was affirmed on appeal while the others were reversed, but the legal landscape was plainly challenging (and unpredictable) after *Actavis*.  *See also Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421 (3d Cir. 2016) (affirming

summary disposition of product hop case).  Getting to a jury was no guarantee of success, either.

*E.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 39 (1st Cir. 2016) (upholding

jury verdict "that although the plaintiffs had proved an antitrust violation in the form of a large

and unjustified reverse payment from AstraZeneca to Ranbaxy, the plaintiffs had not shown that

they had suffered an antitrust injury that entitled them to damages").  *See also La. Wholesale*

*Drug Co. v. Sanofi-Aventis*, 2009 U.S. Dist. LEXIS 77206, at *3 (S.D.N.Y. Aug. 28, 2009) (jury

concluded that defendant's petitioning of FDA was not "objectively baseless").

     **Seventh,** this case was settled at a very advanced stage, on the eve of trial.  Class counsel

took this case through exhaustive fact and expert discovery, significant motion practice (under

Rules 12, 23, 37, 56, 702/*Daubert*, numerous motions *in limine*, and privilege-related

proceedings), compilation of two joint pretrial orders, and extensive mediation proceedings.

     These factors strongly support the 27.5% fee requested herein.

## II.    SUMMARY OF CLASS COUNSEL'S LITIGATION EFFORTS

### A.    Pre-Filing Investigation

     Class counsel began investigating this case in earnest in June of 2014.  Gerstein Decl. ¶ 2.

Class counsel analyzed the '703 patent litigation between Forest and 14 generic drug companies.

These would-be competitors had filed Abbreviated New Drug Applications ("ANDAs") on the

first day possible, with Paragraph IV certifications stating that their products did not infringe the

'703 patent or that the patent was invalid or unenforceable.  Class counsel analyzed the publicly

available information about the series of settlement agreements that delayed generic competition.

Class counsel analyzed Forest's product hop that further suppressed generic competition.  On

May 29, 2015 Class counsel's client Burlington Drug Company filed the first case under Section

4 of the Clayton Act, with five of six claims challenging Forest's reverse payments, and one

claim challenging just Forest's product hop.  Gerstein Decl. ¶ 1.  Burlington Drug withdrew its

complaint on June 12, 2015, but other clients of Class counsel, Smith Drug and RDC, filed shortly thereafter, making substantially similar allegations and claims. *Id*. ¶ 1.

In litigating this case, Class counsel primarily focused their litigation efforts on what turned out to be a disguised reverse-payment deal reached between Forest and Mylan, the last ANDA filer to settle, which carried the greatest potential for recoverable damages for the Class. *Id*. ¶¶ 4-6, 11, 19-28, 31, 46, 63. Class counsel also pursued damages based on the hard switch product hop, efforts that were also fruitful, and which refuted the assertion in the NYAG/Allergan settlement agreement that "the Injunction was effective in protecting competition in the relevant market and permitting lower cost generic drugs to enter the market in July 2015 and subsequently[.]" ECF No. 761-36, at 3. Gerstein Decl. ¶ 7.

### B.   Prosecution of the Case

#### 1.   The Motion to Dismiss

This case was prosecuted with speed and efficiency. On December 22, 2015, Forest filed a 71-page motion to dismiss. ECF Nos. 55-57. Half of Forest's motion argued that the product hop had been enjoined and so was not actionable, and the other half argued that the alleged reverse payments were too small to be actionable, and that plaintiffs could not allege that absent the alleged payments, generic competition would have begun earlier. Gerstein Decl. ¶ 9. Class counsel responded in under 50 pages that the hard switch began before the withdrawal of Namenda IR was enjoined (and that announcing the imminent withdrawal was not speech protected by the First Amendment as Forest had argued), that the alleged reverse payments were sufficiently large, and that plaintiffs could establish generic delay. *Id.* ¶ 11.

The Court denied Forest's Motion in a 34-page opinion issued on September 13, 2016. ECF No. 106. Despite the denial, the Court observed that "viewed in isolation, the settlement terms do not appear anticompetitive," and warned Plaintiffs that "[t]o survive a motion for

summary judgment, Plaintiffs will have to substantiate these allegations with evidence suggesting that the settlement agreements did, in fact, delay generic entry and that the delay had the effect of allowing Forest to complete the hard switch." *Id.* at 31-32.  This case would obviously be difficult and risky.  Class counsel turned to discovery next.

### 2.    Discovery

#### (a)    Fact Discovery

Class counsel were required to file several motions to compel, including against third party generic manufacturers Mylan, Lupin, and Macleods, in order to obtain the millions of pages of documents and 25 fact depositions they ultimately took.  Gerstein Decl. ¶¶ 12-17 .

