# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE NAMENDA DIRECT PURCHASER ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**All Direct Purchaser Actions** | **Case No. 1:15-cv-07488-CM-RWL** |

**DECLARATION OF BRUCE E. GERSTEIN IN SUPPORT OF CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS**

## I.      INTRODUCTION

I, Bruce E. Gerstein, a managing partner of Garwin Gerstein & Fisher, LLP ("GGF"), and

co-lead counsel for Direct Purchaser Class Plaintiffs ("Plaintiffs"), respectfully submit this

declaration in support of Class counsel's application for:

(1)      an award of attorneys' fees from the Settlement;

(2)      reimbursement of expenses incurred in the prosecution of Plaintiffs' claims
against Forest; and

(3)      incentive awards to the named Class representatives, J M Smith Corporation d/b/a
Smith Drug Company ("Smith") and Rochester Drug Co-Operative, Inc.
("RDC").

GGF has been involved in all material aspects of this litigation from the pre-complaint

investigation and filing of Plaintiffs' initial complaint in May 2015, through the filing of the

Settlement with the Court (and continuing), and I am therefore fully familiar with the litigation,

the most significant aspects of which are outlined below.

## II.     COMMENCEMENT OF THE CASE

1.      On May 29, 2015, Class counsel,[1] on behalf of the Class, filed the first lawsuit

challenging Forest's conduct regarding the prescription pharmaceutical product Namenda, which

treats Alzheimer's patients, as violative of the antitrust laws proscribing reverse payment patent

litigation settlement agreements.  Class counsel filed on behalf of a putative class of direct

purchasers. *See Burlington Drug Co. v. Actavis, PLC*, 15-cv-4152 (S.D.N.Y. filed May 29,

2015) (ECF No. 1).  Five of the six claims challenged Forest's reverse payments; one of the

claims challenged Forest's hard switch product hop.  Class counsel then filed additional

complaints: *J M Smith Corp. d/b/a Smith Drug Co. v. Actavis, PLC*, 15-cv-07488 (S.D.N.Y.

---

[1] On December 16, 2016, the Court entered an order concerning the organization of counsel for
the Class by appointing GGF and Berger Montague PC ("Berger") Interim Lead Counsel.  ECF
No. 125.

filed Sep. 22, 2015) and *Rochester Drug Co-Operative, Inc. v. Actavis PLC*, 15-cv-10083

(S.D.N.Y. filed Dec. 28, 2015).  These contained those same claims.  These latter actions were

consolidated at No. 15-cv-7488.  ECF No. 65.

2.      Class counsel began its investigation of this case in earnest in June of 2014.  Class

counsel analyzed the '703 patent litigation between Forest and 14 generic drug companies.

These would-be competitors had filed Abbreviated New Drug Applications ("ANDAs") on the

first day possible, all containing Paragraph IV certifications asserting that their respective

products either did not infringe the '703 patent or that the patent was invalid or not enforceable.

Class counsel analyzed the publicly available information about the series of settlement

agreements that delayed generic competition.

3.      In September of 2014, after Class counsel's investigation was well underway, the

New York Attorney General ("NYAG") sued Forest, seeking to enjoin Forest's withdrawal of

Namenda IR from the market.  The NYAG did not sue over Forest's patent settlement

agreements with would-be generic Namenda IR competitors such as Mylan, and the NYAG did

not pursue damages.

4.      Class counsel's complaints, by contrast, did challenge the patent settlement

agreements and Class counsel did pursue damages.  Class counsel's complaints alleged that

Forest entered into a reverse payment agreement with would-be competitor Mylan

Pharmaceuticals Inc. ("Mylan").

5.      Class counsel alleged that the delay from Forest's reverse payment to Mylan

harmed generic Namenda competition and caused direct purchasers to pay overcharges on their

Namenda purchases, including because the delay facilitated Forest's hard switch from Namenda

IR to Namenda XR.

6.      Class counsel contended that Forest disguised a reverse payment to Mylan of $32.5 million in the form of an amendment to a pre-existing Lexapro authorized generic distribution deal (the "Lexapro Amendment").  Class counsel contended that the $32.5 million was actually a disguised payment to induce Mylan to quit the Namenda IR patent litigation and delay competition until 2015.

7.      After obtaining an injunction that prevented Forest from taking Namenda IR off the market until August 10, 2015, the NYAG asserted that "the Injunction was effective in protecting competition in the relevant market and permitting lower cost generic drugs to enter the market in July 2015," and that "[b]ecause the injunction protected competition … it is no longer necessary to continue legal action."  ECF No. 761-36, at 3; ECF No. 761-37, at 1.  Class counsel disagreed with the NYAG's statements (which Forest repeatedly invoked in defending this class action), and unlike the NYAG (which abandoned seeking damages from Forest), Class counsel continued to pursue damages attributable to the hard switch despite these statements.

8.      Various groups of end-payors filed class actions in this District, substantially copying Class counsel's averments.

