**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/27/20

| | |
|---|---|
| In re Namenda Direct Purchaser Antitrust Litigation | No. 15 Civ. 7488 (CM) |

## OPINION AND ORDER APPROVING THE SETTLEMENT

McMahon, C.J.:

Class counsel representing Direct Purchaser Class Plaintiffs J M Smith Corp. (d/b/a Smith Drug Co.) ("Smith Drug"), Rochester Drug Co-Operative, Inc. ("RDC"), and the direct purchaser class (collectively, "Plaintiffs") reached an agreement in principle with Defendant Forest to settle this matter for $750 million, the largest ever settlement of an antitrust case alleging suppressed generic competition against a single defendant under Section 4 of the Clayton Act. The parties filed the signed settlement agreement with the Court on December 24, 2019, *see* ECF No. 919-1 ("Settlement Agreement" or "Settlement"), and the Court granted preliminary approval on January 6, 2020. (ECF No. 920 ("Preliminary Approval Order").)

This Court now finds that the $750 million settlement is plainly fair, adequate and reasonable, and therefore merits final approval under Rule 23(e)(2) and under the *"Grinnell* factors," derived from *City of Detroit v. Grinnell Corp.*, 495 F. 2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F. 3d 43 (2d Cir. 2000), which courts in the Second Circuit use in tandem with Rule 23 to determine whether a class settlement warrants final approval.

This Court therefore enters the accompanying Order Granting Final Judgment and Order

of Dismissal Approving Direct Purchaser Class Settlement and Dismissing Direct Purchaser Class Claims which, *inter alia*: (a) grants final approval to the Settlement pursuant to Federal Rule of Civil Procedure 23(e); (b) approves the Plan of Allocation (ECF No. 919-2), which provides a fair and reasonable method of determining each Class member's allocated share of the Settlement based upon each Class member's actual purchases of brand and/or generic Namenda IR and brand Namenda XR; and (c) dismisses all claims against Forest. The order reflects the resolution of the Humana submission and the selection of Rust Consulting, Inc., as the settlement administrator. (*See* ECF No. 919-1.)

As discussed at the final approval hearing, this Court will address Class Counsel's requests for (i) $150,000 each for Class representatives Smith Drug and RDC; (ii) $5,823,928.91 in expenses, and (iii) attorneys' fees in the amount of $157,500,000, *i.e.*, 21% of the gross settlement amount (plus interest) in a separate order.

## BACKGROUND

The parties are familiar with the full procedural history of this case, set forth in detail in the Declaration of Bruce E. Gerstein in Support of Class counsel's Motion for Attorney Fees, Reimbursement of Expenses and Incentive Awards for the Named Plaintiffs (ECF No. 927), which is incorporated herein ("First Gerstein Decl.").

To summarize, the Direct Purchaser Class counsel began investigating this case in 2014 and brought it all the way to the eve of trial, when Class counsel reached an agreement in principle with Forest to settle this matter for $750 million, the largest ever settlement of an antitrust case alleging suppressed generic competition against a single defendant under Section 4 of the Clayton Act. The parties submitted the signed settlement agreement to the Court on December 24, 2019, *see* ECF No. 919-1 ("Settlement Agreement" or "Settlement"), and the Court granted preliminary approval on January 6, 2020. ECF No. 920 ("Preliminary Approval

Order"). Pursuant to the Preliminary Approval Order, notice of the Settlement was sent to all Class members by First Class mail on February 12, 2020. *See* Affidavit of Claims Administrator Concerning Provision of Settlement Notice to Class Members filed herewith ("Administrator Decl."), at ¶ 3.

On December 24, 2019, Class counsel filed a fully executed version of the Settlement Agreement with the Court (ECF No. 919-1), and a Motion for Preliminary Approval (ECF No. 917) requesting that the Court preliminarily approve the Settlement, approve the form and manner of notice to the Class, and set a schedule leading up to and including a Fairness Hearing.

On January 6, 2020, this Court concluded that the Settlement between the Class and Forest was arrived at by arm's-length negotiations by highly experienced counsel after years of litigation and fell within the range of possibly approvable settlements, and preliminarily approved it. (ECF No. 920, at ¶ 6.) Concurrently, the Court appointed an escrow agent and claims administrator, approved the form and manner of notice to the Class, and set a schedule. (*Id.* at ¶¶ 7-18.) Thereafter, Forest deposited the settlement fund into an escrow account that is earning interest for the benefit of the Class. (ECF No. 927 at ¶ 56.)