#### (b)    Privilege Disputes

A significant portion of discovery was consumed by privilege disputes Class counsel persistently brought to the Court's attention.  *Id.* ¶¶ 18-28.  Forest planned to defend against Plaintiffs' reverse-payment claim using its subjective beliefs about the strength of its '703 patent and its reasons for the Lexapro Amendment, while withholding documents on privilege grounds that would tell the real story.  Plaintiffs moved to require Forest to elect whether it would continue to assert those beliefs and waive privilege, or maintain the privilege and be precluded from asserting those beliefs.  *Id.* ¶ 20.  Magistrate Judge Francis considered no fewer than six briefs on the subject, and extensive oral argument.  Judge Francis ruled for Plaintiffs, issuing an opinion requiring Forest to "disclose any subjective beliefs it will rely on in its defense of this action."  *In re Namenda Direct Purchaser Antitrust Litig.*, 2017 U.S. Dist. LEXIS 76675, at *15 (S.D.N.Y. May 19, 2017).  This was a watershed moment in this case.  After Forest carefully designated the subjects on which it would rely on its subjective beliefs (and thereby waive privilege), Class counsel persisted in pursuing Forest, resulting in additional opinions which required Forest to produce a number of otherwise-privileged documents, which ultimately

9

demonstrated that the Lexapro Amendment and the Forest-Mylan patent settlement were linked. ECF Nos. 348, 394 & 405.  What Forest produced included a key Forest-Mylan settlement PowerPoint and two "Deal Concept" documents that proved to be important evidence in this case that, absent Class counsel's persistence on issues of privilege, would never have surfaced.

Class counsel persisted in raising issues concerning waiver and preclusion, particularly when Forest appeared poised to reverse its election just prior to trial.  Gerstein Decl. ¶¶ 26-27. Class counsel raised Forest's tactics with the Court, resulting in an emphatic restatement of the Court's ruling:  "if Forest has not answered questions or produced documents on that subject during discovery, Forest will not be permitted to offer any evidence on the point." ECF No. 684; ECF No. 859 at 12 (granting Class counsel's motion *in limine*).

Class counsel's diligence in preventing Forest from reversing its privilege election limited Forest's trial defenses and led to evidence directly linking settlement of the '703 patent case to the compensation Forest paid Mylan for the "Lexapro Amendment" and revealing Forest's knowledge that the payment was greater than Mylan's expected profits from competing.

### 3.    Class Certification

Class counsel were able to successfully certify a class of direct purchasers of both generic and brand Namenda IR and XR.  Class counsel maintained class certification despite Forest's arguments that many Class members lacked standing as direct purchasers of generic Namenda. Gerstein Decl. ¶ 36.  Forest's 23(f) petition was denied.  ECF No. 600.

### 4.    Experts

At their sole risk and expense (totaling over $4 million), Class counsel retained nine experts who issued 17 reports, and sat for 11 depositions.  Gerstein Decl. ¶¶ 32-33, 71.  Class counsel deposed each of Forest's eight experts.  *Id.* ¶¶ 34-35.  This effort required Class counsel to present and defend against exceptionally complex material in a concise and coherent manner.

Class counsel ensured that each expert was fully prepared to provide comprehensible testimony at trial had this action not settled.  In addition to three patent experts, Profs. Einer Elhauge and Ernst Berndt and Russell Lamb, Ph.D submitted crucial reports.  Prof. Elhauge developed his economic model — to determine the entry date that rational economic actors would have agreed to in a lawful no-reverse-payment settlement — specifically for Hatch-Waxman antitrust cases, and tailored it to the facts of this case.  ECF No. 525.  Prof. Berndt examined Forest's so-called "contemporaneous" Lexapro forecasts, in particular their market share numbers, and concluded that they were not credible based on his decades of experience studying competition in the pharmaceutical industry.  He also examined the pricing, costs, and margin assumptions underlying Forest's forecasts, and compared them to actual outcomes and industry precedents, undermining Forest's defense that its Lexapro Amendment payments were "fair value."  He also offered an opinion on the impact of the hard switch on the relative share of Namenda IR and XR. ECF No. 496.  Dr. Lamb constructed models that demonstrated class-wide injury and calculated classwide damages under various alternative scenarios.  ECF No. 497.