III.    **FOREST'S MOTION TO DISMISS**

9.      On December 22, 2015 Forest filed a 71-page motion to dismiss Plaintiffs' claims.  ECF Nos. 55-57.  Forest argued that dismissal was appropriate, primarily because (1) the NYAG injunction prevented Plaintiffs from being harmed; (2) the First Amendment protected Forest's hard switch announcements of impending withdrawal of Namenda IR; and (3) the alleged reverse payment to Mylan was small and the '703 patent was strong.  Forest also argued that (4) Plaintiffs were not injured in fact either by the hard switch or the reverse payment; (5) the introduction of Namenda XR actually increased competition; and (6) Plaintiffs' claims were time barred.

3

10.     Class counsel responded on January 29, 2016, in under 50 pages.  ECF No. 68.
Although Class counsel rebutted each of Forest's arguments, Class counsel focused on their
assertions that the hard switch began before the withdrawal of Namenda IR was enjoined (and
that announcing the imminent withdrawal was not speech protected by the First Amendment, as
Forest argued), and that the alleged reverse payments were sufficiently large.

11.     The Court denied Forest's Motion in a 34-page opinion issued on September 13,
2016.  ECF No. 106.  Despite sustaining Class counsel's complaint, the Court observed that
"viewed in isolation, the settlement terms do not appear anticompetitive," and warned Plaintiffs
that "[t]o survive a motion for summary judgment, Plaintiffs will have to substantiate these
allegations with evidence suggesting that the settlement agreements did, in fact, delay generic
entry and that the delay had the effect of allowing Forest to complete the hard switch."  *Id.* at 31-
32.  The Court's ruling portended that this case would be difficult for Class counsel to prove.

## IV.   WRITTEN DISCOVERY

12.     Following denial of the motion to dismiss, the Court entered a Case Management
Order that consolidated all direct purchaser actions for all pretrial proceedings and set an
aggressive one-year schedule from that point through trial.  ECF No. 128.  *See also* ECF No. 340
(Judge Francis notes the "tight discovery schedule"); ECF No. 348 (same).

13.     Class counsel served written discovery requests on Forest, and 20 subpoenas on
non-parties, consisting of generic drug companies and law firms.  Subpoenas were directed to the
following entities:

| Subpoena recipient | Date |
| --- | --- |
| Actavis | 7/8/17 |
| Amneal | 1/5/17 |
| Aurobindo | 9/14/17 |
| Budd Larner | 6/14/17 |
| Dr. Reddy's | 1/6/17 |

| Subpoena recipient | Date |
|---|---|
| Duane Morris | 5/12/17 |
| Kirkland & Ellis | 5/9/17 |
| Lannett | 8/14/17 |
| Lupin | 1/6/17 |
| Macleods | 8/14/17 |
| Major Pharmaceutical | 1/6/17 |
| Morris Nichols | 5/15/17 |
| Mylan | 1/7/17 |
| Orchid/Orgenus | 6/29/17 |
| Potter Anderson | 5/15/17 |
| Quinn Emmanuel | 5/9/17 |
| Sun Pharma | 1/6/17 |
| Teva | 7/18/17 |
| Unichem | 9/14/17 |
| Wilson Sonsini | 6/6/17 |

14.     Forest served an additional 21 subpoenas, for a total of 41 subpoenas issued in this case that Class counsel had to manage.

15.     Class counsel was required to move to compel compliance with its document requests against Forest and against a variety of the subpoena recipients.  *See* ECF Nos. 197-203, 217, 222, 232-233, 238-239, 249, 256, 258, 264, 265-267, 281-283, 315, 340, 343, 346-348, 361, 363-364, 366-367, 370-377, 382-384, 386-387, 394 (Forest); ECF Nos. 214-215, 427, 429, 579 (Mylan); ECF No. 362, 427 (Lupin); ECF No. 378-380, 391, 393, 398-399, 416 (Macleods). This resulted in a variety of orders and opinions.  *E.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 2017 U.S. Dist. LEXIS 139983 (S.D.N.Y. Aug. 30, 2017); *id.*, 2017 U.S. Dist. LEXIS 173403 (S.D.N.Y. Oct. 19, 2017).

16.     All told, a total of 311,345 documents (of which 28,789 were native computerized files) comprising well over 4.7 million pages (not including the native files, which have no "pages") were produced in this case, from Forest and the non-party subpoena recipients combined.  In addition, over 2.7 million lines of transactional data were produced in this case,

reflecting sales, credits, returns, chargebacks, and price adjustments.  Class counsel, in subject-matter teams, analyzed all such productions, creating a variety of work product memoranda.