The claims administrator sent Notice of Settlement to all Class members via direct mailing on February 12, 2020. The notice detailed, *inter alia*: (a) the terms of the Settlement and proposed plan of allocation; (b) that Class counsel intended to seek attorneys' fees of up to 33⅓% of the Settlement fund, reimbursement of expenses, and incentive awards of $150,000 for each representative plaintiff and would file their motion for fees, expenses and incentive awards by March 13, 2020; (c) the procedures and deadline for objecting to the settlement and/or Class counsel's motion for attorneys' fees, expenses and incentive awards; and (d) the location, date and time of the Court's final fairness hearing on May 27, 2020. The notice also explained that copies of the Settlement, the motion for fees (when filed), and other important documents would

be posted publicly on the websites of Class counsel. (*See* Administrator Decl. & Ex. 1 (copy of mailed notice).)

No objections to the Settlement were filed by the March 30, 2020 deadline set by the Court, and none has been received since. (*See* Administrator Decl. at ¶ 7.)

## DISCUSSION

### I. LEGAL STANDARD

"The compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005); *see also In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 174 (S.D.N.Y. 2014)

Federal Rule of Civil Procedure 23(e)(2) provides that a court may approve a class action settlement if "it is fair, reasonable, and adequate. Rule 23, as amended in December 2018, enumerates four factors for the Court to consider as part of this inquiry. The Court should consider whether:

(A)  the class representatives and class counsel have adequately represented the class;

(B)  the proposal was negotiated at arm's length;

(C)  the relief provided for the class is adequate, taking into account:

   (i) the costs, risks, and delay of trial and appeal;

   (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;

   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

   (iv) any agreement required to be identified under Rule 23(e)(3); and

(D)  the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Courts within the Second Circuit also analyze the *Grinnell* factors listed below to determine whether a settlement is substantively fair and thus warrants final approval:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F. 2d at 463.

"The factors set forth in Rule 23(e)(2) have been applied in tandem with the Second Circuit's *Grinnell* factors and 'focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'" *Christine Asia Co. v. Jack Yun Ma*, 2019 U.S. Dist. LEXIS 179836, at *37 (S.D.N.Y. Oct. 16, 2019).

## II. THE SETTLEMENT IS APPROVED.

### 1. The Settlement is Procedurally Fair

Rules 23(e)(2)(A)-(B) "'constitute the procedural analysis' of the fairness inquiry." *Id.* at *38 (quoting *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019)). "A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations, and great weight is accorded to counsel's recommendation." *Guevoura Fund Ltd. v. Sillerman*, 2019 U.S.

Dist. LEXIS 218116, at *16 (S.D.N.Y. Dec. 18, 2019) (citations omitted). The presumption of fairness and adequacy applies here.

Class counsel prosecuted this complicated antitrust case for over four and a half years, first attempting to resolve the case in March 2017, via direct communications. ECF No. 927 at ¶ 48. In the Fall of 2018, the parties engaged Jonathan Marks, one of the preeminent mediators in the nation. That mediation, which continued into March of 2019, included the exchange of lengthy mediation statements and multiple individual sessions, as well as one joint session with Mr. Marks. *Id.* at ¶¶ 49-50. Starting in September 2019, the parties engaged in additional mediation efforts before retired United States District Judge Faith Hochberg, including additional written submissions and an in-person session. *Id.* at ¶ 51. The mediation before Judge Hochberg included another full day session and laid the groundwork for settlement. *Id.* at ¶ 52. The parties finally reached a settlement in principle with the able assistance of the Court's staff, on October 27, 2019, the night before the first day of trial. ECF No. 927 at ¶ 47. That agreement was the culmination of years of negotiations. *Id.*

Accordingly, the requirements of Rules 23(e)(2) (A)-(B) are met.