### 5.   Summary Judgment and *Daubert* Motions

After expert discovery ended, Forest moved for summary judgment, making complex arguments concerning the '703 patent, the reasonableness of its Lexapro sales forecasts, convoluted Medicaid rebate regulations and laws, the application of *Actavis*'s "large" language, Plaintiffs' causation theories concerning their reverse-payment and hard-switch claims, and antitrust impact.  Gerstein Decl. ¶¶ 37-41.  Including its reply, Forest supported its 89 pages of arguments with a 494-paragraph fact statement and 417 exhibits.  *Id.* ¶ 38.  Forest also filed six *Daubert* motions, totaling an additional 130 pages of briefing (including replies) and 51 exhibits. *Id.* ¶ 39.  Class counsel opposed with a summary judgment brief and fact statement response of equal length, and also submitted a separate 405-paragraph statement of additional facts, which

Forest attempted but failed to strike from the record.  *Id.* ¶ 40.  Plaintiffs also submitted 535

exhibits of their own, and opposed each of the six *Daubert* motions.  *Id.*

In a 99-page opinion, the Court denied Forest's summary judgment motion and all but

one *Daubert* motion.  *Id.* ¶ 41.  The Court credited Class counsel's causation theory that because

each settling generic challenger had "provisions in their agreements that provided for immediate

and simultaneous market entry if Mylan won the patent dispute," the other settlements

"undergird[ed] and compound[ed] the anticompetitive effect of the Forest-Mylan deal," and thus

served to dramatically increase Mylan's leverage to extract a reverse payment.  *In re Namenda*

*Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 196 (S.D.N.Y. 2018).  The Court

recognized that this conclusion had been buttressed by the 2010 Forest-Mylan settlement

presentation's recognition there was "No Financial Upside" to Mylan from winning the patent

litigation — a presentation that Class counsel had dislodged using their persistent privilege

challenges.  *Id.*  *See also id.* at 199 (finding that the same document was itself "enough to create

a genuine issue of material fact").

### 6.    Trial Preparation

Simultaneously with completing fact and expert discovery and briefing summary

judgment, Class counsel prepared for trial, submitting a joint pretrial order on January 12, 2018.

ECF Nos. 487-491.  In the lead-up to trial, the parties prepared and submitted a revised pretrial

order on April 30, 2019.  ECF No. 699.  Class counsel filed 16 motions *in limine* comprising

over 80 pages of briefing, and opposed Forest's 16 motions *in limine*, which comprised 110

pages of briefing.  ECF Nos. 721-736, 737-801, 811-854.  Gerstein Decl. ¶¶ 42-46.  After a

multi-hour October 10, 2019 final pretrial conference and rulings on the admissibility of Phase 1

trial exhibits, and additional skirmishing on the meaning of "large" under *Actavis* (ECF Nos.

887, 895-896), Class counsel made final trial preparations, including conferring with Forest over

deposition and exhibit objections for the first trial day, presented to the Court for disposition. ECF No. 908, 911-912.

### 7.    Mediation and Settlement

The parties reached an agreement in principle on October 27, 2019, the night before the first trial day.  Gerstein Decl. ¶ 47.  This represented the fourth attempt at settlement of this action.  The parties first attempted to resolve the case in March 2017, via direct communications. Gerstein Decl. ¶ 48.  In the Fall of 2018, the parties engaged Jonathan Marks, one of the preeminent mediators in the nation.  That mediation, which continued into March of 2019, included the exchange of lengthy mediation statements and multiple individual sessions, as well as one joint session with Mr. Marks.  Gerstein Decl. ¶¶ 49-50.  Then, starting in September 2019, the parties engaged in additional mediation efforts before retired United States District Judge Faith Hochberg, including additional written submissions and an in-person session.  *Id*. ¶ 51  The mediation before Judge Hochberg included another full day session and laid the groundwork for the parties' ultimate settlement.  *Id*. ¶ 52.  Ultimately, the parties reached a settlement in principle with the able assistance of the Court's staff.  *Id*.  Class counsel negotiated the terms of the settlement over several weeks, signing an agreement on December 20, 2019.  *See* ECF 919-1.

* * *

For nearly five years, Class counsel zealously prosecuted this action, and secured a result unprecedented in the history of Hatch-Waxman antitrust law.

## III.    ARGUMENT

### A.    Class Counsel Should Be Awarded Reasonable Attorneys' Fees

Under the "equitable fund" doctrine, attorneys for the plaintiffs in a class action may petition the court for compensation from the settlement fund that resulted from their efforts. *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980).  "[R]egardless of whether a case is brought

pursuant to a statute with a fee-shifting provision, if the parties settle the case by creating a common fund, common-fund principles control class counsel's fee recovery." *Fresno County Employees Ret. Ass'n v. Isaacson*, 925 F.3d 63, 67 (2d Cir. 2019).  In common fund cases, to determine a fee, courts may use both the "percentage of the fund" or the "lodestar" methods. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 369 F.3d 96, 121 (2d Cir. 2005).  However, "[t]he trend in this Circuit is toward the percentage method." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 U.S. Dist. LEXIS 216796, at *25 (E.D.N.Y. Dec. 16, 2019). This is because "once the parties have agreed to settle, the percentage-of-the-fund methodology serves as an important motivation for counsel to maximize the class's recovery, and, a fortiori, counsel's fee." *Fresno County Employees*, 925 F.3d at 71.  The percentage method also dispenses with the "cumbersome, enervating, and often surrealistic process of lodestar computation," but courts generally assess the hours submitted by counsel as a "cross-check" on the reasonableness of the requested percentage. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (quotation omitted). *See also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 586 (S.D.N.Y. 2008) (McMahon, J.) ("[T]he administrative problems associated with the lodestar method, and the advantages presented by the percentage of recovery approach, [have] led most district courts in this Circuit to adopt the percentage of recovery methodology.").