## V.   DEPOSITIONS OF FACT WITNESSES

17.   From their document review, Class counsel identified and then deposed numerous fact witnesses, both parties and nonparties.  In total, Class counsel took 25 fact depositions, all of which required extensive preparation, and all of which are catalogued in the table below.

| Deponent name | Employer | Deposition date | Location |
|---|---|---|---|
| Eric Agovino | Forest | September 12, 2017 | Westlake Village, CA |
| June K. Bray | Forest | August 18, 2017 | New York |
| Robert Carnevale | Forest | August 23, 2017 | New York |
| Maureen Cavanaugh | Teva | July 18, 2017 | Philadelphia |
| Mark Devlin | Forest | August 29, 2017 | New York |
| James J. Finchen | Forest | November 21, 2017 | Danbury |
| Kapil Gupta | Amneal | July 27, 2017 | Bridgewater, NJ |
| Sanjay Gupta | Torrent | June 15, 2017 | New York |
| Patrick Jochum | Merz | August 30, 2017 | New York |
| Bob Lahman | Optum Rx | July 14, 2017 | Irvine, CA |
| S. Peter Ludwig | Darby & Darby | August 4, 2017 | New York |
| Jinping McCormick | Dr. Reddy's | July 20, 2017 | Princeton |
| Rachel Mears | Forest | August 30, 2017 | New York |
| Katrina Curia | Mylan | August 3, 2017 | Morgantown, WV |
| Seth Silber | Mylan | August 3, 2017 | Morgantown, WV |
| Bharati Nadkarni | Sun | August 31, 2017 | Princeton |
| Lauren Rabinovic | Teva | July 18, 2017 | Philadelphia |
| Charles Ryan | Forest | September 7, 2017 | New York |
| Charles Ryan | Forest | November 7, 2017 | New York |
| Julie Snyder | Forest | October 11, 2017 | New York |
| David Solomon | Forest | September 7, 2017 | New York |
| David Solomon | Forest | November 15, 2017 | New York |
| Michael Towers | Forest | August 21, 2017 | New York |
| G. Venkatesan | Wockhardt | July 13, 2017 | New York |
| Diana Wilk | Orgenus | August 17, 2017 | Lawrenceville, NJ |

## VI.   PRIVILEGE-RELATED MOTION PRACTICE

18.   No discovery disputes were more consequential than the privilege waiver disputes, which involved multiple rounds of briefing and extensive time and effort from Class counsel and Judge Francis, and which were hotly contested by Forest.  ECF Nos. 197-198, 200,

202-203, 217, 222, 232-233, 238-239, 249, 265-267, 281-283, 315, 339-340, 343, 346-348, 361, 363-364, 366-367, 370-371, 376-377, 382-384, 386, 387, 393, 394, 403-405, 684-687, 694-696, 713-714, 717-719, 721, 739, 805, 853-854, 887.

19.     From the outset, Class counsel recognized that Forest's subjective beliefs about the strength of its '703 patent and the reasons why Mylan agreed to the July 2015 entry date were central issues in this reverse payment case.  Class counsel sought document discovery regarding Forest's subjective beliefs on those issues and others.  Forest objected on grounds of privilege.

20.     Class counsel's April 12, 2017 motion to compel (ECF No. 197) argued that, by asserting certain defenses, Forest had placed its subjective beliefs at issue, effectuating an implied waiver of privilege.  On May 19, 2017, Judge Francis denied Class counsel's motion as premature (ECF No. 249), but the Court directed Forest to "disclose any subjective beliefs it will rely on in its defense of this action."  *In re Namenda Direct Purchaser Antitrust Litig.*, 2017 U.S. Dist. LEXIS 76675 (S.D.N.Y. May 19, 2017).

21.     Forest then submitted its election on June 2, 2017 (ECF No. 281-1) stating, *inter alia*, "Forest does not intend to affirmatively rely on its subjective beliefs to rebut any argument that [] its position in the patent case was weak[.]"  ECF No. 281-1, at 5.

22.     In accordance with its election, throughout discovery Forest withheld documents it claimed were privileged and instructed its witnesses at deposition not to answer questions relating to its subjective beliefs about the strength of the '703 patent and other issues it had disavowed in its election.

23.     As the September 15, 2017 close of discovery was approaching, Class counsel renewed their motion to compel, seeking 191 documents that Forest had identified on its privilege log, including documents that Forest had initially produced but "clawed back."  ECF

Nos. 265, 267, 361.  Plaintiffs asserted that Forest had waived the privilege with respect to these documents by electing to rely on its subjective views on the link between the Lexapro Amendment and the Forest-Mylan patent settlement (*i.e.*, that the former was not compensation for the latter).  *See* ECF No. 281-1, at 4, 5 (Forest elects to rely upon its subjective views concerning the Lexapro Amendment's "independence from the then-pending patent litigations and respective settlement agreements," and its belief "that the Namenda IR patent litigation settlement agreements provided the generic competitors [no] consideration beyond the express terms of each of the final agreements.").

24.     Forest opposed the renewed motion, arguing that the documents were privileged.  In a September 25, 2017 Order, Judge Francis found that Forest had waived the privilege over a series of documents because they "appear to link the Namenda settlements with the side agreements with Mylan and Orchid."  ECF No. 394.

25.     Among the documents Judge Francis ordered be produced were two versions of the "Mylan Deal Concept" document and two versions of the "Forest-Mylan Meeting February 11, 2010" presentation, important evidence supporting Class counsel's reverse payment agreement case.

26.     Class counsel's dislodging of this evidence sent Forest into an apparent tailspin.  Suddenly, Forest began to engage in self-help, seeking to *de facto* reverse its earlier election without leave of Court and after the close of discovery.  Deposed on these new documents, the very same Forest witnesses who earlier refused to answer questions about the patent litigations now volunteered under Forest counsel's questioning that Forest's position in the '703 patent litigation was "very strong."