### 2. The Settlement is Substantively Fair

#### a) The First *Grinnell* Factor – the Complexity, Expense and Likely Duration of the Litigation – Favors Final Approval of the Settlement

The first *Grinnell* factor evaluates whether the continuation of the litigation would be complex, expensive, and lengthy. This case, had it not settled, would have been all three. *See, e.g., Jermyn v. Best Buy Stores, L.P.*, 2012 U.S. Dist. LEXIS 90289, at *13-14 (S.D.N.Y. June 27, 2012) (McMahon, J.) (recognizing the complexity of a potential trial with 25 fact witnesses, additional expert witness, and hundreds of exhibits). In general, antitrust trials require the expenditure of significant time and resources by both the parties and the court, and

this case would have been no exception. This case was scheduled to be tried in two phases, with Phase 1 covering Sherman Act Section 1 "pay-for-delay" liability and causation issues, and Phase 2 covering Section 2 "hard-switch" causation, and quantum of damages issues for both Section 1 and 2. For Phase 1 alone, the parties projected calling 23 fact and expert witnesses, some of whom would be on the witness stand for lengthy amounts of time. Forest raised numerous defenses that Plaintiffs would have needed to overcome in order to prevail in Phases 1 and 2 of this jury trial.

Moreover, whichever side lost at trial surely would have appealed (most likely after filing extensive post-trial motions). Given the size and complexity of the case, this process would likely would have included a petition for *certiorari* as well. Such continued litigation would have required further time and resources with no certainty of a favorable outcome. *Fleisher v. Phoenix Life Ins. Co.*, 2015 U.S. Dist. LEXIS 121574, at *22 (S.D.N.Y. Sep. 9, 2015) (McMahon, J.) ("Even if the Class could recover a judgment at trial and survive any decertification challenges, post-verdict and appellate litigation would likely have lasted for years.") (citations omitted). By contrast, the Settlement provides the Class with immediate, substantial and definite relief without the delay, risk, and uncertainty of trial and continued litigation.

Accordingly, analysis of the first *Grinnell* factor strongly supports approval of the Settlement.

    **b)**  **The Second *Grinnell* Factor – the Reaction of the Class to the Settlement – Favors Approval of the Settlement.**

As set forth above, there are no objections to final approval of the Settlement, and eight Class members submitted letters affirmatively supporting it. (*See* Gerstein Fairness Decl. Exs. G-N.) Humana merely sought clarification that the release in the Settlement did not cover its claims

related to indirect purchases of brand or generic Namenda IR and Namenda XR. (ECF No. 930.) That issue was resolved pursuant to a Court-ordered stipulation. (*See* ECF No. 938.)

The National Wholesalers did not object to the $750 million settlement, only to the attorneys' fee sought by Class counsel.

Accordingly, analysis of the second *Grinnell* factor strongly supports approval of the Settlement.

### c) The Third *Grinnell* Factor – the Stage of the Proceedings and the Amount of Discovery Completed – Favors Approval of the Settlement

The third *Grinnell* factor considers the amount of discovery completed, with a "focus[] on whether the plaintiffs obtained sufficient information through discovery to properly evaluate their case and to assess the adequacy of any settlement proposal." *Fleisher*, 2015 U.S. Dist. LEXIS 121574, at *26 (internal quotation omitted). Here all fact and expert discovery was completed, and this case was on the eve of trial. Thus, the parties' "knowledge of the strength and weakness of their claims was more than the norm" in class action litigation. *In re Veeco Instruments Sec. Litig.*, 2007 U.S. Dist. LEXIS 85629, at *23 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.). Class counsel demonstrated their familiarity with the strengths and weaknesses of Plaintiffs' claims and Forest's defenses while negotiating the Settlement.

Accordingly, analysis of the third *Grinnell* factor strongly supports approval of the Settlement.

### d) The Fourth *Grinnell* Factor – The Risk of Establishing Liability – Favors Approval of the Settlement

In assessing the risks of liability, a court need not decide the merits of the case, resolve unsettled legal questions, or attempt to predict the outcome. *See Fleisher*, 2015 U.S. Dist. LEXIS 121574, at *29. Rather, a court "need only assess the risks of litigation against the

certainty of recovery under the proposed settlement." *Id.* (internal quotation omitted). Regardless of the perceived strength of a plaintiff's case, liability is "no sure thing," and "[l]itigation inherently involves risks." *Wal–Mart Stores,* 396 F.3d at 118. "Indeed, the primary purpose of settlement is to avoid the uncertainty of a trial on the merits." *Tiro v. Pub. House Invs., LLC,* 2013 U.S. Dist. LEXIS 129258, at *25 (S.D.N.Y. Sep. 10, 2013) (quoting *Matheson v. T-Bone Rest. LLC,* 2011 U.S. Dist. LEXIS 143773, at *14 (S.D.N.Y. Dec. 13, 2011)).