Guided by the following factors, this Court has discretion to determine a reasonable fee: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation … (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.*; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 480 (S.D.N.Y. 2009).  At bottom, a fee award should be based on what is reasonable under the circumstances. *Goldberger*, 209 F.3d at 47. *See also* Fed. R.

Civ. P. 23(h) ("In a certified class action, the court may award *reasonable* attorney's fees") (emphasis added).  A reasonable fee is determined from the "plaintiff's perspective" and "can account for contingency risk where such risk exists."  *Fresno County Employees*, 925 F.3d at 70.

Where, as here, the contingency risk is significant, a reasonable fee should include compensation for such risk.  The Second Circuit explained this:

> The plaintiff class is therefore appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases.  That is, because class counsel has decided to represent the plaintiff class, class counsel's ability to freely represent other clients is limited by the risk she has assumed that the class's cause will be unsuccessful.  The class, having been enriched by counsel's acceptance of its cause at the expense of other clients' causes, may be charged for counsel's assumption of risk on its behalf.

*Id*. at 70.  In *In re Initial Pub. Offering Sec. Litig.*, the district court awarded a 33⅓% fee on a $586 million settlement, concluding that "[i]t is precisely the promise of a reasonable fee that encourages plaintiffs' attorneys to accept cases such as these and risk spending their own financial resources and personal efforts for years until recovery can be obtained for the class." 671 F. Supp. 2d at 502; *id.* at 516 ("[t]his fee takes into account the risks counsel undertook to represent class members and the hard work that was put into resolving this litigation.").

Here, Class counsel's request for a 27.5% fee of the settlement fund is supported by the *Goldberger* factors and consistent with the law and awards in similar cases.

## B.  The *Goldberger* Factors Support Class Counsel's Fee Request

### 1.  The Time and Labor Expended by Counsel

Class counsel expended more than 52,000 hours in prosecuting this case from investigation in June of 2014 and filing in 2015 through the present time (excluding time relating to this motion).  Gerstein Decl. ¶ 70.  As detailed above and in the Gerstein Declaration, Class counsel:  (a) successfully defeated Forest's motion to dismiss (*id.* ¶¶ 9-11); (b) reviewed and

analyzed millions of pages of documents and lines of transaction data from Forest and third parties (*id.* ¶ 16); (c) took or defended 46 fact and expert depositions (*id.* ¶¶ 17, 33, 35, 80); (d) consulted with and retained nine experts in wide-ranging disciplines (*id.* ¶ 32); (e) engaged in substantial discovery motion practice, including on the issue of privilege (*id.* ¶¶ 15, 18-28); (f) successfully sought class certification and prevailed in the Second Circuit (*id.* ¶ 36); (g) defeated Forest's comprehensive motion for summary judgment and all but one of Forest's *Daubert* motions (*id.* ¶ 41); (h) briefed 32 motions *in limine* filed by both sides (*id.* ¶ 45); (i) prepared for and participated in multiple mediations (*id.* ¶¶ 48-52); and (j) fully prepared for a two-phase trial that would have begun the day after the parties reached the Settlement (*id.* ¶¶ 42-44).

This was a large amount of work, performed efficiently and, in accordance with the Court's discovery schedule, quite rapidly.  Moreover, Class counsel will be expending a significant number of hours in connection with administering the Settlement.  *See Garcia v. Pancho Villa's of Huntington Vill., Inc.,* 2012 U.S. Dist. LEXIS 144446, at *22-23 (E.D.N.Y. Oct. 4, 2012) (acknowledging that class counsel would perform more work on behalf of the class after final approval, including "assisting with the administration of the settlement, and answering Class Member questions, which further supports their fee request").  The significant time and labor that has been (and will be) expended by Class counsel support the fee sought herein.