27. Forest's sharp tactics required Class counsel to file a motion to enforce its earlier election. ECF No. 685. The Court granted the motion, explaining, "I am of the belief that Forest's understanding of the strength of its patent is highly relevant to this case; but if Forest has not answered questions or produced documents on that subject during discovery, Forest will not be permitted to offer any evidence on the point." ECF No. 684. Apparently undeterred, Forest then sought to inject a previously-unproduced document into evidence purporting to reveal Forest's chances of success in litigating the '703 patent against generic seller Dr. Reddy's, by moving to amend two of its expert reports to account for that document, which had been produced in the endpayor plaintiffs' case. ECF Nos. 694-696, 717-718, 804. Class counsel opposed. ECF Nos. 713-714, 805. The Court analogized the late-produced document to a "little grenade explod[ing]." ECF No. 719. The Court denied Forest's motion during a status conference on June 4, 2019.

28. Class counsel's persistence in seeking to require Forest to elect whether to waive privilege or not on certain topics, and in seeking production of otherwise-privileged documents pertinent to that election, led to the production of critical evidence supporting the Plaintiffs' claims. Class counsel's persistence in holding Forest to its election thwarted Forest's apparent strategy of trial by ambush.

## VII.   COLLATERAL ESTOPPEL MOTION PRACTICE

29. On February 16, 2017 Class counsel moved for offensive, nonmutual collateral estoppel with respect to certain aspects of the hard switch, in light of Judge Sweet's injunction, which the Court of Appeals had affirmed. ECF Nos. 134-137, 145-146, 157, 159-160, 169-171, 176-177, 184-185, 253. Class counsel sought collateral estoppel on, among other subjects, (1) Forest's possession of market power with respect to Namenda (an issue which Forest had not

contested on appeal); and (2) the announcement of an imminent product withdrawal as being tantamount to a hard switch.

30.     Class counsel fully recognized the challenge involved in obtaining collateral estoppel based on findings of fact made by a judge during a preliminary injunction hearing.  The Court made abundantly clear that it, too, recognized the challenge Class counsel faced.  *E.g.*, Hr'g Tr. (5/5/17) at 5:10-14 ("[O]n what conceivable basis does the Second Circuit have jurisdiction on an appeal from an order granting a preliminary injunction to enter a final judgment, to change the fundamental nature of the preceding before it?").  Yet, Class counsel demonstrated in briefs and argument that the motion fully comported with Second Circuit law, particularly because Forest itself had, in the Court of Appeals, successfully demanded that the NYAG meet a "practical finality" standard.

31.     Because of Class counsel's ingenuity, the Court precluded Forest from relitigating that it had market power with respect to Namenda and that its hard switch announcement violated Section 2 of the Sherman Act.  *See In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 4358244 (S.D.N.Y. May 23, 2017).  Taken as established, these facts promised to shorten trial and permit focus on the gravamen of Class counsel's case:  Forest's reverse payment to Mylan.

## VIII.   EXPERT DISCOVERY

32.     Plaintiffs retained nine experts in this case who collectively issued 17 reports, catalogued below:

| Plaintiff expert name | Main subject | Number of reports |
|---|---|---|
| Ernst R. Berndt, Ph.D. | Market impact from hard switch; Forest's Lexapro forecasts | 2 |
| James Bruno | Authorized generic Lexapro manufacturing costs | 2 |
| Janet K. DeLeon | Generic Namenda competitors readiness to launch earlier | 2 |
| Einer Elhauge | Earlier entry date in a no-reverse-payment settlement between Forest and Mylan | 2 |
| Nathan Herrmann, M.D. | Noninfringement of the '703 patent | 2 |
| George W. Johnston | Forest's chances of success in the '703 patent litigation | 2 |
| Russell L. Lamb, Ph.D. | Impact and damages | 2 |
| Lon S. Schneider, M.D. | Invalidity of the '703 patent | 2 |
| Jay Thomas | Hatch-Waxman Act background | 1 |

The need for nine experts illustrates the unique complexity of this case. This lawsuit stands apart as uniquely large and complicated, representing the most complex Hatch-Waxman antitrust case Class counsel have encountered in over two decades of prosecuting them. This case uniquely required Class counsel to:

    a.    master various complexities of patent law to show that Mylan would have prevailed in showing that the '703 patent was not infringed, and that the patent claims as well as the patent term extension were invalid, and in rebutting Forest's arguments to the contrary;

    b.    master the biopharmaceutical aspects of NMDA receptor antagonism;

    c.    master several challenging areas of FDA and CMS drug regulation, including:

        i.    FDA regulations regarding approval of transfers of manufacturing technology (for Lexapro) from one site to another; and

        ii.    CMS regulations governing the Medicaid rebate liability consequences of selling an authorized generic (Lexapro) in various ways;

d.      apply those areas of FDA and CMS drug regulation (and the cost savings they imply) to a forensic examination of Forest's deal valuation spreadsheets;

e.      develop economic modeling of the complicated interaction between the delay of generic Namenda entry from the reverse payments (on the one hand) and the hard switch product conversion enabled by that delay (on the other hand), which were interdependent sources of overcharges for direct purchasers; and

f.      develop a defensible multi-input economic model to determine the earlier entry date a reverse-payment-free settlement between Forest and Mylan would have borne.