Plaintiffs faced several substantial obstacles to recovery had they decided to proceed to trial, including the possibility that they would fail to prove Forest's liability, causation and damages on the reverse payment claim, and the chance that they would not be able to prove classwide injury and damages on the product switch claim. Forest could have persuaded the jury, for example, that it made no reverse payment to Mylan because its Lexapro forecasts were reasonable and Forest would have made more money under the Lexapro Amendment than under its prior deal with Mylan. Forest could have persuaded the jury that it made no reverse payment to Mylan because Forest's forecasted Medicaid rebate savings would offset its payments to Mylan. Forest could have persuaded the jury that even if it did make a reverse payment to Mylan, the payment was not sufficiently large, or sufficiently in excess of saved litigation costs, to cause substantial delay. Forest could have persuaded the jury that the '703 patent was not weak, or that the entry date in the Forest-Mylan settlement fairly represented the strength of the '703 patent. Forest could have persuaded the jury that no generic could have entered the market earlier regardless of the reverse payment deal with Mylan. Plaintiffs thus faced myriad risks in prevailing on the reverse payment claim.

On the hard switch product hop, Forest could have persuaded the jury that the conversion from Namenda IR to XR would have been no different absent the hard switch conduct — that

patients and doctors liked Namenda XR, and freely switched between XR and IR and back again — which would have led to a defense verdict on the product hop claim.

Accordingly, analysis of the fourth *Grinnell* factor strongly supports approval of the Settlement.

### e) The Fifth *Grinnell* Factor – The Risk of Establishing Damages – Favors Approval of the Settlement

Akin to the fourth *Grinnell* factor, this factor focuses on the risks of establishing damages. Even assuming that Plaintiffs prevailed on liability, the existence and amount of damages would have been hotly contested at trial. *See, e.g. Fleisher*, 2015 U.S. Dist. LEXIS 121574, at *31 ("Even if Plaintiffs won the liability phase, Plaintiffs also faced risks in establishing damages during the separate damages phase of trial.").

As concerns the Section 1 "pay-for-delay" case, Forest disputed the ability of generics to enter the market earlier from regulatory and manufacturing points of view. Similarly, damages for the Section 2 product switch claim presented serious issues in light of Forest's argument that the prior injunction issued by Judge Sweet had cured any harm from the announced withdrawal of Namenda IR.

At trial, Plaintiffs intended to rely on Russell Lamb, Ph.D., for an analysis of damages, and Forest planned to challenge Dr. Lamb's opinions with the testimony of their expert economists, Lona Fowdur, Ph.D., and Pierre-Yves Cremieux, Ph.D. The jury's reaction to this testimony was uncertain. *See, e.g., Veeco*, 2007 U.S. Dist. LEXIS 85629, at *30 ("It is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable [conduct.]") (quotation omitted). There are numerous examples of antitrust plaintiffs receiving little or no damages (or having damages sharply reduced) despite extensive litigation and despite prevailing on liability.

*See, e.g., United States Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) ("the jury chose to award plaintiffs only nominal damages, concluding that the USFL had suffered only $1.00 in damages"), *aff'd.*, 842 F.2d 1335 (2d Cir. 1988); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1166-67 (7th Cir. 1983) (antitrust judgment for $1.8 billion was remanded for new trial on damages, which were reduced to $111 million (*See* H.R. Rep. No. 102-850 at 42 n. 234)); *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973), *vacated*, 417 U.S. 156 (1974) (after two trips to the Second Circuit and one to the Supreme Court, plaintiff and the putative class recovered nothing).

Accordingly, analysis of the fifth *Grinnell* factor strongly supports approval of the Settlement.

### f) The Sixth *Grinnell* Factor – The Risks of Maintaining the Class Action Through Trial – Is Neutral

There was little, if any, material risk of maintaining the class action throughout trial, although "the risk of maintaining a class through trial is present in any class action." *Guippone v. BH S&B Holdings LLC*, 2016 U.S. Dist. LEXIS 134899, at *19 (S.D.N.Y. Sep. 23, 2016). Forest could have appealed class certification, among other issues, had Plaintiffs won at trial, though the appeal risk is slight. Any hope Forest would have had on appeal was dampened by the fact that Forest's 23(f) petition seeking interlocutory relief from the class certification order was denied. (ECF No. 600.)