### 2. The Magnitude and Complexities of the Litigation

"An antitrust class action is arguably the most complex action to prosecute."  *In re Motorsports Merch. Antitrust Litig.,* 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000).  *See also In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 138479, at *148-49 (E.D.N.Y. Oct. 9, 2015) (price-fixing conspiracy required "complex expert analysis and review of mountains of documents"); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite

expensive.").  Even so, this lawsuit stands apart as uniquely large and complicated, representing the most complex Hatch-Waxman antitrust case Class counsel have encountered in over two decades of prosecuting them.  Gerstein Decl. ¶ 32.  For instance, this case uniquely required Class counsel to master various complexities of patent law to show that Mylan would have prevailed in showing that the '703 patent was not infringed, and that the patent claims as well as the patent term extension were invalid, and in rebutting Forest's arguments to the contrary.  *Id.* As a prerequisite, Class counsel had to master the biopharmaceutical aspects of NMDA receptor antagonism.  *Id.*  This case uniquely required Class counsel to master several challenging and interwoven areas of FDA and CMS drug regulation (in addition to those governing ANDA approvals), including FDA regulations regarding approval of transfers of manufacturing technology (for Lexapro) from one site to another, and CMS regulations governing the Medicaid rebate liability consequences of selling an authorized generic (Lexapro) in various ways, and to apply those (and the cost savings they imply) to a forensic examination of Forest's deal valuation spreadsheets.  *Id.*  This case uniquely required economic modeling of the complicated interaction between the delay of generic Namenda entry from the reverse payments and the hard switch product conversion enabled by that delay, which were interdependent sources of overcharges for direct purchasers.  *Id.*  And, this case required the development of a defensible multi-input economic model, challenged vigorously by Forest, to determine the earlier entry date a reverse-payment-free settlement between Forest and Mylan would have borne.  *Id.*

Against this complicated backdrop, the parties and the Court wrestled with the definition of a "large" reverse payment under *Actavis* (ECF Nos. 887, 895-896; Gerstein Decl. ¶ 46), the application of collateral estoppel in the context of a prior injunction proceeding (ECF Nos. 134-137, 157-160, 176-177, 253; Gerstein Decl. ¶¶ 29-31), and the reach of this Circuit's law of at-

issue waiver of privileged communications and work product (ECF Nos. 249, 361, 366-367, 370-371, 382-383, 387, 394, 403-405, 684, 719; Gerstein Decl. ¶¶ 18-24).  It is hard to overstate the complexities that this massive litigation presented, and the challenge Class counsel faced in making them comprehensible to a lay jury.

### 3. The Risk of the Litigation

"[R]isk of the litigation is one of the most important factors, if not the foremost factor, to consider when determining the reasonableness of fee."  *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 U.S. Dist. LEXIS 132515, at *17 (S.D.N.Y. Aug. 18, 2017).  *See also Christine Asia Co.*, 2019 U.S. Dist. LEXIS 179836, at *62 (similar).  When lawyers undertake litigation on a contingency basis, they face the risk of non-payment.  *See Christine Asia Co.*, 2019 U.S. Dist. LEXIS 179836, at *63 ("might never have been recovered.").  *See also Woburn Ret. Sys.*, 2017 U.S. Dist. LEXIS 132515 at *17 (lawyers on contingency "assume a great deal of risk").

This litigation presented substantial risks.  First was the risk of dismissal, even despite the *Actavis* decision, as the cases cited in the Introduction illustrate.  *See* pp. 5-7, *supra*.

Second was the risk that the jury would be persuaded by Forest.  Forest could have persuaded the jury that it made no reverse payment to Mylan because its Lexapro forecasts were reasonable and Forest would have made more money under the Lexapro Amendment than under its prior deal with Mylan.  Forest could have persuaded the jury that it made no reverse payment to Mylan because Forest's forecasted Medicaid rebate savings would offset its payments to Mylan.  Forest could have persuaded the jury that even if it did make a reverse payment to Mylan, the payment was not sufficiently large, or sufficiently in excess of saved litigation costs, to cause substantial delay.  Forest could have persuaded the jury that the '703 patent was not weak, or that the entry date in the Forest-Mylan settlement fairly represented the strength of the '703 patent.  Forest could have persuaded the jury that no generic could have entered the market

earlier regardless of the reverse payment deal with Mylan.  Any of these conclusions would have led to a defense verdict on the reverse payment claims.  Forest could have persuaded the jury that the conversion from Namenda IR to XR would have been no different absent the hard switch conduct — that patients and doctors liked Namenda XR, and freely switched between XR and IR and back again — which would have led to a defense verdict on the product hop claim.

These risks would present themselves yet again during the inevitable appeal to the Second Circuit after a judgment in the Class's favor (and then to the Supreme Court).  Viewed against these risks, the $750 million settlement is especially impressive.  These risks "of establishing liability and proving damages [], further support the granting of the application for fees." *Christine Asia Co.*, 2019 U.S. Dist. LEXIS 179836, at *64.