33.      Each of Class counsel's experts was deposed, in some cases twice.  In all, Plaintiffs defended 11 expert depositions.

34.      Forest proffered eight experts:

| Defense expert name | Main subject |
|---|---|
| Alexandra Mooney Bonelli | The Medicaid drug rebate program in the context of the Lexapro Amendment |
| Pierre-Yves Cremieux, Ph.D. | Impact and damages |
| Martin R. Farlow, M.D. | Validity of the '703 patent |
| Lona Fowdur, Ph.D. | Absence of delay from Forest-Mylan agreement and absence of harm from hard switch |
| Philip Green | Absence of reverse payment from Lexapro Amendment |
| Roberto Malinow, M.D., Ph.D. | Infringement and validity of the '703 patent |
| Roderick McKelvie | Forest's chances of success in the '703 patent litigation |
| David L. Rosen | FDA practices and procedures concerning applications for patent term extensions |

35.      Plaintiffs took the depositions of each of Forest's eight experts, obtaining admissions needed to cross examine them at trial and limit their testimony prior to trial.

## IX.    CLASS CERTIFICATION

36.    Class certification was heavily briefed and hotly contested in this case.  ECF Nos. 400-402, 406, 409, 410, 417, 514, 523, 551, 552, 559, 561, 589-590, 599, 602, 606, 679.  The Court certified the Class.  ECF No. 570.  Forest appealed under Fed. R. Civ. P. 23(f), but review was denied.  ECF No. 600.  There were no opt out requests, attesting to the confidence that absent members of the Class placed in Class counsel to prosecute this matter to a successful conclusion.

## X.    SUMMARY JUDGMENT AND *DAUBERT* MOTIONS

37.    Class counsel faced a combined total of 219 pages of summary judgment and *Daubert* briefing over an extremely compressed period.

38.    Specifically, Forest filed a 64-page memorandum in support of its summary judgment motion.  ECF Nos. 434-436, 465-467.  Forest filed a 25-page reply.  ECF Nos. 478, 630.  Forest included a 494-paragraph statement of facts (ECF No. 466) and, including those submitted on reply, a total of 417 exhibits (ECF Nos. 467, 479, 666-668, 670, 672-676).

39.    Forest also filed six *Daubert* motions, comprising nearly 80 additional pages of briefing, plus over 50 additional pages on reply, challenging aspects of opinions from almost all of Plaintiffs' experts.  ECF Nos. 437-438 (Deleon); ECF Nos. 439-440 (Elhauge); ECF Nos. 441-442 (Berndt and Lamb); ECF Nos. 443-444 (Johnston); ECF Nos. 445-446 (Lamb); ECF Nos. 485-486 (Thomas); ECF No. 474, 623-628, 537-538 (replies). Forest's *Daubert* motions were accompanied by declarations with 51 exhibits (ECF Nos. 438, 440, 442, 444, 446, 476, 538, 678).

40.    Class counsel had just three weeks to respond to all of these motions. Class counsel responded with a 64-page memorandum in opposition to Forest's summary judgment motion (ECF Nos. 455, 498, 526) and *Daubert* opposition briefing totaling 113 pages (ECF Nos.

493-497, 508, 651-655, 637).  Class counsel also responded to Forest's 494-paragraph statement

of facts and served their own 405-paragraph affirmative statement of facts and 535 exhibits.

ECF Nos. 456, 499-502, 680.  This led to an additional round of briefing on the propriety of

Class counsel's affirmative fact statement (ECF Nos. 457-464) and multiple filings pertaining to

supplemental authority (ECF Nos. 543, 548, 555, 557, 560).

  41. In a comprehensive 99-page opinion dated August 2, 2018, the Court denied

Forest's Motion for Summary Judgment, granted Plaintiffs' motion for Class Certification, and

denied all but one of Forest's *Daubert* motions.  ECF No. 570.  Since then, the Court's opinion

has been extensively cited.

## XI. TRIAL PREPARATION

  42. Class counsel were fully prepared to try this case. After denying Forest's motion

to dismiss, the Court issued a Case Management Order that required the case to be trial ready

within one year.  ECF No. 128.  Thus, at the same time that the parties were briefing summary

judgment and *Daubert*, they were also engaged in meet-and-confers concerning the first Joint

Pre-trial Order which was submitted on January 12, 2018.  ECF Nos. 487-489.  Class counsel

also prepared their 94-page trial contentions, their trial exhibit list, and a joint list of deposition

designations, and objections to deposition designations and exhibits.  At the same time, Class

counsel submitted to chambers their proposed *voir dire*, a proposed verdict form, and a 120-page

set of proposed jury instructions.

  43. After the Court's opinion denying Forest's Motion for Summary Judgment (ECF

No. 570), the Court entered a scheduling order setting a trial date and requiring the parties to

submit a revised Joint Pre-trial Order.  ECF No. 688.  The parties prepared and submitted a

revised pretrial order on April 30, 2019.  ECF No. 699.