On balance, the sixth *Grinnell* factor is neutral.

### g) The Seventh *Grinnell* Factor – the Ability of the Defendant to Withstand a Greater Judgment – Is Neutral

The seventh *Grinnell* factor inquires whether the defendant is able to withstand a greater judgment. This factor is typically relevant only when a settlement is less than what it might otherwise be but for the fact that the defendant's financial circumstances do not permit a greater

settlement. When that situation is not present, courts generally do not give much consideration to this factor, and "this factor, standing alone, does not suggest that the settlement is unfair." *Fleisher*, 2015 U.S. Dist. LEXIS 121574, at *33 (internal quotation omitted). Here, Plaintiffs do not contend that Forest could not withstand a greater judgment. This factor, therefore, drops out.

### h) The Eighth and Ninth *Grinnell* Factors – the Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation – Favor Approval of the Settlement

Typically, courts evaluate the final two *Grinnell* factors together. *Guevoura*, 2019 U.S. Dist. LEXIS 218116, at *28 n.1. Determining "whether a settlement amount is reasonable does not involve the use of a mathematical equation yielding a particularized sum." *Fleisher*, 2015 U.S. Dist. LEXIS 121574 at *34 (internal quotation omitted). Settlement should be in a "'range of reasonableness … recogniz[ing] the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Guippone*, 2016 U.S. Dist. LEXIS 134899, at *20-21 (quoting *Henry v. Little Mint, Inc.*, 2014 U.S. Dist. LEXIS 72574, at *25 (S.D.N.Y. May 23, 2014)). As the Second Circuit held in *Grinnell*, "'[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*, 2019 U.S. Dist. LEXIS 217583, at *230 (E.D.N.Y. Dec. 16, 2019) (quoting *Grinnell*, 495 F. 2d at 455).

The payout here is the largest amount ever paid by a single defendant in a Hatch-Waxman antitrust lawsuit alleging impaired generic competition. Dr. Lamb calculated total damages suffered by proposed Class members as approximately (1) between $5.73 billion and $6.93 billion assuming the jury found Forest liable for damages for the alleged reverse

payment and accounting for the effects of the hard switch product hop; (2) between $3.52 billion and $4.16 billion if the jury found Forest liable for damages only from the alleged reverse payment; and (3) between $659 million and $814 million if the jury found Forest liable for damages only for the hard switch product hop. The range of potential damages was wide – from $659 million to $6.93 billion – and depended on precisely what the jury would find. Given the complexity and risk, the $750 million cash settlement represents an outstanding recovery. *See* Jeff Overley, *Allergan's $750M Deal Among Pharma's Top Antitrust Payouts*, Law360 (Oct. 29, 2019) ("among the most eye-popping sums ever shelled out by a drugmaker for allegedly thwarting generic competition"); *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2007 U.S. Dist. LEXIS 9450, at *33 (S.D.N.Y. Jan. 31, 2007) (approving $40.3 million settlement with a recovery of approximately 6.25% of estimated damages ); *In re Gilat Satellite Networks, Ltd.*, 2007 U.S. Dist. LEXIS 68964, at *36 (E.D.N.Y. Sep. 18, 2007); (approving $20 million settlement representing 10.6% of maximum damages); *In re Omnivision Techs., Inc. Sec. Litig.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ($13.75 million settlement yielding 6% of potential damages after deducting fees and costs). Accordingly, analysis of the eighth and ninth *Grinnell* factors strongly supports approval of the Settlement.

The court has no idea what maximum damages really might be. The settlement is quite large. It is, on its face, reasonable.

### j) The Settlement Treats Class Members Equitably Relative to Each Other (Rule 23(e)(2)(D))

As detailed in Part III.C. below, the Plan of Allocation and Distribution (ECF No. 919-2) allocates funds among Class members on a *pro rata* basis, which courts uniformly approve as equitable. The Settlement therefore meets the requirements of Rule 23(e)(2)(D).