### 4.     The Quality of Representation

Class counsel have vigorously litigated this unusually complicated case from initial investigation in mid-2014 through trial preparation and settlement with both skill and faithful adherence to the Class's best interests at every stage.  Class counsel have decades of experience pursuing and trying pharmaceutical antitrust cases.  *See* Gerstein Decl. ¶ 58 & Exs. A-F; Silver Decl. ¶¶ 27-30.  No group of firms has litigated more Hatch-Waxman antitrust cases.  Each firm practices in particular areas (*e.g.,* antitrust, Hatch-Waxman, pharmaceutical patents, etc.), which lends the team efficiency and sophisticated litigation judgment.  The result speaks for itself: where a settlement, like this one, is "the largest ever" under the particular circumstances, "[t]he quality of representation . . . was high and supports the requested fee." *Christine Asia Co.*, 2019 U.S. Dist. LEXIS 179836, at *65.  *See also Dial Corp. v. News Corp.,* 317 F.R.D. 426, 435 (S.D.N.Y. 2016) ("The results achieved through the efforts of [c]ounsel are a critical element in determining the appropriate fee to be awarded and the [$244 million] settlement here will undoubtedly have widespread benefits to the Class") (quotation omitted).

Not just the laudable end result but also the milestones passed in reaching that result —

motion to dismiss denied, discovery motions granted, privilege motions granted and crucial

documents dislodged, *Daubert* motions denied, summary judgment motion denied — attest to

the high quality of representation Class counsel afforded.  Class counsel were the first to detect

and challenge Forest's reverse payment to Mylan, and the first to pursue Forest for damages

arising from the very real harm to competition from the hard switch that the NYAG incorrectly

believed it had entirely prevented.  *See* ECF No. 761-37, at 1 ("Because the injunction protected

competition and allowed low cost generic drugs to enter the market unimpeded … it is no longer

necessary to continue legal action.").

"[T]he quality of opposing counsel is also important in evaluating the quality of

plaintiffs' counsels' work."  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467

(S.D.N.Y. 2004).  Forest was represented by two leading defense firms, with extensive antitrust

and trial experience, including in the area of pharmaceutical antitrust cases: White & Case and

Wilkinson Walsh.  "That Plaintiffs' Counsel was able to obtain a substantial settlement from

these Defendants confirms the quality of Plaintiffs' Counsel's representation in this matter, and

is a factor in determining the reasonableness of the fee request."  *In re Veeco Instruments Sec.

Litig.*, 2007 U.S. Dist. LEXIS 85554, at *23 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.).

### 5.    The Requested Fee in Relation to the Settlement

As discussed in the Introduction (*see* pp. 3-4, *supra*), a 27.5% fee is both well within the

range of fee awards within this Circuit and for Hatch-Waxman antitrust cases.  *Velez*, 2010 U.S.

Dist. LEXIS 125945, at *59 ("[d]istrict courts in the Second Circuit routinely award attorneys'

fees that are 30 percent or greater"); *In re Beacon Assocs. Litig.*, 2013 U.S. Dist. LEXIS 82192,

at *44 ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little

more of the amount of the common fund."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp.

2d at 480 (awarding 33⅓% of $510 million settlement).  *See also In re Urethane Antitrust Litig.*, 2016 U.S. Dist. LEXIS 99839, at *77 & n.5 (D. Kan. July 29, 2016) (D. Kan. July 29, 2016) (33⅓% fee on $835 million settlement fund); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) (30% of $410 million settlement); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *55 (D.D.C. July 16, 2001) (33.7% of $365 million settlement).  *See also* Silver Decl. ¶¶ 26, 40-54, 70.

Reducing the percentage award as the settlement size increases disincentivizes class counsel from creating incremental value for the class by holding out for more money on the class's behalf, and so should not be considered by the Court.  *See In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000) ("By adjusting downward the percentage of the recovery awarded to counsel as plaintiffs' recovery increases … this method may give rise to an attorney incentive problem by creating declining marginal returns to effort for counsel…. Again, this method can create an incentive to settle quickly and cheaply, when the returns to effort are highest, rather than investing additional time and maximizing plaintiffs' recovery.").  *See also In re Syngenta AG MIR 162 Corn Litig.*, 2018 U.S. Dist. LEXIS 206840, at *101 (D. Kan. Dec. 7, 2018) (articulating same "incentive problem" observations and therefore awarding 33⅓% fee on a $1.5 billion settlement).  *See also* Silver Decl. ¶¶ 22, 38, 84.

Thus, in *In re Buspirone Patent Litigation*, No. 01-MD- 1410 (S.D.N.Y. Apr. 17, 2003) (Gerstein Decl. Ex. G), another Hatch-Waxman antitrust case on behalf of a class of direct purchasers, Judge Koeltl, applying the *Goldberger* factors, approved a requested fee of 33⅓% of a settlement fund of $220 million, reasoning that:

> The fee of one third falls within the range of rates that have been approved in other class actions.  Determining then whether the percentage fee is a reasonable in this case applying the traditional standards it's clear. . . that this is a very large and complex litigation.  There is always risk involved in the litigation.  The fee

> that's being sought is a completely contingent fee.  The case was taken. . . on a
> contingent basis and that is entitled to greater weight than simply an hourly rate
> because the lawyers could have walked away having done substantial work with
> no recovery.