44.     Class counsel prepared their live witness examinations, both directs and crosses for Plaintiffs' case in chief, and cross examinations for Forest's case in chief, both for Phase 1 and for Phase 2.

45.     Class counsel filed 16 motions *in limine* comprising over 80 pages of briefing, and opposed Forest's 16 motions *in limine*, which comprised 110 pages of briefing.  ECF Nos. 721-736, 737-801, 811-854.  The Court ruled on August 2, 2019.  ECF No. 859.  Although Class counsel lost their bid to exclude Forest's evidence that threatened to reduce the magnitude of its reverse payment to Mylan, Class counsel largely prevailed in motions *in limine*, securing rulings, *inter alia*, that:

> a.     Class counsel's experts could testify about statistical outcomes in Hatch-Waxman patent litigation;

> b.     The rule of reason framework did not apply to the Lexapro Amendment;

> c.     Post-Lexapro Amendment sales history was relevant and admissible to impeach Forest's Lexapro forecasts;

> d.     Forest could not justify its reverse payment by pointing to the avoided risk of competition.

46.     The Court then set a final pre-trial conference.  ECF Nos. 863, 868.  The final pre-trial conference resolved numerous issues and questions regarding the admissibility of exhibits.  ECF Nos. 886, 891.  It also gave rise to additional briefing on the issue of how the "largeness" of a reverse payment is measured under *Actavis*, and the extent to which patent infringement and invalidity evidence should be offered at trial.  ECF Nos. 895, 897, 899, 907.

47.     Ultimately, the parties reached agreement on a settlement in principle hours before jury selection was set to start on October 28, 2019.

## XII.   MEDIATION AND SETTLEMENT

48.     In March 2017, Class counsel and Forest engaged in direct discussions to attempt an early resolution of this case.

49.     The parties next engaged in settlement discussions in the Fall of 2018, retaining Jonathan Marks, one of the nation's preeminent mediators. The parties engaged in multiple individual sessions over the course of several months, which led to a March 2019 joint session at the offices of White & Case LLP in Manhattan.

50.     As part of that process, Class counsel provided Mr. Marks with voluminous submissions drafted specifically for the mediation. The final mediation session in March 2019 lasted a full day, but the parties could not reach a resolution.

51.     Starting in September 2019, the parties engaged in additional mediation efforts before retired United States District Court Judge Faith S. Hochberg, a highly distinguished mediator and jurist.  Judge Hochberg brought with her a wealth of experience assessing the risks of trial, including in patent and antitrust cases, including direct purchaser Hatch-Waxman antitrust cases such as *In re Remeron Antitrust Litigation* and *In re Neurontin Antitrust Litigation*, both of which involved Class counsel and the latter of which involved Forest's trial counsel.

52.     The mediation before Judge Hochberg included multiple individual sessions and another full-day joint session, and laid the groundwork for the parties' ultimate settlement, reached with the assistance of the Court's staff the night before a jury was to be selected.

## XIII.  THE SETTLEMENT

53.     On December 24, 2019, Class counsel filed a fully-executed settlement agreement with the Court.  ECF No. 919-1.  The Settlement provides for the payment by Forest of $750 million into an interest-bearing escrow account for the benefit of all Class members.

16

54.     In their Motion for Preliminary Approval (ECF No. 917), Class counsel requested that the Court preliminarily approve the settlement, approve notice to the Class, and set a schedule leading up to and including a Fairness Hearing.  In preparation for filing that motion, Class counsel entered into an escrow agreement with a proposed escrow agent for maintenance of the settlement fund and engaged a proposed claims administrator to assist with the notice process.  Class counsel's request for preliminary approval was also posted on the GGF and Berger Montague PC websites.

55.     On January 6, 2020, the Court concluded that that the settlement between the Class and Forest was arrived at by arms-length negotiations by highly experienced counsel after years of litigation and fell within the range of possibly approvable settlements, and preliminarily approved it.  ECF No. 920.  Concurrently, the Court appointed an escrow agent and claims administrator, approved a form of notice to the class and set a schedule. *Id.*

56.     Thereafter, Forest deposited the settlement fund into an escrow account that is earning interest for the benefit of the Class, and the claims administrator duly mailed the written notice to class members on February 12, 2020.

57.     Class members have until March 30, 2020 to object to the settlement or any of its terms and/or to Class counsel's request for attorneys' fees, unreimbursed expenses and an incentive awards to the class representatives.  As of the date of this Declaration, no objections have been received.  If any objections are received between the date of this Declaration and March 30, 2020, the Court will promptly be notified, and such objections will be addressed in Plaintiffs' upcoming submission for final approval of the settlement, due on April 21, 2020.

## XIV.  SUMMARY OF ATTORNEYS' FEES AND UNREIMBURSED EXPENSES

58.     Class counsel are highly-skilled and nationally-respected law firms and have over two decades of extensive experience prosecuting and trying pharmaceutical antitrust cases

(including cases challenging reverse-payment settlements of patent litigation) on behalf of the same core class of direct purchasers.