## III. THE PLAN OF ALLOCATION IS APPROVED.

The Court hereby approves the proposed Plan of Allocation, which, like many similar plans in analogous cases, would allocate the net settlement fund to Class members who submit claims on a *pro rata* basis efficiently and fairly. Approval of a plan of distribution for a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole, *i.e.*, the distribution plan must be fair, reasonable and adequate. *Hart v. RCI Hosp. Holdings*, 2015 U.S. Dist. LEXIS 126934, at *33-34 (S.D.N.Y. Sep. 22, 2015). "'[A]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent Class counsel.'" *Id.* at *34 (quoting *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002)).

Here, the proposed Plan of Allocation meets this standard. As set forth in the Direct Purchaser Class Plaintiffs' [Proposed] Plan of Allocation for the Direct Purchaser Class and accompanying Declaration Related to Proposed Settlement Allocation Plan by Dr. Russell L. Lamb (ECF Nos. 919-2, 919-3), the proceeds of the proposed Settlement in this case, net of Court-approved attorneys' fees, incentive awards for named Plaintiffs, and costs and expenses ("Net Settlement Fund"), will be paid to Class members who submit timely and valid claims based on each Class member's *pro rata* share of the Class' total purchases of brand and/or generic Namenda IR and brand Namenda XR. Brand purchases will be weighted more than generic purchases because claimed overcharges on brand units were

substantially higher than claimed overcharges on generic units. (*See* ECF No. 919-3 at ¶¶ 5-7.) This plan is similar to plans that have previously been approved by courts in analogous cases and implemented with a high degree of success and efficiency and should be approved here as well. *E.g.*, *In re OxyContin Antitrust Litig.*, No.04 md 1603 (S.D.N.Y.) (Stein, J.) (Jan. 25, 2011); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05 Civ. 2237 (S.D.N.Y.) (Seibel, J.) (Nov. 28, 2011); *In re Buspirone Antitrust Litig.*, MDL Docket No. 1413 (S.D.N.Y.) (Koeltl, J.) (April 7, 2003); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 1:14-md-02503-DJC, ECF Nos. 1163, 1179 (D. Mass.) (*pro rata* shares of settlement fund computed on basis of claimants' brand and generic purchases); *In re Lidoderm Antitrust Litig.*, 3:14-md-02521-WHO, ECF Nos. 1004-5, 1004-6, 1054 (N.D. Cal.) (*pro rata* shares of settlement fund computed on basis of claimants' brand and generic purchases).

The allocation will reflect the amount of relative damage sustained by each Class member. The Plan of Allocation will allocate the Net Settlement Fund to Class members efficiently and fairly by relying upon the electronic data that has been produced in this litigation. Class members will be provided claim forms that set forth each Class member's qualifying purchases based on transaction data produced during discovery. Under the proposed plan, the claims administrator, working with Dr. Lamb and his staff at Monument Economics Group, will prepare and send these individualized claim forms to each member of the Class. (*See* Plan of Allocation at ¶ 1.1.)

The Plan of Allocation provides a fair and reasonable method of determining each Class member's proportionate share of the Net Settlement Fund in proportion to the share of overcharges each suffered. It does so based on each Class member's purchases of brand and/or generic Namenda IR and brand Namenda XR during the time period at issue. (*See*, Plan of

Allocation at ¶¶ 2.1-2.5.) Among other things, the Plan of Allocation describes: (1) the method of calculating each Class member's *pro rata* share of the Net Settlement Fund; (2) the contents and method of disseminating a claim form; (3) the manner in which claims will be initially reviewed and processed; (4) the method of notifying Class members of the amount that each Class member will receive from the Net Settlement Fund; and (5) the process for handling and resolving challenged claims, if any. The Plan of Allocation also provides timetables for completing various tasks related to calculating and distributing each Class member's *pro rata* share of the Net Settlement Fund. Moreover, the Plan of Allocation proposes that Dr. Lamb be retained to assist in making allocation computations under the Plan. *See* Plan of Allocation at ¶ 3.1.

Accordingly, the proposed Plan of Allocation is fair and reasonable.

## CONCLUSION

The motion for Final Judgment and Order of Dismissal Approving Direct Purchaser Class Settlement and Dismissing Direct Purchaser Class Claims is GRANTED. The Clerk of the Court is directed to close the motions at Docket Number 941, and terminate the case.

Dated: May 27, 2020
   New York, New York

               _____
                     Chief Judge

BY ECF TO ALL PARTIES