*Id.* at 41-43.  Judge Koeltl's reasoning is equally applicable in this case and supports the

requested fee of 27.5% of the Settlement.  Class counsel's effective hourly rate for this case was

$667.19.  This is well within the range of reasonableness.  Silver Decl. ¶¶ 74-81.  (The multiplier

is discussed in Part III.C., *infra*.)

### 6.    Public Policy Considerations

"Private suits are an important element of the Nation's antitrust enforcement effort."  *Am.*

*Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 572 n.10 (1982).  In service of that

rationale, courts recognize that "it is important to encourage top-tier litigators to pursue

challenging antitrust cases…[because] [o]ur antitrust laws address issues that go to the heart of

our economy."  *In re Credit Default Swaps Antitrust Litig.*, 2016 U.S. Dist. LEXIS 54587, at *55

(S.D.N.Y. Apr. 25, 2016).  This case presents an excellent example of these principles.  No

government agency pursued the antitrust implications of Forest's reverse payments.  Perhaps no

government agency even detected those reverse payments or the delay in generic competition

they caused.  But Class counsel did, pursued this case despite its many challenges, and secured a

record-breaking award for the Class.  No government agency pursued damages from Forest's

hard switch product hop, either.  In documents that Forest wielded against Class counsel, the

NYAG stated its belief that the injunction it secured prevented such harm from occurring, and

abandoned seeking damages.  ECF No. 761-36, at 3; ECF No. 761-37, at 1.  While the NYAG

was undoubtedly proud of its injunction, its stated belief was mistaken.  Incentivizing the

detection and risky pursuit of violations of the antitrust laws with the promise of a substantial

contingent percentage fee award accords with the public policy behind private antitrust

enforcement.

C.     **A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee**

"[C]ounsel may be entitled to a 'multiplier' of their lodestar rate to compensate them for

the risk they assumed, the quality of their work and the result achieved for the class." *In re Telik,*

*Inc. Sec. Litig.*, 576 F. Supp. 2d at 590.  *See also Christine Asia Co.*, 2019 U.S. Dist. LEXIS

179836, at *62 ("No one expects a lawyer whose compensation is contingent upon his success to

charge, when successful, as little as he would charge a client who in advance had agreed to pay

for his services, regardless of success.") (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448,

470 (2d Cir. 1974)).  Lodestar multipliers naturally tend to increase in direct proportion to the

size of a recovery.  Here, a lodestar "cross-check" shows that the fee requested in this case is

commensurate with the fee awarded pursuant to other large class action settlements.

As detailed in the Gerstein Decl., Class counsel worked 52,112.65 hours on this case thus

far, amounting to $34,769,008.35 in lodestar based on 2019 rates.  Gerstein Decl. ¶ 70.  A 27.5%

fee award equals a lodestar multiplier of 5.9.  Such a multiplier falls within the range routinely

awarded by courts in this Circuit.  "Courts regularly award lodestar multipliers of up to eight

times the lodestar, and in some cases, even higher multipliers." *Beckman v. KeyBank, N.A.*, 293

F.R.D. 467, 481 (S.D.N.Y. 2013) (awarding a multiplier of 6.3 and collecting cases awarding

multipliers in the 6 to 8 range).  *See* Silver Decl. ¶¶ 82-83.  This is certainly true in Hatch-

Waxman antitrust cases brought under Section 4 of the Clayton Act.  Judge Koeltl awarded class

counsel a 33⅓% fee in the *Buspirone* case which translated into an 8.46 multiplier.  Gerstein

Decl. Ex. G, at 42.  *See also Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1239-

40 (S.D. Fla. 2006) (7.8 multiplier on a $1.1 billion settlement); *id.* at 1214 (plaintiff firms had

expended $15.2 million and $26.3 million, respectively, for a total of $41.5 million in billable

time); *id.* at 1240 (court awarded fees of $325,380,997.00, or 31.33% of settlement, which means

a multiplier of 7.8); *New Eng. Carpenters Health Benefits Fund v. First Databank*, , 2009 U.S.

Dist. LEXIS 68419, at *10 (D. Mass. Aug. 3, 2009) ("multiplier of about 8.3 times lodestar").

The lodestar cross check in this case supports the requested fee.

### D.      Class Counsel's Costs and Expenses Are Reasonable and Were Necessary to the Result

It is well-settled that counsel who have created a common fund for the benefit of a class

are entitled to be reimbursed for out-of-pocket expenses reasonably incurred in creating the fund.