59.     At all junctures of this litigation, Class counsel faced substantial risk.  A number of previous reverse-payment cases have been dismissed after significant outlays of time and expenses by Class counsel because of intervening judicial decisions.

60.     For instance, in 2010, over the Honorable Rosemary S. Pooler's dissent, the Second Circuit, *en banc*, affirmed a district court's grant of summary judgment in favor of defendants in a case alleging a $400 million cash reverse payment concerning the drug Cipro, because of the then-emerging "scope-of-the-patent" test.  *See Ark. Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98 (2d Cir.), *reh'g denied*, 625 F.3d 779 (2d Cir. 2010).  Three years later, after denying *certiorari* in *Cipro*, the Supreme Court issued its opinion in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), enabling a later-filing group of Cipro indirect purchasers to reach settlements in California state court worth hundreds of millions of dollars.  *See In re Cipro Cases I & II*, 348 P.3d 845 (Cal. 2015), *on remand*, 2018 Cal. App. Unpub. LEXIS 3258, at *3 (Cal. Ct. App. May 14, 2018) (settlement described).  The Cipro direct purchasers made no recovery despite the expenditure of significant time and money by Class counsel.

61.     Even after *Actavis* was decided, dismissals of other cases at the Rule 12 and Rule 56 stages quickly revealed that *Actavis* was no panacea for the risk these cases present.  *See In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734 (E.D. Pa. 2015) (summary judgment in reverse payment case); *In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015) (pre-answer dismissal in reverse payment case); *In re Effexor XR Antitrust Litig.*, 2014 WL 4988410 (D.N.J. Oct. 6, 2014) (same); *In re Lipitor Antitrust Litig.*, 46 F. Supp. 3d 523 (D.N.J. 2014) (same); *In re Loestrin 24 Fe Antitrust Litig.*, 45 F. Supp. 3d 180 (D.R.I. 2014)

(same); *In re Lamictal Direct Purchaser Antitrust Litig.*, 18 F. Supp. 3d 560 (D.N.J. 2014)

(same).  *See also Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421 (3d Cir.

2016) (affirming summary disposition of product hop case).  Some of these dismissals were

affirmed in whole or part, while others were reversed.

62.     Getting to a jury was no guarantee of success in these cases, either.  *E.g.*, *In re

Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 39 (1st Cir. 2016) (upholding jury verdict

"that although the plaintiffs had proved an antitrust violation in the form of a large and

unjustified reverse payment from AstraZeneca to Ranbaxy, the plaintiffs had not shown that they

had suffered an antitrust injury that entitled them to damages").  *See also La. Wholesale Drug

Co. v. Sanofi-Aventis*, 2009 U.S. Dist. LEXIS 77206, at *3 (S.D.N.Y. Aug. 28, 2009) (jury

concluded that defendant's petitioning of FDA was not "objectively baseless").

63.     The Court directly referenced the risk assumed by Class counsel in this case.  The

Court expressly observed in its motion to dismiss opinion that  "viewed in isolation, the

settlement terms do not appear anticompetitive," and warned Class counsel that "[t]o survive a

motion for summary judgment, Plaintiffs will have to substantiate these allegations with

evidence suggesting that the settlement agreements did, in fact, delay generic entry and that the

delay had the effect of allowing Forest to complete the hard switch."  ECF No. 106 at 31-32.

64.     Thus, Class counsel were acutely aware not only of the inherent risks that come

with prosecuting a complex antitrust case and bringing it towards trial, but also of the additional

risks of litigating such a case in an area of law that is newly developing subsequent to the

issuance of a landmark Supreme Court decision such as *Actavis*.

65.     Plaintiffs' claims could have been dismissed in their entirety at any time,

particularly in view of the rapidly-evolving law, which forced Class counsel to continuously

refine their case theories and strategies.  And, absent the settlement with Forest, if a jury had found in favor of Forest at trial, Class counsel's lengthy and protracted efforts, undertaken at great time and expense on behalf of the Class, would have been for naught.  Even if successful before a jury, appellate and Supreme Court risks would remain.

66.     Despite the risks outlined above, Class counsel diligently prosecuted this case for almost five years.  In doing so, Class counsel: (a) reviewed a voluminous amount of documents; (b) successfully defeated Forest's motions to dismiss and for summary judgment; (c) obtained collateral estoppel as to two factual issues; (d) took or defended 46 depositions (took 25 fact depositions and eight expert depositions; defended two fact depositions and 11 expert depositions); (e) consulted with and retained nine experts; (f) briefed and argued extensive discovery motions pertaining to numerous topics, most significantly, on issues pertaining to privilege; (g) obtained class certification, and survived interlocutory review; (h) prepared the case for trial including all fact witness, expert witness, and exhibit work; (i) briefed 32 motions *in limine*, prevailing on several important ones; and (j) engaged in protracted negotiations concerning the execution of a settlement agreement that embodied the parties' agreement in principle.

67.     Litigating this case has involved significant effort on Class counsel's part, both in terms of time and resources spent.  Class counsel had to constantly formulate and refine their theories of liability, causation and damages both in response to legal developments and in anticipation of arguments that Forest was likely to raise — and often did raise — throughout the stages of the litigation.