*See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010).  Here, Class counsel's

unreimbursed expenses were reasonably incurred and necessary to the representation of the

Class.  These expenses have been itemized by category for the Court's convenience.  *See*

Gerstein Decl. ¶¶ 70-72.  These expenses include costs for computerized legal research, the

creation and maintenance of an electronic document database, experts, travel and lodging

expenses, copying, court reporters, deposition transcripts, and mediation.  *Id.*  These are the

typical kinds of expenses that are routinely deemed reasonable and necessary.  265 F.R.D. at 150

(such expenses are "ordinary and necessary").  Accordingly, Class counsel respectfully request

that the Court approve reimbursement of Class counsel's expenses in full.

### E.      Incentive Awards for the Class Representatives Are Appropriate and Reasonable

The purpose of incentive awards is to reimburse named plaintiffs, who "take on a variety

of risks and tasks when they commence representative actions[.]"  *In re Marsh ERISA Litig.*, 265

F.R.D. at 150.  Here, Class counsel believes that awards of $150,000 each to Smith Drug and

RDC are appropriate, in recognition of the long hours they spent participating in this litigation,

filing suit, collecting discovery, sitting for depositions, and defending their adequacy in motions.

*See* Gerstein Decl. ¶¶ 75-81.  Moreover, courts have recognized the risks inherent in filing suit as

a named plaintiff on behalf of a class against an entity with which all class members transact

business.  *See Dial Corp.*, 317 F.R.D. at 439 ("[T]he decision to fire the first shot on behalf of the Class was fraught with risks.  Notably, the named Plaintiffs in this case assumed a substantial risk in antagonizing a longstanding, powerful business partner[.]").

The amount requested here is in line with awards made to named representatives in other Hatch-Waxman antitrust cases.  *E.g., In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521-WHO, ECF No. 1054 at ¶ 15 (N.D. Cal. Sept. 20, 2018) ($100,000); *In re K-Dur Antitrust Litig.,* Civil Action No. 01-1652, ECF No. 1057 at ¶ 12 (D.N.J. Oct. 5, 2017) ($100,000); *In re Modafinil Antitrust Litig.*, Civil Action No. 2:06-cv-01797 (MSG), ECF No. 870 at ¶ 30 (E.D. Pa. Oct. 15, 2015) ($100,000 to certain representatives); *In re Neurontin Antitrust Litig.,* Civil Action No. 02-1830 (FSH), ECF No. 114 at ¶ 31 (D.N.J. Aug. 6, 2014) ($100,000).  The amount requested here also reflects that this case was not settled until the day before trial, and named representative Smith Drug traveled to the courthouse (from a family wedding) and was prepared to testify on the first day of trial, and that both representatives sat for extensive pretrial depositions, produced in excess of 50,000 pages of documents and several sets of purchase and chargeback data, and as regards RDC responded to repeated challenges to its adequacy.  Gerstein Decl. ¶¶ 75-81.

## IV.    CONCLUSION

For the reasons set forth above and in the Gerstein Declaration, Class counsel respectfully request that this Court enter an Order awarding Class counsel fees in the amount of $206.25 million, *i.e.,* 27.5% of the Settlement (including a *pro rata* share of the accrued interest), and reimbursement of expenses in the amount of $5,823,928.91.  Class counsel also respectfully request that this Court approve incentive awards of $150,000 to each of the class representatives for their efforts on behalf of the Class.

Dated: March 13, 2020                                Respectfully Submitted:

                                                                    */s/ Bruce E. Gerstein*

David F. Sorensen
Daniel C. Simons
Ellen T. Noteware
Nicholas Urban
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
dsorensen@bm.net
dsimons@bm.net
enoteware@bm.net
nurban@bm.net

Peter Kohn
Joseph T. Lukens
FARUQI & FARUQI, LLP
1617 John F Kennedy Blvd., Suite 1550
Philadelphia, PA 19103
Tel: (215) 277-5770
Fax: (215) 277-5771
pkohn@faruqilaw.com
jlukens@faruqilaw.com

Bruce E. Gerstein
Joseph Opper
Kimberly M. Hennings
Dan Litvin
GARWIN GERSTEIN & FISHER LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
bgerstein@garwingerstein.com
jopper@garwingerstein.com
khennings@garwingerstein.com
dlitvin@garwingerstein.com

Susan Segura
David C. Raphael, Jr.
Erin R. Leger
SMITH SEGURA RAPHAEL & LEGER, LLP
221 Ansley Blvd.
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
ssegura@ssrllp.com
draphael@ssrllp.com
eleger@ssrllp.com

Stuart E. Des Roches
Andrew W. Kelly
ODOM & DES ROCHES, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
stuart@odrlaw.com
akelly@odrlaw.com

Russ Chorush
HEIM PAYNE & CHORUSH, LLP
1111 Bagby, Suite 2100
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
rchorush@hpcllp.com

***Counsel for the Direct Purchaser Class Plaintiffs***

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2020, I electronically filed the above by CM/ECF system.

Respectfully submitted,

/s/ *Bruce E. Gerstein*
Bruce E. Gerstein