68.     Forest has been represented by some of the country's leading law firms who have vigorously defended Forest against Plaintiffs' claims at all junctures.

69.     Class counsel believe that the settlement with the Defendants represents an

outstanding outcome for the Class, on a risk-adjusted basis and otherwise.

70.     The following chart summarizes the aggregate time and necessary and incidental

expenses of all Class counsel, as set forth in more detail in the separate firm declarations of Class

counsel, appended here as Exhibits A-F:

| Ex. | Firm Name | Hours | Lodestar | Expenses (Litigation Fund Contributions and Otherwise) |
|---|---|---|---|---|
| A | Berger & Montague, P.C. | 12,470.80 | $ 7,391,532.60 | $ 1,091.301.87 |
| B | Faruqi & Faruqi LLP | 9,699.50 | 6,708,490.00 | 873,203.86 |
| C | Garwin Gerstein & Fisher LLP | 9,268.15 | 7,943,403.75 | 1,020,625.89 |
| D | Heim Payne & Chorush LLP | 4,243.80 | 2,789,083.25 | 951,166.79 |
| E | Odom & Des Roches | 10,135.60 | 6,205,356.25 | 940,397.65 |
| F | Smith Segura & Raphael LLP | 6,294.80 | 3,731,142.50 | 947,232.85 |
|  | TOTALS | 52,112.65 | $ 34,769,008.35 | $ 5,823,928.91 |

71.     The expenses paid from the litigation fund were as follows:

| LITIGATION FUND DISBURSEMENTS | |
|---|---|
| Expense Category | Amount |
| Bank charges for litigation fund itself | $ 204.85 |
| Claims/notice administration | 9,079.90 |
| Deposition transcripts | 117,777.47 |
| Drug sales data | 41,963.41 |
| Expert witnesses | 4,171,257.92 |
| Litigation support document database/processing | 343,051.43 |
| Private mediation services | 40,992.00 |
| Subpoena/summons service | 5,924.00 |
| Transcripts of in-court hearings | 781.19 |
| Trial technology vendors | 148,162.39 |
| TOTAL | $ 4,879,194.56 |

72.     The other expenses of each firm, combined, were as follows:

| FIRM DISBURSEMENTS FOR LITIGATION EXPENSES | |
|---|---|
| Expense Category | Amount |
| Experts | $ 186,642.47 |
| Court reporter | 725.00 |
| Document database | 96,406.73 |
| Filing fees/court costs | 5,339.62 |
| Postage/air express/messengers | 12,493.60 |

| FIRM DISBURSEMENTS FOR LITIGATION EXPENSES | |
|---|---|
| **Expense Category** | **Amount** |
| Process server and subpoena expenses | 20,620.50 |
| Reproduction costs | 94,872.24 |
| Research and datasets | 119,554.73 |
| Telephone/teleconference/facsimile | 7,620.69 |
| Travel/hotel/meals | 359,742.82 |
| Trial expenses (furniture and equipment) | 16,859.85 |
| Miscellaneous | 3,628.13 |
| TOTAL | $ 924,506.38 |

73.     There is currently a balance in the litigation fund in the amount of $20,227.97.

74.     Detailed time records and expense vouchers/receipts are available to the Court *in camera* should the Court wish to examine them.

## XV.     THE EFFORTS OF THE CLASS REPRESENTATIVES ON BEHALF OF THE CLASS

75.     The two class representatives — Smith and RDC — both made a significant contribution in prosecuting Plaintiffs' claims against Defendants for the benefit of all class members.  The class representatives each actively protected the Class's interests by filing the suit on behalf of the Class and undertaking all the responsibilities involved in being a named plaintiff, including monitoring the progress of the case, and responding to discovery requests.

76.     Discovery was a significant burden to the class representatives in this case. Specifically, in accordance with the ESI order, each class representative executed broad document searches and collections, based on keywords negotiated with Defendants, and the resulting document productions comprised over 50,000 pages and 130,000 lines of purchase and chargeback data.

77.     Forest moved to compel more discovery from the class representatives.  ECF Nos. 245-247, 254, 257, 276, 281.  RDC's adequacy was challenged multiple times.  ECF Nos. 640-641, 763-764.

78.     Each of the class representatives also searched for and collected up to 9 years of transactional data reflecting invoice-level purchases and chargebacks.

79.     These discovery efforts required that employees of the class representatives take time away from their regular job functions in order to comply.

80.     Each of the class representatives was also deposed. One was fully prepared to testify on the first day of Plaintiffs' case at trial, and both were fully prepared to monitor the proceedings through verdict.  Smith Drug's witness had to leave a family wedding to be prepared for his trial testimony.

81.     The class representatives were required to expend time and effort that was not compensated over the several years that Class counsel pressed Plaintiffs' claims against Forest.

82.     In recognition of its time and effort expended for the benefit of the Class, Class counsel request an incentive award of $150,000.00 for each of the class representatives.


I, Bruce E. Gerstein, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the above is true and correct.

Dated: March 13, 2020

                    /s/ Bruce E. Gerstein
                    BRUCE E. GERSTEIN